## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **BRENDAN BERGER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 1:19cv00099** |
| **v.** ) | |
| ) | **Judge: Hon. Susan J. Dlott** |
| **NATIONAL BOARD OF MEDICAL** ) | **Magistrate Judge: Hon. Karen L. Litkovitz** |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT NATIONAL BOARD OF MEDICAL EXAMINERS'
## OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Erin D. French (0090813)
VORYS, SATER, SEYMOUR AND PEASE LLP
301 East Fourth Street, Suite 3500
Cincinnati, Ohio 45202
Phone: 513-723-4022
Email: edfrench@vorys.com

Robert A. Burgoyne
(Admitted pro hac vice)
PERKINS COIE LLP
700 Thirteenth Street, N.W. Suite 600
Washington, D.C.  20005-3960
Phone:  202-654-1744
RBurgoyne@perkinscoie.com

Counsel for National Board of Medical Examiners

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

NATURE OF THE CASE ..................................................................................... 3

BACKGROUND ................................................................................................... 3

    I.     NBME and the USMLE.................................................................... 3

    II.    Mr. Berger's Request for Accommodations on the USMLE............... 5

    III.   Mr. Berger's Current Status in Medical School.................................. 6

    IV.   Mr. Berger's Standardized Testing History ....................................... 7

ARGUMENT ....................................................................................................... 9

    I.     Preliminary Injunction Standard ..................................................... 9

    II.    Mr. Berger Has Not Made a Strong Showing That He Is Likely to Succeed on the Merits ........................................................................ 9

          A.  Disability Under the ADA: Substantial Limitation in a Major Life Activity Compared to Most People in the General Population..................... 10

          B.  Mr. Berger is Not Disabled Within the Meaning of the ADA ...................... 11

    III.   Mr. Berger Has Not Shown a Risk of Irreparable Harm ..................... 20

    IV.   An Injunction Would Harm Others .................................................... 24

    V.    An Injunction Would Not Serve the Public Interest ........................... 25

CONCLUSION .................................................................................................... 25

## PRELIMINARY STATEMENT

The National Board of Medical Examiners ("NBME") hereby opposes the motion for preliminary injunction filed by plaintiff Brendan Berger on July 3, 2019. (Doc. 20).

Mr. Berger began attending medical school in the Caribbean islands in 2011. He asserts that he remains enrolled but "must take the USMLE Step 2 CK by August 28, 2019, in order to advance in medical school and to participate in the next residency match." Pl.'s Mot. for Prel. Inj., ¶ 11 (Doc. 20 at PageID 93). He further asserts that he will only be able to pass the Step 2 CK exam, which NBME administers, if he is given extensive testing accommodations to which he claims to be entitled because he has been diagnosed with a learning disability and an Attention Deficit Hyperactivity Disorder ("ADHD").

To get into medical school, Mr. Berger had to take the Medical College Admission Test ("MCAT"), a challenging exam taken by an extremely accomplished segment of the population. Mr. Berger took the MCAT twice with no accommodations and achieved average scores, with his best scores (68th-83rd percentile) coming on the section with the longest reading passages.

To become a licensed physician, Mr. Berger must pass four "Step" exams that comprise the United States Medical Licensing Examination ("USMLE"). He has already passed two Steps of the USMLE, without accommodations. Nevertheless, to help him pass his next exam (Step 2 CK), Mr. Berger is asking the Court to enter a mandatory preliminary injunction that requires NBME to allow him to test with double testing time, over two days, with extra breaks, and in a "distraction limited testing environment" -- the very relief that he would otherwise be entitled to on his ADA claim only if he were to prevail on the merits. Mr. Berger is not entitled to such extraordinary relief.

1

The motion now before the Court seeks emergency injunctive relief. Mr. Berger's actions in the last ten months, however, are inconsistent with this newly-claimed emergency. He did not file this lawsuit until February 7, 2019, more than four months after learning that he had not passed his most recent Step 2 CK exam. He then waited another five months before filing his motion for a preliminary injunction.

Mr. Berger seeks to alter the standardized testing procedures of an examination that is necessary for licensure as a physician. He should not be allowed to force a rushed decision in this important matter by creating a purported emergency. His failure to act diligently after not passing the Step 2 CK exam in August 2018 supports denial of a preliminary injunction.[1] More importantly, his motion fails on its merits. He cannot demonstrate a strong likelihood that he will succeed on his ADA claim.[2] Nor can he show that he will suffer irreparable harm absent a preliminary injunction, as his alleged harm is entirely speculative and there may be no urgency at all. NBME has recently been given a copy of a letter from his medical school's attorney which suggests that Mr. Berger has **not** been threatened with dismissal if he does not take and pass Step 2 CK by August 28, 2019. *See* Decl. of Robert Burgoyne ("Burgoyne Decl."), Ex. A. The balance of harms does not weigh in his favor, and an injunction would not be in the public interest. His motion for preliminary injunction should therefore be denied.

---

[1] *See, e.g., Monroe Fed'l S&L Ass'n v. NEA Galtier Parking, LLC*, No. 3:12-cv-52, 2012 WL 2847547, *6 (S.D. Ohio July 11, 2012) (denying preliminary injunction and noting that plaintiff "waited four months after removal of this case to file the motion"); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F.Supp.2d 42, 48-49 (D. Mass. 2005) (noting that plaintiff waited "three months after NBME denied her [last] request for accommodations" to file suit seeking injunctive relief and denying preliminary injunction).

[2] Although his Complaint asserts claims under the ADA, the Rehabilitation Act, and the Ohio Civil Rights Act, Mr. Berger references only the ADA claim in his preliminary injunction papers. It is not clear whether this reflects concern about the viability of his other claims or a desire not to mention them because he seeks compensatory damages under those claims (damages cannot be recovered under the ADA provision at issue here, 42 U.S.C. § 12189). NBME denies that Mr. Berger is entitled to any relief, including damages, but the fact that his Complaint seeks damages is yet another reason why a preliminary injunction is unwarranted. *See, e.g., Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL 692547, *5 (S.D. Ohio Feb. 22, 2016) (if claimed injury is "compensable by a monetary damages award," there is usually no basis for a preliminary injunction).

- 2 -

## NATURE OF THE CASE

Mr. Berger has been diagnosed as having learning disabilities and ADHD. Pl.'s Mem. in Support of Motion for Prel. Inj. at 6 ("Pl. Mem.") (Doc. 20-1 at PageID 97, 100). Relying upon these diagnoses, he claims to be disabled under the Americans with Disabilities Act ("ADA") and entitled to testing accommodations. *Id*. at 1 (PageID 95).

To prevail, Mr. Berger must demonstrate that he is disabled within the meaning of the ADA and needs reasonable accommodations to take the USMLE in an accessible manner. *See* 42 U.S.C. § 12189. An individual is disabled under the ADA if he has an impairment that substantially limits his ability to perform one or more major life activities, as ***compared to most people in the general population***. 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105(d)(1)(v).

NBME denies that Mr. Berger is entitled to accommodations. As discussed below, there is a significant question whether his learning disability and ADHD diagnoses meet the applicable diagnostic criteria. But even if one accepts the diagnoses, his documentation does not support a finding that he is substantially limited in any major life activities when he is compared -- as he must be under the ADA -- to most people in the general population.

## BACKGROUND

### I.     NBME and the USMLE

NBME is a not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality examinations. Decl. of Catherine Farmer ¶ 3 ("Farmer Decl."). In conjunction with the Federation of State Medical Boards, NBME sponsors the USMLE program. *Id*. ¶ 4.

144910742.1

The USMLE is a standardized examination[3] used to evaluate applicants' competence for medical licensure. *Id.* It is designed to assess an examinee's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. *Id.* Licensing authorities across the United States rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine. *Id.* ¶ 5.

Three "Step" exams make up the USMLE, taken at different times in an individual's graduate medical education process: Step 1, Step 2 (consisting of the Step 2 Clinical Knowledge exam (Step 2 CK) and the Step 2 Clinical Skills exam (Step 2 CS)), and Step 3. *Id.* ¶ 6.

Step 1 assesses whether candidates understand and can apply important science concepts that are basic to the practice of medicine. *Id.* Under standard conditions, Step 1 is a one-day, eight-hour multiple-choice examination. *Id.* ¶¶ 6, 25. Mr. Berger took the Step 1 exam in March 2014, with no accommodations, and achieved a passing score on his first attempt. *Id.* ¶ 14.

Step 2 assesses whether candidates can apply medical knowledge, skills, and understanding of clinical science essential for the provision of care under supervision. *Id.* ¶ 6. Step 2 CS uses standardized patients to test examinees on their ability to gather information from patients, perform physical examinations, and communicate their findings to patients and colleagues. *Id.* Mr. Berger took Step 2 CS in April 2016, without accommodations, and did not pass. *Id.* ¶ 17. He took Step 2 CS again in August 2016, without accommodations, and passed. *Id.* This lawsuit involves the Step 2 CK exam. Like Step 1, Step 2 CK is a one-day, computer-based, multiple-choice examination. *Id.*

---

[3] "When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to ensure that all test takers have the same opportunity to demonstrate their competencies." *Standards for Educational & Psychological Testing* at 111 (2014).

Examinees take the USMLE under standard conditions, including standard time. NBME provides accommodations, however, to individuals who have a disability within the meaning of the ADA. *Id*. ¶ 8. In all instances, NBME's objective is to ensure that "individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage…. As administrator of the national exam used by ... states for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004) (rejecting ADA claims brought by an examinee against NBME and her medical school). NBME also has a duty to protect the integrity of USMLE scores, given the USMLE's role in helping jurisdictions ensure the minimum competency of licensed physicians.

## II.     Mr. Berger's Request for Accommodations on the USMLE

Mr. Berger requested accommodations on the Step 1, Step 2 CS, and Step 2 CK exams. Farmer Decl. ¶¶ 11, 15, 20. Based on its own review and input it received from independent external professionals who reviewed the supporting documentation, NBME concluded in each instance that Mr. Berger had not shown that he has a disability that warrants extra testing time or other accommodations. *Id.* ¶¶ 12-13, 16, 21-23. NBME informed Mr. Berger of its decisions in letters dated December 23, 2013, July 24, 2015, and May 27, 2018. *Id*., Exs. B, D and F.

NBME consulted two external professionals in evaluating Mr. Berger's accommodation requests, Dr. Benjamin Lovett and Dr. Samuel Ortiz. *Id.* ¶¶ 12-13, 21-22, 24. Both concluded that Mr. Berger's supporting documentation did not establish that he has a disability that

warrants testing accommodations. *Id.; see also* Decl. of Benjamin J. Lovett, Ph.D. ("Lovett Decl."), Exs. 2, 3; Decl. of Samuel O. Ortiz, Ph.D. ("Ortiz Decl."), Ex. B.[4]

## III. Mr. Berger's Current Status in Medical School

According to Mr. Berger, he is "currently an enrolled student at American University of the Caribbean College of Medicine (AUC)." Berger Decl. ¶ 1 (Doc. 20-2 at PageID 115). His actual enrollment status, however, is unclear. He asserts that he "completed his course work on April 29, 2016," and that he has also completed his "clinical rotation requirements." *Id.*

Mr. Berger matriculated at AUC in May 2011. *Id.* ¶ 20. According to the AUC Student Handbook, "[a]ny student who does not graduate within 7 calendar years of matriculating" will be placed on "academic dismissal status." *See* Burgoyne Decl., Ex. B at 100-02. Mr. Berger has not graduated from AUC within the required 7 years of his matriculation, thereby presumably "triggering an academic dismissal status." *Id.* NBME does not know whether such an academic dismissal has in fact occurred, whether Mr. Berger has filed an appeal from any such dismissal, or, if so, what the outcome of that appeal was.

Mr. Berger says that he is "on a long-term leave of absence." Berger Decl. ¶ 42 (Doc. 20-2 at PageID 124). He further asserts that "AUC has advised me that I have one final chance to pass the USMLE Step 2 CK and if I do not pass, I shall be dismissed from AUC." *Id.* ¶ 45 (PageID 125).

---

[4] ADHD and learning disability diagnoses provided to support accommodations on high-stakes examinations often do not meet the applicable diagnostic criteria. *See, e.g.,* J. Joy, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104, 106 (2010) (discussing results of an independent professional review of requests for testing accommodations on a medical licensing exam from 50 individuals who claimed to have ADHD: of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD"); W. Mehrens, J. Millman & P. Sackett, "Accommodations for Candidates with Disabilities," 63 The Bar Examiner, No. 4, at 33, 36 (1994) ("There is great difficulty in accurately diagnosing a learning disability, and it is well known that many [such diagnoses] are done … in error.") (citing, among others, a study which found that "approximately 60 percent of the pupils identified [in the study] as learning disabled were misclassified").

- 6 -

In support of his motion for a preliminary injunction, Mr. Berger states that he "must take the USMLE Step 2 CK by August 28, 2019, in order to advance in medical school...." *Id.* ¶ 11 (Doc. 20-2 at PageID 117); *see also* Pl. Mem. 2 (Doc. 20-1 at PageID 96) ("Mr. Berger must take the Step 2 CK no later than August 28, 2019."). This assertion appears to be untrue. According to a letter dated December 14, 2018 from AUC's attorney to Mr. Berger's attorney, AUC is willing to extend Mr. Berger's leave of absence based upon the fact that Mr. Berger has filed suit against NBME regarding his request for accommodations:

> If the suit is successful and Mr. Berger is able to take USMLE Step 2 (CK) with accommodations, AUC will allow Mr. Berger to keep his current academic status at AUC for one additional attempted USMLE Step 2 CK.

*See* Burgoyne Decl., Ex. 7. NBME does not know whether additional communications have occurred between Mr. Berger and his school on this subject, but this letter indicates that his medical school imposed no deadline on Mr. Berger for taking Step 2 CK, provided that he informed the school within 45 days of the date of the letter that he had either sued NBME or requested "an administrative review with the NBME." *Id.*

## III.    Mr. Berger's Standardized Testing History

Mr. Berger took the Stanford Achievement Tests in the 2nd, 3rd, and 4th grades. His Total Reading and Reading Comprehension scores were consistently average to above average, with his total score for the reading subtests "among the highest for the grade" on a nationwide basis when he was in the 4th grade. *See* Lovett Decl. ¶ 17, Ex. 7.

Mr. Berger took the Iowa Tests of Basic Skills and Cognitive Abilities Test in the 6th grade. His total reading score was in the 98th percentile nationally, and his Composite score was in the 91st percentile. His "overall achievement" on the test was "well above average for sixth grade" and reflected the performance of "a typical student in the tenth grade." *Id.*, Ex. 7. Mr.

Berger did not report receiving accommodations on the test, and there were no school records submitted to NBME stating that accommodations were provided.

Mr. Berger took the PSAT in the 11th grade with no extended time. Berger Decl. ¶ 13. He purportedly "ran out of time," *id.*, but he scored in the 77th percentile, which means he was in the top 23% of "college bound juniors" across the country who tested when he did. *Id.*, Ex. 3.

Mr. Berger took the SAT in 2004 with 50% extra testing time. *Id.*, Ex. 4. He scored in the 91st percentile nationally on the Reading section of the test. Lovett Decl., Ex. 8.

Mr. Berger took the MCAT twice, without extra time or other accommodations. *Id.* ¶ 15. He requested accommodations the second time he tested (unclear if he did the first time), based upon his learning disability diagnosis (not based on ADHD). *See* Burgoyne Decl., Ex. D. His request was denied by the test administrator (the Association of American Medical Colleges ("AAMC"), which noted, among other things, that his "recent non-accommodated MCAT score was solidly average even compared to the elite group who take the MCAT." *See id.*, Ex. E at 1. AAMC informed Mr. Berger that, in reaching its decision, it had his "entire file" reviewed by an "external expert" in the field of learning disabilities, who concluded that the documentation did not show that Mr. Berger was substantially limited in learning compared to most people (and who noted in that regard that the 2010 test results of Mr. Berger's supporting professional, Dr. Smith, were "extraordinarily incongruous with all other previous test data and academic history"). *Id.* Like the Step 2 CK exam, the MCAT is a multiple-choice examination taken over multiple hours on a computer. Mr. Berger best scores were on the Verbal Reasoning section of the MCAT, where he scored in the 68th-83rd percentile range. Lovett Decl., Ex. 4.

Mr. Berger took the Step 1 exam in March 2014, with no accommodations. Farmer Decl., ¶ 14. He passed on his first attempt. *Id.*

## ARGUMENT

### I.    Preliminary Injunction Standard

A preliminary injunction is a "drastic" and "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 22 (2008); *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). "'[T]he proof required ... is much more stringent than the proof required to survive a summary judgment motion,'" *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citation omitted), and relief "should be granted only if the movant carries his or her burden that the circumstances clearly demand it," *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).   "[T]he party seeking the injunction must establish its case by clear and convincing evidence." *Roe v. Director, Miami Univ., Office of Community Stds*., No 1:19-cv-136, 2019 WL 1439585, *3 (S.D. Ohio April 1, 2019).

"In determining whether to issue a preliminary injunction, the Court must examine four factors: (1) whether the movant has made a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction."   *Overstreet*, 305 F.3d. at 573.   The claimed irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc*., 443 F.3d 540, 552 (6th Cir. 2006); *see also Winter*, 555 U.S. at 22 ("plaintiffs seeking preliminary relief [must] demonstrate that irreparable harm is *likely* in the absence of an injunction," not merely possible) (original emphasis).

144910742.1

## II.     Mr. Berger Has Not Made A Strong Showing That He Is Likely To Succeed On The Merits

Mr. Berger argues that a preliminary injunction is warranted because he has a "[r]easonable" likelihood of succeeding on the merits of his ADA claim. Pl. Mem. 10 (Doc. 20-1 at PageID 104). As noted above, however, the standard for such extraordinary relief is far more demanding. He must make a "strong" showing that he will prevail, based upon clear and convincing evidence. He cannot make that showing.

Mr. Berger has been diagnosed with a learning disability and ADHD. Both diagnoses are subject to question. More importantly, his supporting evidence does not establish that he is substantially limited in any relevant major life activity[5] when compared to the general population, as he must do to show that he is disabled within the meaning of the ADA.

### A.     Disability Under the ADA:  Substantial Limitation in a Major Life Activity Compared to Most People in the General Population.

Section 12189 of the ADA provides as follows:

> Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189. Pursuant to Section 12189, persons who qualify as disabled under the ADA are entitled to reasonable accommodations during test-taking.

Having a diagnosed impairment, however, is not the same thing as being disabled within the meaning of the ADA. To be disabled under the ADA, a person must have "a physical or

---

[5] Mr. Berger claims to be "substantially impaired in the major life activities of reading, spelling, writing, thinking, cognitive processing speed, attention, and concentration." Pl. Mem. 11 (Doc. 20-1). If one takes this allegation at face value, it naturally invites the question whether he should be licensed to practice medicine. The question here, however, is which of these areas are relevant to taking the Step 2 CK exam, and which qualify as "major life activities" under the ADA. Step 2 CK is a computer-based, multiple-choice examination. Spelling and writing are not relevant to one's ability to take the Step 2 CK, and neither "cognitive processing speed" nor "attention" is mentioned in the ADA or its implementing regulations as an illustrative major life activity. NBME does not contest that "learning, reading, concentrating [and] thinking" are major life activities. *See* 28 C.F.R. § 36.105(c)(1)(i).

mental impairment that substantially limits one or more major life activities," 42 U.S.C. §
12102(1), "as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v).
Thus, in evaluating whether Mr. Berger is substantially limited, his claimed limitations must be
measured against the general population, not against college graduates, other medical students,
or his own expectations. *See Singh v. George Wash. Univ.*, 508 F.3d 1097, 1103-04 (D.C. Cir.
2007); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247, 1249-50 (M.D. Fla. 2017)
("Although Black insists that the Board must compare Black's performance to her 'medical-
school peers,' under 28 C.F.R. § 36.105(d)(1)(v) the substantial-limitation determination
depends on a person's performance in comparison to 'most people in the general population.'");
*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 U.S. Dist. LEXIS 48181, *18 (E.D. Pa.
2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group
or, in the case of standardized tests, other test-takers who are not representative of the general
population") (plaintiff not disabled within the meaning of the ADA, notwithstanding her dyslexia
diagnosis, and therefore not entitled to extra testing time on a medical licensing exam).

If a diagnosis is unwarranted, or if an impairment does not result in substantial
limitations, the individual is not disabled under the ADA and is not entitled to accommodations.

### B.    Mr. Berger Is Not Disabled Within the Meaning of the ADA

Here, there is significant reason to question whether Mr. Berger meets the diagnostic
criteria for either a learning disability or ADHD.  Contrary to what he suggests in his Declaration
(Doc. 20-2 at PageID 116, ¶ 7), he was not diagnosed with a learning disability at "the age of
six" or with a learning disability and ADHD in the "second grade."  *See* Ortiz Decl. ¶¶ 12-14.
Mr. Berger was first given an official diagnosis of a learning disability in 2008 by Dr. Alexander
Smith -- in written expression but not reading.  *Id*. ¶¶ 17-18.  Mr. Berger relied upon the 2008

evaluation report from Dr. Smith and a 2010 addendum to support his request for accommodations on the MCAT exam. (Copies to be provided to the Court at the preliminary injunction hearing.) When his request was denied, Mr. Berger retained Dr. Cheryl Beach to help him obtain accommodations on the MCAT, by way of a second reconsideration request. Dr. Beach's June 3, 2010 evaluation report diagnosed Mr. Berger as having a "Reading Disorder, Severe," and a "Disorder of Written Expression, Severe." Berger Decl., Ex. 5 at 24. She did not diagnose him at that time as having ADHD. *See id.*

Mr. Berger relies heavily (if not exclusively) on the opinions of Dr. Beach in his preliminary injunction papers. *See* Berger Decl. ¶ 15 (Doc. 2012 at PageID 118); Pl. Mem. 6-8 (Doc. 20-1 at PageID 120-22). The two external professionals consulted by NBME disagree with her diagnoses. *See* Lovett Decl. ¶¶ 21-30, 34-36, 40-43; Ortiz Decl. ¶¶ 20-39.

Mr. Berger argues in this regard that "[t]he ADA effectively mandates that the NBME provide accommodations based on the recommendations from professionals, such as Dr. Beach, who [have] provided first hand evaluations of Mr. Berger on several occasions over several years," and that "Dr. Beach's recommendations ... [are] to be given precedent's [sic] over the opinions of NBME's evaluators and consultants." Pl. Mem. 12, 13 (Doc. 20-1 at PageID 106-07). He is wrong. Nothing in the ADA or its implementing regulations requires NBME to defer to the findings or recommendations of an examinee's supporting professional, which is why Mr. Berger provides no statutory or regulatory support for his argument. He instead cites informal guidance from the U.S. Department of Justice ("DOJ"). *See id.* Such guidance, however, does not have the force of law, *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2012), and, as DOJ itself has noted, "cannot create binding requirements that do not already exist by statute

or regulation," U.S. DOJ, Office of the Att'y Gen'l, Mem. for Heads of Civil Litigating Components, at 2 (Jan. 25, 2018) (available at https://www.justice.gov/file/1028756/download).

Indeed, in amicably resolving a complaint filed against NBME by another USMLE examinee, DOJ expressly stated that NBME "is not required to defer to the conclusions or recommendations of an applicant's supporting professional" and may instead seek input from and rely upon its own qualified professionals, so long as it states why it has done so. *See* Settlement Agreement ¶ 17 (Feb. 23, 2011) (available at https://www.ada.gov/nbme.htm). The agreement states that "NBME will carefully consider the recommendation of qualified professionals who have personally observed the applicant in a clinical setting and have determined -- in their clinical judgment and in accordance with generally accepted diagnostic criteria, as supported by reasonable documentation -- that the individual is substantially limited in one or more major life activities within the meaning of the ADA," *id*.; but it does not require NBME to "accept without further inquiry" the findings and recommendations of an examinee's professional (*see* Pl. Mem. 12), or to give "precedence" to the opinions of the examinee's professional "over the opinions of NBME's evaluators and consultants" (*id.* at 13).[6] NBME's actions in this case were entirely consistent with the obligations stated in its settlement agreement with DOJ, and with its obligations under the ADA. NBME carefully considered the opinions set forth in Dr. Beach's evaluations and the reports of other healthcare professionals whom Mr. Berger has seen over the years. It also sought input from external professionals who are experts in the field. And when it made its decisions on his requests for accommodations,

---

[6] Mr. Berger is essentially asking the Court to apply a "treating physician" rule, in the absence of any statutory authority or principled justification for doing so. The Court should decline that invitation. *Cf. Black & Decker v. Nord*, 538 U.S. 822, 832 (2003) (refusing to apply a treating physician rule to disability determinations made under an ERISA plan or to require plans to accord special deference to the opinions of a claimant's physicians).

144910742.1

NBME explained the bases for those decisions. *See generally* Farmer Decl. ¶¶ 11-13, 15-16, 20-22.

Mr. Berger's primary argument regarding his likelihood of success is thus based upon a faulty legal proposition. Contrary to what he argues, NBME was not legally required to defer to the opinions of his healthcare professional. *See* Pl. Mem. 12-13 (Doc. 20-1 at PageID 106-07).

His two other "likelihood of success" arguments are equally insubstantial. First, he argues that his "use of accommodations during his primary, secondary and post-secondary education are to be accorded considerable weight when making accommodation determinations." *Id.* at 13 (PageID 107). NBME agrees with this assertion, but it gets him nowhere. NBME carefully considered his history of accommodations in school, as did its external professionals, along with the fact that he was approved for 50% extra time on the SAT.

He next argues that NBME improperly relied upon his performance on the MCAT and Step 1 exam, both of which were taken without accommodations. *Id.* at 14-15 (PageID 108-09). According to Mr. Berger, "NBME's focus on grades and outcomes on a standardized test has little or no relevance when making accommodation determinations." *Id.* at 15 (PageID 109). He cites DOJ guidance to support his argument, along with legislative history from the ADA Amendments Act. *Id.* at 14-15 (PageID 108-09). Neither the DOJ guidance, however, nor the quoted legislative history, has the force of law, and neither supports his argument in any event. Neither states that a testing organization may not consider an individual's unaccommodated performance on a prior standardized exam when evaluating a request for accommodations on another standardized exam, where the individual claims to need extra testing time to test in an accessible manner. Any prohibition on considering such evidence would make no sense, as that

evidence will often be the best objective evidence of an individual's ability to read, concentrate, and think in the context of taking a standardized test.

Mr. Berger achieved solidly average total scores both times he took the MCAT, with his best score on the section that required the most extensive amount of reading (Verbal Reasoning, 68th-83rd percentile). The suggestion by Mr. Berger and Dr. Beach that he achieved those scores by guessing is simply not credible. *See* Lovett Decl. ¶ 28. He also passed the Step 1 exam, on his first attempt. Individuals who perform at the level that Mr. Berger has performed on standardized tests that require thinking, concentration and extensive reading -- with no extra testing time or other accommodations – are not substantially limited in their ability to read, think and concentrate as compared to most people in the general population and thus are not disabled under the ADA. *See, e.g., Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 630 (6th Cir. 2000) (noting, among other evidence, that plaintiff achieved "an average score" on the SAT with no accommodations and also "took the MCAT twice without accommodations") (preliminary injunction denied because plaintiff examinee with a diagnosed learning disability was not likely to succeed on the merits of his ADA claim); *Black v. Nat'l Bd. of Med. Exam'rs,* 281 F.Supp.3d at 1251 (relying, among other evidence, on plaintiff's average or above-average performance on the MCAT and other standardized examinations in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average (or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most people in the general population'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 U.S. Dist. LEXIS 48181 at *25 ("She took the MCAT twice, and both times scored in the average range on the most reading intensive section of the test, the verbal reasoning section, when

- 15 -

compared to [a] high functioning population: college seniors or graduates wishing to attend medical school.") (holding that a deaf plaintiff diagnosed with dyslexia was not substantially limited in her ability to read when compared to most people in the general population and granting judgment in favor of the NBOME); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d 607, 621 (S.D. Ind. 2012) ("Matthew's above-average standardized testing scores [on the ACT and SAT] ... during which he received no accommodation ... stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011) (noting plaintiff's prior "test-taking without accommodations," in holding that he was "not substantially limited in the major life activities of seeing, learning, and reading"); *Jayatilaka v. Nat'l Bd. of Med. Exam'rs*, 2011 WL 223349, *14 (C.D. Cal. 2011) (noting that plaintiff examinee was able to pass USMLE Step 1 without accommodations, in holding that plaintiff had not shown that "any alleged impairment substantially limits one or more major life activities"); *Love v. Law Sch. Adm. Council,* 513 F. Supp. 2d 206, 214 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and denying accommodations on the LSAT, where, among other evidence, plaintiff had ACT and SAT scores "within the average range" with no accommodations); *Biank v. Nat'l Bd. of Med. Exam'rs*, 130 F.Supp.2d 986, 991 (N.D. Ill. 2000) (noting that plaintiff had passed Step 1 "without an accommodation of additional time" and that both Step 1 and Step 2 "must each be taken in one 8-hour day," and entering final judgment in favor of NBME on plaintiff's request for an injunction requiring NBME to grant double testing time on Step 2).

Here, Mr. Berger's unaccommodated performance on the PSAT, MCAT and USMLE Step 1 exams directly contradicts his claim that he is substantially limited in any major life

activity that is relevant to taking a standardized test, as compared to most people in the general population. But it is not the only evidence that does so. The diagnostic assessments administered to Mr. Berger by Dr. Beach and other professionals reflected performance in the average or above-average range until 2010. *See* Lovett Decl. ¶¶ 21-26. As one court has noted regarding such diagnostic results, "[b]y definition, 'average' is not 'substantially limited.'" *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d 607, 620 (S.D. Ind. 2012) (holding that plaintiff with "average to low average" diagnostic testing results was not disabled within meaning of the ADA and thus was not entitled to accommodations on his medical licensing exam, despite having been diagnosed with learning disabilities and not having answered all questions when he took the SAT and ACT exams with no accommodations); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d at 627 (noting that plaintiff "scored within the average range" on his diagnostic "reading comprehension tests," and holding that plaintiff was not substantially limited by his learning disability "because he can read as well as the average person"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp.2d 636, 651-52 (E.D. Pa. 2013) (noting that plaintiff's diagnostic test scores were "all either in the average or above average range," and holding that plaintiff was not substantially limited in comparison to the general population), *aff'd on other grounds*, 582 Fed. App'x 114 (3d Cir. 2014); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F.Supp.2d at 46 ("Overall, the plaintiff's performance on the diagnostic testing was within the average range, sometimes low average, sometimes high, with occasional scores above and below the average range.") (holding that plaintiff was not disabled within meaning of the ADA).

The evaluation reports of Dr. Berger's professionals also contain other information that contradicts the suggestion that his diagnosed impairments result in substantial limitations. Three of Dr. Beach's reports included a Global Assessment of Functioning (GAF) score for Mr.

Berger.  As the Court knows from handling cases involving disability-based claims for Social Security benefits, GAF scores "measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100...."  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).  GAF scores are relied upon in Social Security cases involving alleged mental impairments "as one factor in assessing a claimant's mental functioning," as well as "the reliability of [a] plaintiff's statements" regarding his level of impairment.  *McBride v. Comm'r of Soc. Sec.*, No. 1:16-cv-708, 2017 WL 3393948, *6 (S.D. Ohio Aug. 7, 2017).  GAF score ranges were provided in the Diagnostic and Statistical Manual of Mental Disorders III and IV (DSM-III and DSM-IV).  They are not provided in the DSM-5, which was first published in 2013, but the Sixth Circuit and this Court have continued to consider GAF scores in assessing a claimant's level of functioning in Social Security cases.  *See id.; see also, e.g., Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835-38 (6th Cir. 2016); *Jordan v. Comm'r of Soc. Sec.*, No. 1:1-18-cv-120, 2019 WL 518533, *10 (S.D. Ohio Feb. 11, 2019) (substantial evidence supported the ALJ's decision to give little weight to the opinion of claimant's supporting professional "concerning marked or extreme limitations in all categories of work-related functioning" because the opinion was "inconsistent with his own treatment notes and plaintiff's GAF score of 60").

In her June 2010 report, Dr. Beach assigned Mr. Berger a GAF score of 90.  Berger Decl. (Doc. 20-2), Ex. 5 at 22.  According to the GAF Scale from the DSM-IV, scores in the range of 81-90 signify "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), [and] good functioning in all areas...."  *See* Burgoyne Decl., Ex. F.  In her July 2013 and January 2015 reports, Dr. Beach assigned Mr. Berger a GAF score of 80.  Berger Decl. (Doc. 20-2), Ex. 6 at 65; Ex. 7 at 16.  Per the GAF Scale, scores in the range of 71-80 signify "no more than slight impairment in social, occupational or school functioning...."  Burgoyne Decl., Ex. F.  And Dr.

Smith's 2008 evaluation report assigned a GAF score of 94 to Mr. Berger (p. 10). Per the Scale, GAF scores in the range of 91-110 reflect that a person experiences "[n]o symptoms." Burgoyne Decl., Ex. F.

GAF scores do not have controlling weight in the Social Security context and should not be given controlling weight in evaluating an individual's functional limitations for purposes of the ADA. But they are an additional piece of evidence that may be considered when determining whether someone with an alleged mental impairment is substantially limited in his ability to perform major life activities. *See, e.g., Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d at 1252 (noting that an examinee diagnosed with ADHD had been assigned a GAF score of 80 by her psychologist, which "evidences no substantial limitation").

Finally, Mr. Berger argues that Congress intended to broaden the coverage of the ADA when it enacted the ADA Amendments Act of 2008 ("ADAAA"). Pl. Mem. 15 (Doc. 20-1). That is of course true, but a plaintiff must still prove that he is disabled within the meaning of the statute. *See* Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) ("By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the ... definition of disability in the ADA. An impairment that does not substantially limit a major life activity is not a disability under [the first prong of the definition]. That will not change after enactment of the ADA Amendments Act...."); *see also, e.g., Mann v. Louisiana High Sch. Athletic Ass'n.*, 535 Fed. App'x 405, 410 (5th Cir. 2013) ("[A] plaintiff must still show substantial limitation....") (setting aside preliminary injunction in case involving a diagnosed anxiety disorder). While learning disabilities and ADHD can be disabilities under the ADA, each

is a disability only if it substantially limits a person's ability to perform major life activities as compared to most people. The evidence here does not support a finding that Mr. Berger's alleged impairments substantially limit his ability to read, think or concentrate while taking a standardized test as compared to most people in the general population.

## III. Mr. Berger Has Not Shown A Risk Of Irreparable Harm

Mr. Berger argues that the Court should "presume" that he will suffer irreparable harm absent an injunction because he has alleged "a violation of the ADA," which is intended to protect civil rights. Pl. Mem. 16 (Doc. 20-1 at PageID 110) (quoting a 1997 case from the Northern District of California). He is wrong. As shown by hundreds of ADA cases in which the irreparable harm factor is appropriately included as part of the required analysis (many of which are cited elsewhere in this brief), irreparable harm is not presumed in ADA cases. *Cf. EEOC v. Anchor Hocking Corp*, 666 F.2d 1037, 1040-42 (6th Cir. 1981) (rejecting argument that irreparable harm should be presumed when the EEOC seeks a preliminary injunction under Title VII of the Civil Rights Act). Mr. Berger must thus show -- with record evidence -- that he is "likely" to suffer "actual and imminent" irreparable harm absent a preliminary injunction. *Abney v. Amgen, Inc*., 443 F.3d 540, 552 (6th Cir. 2006). He cannot make this showing.

According to Mr. Berger, he "must take" Step 2 CK "by August 28, 2019, in order to advance in medical school and to participate in the next residency match." Pl.'s Mot. for Prel. Inj. ¶ 11 (Doc. 20 at PageID 93-94). He says he will be irreparably harmed if not granted an injunction because (1) "if he fails the USMLE Step 2 CK a third time, he will be dismissed from AUC and effectively be barred from earning his medical degree;" (2) if he is not allowed to test with his desired accommodations, "he will be placed at a disadvantage of competing for quality residency positions;" and (3) if he does not test by August 28th, "he will lose the extensive time he has invested in preparation for the exam." Pl. Mem. 17-18 (Doc. 20-1 at PageID 111-12).

- 20 -

These allegations fail to establish irreparable harm. In the first place, they are entirely unsubstantiated. There is no evidence that Mr. Berger is about to be removed from medical school, or that the reason for his alleged impending dismissal is his failure to pass the Step 2 CK exam rather than his failure to graduate in 7 years or other factors. There is no evidence that he cannot obtain additional time from his medical school within which to take the Step 2 CK exam (indeed, it appears that he has done just that, *see* Burgoyne Decl., Ex. A). There is no evidence beyond Mr. Berger's assertions that a need for extra testing time explains his past performance on Step 2 CK, as opposed to a deliberate testing style, his knowledge of the subject matter, his test preparation, his mood the days he tested (*e.g*., was he anxious or depressed), or whether he had a good night's sleep the night before.[7]

There is no evidence that Mr. Berger will pass Step 2 CK if he is granted his requested accommodations or, conversely, that he will fail without accommodations. Other than registering to take the test, there is nothing preventing Mr. Berger from taking the Step 2 CK exam by August 28th. He does not need a preliminary injunction to test without accommodations, and he may well pass if he does so (just as he passed Step 1 and Step 2 CS without accommodations). If he adequately prepares and knows the subject matter, there is no evidentiary basis for concluding that he will not achieve a passing score under standard testing conditions.

Finally, even if a desire to participate in *this year's* residency Match were sufficient grounds to create a risk of irreparable harm (and it is not), there is no evidence regarding the timing or operation of the residency Match program to support his claim that he must have a

---

[7] A failure of proof on the issue of causation would preclude Mr. Berger from establishing that NBME violated the ADA by denying him accommodations, even if he could show that he has been properly diagnosed with a learning disability or ADHD and that one or both of those impairments substantially limit his ability to perform one or more major life activities. *See, e.g., Singh v. George Wash. Univ. Sch. of Medicine*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) ("We need not decide whether Singh has an impairment within the meaning of the ADA, or whether that alleged impairment substantially limited a major life activity. The … factual finding on causation … alone dooms her case. The district court identified 'many reasons aside from [Singh's] impairment that might explain why [she] has done relatively poorly on extremely time-limited tests.'").

passing score on the Step 2 CK exam by October to participate in this year's National Residency

Matching Program (the 2020 "Match"). *See generally* http://www.nrmp.org/. Applicants have

until **February 26, 2020** to submit their rank order lists and verified credentials for this year's

Match, including their Step scores; consistent with that timeline, AUC advised who wanted to

participate in *last year's* Match (the 2019 Match) to **take** Step 2 CK no later than **December 31,**

**2018** "to help ensure that results will be available in time to participate in the 2019 Main Match."

*See* Burgoyne Decl., Exs. G and C. Applying that advice here, Mr. Berger could take Step 2 CK

by the end of the year and still be able to participate in the upcoming Match. Likewise, there is

no evidence that he would obtain a higher-quality residency position if he passes Step 2 CK

before beginning his interviews. There is no evidence that he could not get a residency position

by way of the post-Match "scramble" that will occur between March 16 and March 19, 2020, if

he does not obtain a position in the main Match. *See id.*, Ex. H. And there is no evidence that

he must participate in this year's Match rather than participating next year.

The harm alleged by Mr. Berger is thus factually unsupported and entirely speculative.

As this Court has noted in analogous cases, such speculative harm cannot support a preliminary

injunction. *See Qui v. Univ. of Cincinnati*, No. 1:18-cv-634, 2018 WL 4496304, *8 (S.D. Ohio

Sept. 19, 2018) (denying preliminary injunction in a case asserting claims under the ADA and

Section 504 where plaintiff student failed to present "evidence showing that removal proceedings

and deportation are imminent or that enrollment in the University of Cincinnati's CCM program

is the only way he can maintain his valid nonimmigrant status [and avoid deportation]," or "any

evidence that he has explored alternative options to maintain valid nonimmigrant status beyond

seeking reenrollment as the University"); *Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL

692547, *10-11 (S.D. Feb. 22, 2016) (denying medical student's motion for a preliminary

injunction reinstating him as a student in good standing, where student "offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing" based upon his understanding of "the 'match' and 'scramble' procedures by which medical students are offered residencies," and it was not clear whether plaintiff would be able to obtain a residency even if he was not "reinstated prior to March 14, 2016," or whether any residency he obtained "would be of lesser value" than another residency he might obtain: "Certainly, Mr. Doe's medical education pathway has been disrupted by his dismissal from Ohio State. But it is far from clear that, absent an injunction at this point, he will be unable to complete his education or to pursue his chosen profession."), *objections overruled, report aff'd,* 2016 WL 1578750 (S.D. Ohio April 20, 2016); *see also Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004) (finding, on the question of irreparable harm, that "the harm alleged by [plaintiff test-taker] is speculative") (overturning preliminary injunction); *Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632, *5-6 (M.D.N.C. 2014) (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had successfully taken other standardized tests without accommodations) (denying preliminary injunction); *Nimmer v. Case Western Reserve Univ.*, 2018 WL 5118306, *5-6 (N.D. Ohio 2018) ("A claim of injury must be based on reliable evidence and what Plaintiff offers is not. It is not clear that absent an injunction at this point in time, Plaintiff will be unable to complete his education at CWRU (albeit with a later graduation date), finish dental school elsewhere or pursue his chosen profession."); *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 U.S. Dist. LEXIS 86837, *14-15 (E.D. Pa. 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives. For example, she does not discuss whether her

- 23 -

school might grant her an extension of the seven-year requirement and provides no evidence of an inability to transfer schools."); *Oser v. Capital Univ. Law School*, No. 2:09-cv-709, 2009 WL 2913919, *11 (S.D. Ohio Sept. 8, 2009) (claims of dignitary harm, emotional loss, and inability to gain admission to another law school too conjectural to support a preliminary injunction preventing plaintiff from being dismissed from law school); *Kelly v. W. Va. Bd. of Law Exam'rs*, 2008 U.S. Dist. LEXIS 56840, at *6 (S.D. W. Va. 2008) (no irreparable harm where plaintiff successfully completed other examinations without accommodations); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F.Supp.2d at 49 ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction).

## IV.    An Injunction Would Harm Others

Mr. Berger recognizes that his requested injunction could cause harm to "NBME or others" but asserts that the harm would be "negligible." Pl. Mem. 18 (Doc. 20-1 at PageID 112). That is not the case. NBME has a strong and legitimate interest in ensuring that the USMLE program is fair to all examinees. *See Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d at 88-89. NBME is therefore harmed if an examinee tests with unwarranted accommodations. Once scores are reported, the harm cannot be undone. The potential harm to NBME if it is ordered to provide unwarranted accommodations outweighs any speculative harm to Mr. Berger from not being able to test with accommodations. *See Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x at 125.

Residency programs and applicants to those programs might also be harmed by the preliminary injunction requested by Mr. Berger. A program that relies upon a passing Step 2 CK score that was obtained with the benefit of unwarranted testing accommodations will have allocated a residency position based, in part, on unreliable information. And, because the number of residency positions in any given residency program is limited, a position given to Mr. Berger would necessarily come at the expense of another applicant for that position.

- 24 -

**VI.    An Injunction Would Not Serve The Public Interest**

Mr. Berger asserts that an injunction "would further the public interest in eradicating discrimination" as "embodied in the ADA."  Pl. Mem. 19-20 (Doc. 20-1 at PageID 113-14). That argument, however, is based upon the incorrect premise that Mr. Berger is disabled under the ADA and likely to succeed on the merits of his claim.

Moreover, "[a]lthough the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests."  *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632 at *7-8.  Other candidates do not want extra testing time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other test takers.  Nor do score users want unwarranted accommodations to affect the resulting scores.  This is particularly true in the context of licensing examinations that help protect the public welfare -- in this instance, by helping to ensure that licensed physicians have the minimum competencies to deliver safe and effective healthcare services.

## CONCLUSION

Mr. Berger's motion for a preliminary injunction order should be denied.

Dated:  July 24, 2019                 Respectfully submitted,


                               /s/   Robert A. Burgoyne
                               Erin D. French (0090813)
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Cincinnati, Ohio 45202
Phone: 513-723-4022
Email: edfrench@vorys.com

Robert A. Burgoyne
(admitted pro hac vice)
Perkins Coie LLP
700 Thirteenth Street, N.W. Suite 600
Washington, D.C.  20005-3960
Phone:  202-654-1744
RBurgoyne@perkinscoie.com

Counsel for Defendant NBME

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was electronically filed on July 24, 2019, via the Court's CM/ECF System, which will send notification of such filing to counsel of record for Plaintiff.

s/   Erin D. French
Erin D. French

Counsel for Defendant NBME

144910742.1