```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION
                            -  -  -
 3   BRENDAN J. BERGER,          .  Case No. 1:19-cv-00099

 4          Plaintiff,           .  Motion for Preliminary

 5          vs.                  .  Injunction

 6   NATIONAL BOARD OF MEDICAL   .  Day 1

 7   EXAMINERS,                  .  Monday, July 29, 2019

 8          Defendant.           .

 9                            -  -  -

10                  TRANSCRIPT OF PROCEEDINGS

11      BEFORE THE HONORABLE KAREN L. LITKOVITZ, MAGISTRATE JUDGE

12   For the Plaintiff:          Charles Weiner, Esq.
                                 Law Office of Charles Weiner
13                               Cambria Corporate Center
                                 501 Cambria Avenue
14                               Bensalem, PA  19020

15   For the Defendant:

16   Robert A. Burgoyne, Esq.    Erin Dwyer French, Esq.
     Perkins Coie, LLP           Vorys, Sater, Seymour and
17   700 13th Street, NW         Pease, LLP
     Suite 600                   3500 Great American Tower
18   Washington, DC  20004-3960  301 E. Fourth Street
                                 Cincinnati, Ohio  45202
19

20   Also Present:              Brendan J. Berger

21   Law Clerk:                 Eden Thompson

22   Courtroom Deputy:          Arthur Hill

23   Court Reporter:            M. Sue Lopreato, RMR, CRR

24

25
```

```
 1                    P R O C E E D I N G S

 2                         -   -   -

 3

 4          THE COURT:  We are here in the case of Berger versus

 5     NBME, case number 1:19-99 on plaintiff's motion for a

 6     preliminary injunction.

 7        Are plaintiffs ready to proceed?

 8          MR. WEINER:  Yes, Your Honor.

 9          THE COURT:  Would you like to introduce yourself and

10     your client?

11          MR. WEINER:  Yes, Your Honor.  Charles Weiner

12     representing the plaintiff, and I'm here with Brendan Berger.

13          THE COURT:  Thank you.  Defendants, are you ready to

14     proceed?

15          MR. BURGOYNE:  We are, Your Honor.  Robert Burgoyne

16     and Erin French on behalf of the National Board of Medical

17     Examiners, and our client representative is flying in today.

18     She will be here shortly.

19          THE COURT:  Very well.  Thank you.

20          MR. BURGOYNE:  We also have in-house counsel from the

21     National Board of Medical Examiners.

22          THE COURT:  Great.  Everyone ready to proceed?

23          MR. WEINER:  Yes, Your Honor.

24          MR. BURGOYNE:  Yes, Your Honor.

25          THE COURT:  Are there any preliminary items we need
```

1    to take up before I hear opening statements?

2              MR. WEINER:  No, Your Honor.

3              MR. BURGOYNE:  No, Your Honor.

4              THE COURT:  Okay.  Mr. Weiner, you may proceed.

5              MR. WEINER:  Thank you.  Good morning, Your Honor.

6    May it please the Court.  I'm Charles Weiner, and I represent

7    the plaintiff, Brendan Berger, in this matter which involves a

8    preliminary injunction.

9        Mr. Berger is a person with disabilities.  He has a

10   learning disability.  He also is affected by Attention Deficit

11   Hyperactivity Disorder.  His learning disability impacts his

12   reading, writing.  His Attention Deficit Hyperactivity

13   Disorder, ADHD, impacts his thinking, concentration.

14       What impacts him most is performing timed measures on

15   standardized tests.  His reading is slow and plotted.  His

16   thinking is slow and plotted.  It affects his processing

17   speed, and he has been unable to complete timed tasks,

18   particularly on standardized tests, within the standardized

19   time.

20       He is seeking a preliminary injunction in order to give

21   him accommodations of extended time on a medical licensing

22   exam, which is the National Board of Medical Examiners

23   licensing exam called the United States Medical Licensing Exam

24   Step 2 Clinical Knowledge, or USMLE Step 2 CK.  He's

25   requesting this accommodation of extended time because of his

1   slow implied reading because he has been unable to complete

2   the test.

3       He has attempted to request accommodations on three

4   separate occasions, and he has been denied by the NBME on

5   three separate occasions.  He has taken the USMLE Step 2 on

6   two occasions, and he has failed both times because of his

7   impairment because he has been unable to complete the exam.

8       Medical students are required to take the United States

9   Medical Licensing Exam in order to gain licensing to be a

10  physician.  They are also required to take the medical

11  licensing exam in most medical schools, including his medical

12  school, in order to be able to graduate.

13      There is a barrier here that's been established by the

14  NBME by not providing the accommodations, which prevents him

15  from pursuing his career, and which prevents him from

16  graduating from medical school.  We're asking that this Court

17  enter an order requiring that the NBME cease its

18  discrimination and provide accommodations on the medical

19  licensing exam.

20      This is not a matter where we have a plaintiff or a

21  claimant who is seeking accommodations on the 23rd hour.

22  Mr. Berger's disability has been a long-standing disability.

23  It has been affected and documented since his early childhood.

24      When he was in kindergarten, in second grade, he was

25  evaluated by his school.  They had concluded that he required

1    specialized instruction.  He received specialized instruction.

2    He received extended tutoring.  He was actually home schooled

3    for a couple years in order to address and try and remediate

4    his significant impairments.  These impairments included both

5    problems with reading, included problems with writing, and it

6    included problems with attention.

7        As he proceeded into high school, these problems

8    continued.  His school provided him with extra tutoring.  They

9    provided him with accommodations, including extended time on

10   assignments and exams.  They also included accommodations such

11   as providing him with audio books and other forms of

12   assistance in order to help him read books, since he had

13   difficulty reading himself, that he would be provided with a

14   reader.  He also was provided with a reader at home.

15       You will see documentation which supports that he

16   received these type of accommodations throughout elementary

17   and high school.

18       As he proceeded into college, he then went to University

19   of Cincinnati.  He provided his documentation to the

20   University of Cincinnati.  He had also been evaluated again.

21   The University of Cincinnati, which is subject to the

22   Americans with Disabilities Act, as well as Section 504,

23   reviewed his documentation and had concluded, based on his

24   documentation, that he is a person with a disability and that

25   he is entitled to accommodations.  And he received

1    accommodations of extended time.  He actually received double

2    extended time during his college years at University of

3    Cincinnati.  He also received audio books.  He received a

4    quiet room.  And you will hear testimony regarding that, and

5    you will see documentation supporting that he had this

6    documentation.

7        When he went into medical school at the American

8    University of the Caribbean, he also submitted documentation

9    supporting his request for accommodations.  His medical school

10   also provided him with accommodations, including extended time

11   on exams.  Many of those exams are computerized exams, similar

12   to the USMLE exam, and including some of the exams which he

13   took in the United States are exams that are prepared by the

14   NBME.

15       The only place where he had previously been denied

16   accommodation was on the MCAT.  And he had taken the MCAT.  He

17   utilized strategies.  You will hear the strategies he

18   utilized.  He did not obtain a great score.  He obtained a

19   score that was satisfactory enough to get him into a Caribbean

20   medical school, but he had great difficulty in completing that

21   test despite significant study efforts.

22       In 2013, he applied to take his first licensing exam,

23   which is the United States Medical Licensing Exam Step 1.  He

24   submitted extensive documentation.  You will have the exhibits

25   there in front of you, hundreds of pages of documents,

1    including elementary school records standardized test scores

2    from his early elementary years showing below average

3    performance, evaluations, and two evaluations which were

4    performed by Dr. Beach, who will be testifying here in court.

5        Dr. Beach did extensive evaluations, took an extensive

6    history, reviewed the extensive amount of documentation, and

7    performed various assessments herself, which she herself

8    administered, and had the opportunity to observe the

9    condition, manner, duration with which Mr. Berger reads,

10   writes, and performs academic tasks.

11       And she had concluded that Mr. Berger is a person with a

12   disability; that he is a person who has a learning disability

13   in reading and writing, and that he has Attention Deficit

14   Hyperactivity Disorder.  She further recommended

15   accommodations, including extended time on the United States

16   Medical Licensing Exam Step 1.  The NBME denied his request

17   for accommodations.

18       Their denial was submitted to Dr. Lovett, who will

19   testify on behalf of the NBME.  Dr. Lovett is a consultant

20   utilized by the NBME.  They have utilized him for the past ten

21   years.  He is utilized by many testing entities.  He has a

22   pension for recommending accommodations that are denied.

23   That's who they sent this to.

24       Dr. Lovett and the NBME never evaluated Mr. Berger.

25   They've never seen him.  They've never talked to him.  They've

1    only reviewed his test scores, and they have essentially taken

2    the liberty of disregarding Dr. Beach's evaluation reports and

3    the extensive documentation.

4        He took the United States Medical Licensing Exam Step 1.

5    He put in a significant study effort.  You will hear the

6    strategies he utilized.  He passed by six points, and it's a

7    scaled score.  He passed by the skin of his teeth.  He had a

8    great amount of difficulty passing this particular exam.

9        As he proceeded through his medical program, he then had

10   to take the United States Medical Licensing Exam Step 2 CK,

11   which is what we're here about today.

12       In 2015, he submitted another request for accommodations.

13   He submitted additional documentation, including the extensive

14   documentation that was previously submitted.

15       The NBME reviewed this documentation.  They did not

16   submit it to an outside consultant.  Their own inside

17   consultant reviewed the documentation, took over 100 days to

18   make a decision, and denied his request.  They used dilatory

19   tactics.  Throughout this process you will hear about the

20   dilatory tactics that the NBME utilizes.

21       Mr. Berger took the USMLE Step 2 CK.  You will hear about

22   the strategies.  You will hear about the extended study effort

23   he put in.  He failed the exam.  He failed by a lot.  And he

24   failed because he was unable to complete the exam.  In fact,

25   he was only able to complete about 60 percent of the exam when

1   he took it, because of his reading impairments.

2       In 2018, he attempted to take the exam again.  He once

3   again applied for accommodations for the Step 2 CK exam.  He

4   submitted additional documentation.  This included additional

5   evaluation that was conducted by Dr. Beach.  So this is the

6   third evaluation that Dr. Beach had performed.

7       She performed all the assessments herself.  She had an

8   opportunity to observe the condition and manner in which

9   Mr. Berger reads, writes, and performs academic tests.  She

10  had concluded once again that Mr. Berger is a person with a

11  disability, and she had concluded that he is entitled to

12  accommodations.

13      Because he had performed so poorly, and because he was

14  unable to complete the Step 2 CK within the standard amount of

15  time and only got through about 60 percent of the exam, she

16  this time had recommended a hundred percent extended time,

17  rather than the previously requested 50 percent extended time.

18      Mr. Berger submitted his request.  The request was once

19  again reviewed by the NBME.  They once again submitted it to

20  Dr. Lovett.  Rather than sending it to someone new, who might

21  gave him a fair shake, they sent it to Dr. Lovett.  Dr. Lovett

22  once again recommended a denial.  NBME once again utilized

23  dilatory tactics and didn't respond to his request for 80

24  days.  They told him he was denied.

25      He once again put forth a very significant study effort

1    to study for this exam.  He utilized various strategies.  You

2    will hear the strategies he utilized this time, which was at

3    the outset of each block of the exam, he put in all C's in

4    order to be able to answer as many questions as he could, and

5    he wouldn't have to take time at the end of each block to make

6    guesses or write in letters.

7        He took the exam.  He failed the exam.  He only got

8    through 60 percent of the exam.  He failed by a lot,

9    unfortunately.

10       After the exam, the USMLE program contacted him and said

11   we see some irregular behavior here.  You guessed so many C's.

12   We think that you weren't ready for the exam or didn't take

13   the exam in earnest.  And he now had a block on his ability to

14   take the exam.  They had the information in front of them that

15   he was unable to complete the exam.

16       He responded to the USMLE and they lifted the block.  And

17   when he responded, he advised them of his learning disability,

18   of his test taking strategies and his inability to take the

19   exam.

20       He is ready to take this exam.  He has the knowledge and

21   ability to take this exam.  He has taken medical school exams,

22   and he has taken other NBME prepared exams, and he has

23   demonstrated proficiency to practice medicine.  This is a

24   barrier in his moving forward in his degree and moving forward

25   in his career.

1        We are requesting the injunction at this point because

2    the residency match is coming up.  He needs to take the exam

3    so that the exam is scored in the beginning of October.  That

4    is when the interviews begin for the match program for

5    residency.  This is why we are requesting the injunction be

6    entered now.

7        If he can't take the exam now, he will be unable to

8    pursue a match in the program.  If he is unable to take the

9    USMLE without accommodations, he will likely fail again, as he

10   has failed two times.  If he doesn't take the exam with

11   accommodations of extended time, he will be removed from

12   medical school because he has gone beyond the seven years that

13   his medical school requires one to complete a degree.

14       If he does not receive extended time on the USMLE, he

15   will not be able to pursue his lifelong dream of becoming a

16   doctor.

17       We request that this court enter an injunction providing

18   that Mr. Berger be given an opportunity to pass this exam, be

19   given an opportunity to take the exam with extended time and

20   pursue his career and finish his degree.

21       Thank you, Your Honor.

22              THE COURT:  Thank you.

23              MR. BURGOYNE:  Good morning, Your Honor.

24              THE COURT:  Good morning.

25              MR. BURGOYNE:  Your Honor, the United States Medical

1    Licensing Exam, as you know from the papers, is relied upon by

2    jurisdictions across the country as an important indication of

3    an individual's ability to deliver safe and effective

4    healthcare, therefore, the manner in which the exam is

5    administered is important not only for people who rely upon

6    the score, but for all examinees who are taking the exam.

7        As a consequence, NBME, when it reviews accommodation

8    requests, is fair but consciousness in its review of the

9    accommodation requests, and its goal in all instances is to

10   make sure that individuals with bonafide disabilities are

11   provided with testing accommodations, and that those who do

12   not document an impairment within the meaning of the Americans

13   with Disabilities Act do not obtain accommodations.

14       They do not engage in dilatory tactics in their review of

15   accommodation requests.  In fact, not surprisingly, the number

16   of requests that they receive has steadily increased over the

17   years, and they receive hundreds of requests every year, which

18   they attempt to process in an orderly fashion within their

19   capabilities as an organization in staffing.

20       We're before you today on a motion for a preliminary

21   injunction, and as Your Honor well knows, a preliminary

22   injunction is an extraordinary and drastic remedy, to be

23   awarded only if there is a showing that the plaintiff is

24   likely to succeed on the evidence, I think prevailing on the

25   merits, and is likely to suffer irreparable harm.  Irreparable

1    harm has to be immediate, not remote, and it has to be

2    certain, not speculative.

3        In this case, Your Honor, plaintiff is not going to be

4    able to and has not met those showings.  In order to prevail

5    on the merits, he has to establish that he has a disability

6    within the meaning of the Americans with Disabilities Act.  To

7    be disabled under the Americans with Disabilities Act, he has

8    to have a substantial limitation in a major life activity as

9    compared to most people in the general population.

10        In this case, the evidence is going to show that his own

11   assessments performed over the years show average to superior

12   performance in his reading and cognitive skills.  The evidence

13   will show that he's taken many standardized tests without

14   accommodations and done very well; in fact, well above the

15   50th percentile, which is in excess of average.

16        He took the medical college admission test twice, and his

17   best score on that exam came on the verbal reasoning section,

18   which has lengthy vignettes, longer than anything he will

19   encounter on the Step 1 exam, and scored on that exam, I think

20   it was the 70th -- in the roughly 70th percentile range, which

21   meant he was in the top 30 percent, at least, of everybody who

22   took that exam.  People who take the MCAT aren't the general

23   population.  That's a very talented population that takes the

24   medical school exam.

25        He also took the PSAT when he was a junior in high school

1    and scored in the 77th percentile.  He took that test without

2    accommodations and scored in the 71st percentile in his verbal

3    section.  That's a measure of the skills that he is saying he

4    is substantially limited in.

5         He also took the Step 1 exam, as Mr. Weiner mentioned,

6    passed that on his first attempt.  Step 1 exam is a difficult

7    exam.  When he took that exam, after the exam, he contacted

8    Dr. Beach and said I felt good about my time management.  So

9    certainly after the exam, there was no suggestion that he had

10   guessed throughout the exam, or only put a particular answer

11   for certain answers.  He seemed to have felt good immediately

12   after the exam; and, in fact, he passed.

13        He also took the Step 2 clinical skills exam, which is

14   not a multiple choice test.  They use so-called standardized

15   patients, where you interact with individuals who have a

16   described medical condition.  He failed that exam the first

17   time, and his deficiencies were in the area of

18   intercommunication skills, and then he passed it the second

19   time.  Neither of those times did he have accommodations.

20        Dr. Beach's opinions in this case are certainly entitled

21   to substantial weight, considerable weight, but they are not

22   entitled to a presumption of correctness.  And the NBME, like

23   any other testing organization, was not required to defer to

24   the opinions reached by Dr. Beach.

25        He went to Dr. Beach in 2010 specifically to get

1   documentation to cause AAMC to change its mind, so he didn't

2   go to her for a neutral evaluation.  She wasn't somebody that

3   he had been seeing his whole life.  He went to her

4   specifically because she has experience in providing

5   documentation to testing organizations in support of

6   accommodation requests.

7       The evidence will show that there are many issues with

8   characterizations in her reports and elsewhere regarding

9   Mr. Berger's history of accommodations.  There will be

10  instances, for example, where there is a suggestion that he

11  was accommodated in high school from the point of

12  matriculation forward.

13      In fact, the evidence will show that that wasn't the

14  case; that it was not until his junior year in high school,

15  according to a letter from Archbishop Moeller, in which he

16  received an evaluation report from a Dr. Smith in January

17  2003, and it was after that point that he was approved for

18  accommodations, so basically the second half of his junior

19  year in high school.

20      On the issue of irreparable harm, Your Honor, that's

21  tied, as I understand, to two things.  One is the proposition

22  that he's about to be kicked out of his medical school.

23  Frankly, the status of his situation at medical school is

24  unclear to me.  There's a letter in the record reflecting an

25  agreement between Mr. Berger's lawyer and the medical school's

1    lawyer saying, you know, if you've got a lawsuit pending

2    against him, he'll remain in good standing, in effect, and at

3    the end of that exercise, he'll be allowed to take the

4    Step 2 CK one more time.

5        We haven't seen direct communication between the medical

6    school and Mr. Berger, so we don't know what communications

7    have occurred since then, but at least as of December 2018,

8    there was nothing suggesting that he was about to be kicked

9    out of school if he didn't take the Step 2 CK exam in August

10   of 2019, or on any particular date.

11       The other alleged harm relates to his desire to

12   participate in the 2020 match.  I don't know if Your Honor's

13   familiar with that, but that's the process by which medical

14   students get placed in residency programs.  The 2020 match

15   begins, as he suggests, in the fall of 2019, but the match

16   itself doesn't take place until the spring of 2020.

17       His medical school advises students that they need to

18   make sure they take the Step 2 CK exam by December 31, 2019,

19   to ensure that they can participate in the 2020 match.  So

20   even if participating in the match this year was, in fact, the

21   type of harm that was irreparable, an inability to participate

22   in the match, he doesn't have to take the exam in August in

23   order to participate in the main residency match, he could

24   take it later.

25       So we're in a situation here of sort of an expedited

1    preliminary injunction filed many months after the lawsuit was

2    filed, and without discovery having taken place, for a need

3    to, as I take it, he wants to begin interviews soon, and he

4    thinks he will be better positioned to get interviews with

5    schools if he has passed Step 2 CK at the time.

6         But all of that, all of the discussion about the

7    residency is based entirely on the suggestion of Mr. Berger

8    regarding how that process works and when he needs to start,

9    is not supported with evidence in the record regarding how the

10   whole match system works, nor is it supported with any

11   evidence or discussion of other options he has for obtaining a

12   residency position; and, in fact, there are other options for

13   obtaining a residency position.

14        If he participants in the main match and doesn't get a

15   residency position, he has the opportunity then, in March, to

16   participate in the so-called scramble, and that doesn't

17   require interviews.  He and anybody who doesn't match can

18   engage in discussions or express interest to a residency

19   program, and they might get a position that way.

20        Individuals can also apply for residency positions

21   outside of the match.  There are some programs which offer

22   residency positions to people without going through the main

23   match.  And then there's also something called Find A Resident

24   program, which allows individuals throughout the year to

25   evaluate the possibility of residency positions.

1    So again, that's more information that has come in --
2  that hasn't come in through his papers, but the record exists.
3  We've put information in the record showing that there are
4  many options for him, and that his need to participate and get
5  a position in a residency program isn't, in fact, hinged on
6  taking the exam in August in order to participate in the main
7  match.
8    Finally, Your Honor, we think it's at least relevant in
9  this case that there has been a delay in seeking the
10  preliminary injunction.  He learned five months before he
11  filed the lawsuit that he had failed the Step 2 exam on his
12  last administration.  His score went up the second time, but
13  not enough to pass.  He then waited five months to -- four to
14  five months to file suit, and then he waited another five
15  months to seek a preliminary injunction.  And while we don't
16  think an injunction should be denied solely on that basis,
17  Your Honor, we certainly think it's a relevant consideration.
18    For all of these reasons, we respectfully request that
19  the Court deny the preliminary injunction.
20    THE COURT:  Thank you.
21    MR. BURGOYNE:  Thank you, Your Honor.
22    THE COURT:  Mr. Weiner, you may proceed.
23    MR. WEINER:  Your Honor, I'm going to go a little bit
24  out of order.  I normally would have started with the
25  plaintiff, Mr. Berger; however, Maureen Holland, who is his

*HOLLAND - DIRECT*

1    mother, is here, and she has to catch an early flight this

2    afternoon.  I have very short testimony with her to address a

3    small point, and I'm going to start with Maureen Holland.

4              THE COURT:  Very well.

5                        MAUREEN HOLLAND

6    a witness herein, being first duly sworn, was examined and

7    testified as follows:

8                      DIRECT EXAMINATION

9    BY MR. WEINER:

10   Q.   Good morning.  Can you state your name, please?

11   A.   Maureen Holland.

12   Q.   Where do you live?

13   A.   I live in Rhode Island.

14   Q.   What is your relationship with Brendan Berger?

15   A.   I'm his mother.

16   Q.   What is Brendan's native language?

17   A.   English.

18   Q.   Was he born in the United States?

19   A.   He was born in New Haven, Connecticut.

20   Q.   During his preschool and early elementary education, in

21   what country did he live?

22   A.   America.

23   Q.   In what country were you born?

24   A.   America.  Cincinnati.

25   Q.   Is English your native language?

*HOLLAND - DIRECT*

```
1    A.   Yes.

2    Q.   What is your educational background and training?

3    A.   Up to the point -- you mean all the way through, or just

4    the beginning?  I mean, I have a --

5    Q.   Your latest, yes.

6    A.   So my undergraduate degree is a BA in English Literature.

7    Q.   And did you work at all after you had graduated college?

8    A.   Yes.  My first job after college was working at a

9    publishing company, and we took care of -- we did monographs

10   of great American literature and children's literature.

11        And then after I was married, I moved to France and I

12   taught two years, and what I taught was English as a foreign

13   language.

14   Q.   So you lived in France for a period of time?

15   A.   Yes.

16   Q.   Did Brendan live in France?

17   A.   No.

18   Q.   What did you do in France?

19   A.   What did I do?

20   Q.   Yes.  In terms of employment.

21   A.   I taught.

22   Q.   Was your husband at the time, is he a French native

23   speaker?

24   A.   My ex-husband is a French native, yes.

25   Q.   When Brendan was born, did he speak English?
```

*HOLLAND - DIRECT*

1    A.   My --

2    Q.   I'm sorry.  Your ex-husband, did he speak English at the

3    time?

4    A.   Yes.  When Brendan was born, he was actually doing a

5    residency at Yale University.

6    Q.   And who was the primary caregiver for Brendan during that

7    period of time?

8    A.   I was.

9    Q.   And what language did you speak to Brendan in the home?

10   A.   English.

11   Q.   And did Brendan go to any preschools?

12   A.   He did.  He went to preschools, I believe, beginning when

13   he was three, so three, four, and five.  And then he entered

14   kindergarten when he was six, so a little bit late, but --

15   Q.   And his preschool years, did they speak English in the

16   preschool?

17   A.   Yes.

18   Q.   Did they speak English in his elementary school?

19   A.   Yes.

20   Q.   Was he ever taught French?

21   A.   No.

22   Q.   During his preschool years and early elementary school,

23   was French spoken at home?

24   A.   No, it was not, with some exceptions.

25   Q.   And what would those exceptions be?

HOLLAND - DIRECT

1   A.   So my ex-husband, being a Frenchman, all his family was

2   still living in France, so obviously sometimes we would have

3   phone calls, you know, birthdays, holidays, whatever; and, you

4   know, we would be, you know, speaking French to them on the

5   phone.

6        I think another occasion where we would speak French, and

7   this isn't very nice, but for example, if we were at a

8   restaurant.  Let's say the family was at a restaurant, and my

9   husband and I didn't want people around us to know what we

10  were talking about, like the waiter, we would say something

11  quick in French.

12  Q.   When Brendan was -- you had mentioned you also went to

13  France when Brendan was younger?

14  A.   Yes.

15  Q.   When you went to France, was French spoken to him then?

16  A.   So the deal with Brendan was that he didn't understand

17  French.  So I, for example, would speak French to my French

18  relatives, but I would speak English to Brendan because he

19  didn't understand French.  And as a matter of fact, his French

20  relatives, for example, his French grandparents, spoke very

21  little English, but they had to speak English to Brendan

22  because he did not understand French.

23  Q.   When Brendan was in his early elementary school and

24  preschool years, did he understand some French?

25  A.   You know, probably words here and there.

*HOLLAND - DIRECT*                                                                23

1    Q.   Was he taught French at all in early elementary school?

2    A.   Absolutely not.

3    Q.   If you're able to quantify in terms of a percentage, how

4    much English was spoken to Brendan during his preschool and

5    early education?

6    A.   I mean, I don't think any French was spoken to him

7    because he didn't understand.

8    Q.   In terms of speaking around Brendan during his early

9    education and preschool years, can you put a percentage on how

10   much English was being spoken?

11   A.   You know, I mean, what, 90, 99 percent.

12   Q.   Brendan had an evaluation by a Dr. Artner in 1994.  Were

13   you present during that evaluation?

14   A.   Yes.

15   Q.   Were you the one who took Brendan to that evaluation?

16   A.   Yes.

17          THE COURT:  How do you spell Artner?

18          MR. WEINER:  Dr. Artner, A-r-t-n-e-r.

19          THE COURT:  Thank you.

20   Q.   What was the purpose of that evaluation?

21   A.   When Brendan was in first grade, he just didn't seem to

22   be able to do the reading and writing in school.  And I was

23   pretty involved.  I was a parent volunteer, so I would go and

24   read stories to the kids on occasion and help the teacher

25   like, you know, do cutouts, whatever.  So I was kind of there,

1    you know, on an occasional basis, so I could kind of see what

2    was going on in the classroom. And I also knew how bright he

3    was, you know, and it didn't make sense to me.

4        He's my third child, and I had already been through this

5    whole reading process with my two daughters; and, you know, I

6    was just surprised. So we actually hired a reading tutor that

7    would come to the house in the afternoons after school and

8    work with Brendan, for about half a year, and that didn't seem

9    to do much either. So I was kind of at my wit's end because I

10   thought, you know, if we continue on this path, this child is

11   not going to be able to read.

12       So I did several things. I went to Springer school,

13   because we were thinking, well, maybe he should go to

14   Springer, which is, for people that don't know, that's a

15   specialized school for kids with learning disabilities. And

16   my husband and I thought that they could definitely support

17   his learning -- I should say his reading issues.

18       But Brendan was a child that was, I'm going to say twice

19   exceptional. Yes, he had this learning disability something,

20   I didn't really know what it was at that point, but I also

21   knew how bright he was, because I talked to him, and he was

22   very curious. But anyway, Dr. Artner, I wanted to get an

23   expert to tell me what was going on. That's why I went to

24   her.

25   Q.  And you were looking for some type of direction in terms

*HOLLAND - DIRECT*

1    of how to educate?

2    A.   Correct.  I mean, I was looking for analysis of what the

3    heck was going on here, okay.  And I mean, the other thing is,

4    he was a premie, so I thought maybe something was connected to

5    that.  But secondly, I wanted direction on, you know, what I

6    really needed to do to help him, because I was thinking of

7    home schooling him.  That was the deal.  I thought, you know,

8    if I can't find anything else that makes sense, I'm going to

9    just to do it myself.

10   Q.   Did you provide a history to Dr. Artner?

11   A.   I'm sure I did.

12   Q.   Do you recall her asking whether or not English is spoken

13   in the home, or whether or not French is spoken in the home?

14   A.   You know, I really don't recall, to be honest.

15   Q.   Do you recall, if she asked that question, what your

16   answer was?

17   A.   I don't recall.  I mean, I've seen the documentation, but

18   I don't recall.

19   Q.   Is there any reason why you would have told Dr. Artner

20   anything different than what you've just testified to?

21   A.   I can't imagine that I would have, because what I've told

22   you is the truth.

23   Q.   Did Dr. Artner ever indicate to you about not speaking

24   French in the home?

25   A.   I don't remember talking about that.

*HOLLAND - DIRECT/CROSS*                                    26

```
 1              MR. WEINER:  That's all the questions I have.

 2              THE COURT:  Okay.  Hang on one second.

 3              THE WITNESS:  Oh, I'm sorry.

 4              THE COURT:  That's okay.  Mr. Burgoyne gets a chance

 5    to ask you questions now.  Mr. Burgoyne?

 6              MR. BURGOYNE:  Thank you, Your Honor.

 7                           CROSS-EXAMINATION

 8    BY MR. BURGOYNE:

 9    Q.  Good morning, Mrs. Holland.

10    A.  Good morning.

11    Q.  And thank you for coming.  I know nobody likes to travel.

12    Just a few quick questions.  Are you fluent in French?

13    A.  I am.

14    Q.  And I believe you testified that French was rarely spoken

15    in the home?

16    A.  Yes.

17    Q.  And then you testified that you also went with Brendan to

18    see Dr. Artner?

19    A.  Correct.

20              MR. BURGOYNE:  Your Honor, I'd like her to have the

21    document I'm asking her about so she's not at a disadvantage.

22    Can I get her the exhibit?

23              MR. WEINER:  It's also Exhibit 17 that's up there.

24    Q.  Oh, you have the exhibits.  Fantastic.  There should be a

25    book in which there's an Exhibit 17, which is Dr. Artner's
```

1    report.

2    A.   Okay.  I'm probably going to need my glasses, actually.

3    Q.   Can I hand you your purse?

4    A.   Sure.

5    Q.   Exhibit 17, do you recognize this as Dr. Artner's report?

6    A.   Yes.

7    Q.   And then on page 3, if you'll look at the page number at

8    the bottom?

9    A.   Okay.

10   Q.   Dr. Artner said, "It should be mentioned that French is

11   often spoken in the home"?

12   A.   I see that.

13   Q.   All right.  And that was information, I assume, she got

14   from you at the time?

15   A.   I mean, I don't know what to say about that because I

16   can't imagine that I would have said that because it would

17   have been untrue.

18   Q.   You mentioned that you decided eventually to home school

19   Brendan because of the issues he was experiencing?

20   A.   Correct.

21   Q.   Did you also home school your two daughters?

22   A.   I did.

23   Q.   And for how long did you home school them?

24   A.   Three and a half years.

25   Q.   Is that roughly the same amount of period you home

 1    schooled Brendan?

 2    A.   Yes.

 3    Q.   And neither of your daughters have any learning

 4    disabilities issues?

 5    A.   Correct.

 6            MR. BURGOYNE:  Nothing further, Your Honor.

 7            THE COURT:  Any redirect?

 8            MR. WEINER:  No, Your Honor.

 9            THE COURT:  All right.  Thank you.  You may step

10    down.

11            THE WITNESS:  Thank you.

12            (Witness excused.)

13            MR. WEINER:  I would like to call Brendan Berger as a

14    witness.

15                        BRENDAN J. BERGER

16    the plaintiff herein, being first duly sworn, was examined and

17    testified as follows:

18                        DIRECT EXAMINATION

19    BY MR. WEINER:

20    Q.   Good morning.  Can you state your name, please?

21    A.   Brendan Berger.

22    Q.   Where do you live, Mr. Berger?

23    A.   Here in Ohio, in Glendale, Ohio.

24    Q.   Have you lived in Ohio most of your life?

25    A.   Yes.

*BERGER - DIRECT*                                                                29

1    Q.   How old are you?

2    A.   I'm thirty-three.

3    Q.   Can you talk about your educational experience and your

4    current status in terms of your education?

5    A.   Yes.  So I went to public school in Glendale, at Glendale

6    school, and I was home schooled from second through fourth

7    grade by my mother.  And then I went to a private school fifth

8    through eighth grade in Glendale, and then I went to private

9    high school in Cincinnati here called Moeller.

10        And then after that was finished, I went to the

11   University of Cincinnati to do an undergraduate degree.  And I

12   did some postbac classes at University of Cincinnati after I

13   got my undergraduate degree, and then I went to medical school

14   in St. Maarten at the American University of the Caribbean.

15        I'm currently a student at the American University of the

16   Caribbean, and I've completed all my course work except the

17   Step 2 CK exam, which is still outstanding to have a passing

18   score on that.

19   Q.   Is there anything further you need to do in medical

20   school in terms of graduating?

21   A.   No, that's it.

22   Q.   The last requirement for you is to pass the Step 2 CK?

23   A.   Yes, that's correct.

24   Q.   And after that, you will receive your MD?

25   A.   Correct.

*BERGER – DIRECT* 30

1   Q.   When did you first want to become a physician?

2   A.   So my father is a physician, and so I thought about it

3   for many years, but I think that the decision for me really

4   came during my undergraduate years.  That's when I realized

5   that the material that I had encountered in my course work

6   that related to medicine was something that I really felt I

7   had a talent at, and I was very skillful with that material,

8   and that I had the skill sets that would make me a good

9   physician, so probably in 2007, I'm guessing, maybe.

10  Q.   All right.  Is there a particular specialty that you wish

11  to pursue?

12  A.   Yes.  I'm interested in psychiatry.

13  Q.   Why is that?

14  A.   So there's a family history of relatives with mental

15  illness, and through exposure to that, I've always kind of

16  kept an eye on psychiatry.  And during my rotations, I felt

17  that it was an area where I was able to excel.  And as

18  somebody with a learning disability, the fact that I'm able to

19  interview patients, and a lot of what is required is actually

20  interviewing them, that interfaces very well with my strengths

21  instead of my weaknesses of, you know, reading and reviewing

22  tons of documentation, because I'm able to actually speak to

23  them and develop rapport with the patients, and I think

24  psychiatry is a very good fit for that reason.

25  Q.   We're here in court regarding a preliminary injunction.

*BERGER - DIRECT*                                                      31

1    Why are you pursuing this preliminary injunction?

2    A.   It's a long story, but basically, I've had accommodation

3    in school since early childhood.  I have needed that to

4    complete all of my testing and proceed through my academic

5    career.  And I've made it all the way to the point where now

6    I've completed the work for medical school after extreme,

7    many, many years of work and a lot of dedication, but when I

8    have applied for accommodation with the NBME, and I provided

9    all of the documentation that I could possibly have provided,

10   they'll come back with denials stating that they don't believe

11   that I fulfill the criteria for that.

12        And I'm in a position now where I finished all of my

13   course work in 2016, and the only thing remaining that entire

14   time, from 2016 until now, has been passing the Step 2 CK

15   exam.

16        I've tried to take it with accommodation -- without.  I

17   tried to request accommodation on it, but since it wasn't

18   granted, I had to take the exam without accommodation.  And

19   when I took the exam without accommodation, I was not able to

20   read and understand what they were asking because of the time

21   constraints, and I haven't been able to show my level of

22   mastery on this material, and instead I'm showing the fact

23   that my disability is showing.

24        And it's something that it is preventing me from moving

25   forward with my career, and it's preventing me from, you know,

*BERGER - DIRECT*                                    32

1    from completing medical school and actually moving on towards

2    the role of physician, which is what my career path is.

3         And you know, I'm also extremely stressed from all of

4    this, because I had to take out student loans to complete

5    medical school.  And I know that that's not the main purpose

6    of this, but it is something that does affect me greatly

7    because I have the stress of constantly preparing for this

8    exam because at any moment the NBME could decide that I have

9    to take the exam.  And I can't work while I'm busy studying

10   for the exam.

11        So I'm in a position here where I'm in this holding

12   pattern.  I've been in this holding pattern for a long time,

13   and until that changes, I won't be able to move forward with

14   my career path, and I can't -- you know, sorry.  I kind of got

15   a little lost there.  I'm sorry.

16   Q.   You had mentioned that you're a person with a disability.

17   What's the nature of your disability?

18   A.   So I have a disability related to reading, and I also

19   have attention issues related to ADHD.

20   Q.   How does that impact your life?

21   A.   It impacts so many different areas.  Basically, anything

22   that involves reading, I have to constantly seek out ways to

23   either avoid reading, or ways to use assistive technologies to

24   get through material that's written, like text to speech, and

25   audio books, things like that.

1          As far as focus is concerned, it's something that does

2     impact me on standardized testing, but it also impacts me in

3     other areas as well, you know.  When driving, I have to be

4     extremely careful not to have any distractions because I don't

5     want to end up losing focus and, you know, causing something

6     bad to happen with an accident, or something like that.

7          And it's just -- it's something that I'm trying to take

8     steps to limit the effect that my attention issues have; but,

9     you know, even through meditation and working on that, there's

10    only so much I can do.  And I've done everything I can to

11    limit the effect it has, but I still have this wall that I

12    just can't get past, and that's where this disability is.  And

13    without accommodation, there's no way that I can actually show

14    what I know and what I've achieved through all of the hard

15    work that I've put in.

16    Q.   How have your disabilities impacted you with respect to

17    standardized exams?

18    A.   So my reading speed is very important for being able to

19    get through exams during certain time constraints.  So if I

20    have standardized conditions on an exam without accommodation,

21    it's almost impossible.  I mean, I basically have to rush

22    through the exam as quickly as I can, not really understanding

23    anything that I'm reading because I'm not able to read at a

24    speed where I comprehend what I'm reading.  And I still, even

25    doing that, run out of time and am not able to finish

*BERGER - DIRECT*                                                     34

1    questions on the exam.  And I come back, you know, with

2    basically a score report that doesn't show anything about my

3    knowledge base.  It instead shows the fact that I wasn't able

4    to complete the exam in the timed conditions.

5    Q.    And how did that impact you with respect to the Step 2

6    CK?

7    A.    The Step 2 CK exam has a lot of reading on it, and it's

8    very complicated, the information you have to process and

9    parse.  And it definitely had a huge impact, especially the

10   last time, you know.  I think that I was only able to read

11   about 60 percent of the exam, and that's by using every single

12   strategy I could to get through it as quickly as possible.

13   Q.    I want to discuss your childhood.  Let's first start out,

14   what is your native language?

15   A.    English.

16   Q.    What language were you taught in the house?

17   A.    English.

18   Q.    What language was spoken to you in the house?

19   A.    English.

20   Q.    Was French spoken in the house?

21   A.    Occasionally, I heard my parents speaking, but they

22   didn't speak it to me.

23   Q.    Did you go to a preschool?

24   A.    Yes.

25   Q.    Did they speak French in the preschool?

 1    A.   No.

 2    Q.   Were you taught French in preschool?

 3    A.   No.

 4    Q.   What language did they speak?

 5    A.   English.

 6    Q.   Did you go to elementary school?

 7    A.   Yes.

 8    Q.   Were you taught French in elementary school?

 9    A.   No.

10    Q.   Did you learn French in elementary school?

11    A.   No.

12    Q.   What language were you taught in elementary school?

13    A.   English.

14    Q.   Can you speak French now?

15    A.   No.

16    Q.   Can you speak any language other than English?

17    A.   Yes.

18    Q.   What language?

19    A.   Japanese.

20    Q.   When did you learn that?

21    A.   When I was 20, I did a year abroad in Japan.

22    Q.   When you were in elementary school, did you encounter any

23    educational challenges?

24    A.   Yes.

25    Q.   Can you describe those?

1    A.   So in elementary school, especially in first grade, as we

2    were learning to read and write, and we had to learn the

3    letter sound correspondence, things like that, I was having a

4    lot of difficulty.  Exercises that we would do in class, like

5    they would have us write out A is for apple, or something like

6    that, and my writing was so slow that I wasn't able to

7    complete those tasks in the amount of time that the teacher

8    had planned for during class.

9        So as a result, I was sent during -- instead of going out

10   to recess with the other kids, I was sent to a room that was

11   next to the boiler room in the school, and basically, if you

12   hadn't completed your homework, you were sent there.  Most of

13   the kids were older kids, but I was one of the young kids that

14   was sent there.  And they would have me work basically every

15   day trying to complete the assignments that I couldn't

16   complete in class, and so I was never going out to recess, et

17   cetera.

18       Then when I still was often not able to finish those

19   assignments during that time period, they would send it home

20   with me as part of the homework to complete when I got home.

21   I would do it at home, along with whatever other homework

22   there was, and then bring it back the next day.

23       But every single day the cycle would repeat, where even

24   though I was working consistently and as quickly as I could

25   throughout the entire time that the teacher would give during

*BERGER – DIRECT*

1    class, it was never enough.  And even with this extra time

2    that they gave me to complete it, it was still not enough.

3        And I wasn't able to normalize, basically, with what the

4    expectations were for the teacher, and it's something that, as

5    a result of that, you know, I -- it was a very extremely

6    challenging year for me when I was in first grade.  And I was

7    really confused because I had all these issues in class

8    happening, and at the same time, I knew that when people asked

9    me questions, I could answer their questions, but when it came

10   to reading or writing, I was completely incapable of showing

11   what I had learned.  So I was unable to show what I had

12   learned.

13       And at the same time, I'd always had an aptitude for the

14   sciences, and I was being taken into sort of a small group out

15   of the first grade class, and I was put in basically a science

16   enrichment class.  They would take kids and put them in that

17   class.

18       So I was very confused because at once I was somebody who

19   could not do these basic skills with all the other students to

20   the level that they were able to, but I was also being told

21   that the school had recognized that I was intelligent, and I

22   was being put in this enrichment class.  And I was able to do

23   well in the enrichment class because it was a lecture, sort of

24   seminar format where we would talk, and for me that works.

25   I'm able to express verbally what I'm able to comprehend, et

1    cetera, and so it was a very confusing time for me.

2    Q.   I want to go back to the challenges that you experienced.

3    A.   Sure.

4    Q.   Was this in first grade that you just described?

5    A.   This was in first grade, yes.

6    Q.   Did you repeat any grades?

7    A.   I think my parents held me back, which is why I started

8    kindergarten or first grade late, but other than that, I'm not

9    aware of repeating any grades.

10   Q.   During this period of time in first grade, did you have

11   any type of interventions for your educational challenges?

12   A.   Yes.  I remember doing tutoring basically to work on

13   these literacy skills to try to improve, but I don't remember

14   in detail what --

15   Q.   Were there any classes that were provided at the school?

16   A.   I don't remember during the school day.  I just -- my

17   main thing I remember was going to this room instead of recess

18   every day, so I don't know.

19   Q.   And how about at the home, was there any intervention

20   being done at the home to address these challenges?

21   A.   Yes.  There was a tutor that came, and I would work with

22   them after school at home.

23   Q.   And what were you working with with that tutor?

24   A.   It was language skills.  Basically, the same things we

25   would do in class where, you know, I'd be trying to learn how

*BERGER - DIRECT*

1    to write, see if I could improve my speed, and they would

2    basically just try to work on the same things that we were

3    supposed to be learning during the school day but I was not

4    making progress with.

5    Q.    And did there come a time that you were home schooled?

6    A.    Yes.

7    Q.    And for how long were you home schooled?

8    A.    So it was second, third, and fourth grade, so three

9    years, I guess.

10   Q.    And who provided the home schooling?

11   A.    My mother was the teacher.

12   Q.    Was there any other additional tutoring or services

13   provided to you regarding your challenges?

14   A.    So during home schooling, my mom basically custom made

15   the curriculum so that I could get as much remediation as

16   possible during that time, and so she did that in the home.

17       I also went to a person, her name was Susan Collins.  I

18   think she's one of the people who wrote one of the reports.

19   And I remember going to her and working on different literacy

20   skills as well, but I don't know if it was during home

21   schooling or later.  I can't remember exactly when that was.

22   Q.    Did you have evaluations that were conducted during your

23   elementary school years?

24   A.    Yes.

25   Q.    And those were evaluations of Dr. Artner, we had seen her

1    one report?

2    A.   Yes.

3    Q.   And that was in second grade.  And you mentioned this

4    Susan Collins.  Did she conduct an evaluation?

5    A.   Yes.

6    Q.   Did you eventually return back to your elementary school?

7    A.   So I went back to regular school in fifth grade, but I

8    ended up going to a local parochial school instead of the

9    public school.

10   Q.   And which parochial school was that?

11   A.   The name is St. Gabriel Consolidated School.

12   Q.   What grade does St. Gabriel's go to?

13   A.   It goes up through eighth grade.  I was there from fifth

14   through eighth grade.

15   Q.   Did you have any accommodations when you were at

16   St. Gabriel's?

17   A.   Yes.

18   Q.   What was the nature of your accommodations?

19   A.   I was given extra time to complete in class assignments,

20   as well as examinations, quizzes, tests, whatever.  Also, they

21   did oral exams with me, where they would have somebody read

22   the questions to me, and then I would respond orally to it

23   because they knew that I had issues with reading.  I was also

24   given, if it was something that I had to do that was written

25   and that couldn't be read to me, then it was something that --

1    it would be like in a small, quiet room as well.  And then

2    that was pretty much -- during the school day, those are the

3    main things I could think of.

4    Q.  If you turn to Exhibit 1 in the booklet you have there?

5    A.  Okay.

6    Q.  Can you explain what this is?

7    A.  It appears to be a letter from my fifth grade teacher at

8    St. Gabriel's school.

9    Q.  And what is the purpose of that letter?

10   A.  So she wrote this letter to explain the accommodations

11   that I have had while I was at St. Gabriel's school.  And it

12   was something that we included, along with my accommodations

13   request, to the MCAT.

14   Q.  And does that document the accommodations you had at

15   St. Gabriel's?

16   A.  Yes.

17   Q.  Did you eventually press on to high school?

18   A.  Yes.

19   Q.  Where did you attend high school?

20   A.  At Moeller.

21   Q.  How long were you at Moeller?

22   A.  For four years.

23   Q.  Ninth through twelfth grades?

24   A.  Correct.

25   Q.  Did you encounter any challenges while you were at

1    Moeller?

2    A.   Yes.

3    Q.   Can you explain what those challenges were?

4    A.   So I continued to have similar challenges to what I had

5    earlier, where I had issues related to reading and sustained

6    focus.  And while I was at Moeller, I was informally

7    accommodated in the classroom by the teachers.  Since it was a

8    private school, they were able to do that.  And they gave me

9    extra time to complete tests, et cetera.  I had an extra set

10   of textbooks so that I could highlight and aid my

11   comprehension that way.  They also did audio books.  They

12   would allow me to do that.  And I would meet with Jane Kagy to

13   review different remediation skills.

14   Q.   Who is Jane Kagy?

15   A.   She was a coordinator that worked at Moeller.

16   Q.   Was she a coordinating specialist?

17   A.   From what I understand, basically her job was to work

18   with the different students that had disabilities or

19   difficulties, and work on the different skills with them, and

20   make sure that their accommodations were implemented in a way

21   that was beneficial while they were at the school.

22   Q.   Mr. Burgoyne had mentioned, in his opening, that you did

23   not have accommodations throughout your high school

24   experience.  Could you speak to that?

25   A.   That's incorrect.  I had accommodation.  Initially, when

1   I was at Moeller, it was informally granted until I was able

2   to actually have it transition to formal granted after.  And

3   that was one of the reasons that we ended up going to

4   Dr. Smith for the evaluation is because my school had already

5   given me accommodation and seen that the accommodation was

6   warranted.

7       And they wanted an updated assessment because they wanted

8   to see if there were any adjustments, and they also felt that

9   since I needed that accommodation in the classroom

10  environment, it would be important for me to continue to have

11  that on the SAT when I took the SAT.

12  Q.   So during ninth, tenth, and part of your eleventh grade

13  year, at that time your accommodations were informal?

14  A.   At the beginning it was informal, and then it was

15  formalized after the evaluation, I guess.

16  Q.   What do you mean by informal?

17  A.   So in private schools, they are not required to have an

18  IEP.  They don't have to have like a paper trail, and so

19  the -- when students are struggling to finish exams, or things

20  like that, you know, I was routinely -- I was basically always

21  the last student to finish any exam.  I was always going to

22  the very last second.  And my teachers realized that the

23  questions that I would answer I would have good scores on, and

24  then the ones that would be blank because I ran out of time

25  would be blank, you know.

*BERGER - DIRECT* 44

1     And so it's something where it was in their purview, I

2 guess, to say that they would give me extra time, or they

3 would somehow adjust it so that I could finish those exams,

4 because what they were interested in was to find out what my

5 knowledge was, not how quickly I could complete the exam, and

6 so they did that initially.

7 Q.  All right.  And what type of informal accommodations were

8 you receiving?

9 A.  So it was extra time to complete assignments, as well as

10 tests.  The textbooks, it was formalized later, but the extra

11 time was the initial thing.  And then I already had support

12 related to audio books, and reading, and things like that in

13 place at home, and that was also formalized later.

14 Q.  During your high school years, did you receive any other

15 type of special instruction or tutoring, or anything of that

16 nature, to address your challenges?

17 A.  So I met with Jane Kagy, and I worked with her on some

18 things, but other than that, I don't remember.  I don't

19 remember any other specific tutoring.

20 Q.  If you would, could you turn to Exhibit 2, please.

21     Can you explain what this is?

22 A.  This looks like a letter from Jane Kagy.

23 Q.  And what is the purpose of that letter?

24 A.  So she wrote this letter when I was -- so I first -- I

25 guess I had already transitioned to my undergraduate degree,

1    and it was to document what accommodations I had had

2    throughout high school so that the university would understand

3    what accommodations profile I had needed before, and that

4    would help them with their implementation while I was a

5    university student.  And I believe this was also submitted

6    with the MCAT request for accommodation.

7    Q.   Does this document accurately the accommodations you

8    received when you were at Moeller?

9    A.   I believe so.

10   Q.   If you would, could you take a moment to read and make

11   sure?

12   A.   (After reviewing document) Yes.

13   Q.   Is the information there accurately stating the

14   accommodations you received when you were at Moeller?

15   A.   Yes.

16   Q.   When you were in the eleventh grade, did you take the

17   PSAT?

18   A.   Yes.

19   Q.   And what is the PSAT?

20   A.   It's a practice test that students take the year before

21   they're going to take the SAT, to get used to the format of

22   the exam, and I guess anticipate how they might perform on the

23   SAT.

24   Q.   At the time that you were approaching the PSAT, had you

25   started studying yet for the SATs?

*BERGER – DIRECT*                                                          46

1    A.   I don't remember.  I think I viewed it as a practice

2    test, so I don't remember.

3    Q.   Did your school provide any type of instruction related

4    to the PSAT or SAT that you were taking?

5    A.   I do think that they did -- I think we did something as

6    students together.  I can't remember how long it was, but

7    maybe a few sessions or something.

8    Q.   When you took the PSAT your junior year, did you have

9    accommodations when you took that test?

10   A.   On the PSAT, no.

11   Q.   Can you describe what occurred when you took that test,

12   when you took the PSAT test?

13   A.   Yes.  So I took it with other students.  It was basically

14   a standardized examination, and because it was a practice

15   test, I wanted to sort of just take it, and I didn't want to

16   have to go through the process of applying for the

17   accommodation on everything because the outcome of the test

18   didn't matter for my advancement in the school.

19        So when I did the test, I was struggling a lot with the

20   time constraints, and I was unable to finish sections on the

21   exam, even though I was skipping and going through as quickly

22   as I could as many questions as I could get through.  And not

23   only was my reading speed a factor, but also my processing and

24   attention over the long periods of time was something that was

25   greatly affecting me during that exam.

*BERGER - DIRECT* 47

1      And at the end of that exam, it was obvious to me that if

2   I did the SAT under that same scenario, there's no way that I

3   was going to be able to pass it and adequately move on to

4   undergraduate.

5   Q.   If you would, could you turn to Exhibit 3, please?

6          MR. WEINER:   I apologize in advance to Your Honor.

7   This was a color document, and it appears that some of the

8   items did not copy.   When I return to my office, I can furnish

9   ones that contains all the information.

10  Q.   Is this a copy of your PSAT score report?

11  A.   Yes, it looks like it.

12  Q.   And does this show the answers you provided and furnished

13  for that exam?

14  A.   Yes.

15  Q.   I wanted to -- and we're looking at the left side of

16  Exhibit 3, and it shows Section 1 and Section 3.   What is

17  Section 1 and Section 3 referred to as?

18  A.   So the left column is basically a verbal section of the

19  exam, so that Section 1 and Section 3 is verbal.

20  Q.   Can you explain what is contained, or the construct of

21  Section 1, the verbal exam?

22  A.   Yes.   So it's broken down into sections.   So they have

23  sentences where it will have basically a sentence with a

24  blank, and then you have to pick a multiple choice answer that

25  would fill in the blank, based on my recollection.

1          They also had a section with analogies, where they would

2     have, you know, this word is to this as this is to, and then

3     blank, and you have to fill in -- pick your answer that would

4     fill in the analogy section.

5     Q.   So those were single words or double words that you would

6     be looking at?

7     A.   Yes.

8     Q.   And the critical reading section?

9     A.   Yes.  There's also a critical reading section where, if I

10    remember correctly, I think it was similar to the sentences

11    but it was sort of longer, where you'd have longer passages,

12    and then there would be multiple choice questions about it.  I

13    can't remember if that was actually sort of filling in blanks,

14    or if it was actually about what the paragraph contained.  I

15    don't remember the details exactly.

16    Q.   Did you encounter any challenges with taking the verbal

17    section of the PSAT?

18    A.   Yes.

19    Q.   And explain what your challenges were.

20    A.   So I ran out of time on the sections as I was going

21    through.  And due to the increased reading in the critical

22    reading sections, I basically ended up going all the way until

23    the last second, but I didn't have time to answer certain

24    questions so I left them blank at the end of the exam.

25    Q.   All right.  The sentence completion analogies and

1  critical reading, is that all timed as one section?

2  A.  Yes, each section has its own timed limit.

3  Q.  Right.  So sentence completion wouldn't have its own time

4  limit, analogies would not have its own time limit, critical

5  reading would not have its own time limit?

6  A.  That's correct.

7  Q.  They were all timed as one section?

8  A.  Yes.

9  Q.  Can you describe what your approach or your strategy was

10  on the verbal section?

11  A.  So because there was less reading in the sentence

12  completion and analogies portions, I went through those

13  because I knew I would be able to comprehend them more, and I

14  had more likelihood that I could actually get those questions

15  answered within the limited time that I had.  And then with

16  the time I had remaining, I would work through the critical

17  reading section as much as I could until I ran out of time.

18  Q.  You had mentioned that you had difficulty reading the --

19  finishing the critical reading section in Section I.  Is that

20  reflected on this report?

21  A.  Yes.  There are blanks at the end here, yes.

22  Q.  And what questions did you have to omit On Section 1?

23  A.  There are three questions omitted, and they're on the

24  critical reading section.

25  Q.  In Section 3, is that also a verbal section?

1    A.   Yes.

2    Q.   Did you also encounter difficulty?

3    A.   Yes.

4    Q.   What were your difficulties in in Section 3?

5    A.   So it was more of the same because of the reading

6    involved.  But at this point, it was later in the day.  I had

7    already done the first verbal section, and then a math

8    section, and then a verbal section again, and so I was a lot

9    more fatigued, and it slowed me down.  My processing was

10   slower because I had more difficulty focusing, and I omitted

11   several questions at the end of Section 3 as well.

12   Q.   Is this reflected on Exhibit 3?

13   A.   Yes.

14   Q.   How many questions did you omit in the critical reading

15   of Section 3?

16   A.   Six were omitted.

17   Q.   And why were they omitted?

18   A.   Because I ran out of time.

19   Q.   By the way, how long a test is the PSAT?

20   A.   I know it was all done in one day, but I don't remember

21   how long each section was, but it was multiple hours total.

22   Q.   Did you encounter any problems as a result of your

23   impairments on any other sections of the PSAT?

24   A.   Yes.

25   Q.   Explain what challenges you encountered.

*BERGER - DIRECT*                                      51

1    A.   So I also had difficulty in the math section, because

2    when I do calculations, it requires a lot of intense focus.

3    And when I have to keep details in my mind and do

4    calculations, it's very draining for me.  And so I also

5    struggled with running out of time at the end of the math

6    section for Section 2, it looks like.

7    Q.   And is that reflected on the report?

8    A.   Yes.

9    Q.   And how many questions did you omit because of that?

10   A.   Six.

11   Q.   And that's at the end of this section?

12   A.   Yes, that's correct.

13   Q.   On the verbal section, do you recall what your score was?

14   A.   I remember the -- at the top of this report, they have

15   percentages, so I think that one of them was maybe a 71 and

16   then another one was a 77.  I'm not sure exactly if that was

17   the verbal score or what, but --

18   Q.   So somewhere in the 70th percentile you scored on the

19   PSAT?

20   A.   Yes.

21   Q.   And that was on the verbal section?

22   A.   I believe so.

23   Q.   And on the math section?

24   A.   I believe that one was the higher, maybe the 77.  I can't

25   remember offhand.

1    Q.   And 77th percentile?

2    A.   I think so, yes.

3    Q.   And you scored that amount, despite having to omit

4    several questions on this exam?

5    A.   Correct.

6    Q.   Did you eventually take the SAT exam?

7    A.   Yes.

8    Q.   Did you submit a request for accommodations to The

9    College Board?

10   A.   Yes.

11   Q.   And how did The College Board respond to your request?

12   A.   They responded with granting accommodation and extra

13   time.

14   Q.   If you'd turn to Exhibit 4, please.

15        Is this a copy of the accommodation letter of the

16   accommodations you received from The College Board?

17   A.   Yes.

18   Q.   And what accommodations did you receive?

19   A.   They gave 50 percent extra time.

20   Q.   Did you utilize that extended time when you took the

21   college board?

22   A.   Yes.

23   Q.   When did you take the college board?

24   A.   I believe it was -- I guess it was my senior year, which

25   was probably 2004.

*BERGER - DIRECT*                                                  53

1    Q.   All right.  And if you turn to Exhibit 25.

2         Is this a copy of your SAT score report?

3    A.   Yes.

4    Q.   Other than the score report, did you take the SATs on any

5    other time?

6    A.   No, just once.

7    Q.   And when you took the SAT, you had accommodations?

8    A.   Yes.

9    Q.   And what accommodations did you have?

10   A.   Extended time.

11   Q.   And what was your score on your SAT?

12   A.   The reading was 660 and the math was 680.

13   Q.   The reading score, in what percentile did you fall?

14   A.   91st percentile nationally.

15   Q.   Was that improvement from your PSAT?

16   A.   Yes.

17   Q.   And at 94 percent, does it indicate, is that compared to

18   whom?

19   A.   The national percentile.

20   Q.   Of college seniors?

21   A.   Of college-bound seniors, yes.

22   Q.   The math score, what percentile?

23   A.   That was 90 percent.

24   Q.   And was that for college-bound seniors as well?

25   A.   Yes.

*BERGER – DIRECT*                    54

1   Q.   Did you graduate from Moeller?

2   A.   Yes.

3   Q.   Did you eventually matriculate to college?

4   A.   Yes.

5   Q.   And where did you go to college?

6   A.   The University of Cincinnati.

7   Q.   When you went to the University of Cincinnati, did you

8   submit a request for accommodations?

9   A.   Yes.

10  Q.   Did you submit that at the beginning of your college?

11  A.   Yes.

12  Q.   And to whom did you submit that request?

13  A.   So the University of Cincinnati had a Disability Services

14  Office, where they had staff that implemented and managed

15  accommodation for students that had it at the school.

16  Q.   And if you turn to Exhibit 27.

17       Does Exhibit 27 accurately document the accommodations

18  you received at University of Cincinnati?

19  A.   Yes.

20  Q.   Did you have these accommodations during the entire time

21  of your matriculation?

22  A.   Yes.

23  Q.   Can you state what your accommodations were?

24  A.   So extended time, double time, proofreader, and audio

25  versions of written text.

```
1    Q.   Can you explain your use of the audio version of written

2    text?

3    A.   Yeah.  Basically, because there's a lot of reading in

4    college studies, and I have difficulty related to reading,

5    they provided me with audio versions.  They actually didn't

6    have text to speech at the time, they had student readers that

7    would read and produce MP3 files, and then that would be given

8    to me.  And I would use that to listen to the material as I

9    would go through the assignments, and that allowed me to get

10   through them and keep pace with the class.

11   Q.   And your extended time, that was double time?

12   A.   Yes.

13   Q.   Where did you take your exams?

14   A.   At the Disability Services Office.

15   Q.   Did you ultimately graduate from the University of

16   Cincinnati?

17   A.   Yes.

18   Q.   And what did you graduate with?

19   A.   I had a BS in biology and a BA in Asian studies.

20   Q.   Did you have any postgraduate time at the University of

21   Cincinnati?

22   A.   Yes.  I did some postgraduate classes.

23   Q.   And what was the purpose of those?

24   A.   So at that time, I was still figuring out what was

25   happening with the MCAT, and I wanted to continue to keep my
```

1    skills fresh so that if I was able to go on to medical school,

2    I would be as ready as possible, so I continued taking those

3    classes to keep my skills fresh.

4    Q.   When you were taking those classes at the University of

5    Cincinnati, did you have accommodations then?

6    A.   Yes.

7    Q.   And were they consistent with the accommodations that are

8    shown on Exhibit 27?

9    A.   Yes.

10   Q.   At some point in time, did you make a decision to go to

11   medical school?

12   A.   Yes.

13   Q.   And in terms of applying for medical school, you had to

14   take the MCAT?

15   A.   Correct.

16   Q.   And can you discuss your effort studying for the MCAT?

17   A.   Yes.  So I took a Kaplan prep course to prepare for it,

18   and I also worked through practice questions for many hours to

19   prepare.

20   Q.   Can you give a sense of how many hours you would study

21   every day?

22   A.   I was still doing courses, so it was more limited since I

23   had other things I had to do, but I would guess maybe around

24   three hours a day, or something like that, if I could manage

25   it.

*BERGER - DIRECT*                                                    57

1    Q.   And when was it that you were planning to take the MCAT?

2    A.   So I wanted to take it near the end of my time at the

3    University of Cincinnati.  I can't remember --

4    Q.   Is that around 2009?

5    A.   I can't remember if it was 2009 or 2008 when I decided

6    to, but yes.

7    Q.   And ultimately did you take the MCAT?

8    A.   Yes.

9    Q.   And you took it September 2009?

10   A.   That sounds correct.

11   Q.   Prior to taking the MCAT in 2009, did you apply for

12   accommodations?

13   A.   Yes, I did.

14   Q.   And what was the -- and AAMC administers the MCAT?

15   A.   Yes.

16   Q.   And how did AAMC respond to your request for

17   accommodations in 2009?

18   A.   They denied the request for accommodations.

19   Q.   Did you ultimately take the MCAT in 2009?

20   A.   Yes.

21   Q.   And did you take it without accommodations?

22   A.   Yes.

23   Q.   Describe your study strategy when taking the MCAT in

24   2009.

25   A.   So I -- as I said, I did the prep course, and I did

*BERGER – DIRECT* 58

1    practice questions to try to be as ready as possible and

2    process the questions quickly.

3    Q.   Were you aware of other students similarly situated to

4    you who were also studying for the MCAT?

5    A.   Yes.

6    Q.   Can you compare your study efforts to your peer's study

7    efforts?

8    A.   Yes.  So to me it didn't seem like my study was out of

9    the ordinary because every time that I have to do schoolwork

10   and prepare, it always takes me a lot longer to complete

11   things.  So I'm used to spending many, many hours to finish

12   things, and preparing, and go through it.

13       And a lot of the other students told me that they thought

14   I was very intense because of the fact that I was studying so

15   much for it, but I knew that if I had a good chance at the

16   exam, it would allow me to go to medical school.  And it was

17   something that was very important, to optimize my performance

18   on it if I could, so I studied as much as I could within the

19   time constraints.

20   Q.   When you actually took the exam in September of 2009, can

21   you discuss your strategy while taking the exam?

22   A.   Yes.  So when I took the exam in 2009, it was without

23   accommodation, just -- I don't know if this is relevant, but

24   we had requested accommodation, and I had scheduled the exam

25   at the time that we requested the accommodation from AAMC.

1   And on their website, they basically said that they wanted you

2   to schedule an exam, and at least you would have an exam date

3   scheduled.

4       So we hadn't heard back from the AAMC.  They hadn't given

5   a decision one way or another.  And because I had the exam

6   scheduled, I viewed it as a practice test basically, again,

7   kind of like the PSAT, but this time I had been preparing

8   because I expected to have a decision about accommodation

9   back.

10      And so when I took the exam, I did as many strategies as

11  I could to go through it; but, again, it was difficult to

12  impossible for me to finish the sections within the time limit

13  given, and particularly the verbal section was difficult

14  because it had so much reading.  It basically has long

15  passages, and then it has like four or five questions about

16  those passages.

17      And I tried to go through as quickly as I could and mark

18  answers down so I wouldn't leave anything blank, but I wasn't

19  able to understand the questions very well because I was

20  rushing through and I wasn't able to really read the material

21  in the sections.  But it also affected me in the physical

22  sciences and biology sections as well, not just the verbal

23  section.  So I had basically marked answers, but they were

24  kind of random because I didn't understand what the questions

25  were asking.

1    Q.   Were you able to complete each section of the MCAT?

2    A.   I ran out of time, but I marked random questions so that

3    nothing would be left blank.

4    Q.   Do you feel that you were able to demonstrate your

5    knowledge and skill that you possessed when you were taking

6    the MCAT in September 2009?

7    A.   No.

8    Q.   And if you turn to Exhibit 5, please.  I'm sorry, 55,

9    please.

10        What is Exhibit 55?

11   A.   This looks like my school report from 2009 on the MCAT.

12   Q.   And does this report also reflect the various percentiles

13   of how you ranked on that exam?

14   A.   Yes.

15   Q.   And at the time that you took that verbal reasoning, that

16   was the one that you said had the most reading?

17   A.   Yes.

18   Q.   And your percentile rank was what?

19   A.   The percentile range was 27th to 37th percentile.

20   Q.   And your writing sample?

21   A.   11th to 35th percentile.

22   Q.   And the other percentiles on the other subject matters

23   were increased beyond the -- were better than the writing and

24   the verbal?

25   A.   Yes, that's correct.

*BERGER - DIRECT* 61

```
 1    Q.   Did you ultimately take the MCAT a second time?

 2    A.   Yes.

 3    Q.   And when did you take the MCAT a second time?

 4    A.   I believe it was in 2010.

 5    Q.   Was it October 2010?

 6    A.   That sounds right.

 7    Q.   So that was a year after Exhibit 55?

 8    A.   Yes.

 9    Q.   During that year, what did you do?

10    A.   So after the exam in 2009, I got the letter from AAMC

11    saying that they had denied the first accommodations request,

12    and that part of the reason for that was that they didn't

13    think there was enough supporting documentation.  I guess they

14    wanted further testing.

15         So I went back to the psychologist, and he did further

16    evaluation, and we submitted another request for accommodation

17    to the AAMC, and we waited for the response before I took the

18    MCAT a second time.

19    Q.   And did you also, in the interim, go see Dr. Beach the

20    first time in 2010?

21    A.   I believe so.  I think I saw her before I took the MCAT

22    the second time.

23    Q.   And it sounds like you had submitted a few requests to

24    the AAMC for accommodations?

25    A.   Yes.
```

1    Q.   And they were denied?

2    A.   Yes.

3    Q.   Did you ultimately take the MCAT a second time?

4    A.   Correct.

5    Q.   That was in October 2010?

6    A.   Yes.

7    Q.   Can you describe your study efforts prior to the October

8    2010 MCAT?

9    A.   Yes. So I went back to Kaplan again and actually did the

10    review course again, and I also did more study. I

11    specifically -- because I had run out of time and I had found

12    out that I was denied accommodation again after the second

13    request, I specifically was working on trying to get through

14    the questions as quickly as possible so that I could finish as

15    much of the exam as possible, and seeing if there were any

16    strategies I could come up with to optimize my score so that I

17    could end up successfully applying to U.S. medical schools.

18    Q.   It's a year difference, roughly, between the two exams,

19    the September 2009, October 2010 exam?

20    A.   Yes.

21    Q.   Did you take that entire year to study?

22    A.   Most of it.

23    Q.   And about how many hours a day would you work on studying

24    for the MCAT?

25    A.   I think it was -- this time it was more, because part of

*BERGER - DIRECT*                                                                   63

1     that year I wasn't doing classes, so I was able to spend some

2     more time.  I don't know.  Maybe three to five hours,

3     depending.

4     Q.   When you took the MCAT, can you describe what strategies

5     you utilized during the MCAT?

6     A.   Yes.  So particularly in the verbal section, because I

7     had not been able to understand what was written in that

8     section, my approach was to actually not read the passages at

9     all.  Basically, they have long multiple paragraph passages,

10    and then they have five questions, or something like that.

11         What I did is I didn't read the passages at all.  I just

12    read the questions.  And based on the sentence or two that was

13    in the question, then I would try to pick what I thought the

14    best answer was.

15         And so if it was a question about, you know, why did the

16    author use such and such a word in this part of the paragraph,

17    I had no idea how the author used it, but if I knew what the

18    word meant, then I could make an educated guess about how to

19    answer that question because I knew what the definition of

20    that word was.  And so I was able to answer questions like

21    that, but it was making my best guess and kind of randomly

22    guessing on ones that I didn't have any intuition about where

23    I should go because I didn't have access to what was in the

24    paragraphs, but that effectively gave me the extra time I

25    needed to actually read through the questions and answer them.

*BERGER - DIRECT*                                                 64

1    Q.   Did you discuss this strategy with Dr. Beach during her

2    various evaluations of you?

3    A.   It's possible.  I might have.

4    Q.   When you refer to guessing, is that what you're referring

5    to, what you just testified to?

6    A.   Yes.  That's what -- yep.

7    Q.   After you took the MCAT in October 2010, did you send an

8    email to Dr. Beach and indicate that you felt good about your

9    time management?

10   A.   So I believe so.  I know that I had discussed with her

11   sort of some of the strategies.  I think I had asked her if

12   she had any suggestions when she had worked with other

13   students about how to optimize my timing, so it's possible

14   that I would have said that, yeah.

15   Q.   Did you say you felt good about your time management

16   during the exam?

17   A.   I think that -- sure.  I don't remember specifically, but

18   I could see myself saying that, because if I was able to

19   institute my strategies optimally, then that was the best I

20   could do within the time constraints given, even though I was

21   still not able to access and answer the questions as I would

22   have been able to with extended time.

23   Q.   What did you mean by you felt good about time management?

24   A.   So to me that means that the strategy that I went into

25   the exam with, I was able to successfully implement that

*BERGER - DIRECT* 65

1    strategy.  So for me that was basically skipping the verbal

2    sections and just reading the questions and not reading the

3    paragraphs.

4    Q.   Could you turn to Exhibit 30.

5         Is this a copy of your score report for the 2010 MCAT?

6    A.   Yes.

7    Q.   And it reflects that you had improved in the area of

8    verbal reasoning?

9    A.   Yes.

10   Q.   Can you explain how you were able to improve that?

11   A.   So because I was able to actually take the time I needed

12   to read the questions, the sentences, and then the answer

13   choices, I was able to make an educated guess about what the

14   correct answer might be and show what my understanding was of

15   those questions, even though it was an incomplete version of

16   that section because I hadn't read the paragraphs.

17   Q.   Was this a different strategy that you employed from the

18   2009 MCAT?

19   A.   Yes.

20   Q.   Did you apply for medical school in -- well, first of

21   all, after the 2009 MCAT, did you apply to medical school?

22   A.   I only applied to medical school once, and I think it was

23   after this was finished.

24   Q.   All right.  And did you gain acceptance to medical

25   school?

1     A.   Not in the United States.

2     Q.   How about outside of the United States?

3     A.   So after the U.S. didn't work out, I ended up applying to

4     Caribbean schools, and I was accepted at the American

5     University of the Caribbean in St. Maarten.

6     Q.   In what year were you accepted?

7     A.   I started there in May of 2011.  So they do rolling

8     admissions, so I'm assuming it was shortly before that.

9     Q.   And when did did you start at AUC?

10    A.   May of 2011.

11    Q.   What is the expected graduation at AUC?

12    A.   So medical school is four years, so four years from May

13    2011 would be May of 2015.

14          THE COURT:  Mr. Weiner, excuse me.  Are you at a

15    section where maybe we can take a short break and then

16    continue on?

17          MR. WEINER:  Yes.  Sure, Your Honor.  I'm at a good

18    place.

19          THE COURT:  Great.  Let's take a ten-minute break.

20          (Brief recess.)

21    BY MR. WEINER:

22    Q.   Mr. Berger, can you talk about the program at AUC, where

23    your didactics take place, where your clinicals take place?

24    A.   Yes.  So as I said before, medical school is four years,

25    and you do two years of book work and then two years of

*BERGER - DIRECT*                                    67

 1    clinical rotations in the hospital.

 2        So at AUC, the book work is done on the island of

 3    St. Maarten in the Caribbean, and then you come back to U.S.

 4    hospitals to do rotations for two years.

 5    Q.   And did you do your rotations at U.S. hospitals?

 6    A.   Yes, in New York City.

 7    Q.   When you went to AUC, did you request accommodations?

 8    A.   Yes.

 9    Q.   And then can you discuss the process of doing that?

10    A.   So basically, it included just giving your documentation

11    to a member of staff who was in charge of reviewing the

12    accommodations request.

13    Q.   And were you approved for accommodations?

14    A.   Yes.

15    Q.   What accommodations were you approved for?

16    A.   They provided me with 50 percent extra time, but I did

17    ask for a hundred percent extra time since the accommodation

18    of 100 percent extra time had been given in the past.  But she

19    told me that she only was able to approve 50 percent extra

20    time because that's all that they provided to their students.

21    Q.   What accommodations did you utilize during your time at

22    AUC?

23    A.   I used the extra time accommodation.

24    Q.   All right.  My understanding is medical school has an

25    awful lot of reading?

*BERGER - DIRECT*      68

1    A.    Yes.

2    Q.    How did you manage the reading?

3    A.    I used text to speech, and different assistive

4    technologies like that to get through reading.

5    Q.    And while you were in medical school, did you have any

6    evaluations conducted?

7    A.    Yes.

8    Q.    And who conducted that evaluation?

9    A.    I had an evaluation performed by Dr. Beach, and I believe

10    it was in 2013, maybe 2012, in anticipation of submitting a

11    request on the USMLE Step 1 exam for accommodation.

12    Q.    When you took exams in medical school, can you describe

13    the exams, the construct of those exams?

14    A.    They were computer-based exams that were multiple choice.

15    And basically the different teachers would make the exams, and

16    then we would be given that. And then for the final exams,

17    sometimes they would have an in-house exam they would use, but

18    sometimes they would have shelf exams that they would use.

19    Q.    What's a shelf exam?

20    A.    A shelf exam is an exam -- I believe that they're all

21    made by the NBME, and they're exams that are given to medical

22    students sort of to, I guess, check their knowledge base after

23    they've completed a certain topic.

24    Q.    The exams in medical school, about how long would they

25    be?

*BERGER - DIRECT* 69

1   A.   So the final exams were longer, but most of the regular

2   exams under standard administration were maybe an hour, an

3   hour and a half.  I can't remember exactly, but the final

4   exams would have been longer.

5   Q.   All right.  About how long would they be on the standard?

6   A.   I'm guessing maybe two to two and a half hours maximum.

7   Q.   And how about the shelf exams, what's the standard amount

8   of time for the shelf exams?

9   A.   So at that time, I think the shelf exams were maybe

10  around that length, I can't remember, but later --

11  Q.   What's "that length"?

12  A.   I'm assuming two and a half exams -- or hours.

13  Q.   And the accommodations you had, they apply to your

14  medical school exams?

15  A.   Correct.

16  Q.   And so you had time and a half?

17  A.   Yes.

18  Q.   And the shelf exams, which you described were NBME-type

19  exams?

20  A.   Yes.

21  Q.   Did you have extended time on those?

22  A.   Yes.  My school gave me extra time on that.

23  Q.   And where were they administered?

24  A.   So they were computer-based tests, and they were

25  administered at my school.

*BERGER - DIRECT*

1   Q.   What has been the impact of your disability?

2   A.   Well, it's been something that, you know, it's affected

3   my whole life, from early childhood to today.  It's something

4   that, you know, for a long time I actually wasn't sure if I

5   wanted to go into medicine because I was concerned that the

6   reading, and all of that required information sort of

7   processing was going to be too much for me to complete given

8   the time constraints.  But because I had text to speech and

9   audio stuff, I've been able to get through as much of that as

10  I could within the time constraints, so that has helped.

11       But you know, in daily life, when I am doing regular

12  activities, like even going to the doctor and they give me

13  forms to read and all of that, it's an issue because I can't

14  read them quickly enough, so I always request to have like an

15  advanced copy if I can review it beforehand.  I have to allow

16  myself extra time to complete even what seems like routine

17  tasks for most people.

18  Q.   Do you read for pleasure?

19  A.   No.

20  Q.   Why?

21  A.   It's extremely grueling.  So I'm not -- number one, my

22  comprehension when I read is a very, very hard one, so it's

23  something where I -- when I'm processing, I am never sure if

24  I'm reading the information correctly off the page.  So

25  sometimes I'll read something, and I think I read it

1    correctly, but actually what my brain is telling me I read is

2    wrong, and so when I'm going through a book or any written

3    material, I never know if I'm actually able to access what is

4    actually written on the page.  Is it because I misread

5    something and there are typos?  Or is it because the author

6    miswrote something, or is it because I misread it?  And

7    because of that, and the intense focus demands to sustained

8    reading, it's not something I can enjoy, because it's

9    basically like -- I mean, I guess there's some people that run

10   miles and they really enjoy that vigorous activity, but for me

11   that's what it feels like, and it's something that's constant

12   attention, constant focus, and it's extremely draining.  And

13   so instead, if I want to enjoy a book, I always will listen to

14   audio books instead.

15   Q.   And is that your method, or your alternative method, of

16   enjoying novels?

17   A.   Yes.  I enjoy audio books, and I actually get through

18   quite a few books a year that way.

19   Q.   You've also mentioned that you have Attention Deficit

20   Hyperactivity Disorder, or ADHD?

21   A.   Yes.

22   Q.   Can you explain what that is?

23   A.   So when you have ADHD, it is something where you have

24   difficulty with concentration and holding your focus.  So if

25   you are trying to shift your focus, it can be a difficulty.

*BERGER - DIRECT*                                                72

1    And also if you're trying to hold your focus, it can be a

2    difficulty, and so that can affect any activity that I'm

3    doing.  I don't always notice when I lose my focus, I'll just

4    afterwards, I'll be lost, and then I'll realize that my focus

5    had gone and then I have to kind of recenter.

6         I have tried to optimize my focus shifting ability by

7    doing meditation.  I started that as a teenager, and it's

8    something that has helped somewhat for me to at least notice

9    when my attention has wandered and then I can bring it back.

10   But any activity I'm doing, if I lose my focus, it can be an

11   issue.

12   Q.  At some point in time, did you have to take a medical

13   licensing exam?

14   A.  Yes.

15   Q.  Can you first discuss what is the requirements with

16   respect to medical licensure?

17   A.  Sure.  So medical school is usually four years.  You have

18   two years of book work, then you have the USMLE Step 1 exam

19   that you pass.  And then most schools, after you pass the

20   Step 1 exam, then you start that second half of your

21   curriculum where you have two years in the hospitals.

22        And during those two years in the hospitals, you take the

23   Step 2 CS exam and the Step 2 CK exam.  And as far as my

24   school is concerned, and most schools, you're required to pass

25   all three of those exams; the Step 1, the Step 2 CS, and the

1   Step 3 in order to graduate.

2   Q.   And the Step 2 CK as well?

3   A.   I'm sorry, yeah, CK.  Step 3 is done after residency,

4   usually, after you start residency.

5   Q.   You don't need to pass the Step 3 in order to graduate?

6   A.   That's correct.

7   Q.   But you would need to pass that in order to obtain

8   licensure as a medical doctor?

9   A.   Yes, that's correct.

10  Q.   So at the end of your second year, did you plan on taking

11  the USMLE Step 1?

12  A.   Yes.

13  Q.   Did you plan on requesting accommodations?

14  A.   Yes.

15  Q.   First, in terms of your study efforts for the Step 1, can

16  you describe that?

17  A.   Yes.  So most students spend a month or more preparing

18  for this exam because it's extremely demanding.  At my school,

19  it is traditional, and most students take one leave of

20  absence, which is about three months, three or four months, to

21  prepare for the exam.

22       I applied for accommodation on the Step 1 exam, and due

23  to the time that I was waiting for the response about the

24  accommodation, I ended up actually taking two leaves of

25  absence during that time.  And during that entire two leaves

1      of absence time, I prepared for the exam, and I studied all

2      day, every day, you know, as many hours as I could.  It was --

3      my only job was to prepare for this exam, and so it was

4      basically six months of endless studying, yeah.

5      Q.   And you mentioned you applied for accommodations to the

6      NBME?

7      A.   Yes.

8      Q.   Prior to applying, did you review any material regarding

9      instructions about applying for accommodations with the NBME?

10     A.   I think that they have some -- maybe there's some

11     information posted on their website about how the process

12     works.  I don't particularly remember.

13     Q.   At the time, did you review that information?

14     A.   Sure.

15     Q.   And if you turn to Exhibit 56, and you could just kind of

16     bend to it quickly.  I don't have many questions about that.

17     A.   This looks similar to what I would have reviewed at the

18     time.

19     Q.   Did you make your best effort to comply with that request

20     when applying for accommodations?

21     A.   Yes.

22     Q.   Can you describe the application process for applying for

23     accommodations?

24     A.   So when you make an application, one of the things that's

25     asked for is a current assessment of your functioning to see

1    what your disability is, as well as documentation about

2    accommodations you've had in the past, at school, in your

3    life, and on different testing that you've had, different

4    tests you've taken, like the MCAT, or GRE, et cetera.

5    Q.   In Exhibits 12 through 36, are these a copy of the

6    documents that you furnished to the NBME in connection with

7    your request for accommodations?

8         THE COURT:  For the record, do you want to identify

9    what each of those are, please?

10        THE WITNESS:  Okay.

11        MR. WEINER:  Yes.  Exhibits 12 through 36 are the

12   documents that Mr. Berger submitted to the NBME in regard to

13   his 2013 request for accommodations on the USMLE Step 1.

14   Q.   Exhibit 12, can you explain what that is?

15   A.   Yes.  This is a letter that I wrote where I explain what

16   my disability is, what my history is with that disability, and

17   how it has affected my life.

18   Q.   And if you would, can you look down to the fourth

19   paragraph on PX223 of Exhibit 12.  It begins "in the first

20   grade."  Can you read that out loud, please?

21   A.   Okay.  "In the first grade, I was already having

22   difficulty with reading and writing.  I made little progress

23   with the whole language approach that was used at my school,

24   and I was often unable to finish written assignments in the

25   amount of class time our teacher had allotted."

*BERGER - DIRECT*                                                76

1    Q.   Is this describing what you had testified to earlier?

2    A.   Yes.  I'm sorry.  Would you like me to continue?

3    Q.   No, that's fine.  Your letter and cover letter is dated

4    October 3, 2013?

5    A.   Yes.

6    Q.   Is this the approximate time that you were putting

7    together your application?

8    A.   Yes.

9    Q.   In papers filed that NBME has filed with this court, it's

10   represented that they received your request on October 14,

11   2013.  Does that comply with when you had submitted your

12   documentation?

13   A.   That sounds correct.

14   Q.   Did you also attempt, in Exhibit 12, to describe your

15   compensatory strategies to the NBME?

16   A.   Yes, I believe so.

17   Q.   Can you review and indicate where you describe your

18   compensatory strategies?

19   A.   I think it's probably on the second page.

20   Q.   That's PX 224?

21   A.   Yes.

22   Q.   And what is it that you are attempting to convey?

23   A.   So I talked about the fact that one of the things that I

24   mentioned here is when I was like at mass, I can't read the

25   prayers along with the other members of the congregation, so

1    I've had to memorize the responses.  And there's a thing

2    that's done where everyone is supposed to read as the crowd,

3    and I can't read that with them, so I don't say anything at

4    all for that portion.

5        And then I also talk about when I was working in a

6    research lab, basically they would have me -- they would give

7    me documentation to review to learn different approaches for

8    like basic science techniques, like bench work, basically it

9    would be like a lab technique, and it would be a sequence of

10   different things you'd have to do.

11       When I was given that type of information, and I wasn't

12   given text to speech and I had to just read it, I wasn't able

13   to read through that information quickly enough to actually

14   prepare adequately to do whatever it was.  So what would

15   happen is the person at the lab would usually go through the

16   process with me, and they would basically teach you once,

17   expecting that you would have already read the material and

18   understood.

19       And so what I had to do was basically memorize everything

20   that they did as they did it so that then later on I could do

21   it myself, but I didn't have the benefit of the written

22   materials that they had provided beforehand.

23   Q.   Exhibit 13, is this like an index of all the

24   documentation you provided to the NBME in connection with your

25   request for accommodations on the Step 1?

*BERGER - DIRECT*                                                           78

 1    A.   Yes, that is correct.

 2    Q.   And did you provide this index as well?

 3    A.   I believe so, yes.

 4    Q.   Exhibit 14, is this a copy of the application that the

 5    NBME requires that you complete?

 6    A.   Yes.  This is the request for test accommodations form.

 7    Q.   And if you would turn to Exhibit -- same Exhibit 14, to

 8    page 230, PX230.

 9    A.   Okay.

10    Q.   Do you indicate what accommodations you're requesting?

11    A.   Yes.

12    Q.   And what accommodations did you request?

13    A.   So I requested 50 percent additional time over two days

14    for the exam, and additional break time for over two days, as

15    well as a test reader or a recorded version of the exam, in a

16    distraction-limited environment.

17    Q.   If you would turn to PX231 of Exhibit 14, is this where

18    you identify your impairments?

19    A.   Yes.

20    Q.   And the impairments you identified are what?

21    A.   Issues with reading, writing, and ADHD.

22    Q.   And on PX232 and 233, do you discuss your accommodations

23    history on these pages?

24    A.   Yes.  This contains a summary of that.

25    Q.   And Exhibit 15, can you describe what Exhibit 15 is?

*BERGER - DIRECT*                                              79

1    A.   This is the certification of prior test accommodations.

2    It's a form that my school was required to fill out to show

3    the NBME what accommodations I had during my time as a medical

4    student.

5    Q.   And what accommodations did they document you received in

6    medical school?

7    A.   Fifty percent extended time in a distraction-limited test

8    setting.

9    Q.   Exhibit 16, can you explain what that is?

10   A.   This is a copy of a report by Mrs. Collins, and I believe

11   it was performed in 1992.

12   Q.   And how old were you at that time?

13   A.   According to this, I was six years old.

14   Q.   You were in kindergarten?

15   A.   I would guess so, maybe.  I'm not sure.  I would think

16   so.

17   Q.   And Exhibit 17, this is an evaluation from Dr. Artner?

18   A.   Yes.

19   Q.   And that was an evaluation that was conducted in second

20   grade?

21   A.   I believe so.  I think I was 8-years-old.

22   Q.   Okay.  Exhibit 18, is this something you provided to the

23   NBME?

24   A.   Yes.

25   Q.   Why did you provide this?

1    A.   So this is the Stanford Achievement Test.  And it shows

2    that I have very low scores in certain areas of the test, and

3    then high scores in other areas of the test.  Particularly the

4    thing that I remember talking to Dr. Beach about before we

5    submitted this is the fact that my spelling scores were

6    extremely low, and my listening and comprehension scores were

7    very high.

8    Q.   And on Exhibit 18, when was this standardized test

9    performed?

10   A.   I'm -- so it says here, this was in 1994 -- wait.  I

11   don't know.  This is grade two.  Second grade.

12   Q.   What is Exhibit 19?

13   A.   So this is the Stanford Achievement Test from the

14   following year, because I took it each year for three years in

15   a row.  And this is for grade three.

16   Q.   And Exhibit 20?

17   A.   This was the next year during grade four, same exam, type

18   of exam.

19   Q.   And Exhibit 21?

20   A.   This is a score report from the Iowa Tests.  I think I

21   took this in sixth grade, I think.

22   Q.   And Exhibit 22, and I believe we have seen this document

23   before, this is the accommodations you received at St.

24   Gabriel's?

25   A.   Yes.  This is a letter from my fifth grade teacher at St.

*BERGER – DIRECT*      81

1    Gabriel's, yes.

2    Q.  That was provided to the NBME?

3    A.  Yes.

4    Q.  Exhibit 23, what is this?

5    A.  This is an evaluation report from Dr. Smith for the

6    evaluation he performed in 2003.

7    Q.  And you were in eleventh grade at that time?

8    A.  Yes, I believe so.

9    Q.  Exhibit 24, this is a copy of your accommodations from

10   The College Board?

11   A.  Yes.

12   Q.  And Exhibit 25, which we looked at before, that's your

13   score report for the January 2004 College Board exam?

14   A.  Yes.

15   Q.  And you provided that to the NBME?

16   A.  Yes.

17   Q.  And Exhibit 26, is this the documentation of your

18   accommodations while you were in high school?

19   A.  Yes.

20   Q.  And that was provided to the NBME?

21   A.  Yes.

22   Q.  Exhibit 27, this is a copy of the accommodations you

23   received from the University of Cincinnati?

24   A.  Yes.

25   Q.  And you provided a copy of this to the NBME?

*BERGER - DIRECT*                                                    82

1    A.   Yes.

2    Q.   And Exhibit 28 is your University of Cincinnati

3    transcript?

4    A.   Yes.

5    Q.   And is that something that's requested by the NBME in

6    request for applications for accommodations?

7    A.   I believe so, yes.

8    Q.   And Exhibit 29, what is this?

9    A.   So this is another report by Dr. Smith from 2008.

10   Q.   All right.  And you provided a copy of that to the NBME?

11   A.   Yes.

12   Q.   Exhibit 30 is your score report for the 2010 MCAT?

13   A.   Yes.

14   Q.   And you provided that to the NBME?

15   A.   I believe so.  I don't remember if it was 2009 or 2010,

16   but I know there was an MCAT score report, yes.

17   Q.   Exhibit 31, is this a copy of the denial letter that you

18   received from the MCAT?

19   A.   Yes, it looks like it.

20   Q.   And you provided a copy of that to the NBME?

21   A.   Yes.

22   Q.   And Exhibit 32, what is this?

23   A.   So this is a report from Dr. Smith that he prepared in

24   2010.  After we had gotten the initial denial from the MCAT

25   asking for further evaluation and testing, he did further

*BERGER - DIRECT* 83

1    testing and then wrote up this addendum report.

2    Q.   Right.  How many times were you evaluated by Dr. Smith?

3    A.   I think it was three times.

4    Q.   Okay.  And Exhibit 33, what is Exhibit 33?

5    A.   So this is a letter that my mother wrote, and we included

6    with our application, explaining the accommodations that I

7    have had during my home schooling years.

8    Q.   And she was the person who provided your home school

9    education?

10   A.   Yes.

11   Q.   And you provided that to the NBME?

12   A.   Yes.

13   Q.   And Exhibit 34, what is this?

14   A.   So this is a report from Dr. Beach that she wrote in

15   2010.

16   Q.   And 2010, is that the first time that you saw Dr. Beach?

17   A.   I believe so, yes.

18   Q.   Why did you go to Dr. Beach?

19   A.   So when we submitted the report from Dr. Smith to the

20   MCAT the first time when they came back with their denial,

21   they said that they wanted further testing and they needed

22   basically more data, and in the meantime, it was denied.  So

23   he wrote up the addendum.  We submitted that to the MCAT and

24   they denied that again.  And when that happened, I went to the

25   Disability Services Office --

*BERGER – DIRECT*

1   Q.  Where?

2   A.  -- at the University of Cincinnati, and I explained the

3   situation to them.  And I said, you know, I've submitted two

4   reports for accommodation, the, you know, psychologist, you

5   know, he's provided everything that he thinks he needs to

6   provide to them, so all I can imagine is that, you know, he

7   doesn't know where to go from here.  Do you have anybody you

8   can recommend that is more familiar with this kind of testing

9   and could do a more comprehensive evaluation, so we can give

10   them all the information that they need to help them make a

11   decision and show them that I do fulfill the criteria.  And

12   they recommended Dr. Beach.

13   Q.  And the exhibits, we just went through those, are all the

14   documents that you submitted to the NBME in connection with

15   your request for accommodations on the USMLE Step 1?

16   A.  I don't remember.  Was Dr. Beach's 2013 report listed in

17   here as well?  I don't remember if we covered that or not, but

18   that was also included.

19   Q.  So let me address that.  I believe that's Exhibit 6.

20   A.  Yes.  This was the 2013 report that was included as well.

21   Q.  And is that a second evaluation that you went to with

22   Dr. Beach?

23   A.  That was the second time that I went to her, yes, that's

24   correct.

25   Q.  And you submitted Exhibit 6 to the NBME in connection

*BERGER – DIRECT*

```
 1    with your USMLE Step 1 request for accommodations?

 2    A.   Yes.

 3    Q.   How did the NBME respond to your request for

 4    accommodations?

 5    A.   I received a letter stating that they denied

 6    accommodation.

 7    Q.   And if you turn to Exhibit 37.

 8         Is Exhibit 37 a copy of the denial letter you received?

 9    A.   Yes.

10    Q.   Did you agree with the denial?

11    A.   No.

12    Q.   Can you explain why you don't agree with it?

13    A.   So I felt that we had submitted so much documentation.

14    All of the evaluators that I had worked with had felt that I

15    needed accommodation; and, you know, if it hadn't been for

16    those recommendations by them, I wouldn't have had

17    accommodation in the school system, et cetera.  And I was

18    frankly very confused when I received this letter from the

19    NBME stating that they were denying, because I couldn't

20    possibly think of more documentation that we would have

21    provided that would have helped them make a decision in

22    regards to this matter.

23    Q.   The date of the letter is December 23, 2013.  Does that

24    comport with your recollection as to when you received it?

25    A.   Yes.
```

1    Q.   Based on NBME's acknowledgement that they received your

2    documentation on October 14th, and the date of this denial, is

3    that roughly 70 days it took them to make this denial?

4    A.   That sounds correct.

5    Q.   Did you appeal this denial to the NBME?

6    A.   I didn't, because after this denial came through, my

7    scheduling permit was issued for me to take the Step 1 exam

8    without accommodation.  And if you take the step exam and you

9    pass the step exam, you're not allowed to take the step exam

10   again.  If you pass it, you can never take it again, is my

11   understanding.

12        And so basically, after I took the exam and I passed with

13   a very low score, there was no way for me to appeal it because

14   I had passed the exam and I wouldn't be allowed to take the

15   exam again.

16   Q.   So I take it you did take this Step 1 without

17   accommodations?

18   A.   Yes.

19   Q.   Can you describe your study strategy?

20   A.   Yes.  So when I was preparing for Step 1, that's when I

21   took two years of absence, and I was preparing all day long,

22   every day, maybe 12 hours a day, something like that, if I

23   could.  Obviously, I had to take breaks because it's hard for

24   me to stay focused that long, but yeah.

25   Q.   How would you describe your knowledge base and

*BERGER - DIRECT*                                                    87

1    preparedness for your Step 1 exam?

2    A.   I felt extremely prepared.

3    Q.   Can you describe your strategy when you actually took the

4    USMLE Step 1?

5    A.   Yes.  So when I took the Step 1 exam under standard

6    conditions, I knew that time management was going to be very

7    important because I knew that with my reading speed and my

8    ability to process the information, there's no way I was going

9    to be able to read everything and comprehend and answer the

10   questions.

11       So my strategy was to basically speed through as quickly

12   as I could, and I actually would read the last sentence.  So

13   the way that the questions are made, they have multiple

14   sentences, and then the last sentence or two has the question.

15   So it'll say, you know, what is the diagnosis, or something

16   like that, and then their answer choices below that.

17       But in order to understand what the diagnosis is, you

18   have the paragraph above that you're supposed to read.  So

19   what I would do is I would read that last sentence.  And then

20   sometimes you can actually answer the question based on just

21   that one sentence or a sentence before it, there was only one

22   or two sentences, and so if I could answer the question that

23   way, I would.

24       And then on the other ones, I would try to go through as

25   quickly as I could looking for key words because I knew I

1    wouldn't have a chance to read the actual full questions.  And

2    I rushed through, and I basically was running out of time in

3    every section.  And in order to not leave anything blank, I

4    marked answer choices so that I would have everything answered

5    and I wouldn't leave anything blank.

6    Q.   Can you describe the construct of the USMLE Step 1?

7    A.   So the questions are -- I guess you would describe them

8    as clinical vignettes.  So they'll describe a patient, or a

9    certain scenario, or a disease process, or something like

10   that, and then you're supposed to read that and then

11   understand what's going on with that patient.  And then on

12   Step 1, the questions will be about, you know, how does that

13   disease work, or, you know, what is the name of this disease,

14   or things like that.

15   Q.   How long of an exam is it?

16   A.   It is divided into hour long blocks, and there are, I

17   think, seven blocks, and then you have, I think it's one block

18   of break time.  So it's basically eight hours of -- the test

19   day is about eight hours long for a standard administration.

20   Q.   Have you ever taken an exam this long?

21   A.   Not as part of my schooling, no.

22   Q.   What kind of challenges did it present to you in terms of

23   your impairments?

24   A.   It was extremely tiring and grueling, and I felt that I

25   had no comprehension of what was on the exam.  I remember

1    walking out of the exam at the end and having no idea what had

2    just happened.  I couldn't remember a single sort of, you

3    know, and specific, you know, question, or whatever.  It was

4    just something that I felt extremely drained, and I remember

5    telling a student friend of mine that I felt like, you know,

6    my brain had been sucked by aliens, or something like that.

7    Basically, I just felt like I had no focus left and I was

8    completely exhausted.

9    Q.   Did you ultimately get your score for the exam?

10   A.   Yes.  Eventually, the score report came back.

11   Q.   And what happened?

12   A.   I received a passing score, but it was a very low passing

13   score that was actually within error bars of failing.

14   Q.   If you turn to Exhibit 38, can you explain what this is?

15   A.   This looks like my score report from Step 1.

16   Q.   And it reflects that you passed?

17   A.   Yes.

18   Q.   What was your score?

19   A.   198.

20   Q.   Is that a raw score or scaled score?

21   A.   I think it's scaled.

22   Q.   And what was the passing score?

23   A.   At the time, it was set to 198.  I believe it's been

24   increased since then.

25   Q.   I'm sorry, your score was a 198.  What was the passing

*BERGER - DIRECT*

1    score?

2    A.   Oh, I'm sorry.  The passing score at the time was 192.

3    I'm sorry.

4    Q.   And 192 is also a scaled score?

5    A.   I believe so.

6    Q.   After the Step 1 exam occurred, at some point in time,

7    did you have to take the Step 2 CK exam?

8    A.   Yes.

9    Q.   And when did you plan on taking that?

10   A.   So students normally take the Step 2 CK exam during their

11   clinical rotation years, near the end of their third year or

12   beginning of their fourth year, so that they'll be able to

13   apply for residency, and they don't have to have a year off

14   after they finish their medical curriculum, they can just go

15   straight into residency.

16   Q.   Did you do that?

17   A.   So I applied for accommodation in 2015 while I was doing

18   rotations, and I received a denial letter from the NBME

19   stating they had denied my request for accommodation on the

20   Step 2 exams.  And I was still doing rotations, so I knew that

21   I was going to have to have a dedicated study time for this

22   exam.  And I continued rotations, and then I had dedicated

23   study time after.

24   Q.   And what was taking place with respect to your status as

25   a student at AUC?

*BERGER - DIRECT*

1    A.   So when you finish rotations, and you don't have any

2    rotations left, my school's policy is that they will give you

3    three leaves of absence in a row, and if you don't take the

4    step exam within that time period, it's grounds for dismissal.

5        And so I prepared to try to take the exam, but I was on

6    those leaves of absence, and basically I requested for my

7    school to allow me to take it.   At that time, I was also

8    taking a comp exam as part of my school's curriculum, and that

9    was a very long exam as well.   It's actually the longest exam

10   that my school gives is that exam.   And with the extended

11   time, I believe it was six hours straight, or something like

12   that that I had to sit for that exam.   I can't remember.

13       And so the long duration of that exam and the grueling

14   nature of that exam made it very difficult for me to get the

15   score that my school wanted.   And so my school didn't want me

16   to take the Step 2 CK exam until I had passed the comp.

17   Eventually, they allowed me to go ahead and take the CK exam,

18   because they said that if I didn't take the CX exam, they

19   would be dismissing me, and it would be because I had not

20   provided a passing Step 2 CK score within three leaves of

21   absence.

22   Q.   The construct of the Step 2 CK, does it differ from the

23   Step 1?

24   A.   The questions are different.   There's more clinical

25   information that's more related to what you experience in the

*BERGER - DIRECT*                                                     92

 1    hospital in the real world as a physician.  And they also have

 2    lab values, and things like that that, you have to integrate

 3    together.  Also, the focus is less on just diagnosis or

 4    pathophysiology, like how do these process works, that's more

 5    Step 1.

 6         Step 2 is more about management and what the best next

 7    step is, things like that, or managing a patient, or something

 8    like that.

 9    Q.   And how many blocks are in the Step 2?

10    A.   So the Step 2 CK exam is a longer exam than Step 1.  I

11    believe it's eight blocks of questions and I think one hour of

12    break time total, so it's nine hours total, the testing day.

13    Q.   And did you apply for accommodations for the USMLE Step 2

14    CK?

15    A.   Yes.

16    Q.   Can you go to Exhibit 39, please.

17         Is this a blank copy of the application?

18    A.   Yes.

19    Q.   Did you submit a completed copy?

20    A.   Yes.  It looks like the same type of application that we

21    did the previous year for this form.

22    Q.   All right.

23    A.   Yeah.

24    Q.   And what accommodation were you requesting on the Step 2

25    CK the first time?

1    A.   I believe that the accommodations we requested were

2    similar to our Step 1 request, and it included 50 percent

3    extended time and multiple day testing, a quiet testing

4    environment, I think also an audio version of the exam, et

5    cetera.

6    Q.   Exhibit 40, can you explain what this is?

7    A.   So this is a copy of the cover letter that I wrote, that

8    I submitted along with my application, where I explained about

9    how my disability affects me.  And I tried to give some

10   updated information to the NBME since there had been some time

11   that had passed since their first denial.

12   Q.   And this is a copy of your cover letter that you sent in

13   connection with your application for the Step 2 CK?

14   A.   Yes.

15   Q.   Exhibit 41, is this a document you submitted in

16   connection with your application for the request for

17   accommodations on the USMLE Step 2 CK?

18   A.   Yes.  This is a letter from my school verifying that I

19   continue to be given accommodation while at AUC, up through

20   the time that I was applying for accommodation in 2015, yes.

21   Q.   And what accommodation was AUC providing?

22   A.   Extended time and distraction-limited environment.

23   Q.   Okay.  Exhibit 42, did you provide Exhibit 42 to the NBME

24   in connection with your request for accommodations on the

25   USMLE Step 2 CK?

*BERGER - DIRECT*

1    A.   Yes.  This is a summary sheet, it's called.  My school

2    issues these periodically, where it shows different rotations

3    you're scheduled for, as well as your scores on those, et

4    cetera.

5    Q.   All right.  There's a section there that says "Core Test

6    Scheduling Results."  What does that refer to?

7    A.   Where is that?

8    Q.   That's in the middle of the page.

9    A.   Okay.  So the core rotations are basically your third

10   year rotations that you do.  And when you are at the end of

11   each of those rotations, you have a shelf exam that you have

12   to take to pass.  There's evaluations that are given by your

13   preceptors, who are the people you worked with in the

14   hospital, about your performance working with patients and

15   your knowledge base, et cetera.  And then there's also a

16   component that's based on the scores on the standardized

17   tests, and those things are put together to be the score you

18   get on that rotation.

19   Q.   And the shelf exams that you referred to, are those the

20   NBME-type exams?

21   A.   Yes.

22   Q.   And you had accommodations on those exams?

23   A.   Yes.  Those are given in Prometric centers, and my school

24   was able to have accommodation for me on those.

25   Q.   Did you pass all your shelf exams?

*BERGER - DIRECT*

1    A.  Yes.

2    Q.  And is that reflected on Exhibit 42?

3    A.  Yes.  I mean, this is an incomplete summary sheet, but I

4    did pass them all, yes.

5    Q.  All right.  Subsequent to submitting this summary sheet,

6    you took more shelf exams?

7    A.  Yes.

8    Q.  How many shelf exams did you take in total?

9    A.  So I believe there are six core rotations, and there's a

10   shelf exam at the end of each of the core rotations, so six.

11   Q.  And on those six shelf exams, you received 50 percent

12   extended time?

13   A.  Correct.

14   Q.  Did you pass all those exams?

15   A.  Yes.

16   Q.  And how long are those shelf exams under standard

17   administration?

18   A.  I believe maybe in the area of two hours.  I'm not

19   certain exactly.

20   Q.  So they're quite smaller than the Step 2 CK?

21   A.  Yes.

22   Q.  That's all the documentation that we went through that

23   you submitted to the USMLE -- to the NBME for the USMLE

24   Step 2 CK exam in 2015?

25   A.  So all of these documents, but I believe there was also a

BERGER - DIRECT                                                96

1    report from Dr. Beach from 2015 as well.

2    Q.    And Dr. Farmer had indicated in her exhibits with her

3    declaration that your application, the first application for

4    USMLE Step 2 CK, was received on April 3rd, 2015.  Does that

5    comport with your recollection?

6    A.    Sounds correct.

7    Q.    Did the NBME respond to your request for accommodations?

8    A.    Yes.

9    Q.    And what was their response?

10   A.    Another denial.

11   Q.    Exhibit 43.  Is this a copy of the denial letter?

12   A.    Yes.

13   Q.    The letter is dated July 24, 2015.  Does that comport

14   with your recollection as to when you received it?

15   A.    Yes.

16   Q.    That would suggest that the NBME took over 110 days to

17   respond to your request.  Is that your recollection?

18   A.    That sounds correct.

19   Q.    Did you ultimately take the USMLE Step 2?

20   A.    Yes.

21   Q.    I'm sorry, the USMLE Step 2 CK?

22   A.    Yes.

23   Q.    When did you take that?

24   A.    I believe it was in 2017.

25   Q.    So roughly two years after you had submitted your

*BERGER - DIRECT*

1    application for accommodations?

2    A.   Yes.

3    Q.   During that two-year period, did you study for the Step 2

4    CK?

5    A.   Yes.  I finished my rotations in, I think it was in

6    April of 2016, and so at that point, I was finished with all

7    of my course work, and I had time to study just for the step

8    exams, so I studied for Step 2 CS and Step 2 CK.

9    Q.   About how many hours were you spending studying for the

10   Step 2 CK during those two years?

11   A.   Many, many hours.  It was similar to my preparation for

12   Step 1, where I would spend as many hours in a day as I could,

13   and it was my main focus.

14   Q.   Can you describe your preparedness and knowledge base for

15   the Step 2 CK prior to taking it?

16   A.   I felt prepared.

17   Q.   Did you ultimately take the exam?

18   A.   Yes.

19   Q.   What strategy did you utilize when taking the exam?

20   A.   So the first time I took the Step 2 CK exam I tried to do

21   a similar strategy as what I did during Step 1.  Even though

22   it was very difficult, and I still had areas of study when I

23   couldn't finish, I had achieved a passing score and so, you

24   know, if I was able to do something similar on a Step 2 CK,

25   then maybe I could get a passing score as well.

*BERGER - DIRECT*

1       So I was rushing through and, you know, trying to look

2  for key words, and basically marking things randomly so I

3  didn't leave anything blank on the exam when I was running out

4  of time at the end, and that was -- that happened every single

5  block, where I was basically running out of time and had

6  marked things randomly, and that was the approach that I used.

7  Q.  Do you have an estimate of about how many questions on --

8  in terms of a percentage basis, how many questions you were

9  able to get through?

10 A.  I mean, it's difficult to say because I -- I was rushing

11 so fast that I was basically trying to answer questions

12 without reading them.  So I know that I had, you know, the

13 different questions, I had clicked through them, but as far as

14 questions that I actually understood and answered with

15 comprehension, very minimal, you know, maybe 10 to 20 percent

16 that I felt that I'd really understood what they were asking.

17 Q.  And in terms of questions that you answered completely?

18 A.  I answered all of the questions.  I didn't leave anything

19 blank.

20 Q.  So you're allowed to guess?

21 A.  I just would guess randomly, yes.

22 Q.  Do you feel that you were able to demonstrate your skill

23 and knowledge on the USMLE Step 2 CK exam that you took in

24 April 2017?

25 A.  No.

1    Q.   Exhibit 44, can you state what this is?

2    A.   This is my score report on the Step 2 CK exam.

3    Q.   And what was the result?

4    A.   It was a failure.

5    Q.   And what was your score?

6    A.   I had a 151.

7    Q.   And what was the passing score?

8    A.   209 was the passing score.

9    Q.   Did there come a time that you went to take the Step 2 CK

10   a second time?

11   A.   Yes.

12   Q.   When about was that?

13   A.   I believe that was in 2018.  I can't remember exactly.

14   Q.   So several years later?

15   A.   Yeah, maybe a year or so later, yeah.

16   Q.   During this period of time, roughly three years, what is

17   taking place with respect to your status as a student at AUC?

18   A.   So I've finished all of my course work in 2016, in April,

19   and so the entire time from there on I am a student on leave

20   of absence.  And according to my school's rules, if you are on

21   leave of absence for three leaves of absence in a row, and you

22   don't have a passing score on one of these exams, then you

23   are -- it's grounds for dismissal.

24        And after I received this first failing score on the Step

25   2 CK exam, my school dismissed me, and -- because I hadn't

1    provided a passing Step 2 CK score.  And I had to go through

2    the appeals process of my school to be readmitted to my school

3    so that I could have another chance at taking the Step 2 CK

4    exam.

5        So normally what happens with students is they have three

6    leaves of absence.  If they don't pass the exams, they get

7    dismissed.  And then if they win their appeal, they are

8    readmitted for one more term.  And then if they don't pass it

9    within that one term, then they're dismissed.  So within four

10   terms after they finish their rotations, if they aren't

11   passing the exam, they're dismissed without right to appeal.

12   Q.  And were you able to get some type of accommodation and

13   relief from your school from that rule?

14   A.  I engaged a lawyer named Phyllis Brown.  And she was able

15   to work with my school, and they agreed to give me a year

16   extension to submit another application for accommodation with

17   the NBME to request accommodation on the Step 2 CK exam.

18   Q.  Did you submit another application to the NBME for

19   accommodations?

20   A.  Yes.

21   Q.  And if we can go to Exhibit 45.

22       Is this the copy of the application requesting

23   accommodations?

24   A.  Yes.

25   Q.  And this is for the second time you attempted the Step 2

1    CK?

2    A.   Yes.

3    Q.   If you go to page PX386.

4         What accommodation were you requesting?

5    A.   So again, we requested a similar profile of

6    accommodation, but the difference this time is that we

7    requested 100 percent extra time instead of 50 percent extra

8    time.

9    Q.   Why 100 percent?

10   A.   So when I had taken the Step 2 CK exam, it was obvious to

11   me that due to the increased complexity of the exam, and the

12   way in which I had to integrate the information together, and

13   the reading demands, that I was able to comprehend so little

14   of the test there's no way that I was going to be able to

15   finish the exam and adequately show my knowledge with 50

16   percent extra time.

17        And so when Dr. Beach evaluated me, as part of the report

18   that was submitted with this, the testing that she did, she

19   felt that it did justify a hundred percent extended time and

20   that was part of this request form.

21   Q.   Okay.  And if you turn to page 387, at the bottom.

22   Regarding your standardized test accommodations history,

23   there's an indication there for shelf exam 2014, 2016?

24   A.   Yes.

25   Q.   Are those the exams that we had discussed earlier in your

1    testimony that are provided during your clinical rotations?

2    A.   Yes.  This would be the core shelf exams.

3    Q.   And this is an updated piece of information that you

4    provided to the NBME from earlier requests?

5    A.   Yes.

6    Q.   And Exhibit 46, did you provide this to the NBME?

7    A.   Yes.

8    Q.   All right.  And that's from AUC, the accommodations you

9    were receiving from them?

10   A.   Yes, that's correct.

11   Q.   And Exhibit 47.

12        Is this a copy of a cover letter?

13   A.   Yes.

14   Q.   And what's the purpose of this cover letter?

15   A.   So since this was my third submission requesting

16   accommodation with the NBME, I updated my cover letter and

17   included information to try to give them an update on what had

18   been going on since my student status had progressed, et

19   cetera, and basically just I was trying to describe how my

20   disability affects me, as well as what my experience was

21   during the exams that I took with the NBME that the NBME had

22   denied me accommodations for, and what the experience was when

23   I took those under standard conditions.

24   Q.   And Exhibit 48, this is a letter from Phyllis Brown?

25   A.   I believe so, yes.

1  Q.  Is this a document you submitted to the NBME with your

2  request for accommodations?

3  A.  Yes.

4  Q.  And Exhibit 49, is that a document that you submitted to

5  the NBME in connection with your request for accommodations?

6  A.  Yes.

7  Q.  And what is this?

8  A.  This is the evaluation write-up that Dr. Beach did, I

9  believe.

10 Q.  Okay.  And this is a document you provided in connection

11 with your request for accommodations?

12 A.  Yes.

13 Q.  And I apologize to have to do this, but back at

14 Exhibit 8, can you state what this document is?

15 A.  This is the report update that Dr. Beach wrote.  I think

16 the other one was maybe a cover letter or something.  I don't

17 remember exactly what the other one included, but that was

18 also from Dr. Beach, but this is her evaluation.

19 Q.  And this is an evaluation that Dr. Beach had performed on

20 you in July of 2017?

21 A.  Yes.

22 Q.  And is that the third evaluation that Dr. Beach

23 conducted?

24 A.  Yes, I believe so.  Yeah.  Actually, that might have been

25 her fourth.  I can't remember, because I think 2010, 2013

1    2015, 2017, so four.

2    Q.   And I believe that the documents that NBME filed with

3    this court reflects that your request was received on March 2,

4    2018.  Does that comport with your recollection?

5    A.   That sounds right.

6    Q.   Did the NBME respond to your request?

7    A.   Yes.

8    Q.   What was their response?

9    A.   It was another denial.

10   Q.   And Exhibit 50?

11   A.   Five zero?

12   Q.   Five zero, yes.

13        Is this a copy of the denial letter that you received?

14   A.   Yes.

15   Q.   And it's dated May 27, 2018?

16   A.   Yes.

17   Q.   And that would appear that it took them over 80 days to

18   respond to your request for accommodations?

19   A.   Sounds right.

20   Q.   Did you take the USMLE Step 2 CK a second time?

21   A.   Yes.

22   Q.   Can you describe your study efforts?

23   A.   Yes.  So at this point, I knew that I was on thin ice

24   with my school.  They had already dismissed me, and I had

25   appealed and been readmitted.  I submitted another request for

1    accommodation and had been denied.  I knew that this was going

2    to be my last chance, basically, at this exam.  That's what it

3    felt like.  And so I was extremely intense with my studying,

4    as before.  I had done a review course and spent many, many

5    hours, as before, a long time, months, you know, I don't know,

6    years, depending.  It feels like it had been going on for so

7    long.  And anyway, so I just -- I did everything that I could

8    to prepare for this exam.

9        And I also worked with a testing advisor specifically to

10    try to see if there was anything I could do to increase the

11    speed at which I processed through questions.  And it was

12    someone who specialized in working with people with learning

13    disabilities and had working memory limitations like ADHD and

14    dyslexia, both.  And so we worked together on that and tried

15    to see if there were ways I could speed up my processing of

16    questions.

17        There were certain things that I was able to sort of

18    change how I processed that seemed helpful and could improve

19    my accuracy, but as far as actually increasing the speed to a

20    point where I could get through it under standard conditions,

21    it wasn't possible.  And so my strategy, after working with

22    that person, was to basically try to go for accuracy instead.

23        And so instead, I was going to go as quickly as I could,

24    but I was going to actually give myself a chance to read the

25    questions for like the first time ever on these exams.  And I

1    was going to read the questions, and at the beginning of each

2    block, I was going to mark the entire second half of the

3    block, just like I think it was either C or D that I'd picked.

4    I picked one letter and I used it all that entire test day.

5        And I just know I wasn't going to have time to get

6    through the entire block, so I marked the same letter for the

7    whole second half of the block during the first however many

8    seconds of each block, and then I went back to the beginning,

9    and then I started working through the block, reading as

10   quickly as I could with comprehension to get through the

11   questions.

12       And when I did that, I felt that the experience on the

13   exam was totally different.  I was actually able to understand

14   what the questions were asking.  I was able to actually answer

15   the questions without just feeling like I was completely

16   marking things randomly, which is what I had experienced in

17   the past.

18       And so I ended up going through, and when I actually took

19   the exam, my estimate is that I got through about maybe 60

20   percent of the questions using this approach, where I was

21   going as fast as I possibly could and using every single

22   strategy I could.  If I had to skip questions because I had

23   identified that those questions were questions that would take

24   too mime time, et cetera, I would do that.

25       But even with that, I would still get through about maybe

1    60 percent, maybe, of the questions, and then the remainder of

2    them were just marked from the beginning.  And because I had

3    marked them at the beginning of each block, I could work to

4    the very last second without having to split my attention

5    between reading the questions and watching the clock as I

6    counted down, and worrying about having half the block blank

7    and empty.

8    Q.   Okay.  And you indicated that those questions that you

9    had filled in the blanks, it was one letter?

10   A.   Yes.

11   Q.   Did you ultimately receive a score for your exam?

12   A.   Yes.

13   Q.   If you would turn to Exhibit 51, please.

14        Is this a copy of your score report?

15   A.   Yes.

16   Q.   And what occurred?

17   A.   I failed the exam again.

18   Q.   What was your score?

19   A.   166.

20   Q.   That was an improvement from your prior attempt?

21   A.   Yes.

22   Q.   And what was the passing score?

23   A.   I believe it was still 209.

24   Q.   Now, this USMLE Step 2 CK, do you have an understanding

25   of how many people pass this exam in terms of a percentage?

1    A.   So all of medical students are required to take this exam

2    if they want to practice in the United States.  If you're from

3    another country, and you already have an MD from abroad, you

4    also have to take the USMLE exam to be licensed in the United

5    States.  But I would assume that a high percentage passed.  I

6    think it's somewhere in the 90 percent.  It depends if it's a

7    U.S. school or international school what the percentage would

8    be.

9    Q.   Have you ever looked online at the USMLE website to see

10   what the passing rate is?

11   A.   Yes.

12   Q.   I'm going to direct you to Exhibit 57.

13       Is this a copy of the performance data from the USMLE

14   that you reviewed regarding the results of the passing rates

15   for the Step 2 CK?

16   A.   Yes, it appears to be.

17   Q.   And what is the passing rates that they publish?

18   A.   So for the first time test takers, it's 96 percent.

19   Q.   Are you aware of what the passing rates are for

20   individuals out of AUC?

21   A.   I believe it's a little bit lower than U.S. graduates,

22   but it's also in the 90 percent something, 90 percent

23   something.

24   Q.   All right.  And if you look at Exhibit 58, on PX440, are

25   these the passing rates that you reviewed from AUC?

1    A.   Yes.

2    Q.   And what do they indicate?

3    A.   The Step 2 CK first time pass rates for AUC students is a

4    92.8 percent.

5    Q.   After your results were published for the second attempt

6    on the Step 2 CK, did you receive any communication from the

7    USMLE program?

8    A.   Yes.

9    Q.   If you turn to Exhibit 52, can you explain what this is?

10   A.   This is a letter I received from the USMLE stating that

11   my performance on the second CK attempt was being flagged as

12   anomalous performance.

13   Q.   And what was the impact of that?  Were you able to take

14   the Step 2 again?

15   A.   So this letter informed me that I was having a hold put

16   on my account, and I was not allowed to schedule any further

17   Step 2 CK exams until it had been evaluated and resolved.

18   Q.   And how did you respond to that?

19   A.   So when I received this, I think there was a deadline

20   where I had to give some sort of a response.  I was shocked to

21   have received this because I had already requested

22   accommodations so many times, and one of the things that the

23   letter was saying is that I had marked the same letter for

24   44 percent of the exam.  And so I knew that to respond to this

25   without legal counsel was not a good idea, and that's when I

1    engaged you to help me with the response.

2    Q.   Okay.  Do you agree with the statement in the letter

3    which says, "During this test administration, you selected one

4    letter option more than 44 percent of the time"?

5    A.   Yes.

6    Q.   And if you turn to Exhibit 53.

7         Is this, in part, your response to USMLE and their prior

8    letter in Exhibit 52?

9    A.   Yes.

10   Q.   And what were you trying to convey to the USMLE in this

11   declaration?

12   A.   So I wanted to explain, you know, sort of a summary,

13   because it seemed like in the letter, the person who wrote

14   that letter didn't understand that I had already applied for

15   accommodation, et cetera.  And since they were accusing me of

16   anomalous performance, I thought that I should explain not

17   only my disability status and my experience during the exam,

18   but actually the, you know, sort of the context that went into

19   that.

20        And the fact that it was actually a testing taking

21   strategy, where I was trying to optimize my performance to get

22   the highest score possible given the limited amount of time

23   that I had since I had been denied accommodation, and so it

24   wasn't anomalous, it was on purpose.  I was trying to maximize

25   my score.  I wasn't trying to lower my score.

1    Q.   Did you advise the USMLE as well in this declaration

2    about your preparedness for this exam?

3    A.   I believe so, yes.

4    Q.   And in response to submitting this submission to the

5    USMLE, did they respond to you?

6    A.   The response was that the flag was being removed from my

7    account.

8    Q.   And if you turn to page 264, is this a copy of the

9    response?  I'm sorry, 54.

10   A.   Yes, it looks like, yes.

11   Q.   And so after that, you were clear to be able to take the

12   USMLE Step 2 CK a third time?

13   A.   Yes.

14   Q.   What was taking place at this point with respect to your

15   status as a student with AUC?

16   A.   So when I received the score report the second time that

17   I took the CK exam, shortly after that I had received a letter

18   about the anomalous test taking and that my account had been

19   flagged because of answering the same letter.  And I think it

20   was either the same day or a couple days later, I also

21   received notification from my school that because I had not

22   provided a passing CK score, they were dismissing me again,

23   without right to appeal, and that the dismissal would be

24   basically forthcoming, and I could expect the paperwork

25   dismissing me for good with no ability to appeal.

1    Q.   Does your school also have a requirement in terms of how

2    long it should take you to graduate?

3    A.   Yes.

4    Q.   And what is that requirement?

5    A.   So students are required in the student handbook to have

6    completed all of their course work within seven years total.

7    Q.   If you turn to Exhibit 59.

8         And pages PX444 through 446, does this contain the

9    requirement that you must graduate within seven calendar

10   years?

11   A.   Yes.

12   Q.   And what is the impact of not completing the program

13   within seven calendar years?

14   A.   They will dismiss the student.

15   Q.   In terms of addressing the problems with your med school,

16   what did you do?

17   A.   So I informed them about the situation, that I had

18   received the letter from USMLE about the testing flag and that

19   I had to give a response and asked them to hold any dismissal.

20   I had a conversation with a member of AUC faculty or staff,

21   and she said that unfortunately, because the handbook requires

22   that the student will be dismissed, that's, you know,

23   unfortunate that I'm in this situation, but they are going to

24   go ahead and dismiss me anyway, and I'll be issued the

25   paperwork any day.

1       So I was already working with you to respond to the

2    letter.  And I believe I reached out to you to draft a

3    response so that we could try to get my school to not dismiss

4    me and extend my student status.

5    Q.  And at Exhibit 60 -- first of all, what is Adtalem?

6    A.  So my school is American University of the Caribbean, and

7    Adtalem is like an umbrella organization that is over that.

8    There are a few different schools that are all owned, I guess,

9    by Adtalem.  And when there's an issue where it needs

10   arbitration, or ombud has to get involved, they transferred it

11   basically to Adtalem.

12       Also, this was happening, I believe, around the same time

13   that there was a hurricane hitting St. Maarten's, so I don't

14   know if that was also an administrative thing, where their

15   offices was not working because of the hurricane, I'm not

16   certain.  But this is the umbrella organization above my

17   school.

18   Q.  Did you receive a copy of this letter from Adtalem's

19   attorney?

20   A.  Yes.

21   Q.  And what is your understanding of what's required from

22   you from AUC?

23   A.  So they stated that I had to start legal proceedings

24   within 45 days in order to maintain my student status,

25   otherwise I would have immediate dismissal from my school, and

1    that they would give leaves of absence so that I could pursue

2    this in the legal system was my understanding.

3    Q.   Okay.  This Complaint, this lawsuit, was filed at the

4    beginning of the year.  Why are you requesting the preliminary

5    injunction now?

6    A.   So when we initially submitted the Complaint, I was

7    hopeful -- since your interactions with NBME, it sounded like

8    they were sending out my information for review by an

9    independent reviewer.  And I was hopeful that an independent

10   reviewer looking at the case would be able to see the merits

11   of what we had submitted.

12       And it was multiple months before the August timeline to

13   take the -- to have the CK exam taken in order to stay on

14   track with the residency timeline.  And so it -- I was hoping,

15   I guess, that the actual preliminary injunction would not be

16   necessary since there were multiple months to go.

17       But then as things got closer and closer to the August

18   deadline, and then the courts had given dates of May -- I

19   think it was May of 2020 to have the trial, it was clear to me

20   that I wouldn't be able to move forward with my career

21   progression.  And by not moving forward with residency, I

22   wouldn't be able to move on with my career path, even though I

23   had already been on thin ice and basically dismissed and

24   readmitted from my school, and all of this was pending a

25   decision relating this.  And despite all of these submissions

1    to the NBME, the actual decisions were never changing, and the

2    reasons given were not things that matched up with my

3    experience, so --

4    Q.   When do you have to take this exam by?

5    A.   So my school advised the students to take the exam in

6    August, by the end of August, so that they could have the

7    scores back for the beginning of when interviews go out in

8    October.

9         The way that the cycle works, you have interview season,

10   which is basically October, November, December, and then

11   that's done.  And if you haven't interviewed, then you can't

12   rank schools, you can't rank programs that you haven't

13   interviewed at.  And then the match happens, I think it's in

14   March, where they release the decision.  But the students that

15   match or don't match, that's a decision for what happens in --

16   July 1st is when they would start residency.

17        So if I can't stay on cycle this time, then basically it

18   would be pushing when I would start residency.  Instead of it

19   being July of 2020, it would be July of 2021, so that's my

20   understanding.

21   Q.   Can you describe the match and the match process?

22   A.   So there's a centralized application.  On your

23   application, it includes a letter from your school that

24   includes your grades, as well as you have letters of

25   recommendations from the attendings and different people that

1    you work with explaining your clinical skills as they've

2    observed them.

3         And then once the programs review that, then they will

4    send out invites, and they'll invite you to come and interview

5    you at their program if they're interested.  And it's

6    something that if you don't interview, then you can't rank a

7    program.  It's -- that's how it works.

8         But there is something that Mr. Burgoyne mentioned, it's

9    called the SOAP, that can come at the end, or it's also called

10   the scramble.  Basically, if you go through that process and

11   you don't match, then you can be put on a list for programs

12   that might still have spots.  And if you're lucky, then they

13   might contact you and you can try to match into a spot at the

14   last minute, but it's something that the students from my

15   school that I know who have gone through it have not had luck

16   with that, so --

17   Q.   Is there anything about your particular application that

18   is unique, that mandates or requires you to be able to take

19   the exam when you are requesting to take the exam in this

20   preliminary injunction?

21   A.   Yes.  I think that an expectation of having program

22   directors looking at my application and seeing two extremely

23   low failing CK scores, to expect them to want to interview me,

24   and look at me, and not actually have any idea if I'm going to

25   be able to pass the exam, it's extremely unlikely.

1       And what that effectively means is if I'm not able to

2  take this exam and show that I can pass the exam, then, you

3  know, either I get no accommodation, I'm dismissed by my

4  school without right to appeal, or I have a passing score on

5  the exam, then I might actually have a chance to have

6  interview invites.  But if I don't have that to submit an

7  application, and my application is not complete with a CK

8  score, there's no way that any program director is going to

9  look at me as a serious applicant.

10 Q.  If you don't take the exam now with accommodation, what

11 impact does that have?

12 A.  I'll have immediate -- well, so if I don't take it with

13 accommodation, I most likely will fail, given that I've

14 already failed it twice before, and I won't have a chance to

15 read the questions and understand the exam.  And that will

16 lead to a failure on the Step 2 CK a third time, and that will

17 result in immediate dismissal from my school and the end of my

18 medical career.

19 Q.  Why couldn't you then just try and take the USMLE Step 2

20 CK a fourth time?

21 A.  My school would not allow that.

22 Q.  All right.  Is it a requirement with the NBME to be an

23 active student to take the USMLE Step 2 CK?

24 A.  Yes.

25 Q.  Is there any other prerequisite to taking the Step 2 CK?

1    A.   You already have to have an MD degree, or you have to be

2    an active student to take the Step 2 CK exam.

3    Q.   So if you were dismissed from AUC, you will neither be an

4    active student nor will you be an MD?

5    A.   Correct.

6    Q.   How would extra time help you on the USMLE Step 2 CK?

7    A.   So it would give me the ability to read and comprehend

8    the questions and show the knowledge base that I have amassed.

9    When I have been evaluated through other evaluations during my

10   time as a student, I've had good scores on my evaluations from

11   preceptors, who have observed me and seen me with patients and

12   seen how I interact.  And I've also passed all of my scores

13   with accommodation when I've had accommodation.

14        So it's something that if I don't have that, I will not

15   be able to pass and I will not be able to continue onwards.

16   It's, you know, something that will greatly affect my life.

17   I'm under a lot of pressure because of the fact that I, you

18   know, have been unable to work because I'm constantly studying

19   for this exam for years now, and I never know when the exam is

20   going to come, because at any moment the decision could be

21   made that my scheduling permit becomes active, and I have to

22   be ready to sit for the exam.  So until a decision is made one

23   way or another, I can't move on with work personally or my

24   career development.

25             MR. WEINER:  Thank you.  Your Honor, I have no

1    further questions on direct.

2            THE COURT:  Okay.  I think now would be a good time

3    for a lunch break.  If we take an hour and 15 minutes, does

4    that give folks enough time to run out, grab something?

5            MR. BURGOYNE:  Sure.

6            THE COURT:  Okay.  So let's plan on -- it's about ten

7    after.  Let's plan on 1:30 to resume.

8            (Lunch recess.)

9            THE COURT:  Mr. Burgoyne, you may proceed.

10           MR. BURGOYNE:  Thank you, Your Honor.

11                     CROSS-EXAMINATION

12   BY MR. BURGOYNE:

13   Q.  Good afternoon, Brendan.  Bob Burgoyne, again, for the

14   National Board of Medical Examiners.  Let me ask a couple of

15   quick follow-up questions from this morning.

16       Your mother testified that you don't understand French;

17   is that correct?

18   A.  Yes.

19   Q.  And you do not speak French; is that correct?

20   A.  That's correct.

21   Q.  Do you understand French?

22   A.  Depends on what it is.  I understand some words.

23   Q.  Is it limited?

24   A.  Yes.

25   Q.  And are your sisters both fluent in French?

1    A.   Yes.

2    Q.   And would you say you grew up in a bilingual home?

3    A.   Both of my parents speak two languages, yes.

4    Q.   You also mentioned that you are, I believe, fluent in

5    Japanese?

6    A.   Yes.

7    Q.   And you've learned Japanese while you were a sophomore in

8    college?

9    A.   That's correct.

10   Q.   And you became fluent while there on that program?

11   A.   That's correct.

12   Q.   Did you, at some point, start tutoring students in

13   French -- or Japanese and biology?

14   A.   Yes.

15   Q.   And that was while you were in Japan?

16   A.   That was after I came back to the United States.  That

17   was at the University of Cincinnati.

18   Q.   You testified you attended first grade in a public

19   elementary school, and then you were home schooled for second,

20   third, and fourth grades, correct?

21   A.   Yes.

22   Q.   And then in fifth grade, you went to St. Gabriel

23   Consolidated School?

24   A.   Yes.

25   Q.   And you attended that from fifth through the eighth

1    grade?

2    A.   Yes.

3    Q.   And you didn't have any individual education program, an

4    IEP, or anything like that, that provided for formal

5    accommodations at St. Gabriel?

6    A.   The accommodations I received were informally given.

7    Q.   Take a look, if you would, please, PX1.  It's the

8    plaintiff's exhibit book.

9    A.   Is that the same as Number 1?

10   Q.   Yes.  Do you recall testifying this morning about this

11   letter?

12   A.   Yes.

13   Q.   And who is Mary Lou Huth?

14   A.   She was my teacher at St. Gabriel school.

15   Q.   What subject did she teach?

16   A.   She taught all the subjects.

17   Q.   What subject did she teach you?

18   A.   She was a fifth grade teacher.  She taught all the

19   different subjects, so English, writing, math, science.

20   Q.   So you only had one teacher for all of fifth grade?

21   A.   For all of -- yes, that's correct.

22   Q.   And this letter is dated May 28th, 2010, and that was

23   shortly after you first went to see Dr. Beach; is that

24   correct?

25   A.   This letter?

1    Q.    Yes.

2    A.    This is 2009, it says.  Is that --

3    Q.    The version I have says 2010.

4          THE COURT:  I think he's looking at the defendant's

5    exhibit.

6          THE WITNESS:  Sorry.  Am I looking at the wrong

7    thing?

8          THE COURT:  Yes.

9          THE WITNESS:  Sorry.  Okay.

10   Q.    I know it's a lot to deal with.

11   A.    Okay.  Here we go.

12   Q.    You see this letter is dated May 28, 2010?

13   A.    Yes.

14   Q.    And that was shortly after you first went to see

15   Dr. Beach for the first time?

16   A.    It's possible, yes.

17   Q.    And who requested this letter from Ms. Huth?

18   A.    I did.

19   Q.    And did you talk to her about the content of the letter?

20   A.    I explained to her that I was preparing to submit an

21   application for accommodation, yes.

22   Q.    And who drafted the letter?

23   A.    She did.

24   Q.    And did you obtain the signature from her on that letter?

25   Did you ask for a signed version of the letter?

1    A.   She prepared it and gave it to me like this.

2    Q.   So the only version you've ever seen is this signed

3    version of the letter?

4    A.   As far as I know, yes.

5    Q.   Take a look, if you would, at the other notebook now.  My

6    apologies for making this -- the notebook of our exhibits.

7         THE COURT:  We're all going to get really strong by

8    lifting.

9         MR. BURGOYNE:  We are, Your Honor.  And I apologize

10   for that.  It was no treat bringing them out here.

11   Q.   And if you would, look at Tab 6 in this document.

12   A.   (Complies with request.)

13   Q.   Do you see this is the identical letter?

14   A.   Okay.

15   Q.   And there's no letterhead?

16   A.   Okay.

17   Q.   You'll agree with that, there's no signature on this

18   letter?

19   A.   I see that.

20   Q.   And I'll represent to you the letters at the bottom we

21   put on here to reflect the fact that this is the document we

22   obtained from Dr. Beach.

23   A.   Okay.

24   Q.   Do you know why Dr. Beach has an unexecuted version of

25   this letter in her files?

1    A.   I'm assuming that it was sent as a draft.  I'm not sure.

2    Q.   Did you ever discuss this version of the letter with

3    Dr. Beach?

4    A.   I may have.  I don't remember.

5    Q.   And if you look at the -- what did you tell Ms. Huth you

6    wanted in terms of the contents of her letter?  What did you

7    want her to address in her letter?

8    A.   I believe that I explained that we were applying for

9    accommodation, and that in the denial letter from the MCAT

10   review, I guess they were questioning whether I had had

11   accommodation earlier in life, so I would assume that I asked

12   her to write down what the accommodations were that I had when

13   I was at their school.

14   Q.   And to your knowledge, does she have any background in

15   psychiatry or psychology?

16   A.   I'm not certain what her background is.

17   Q.   If you look at the second full paragraph here in this

18   letter, you'll see she starts out saying you were a student in

19   her fifth grade classroom?

20   A.   Uh-huh.

21   Q.   And then do you see that she goes on in this letter to

22   address the accommodations in her classroom when you were at

23   St. Gabriel, as opposed to the accommodations that you

24   received from fifth grade through eighth grade at St. Gabriel?

25   A.   Where is that located?

*BERGER – CROSS*                                                   125

1   Q.   She starts out saying, "Brendan Berger was a student in

2   my fifth grade classroom"?

3   A.   Okay.

4   Q.   And then she goes on, in the third paragraph, she says,

5   "Because St. Gabriel Consolidated is a parochial school and an

6   IEP was not required for Brendan at the time, Brendan was

7   informally accommodated in my classroom."

8        So she didn't address in this letter accommodations you

9   got at any other point when you were at St. Gabriel, did she?

10  A.   My accommodations were the same during my time at

11  St. Gabriel, so this would have been representative of that.

12  Q.   Okay.  But this is the only documentary evidence, other

13  than your testimony, that addresses accommodations that you

14  received when you were at St. Gabriel?

15  A.   I believe so.

16  Q.   Take a look at -- let's look at your version.  Let's look

17  at Plaintiff's Exhibit 2.  It's the letter from Moeller,

18  Archbishop Moeller.

19  A.   Is that the other?

20           THE COURT:  Yes.

21  Q.   Do you recall discussing this letter this morning?

22  A.   Yes.

23  Q.   And is this the letter you relied upon as setting forth

24  the accommodations you received at Archbishop Moeller?

25  A.   Yes.

1    Q.   And I believe you read this letter this morning.  It said

2    that it was an accurate description of your accommodation

3    history at Archbishop Moeller?

4    A.   Yes.

5    Q.   Tell me if this part of the letter is accurate.  It says

6    in the second paragraph, "Upon entering Moeller High School,

7    Brendan continued to use audio books that he acquired on his

8    own, and to apply acquired strategies to deal with his

9    disability without direct support from the Moeller support

10   team."  Is that an accurate statement?

11   A.   Yes.

12   Q.   And then, However, during your junior year at Moeller,

13   you experienced difficulty with timed tests, especially those

14   with extended reading and writing requirements.  Given this

15   past history, a referral was made to determine your level of

16   functioning, and you were referred to Dr. Smith in

17   January 2003 --

18   A.   Yes.

19   Q.   -- is that correct.  And then it says in the next

20   paragraph, "Given the results of the evaluation, a Moeller

21   Assistance Plan was developed to provide accommodations to

22   address Brendan's needs."  Do you see that?

23   A.   Yes.

24   Q.   And so it was from that point forward that you were

25   approved to test, and that those accommodations consisted of

1    extended time, separate area, and you were permitted to

2    purchase your own copies of texts and audio books?

3    A.   This is when that was formalized, yes.

4    Q.   So according to this letter, it was after you got your

5    evaluation by Dr. Smith that you were provided with extended

6    testing time at Moeller?

7    A.   No.

8    Q.   That's not how you understand this letter, or that's not

9    what happened?

10   A.   It was informally accommodated before, and the teachers

11   gave me extended time, even though it wasn't formalized in the

12   Moeller system's plan at the beginning of my time at Moeller.

13   Q.   Why have a Moeller Assistance Plan if you could just get

14   accommodations without that, and why did did you need to go to

15   see Dr. Smith to get an evaluation if you were already getting

16   the accommodations you needed?

17   A.   I can't explain why their policies are the way they are.

18   I'm not certain.

19   Q.   Jane Kagy, am I pronouncing that correctly?

20   A.   I think it's Kagy.

21   Q.   And you mentioned her earlier, and she was the case

22   manager for students with disabilities?

23   A.   Yes.

24   Q.   And then there's also a mention in her letter of a

25   Moeller Assistance Plan.  Is that an official document like an

1    IEP or something?

2    A.   I would assume it's similar.

3    Q.   Okay.  Did you ever see a copy of that?  Did you receive

4    a copy of that?

5    A.   Yes.

6    Q.   And I take it it's not a document you still have?

7    A.   No.  I've looked.  I can't find a copy of it.

8    Q.   Where did this letter come from in order to provide it to

9    the Association of American Medical Colleges?

10   A.   The letter by Jane Kagy?

11   Q.   Yes.

12   A.   She prepared it and she gave it to me.

13   Q.   This is dated March 2007, which is several years before

14   you sought MCAT accommodations, and it looks like this one was

15   used to obtain audio books at the University of Cincinnati?

16   A.   I submitted this to the DSO at the University of

17   Cincinnati, correct.

18   Q.   And when it came time for you to submit this to the

19   Association of American Medical Colleges in 2009 and 2010,

20   where did you get this letter?  Did you have a copy of it at

21   your house or something?  How did you get a copy of this

22   letter to share with the AAMC?

23   A.   I believe I still had a copy.

24   Q.   Take a look, if you would, at Defendant's Exhibit 14.

25        And this, while you're looking for that, is a series of

1    email communications that were produced to us by Dr. Beach in

2    response to a subpoena we served in this case.

3        And look, if you would, I just put Bates numbers for

4    purposes of our use today.  If you look on the bottom right,

5    there's some numbers.  If you'll go to the page that's 0007.

6        And this is an email from you October 2013, and you're

7    sending an email to Dr. Beach.  Do you recognize that?

8    A.   At the top here?

9    Q.   Yes.

10   A.   Okay.

11   Q.   And then in here, you're discussing the Jane Kagy letter

12   that we just looked at, correct?

13   A.   I believe so.

14   Q.   And you say here, "I was able to get Jane Kagy's letter

15   put on letterhead, which meant delaying a day before

16   everything went out."  If you already had a copy of the letter

17   in your files, why were you putting a letter on letterhead

18   before it went out, and how were you able to do that?

19   A.   All I can remember is I know that Jane Kagy had retired,

20   so I do remember going to my school, and it's possible I might

21   have asked them if they could print it on letterhead from the

22   school since she had produced it while she was still working

23   at the school, but I don't remember exactly how that happened,

24   if it was a staff member that printed it, or something like

25   that.

1    Q.   In all events, the version of the document that went to

2    AAMC in 2010 wasn't whatever version you had in your files?

3    A.   There's no text that was changed, or anything like that,

4    if that's what you mean.

5    Q.   Let's talk briefly about your situation at the American

6    University of the Caribbean.  You enrolled there in May 2011,

7    correct?

8    A.   I believe so, yes.

9    Q.   And you testified, I think, that you finished all of your

10   course work and all of your clinical rotations in 2016?

11   A.   April of 2016.

12   Q.   And then I think you also testified that from that date

13   forward, the only thing standing in the way of you graduating

14   was passing Step 2 CK?

15   A.   The Step 2 exams.  The Step 2 CS and the Step 2 CK.

16   Q.   Okay.  Other than that, there was nothing else you had to

17   complete?

18   A.   My school wanted me to take the comp before they wanted

19   me to take the CK, but it's not required for graduation that

20   you have passing comp.

21   Q.   Did you ever -- because I know I saw communication saying

22   you still hadn't taken that as of October 2018.  Did you ever

23   end up being required to take that?

24   A.   What that are you referring to?

25   Q.   Your comprehensive clinical sciences.

*BERGER - CROSS*

1    A.  I did take it.

2    Q.  And when did you take that?

3    A.  I took it on multiple occasions.  I don't remember the

4    exact dates, but it would have been at the end of my clinical

5    rotations and then continuing after that.

6    Q.  So you took it, but you didn't pass it?

7    A.  Correct.

8    Q.  And did you have accommodations on that exam?

9    A.  I had 50 percent extra time on that exam.

10    Q.  And have you ever passed that exam?

11    A.  No.

12    Q.  And is it your testimony it is not a graduation

13    requirement to pass that exam?

14    A.  My school said that they're not requiring it of me.

15    Q.  Not requiring it of you?  Have they waived the

16    requirement for you?

17    A.  I believe so.

18    Q.  But for other students, it's a requirement?

19    A.  I know other students who graduated without it, but I'm

20    not certain if their policies want other students to pass it.

21    I can't remember offhand.

22    Q.  Why did the school want you to take that exam before you

23    take the Step 2 CK exam?

24    A.  My understanding is that my school uses it as a quality

25    assurance measure.  They would prefer to have students obtain

1    a high score on the comp exam before taking the step exam so

2    that the step exam, the first time pass rate is as high as

3    possible.

4    Q.   Okay.  So earlier you talked about the first time pass

5    rate at AUC, and you said it was around 90 percent.  That

6    reflected, in part, the school's efforts to make sure people

7    were as prepared as possible before they first took the Step 2

8    CK exam?

9    A.   Yes.

10   Q.   You testified that you've been placed on academic

11   dismissal at least twice; is that correct?

12   A.   I was dismissed once.  I don't know what my current

13   status would be, if they would count it as dismissal or not.

14   I mean, I'm an active student, if that's what you mean.

15   Q.   Were you dismissed after the first failure of the Step 2

16   CK exam?

17   A.   Yes.

18   Q.   And then you appealed that?

19   A.   Correct.

20   Q.   All right.  And then were you dismissed again after the

21   second failure of the Step 2 CK?

22   A.   My school said they wanted to dismiss me, and they were

23   planning to do so, but then that was when Mr. Weiner was able

24   to negotiate with them and it was not dismissed.

25   Q.   And your counsel got involved at that point?

1    A.   Yes.

2    Q.   Do you know whether you're currently enrolled and in good

3    standing at AUC?

4    A.   That's my understanding.

5    Q.   Look if you would, please, at DX21, since that's the one

6    you have opened, and it's Exhibit A to that.  So go to 21, and

7    then go to the tab that says Exhibit A or A.

8         You recognize this letter as one you testified about

9    earlier today?

10   A.   Yes.

11   Q.   And this is the letter from an attorney for, I believe

12   it's the parent company that owns the American University of

13   the Caribbean?

14   A.   Yes.

15   Q.   And in the second paragraph, she says, "If the suit is

16   successful and Mr. Berger is able to take the USMLE Step 2 CK

17   with accommodations, AUC will allow Mr. Berger to keep his

18   current academic status at AUC for one additional attempted

19   USMLE Step 2 CK."

20        The letter doesn't impose any deadline by which you have

21   to take Step 2 CK.  Is there any communication from the school

22   that puts a deadline on you by which you have to take Step 2

23   CK?

24   A.   No.

25   Q.   So if at the end of this lawsuit, and after we've had

1   discovery and everything else, if the lawsuit is still going

2   on and you win at that point, the school is going to let you

3   take Step 2 CK at that time?

4   A.   I would presume.

5   Q.   Do you know if there are any other written communications

6   from the school regarding your status subsequent to that

7   December 2018 letter?

8   A.   Not to me, not to my knowledge.

9   Q.   And to just wrap things out now.  Are you currently

10  taking classes at New England University?

11  A.   I'm not.

12  Q.   Did you complete those classes?

13  A.   I did part of it, and then I decided to stop.

14  Q.   Let's review your standardized testing history a little

15  bit.  I don't think we had a complete history.  We got into a

16  lot of it.  My apologies.  This is working out badly.  Would

17  you please look at the other notebook for me.

18         MR. BURGOYNE:  And I apologize to you as well, Your

19  Honor.  Mr. Weiner and I attempted to avoid duplication as

20  best we could but didn't always succeed.

21  Q.   Okay.  Are you all set?

22       You testified earlier that you took some tests known as

23  the Stanford Achievement Test?

24  A.   Yes.

25  Q.   And you took those in the second, third, and fourth

1    grades.  And those are among the documents that you sent to

2    the National Board of Medical Examiners, correct?

3    A.   Yes.

4    Q.   And you were being home schooled those years?

5    A.   Yes.

6    Q.   And do you recall taking those specific tests?

7    A.   Not very clearly.

8    Q.   It's a long time ago, I realize.  Any recollection you

9    have about taking the test?

10   A.   I remember going for standardized tests during home

11   schooling once a year, so I'm assuming it might be those

12   exams, but I'm not certain.

13   Q.   And that was going to be exactly my next question.  Where

14   did you go to take the test?

15   A.   I think it was located in the school.  I'm not -- I don't

16   remember the name of the school, or anything like that.

17   Q.   But those were tests administered to you by someone at

18   the school?

19   A.   Yes.

20   Q.   They weren't tests that your mother administered to you,

21   for example?

22   A.   That's correct.

23   Q.   And that's also true of the Iowa Test of Basic Skills and

24   Cognitive Abilities Test, which you took in the sixth grade?

25   A.   Yes.

1    Q.   And do you have any recollection of taking that test?

2    A.   I vaguely remember that.  I know we did have standardized

3    tests at St. Gabriel's school, so I don't remember

4    particularly that test.

5    Q.   Okay.  But that's one you took?

6    A.   I do remember taking the standardized tests.

7    Q.   And according to the score report, that's a test you took

8    at St. Gabriel's school, right?

9    A.   Correct.

10   Q.   So at that time, you're back in school?

11   A.   Correct.

12   Q.   And when you were being home schooled, you didn't have an

13   IEP or any state approved accommodation plan?

14   A.   No.  It wasn't necessary.

15   Q.   And then likewise, when you took the Iowa test, the Basic

16   Skills and Cognitive Abilities Test, you didn't have an IEP in

17   place at St. Gabriel, I believe you testified?

18   A.   Not that I'm aware of.

19   Q.   Did you have any other kind of state approved

20   accommodation plan in place at St. Gabriel?

21   A.   Not that I'm aware of.

22   Q.   Do you recall taking any other standardized test at

23   St. Gabriel?

24   A.   I know we took standardized tests.  I don't know if it

25   was every year or every other year.  I can't remember how

1   often we had to take them, but probably, yeah.

2   Q.   Okay.  And I think the next one we get to is you took the

3   PSAT in the eleventh grade, 2002?

4   A.   That sounds right.

5   Q.   And you took that -- at that point, you had not applied

6   for accommodations?

7   A.   That's correct.

8   Q.   Right.  And at that point, you had not been examined by

9   Dr. Alexander, so you didn't have an evaluation report to

10  support accommodations, did you?

11  A.   That's correct.

12  Q.   And your Moeller Assistance Plan was put in place after

13  that, correct?

14  A.   Officially, yes.

15  Q.   Look if you would at DX24.  This time I can at least keep

16  it in the same notebook.  And when you get to 24, look at

17  Exhibit 5.

18       You'll see this is a second copy of your PSAT score

19  report that you looked at earlier?

20  A.   Is that the second page?

21  Q.   Yes, should be that if you're in Exhibit 5.

22  A.   Oh, Exhibit 5.  I'm sorry.  I thought you said 25.

23  Q.   No, it's 24, and then Exhibit 5 within.  I apologize.  It

24  gets confusing at the end.  So go to Tab 24 first.

25  A.   Okay.

1    Q.   And then within that tab, look for Exhibit 5.

2    A.   This is in the defendant document?

3             MR. BURGOYNE:   Yes.   May I approach the witness, Your

4    Honor, and just sort of help him?

5             THE COURT:   Yes, you may.

6    A.   Sorry.   Is this Exhibit 24?

7    Q.   This is your PSAT that you testified about earlier.

8    A.   Hold on just one second.

9    Q.   Sure.

10   A.   So you said I have to go to 24?

11   Q.   Yes.   And then Exhibit 5.

12   A.   Exhibit 5.   Okay.   This is looking better now.

13   Q.   Yes.   My apologies.   And this is the document that

14   reflects your performance on the PSAT without accommodations,

15   correct?

16   A.   Yes.

17   Q.   And I believe you testified that there were some answers

18   that you omitted?

19   A.   Yes.

20   Q.   At that time, there was a penalty, wasn't there, for

21   guessing?

22   A.   I believe so.

23   Q.   So students were encouraged, if you don't know the

24   answer, don't guess?

25   A.   Okay.

*BERGER - CROSS*                                                  139

1    Q.   And in fact, while you did omit some answers at the end

2    of these sections, you also omitted some answers earlier on

3    some of these sections?

4    A.   I can see how that happened, yes.

5    Q.   And at the end of that exercise, I think we discussed

6    that you performed in the top 23 percent of all examinees

7    across the country with your overall percentile?

8    A.   I suppose so, if 77 is indicative of that.

9    Q.   Okay.  And then we move on, and you take the Medical

10   College Admission Test, correct?  That's your next

11   standardized test -- well, you took the SAT?

12   A.   Right.

13   Q.   You received 50 percent extra testing time, and you

14   scored in the 91st percentile?

15   A.   Yes.

16   Q.   After that, your next standardized test is the MCAT?

17   A.   Yes.

18   Q.   Okay.  And you first took that in September of 2009, and

19   then you took it again in September of 2010, correct?

20   A.   Sounds correct.

21   Q.   And you requested 50 percent extra time based upon a

22   diagnosis of a learning disability; is that correct?

23   A.   I believe so.

24   Q.   And the learning disorder that you had been diagnosed

25   with was disorder of written expression, correct?

1    A.   I believe so.

2    Q.   It wasn't a reading disorder, it was disorder of written

3    expression, and that was the diagnosis from Dr. Smith?

4    A.   I would have to refer back to his report to say that's

5    what it says.

6    Q.   Okay.  We'll do that.

7    A.   Sure.

8    Q.   You did not identify any ADHD diagnosis at that time as a

9    basis for accommodations on the MCAT?

10   A.   I don't believe that was included.

11   Q.   Okay.  Look, if you would, at DX17, Tab 17 in the

12   defendant's exhibit that you have in front of you.

13        This is the document called "Welcome to the 2010 MCAT

14   Essentials."

15             MR. BURGOYNE:  And Your Honor, this is from the

16   Association of American Medical Colleges, which administers

17   the MCAT exam.

18   Q.   And this is a document you've seen before, isn't it,

19   Mr. Berger?

20             THE COURT:  Give him a chance to get there.

21             MR. BURGOYNE:  Sure.

22   A.   I'm just looking through to see what's in the document

23   here.  I mean, it looks similar to what I would have looked at

24   at the time.

25   Q.   And in fact, this is the document that examinees are

1    required to read and acknowledge that they've reviewed before

2    they take the MCAT exam?

3    A.   I don't remember that, but it's possible.

4    Q.   I'll help you out.  "Required reading," if you look at

5    the bottom of the page, and that it indicates, "Please note

6    that you are required to read the 2010 MCAT Essentials before

7    you register."  And then, At the time you register, you'll be

8    required to certify that you've reviewed this material.  And

9    then if you look at page 3 of this document, there's a

10   description of the exam content?

11   A.   Okay.

12   Q.   And this is the exam content that was on the exam both

13   times that you tested, 2009 and 2010?

14   A.   I believe at a later date they changed the format, but I

15   think it was consistent when I took it both times.

16   Q.   And then on the next page, you can see there's a

17   description of the specific content on the exam, and how many

18   questions there are?

19   A.   Yes.

20   Q.   And it looks like there were 40 verbal reasoning

21   questions, 52 in the physical sciences, and then 52 in the

22   biological sciences, correct?

23   A.   Sure.  I believe so.

24   Q.   And was there also a writing component on the MCAT?

25   A.   Yes.

1    Q.   Go next, if you would, please, to Exhibit 18, to the next

2    exhibit.

3         And this is also a document from the Association of

4    American Medical Colleges, and it's titled "MCAT Release Form

5    For the State of New York, (Form administered on January 29,

6    2010)."  Do you see that?

7    A.   I see that.

8    Q.   And will you thumb through here and just confirm that

9    this appears to be a sample MCAT form from 2010, and it

10   contains the same sections that were on the exam when you

11   tested?

12   A.   Do you want me to go through all of this, or just --

13   Q.   This looks familiar to you?  That's all I'm trying to

14   establish.

15   A.   The format looks similar.

16   Q.   Okay.

17   A.   When I took it, it was a computerized test so it's a

18   little bit different, but it looks similar, at least the

19   physical sciences section does.

20   Q.   And in that respect, the MCAT is very similar to the

21   Step 1 and Step 2 CK exams, they're both computer administered

22   exams?

23   A.   Yes.

24   Q.   And the MCAT exam is roughly a five-hour exam?

25   A.   I suppose so.  If that's what it says, sure.

1    Q.   And let's just look quickly at a sample, but on page 5 of

2    Exhibit 8, there's a sample physical science question.

3    A.   Okay.  I'm on page 8.

4    Q.   All right.  And do you see there -- well, you're on

5    page 8.  That's fine too.  Actually, go to page 5, that's

6    where the passage is.

7         So the question begins with a passage that's on page 5,

8    and then it's followed by a series of questions relating to

9    that passage.

10   A.   Yes.

11   Q.   And then if we go look at how the verbal reasoning

12   section is structured.  If you go to page 29, and you see

13   there there's a verbal reasoning question there for you to

14   look at?

15   A.   There's a passage on page 29.

16   Q.   Correct.  And then that's followed by a series of

17   questions, all of which relate to the passage?

18   A.   Correct.

19   Q.   And then finally, if we go to the biological sciences --

20   let me ask you, first of all, the passage that you're looking

21   at on page 29, is that longer or shorter?  How does that look

22   compared to one of the vignettes on the Step 2 CK exam?

23   A.   This passage is longer than one of the clinical

24   vignettes, like for one question on the step exams.

25   Q.   Okay.  And then I interrupted you there, but take a look

1    at page 50. And this is where the biological sciences

2    questions appear. And are they structured the same way, where

3    there's a passage, and then it's followed by a series of

4    questions that you have to answer?

5    A. I believe so. Yes, it looks like it.

6    Q. And I want to make sure I got this right. I think you

7    testified that your strategy the second time you took the MCAT

8    was you didn't read the passages at all, all you read was the

9    questions?

10    A. For the verbal portion, yes.

11    Q. And I think you testified that you developed a special

12    test taking strategy for taking that exam and the other Step 2

13    exam, different strategies?

14    A. Yeah. I tried to optimize my performance through testing

15    strategies, yes.

16    Q. And that's not uncommon, is it, for students to develop

17    test taking strategies?

18    A. I think most students try to optimize their performance,

19    yes.

20    Q. And I think you also said that you randomly guessed when

21    you were entering verbal reasoning questions on the MCAT?

22    A. The first time specifically, yeah.

23    Q. Did you randomly guess on the other sections the first

24    time you took the MCAT?

25    A. I ran out of time, so I did have questions I had to guess

1    on, yes.

2    Q.  Let's look at Exhibit 24.  And then within Exhibit 24,

3    please look at Exhibit 4.  These are your MCAT results?

4    A.  Yes, this is the 2010 MCAT scores.

5    Q.  All right.  So in 2010 -- first of all, all of your MCAT

6    scores were in the average range, weren't they?

7    A.  I don't know.  Some of them are 10th to 20th percentile.

8    Q.  Where your total score is in the percentile range 38 to

9    43, was that an average score?

10   A.  If it says so, it must be.

11   Q.  And then on the 2010, you scored in the 67.8 to the 83.4

12   percentile, so that means you were no worse than the top 23

13   percent of all examinees who took that test, and perhaps as

14   high as the top 17 percent of individuals on that section of

15   the test?

16   A.  Based on those percentile numbers, that would make sense.

17   Q.  Yes.  And it's your testimony you got that score by not

18   reading the passage and only reading the questions?

19   A.  Yes.

20   Q.  And then if we look at the next page, these are your 2009

21   results, correct?

22   A.  Yes.

23   Q.  And in 2009, this one didn't get a lot of discussion this

24   morning, but on your biological sciences section, you scored

25   in the 58th percentile to the 77th percentile basically; is

1    that right?

2    A.   I see that here.

3    Q.   Okay.  And that's a very good score, you'd agree with

4    that?

5    A.   I suppose so.

6    Q.   You took Step 1 the first time in March 2014.  Did you

7    take a test preparation program in advance of taking Step 1?

8    A.   Yes.

9    Q.   Who did you use for that test prep?

10   A.   It was Kaplan.

11   Q.   I apologize, Your Honor, and Brendan.  One of the things

12   you testified to this morning is that when you took the MCAT

13   the second time, you had studied more, and you felt like you

14   were more knowledgeable and better prepared?

15   A.   Correct.

16   Q.   You think that's part of the reason you did better on the

17   exam the second time?

18   A.   It may have played a role, but I think that my test

19   taking strategy was what made the difference in the scores.

20   Q.   Let's take a look here, just so we get a sense of what

21   the Step 1 exam looks like compared to the MCAT.  First of

22   all, I think you described that as an extremely demanding

23   exam, Step 1.  Do you agree with that?

24   A.   Yes, I would agree with that description.

25   Q.   And I think you said, when you got out of that exam, you

1    were exhausted and could hardly think?

2    A.    Yeah.  I think I -- my words were that it felt like my

3    brain had been sucked by aliens, so yes.

4    Q.    Do you think other examinees had the same reaction after

5    taking that exam?

6    A.    Possibly.

7    Q.    Would it surprise you if that was a common reaction to

8    anybody who had just taken an eight-hour standardized test?

9    A.    Well, I'm sure it's grilling for most people to take that

10   test.

11   Q.    Look at Exhibit 23, and within Tab 23, look at Exhibit G.

12        MR. BURGOYNE:  While he's getting oriented, Your

13   Honor, I'll identify Exhibits G and H are sample practice

14   questions for the Step 1 and then for the Step 2 CK exam.

15   Q.    And have you seen questions before posted on the USMLE

16   website that constitute practice questions?

17   A.    Yes.

18   Q.    Okay.  So these look familiar to you, this -- if not

19   these particular questions, I take it you can -- in fact, you

20   may even have reviewed these questions in preparation for your

21   exams?

22   A.    I'm assuming that the questions change from time to time,

23   but maybe some of them are the same.  I'm not certain about

24   that.

25   Q.    Okay.  In Exhibit G, page 3, there's some recommended

 1    strategies for answering questions.  Take a look at that for

 2    me.

 3    A.   Page 3?

 4    Q.   Page 3.  And it's second heading from the top.

 5    A.   Okay.

 6    Q.   And do you see the last bullet point there, "If unsure

 7    about an answer, it is better to guess, since unanswered

 8    questions are automatically counted as wrong answers"?

 9    A.   Yes.

10    Q.   So you were aware going in to both your step exams that

11    you should guess, and that that's better than leaving an

12    answer unanswered?

13    A.   Yes.

14    Q.   And then at page 5, could you just explain to the Court

15    what these two pages are?

16    A.   So the exam has reference values.  So if it provides lab

17    work, or something like that, the values are accessible on a

18    side tab.  If you click, it will come up with these, I

19    believe.

20    Q.   So at various points in the exam, if a question called

21    for a lab value, you would click on that link, this

22    information would come up, and you'd consult that information

23    to answer the question?

24    A.   Well, because of my lack of time, I didn't feel that I

25    had time to read extra pages that were not related to

1    questions, so one of my strategies was to memorize as many lab

2    values as I could.  But this is available on the exam for

3    people who want to look at it, yes.

4    Q.  Do you recall consulting the lab values at any point when

5    you were taking the exam?

6    A.  I might have looked at it once or twice, but I know that

7    I tried not to.

8            MR. BURGOYNE:  Your Honor, I won't belabor it, but

9    this, as I say, this sample illustrates the type of content

10   found on the Step 1 examination.

11   Q.  And then Exhibit H, would you look at that document for

12   me, Brendan.

13       And would you confirm that these are representative of

14   the questions that are found on the Step 2 CK exam?

15   A.  After reviewing the first block, it does seem like the

16   format is similar.

17   Q.  Look at DX14, if you would.  Step 1 you took in March

18   2014.  DX14, again, is a collection of emails that were

19   produced to us by Dr. Beach.

20   A.  Okay.  I'm there.

21   Q.  And then if you'd look, please, at the page that ends 010

22   within that collection.

23   A.  Okay.  I'm there.

24   Q.  Looks like on the top email here, dated April 2, 2014, it

25   looks like you were providing a report to Dr. Beach on taking

1    the Step 1 exam?

2    A.   I would assume so.

3    Q.   And you say there, "I think I did well with time

4    management, but the exam was long and grueling.  I should know

5    my score in about a month."

6    A.   I see that.

7    Q.   And did you report anything to her at that time about

8    randomly guessing at any answers?

9    A.   I mean, as far as email correspondence, I'm sure this is

10   the correspondence we had.  I know at some point I did discuss

11   with her what my experience was during the exam, but I don't

12   remember what the date was that we had that discussion.

13   Q.   Okay.  And then, again, you passed the exam on your first

14   attempt, not with a score as high as you would like, but I

15   think it was a 198 and the passage was 192?

16   A.   That sounds correct.

17   Q.   You then took the Step 2 clinical skills exam next,

18   correct?  Actually, you had already taken it by that point,

19   right?

20   A.   Took it when?

21   Q.   I apologize.  You took Step 2 CS in 2016 the first time?

22   A.   Yes, that sounds -- probably that's correct.

23   Q.   And let's look at DX21.

24        MR. BURGOYNE:  I apologize, Your Honor.  I don't

25   think my notes track what I'm looking for here.  It's actually

1   Exhibit 16.  I apologize.

2   Q.  And this is a complete collection of your score reports

3   for the step exams.  The first report I think we've seen?

4   A.  The Step 1 results, yes.

5   Q.  Right.  You passed.  And then I don't know the version

6   you provided to the Court included the second page here

7   earlier, but would you explain to the Court what page 2 of the

8   score report is?

9   A.  So this is what they call the performance profile, and

10  based on my understanding of it, questions are, I guess,

11  categorized into different groupings, and I think questions

12  can actually be in multiple groupings, not just one grouping.

13  I don't know exactly the details.  But when you complete the

14  exam, you're provided with this performance profile to show

15  which topics, I guess, you had stronger performance in and

16  weaker performance in.

17  Q.  And fair to say you did better in some areas than you did

18  in other areas?

19  A.  The -- yes.  The further to the right the bars are, the

20  better it's considered.  The further to the left, the worse it

21  is.  And the wider it is, the less accurate that is.  I

22  believe that's what that means.

23  Q.  Okay.  Take a look at the next page and confirm for me

24  that this is the score report from your first clinical skills

25  test?

1    A.  Looks like it, yes.

2    Q.  And this time, you only get a pass/fail on this exam,

3    correct?

4    A.  Yes.

5    Q.  You don't get a score?

6    A.  Scored a pass/fail.

7    Q.  And there's three parts to that exam?

8    A.  That's correct.

9    Q.  And the first is integrated clinical encounter, ICE?

10   A.  Yes.

11   Q.  The second is communications and interpersonal skills?

12   A.  Yes.

13   Q.  And the third is spoken English proficiency?

14   A.  Yes.

15   Q.  And there's virtually no reading.  There's a little bit

16   of reading on that exam, but it's mostly patient interaction?

17   A.  Yes and no.  There are sentences that you have to read

18   before you enter the patient room that give you information

19   about the patient scenario.  And then you're expected to take

20   notes and record basically how the interview goes, and then

21   use those notes to afterwards write up a patient note on the

22   computer.  You have to type it up.

23   Q.  Okay.  And you took this exam without accommodations?

24   A.  That's correct.

25   Q.  And then page 2 reflects where your performance was on

1    this particular administration?

2    A.   It says, I think, four in the bottom right corner.

3    Q.   It does, yes, handwritten four.

4    A.   This is the performance profile.

5    Q.   And it looks like the reason you didn't pass was because

6    of your performance on the communication and interpersonal

7    skills?

8    A.   That's what this shows.

9    Q.   But you did very well with spoken English proficiency?

10   A.   Yes, I see that.

11   Q.   And then is the next page your score report from the

12   August 2016 clinical skills exam?

13   A.   Yes.

14   Q.   And you took this without accommodations?

15   A.   Yes.

16   Q.   And you achieved a passing score this time?

17   A.   Yes.

18        MR. BURGOYNE:   And then, Your Honor, the last four

19   pages consist of his Step 2 CK reports, with the performance

20   profile for each exam.

21   Q.   Is that correct, Brendan?

22   A.   Yes, that looks to be correct.

23   Q.   Switch notebooks, if you would, for me.  I'd like to

24   quickly go through your evaluation history.  I'll let you get

25   that notebook open before I start asking you questions.

1    A.   Which exhibit?

2    Q.   Why don't you go ahead and open to PX23.

3         Let's walk back sequentially.  You were first evaluated

4    in 1992 by Sharon Collins when you were in kindergarten?

5    A.   Yes.

6    Q.   You were next evaluated March 1994 by Dr. Artner when you

7    were in the second grade?

8    A.   Yes.

9    Q.   And then your next evaluation comes in January 2003, when

10   you are seen by Dr. Alexander Smith, correct?

11   A.   Sounds correct.

12   Q.   And in this document, looks like Dr. Smith saw you over

13   three days of his assessment, on the left there?

14   A.   Yes, that's what it looks like.

15   Q.   And these are the tests he administered for you at that

16   time?

17   A.   Yes, I believe so.

18   Q.   One of them is the Brown Scale For Attention Deficit

19   Disorders?

20   A.   That's what is listed here, yes.

21   Q.   And then at the top of the next page 2, he reports why

22   you've come to see him?

23   A.   It says "background and referral information."

24   Q.   Yes.

25   A.   Okay.

1    Q.   It says you're currently in your junior year at Moeller

2    High School?

3    A.   Yes.

4    Q.   And then it goes on to say, Both Brendan and his father,

5    Dr. Berger, wished to both document any deficits that may need

6    appropriate accommodation for college entrance tests, as well

7    as to more clearly define the nature of problems he may be

8    experiencing.  Do you see that?

9    A.   Yeah, that sounds correct.

10   Q.   So you went and got this evaluation shortly before you

11   were taking the college admissions test?

12   A.   It was before the SAT, yes.

13   Q.   And did you ever end up taking the ACT exam?

14   A.   No, never.

15   Q.   So you've never received accommodations on the ACT exam?

16   A.   I've never requested or taken it.

17   Q.   Okay.  And then the information -- was your mother with

18   you at this evaluation?

19   A.   I don't recall.  I don't recall if she was there.  It's

20   possible.  This place was located like across the street from

21   my school, and my school's the one who recommended Dr. Smith.

22   So I don't remember how I got there, I mean, if I was driven

23   across the street or walked across.  I don't remember,

24   honestly.

25   Q.   Okay.  And at the bottom here, one of the things that is

1    reported by Dr. Smith is that you grew up in a bilingual

2    family?

3    A.   Where is that?

4    Q.   Right above "interview information."

5    A.   Oh, I see that here.

6    Q.   And was that information you provided to him?

7    A.   It's possible.

8    Q.   And then if you look at page 3?

9    A.   Is that the next page?

10   Q.   Yes.  Yes.  And he's discussing there a meeting between

11   the Moeller committee and a psychologist from Princeton

12   schools?

13   A.   The second paragraph here?

14   Q.   Yes.  And he's reporting that the Moeller committee had

15   concluded that there was no need for special education

16   assistance at that time, and there were no major concerns

17   along those lines?

18   A.   I see what he's written here.

19   Q.   Good.  Do you know what that Moeller committee is that's

20   being referred to here?

21   A.   I'm not certain.

22   Q.   Is that Ms. Kagy's office?

23   A.   I'm not certain.

24   Q.   And then on page 6, there's a discussion of the question

25   of a learning disability.

1          THE COURT:  Can you refer to the PX number at the

2     bottom of the page.  It's hard for us.

3          MR. BURGOYNE:  I apologize, Your Honor.  I don't have

4     the version that has PX numbers at the bottom, so --

5          THE COURT:  Okay.  We don't have the numbers that

6     you're referring to.

7          MR. BURGOYNE:  You don't have numbers at the top?

8          THE COURT:  No.

9          THE WITNESS:  I don't see them.

10          MR. BURGOYNE:  Because that's the version that was

11     provided to NBME.  Just one moment.  Okay.  Well, I have the

12     PX numbers at the bottom.  Strange.

13     Q.  So I am looking at 272.  Again, in the very last part of

14     the paragraph, the question of a learning disability, there's

15     the discussion, and it's referring again to the fact that the

16     Moeller committee meeting with the psychologist from the

17     Princeton schools determined there was no need for special

18     education assistance.  Do you see that sentence?

19     A.  Is that the last sentence?

20     Q.  Last sentence in the paragraph.

21     A.  I see that sentence, yes.

22     Q.  What was the relationship between Princeton schools and

23     Moeller?  Why were those two entities meeting on the question

24     of possible special needs assistance?

25     A.  So Moeller is the private school that I was attending,

1    and Princeton is the public school district in which I lived.

2    Q.   And did the school district have to approve of any

3    accommodation program that was put in place for you?

4    A.   My understanding is that as a private school, Moeller

5    could institute any accommodations that they wanted, but if

6    they were seeking public funding, I guess they could seek

7    approval for public funding, but I don't really know the

8    details of that.

9    Q.   Okay.  And then at the top of the next page, there's a

10   discussion of whether or not you need extra time on the ACT or

11   SAT?

12   A.   I see that.

13   Q.   And it says in the middle of that paragraph, "He has been

14   noted to have difficulty finishing on time, though it is noted

15   that this is not uncharacteristic for other students in

16   several of his classes."

17   A.   I see that.

18   Q.   Is that information you provided to Dr. Smith?

19   A.   Possibly.  I don't recall telling him that.

20   Q.   And then at the bottom of the next page is where he

21   provides a suggested diagnosis, learning disorder of written

22   language?

23   A.   In bold at the bottom here?

24   Q.   Yes.  Correct.

25   A.   Uh-huh.

1    Q.   And so Dr. Smith did not diagnose you with ADHD in 2003?

2    A.   That's my understanding.

3    Q.   And likewise, he didn't diagnose you with a reading

4    disorder in 2003?

5    A.   He diagnosed me with whatever this is, I'm assuming,

6    learning disorder of written language.

7    Q.   Did there come a time when Dr. Beach diagnosed you with

8    both a learning disorder of written language, of written

9    expression, and a disorder of reading?

10   A.   I believe so.

11   Q.   Look if you would, please, at Exhibit 17.

12        And this is the evaluation that was performed when you

13   were in the second grade?

14   A.   Yes.

15   Q.   And there's a statement here, look right above

16   "behavioral observations"?

17   A.   On the first page, or --

18   Q.   It's on page 3, where it says page 3 at the bottom on the

19   original document.

20        THE COURT:  We don't have a page 3.  We have PX243.

21   Are you looking at the plaintiff exhibits?

22        MR. BURGOYNE:  Yes.  I'm looking at the plaintiff's

23   exhibit, Your Honor, but the version I'm looking at is what

24   went to --

25        THE COURT:  Oh, I see.  Yes, it's obliterated

1    partially, so I see a three, so it's PX245, for the record.

2          MR. BURGOYNE:  Thank you, Your Honor.

3    Q.  And you see where it's behavioral observations at the

4    bottom there?

5    A.  I see that.

6    Q.  And it says, "It was reported that Brendan understands

7    French but does not speak it"?

8    A.  Above behavioral observations?

9    Q.  Yes.

10   A.  I see that.

11   Q.  And you think that was accurate information, when you

12   were in the second grade, you understood French but you didn't

13   speak it?

14   A.  I could understand some French words, but I'd say saying

15   I understood French is reaching.

16   Q.  You went to see Dr. Smith again in October 2008, correct?

17   A.  So 2003, in 2008, that sounds correct.

18   Q.  You went to see him that time because you wanted to get

19   accommodations on the MCAT exam?

20   A.  I believe that was in anticipation of applying, yes.

21   Q.  And then you went to see him again in 2010, and that was

22   to help you get reconsideration of the original denial?

23   A.  So after -- yes.  After the first denial, I went back to

24   him.

25   Q.  And then after AAMC denied it again, and you wanted to

*BERGER - CROSS*                                                161

1    get another consideration, you went to see Dr. Beach?

2    A.   Yes.

3    Q.   And the first time she diagnosed you, Dr. Beach, was that

4    a comprehensive evaluation?

5    A.   In 2010?

6    Q.   Yes.

7    A.   I believe it was an addendum or an update.  I don't think

8    it was a full eval.  I don't remember exactly.

9    Q.   All right.  We can look at it.  In all events, at that

10   point, she did not diagnose you with ADHD, did she?

11   A.   I don't remember.

12   Q.   Have you applied for accommodations recently on the GRE

13   exam?

14   A.   Yes.

15   Q.   And in connection with that exam, did you get another

16   evaluation from Dr. Beach?

17   A.   Yes.

18   Q.   All right.  And at that time, did she provide a new

19   diagnosis for you in support of requests for accommodations on

20   that exam consisting of a learning disability in math?

21   A.   Possibly.  I don't remember if there was a new diagnosis

22   on there.

23   Q.   And is there a math component on the GRE?

24   A.   That's my understanding, yes.

25   Q.   Are you registered to take the Step 2 CK exam?

1    A.   I purchased the scheduling permit back in February from

2    ECFMG, so yes.

3    Q.   That has expired, hasn't it?  It's a three months --

4    A.   No, it's on hold until a decision is made regarding my

5    accommodation status.

6    Q.   Who put that on hold?  What do you have that --

7    A.   So it's standard procedure that when you apply for a

8    scheduling permit with accommodation through ECFMG, you pay

9    for it, and then it is basically kept on hold until NBME

10   renders a decision about whether accommodation is granted or

11   denied.

12       If accommodation is denied, then the scheduling permit is

13   issued at that time; and if it's granted, then it's issued

14   with, I guess, accommodation.  So based on the decision of

15   NBME, the permit will be granted.

16   Q.   So ECFMG issues a permit, and then at that point, who

17   schedules the test?

18   A.   So my understanding is the ECFMG basically handles

19   foreign medical graduates, which is what I am because I went

20   to the Caribbean for medical school.  But I believe that the

21   money that they get, I guess, is somehow paid to the NBME.

22   I'm not really certain exactly how that works, but I just know

23   that the permit I requested is on hold until a decision is

24   made by NBME.

25            THE COURT:  Now I'm confused by this line of

1    questioning.  So who is ECFMG?  What does it stand for?

2         THE WITNESS:  So I actually don't know what the

3    acronym stands for, but basically it's -- so whenever you have

4    to apply for NBME exams as a foreign medical graduate, ECFMG

5    is the one you apply to.  You don't actually apply, I guess,

6    directly with the NBME or USMLE, which is what U.S. students

7    would do.

8         And so the ESFMG's role is basically they make sure that

9    all the documents are in order for all the foreign doctors, so

10   that they have confirmed that you are able to take the exam,

11   and they're not letting people who don't fulfill the criteria

12   get scheduling permits and take the exams.

13        So as a foreign medical graduate, I pay them, and then I

14   guess they interface with the USMLE or NBME, and then the

15   scheduling permit is scheduled.

16        THE COURT:  And what is a scheduling permit?

17        THE WITNESS:  A scheduling permit is a period of time

18   during which I'm able to pick a test date.  So when you apply

19   for a scheduling permit, you pay for the exam, and then it

20   grants you -- you tell them when you want to request to take

21   the exam.  Basically, it's a three-month time period that

22   you're able to sit for the exam.

23        When I applied for it back in February, I believe I

24   requested, I think March through June, or something like that,

25   for my eligibility time period, but it's still on hold because

1    a decision hasn't been reached.

2              THE COURT:  A decision by whom?

3              THE WITNESS:  A decision about accommodations.  I

4    don't know if it's NBME that would be issuing that and then it

5    would be released, or if it's the Court's decision or not.

6    I'm not certain exactly how that would work.

7              THE COURT:  Okay.

8              THE WITNESS:  But when you apply, there's a question

9    where you say are you applying for this with accommodation or

10   without.  And if you're applying for it with accommodation, it

11   basically processes by them, and then it goes in a holding

12   pattern until a decision about accommodations has been

13   reached.

14             THE COURT:  When was the last time you took the

15   Step 2 CK?  When was the last time?

16             THE WITNESS:  I believe it was in 2018.

17             THE COURT:  And then you made a subsequent request

18   for an accommodation, correct?

19             THE WITNESS:  Correct.

20             THE COURT:  And that was denied?

21             THE WITNESS:  Yes, I believe so.

22             MR. BURGOYNE:  Your Honor, just the chronology here,

23   if it's helpful.  He last took the Step 2 CK in August 2018.

24   So I think his last request for accommodations was in 2017.  I

25   don't think there's a subsequent one.

1              THE COURT:  Okay.  And that's what I'm confused

2       about, because what I was hearing was that after the Step 2

3       CK, there was a subsequent request for accommodation made for

4       the ability to take a third Step 2 CK.

5              MR. BURGOYNE:  There is no pending accommodation

6       request, nor was there a post August 2017 or August 2018

7       request.  So there's no additional documentation request that

8       was submitted to us after the last taking of the Step 2 CK.

9              THE COURT:  Okay.  So then I guess I'm confused about

10      how the permit got placed on hold, and maybe it's pending this

11      decision, the lawsuit.  I don't know if anybody can --

12             MR. BURGOYNE:  I don't know the status, Your Honor.

13      All I know is that there are steps that have to take place

14      relative to the ECFMG before he would even be in a position to

15      test, and that's why I was asking him where all that stood.

16      And I don't know the status of -- his registration status, or

17      how long it would take ECFMG to process any information, or

18      anything like that.  They're a distinct organization from us.

19             THE WITNESS:  May I speak?

20             THE COURT:  Yes.  Go ahead.

21             THE WITNESS:  So in the past, when I have requested

22      accommodation from the NBME on the Step 2 CK exam, I would

23      submit the documentation from the psychologist, and the

24      historical documents and all of that, and as a part of that, I

25      believe that I would also pay on the ESFMG's website for this,

1    basically, permit request.  And then once that has been

2    processed on their end, it usually takes them about two weeks

3    to do that, then it's in holding until the NBME would make a

4    decision about accommodation.

5         So then when the letter would come back saying it was

6    denied accommodation, within a couple days, basically, the

7    permit would become active, and I would have three months of

8    eligibility, and then I would have to go on the Prometric

9    website and pick an actual test date within that three-month

10   time period.

11        And I do agree with what Mr. Burgoyne said.  I submitted

12   documentation to NBME before I took the exam in 2018.  And I

13   think that was the last submission.  I can't remember if it

14   was in 20 -- I don't remember.  I think that was the last

15   submission, and it was denied, and then I took the exam with

16   accommodation.

17        But when I actually requested through ESFMG, it says are

18   you requesting this exam with accommodation or without?  And I

19   checked with accommodation, because it was, as far as I

20   understood, pending the decision of the courts about whether

21   accommodation is appropriate or not.

22             THE COURT:  Okay.  Thank you.

23   BY MR. BURGOYNE:

24   Q.  Mr. Berger, look if you would, please, at -- it's our

25   exhibit, so the defendant's exhibits.  I'm not sure which one

*BERGER - CROSS*

1    you have in front of you.  I'm going to direct your attention

2    to Exhibit 15.  Do you have that in front of you?

3    A.   Yes.

4    Q.   Is this your official transcript as of 2017, July 2017,

5    from your medical school?

6    A.   Looks like it, yes.

7    Q.   And does this have your class rank on it?

8    A.   In the top right corner, it says medical sciences rank.

9    Is that what you're referring to?

10   Q.   Well, that's my question, is that your class rank there?

11   A.   I'm not certain if that is my class rank or not.  I don't

12   know.

13   Q.   What does medical sciences refer to there?

14   A.   So medical sciences is probably their term for basic

15   sciences, which is the first two years of medical school.

16   Q.   Do you know what your class rank is?

17   A.   No, not certain.

18   Q.   And about how many students are in your class?

19   A.   I know when I started, the group I was with was -- they

20   have three groups per year, and the group I was with was 115,

21   or something like that.  But there are changes, and I've been

22   switched to different groups because of the delay, so I'm not

23   certain even what class I'm technically in as far as the

24   school is concerned.

25   Q.   So you don't know whether as of July 2017, your class

1    rank was 70 out of 92 students?

2    A.   I'm assuming this is based on my medical sciences

3    performance, so -- but I don't know if anything related to my

4    clinicals is included in that calculation.

5    Q.   Has your dean written a dean's letter for you that you're

6    going to rely on as part of your electronic residency

7    application process?

8    A.   I have requested an MSP letter from my school.

9    Q.   You don't have one currently?

10   A.   They prepared one in 2016.  I don't have an updated one

11   this cycle yet, if that's what you're asking.

12   Q.   And you've got to have that as one of your credentials to

13   participate in the match, correct?

14   A.   It's part of the application.

15   Q.   Okay.  And do you have any understanding when you're

16   going to be provided with that document?

17   A.   I'm not certain.

18   Q.   In connection with your testimony about residency

19   program, could you give the Court a little better

20   understanding of how the whole process works in terms of what

21   you have to do to participate in the match?  First of all, for

22   example, do you have to submit an application through the

23   electronic residency application service?

24   A.   There's a centralized application, yes.

25   Q.   And that's operated by the Association of American

1    Medical Colleges?

2    A.    Possibly.  I don't remember the name of who manages it.

3    Q.    And have you submitted your application yet for the

4    residency application process?

5    A.    No.

6    Q.    And when do you plan to do that?

7    A.    I was planning on doing it as soon as I take the exam.

8    Q.    And then you need a dean's letter as well, and you don't

9    have that yet?

10   A.    There is a version from 2016 that can be updated quickly,

11   if need be, so it shouldn't take long to provide that.

12   Q.    Okay.  But that's out of your control, the dean deals

13   with that, and --

14   A.    Yeah.  There's people at my school that would be dealing

15   with that, yes.

16   Q.    And then what other credentials do you have to submit to

17   the match program to participate in the match?

18   A.    My understanding is that the application includes letters

19   of recommendation from attendings, the dean's letter, and

20   scores on the step exams.  I think there's also a personal

21   statement component, if I remember correctly.

22   Q.    Have you prepared your personal statement yet?

23   A.    Yes.

24   Q.    And when do you have to have your Step 2 CK passing score

25   by?  Is there a date by which you have to confirm that you've

1    passed the Step 2 CK exam?

2    A.   So my school asks students to have their Step 2 CKs taken

3    by the end of August in order to have it as part of the

4    application when the applications go -- the MSP letter is

5    added in the beginning of October.  So my understanding is

6    that I have to take it by the end of August in order to be a

7    part of that.

8    Q.   Take a look, if you would, please, at -- start with DX,

9    so it's the defendant exhibit.  Do you have that in front of

10   you now?

11   A.   I have it.

12   Q.   And it's Exhibit 21, Exhibit C within that.

13   A.   Yes.

14   Q.   And would you identify this document for the Court,

15   please?

16   A.   It looks like a document from AUC.

17   Q.   Have you ever seen this document before?

18   A.   It looks familiar, but I haven't looked at it recently.

19   Q.   It surprises me.  The caption is "United States Medical

20   Licensing Exam Step 2 Clinical Knowledge (CK) Exam, FAQs" from

21   your medical school.  And it discusses what's required, when,

22   and everything like that.  Your testimony is you haven't

23   looked at this recently?

24   A.   I'm sure that I already reviewed it back in 2016, so I

25   didn't review it again recently, that's what I mean.

BERGER - CROSS

171

1    Q.   All right.  And then there's a discussion on page 2 of

2    the document that -- the question is, "How important are NBME

3    shelf exam and the NBME comprehensive clinical science exam,"

4    and that's the exam you were discussing earlier?

5    A.   The comprehensive exam?

6    Q.   Correct.

7    A.   Yes.

8    Q.   And then there's a statement in here that says,

9    "Comprehensive clinical science exam can be a predictor for

10   readiness to take Step 2 CK and must be passed before AUC

11   students are cleared to take Step 2 CK."  And I believe you

12   testified that you understand you have a waiver from that

13   requirement?

14   A.   That's correct.

15   Q.   Do you recall your performance, what your performance was

16   on that exam, how close did you come to pass it?

17   A.   I don't remember what the passing score was, but I was

18   not able to pass the exam.  I took it multiple times, so -- it

19   would be hard for me to say a specific score.

20   Q.   And you took that with extra testing time?

21   A.   I had 50 percent extra time.

22   Q.   And then if you look at -- the number on the top is

23   page 5 on the original document, and there's a discussion

24   about registering for Step 2 CK?

25   A.   I see that.

1    Q.   And it talks about how you schedule it.

2         MR. BURGOYNE:   And there's a reference here, Your

3    Honor, to the ECFMG.

4    Q.   And then it says "when should I take Step 2 CK," and then

5    you see the second paragraph here, "Students need to take

6    USMLE Step 2 CK by December 31, 2018, to help ensure that

7    results will be available in time to participate in the 2019

8    main match"?

9    A.   Okay.

10   Q.   And this is the document from last year, I should

11   clarify.  There isn't a version on the website that I'm aware

12   of applying to the 2020 match.  But is it your understanding

13   that you could take Step 2 CK as late as December 31st and

14   still be able to participate in the match?

15   A.   My understanding is that technically that is correct.

16   Q.   Exhibit E.  Same Exhibit 21, but Exhibit E within this.

17   It's two exhibits further in.  I don't think you offered this

18   exhibit, but this is the AAMC's denial of your request for

19   reconsideration --

20   A.   I see that.

21   Q.   -- on the AAMC accommodations, the MCAT accommodations.

22   And do you recall, when you applied for accommodations, AAMC

23   informed you that they had sent your paperwork out to an

24   external reviewer to evaluate your accommodation request?

25   A.   That sounds correct.

1    Q.   And that external reviewer concluded that you were not

2    substantially limited in any major life activities.  Do you

3    recall that?

4    A.   I would assume, if the letter says so, that's what they

5    said, yes.

6    Q.   Exhibit G, is this the calendar for the 2020 match?

7    A.   I think it says 2019.

8    Q.   You're exactly right.  I printed the wrong one.  My

9    apologies.  What's your understanding of the timing for the

10   2020 match?  Is it also held in March?

11   A.   The cycle is similar from year to year.

12   Q.   Okay.  And then just so the Court understands, there's a

13   deadline by which you submit a rank order list?

14   A.   Yes.

15   Q.   And that's you put the residency programs you want to

16   interview with?

17   A.   No.  So the rank order list is after you've done

18   interviews, you rank the programs that you interviewed at and

19   the programs rank the people that they interviewed.  So both

20   people rank who they met basically during interviews earlier

21   in the season.

22       And then once that is done, that's entered into an

23   algorithm, and then the algorithm decides which residents are

24   matched up to which programs, and that's what the match is.

25   Basically, it spits out a matchup, which is --

1    Q.   But the fact that you interview with somebody doesn't

2    mean you're going to get listed on their rank order list, does

3    it?

4    A.   So both sides list who they want on their rank order

5    list, so both sides have control over that.

6    Q.   Right.  But if a residency program interviews you but

7    doesn't want to put you on their rank order list, they're not

8    required to, are they?

9    A.   I don't believe they're required to, no.

10   Q.   And then at some point in March or February, there's --

11   the rank order list goes in February 20th, and then there's

12   match week where the algorithm does its process.  And then if

13   students don't match, that's when they can participate in what

14   you referred to as the SOAP process or the scramble?

15   A.   That's how I understand it.

16   Q.   Okay.  And if you look at Exhibit H, is that a

17   description of the Supplemental Offer and Acceptance Program?

18   A.   It looks to be, yes.

19   Q.   And in order to participate in this program, if you don't

20   match as part of the main match process, then you still have a

21   chance to get a residency position by participating in this

22   scramble; is that correct?

23   A.   I believe it was instituted so that people would get a

24   chance if there were spots remaining.

25   Q.   And if you participate in that process, these are

1    programs that you will not have interviewed with, correct?

2    A.  My understanding is that during this process, you either

3    talk to or can be contacted by the program so they may

4    interview you.  I don't know how that works, exactly.

5    Q.  But if that happens, that's happening next March?

6    A.  It would -- yeah, it would probably be near the end of

7    the cycle.

8              THE COURT:  Counsel, are you going to move on to

9    another exhibit, because I did have a question about this.

10             MR. BURGOYNE:  Okay.

11             THE COURT:  I'm looking at 21G, the timeline.  So

12   Mr. Berger, you testified that technically you could take the

13   CK exam as late as December the 31, 2019.  Where would

14   interviews for residency matching programs, when would that

15   occur, if that was the --

16             THE WITNESS:  So residency interview season is

17   basically October -- it's like October, November.  Yeah,

18   October, November, December, and then pretty much all the

19   interviews are done at that point.  And so if you -- some U.S.

20   grads don't take the CK until sort of later in the cycle, but

21   as a foreign medical graduate, if you don't have a CK score

22   back, your chances of interviews are virtually nil.  And so if

23   you -- in my case especially, with two failing CK scores, the

24   likelihood that I would have any interviews late in the season

25   is very minimal.

1          THE COURT:  Thank you.

2     BY MR. BURGOYNE:

3     Q.  If you don't participate in this year's match, given the

4     status of your arrangement with the school, you'll still be

5     able to participate in next year's match, correct?

6     A.  It's possible.

7     Q.  And in fact, you could -- if you pass the Step 2 CK

8     before that, you'll be able to get on the interview schedule,

9     and everything will proceed from that point forward?

10    A.  I would have a completed application as far as having a

11    passing CK score, so that would be helpful.

12         MR. BURGOYNE:  Your Honor, I have two more lines of

13    questioning.  Do you want a break, or do you want to have me

14    keep going?  I realize I've been going --

15         THE COURT:  Two more questions, or two more lines?

16         MR. BURGOYNE:  Two more lines of questioning.  I

17    don't think it's going to be that long, but --

18         THE COURT:  Let's take a ten-minute break.

19         (Brief recess.)

20         THE COURT:  Go ahead.

21         MR. BURGOYNE:  Thank you, Your Honor.

22    Q.  Mr. Berger, we talked briefly about you going to see

23    Dr. Beach in 2010.  I believe it was May 2010, is that right,

24    end of May?

25    A.  That sounds correct.

BERGER - CROSS

1   Q.   And you went to her because somebody at your medical

2   school or your undergraduate school, University of Cincinnati,

3   recommended that she is somebody you could go see about

4   getting additional documentation?

5   A.   That's correct.

6   Q.   And you had no relationship with her previously?

7   A.   That's correct.

8   Q.   And then you worked very closely with her to develop a

9   strategy for obtaining accommodations from the Association of

10  American Medical Colleges, correct?

11  A.   I explained the situation to her, and she evaluated me,

12  if that's what you mean.

13  Q.   Did it end there with the evaluation?

14  A.   I mean, we discussed the situation, if that's what you're

15  asking.

16  Q.   Let me ask it to you this way.  She helped you draft your

17  cover letter to send to AAMC, didn't she?

18  A.   Yes, I suppose so.

19  Q.   And then she would routinely send you drafts of her

20  report, and ask you to read those drafts and provide comments

21  and suggest the changes, wouldn't she?

22  A.   She asked me to check for accuracy, to make sure there

23  weren't any typos or inaccuracies in the reports, yes.

24  Q.   And you did that every time that she drafted one of her

25  reports?

1    A.   Well, if she sent something to me, I tried to review it,

2    yes.

3    Q.   And that includes the 90-page report that she sent to

4    NBME.  Do you recall reviewing that report?

5    A.   Most likely I reviewed it, sure.

6    Q.   And then you also discussed what documents you should try

7    to provide to the AAMC and then subsequently to the NBME?

8    A.   Well, she informed me that she thought that because I had

9    a long history, and I hadn't included all of the documents in

10   previous submissions, that it would make sense to include as

11   many documents as possible so the reviewers could review

12   everything, yes.

13   Q.   And is she the one that suggested you contact someone

14   from St. Gabriel to see if they had any documentation you

15   could use?

16   A.   It's possible.

17   Q.   And do you know if she contacted Archbishop Moeller to

18   see if they had any documentation that supported the fact that

19   you had gotten accommodations there?

20   A.   I believe she did.

21   Q.   And do you recall what the outcome of that was?

22   A.   My understanding is that Moeller said they didn't have

23   older documents.  I know I contacted Moeller as well myself at

24   some point.  I don't know if that was before or after

25   Dr. Beach, but --

1   Q.   Okay.  If you could look at the defense exhibits.  Do you

2   have those in front of you?

3   A.   That's in front of me, yep.

4   Q.   And let's start with DX4.

5        Do you recognize this document?

6   A.   Yes.  It looks familiar.

7   Q.   Do you recall that she prepared it -- well, what is this

8   document?

9   A.   I believe this is something that Dr. Beach wrote up.

10  Yeah, I think she wrote up this list.

11  Q.   And then take a look at DX14, which are some emails to

12  and from you and Dr. Beach?

13  A.   Okay.

14  Q.   And in the middle there, she writes, "By the way, the

15  edits you sent me for the introduction and recommendations

16  sections are made in the master copy I am still working on."

17  Do you see that?

18  A.   I see that.

19  Q.   Do you recall what edits you made to the intro or the

20  recommendations regarding accommodations?

21  A.   No.

22  Q.   The last thing I have is just some quick cleanup on some

23  documents that I neglected to ask you about, and I apologize.

24  First of all, just closing up on the residency, are there some

25  residency programs that select residents without participating

*BERGER - CROSS*                                                              180

1    in the match?

2    A.   My understanding is that it used to be more common, but I

3    do believe it still exists, but the number of programs is

4    decreasing yearly.

5    Q.   Do you support that at all?

6    A.   I know people who have gone through what's called

7    pre-matching, which is what I think you're referring to.

8    Q.   Now, are you familiar with the Find A Resident program

9    that the Association of American Medical Colleges operates?

10   A.   I don't recognize that name specifically.

11   Q.   Okay.  And you don't know whether or not that's something

12   that international medical school graduates often use?

13   A.   I've never heard of an international medical graduate

14   mentioning to me, so no.

15   Q.   You discussed earlier your issues you were having with

16   concentration and focus relating to the ADHD diagnosis that

17   you had?

18   A.   Yes.

19   Q.   Did you have difficulty concentrating and paying

20   attention as a child?

21   A.   Yes.

22   Q.   And did you have those same issues at age 17, when you

23   were evaluated by Dr. Smith the first time?

24   A.   I would assume so, yes.

25   Q.   And did you have those same issues when you were

1    evaluated by Dr. Smith at age 23 in 2008?

2    A.   I would believe so.

3    Q.   And likewise, did you have those same issues when you

4    were first examined by Dr. Beach in 2010?

5    A.   Most likely, yes.

6    Q.   You mentioned that your school requires or has

7    limitations on how many times you can take and fail the step

8    exams.  How many times is an AU student, AUC student, allowed

9    to fail Step 1 without being dismissed from school?

10   A.   My understanding is, I think it's three times.

11   Q.   Okay.  Do AUC students have up to six times to fail the

12   Step 2 CK exam without being dismissed?

13   A.   So according to the -- I think it's the ECFMG guidelines,

14   or I don't know if it's USMLE or ECFMG that sets that, but the

15   theoretical maximum is six for anybody taking the exam, but I

16   believe that my school has a limit that might be lower, it

17   might be three.

18   Q.   And I take it the reason they have these limits, it's not

19   uncommon for people to fail Step 1 or Step 2 CK the first or

20   second time they take it?

21   A.   I don't know if that's the reason they have the limits,

22   but there are certainly students who fail the exams.

23   Q.   And those are students without any disabilities?

24   A.   Anybody who takes the exam could potentially fail it.

25   Q.   Okay.  We looked at PX13, which was the list of exhibits

1    that you submitted to the National Board of Medical Examiners

2    in support of your accommodation request?

3    A.   I don't specifically remember if this was included or

4    not, but --

5    Q.   Do you recall that, in general, when you submitted

6    accommodation requests after you started working with

7    Dr. Beach, your submissions included a list of documents?

8    A.   Yes.

9    Q.   Okay.  I believe -- I thought I heard you testify this

10   morning that this was a list of documents that you provided to

11   the National Board of Medical Examiners?

12   A.   From across the room, it looked similar to the index

13   list, yes.

14   Q.   Is that the index you have in front of you?

15   A.   No, this is the ADHD verification form.  You said DX13?

16   Q.   No, it's PX.  I'm sorry.  My apologies.

17   A.   Oh, PX.  Okay.  So we switched.

18   Q.   My apologies.  PX.  That was my pronunciation, not you.

19   A.   The request for test accommodation form, is that what I

20   should be looking at?

21   Q.   Yes, the index.

22         THE COURT:  Or appendix?

23         MR. BURGOYNE:  Appendix, yes.  Appendix it's called

24   at the top, yes.

25   A.   Exhibit 14?

1   Q.   13.

2   A.   13.  Okay.  I misunderstood.

3   Q.   You got that?

4   A.   Okay.  Here we go.  Yes, this is the appendix.

5   Q.   And did you work with Dr. Beach to determine what

6   documents you were going to submit in support of your

7   accommodation request?

8   A.   I think we might have discussed it, sure.

9   Q.   I notice that your list of documents here and subsequent

10  list did not include your 2010 MCAT results.  Was there a

11  conscious decision to exclude those MCAT results?

12  A.   I don't particularly remember.

13  Q.   Okay.  They're not on this list, are they?

14  A.   There's MCAT score report, but it looks like it's just

15  2009.

16  Q.   And then likewise, your results from the PSAT were not

17  provided.  Was that a conscious decision not to include your

18  performance results from the PSAT when you provided

19  documentation?

20  A.   I don't remember making a decision to omit that, but I

21  know that we had submitted it subsequently, so I don't know

22  why we would have specifically not submitted it and then

23  submitted it later if we didn't want to.

24  Q.   Do you know if you submitted it later as part of your

25  court papers, as opposed to submitting it to NBME when they

1    were reviewing your accommodation requests?

2    A.   I know it was one of the exhibits that was submitted by

3    Mr. Weiner, if that's what you're referring to.

4    Q.   Okay.  And then I notice that there were two subsequent

5    letters from the Association of American Medical Colleges

6    denying your reconsideration requests that were not provided

7    to AAMC.  Were those omitted for a reason, or do you recall

8    discussing whether they should be provided?

9    A.   We had three denials from the AAMC, if that's what you're

10   asking, yes.

11   Q.   And did you provide all three of those to the National

12   Board of Medical Examiners?

13   A.   I don't believe so.  I'm not sure.  I think either the

14   first or the second.  Maybe just the first one was included.

15   I'm not sure.

16   Q.   If you look at, to make sure we get in the record,

17   Defense Exhibit 9.  It's the other notebook.  Got that?

18   A.   Okay.

19   Q.   Could you confirm for us, please, that this is the letter

20   that you received from the Association of American Medical

21   Colleges denying your second request for reconsideration?

22   A.   That's what it looks like, yes.

23   Q.   And this was denying the request that had been submitted

24   on your behalf, or with documentation from Dr. Beach, correct?

25   A.   If this is the second denial, I believe that was

1    Dr. Smith's, the submission of information from Dr. Smith.

2    Q.  Well, you recall Dr. Beach's first report is June 2010?

3    A.  Okay.  So maybe this is the third one, then.  So if this

4    is the third one, then that would be Dr. Beach.

5    Q.  Okay.  And in fact, if you look, the second paragraph

6    references Dr. Smith, and then the third paragraph discusses

7    the additional testing that was done by Dr. Beach?

8    A.  Okay.  I see that here.

9    Q.  Do you see that?

10   A.  Uh-huh.

11   Q.  You indicated you got accommodations on the shelf exams.

12   Was that 50 percent extra testing time?

13   A.  Yes.

14   Q.  And that accommodation was approved by your medical

15   school.  You got that extra time because your medical school

16   approved it?

17   A.  That's correct.

18            MR. BURGOYNE:  I have no further questions, Your

19   Honor.

20            THE COURT:  Thank you.  Redirect?

21            MR. WEINER:  Thank you, Your Honor.

22                    REDIRECT EXAMINATION

23   BY MR. WEINER:

24   Q.  The comp exam that had been discussed, you indicated you

25   had 50 percent extended time?

1    A.   Yes.

2    Q.   That exam, how long an exam is it?

3    A.   The comp before the Step 2 CK exam, under standard

4    conditions, I think it's maybe three or -- somewhere between

5    three and four hours, I think.

6    Q.   Is it longer than the shelf exams?

7    A.   Yes.

8    Q.   And when you took that exam, were you able to complete

9    the exam?

10   A.   No.

11   Q.   Why?

12   A.   So the exam is not quite as reading intensive as the

13   actual step exams, but it's extremely long.  So with 50

14   percent extended time, I think my exam time was about six and

15   a half hours straight with no breaks.  And when I was going

16   through and trying to do that exam, the fatigue and inability

17   to focus hit really hard.  I think, honestly, anybody who has

18   to do something like that non-stop for six and a half hours

19   would struggle with that.

20       And it's something that when I was going through, I would

21   hit a wall, where I basically was doing my best and trying to

22   read as quickly as possible; and, you know, even though I had

23   the extra time, I still would get to the point where I just

24   couldn't focus any more, and it was still counting -- the

25   clock was still counting down.  And basically, I would guess

*BERGER - REDIRECT*

1    at answers because if you leave them blank, you -- it will

2    hurt your score, so I had to do that, yes.

3    Q.   Were you able to demonstrate your skill and knowledge on

4    that exam with 50 percent extended time?

5    A.   No.

6    Q.   How would you have been able to demonstrate your skill

7    and knowledge on that exam?

8    A.   I think, if I had been given extra time and breaks, it

9    would have been possible.

10   Q.   And during Mr. Burgoyne's questioning, there were points

11   about Dr. Beach assisting you with the documentation submitted

12   to both the MCAT as well as NBME.  Did you request her

13   assistance?

14   A.   Not that I -- I mean, I don't remember specifically

15   asking her to do anything in that regard, other than

16   evaluation.

17   Q.   There was a discussion about how many times typical

18   students at AUC can take the Step 2 CK.  And you had indicated

19   how many times?

20   A.   I think that my school sets a limit of three times.

21   Q.   Okay.

22   A.   But I don't remember offhand.

23   Q.   All right.  Has your school set a limit for you in terms

24   of how many more times you can take the Step 2 CK?

25   A.   Yes.  They're allowing me one more time.

1   Q.   And if you go to Plaintiff's Exhibit 60.

2   A.   All right.  I'm there.

3   Q.   Is this the source of your knowledge about how many more

4   times you can take this Step 2 CK exam?

5   A.   Yes.  This is the letter from Adtalem.

6   Q.   All right.  And is it in paragraph 2 where they make that

7   statement?

8   A.   I believe so.

9   Q.   Is it paragraph 2 where you're told you have one more

10  chance?

11  A.   So it says here too, and there's one additional attempt,

12  yes.

13  Q.   And if you could turn to Exhibit 48, please.

14  A.   I'm there.

15  Q.   Is this a copy of your prior attorney, Ms. Brown's letter

16  to Dr. Farmer in connection with your 2018 request for

17  accommodations?

18  A.   Yes, it looks like it.

19  Q.   And this was submitted to the NBME?

20  A.   Yes.

21  Q.   And if you turn to PX400 and PX -- it got knocked off,

22  but it would be 401.

23  A.   Is that Exhibit A?

24  Q.   Yes.  Exhibit A is your PSAT score?

25  A.   Yes.

1    Q.    Does that refresh your recollection as to when you sent

2    the NBME a copy of your PSAT score?

3    A.    Yes.

4              MR. WEINER:  Nothing further, Your Honor.

5              THE COURT:  And when would that be?

6              THE WITNESS:  In February of 2018.

7              THE COURT:  Thank you.  Thank you, sir.  You may step

8    down.

9              THE WITNESS:  Thank you.

10             (Witness excused.)

11             THE COURT:  Let's talk a little bit about

12   housekeeping.  Your next witness will be Dr. Beach?

13             MR. WEINER:  Yes.

14             THE COURT:  When we were planning for these two days

15   of hearings, my understanding was that we were going to do

16   both plaintiff's witnesses today and defendant's tomorrow.  So

17   I guess the question is, I don't know how much time you plan

18   on taking with Dr. Beach, and I guess I'd like to wrap up by

19   6:00, if we could.

20             MR. WEINER:  Okay.  Your Honor.

21             THE COURT:  And I don't know if Dr. Beach is

22   available to come back tomorrow.  I don't know how much

23   questioning --

24             MR. WEINER:  She indicates she is, and hopefully we

25   can wrap up by 6:00, or if we don't, early tomorrow we can

 1    wrap up.

 2              THE COURT:  All right.  Very well.  Thank you.

 3              MR. WEINER:  Dr. Beach, will you come forward,

 4    please.

 5                        CHERYL BEACH, Ph.D

 6    a witness herein, being first duly sworn, was examined and

 7    testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MR. WEINER:

10    Q.   Good afternoon, Doctor.  Can you state your name and your

11    business address, please?

12    A.   Cheryl Beach, and business address is 3001 Highland

13    Avenue, Cincinnati, Ohio, 45219.

14    Q.   Where are you employed?

15    A.   I'm self-employed in private practice in psychology.

16    Q.   Can you discuss your educational background?

17    A.   I have a Ph.D from the University of Wisconsin, and after

18    that, I did a postdoc fellowship with Elizabeth Bates at UC

19    San Diego.  And after that, with experience working with

20    children and adults who have language impairment, I developed

21    an interest in getting more information about clinical work

22    with actual patients.  So then I completed a second doctoral

23    level training program in clinical psych, and then did a

24    fellowship at Cincinnati Children's in the area of pediatric

25    psychology, with an emphasis on evaluation of learning

1    disabilities, and children that have a wide range of problems

2    that involve cognitive and academic processing.

3    Q.   Did you prepare a curriculum vitae in connection with

4    this matter?

5    A.   Yes.

6    Q.   And at Exhibit 3 -- I'm sorry.  Exhibit 63 of the larger

7    binder.

8              MR. WEINER:  May I approach the witness, Your Honor?

9              THE COURT:  Yes, you may.

10   Q.   Is this a copy of your curriculum vitae?

11   A.   Yes.

12   Q.   And does that reflect your educational employment

13   history?

14   A.   Yes.

15   Q.   And does it also reflect your publications and

16   presentations?

17   A.   Yeah.  Publications are on there.  Presentations are not

18   necessarily up to date.

19   Q.   It's abridged?

20   A.   Yeah.  I don't always update.

21   Q.   Could you discuss the nature of your current practice?

22   A.   About half the work I do is evaluation, and the other

23   half is psychotherapy.

24   Q.   What type of evaluations do you conduct?

25   A.   Most of my referrals come from either psychology for

1    differential diagnosis, including ruling out a psychotic

2    disorder, differential with depression, anxiety, maybe more

3    severe disorders, and also learning and attention disorders.

4         And I also see people that are kind of on the extreme of

5    the spectrum, like sometime -- I recently evaluated somebody

6    with Down syndrome who is in a private high school and so has

7    not had IEPs, and -- but I also see a lot of people that are

8    very high functioning and have significant learning and

9    attention disorders.  And I often assist with evaluating,

10   updating, evaluation, and either advising on learning

11   strategies, or submitting requests for accommodations for

12   things like professional and graduate admission or licensure.

13        I work with a lot of medical specialty boards; USMLE, bar

14   exam, CPA exam, so a number of that type of evaluation.  I

15   also see a lot of people who are in eleventh or twelfth grade

16   preparing for the transition to the college setting, and they

17   often need an updated psychoeducational evaluation.

18   Q.   So it's fair to say that some of your work is associated

19   with doing evaluations for people seeking accommodations on

20   high stakes exams?

21   A.   Correct.

22   Q.   And some of your evaluations are associated with people

23   who need learning strategies?

24   A.   Right.

25   Q.   And some of your evaluations are associated with

1   individuals who actually need some type of therapy treatment?

2   A.   Uh-huh.  Right.  Or a psychiatry differential diagnosis.

3   Q.   Does your practice entail evaluating individuals to

4   determine whether or not they have a disability under the

5   Americans with Disabilities Act?

6   A.   Well, my job would be primarily to determine if there is

7   a disorder and a diagnosis, and then I might have an opinion

8   about disability, but that determination would ultimately be

9   made by the university they're going to attend, or the

10  licensing board, or, you know.

11  Q.   In your practice, do you evaluate individuals for

12  suspected learning disability?

13  A.   Yes, frequently.

14  Q.   And in your practice, do you evaluate individuals with

15  suspected Attention Deficit Hyperactivity Disorder?

16  A.   Yes.

17  Q.   About how many individuals would you estimate you

18  evaluate on, let's say, an annual basis?

19  A.   That's a little tough to call.  An evaluation such as the

20  one we're talking here for Mr. Berger would take me a very

21  long time, but not all evaluations are that complicated.  So I

22  would have to estimate between maybe 50 -- maybe 50 a year at

23  the present time.

24  Q.   And over the course of your professional history, about

25  how many evaluations have you conducted?

1     A.   Well over a thousand, and I think I would be safe in

2     ballparking it around 1,500, and that's because I'm old.  No,

3     I've been doing it a while, yeah.

4     Q.   In your curriculum vitae, there's a position that you had

5     with the medical school.  Can you explain what that position

6     was?

7     A.   Assistant dean of student affairs.  And that included

8     looking after student well being in general.

9     Q.   Which medical school?

10    A.   University of Cincinnati, College of Medicine.

11    Q.   And when did you hold that position?

12    A.   I think starting in 2001, I think.

13    Q.   How long did you hold that position?

14    A.   Maybe four years.

15    Q.   And what was your role in that position?

16    A.   Organizing programs to make mental health services

17    available that were confidential for medical students, being

18    available for general counseling.  But a large part of my role

19    was involved in assisting students with learning activities,

20    running a tutoring program.  But also I developed and ran the

21    disability accommodations program, and reviewed -- that would

22    review the documentation for the students that were coming in

23    and requesting disability accommodations.

24         But I also met with every student that was preparing to

25    take Step 2 for at least an hour one time, and any student who

1    was close to the borderline in passing courses, I would meet

2    with frequently to make sure that they were okay with their

3    study and learning strategies.

4        And anybody that failed a board exam was also at great

5    risk for being dismissed, and so I would work very closely

6    with those students.  And I also was available to help all the

7    students as needed with learning and study strategies for the

8    medical education curriculum.

9    Q.   When you're conducting an evaluation and rendering a

10   diagnosis, on what criteria do you rely?

11   A.   The DSM-V.

12   Q.   Can you explain what that is?

13   A.   It's a system of psychiatric diagnosis that is organized

14   into groupings, and it has -- each disorder has specific

15   criteria for making that diagnosis.

16   Q.   Can you explain what a learning disability is?

17   A.   It is an individual difference, neurological in origin.

18   Something about that individual that interferes with their

19   ability to learn specific skills that are essential for

20   academic learning, and it's something that persists despite

21   interventions.  And it's in place even though this person's

22   had appropriate learning opportunities, and there's not --

23   there aren't other factors that are interfering with their

24   learning chances.

25       It's also something that's diagnosed under the current

1    system by a combination of scores from individual tests,

2    individual administered tests, that are substantially below

3    what is expected for their age, and a combination of that with

4    clinical observations, error patterns that are diagnostic, so

5    additional observations that come from a more qualitative

6    source.

7    Q.   What are some of the features that exist for a learning

8    disability?

9    A.   Well, to the present concern, dyslexia -- this is a

10   relatively recent revision to our system, and --

11   Q.   One thing.  You used the term "dyslexia."  What is that?

12   A.   Well, dyslexia is a type of learning disorder.  It's

13   neurologically based, and it interferes with the learning of

14   phonological rules, as well as letter, sound correspondence,

15   and it is something that does persist into adulthood.

16        And what it basically does with adults is it makes it so

17   that the person is slower to identify words, and less accurate

18   in identifying words, and so it interferes with reading

19   comprehension by introducing errors, a higher error rate at

20   that kind of basic input level of word identification.

21        And it didn't used to be a term that was acceptable in

22   the diagnostic manuals.  So in the DSM-IV, dyslexia did not

23   exist, technically.  So a lot of clinicians would not seek to

24   use that as an official diagnosis because there wasn't one,

25   where now we have a way to build it in.

1    Q.   And have you discussed all the features of a reading

2    learning disability, or a learning disorder in reading?

3    A.   Not everybody has this lower level disruption to the rate

4    and accuracy of word identification.  Some people

5    predominantly just have difficulty with organizing the

6    information and interpreting the meaning of what they're

7    reading.

8    Q.   And is that a reading comprehension problem?

9    A.   Yeah.  So you could say that dyslexia is a subtype of

10   reading disorder; and, you know, it tends to generate a

11   problem very similar to the other one.

12   Q.   Is reading fluency a feature of a learning disorder in

13   reading?

14   A.   Reading disfluency, meaning -- what that means is that

15   the fluency refers to the rate and accuracy of reading.  So if

16   you have a slower rate, and you're significantly less accurate

17   than most people, then you are disfluent.

18   Q.   Is there a cure for learning disabilities?

19   A.   No.

20   Q.   How are learning disabilities addressed in an educational

21   setting?

22   A.   There are different categories for clinical diagnosis or

23   identification of learning disability.  So there are a variety

24   of kind of learning disabilities.  It's a mixed group of

25   different kinds of disorders that affect different systems,

1       but the school categories and the clinical categories don't

2       necessarily line up.

3       Q.  All right.  How does one go about diagnosing a learning

4       disorder?

5       A.  Individual assessment, and looking to see if there's

6       evidence of substantially lower scores than you're expecting

7       for that person given their age and the quality of their

8       learning opportunity.  And you have to make sure that the

9       difficulties aren't due to other factors.  Like if you have a

10      hearing impairment, and it interferes somehow with the

11      performance of communication, it doesn't mean you have a

12      learning disability due to that.

13      Q.  You've said it that, in diagnosing a learning disability,

14      it's dependent upon scores.  What are you referring to in

15      terms of scores?

16      A.  Well, let me clean out my terminology, because I -- the

17      clinical term and the medical diagnosis is disorder.  A

18      disability is a legal term that pertains to the functional

19      impact of something like a disorder or a condition.  It's

20      causing an impairment that substantially limits your

21      functioning in major life activity areas, where a disorder

22      would mean that you have enough symptoms present that we would

23      say we're diagnosing a disorder.  In the old version of our

24      diagnostic categories not too long ago, the diagnostic

25      criteria for learning disorder had to do with comparing like

1    an IQ score with a reading score, and how big -- if there was

2    a gap between them, how big that gap would be.

3        Under the new system we've gotten rid of that, and now we

4    say we are -- you're in the range of substantially lower than

5    we would expect for you.  So the current clinical system is

6    more in line with the disability definition by law, but I do

7    need to be careful about how I'm speaking about it because

8    it's an area that clinicians often mishmash, as I think we've

9    seen.

10   Q.   So my question is really directed to the scores.  What

11   are you referring to when you're talking about scores?  Scores

12   on what?

13   A.   Tests of speaking, listening comprehension, reading,

14   writing, math.

15   Q.   These are different assessments that psychologists

16   administer?

17   A.   Yes.

18   Q.   And what is Attention Deficit Hyperactivity Disorder?

19   A.   That is a difficulty with sustaining concentration and

20   attention.  There are a number of symptoms.  We group them to

21   inattentive, as well as hyperactive, impulsive.  Some people

22   have both.  Some people have one and not the other so much.

23       And what we're saying is that the person has problems

24   with sustaining their concentration or their focus, and with

25   vulnerability to detail errors and other types of symptoms to

 1    a greater extent or more frequently than the average person so

 2    that it's actually causing -- it's interfering with their

 3    functioning, and it's been present -- or evidence of that has

 4    been present before the age of 12.

 5    Q.   When making a determination regarding accommodations on a

 6    high stakes exam, what type of criteria do you use?

 7    A.   Say that again, please.

 8    Q.   When making a determination or a recommendation, perhaps,

 9    what criteria do you use?

10    A.   In formulating my recommendations, I would base that on a

11    combination of age norm-based test scores, consideration of a

12    detailed history, because I require, when I do this type of

13    evaluation, that I have extensive documented history, not just

14    patient self-report, and also clinical observations of -- that

15    are consistent with what the numbers are telling me.  So you

16    develop a sense of, you know, what a disorder presents with.

17    Q.   When making a recommendation regarding a disability for a

18    high stakes exam, what criteria do you use when making a

19    recommendation?

20    A.   A combination of a review of the history, and clinical

21    observations, and test scores.

22    Q.   And are your recommendations regarding high stakes exam,

23    do you consider the Americans with Disabilities Act?

24    A.   Yes.

25    Q.   And what is the definition of a disability under the

1    Americans with Disabilities Act?

2    A.  Well, a person has a disability if they have a disorder

3    or some other condition that imposes a substantial limitation,

4    and it's interfering with their ability to perform -- it

5    affects major life activities, so meaning the ability to do

6    things that are very important for us in daily living, like

7    reading, concentrating, reading, et cetera.

8    Q.  When did Mr. Berger first come to your attention?

9    A.  He was referred by the University of Cincinnati

10   Disability Services Office.

11   Q.  Why was he referred to you?

12   A.  They contacted me because he was a student there that was

13   known to them, and he had previously requested MCAT

14   accommodations consistent with those that were granted at the

15   university, and the request had been denied, and they were

16   very concerned about that.

17       They told me that they felt that he really needed the

18   accommodations, and they were mystified as to why the denial.

19   They really didn't understand what that was.  And they know

20   that I work with a lot of different boards, and they asked me

21   to look at the evaluation reports that have been completed,

22   and to read the denial letters, and to try to help them

23   understand why this might have been denied.

24       MR. BURGOYNE:  Objection on that as hearsay, Your

25   Honor.  I haven't said much today, but I ought to at least

1    point out the obvious.

2         THE COURT:  Do you wish to respond?

3         MR. WEINER:  No, Your Honor.

4         THE COURT:  Okay.  Sustained.

5    Q.  When an individual comes to you requesting an evaluation

6    for accommodations, what's your approach with that?

7    A.  Well, the first thing I want to know is is there previous

8    diagnosis of a disorder, and I want to know what the history

9    of disability determination and accommodation is.

10   Q.  Do you make any promises or commitments to the

11   individuals who come to you seeking accommodations?

12   A.  No, the reverse.  If I -- I tell people up front that,

13   you know, first of all, determining who has a disability, I

14   can have an opinion but I don't make that decision.  The

15   decision is made by the person or the people in charge of a

16   high stakes test, or university that might grant

17   accommodations, or law school.  So that determination is up to

18   them, and so I don't have that power.

19        But also, I make it very clear that I make no guarantees

20   about the results of the evaluation, so you may or may not

21   like the findings that I have.  I'm not -- I'm going to be

22   objective, and I'm going to give you my honest opinion; and,

23   you know, it may not be the opinion or the conclusion that you

24   are hoping for.

25   Q.  When an individual comes to you seeking accommodations on

*BEACH - DIRECT*                                          203

1    a high stakes exam, do you always recommend that

2    accommodations be provided?

3    A.   No.

4    Q.   When did Mr. Berger first come to you?  Was it in the

5    2010?

6    A.   Right.  It was after the second denial of the MCAT

7    request.

8    Q.   Did you conduct an evaluation?

9    A.   I reviewed the information.  I looked at the letters from

10   the denial, and I looked at the evaluation report.  And

11   initially, I met with him and also his parents to get more

12   history and to learn a little bit more about the situation

13   before I knew that I wanted to do any action, you know.  My

14   initial thing was to consult and just to say, you know, this

15   is the problem that I believe I see with your documentation.

16   Q.   All right.  Did, at some point in time, you conduct an

17   evaluation?

18   A.   Just enough to -- mainly, my evaluation was I wanted to

19   collect documentation of the reported history to the greatest

20   extent that I could to verify what was there.  And I wanted to

21   see the earlier evaluation reports.  And then I administered a

22   couple of additional tests to have the opportunity for

23   clinical observation of his process during reading and some

24   other activities.

25        And in particular, I gave the Gray Oral Reading Test,

1    because Dr. Smith had already given a lot of tests, but what I

2    did not find in that report was much of a description of the

3    actual observation of what's happening when this person reads.

4    He gave the numbers.  And so with Gray Oral Reading Test, it

5    gives me an opportunity to see for myself what's happening

6    when reading is going on.

7    Q.   In 2010, when you met with Mr. Berger and administered

8    some of these assessments, did you prepare an evaluation

9    report to document the evaluation?

10   A.   Yes, because one of the problems I saw with the previous

11   eval --

12   Q.   I was just wondering if you prepared a report?

13   A.   Oh, okay.  Yes.

14   Q.   If you'd turn to Exhibit 5 in the binder.

15   A.   We're almost there.  Hey, I've got an idea.  What we need

16   is an iPad, you know, so you could swipe.

17   Q.   Note to self.  Make two binders next time.

18   A.   Good idea, or four.  I'm there.

19   Q.   Is that a copy of your evaluation report from 2010?

20   A.   Yes.

21   Q.   In conducting an evaluation, or in conducting

22   Mr. Berger's evaluation, did you take a history?

23   A.   Yes.

24   Q.   Did you administer assessments?

25   A.   Yes.

1    Q.   And did you make observations?

2    A.   Yes.

3    Q.   And did you document all those in this 2010 evaluation

4    report?

5    A.   Yes.

6    Q.   Your history, what is the source of your history?

7    A.   Careful in-depth interview with the patient.

8    Q.   In this case, whom did you interview?  Who was present at

9    the interview?

10   A.   Mr. Berger.  I also interviewed both parents.

11   Q.   All right.  Continue on with the history.

12   A.   Yeah.  And so in this case, I don't recall if I went

13   beyond that.  I know I did talk with disability services at

14   his university and got their impressions, which gives me good

15   information.  And in many cases, I would go beyond that, like

16   if somebody was actively in school, or something like that, I

17   would try to talk to teachers.  But in this case, I talked to

18   him, his parents, and the university.

19   Q.   In Mr. Berger's case, what other sources of history did

20   you have?

21   A.   I had Dr. Smith's two reports from 2010.

22   Q.   So did you review documents as part of your history?

23   A.   Yes.  I requested that after the interview, and saying,

24   you know, what is the history here pertinent to disability,

25   you know.  I asked that these documents be gathered up for me.

1    Q.   And there's a list of documents on PX12?

2    A.   Yes.

3    Q.   Is that a copy of the documents that you reviewed?

4    A.   Yes.

5    Q.   And did you feel that you had a thorough history after

6    reviewing those documents and speaking with Mr. Berger, his

7    parents, and the school disability services?

8    A.   Yes.

9    Q.   Can you go through what Mr. Berger's history was?

10   A.   Oh, can I add one more person?

11   Q.   Yes.

12   A.   I also spoke to Dr. Alexander Smith, just to talk with

13   him.

14   Q.   So what was Mr. Berger's relevant history?

15   A.   I was told that he was diagnosed with -- that he had a

16   history from the beginning of academic education of delays in

17   learning early literacy skills.  But let me back up and say

18   that he also had a number of characteristics of his early

19   development that are -- place him at risk for a learning

20   disability.

21        So he was born prematurely.  He weighed three pounds,

22   twelve ounces, something like that, so low birth weight.  He

23   had a cerebral hemorrhage.  Spent six weeks in the NICU,

24   Neonatal Intensive Care Unit, before going home, and had

25   delayed onset of spoken communication language until age

*BEACH - DIRECT*                                                              207

1       three.  So those are risk factors.

2           And then when he went to -- he was in kindergarten, he

3       had a remarkable difficulty with learning and retaining early

4       decoding skills, and letter and number writing skills,

5       including some diagnostic features like mirror writing, letter

6       reversals, not remembering the letter and making up a symbol,

7       so some of the signs that I would expect to see during early

8       childhood that would suggest a learning disorder.

9           It was severe enough the parents considered placing him

10      at a specialized school that does individualized educational

11      plans for severe learning disorders.  That's the Springer

12      school.  Instead, because his mother was a licensed teacher,

13      they determined that she would educate him at home and give

14      very intensive, phonological instruction in early reading and

15      writing.

16          Then he went back to the -- a private school, where an

17      IEP is not needed, and it's a smaller class size so the

18      teachers communicate with parents and one another.  And he was

19      provided with a high quality learning opportunity, and also

20      with a flexible responsive learning setting.  So he was

21      accommodated through there, and then continued through high

22      school.

23      Q.  What continued through high school?

24      A.  Accommodation.

25      Q.  Okay.

1    A.   Extended test time.

2    Q.   Did you also review prior evaluations?

3    A.   Yes.

4    Q.   And what evaluations had you reviewed?

5    A.   I looked at the speech and language evaluation from '92,

6    and I looked at the psychological eval from '94 that was done

7    by Dr. Artner.  That had a lot of very informative

8    information.  And then there was a gap in time where he was

9    not individually evaluated for a long time, until he was in

10   the eleventh grade of high school.  So there was quite a gap

11   there.  And then I looked at that report, and then the two

12   that were done during college.

13   Q.   You mentioned that the '94 report from Dr. Artner was

14   very informative in what way?

15   A.   That's the -- well, that's a report where, in my opinion,

16   dyslexia was diagnosed and ADD was also diagnosed.  And in the

17   old days, it wasn't always done that people explicitly listed

18   a DSM diagnosis like we do in current year.  A lot of times

19   people avoided terms like disability and disorder, and they

20   said challenges, and they kind of put things between the

21   lines.  So if you look at that report --

22   Q.   Well, can you go to that report --

23   A.   Yeah.  Where is it?

24   Q.   -- and then point out what you're --

25   A.   I'll show you what I'm talking about.

1    Q.   What was informative?

2    A.   Also during my history taking with parents, Mrs. Berger

3    told me that her son was diagnosed with dyslexia in second

4    grade as a result of that evaluation, and that was the point

5    at which -- at the end of second grade, second half of second

6    grade, you really are trying to figure out if there's a

7    learning disorder, because by third grade there's another

8    level of expectation of fluency.  So that's another reason

9    that that report is important.

10        Okay.  I forgot where am I going.

11   Q.   Exhibit 17.

12   A.   Oh, okay.  Takes me so long, I forget where I'm going.  A

13   couple of things I remember right off the top of my head, like

14   even the reason for referral on the first page, it says to

15   determine if dyslexia or some other specific problem is the

16   reason for his trouble with reading.  So that's the reason for

17   the evaluation.

18        And Dr. Artner also points out, if I could find it here,

19   test scores -- oh, here we go.  She also points out that there

20   are -- so harking back to the DSM-IV and the diagnostic

21   criteria for a learning disorder or reading disorder, that

22   there were several achievement scores that were two or more

23   standard deviations below measure of general intelligence,

24   which would have been a diagnostic sign.  And those include

25   word identification, passage comprehension, calculation, which

1    is written math with numerals, as opposed to looking at

2    pictures and counting.  His score for that was extremely high

3    for applied math.  And spelling was another area.  And so

4    that's a way of saying this is a significant issue.

5    Q.   Did Dr. Artner, in her report, make any particular

6    recommendations which were of note to you?

7    A.   Yes.

8    Q.   What were they?

9    A.   Oh, yeah, I think also the coding might have been at the

10   16th or 25th percentiles.

11   Q.   What is coding?

12   A.   It's a symbol copying task that is time limited, and low

13   scores on that can be associated with dyslexia or other slow

14   processing speed related problems.  I'm looking for --

15   Q.   We're discussing what recommendations Dr. Artner meant.

16   A.   Yes.  Somewhere in here too she says that the pattern of

17   performance, you know, could be considered indicative of a

18   learning disability.  But it's important to note that people

19   stay in their lane, you know, so that the school -- the public

20   school that he was in -- Dr. Artner was a private practice

21   person.  She's not going to tell the school there's a

22   disability, but she's going to suggest that they take a look

23   at it in that way.

24        And in the recommendations, another note is that the

25   projective also show some anxiety around learning.  Here we

1    go.  So when she talks about specific deficits involving

2    reading, and gives examples of like the mirror writing and the

3    backwards letters and so forth, she said that in spelling a

4    word it took an extreme amount of time and effort to even

5    write like two or three letters.  What she's doing is she's

6    saying the symptoms are here.

7         And then in the recommendations, under Roman Numeral II,

8    she's saying that the parents are advised to stress a phonics

9    approach in reading, and site words should be imprinted by

10   using a multisensory technique.  So that's a way of saying to

11   provide a specific intervention, like Orton Gillingham, and

12   that would be used, you know, for a reading disorder with

13   dyslexia.  So she's describing many of the signs, and then

14   she's prescribing the recommendation.

15   Q.   And where you were just reading from, is that on page

16   PX251?

17   A.   Yes.

18   Q.   And a phonics-based approach, is that a research-based

19   approach?

20   A.   Yes.

21   Q.   What is that research-based approach used for?

22   A.   It's especially effective for teaching people reading

23   skills who have a problem like dyslexia, where they are less

24   intuitive in learning some of the patterns of letter sound

25   correspondence and the combination, including the higher level

1    phonological rules.

2        And then for Roman Numeral III, you know, she also said

3    in here that his -- if you want me to find it, I can find it,

4    but basically she says his most defining characteristic is his

5    distractibility.  And she talks about how he has very slow

6    processing speed, he loses his focus, he's easily frustrated.

7    He was very frustrated with reading especially, but he had

8    difficulty with multistep instructions.  I want to find it and

9    not just keep talking and not find it.

10       I'm on page PX249, which is page 3 of the test report.

11   "It was hard to keep Brendan on task."  Partway through the

12   test he jumped up from the couch, et cetera, so he's getting

13   up and down.  He's having a hard time staying seated.  He's

14   talking about other things, he's off task, and he appears to

15   be unaware of that, that his off task behavior is

16   inappropriate.  Seemed that -- and I'm quoting, It definitely

17   seemed that he had to immediately yield to his inner

18   distractions and impulses.

19   Q.   In terms of other documentation that you reviewed, was

20   there anything else in Mr. Berger's history which was

21   significant to you?

22   A.   There is Roman Numeral III, under recommendations.  So

23   even though there's not a DSM-IV diagnosis with numbers and

24   official labels, what it says here is that if the parent has

25   noticed the uneven attention and distractibility, and these

1    have interfered with learning, then the psychologist is

2    recommending they discuss this with their physician, and at

3    that time, the physician may advise a brief trial on a

4    medication to learn if this would be one means of promoting

5    concentration and task completion.  Reading material about ADD

6    and medical treatment plans for ADD were provided.

7        So that is a way of staying in your lane and saying let's

8    let the pediatrician make the diagnosis, but I'm saying it's a

9    diagnosis.

10   Q.   Other than Dr. Artner --

11   A.   My opinion.

12   Q.   Other than Dr. Artner's report, was there anything in the

13   documentation that you reviewed which was also significant in

14   terms of Mr. Berger's history?

15   A.   The evaluation from Dr. Smith in 2003.  Basically, he

16   is -- he gave -- he only gave extended time academic tests,

17   and he --

18   Q.   I'm not sure what you mean by that.  Can you explain what

19   "extended time academic tests" mean?

20   A.   He gave a particular test that does not have a time limit

21   for the response.

22   Q.   Which test would that be?

23   A.   The Wechsler Individual Achievement Test.

24   Q.   Okay.

25   A.   And that test, as would be expected, without a time

1   limit, he was able to do quite well on, and he earned some

2   very strong scores.

3       At that time, I'm not looking at it right now, but I

4   believe that was eleventh grade, right?  Can you tell me where

5   that evaluation is?

6   Q.   Okay.  Perhaps Exhibit 29, is that the one you're

7   referring to?

8   A.   Actually, it's 23.  So he gave a Wechsler Adult

9   Intelligence Scale and the achievement test I mentioned, and

10  this was the one that was completed when he was in the

11  eleventh grade of high school.  And so one of the things that

12  I noticed in looking at that is he continues -- with the WAIS

13  III, he continues to have a low score for coding, and also his

14  score for digit span as well.

15      So his achievement scores are at or above average with

16  extended time and conceptual -- most of the conceptual tests

17  from the WAIS are quite high, meaning a high level of

18  cognitive ability.

19  Q.   When you conducted your evaluation in 2010, did you make

20  any inquiry as to what the primary language was in the

21  household?

22  A.   Yes.  I always do.

23  Q.   And what had you concluded?

24  A.   I was told that English was the language in the home, and

25  that Brendan was a native speaker of English.

*BEACH - DIRECT*                                                      215

1    Q.   And if you look at the PX16 of Exhibit 5.

2         Is the source of Mr. Berger's language background located

3    on that page?

4    A.   Yes.  It's the first sentence in psychosocial history.

5    Q.   And what did you write?

6    A.   "Mr. Berger grew up in a family with English as the

7    primary language, and he speaks English fluently."

8    Q.   And what was the source of this information?

9    A.   Parents.

10   Q.   And you had spoken with both parents?

11   A.   Right.

12   Q.   Did you conduct any assessments during the 2010

13   evaluation?

14   A.   Yes.

15   Q.   What assessments did you perform yourself?

16   A.   The Gray Oral Reading Test, Fourth Edition, and the

17   Nelson-Denny Reading Test.  Dr. Smith had previously

18   administered the extended time version of that test.  In

19   response, he was responding to the denial of the first MCAT

20   accommodations request, and it had been recommended that he

21   might administer the Nelson-Denny.  And his interpretation of

22   that was to give the extended time version.

23        So I gave its companion, which is a shorter time limited

24   version of that test, the point being that they can be

25   compared, and a brief test from the Wechsler Memory Scale, and

1 the Millon, which is a psychological assessment, because the

2 assessment by Dr. Smith had not really looked at psychological

3 percentile like anxiety, depression, and those are things that

4 have to be ruled out as explanations for learning issues.  So

5 two of those were given.

6 Q.   And did you administer the assessments yourself?

7 A.   Yes.

8 Q.   And why did you administer them yourself?

9 A.   Because I needed to have an understanding directly, with

10 my own clinical observation of the process of performing these

11 types of activities, especially reading, because the diagnosis

12 of a learning disorder does depend on the test score, but also

13 it depends on other characteristics of the person, including

14 the type of error and the type of difficulty that I can

15 observe.

16 Q.   Can you discuss the importance of the clinical evaluation

17 in connection with learning disabilities and/or ADHD?

18 A.   It's essential to -- for me to not just have someone tell

19 me what's going on with them, and then I write it down and say

20 oh, okay, fine.  I really want to have some evidence that

21 comes from my own eyes and an analysis there, but I want to

22 see the person do it.

23 Q.   Is it appropriate to make a diagnosis of either a

24 learning disability or ADHD without having conducted a

25 clinical evaluation?

1    A.   I would not do it.

2    Q.   Is it appropriate to rule out a diagnosis of learning

3    disability or ADHD with a clinical evaluation?

4    A.   No.

5    Q.   Let's discuss the results of the evaluation you

6    performed.  So what was the first assessment that you

7    performed?

8    A.   The Wechsler Memory Scale, Third Edition, the mental

9    control subtest.  It's kind of a mental status exam.  It

10   involves attention, concentration, a certain amount of

11   executive percentile.  It's sort of a broad assessment of

12   those factors, and processing speed comes into play, as well

13   as working memory.

14   Q.   What were the results of that assessment?

15   A.   The score is fairly low.

16   Q.   Can you go through those scores?

17   A.   Yeah.  It's at the fifth percentile for that subtest.

18   Q.   And what is the significance of that?

19   A.   It is what I would call substantially low.  And to me

20   that is a measure or a sign of the kind of difficulty with

21   working memory and sustained concentration that gets mentioned

22   in the previous evaluation reports; for example, Dr. Smith

23   refers to this, but he stays in his lane, and he doesn't

24   diagnose an attention disorder but he says, hey, I see a lot

25   of symptoms but I'm stopping short of that, he should see a

1    neuropsychologist.  So that is something I wanted to check out

2    for myself.

3    Q.   And you also administer the Woodcock-Johnson Test of

4    Cognitive Ability?

5    A.   Yeah, cognitive and achievement.  This is the Woodcock

6    III.

7    Q.   Did you administer the entire test, or just selected

8    subtests?

9    A.   No, just selected subtests because Dr. Smith had

10   administered other things.

11   Q.   Did you administer any of the same assessments that

12   Dr. Smith had done?

13   A.   Not during this evaluation, no.

14   Q.   Why is that?

15   A.   I don't want to administer anything that's been given

16   within the last year because of a practice effect.

17   Q.   So Dr. Smith's evaluation that you were talking about was

18   this 2010 evaluation?

19   A.   Yes.

20   Q.   And you administered this evaluation?

21   A.   In 2010 also.

22   Q.   So it was several months after his?

23   A.   Right, right, right.

24   Q.   And so you didn't administer any of the identical tests?

25   A.   No.

1    Q.   What's the problem with administering identical tests?

2    A.   The person might remember some of the content of that

3    test.  It might make them work faster.  It might mean that --

4    like let's say that you had a math problem, and you had a lot

5    of difficulty solving it but you eventually got the right

6    answer.  A few months later, if I give you the exact same math

7    problem, you might remember it and just go boom boom boom.

8    Q.   And that would impact the ultimate results?

9    A.   Yeah.  It would compromise my ability to measure what I'm

10   trying to measure.

11   Q.   The assessment -- which assessments were subtests of the

12   Woodcock Johnson that you administered?

13   A.   Spelling of sounds, because word attack and other

14   decoding-type tests had already been done, and I wanted to

15   have my own picture of difficulty with phonological analysis.

16   So this is a test where a fake word, a made-up word, is given

17   to you, and then you write down how you think it should be

18   spelled using the rules of English spelling.

19   Q.   And on PX37 of Exhibit 5, is that where you report the

20   results of the spelling sounds?

21   A.   Right.  That came in at the tenth percentile.  What I

22   recall is that he made some diagnostically classic kinds of

23   errors, even with like consonant sounds, as well as long,

24   short vowels.  And those are atypical for adults, unless they

25   have a dyslexic type of reading disorder.

*BEACH - DIRECT*                                                    220

1    Q.    What does tenth percentile mean?

2    A.    That means that he was higher than ten percent of people,

3    so at the bottom ten percent, you could say.

4    Q.    And rapid picture naming, what does that assessment

5    entail?

6    A.    That's a measure of processing speed.  And it has to do

7    with memory retrieval fluency for something that we would call

8    overlearned, so it's not a difficult task.  These are really

9    simple pictures of everyday objects that you name, and I'm

10   measuring how many of those you can name in a set time limit.

11   And it has to do with when I look at a picture, how quickly

12   can I pull up the word that goes with that picture.  So it's a

13   measure of automaticity and processing speed.

14   Q.    And how did Mr. Berger perform on that?

15   A.    Extremely low.

16   Q.    You also administered tests of achievement?

17   A.    The Gray Oral Reading Test, Fourth Edition.

18   Q.    What is the Gray Oral Reading Test?

19   A.    This is a test where you read a paragraph out loud to me,

20   and while you're reading, I'm recording the time it takes you

21   to read that paragraph, and I'm marking errors on a scoring

22   sheet.  So if you misidentify a word, you misread it, you omit

23   it, you put in a word that doesn't belong there, I'm going to

24   mark these little errors that occur at this lower level of

25   reading.

*BEACH - DIRECT*                                                   221

1       Then what I do is take -- you read it one time only, and

2   then I take it away so you can't look back, and then I give

3   you multiple choice questions on that material, but for this

4   version of the test, you are allowed to see the questions, and

5   then I read them out loud to you, and then you tell me your

6   answer.

7       And the passages are of increasing difficulty as we go

8   along, and the idea is to continue until you reach a ceiling

9   of ability for a person.

10  Q.   Why did you feel it was important to administer the Gray

11  Oral Reading Test?

12  A.   I wouldn't use it as my only assessment of reading

13  because you are reading out loud and that may not be something

14  that you do, although I have observed that

15  Mr. Berger typically does whisper to himself when he's

16  reading.

17  Q.   Reading silently?

18  A.   Yeah.  It's just an observation; but, you know, in this

19  case, it gives me more of a window into the reading process

20  and whether certain kinds of errors are occurring.  And then I

21  can compare the performance of that individual with norms that

22  are based on a large number of other people of similar age to

23  determine whether or not their performance is consistent with

24  what is typical or deviant.

25  Q.   In administering the Gray Oral Reading Test, are you able

1    to observe the condition and manner in which the -- or in this

2    case, Mr. Berger, was reading?

3    A.   Yes, I can observe the behavior better than if they are

4    reading silently, because then I'm speculating about what's

5    going on there.

6    Q.   What kind of observations did you make about Mr. Berger's

7    reading when you administered the Gray Oral Reading Test?

8    A.   There were a lot of hesitations before very simple words

9    that would be automatic site words for most adults.  His

10   reading is much less automatic, much less accurate for word

11   reading.  And several words were misidentified.  He made

12   errors with syntactic or morphological markers, as well as

13   word omissions or insertions, or he might substitute an

14   orthographically similar word, like a word with similar

15   spelling.  So if you see the word whether, w-h-e-t-h-e-r, and

16   you're reading along and you say "whoever" and you get that

17   word wrong.  They had some similarity.  Your comprehension,

18   it's sort of evolving as you're going along, just gets

19   completely derailed.

20        And then you have to halt, and you have to go back and

21   then reread words or reread phrases, or even larger units of

22   text just to kind of proceed, and that's what he did is he

23   repeated a lot of words and just made a lot of errors at that

24   level.

25   Q.   And what were the results of the Gray Oral Reading Test?

1    A.   His reading rate, because when you have to keep going --

2    when you keep hesitating before reading a word, or you have to

3    keep going back to revise it or reread a phrase, that slows

4    you down.  And so his rate was slow.  And it was slow because

5    his word reading accuracy was very slow.

6         And in looking at the comprehension, so you can't look

7    back at the passage, but you can look at the questions, he was

8    incredibly slow at answering the questions.

9    Q.   What was his score on the reading rate?

10   A.   Reading rate, first percentile.

11   Q.   Did you also measure reading accuracy?

12   A.   First percentile, so bottom one percent.

13   Q.   And reading fluency?

14   A.   That's a combination of those two scores and, again, you

15   know, first percentile.

16   Q.   And how about his reading comprehension?

17   A.   That was a little higher.  It's in the lower end of the

18   average range, at the 37th, so higher than 37 percent of

19   people.  And what I can tell you about that is that he was

20   spending an awful lot of time kind of reading the

21   alternatives, and then trying to logically reason about what

22   is probably the best answer.  So it was very inconsistent

23   accuracy, and very slow.

24   Q.   And that was something you had observed?

25   A.   Yes.

1   Q.   And what is the oral reading quotient?

2   A.   That's a summary score taken over all of the subscores.

3   Q.   And where did that fall at?

4   A.   Second percentile.

5   Q.   And what norm is this based on?

6   A.   That's a good question.  So this is a previous version of

7   this test.  The current one has -- goes up to higher ages.  So

8   this test has age-based norms going up to age 18.  So at that

9   point in time, then that's all we had.  So one common

10  procedure is to use the age norms for, say, age 18 or, you

11  know, the highest level, and to have that be representative of

12  the typical adult.

13  Q.   Is there anything in the instruction manual for the Gray

14  Oral Reading Test which prohibits you from administering the

15  GORT to someone who is older than age 18?

16  A.   No.

17  Q.   And so in scoring this assessment, you were comparing

18  Mr. Berger at that time to 18-year-olds?

19  A.   Yeah, because that would be representative of the average

20  adult or high school graduate.  And it's a similar process to

21  what is used with the Nelson-Denny, and say, for example, the

22  LSAC uses that kind of a technique for looking at reading

23  performance with people requesting accommodations for the

24  LSAT.

25  Q.   Did you administer any assessments of silent reading in

1    your 2010 evaluation?

2    A.   No.  Oh, wait.  Did I?  Yes, I did.  Sorry.  I had to

3    turn the page.  I did do the Nelson-Denny, and I did the --

4    the scores for that are on PX39.  And the italics are the

5    score results from Dr. Alexander Smith earlier in the year,

6    and that was the extended time version.

7    Q.   So can you describe how the Nelson-Denny Reading Test is

8    administered?

9    A.   It's another test where you read a passage and then

10   answer comprehension questions.  These passages are a little

11   longer than the Gray Oral.  And when you're answering the

12   questions, you read the passage silently, and then the

13   questions are below.  And while you're answering the

14   questions, you can look back at the passage to find the

15   answers, where with the Gray Oral, you can't look back.

16   Q.   All right.  So in the one format, it's administered under

17   a standard time?

18   A.   Yes.  And that's 20 minutes.

19   Q.   And did you administer that version?

20   A.   I did.

21   Q.   And what was Mr. Berger's results?

22   A.   First percentile on reading rate and comprehension.

23   Q.   Okay.  And just so we're clear on this, how is the

24   reading rate measured?

25   A.   So for this test, what you're doing is silent reading,

1     and I have a stopwatch. And when exactly one minute is gone,

2     I ask you to take note of where you were in your silent

3     reading and to code that over here on the side of your test

4     response sheet. And then there are norms where I look up

5     where you were at at that moment. So it's basically measuring

6     how many words you read per minute.

7     Q.   And it just measures the first minute?

8     A.   Right.

9     Q.   The comprehension, however, that's over the entire

10    assessment?

11    A.   Yes.

12    Q.   And from your recollection, did Mr. Berger complete that

13    assessment in 20 minutes?

14    A.   You mean all of the test questions?

15    Q.   Yes.

16    A.   No.

17    Q.   On the extended version, that was administered by

18    Dr. Smith?

19    A.   Right.

20    Q.   And how much time is the extended version time?

21    A.   Thirty-two minutes, so it's kind of like time and a half.

22    Q.   So I've noticed yours says Form H, and Dr. Smith's

23    indicates Form G. Are those two different assessments?

24    A.   They're two different assessments, meaning they have

25    different passages and different questions --

1    Q.   Yes.

2    A.   -- but they are statistically designed and studied to

3    make sure that they are equivalent in difficulty and other

4    properties.

5    Q.   After conducting your evaluation, which included your

6    history, your review of documentation, and administration of

7    assessments, had you drawn any conclusions regarding

8    Mr. Berger?

9    A.   Yes.  It was my impression that he presented as a

10   classic, a higher IQ individual who has dyslexia and maybe

11   some ADD, but I didn't really have data to be conclusive on

12   that.

13   Q.   All right.  Did you make a diagnosis?

14   A.   Yes.  It's on page PX33.

15   Q.   And what was your diagnosis?

16   A.   Reading disorder, and disorder of written expression.

17   Q.   And is your diagnosis consistent with the DSM -- was it

18   the DSM-IV or DSM-V?

19   A.   This would have been the DSM-IV criteria.

20   Q.   So was it consistent with the DSM-IV criteria?

21   A.   Yes.

22   Q.   Can you explain how it's consistent with the DSM-IV

23   criteria?

24   A.   Discrepancy scores between the IQ score and these reading

25   scores would have been significant, but I would not say that

*BEACH - DIRECT* 228

1    would be my number one factor I would be looking for, but more

2    a characteristic pattern of errors, evidence is this problem

3    persisting back into early childhood with less automatic and

4    less accurate word reading and an impact on comprehension.

5    Q.   And do you state how Mr. Berger meets the DSM-IV criteria

6    for a reading disorder at PX29 and PX30?

7    A.   Yes.  Actually, that's like a paraphrase summary of the

8    diagnostic criteria.

9    Q.   And with respect to the diagnosis of a written order

10   disorder, did you state how that diagnosis was made in

11   connection with respect to the DSM-IV?

12   A.   Yes.

13   Q.   And that's at PX30?

14   A.   Right.

15   Q.   And what recommendations did you make?

16   A.   Extended time for the MCAT was recommended, and a

17   rationale for why that recommendation was given.  My

18   recommendation was for double the standard time.  People don't

19   always request what I recommend, but that's my opinion.  And I

20   believe he requested time and a half, I don't recall, but I

21   recommended double time because of the intensity of the

22   problem.

23       I also recommended rest breaks, additional rest breaks,

24   and distribution of the long exam over two days 'time to

25   offset fatigue, which is another factor that can really affect

1    his reading rate and accuracy.  It kind of compounds over the

2    course of a long day.  Also recommended this for medical

3    school courses.

4    Q.  And are your recommendations listed at PX33 through PX36?

5    A.  Yes.  Oh, yes, distraction-limited room for tests.

6    Q.  When conducting an evaluation, do you try to make some

7    assessment of the individual's either vigilance or motivation?

8    A.  Oh, yes.  That's another part of wanting to see for

9    myself what the presentation is.

10             THE COURT:  I'm sorry.  Can you repeat that?  I just

11   missed it.  I was writing.  Your last question.

12   Q.  My last question was do you try to make some assessment

13   of the individual's vigilance or motivation?

14   A.  Yes, it's very important to have a direct impression of

15   that, and I have a lot of clinical experience to guide me on

16   that, but I did not give a specific test to try to evaluate

17   that.

18   Q.  Does the NBME require that you administer any type of

19   specific test of vigilance or motivation?

20   A.  Like Noll and Green, or --

21   Q.  Yes.

22   A.  Not to my knowledge, but I think it would be good for me

23   to include that in a test battery just to do it, you know, so

24   I have something objective beyond my own impression.

25   Q.  Did you make any type of assessment for the 2010

1    evaluation whether or not Mr. Berger was being vigilant or

2    demonstrating motivation with respect to the test?

3    A.   He appeared to me to be working very hard to do his best,

4    and it was my impression that he's the real deal.

5    Q.   What made you come to that conclusion?

6    A.   A high level of effort, and it's very hard to fake the

7    amount of time, effort, and frustration that he experiences

8    when completing the reading activities that I observed.

9    Q.   Did you also conduct an evaluation in 2013?

10   A.   Yes.

11   Q.   Were there any differences or updates to Mr. Berger's

12   history from your 2010 evaluation?

13   A.   Oh, I should -- should I say something about the

14   assisting him with putting together history documents?

15   Q.   I'll ask you that question later.

16   A.   Oh, okay.  Because that's a part of the process.  Yeah,

17   he had been denied MCAT accommodations.  Apparently, he had

18   taken the MCAT again and gone to medical school, and was in

19   the process of looking at Step 1 and requesting accommodations

20   for Step 1.

21   Q.   Since you brought up the documentation, did you assist

22   Mr. Berger in putting together documentation associated with

23   his request for accommodations for the MCATs?

24   A.   Yes.  I always do that for this type of test.  I will go

25   online, I will look up the documentations for whatever test

1    the person might request accommodations for.  I always look

2    that up, and I follow it very carefully, because I understand

3    why that information is important to the people that will

4    review the request.  And if you do not provide them with the

5    information they need, they cannot review your request.  And I

6    find that a lot of people that I am working with in this

7    regard are not always as aware of the importance, you know.

8    Like if it says that an official transcript is required from

9    high school, that's what that means, you know.  Don't just

10   say, oh, here's a copy of one from somewhere, I'll download it

11   off the web, you know.

12        And so what I'm saying is that I take that very

13   seriously, and I also want to see it for myself.  So if I say

14   bring me a letter from your teacher, I would like that

15   notarized.

16   Q.   Did you assist Mr. Berger in getting earlier letters

17   from St. Gabriel's?

18   A.   I directed him what material to try to get.  Back in the

19   day, especially in the private schools, there was --

20   Q.   I'm just wondering about Mr. Berger.  Did you --

21   A.   Well, I'm just saying, you know, a lot of times there was

22   not a written record, but what I said was try to get a written

23   record of the service plan, and if you can't do that, see if

24   there's still a teacher there that you know that can, you

25   know, do something to attest to that for you.

1    Q.   Did the teacher at St. Gabriel send you a draft letter

2    ahead of time?  Mr. Berger had a draft letter in his file.

3    A.   What I recall is that -- and I'm going on my

4    recollection, but what I recall is that the teacher had

5    retired, had prepared a letter but was retired and didn't have

6    school letterhead and whatnot.  And so there was a lag time

7    between I wrote this letter, but I need to get to the school

8    and put it on official letterhead.  But at the time, also I

9    was writing the report, and I wanted to know what was he

10   granted, you know, so it's possible they sent me one ahead of

11   time.

12   Q.   And did you contact the individual, I believe it was

13   Ms. Kagy, at Moeller school?

14   A.   No.  No, I just wanted to know so I could put it in my

15   report, but I find that it's very important to be accurate

16   about these things, and to have as official -- I want a

17   verification, not just a self-report.

18   Q.   For the 2013 evaluation, did you administer assessments?

19   A.   I did.

20   Q.   Did you administer them yourself?

21   A.   Yes.

22   Q.   And what assessments did you administer?

23   A.   You want me to read them?

24   Q.   Yes, please.

25   A.   Bender Gestalt Test, Second Edition.

1    Q.   Just so we can inform the Court, you're reading from

2    Exhibit 6 at PX42?

3    A.   Yes.

4    Q.   Okay.

5    A.   Bender Gestalt Test, Second Edition.  Wechsler Adult

6    Intelligence Scale, Fourth Edition.  Wechsler Memory Scale,

7    Fourth Edition.  Woodcock-Johnson III, Normative Update 3.0.,

8    Tests of Cognitive Abilities and Achievement.  Scholastic

9    Aptitude Test For Adults.  Behavior Rating Inventory For

10   Executive Functioning, Adult Form, Self-Report.  Brown

11   Attention Deficit Disorder Scales, Adult, History and

12   Diagnostic Form, and also the Attention Deficit Disorder

13   Scales.  So I did a clinical interview self-report and also

14   had collateral respondents.

15   Q.   And what's the importance of doing that collateral

16   respondents?

17   A.   Again, you don't want to just have the patient

18   self-report.  Someone could take a self-report rating scale

19   for their attention problems and just rate everything as

20   extremely high, and then I'm just taking one person's word for

21   it.  So I had an instructor from the medical school complete

22   that as well, based on the instructor's observations of him in

23   the classroom and his learning.

24   Q.   And is that practice consistent with DSM practices?

25   A.   Yes.  I would say it's not always done, especially for

*BEACH - DIRECT*                                                    234

1   adults, but I think it's important.

2   Q.   It's the best practices in neuropsychology --

3   A.   That's what I would say, right.

4   Q.   Let me finish my question.  Is that the best practices in

5   the area of psychology?

6   A.   Yes.

7   Q.   And what were the results of Mr. Berger's assessments in

8   2013?

9   A.   There's more tests.  Do you want me to keep reading them?

10  Q.   Are they listed there on PX42?

11  A.   Yes.

12  Q.   So why don't we go through the results.  You indicated

13  that there was the Wechsler.  What is the Wechsler?

14  A.   It is a test of cognitive and intellectual ability.

15  Q.   And what results did you find?

16  A.   The results?

17  Q.   They're on PX123.

18  A.   Okay.  Consistent with previous assessment, very high

19  level of verbal conceptual knowledge and reasoning.  Verbal

20  comprehension index at the 99th percentile, higher than 99

21  percent of people.  Perceptual reasoning index is at the 97th

22  percentile.  And within those areas, his abilities are fairly

23  evenly developed.  He did lose points for some of the

24  perceptual reasoning tests due to slow processing speed.

25  Those scores are significantly higher than measures of

1    auditory and visual attention, working memory, and processing

2    speed.  And those are very low and at the ninth and second

3    percentile.

4    Q.  All right.  What is processing speed?

5    A.  Well, in this case, it's measuring the rate of speed for

6    symbol processing, so symbol scanning or copying.  So if

7    there -- do you want me to describe it?

8    Q.  Sure.

9    A.  If there is a row of numbers across the top of a page,

10   and each number has a little mark that goes with it, a

11   different mark, down here you're given squares that have the

12   numbers, and your job is to fill in the mark that goes with

13   each number.  And then we time you to see how many of those

14   you can complete in a set period of time.

15   Q.  And that's the simple search?

16   A.  That is coding.  So you're writing symbols, and you're

17   scanning and associating them with a number, and then

18   remembering it, bringing it down and writing it.

19   Q.  And that's a timed assessment?

20   A.  Correct.

21   Q.  Does that have any relevance with respect to Mr. Berger's

22   reading?

23   A.  It's always been one of his lowest test scores, and low

24   scores on that are associated with dyslexia, but it doesn't

25   mean that you automatically have dyslexia if you have a low

1    score for that.

2    Q.   Okay.  On the next page, PX124 is your report on the

3    Wechsler Memory Scale?

4    A.   Yeah.  Can I note one more thing about --

5    Q.   Yes.  Please.

6    A.   I didn't mention this before, but in the original

7    assessment back by Dr. Artner back in '94, she did not report

8    a working memory index, but the two subtests that are used to

9    compute it were, by my interpretation what she said, around

10   the 25th percentile.  And then when Dr. Smith evaluated in

11   2003, there's like a 38 point increase in that index to 128,

12   and so that doesn't usually happen.

13        So I don't know if that was an error recording the test

14   score, or if that was a strategy that really worked, or, you

15   know, I don't have an explanation for that, but these scores

16   are back down in a range of the previous assessment, even

17   though it was very long ago.

18   Q.   And so if we go to the Wechsler Memory Scale.

19   A.   Yes.

20   Q.   What was significant about the results on this

21   assessment?

22   A.   I'm thinking how best to summarize.  That he showed a

23   stronger ability for a more factual kind of memory activity,

24   where you're pairing two things together, but there were

25   significant limitations in the accuracy and consistency

1    during -- if he's listening to a story, so logical memory. I

2    read you a story. Then when I'm done reading the story, I

3    say, all right, now tell it back to me as best you can, you

4    know, and try to get the details. Then I'm counting, you

5    know, how many bullets or how many details he recalled from

6    that story.

7        And he showed a pattern of performance that is typical

8    for ADD, with involuntary fluctuations of attention, so he

9    would get a chunk of material, and there would be a gap, and

10   then a chunk, and then a gap, so sort of an intermittent

11   process so that the immediate memory recall was at the 25th

12   percentile.

13       Yeah, so that is a significant finding. Also, the

14   overall memory scores were significantly lower than the --

15   than a global measure of conceptual intelligence. So that's

16   another way of saying like the cognitive efficiency, the

17   processing speed of that individual, is very limited and it

18   can impose a bottleneck on their processing speed, even though

19   they have a high level of intelligence.

20   Q.   And on PX126 is your report on the results of the

21   Woodcock-Johnson Test of Cognitive Abilities?

22   A.   Yeah.

23   Q.   On timed measures on that Woodcock-Johnson, how did

24   Mr. Berger perform?

25   A.   Consistently low.

*BEACH - DIRECT*                                                                    238

```
 1    Q.   Can you give an example?

 2              THE COURT:  Excuse me, counsel.  Can I interrupt you?

 3              MR. WEINER:  Yes.

 4              THE COURT:  I'm still trying to understand the

 5    Wechsler Memory Scale.  Can you just repeat the last thing?  I

 6    don't --

 7              THE WITNESS:  If you look at this paragraph down

 8    here, this part down on the bottom.

 9              THE COURT:  Okay.

10              THE WITNESS:  And it says WAIS-IV GAI, that stands

11    for general ability index.  So what we do is we take your test

12    scores from the verbal conceptual tests and from the visual

13    spatial logical tests, so anything conceptual, we average that

14    together and try to get a ballpark of your conceptual

15    intelligence, and then we compare that to the efficiency of

16    your memory processing.

17       And so the idea being that kind of expecting those to

18    line up ideally, and the degree to which they don't line up

19    would reflect potentially like a limitation that could be

20    imposed by your attention focus, or your working memory, or

21    just your cognitive efficiency.  So you have a lot of

22    knowledge and a lot of thinking ability, but there are these

23    factors, like how much you can hold in your mind at one time,

24    or how consistently you register multistep instructions, or,

25    you know, so there's like an inefficiency at that level that
```

1    can put a barrier there to make it harder for you to kind of

2    get your smartness out, and it would be related to memory.

3    And the relevance to attention is that attention is kind of a

4    gateway to memory, so if you're not focusing, it interferes

5    with memory.

6             THE COURT:  So your takeaway from these test scores,

7    the memory scale, is that this gave you some information about

8    his ability to attend and focus and --

9             THE WITNESS:  And learn and retain.  And so where it

10   says difference, and that column, a difference would be -- a

11   standard deviation would be 15 points.  So these are very

12   large differences.  And when it says base rate, it says, well,

13   this is the percentage of the population that would show a

14   difference that size, because maybe I have a difference too,

15   or maybe you have a difference, but when do we say this is

16   really an impairment, or this is interfering with how I go

17   about doing things, compared to how it could be a problem for

18   everybody.  And so very few people are as affected by this

19   factor.

20             THE COURT:  Thank you.

21   BY MR. WEINER:

22   Q.  The Woodcock-Johnson, that's on page 126, were there `

23   measures that were administered?

24   A.  Yeah, in the little symbol, the little dagger symbol,

25   that means that it was a time-limited test, just so people can

*BEACH - DIRECT*                                                    240

1    look at it and see.

2    Q.   So on the time-limited test, how did Mr. Berger perform?

3    A.   He tended to perform in a lower level.

4    Q.   Did he perform below average?

5    A.   Not for everything, but for most things, yes, including

6    things that are specifically designed to measure processing

7    speed that are not necessarily based on this kind of symbol

8    copying and, you know, symbol processing.  They're different

9    kinds of materials, like pictured objects, and --

10   Q.   So on the processing speed cluster --

11   A.   Yes.

12   Q.   -- his performance was at the two percentile?

13   A.   Uh-huh.  Right.

14   Q.   What relevance does that have in terms of reading or

15   taking a test, or anything associated with the major life

16   activities that Mr. Berger needs to perform on the USMLE?

17   A.   The tests in that grouping provide measures of thinking

18   efficiency with respect to time.  And so that would relate to

19   reading in terms of -- like with rapid picture naming.  Like

20   even if I'm not looking at the spelled version of a word, I'm

21   looking at its picture, like a teacup or something, how

22   quickly do I pull up the name of that item.  And decision

23   speed has to do with comparison, so again, it's like a

24   relatively automatic type of retrieval, and then a comparison,

25   mental comparison process at a very basic level.  So these

1    materials aren't hard, they're easy, but we're just looking to

2    see when we give you these simple things to do.

3    Q.   How about the cognitive fluency cluster.  What's your

4    takeaway on how that impacts Mr. Berger?

5    A.   Very similar, in the sense that what it is, these are

6    measures, again, of like retrieval, like looking up in your

7    mind to pull up a word, or to pull up -- for example, they can

8    be diagnostic of learning and attention disorders, because

9    people that have those disorders also have slower processing

10   speed for this kind of access.

11       So for example, retrieval fluency, I say okay, quick,

12   you've got one minute to name as many kinds of tree as you can

13   think of.  And so, you know, they're simple tasks, but we're

14   comparing to most other people.

15   Q.   And on this assessment on the verbal comprehension, is

16   that a timed assessment?

17   A.   You mean under verbal ability?

18   Q.   Verbal ability cluster.

19   A.   No, that is not.  So that would be conceptual without a

20   time limit.

21   Q.   And he scored in the 88th percentile on that?

22   A.   Uh-huh.  Uh-huh.  And again, that has to do with specific

23   fact and word retrieval.

24   Q.   The Woodcock-Johnson Test of Achievement?

25   A.   Yeah.

1    Q.   That's on PX127.  Is that a test you administered?

2    A.   Yes.

3    Q.   And what does that test assess?

4    A.   That assesses various component activities related to

5    reading, writing, and math, and also the performance of

6    different types of reading, writing, and math.

7    Q.   And assessing one's reading, do they have both timed and

8    un-timed measures on the Woodcock-Johnson?

9    A.   Yes.

10   Q.   Can you discuss the results of the un-timed measures?

11   How did Mr. Berger perform?

12   A.   The un-timed reading comprehension is at the 91st

13   percentile.  And I don't recall Dr. Smith's scores from the

14   past, but I am sure it's, you know, close, although I would

15   say that his performance tends to be uneven but it's still a

16   very strong score.  So if he has unlimited time to respond to

17   a comprehension item, then he scores very high.

18   Q.   And on the reading fluency, is that a timed measure?

19   A.   Yes, it is.

20   Q.   Can you explain how that test is administered?

21   A.   It is a test where you have a set number of minutes, and

22   then you read sentences, and then you mark them as true or

23   false.

24   Q.   And are these complex sentences?

25   A.   No, they're first or second grade level.

1    Q.   All right.  And how much time is one given for this

2    assessment?

3    A.   Three minutes.

4    Q.   How did Mr. Berger perform?

5    A.   Around the fifth percentile.

6    Q.   And is this something you actually observed?

7    A.   Yes.

8    Q.   Did you administer any other timed assessment of silent

9    reading?

10   A.   Yes.  The SATA, the Scholastic Ability Test For Adults,

11   Reading Comprehension.

12   Q.   And that's located on PX127?

13   A.   Yes.  Right under "reading fluency."

14   Q.   And how is that normed?

15   A.   It's age basis for adults.

16   Q.   How did Mr. Berger perform on that?

17   A.   Consistently, fifth percentile.

18   Q.   Can you describe this data?  How is it administered?

19   A.   It's another test where you read a passage, and then you

20   answer questions, and the passage remains displayed.

21   Q.   Did you make any assessments of Mr. Berger's attention?

22   A.   Yes.

23   Q.   And what were they?

24   A.   Some of the scores from the previous Woodcock cognitive

25   we'd already talked about, like the processing speed and

1    cognitive efficiency, the measure of -- on this page, on

2    PX127, understanding directions is at the 51st percentile.

3    While that's not below average, it's below the expected level

4    for someone with his verbal intelligence.  What that is is

5    listening to multistep instructions, and then you're looking

6    at a pictured scene, and the instructions are to point to a

7    series of things in the picture.  The processing speed was

8    difficult, and I suspect maybe sometimes the language

9    component.

10        So there was also very inconsistent performance, and it

11   looked to me like attention was fading in and out, where if a

12   person reaches a limit of language complexity they can't

13   understand beyond, they get the items correct until they reach

14   a certain difficulty level, and then they're tapped out.

15   Q.   Did you administer any behavior rating scales regarding

16   Mr. Berger's attention?

17   A.   The BRIEF, which is Behavior Rating Inventory of

18   Executive Functioning.  Executive percentile is an aspect of

19   attention percentile.  Inattentive features have more to do

20   like things with planning, organization, initiation, getting

21   started on things, et cetera.

22   Q.   And why do you administer the behavior rating scales?

23   A.   For self-report, to assess are any of these areas

24   remarkably difficult for someone compared to most other

25   people.

1    Q.   And you also provided these behavior rating scales to a

2    secondary source?

3    A.   In this case, I don't know that I did that.  I don't

4    think I did for the brief.

5    Q.   All right.  And what diagnosis did you identify in your

6    report?

7    A.   Oh, I forgot -- the Brown ADD scales were given, and I

8    forgot that there was a collateral respondent, so that's on

9    129.  So the self-report, the higher the score, the greater

10   the frequency or intensity of problems, symptoms of ADD in

11   terms of functional impact in major life activities.

12       And they're broken out into categories of difficulty.

13   Activation is getting organized, getting started.  Attention

14   is sustaining your focus, concentration.  Effort really

15   relates to fatigue and the experience of fatigue.  Affect,

16   getting discouraged or frustrated or annoyed by having

17   additional learning issues.  And memory is the impact on

18   memory that would be secondary to attention-related problems.

19   And so yeah, so this is his professor.

20   Q.   And what diagnosis did you identify, or diagnoses?  And

21   that would be at PX106.

22   A.   Reading disorder, disorder of written expression, and

23   Attention Deficit Hyperactivity Disorder, predominantly

24   inattentive.

25   Q.   And did you also perform a differential diagnosis to rule

1   out that this might not be as a result of any other condition?

2   A.   Yes, I did.

3   Q.   And are your impressions summarized in your report at

4   PX99 and PX100?

5   A.   Yes.

6   Q.   And did you make your diagnosis consistent with the

7   criteria set forth in the DSM-IV?

8   A.   Yes.

9   Q.   And did you detail that on pages PX107 through 115?

10  A.   Yes.

11  Q.   What were your recommendations regarding accommodations

12  in 2013?

13  A.   At that time, I recommended that a reader or a recorded

14  version of a test be made available.  Sometimes a recording is

15  made available so the person can play a particular test item

16  if they want to hear it.  Extended time to complete the test.

17  At this point, I recommended 50 percent.  And extra rest

18  breaks, and multiple day administration, and a quiet room.

19  Q.   And that was for this Step 1?

20  A.   Yes.

21  Q.   Did you have an occasion to evaluate Mr. Berger for a

22  third time?

23  A.   Yes.

24  Q.   And that was in 2017?

25  A.   Yes.

1    Q.   And I believe that's at Exhibit 8.

2         Is your evaluation in 2017 that Exhibit 8?

3    A.   Yes.

4    Q.   Was this evaluation performed in connection with the

5    Step 2 CK?

6    A.   Yes.

7    Q.   What assessments did you administer?

8    A.   The Woodcock-Johnson Test of Achievement, and this is the

9    Fourth Edition.

10   Q.   Were the results consistent with prior results?

11   A.   They were a little different.  The construction of the

12   test does change in third and fourth.  I've had different --

13   some more scored differences.  The tests are very carefully

14   constructed to provide the same scores as the previous version

15   for the average person, but people who have learning

16   disabilities are more sensitive to the format of the task and

17   the material, and so they're more likely to be inconsistent

18   than the average person.  So I have found a little variability

19   in that regard.  There's also new norms, updated norms.

20   Q.   And when you conducted this evaluation, did you make an

21   assessment of Mr. Berger's motivation and vigilance?

22   A.   Yes.

23   Q.   And what have you concluded?

24   A.   He was motivated, business like, on task and, you know,

25   wanting to be successful.

1   Q.   And what were your conclusions based on after doing that

2   evaluation?

3   A.   Basically, it was an update, updated measure.  And the

4   scores are very similar, so the findings are very similar, but

5   I will say also that not only did the achievement test get a

6   revision, but the diagnostic system was revised.  So the DSM-V

7   is now in use instead of the DSM-IV, and it has different

8   categories in terms of learning disorder and so on.

9   Q.   And did you administer timed reading assessments?

10  A.   Yes.

11  Q.   And what timed reading assessment did you administer?

12  A.   Some of the tests of the Woodcock IV under reading are

13  either time limited or they're functionally time limited in

14  the sense that you can only read the material one time.

15  Q.   And what were the results of the Woodcock-Johnson IV?

16  A.   Continues to show very low scores for time limited

17  reading comprehension and other academic areas, and limited

18  ability, or much less automatic and accurate in word

19  identification and phonological decoding.

20  Q.   There's a subtest for oral reading fluency.  Is that

21  something --

22          THE COURT:  Can you tell me what page you're on?

23          THE WITNESS:  211.

24          MR. WEINER:  Oh, I'm sorry, Your Honor.  PX211 is the

25  result.

*BEACH - DIRECT*                                              249

1          THE COURT:  Thank you.

2     Q.  The oral reading fluency, is that something that you

3     would administer yourself?

4     A.  Yes.

5     Q.  Are you able to take observations of his oral reading

6     fluency?

7     A.  Yes.  It's very much like the Gray Oral Reading Test, in

8     terms of someone reads a passage out loud to me, and I'm

9     marking the accuracy of their reading.  So I'm not recording

10    how fast they're reading or their time, but I am marking

11    accuracy.

12    Q.  And what did you note about his oral reading fluency?

13    A.  Same as before.  He has a high rate of word

14    identification errors, including omissions, and substituting

15    words that look similar but are not, don't make sense in the

16    context, and -- yep.

17    Q.  And the sentence reading fluency, is that silent?

18    A.  Yes.

19    Q.  And so in the sentence reading fluency subtest, how did

20    he score?

21    A.  Very low.

22    Q.  And in the oral reading fluency, how did he score?

23    A.  The which?

24    Q.  The oral reading.

25    A.  Both of those are like at the first percentile.

1    Q.   Okay.  That's below average?

2    A.   Yes.

3    Q.   And how about his reading rate, where did that fall?

4    A.   By different measures of reading rate, again, around that

5    first percentile, pretty low.

6    Q.   Did you render a diagnosis?

7    A.   Yes.

8    Q.   Is your diagnosis consistent with your prior diagnoses?

9    A.   Yes.

10   Q.   The measures that you've administered over the course of

11   your three evaluations, are these all recognized or robust

12   measures that are performed in the area of psychology?

13   A.   Yes, they are typical.

14   Q.   And were your diagnoses for the 2017 evaluation

15   consistent with the DSM?

16   A.   I'm still finding it, but yeah, they were conceptually

17   consistent but we just have different categories.

18             THE COURT:  It's on 199.

19             THE WITNESS:  Thank you.

20             THE COURT:  You're welcome.

21   A.   Right.  So now we say specific learning disorder, and

22   then within that, then we break out by category that it

23   involves, you know, various specific academic areas.

24   Q.   And are these diagnoses made consistent with the DSM?

25   A.   Yes.

1    Q.  Did you make recommendations regarding accommodations for

2    this Step 2 CK?

3    A.  Yes.

4    Q.  And what were your recommendations?

5             THE COURT:  Can I ask a question?  Back in the

6    diagnosis page, on 199, and maybe this is just a result of the

7    amendments to the DSM-V, there's an etiology, severity, and

8    prognosis?

9             THE WITNESS:  Uh-huh.  Well, you know, there really

10   was a major revamp, and so in the past, we called it a

11   five-axis diagnosis, and we had various information on there.

12   And so also like over time, in my own report writing style,

13   you know, I've evolved conventions.  And so in more later

14   years, I started putting that in the diagnosis because it

15   really wasn't -- you know, it wasn't captured in that five

16   axis any more, but also it's a relevant question you do need

17   to address, for every diagnosis you're giving, what is the

18   etiology, you know.  Did they get a head injury last week, you

19   know, do we know that it was due to some factor or not.  And

20   that becomes relevant for a lot of purposes, because then we

21   know if it's a short-term or long-term kind of problem.

22       In terms of severity too, sometimes it's a little hard to

23   take a diagnosis like a learning disability and force it to

24   fit into a diagnostic coding system that's really invented by

25   MDs, you know; for depression, sometimes the way they have

*BEACH - DIRECT*                                                                252

1    these diagnostic things laid out makes a lot more sense, but

2    for us, we need a little more information.

3        And the same with prognosis.  So any good evaluation

4    report that concerns this kind of disability needs to make a

5    statement about the severity of the impact, the prognosis, and

6    do you know the etiology.  That's just me adding.

7            THE COURT:  Thank you.

8    BY MR. WEINER:

9    Q.  Going back to the recommendations you made for the

10   accommodations on the Step 2, what were they?

11   A.  Additional testing time.  This time I'm recommending a

12   hundred percent.  I just went back to that recommendation,

13   especially in my concern for Step 2 because it is a more

14   reading-intensive exam.  And I know that because I have helped

15   a lot of people study for that exam, and worked with a lot of

16   people who were struggling with the reading aspect of that

17   exam.  So I'm very familiar with it.  And I had concern about

18   the impact of that.

19       And a recorded version.  Again, because his reading

20   accuracy is so low and his comprehension is inconsistent, that

21   could really do damage to you in that type of an exam.  If

22   you're not reading accurately, you can't answer the question

23   using the knowledge that you have.  And I thought hearing it

24   would be important.

25       Extra rest breaks.  If you're going to have a six-hour

*BEACH - DIRECT*                                                  253

1    exam, let's have some rest breaks.  Usually, that's provided.

2    If you're going to give extended time, you have extra rest

3    breaks.  I would recommend two-day administration, because

4    otherwise it would be impossible to have, you know, double

5    time on an exam of this length.  He can't take a test for

6    16 hours.

7        A private distraction-limited room.  Ever since very

8    early childhood, he's been very vulnerable to distraction and

9    has a hard time sustaining his focus, and that creates

10   problems.  You have to use a lot more mental energy and effort

11   to be able to read and comprehend, and if there are noises,

12   then you're using mental effort to screen those out.

13       And if there's a clinical skills component to future

14   exams, where he has to read a patient chart or he has to write

15   a more extensive note, then I would recommend extra time for

16   that.

17   Q.  Did you review Mr. Berger's MCAT scores in connection

18   with your evaluation?

19   A.  Yes.

20   Q.  Did you also review his score report for the USMLE

21   Step 1?

22   A.  Yes.

23   Q.  Are those scores inconsistent with his reading fluency

24   scores or his other timed reading scores?

25   A.  I'm sorry.  Can you rephrase that?

1     Q.   Are his MCAT scores inconsistent with the type of scores

2     that he received on his timed reading scores that you

3     administered?

4     A.   You mean are they higher?

5     Q.   Yes.

6     A.   Yes.

7     Q.   Can you explain how that could possibly happen?

8     A.   Well, there are different kinds of reading, and one way

9     that people can significantly increase their reading rate is

10    if they know ahead of time what the material is going to be,

11    and they can practice and rehearse, they know what the format

12    of the question is, so you have a good opportunity to really

13    familiarize yourself with more context for what to expect.

14         And in addition, he's very good at coming up with

15    compensatory strategies to speed up his reading for this kind

16    of test, like the whole idea of not reading the content but

17    just reading the responses is, you know, so he's very

18    strategic in that way.

19         And those kinds of strategies just really don't work for

20    something I give you that's novel, even if it's really simple

21    reading, because you haven't just spent the last six months

22    trying to figure out a way to break through.

23    Q.   Have you had other patients where you've seen low reading

24    fluency scores but MCAT scores within the average range?

25    A.   Yes.

*BEACH - DIRECT/CROSS*                                         255

```
 1    Q.   Is this something that you've seen on several occasions?

 2    A.   Yes, because of the strategy.

 3    Q.   Is the MCAT a diagnostic test used in making diagnoses of

 4    reading disabilities?

 5    A.   Not officially.

 6    Q.   Okay.  Is utilizing the MCAT to rule out a diagnosis

 7    based on the DSM an appropriate thing to do?

 8    A.   I would not do that.

 9              MR. WEINER:  I'm done, Your Honor.

10              THE COURT:  You want to get started for 20 minutes?

11              MR. BURGOYNE:  I could at least ask some preliminary

12    questions I had on her CV, Your Honor.  That will get a few

13    questions out of the way.

14              THE COURT:  All right.  Let's do that, then.  Thank

15    you.

16                        CROSS-EXAMINATION

17    BY MR. BURGOYNE:

18    Q.   Just to remind you, I think it's Exhibit 63, your CV.  Do

19    you have that page, or that exhibit?

20    A.   Yes.

21    Q.   Just two sections here I want to ask you about.  One is

22    on page 6.  This is where you were discussing your work doing

23    evaluations and preparing reports to support accommodation

24    requests?

25    A.   Uh-huh.
```

*BEACH - CROSS*                                                    256

1    Q.   And you reference several exams here.  About how many of

2    those do you do in a given year?

3    A.   Did you say page --

4    Q.   Page 6.  Numbered page 6.

5    A.   Oh, oh, oh.  Hang on, please.  Yes.  Got it.

6    Q.   And you see the second paragraph there?

7    A.   Uh-huh.  How many?

8    Q.   Yeah.  About how many of those do you do?

9    A.   Per year, per --

10   Q.   Well, just in the past year, how many would you say

11   you've done of individuals seeking compensation on tests?

12   A.   I would estimate maybe five or six, because I limit those

13   because they're so lengthy and detailed.  They're very time

14   intensive.

15   Q.   I believe you described your work on Mr. Berger's report

16   "it was a complicated case."  What was complicated about it?

17   A.   I don't know if I said that.

18   Q.   Do you think it was a complicated --

19   A.   Complicated how?  I mean --

20   Q.   Well, I was just following up on your testimony.  I can't

21   tell you what you meant by it.

22   A.   I guess I would say that it was -- I'm trying to think if

23   I would think of it as complicated.  I felt that

24   diagnostically it was not complicated, but what was

25   complicated is that he had a large chunk of time where he did

*BEACH - CROSS*                                                    257

```
 1   not have individual evaluations, and in the private school
 2   system, they -- back at that time especially -- did not keep
 3   written records.  And so it can be complicated to round up
 4   documentation in that regard.
 5        It's also hard, you know, when I came in to it in 2010,
 6   my original goal was to just be helpful by looking at the
 7   evaluations that had been done, in looking at the denial
 8   letters and interpreting that for people, because it has --
 9   sometimes people don't know what they don't know, if they
10   don't know to go to a website and look up the documentation
11   requirements, and so it's always complicated if you're walking
12   into a situation like that and going beyond just saying here's
13   what I think would be -- you know, this is what I think the
14   NBME is trying to tell you they need.  If you take it beyond
15   that, it does become complicated.
16   Q.   Did you have any reason to think that Mr. Berger wasn't
17   familiar with the documentation requirements for the NBME,
18   that he hadn't gone to the website and retrieved those?
19   A.   I don't remember that far back, but I do remember that
20   neither the disability service office, nor Dr. Smith, and I
21   don't think the family was as dialed in on that as they might
22   have been.  He might have been aware for the MCAT; but, like I
23   say, you know, oftentimes, you know, people look that up and
24   they -- like for Dr. Smith, his thinking was this is so
25   obvious, I really don't need to do much other than kind of
```

1    like an update, you know.  And if he would have -- so I can't

2    say whether he looked up the requirements and then decided

3    they didn't apply, or, you know, what, but --

4    Q.   And --

5    A.   -- a lot of people just don't even know they're there,

6    you know.

7    Q.   Take a look at page 11 of your CV.

8         Looks like, for at least two years, you served as a

9    medical expert for the Social Security Administration --

10   A.   Yes.

11   Q.   -- Office of Hearings and Appeals?

12   A.   Right.

13   Q.   And can you tell us what that work involved?

14   A.   I would advise the judge in an appeal hearing.  So they

15   would give me the request for disability, the file for that

16   person, meaning the medical record and all the supporting

17   documents, and I would review the assessment that had been

18   done to determine if there was evidence, in my opinion, to

19   show that there's a disability based on the criteria for

20   Social Security Disability.

21   Q.   Okay.

22   A.   Under whatever category.

23   Q.   And what type of impairments did you provide those types

24   of recommendations and opinions?

25   A.   The psychiatric code.

*BEACH - CROSS*                                                                259

1    Q.   And by that sort of DSM-IV are the same type of

2    impairments that we're talking about here today?

3    A.   Right.  And so for both children and adults, and there

4    are different disorders qualifying under those, and -- but it

5    would be things like depression, bipolar disorder, et cetera.

6    Q.   And did any of those reviews include any diagnoses of

7    ADHD or learning issues that either a child or adult had?

8    A.   Yes.

9    Q.   And when you did those, I believe you said you did those

10   based on a paper-based record?

11   A.   Right.

12   Q.   And you didn't personally evaluate the candidate?

13   A.   No.  I evaluated the data that resulted from the

14   evaluation.

15   Q.   Okay.  And then at the end of that, you felt you were in

16   a position to make a recommendation to the judge as to whether

17   or not this individual met the applicable standard for being

18   disabled?

19   A.   Right.  And there's specific criteria.

20        MR. BURGOYNE:  No further questions right now, Your

21   Honor.

22        THE COURT:  Okay.  Let's talk about tomorrow.

23   Assuming everybody is in town staying around.  I know we've

24   got two -- how many witnesses are you calling besides

25   Dr. Beach?  Do you have anybody else?

*BEACH - CROSS*                                                         260

 1            MR. WEINER:  No one else, Your Honor.

 2            THE COURT:  Mr. Burgoyne, do you have two?

 3            MR. BURGOYNE:  Your Honor, I have three.  One of the

 4    them, though, is Cathy Farmer, whose declaration we've

 5    provided, that just walks through the process for reviewing

 6    the accommodation request.  Subject to what he wants to do, I

 7    could probably expedite that if we could just rely some on her

 8    declaration instead of having her go through that whole

 9    testimony again.

10            THE COURT:  Any objection?

11            MR. WEINER:  No objection, Your Honor.

12            MR. BURGOYNE:  Okay.  And then I'll try to streamline

13    the other two, because everybody would like to finish

14    tomorrow.

15            THE COURT:  Okay.  I'm wondering if we started at

16    8:30?

17            MR. BURGOYNE:  Great.

18            MR. WEINER:  Fine.

19            THE COURT:  Sue?

20            THE COURT REPORTER:  Yes.  That's fine, Judge.

21            THE COURT:  And that works for, you Dr. Beach?

22            THE WITNESS:  Fine.

23            THE COURT:  Thank you.

24             (Proceedings adjourned at 5:49 p.m.)

25                          -  -  -

1                      C E R T I F I C A T E

2                            -   -   -

3       I, M. Sue Lopreato, the undersigned, certify that the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6

7

8                        /s/ M. Sue Lopreato
                         M. Sue Lopreato
9                        Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2
                                              PAGE
3     MAUREEN HOLLAND

4     Direct by Mr. Weiner............................    19
      Cross by Mr. Burgoyne...........................    26
5
      BRENDAN J. BERGER
6
      Direct by Mr. Weiner............................    28
7     Cross by Mr. Burgoyne...........................   119
      Redirect by Mr. Weiner..........................   185
8
      CHERYL BEACH, Ph.D
9
      Direct by Mr. Weiner............................   190
10    Cross by Mr. Burgoyne...........................   255

11

12

13                         -  -  -

14

15

16

17

18

19

20

21

22

23

24

25