1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  WESTERN DIVISION

4                    -  -  -

5    BRENDAN J. BERGER,           .  Case No. 1:19-cv-00099

6          Plaintiff,             .  Motion for Preliminary

7          vs.                    .  Injunction

8    NATIONAL BOARD OF MEDICAL    .  Day 2

9    EXAMINERS,                   .  Tuesday, July 30, 2019

10         Defendant.             .

11                   -  -  -

12              TRANSCRIPT OF PROCEEDINGS

13      BEFORE THE HONORABLE KAREN L. LITKOVITZ, MAGISTRATE JUDGE

14   For the Plaintiff:          Charles Weiner, Esq.
                                 Law Office of Charles Weiner
15                               Cambria Corporate Center
                                 501 Cambria Avenue
16                               Bensalem, PA  19020

17   For the Defendant:

18   Robert A. Burgoyne, Esq.    Erin Dwyer French, Esq.
     Perkins Coie, LLP           Vorys, Sater, Seymour and
19   700 13th Street, NW         Pease, LLP
     Suite 600                   3500 Great American Tower
20   Washington, DC  20004-3960  301 E. Fourth Street
                                 Cincinnati, Ohio  45202
21

22   Also Present:              Brendan J. Berger

23   Law Clerk:                 Eden Thompson

24   Courtroom Deputy:          Arthur Hill

25   Court Reporter:            M. Sue Lopreato, RMR, CRR

1                        P R O C E E D I N G S

2                              -  -  -

3              THE COURT:  Good morning, everyone.  Dr. Beach, if

4     you would like to come forward, please.  You've already been

5     sworn, so we can just resume.

6              MR. BURGOYNE:  All set, Your Honor?

7              THE COURT:  All set.

8                  CONTINUED CROSS-EXAMINATION

9     BY MR. BURGOYNE:

10    Q.  Good morning, Dr. Beach.

11    A.  Good morning.

12    Q.  Follow up on a couple of things quickly.  You said

13    yesterday, according to my notes, you stated it's very

14    important to be accurate in your evaluation reports --

15    A.  Right.

16    Q.  -- do you agree with that.  And I believe you said that's

17    why you ask your patient to collect historical documentation

18    when you do your evaluations?

19    A.  Right.

20    Q.  And I think you also said I want verification not just

21    self-report?

22    A.  Right.

23    Q.  Why is that?

24    A.  It's a best practice approach, otherwise someone could

25    come in and just tell you something they thought would

1    influence you to make a decision, and so it's a way of

2    verifying that something actually happens.  So someone says to

3    me, you know, I got this score on a test or whatever, I want

4    to see if they had a service plan or an IEP, or something like

5    that, I would like to see it.

6    Q.  Shifting gears directly to your interactions with

7    Mr. Berger.  He came to see you after he was denied

8    accommodations on the MCAT?

9    A.  Right.

10   Q.  He came to you specifically to get an evaluation and

11   report that he could submit to AAMC in support of an

12   accommodation request?

13   A.  Not initially.  Initially it was the university

14   disability services were confused about the reason for the

15   denial, and the psychologist who had prepared those reports,

16   he was confused.  And so they had asked me just to like

17   consult and say, you know, I suggest that these are deficits

18   in what was submitted, you know, that there is missing

19   information, and so it wasn't automatic I was going to

20   evaluate him.

21       But when I assessed the kind of things that were lacking

22   in the information that was sent, I felt like, well, this is

23   fixable, you know, and so then I did offer to do that.

24   Q.  Are you suggesting that your initial contact came from

25   the university as opposed to Mr. Berger?

1  A.  I don't remember who contacted me first, probably the

2  patient because, you know, they might recommend that he come

3  to see me, but me may or may not, so -- and he would be

4  contracting for the service, so they weren't going to pay me a

5  fee, you know, but they had suggested that since I'm someone

6  who works with licensing boards a lot, that I might have some

7  insight.

8  Q.  Okay.  You should still have two notebooks up there, one

9  of the defense exhibits, one of the plaintiff's.  Let's start

10 first with the defense exhibits.

11         MR. BURGOYNE:  May I approach the witness, Your

12 Honor?

13         THE COURT:  Yes.

14 A.  I don't speak law.  I'm not sure which one that is.

15 Q.  These are our exhibits, so we'll start with this one.

16 A.  Okay.  So start with this one.

17 Q.  I'll move these out of the way for you.

18 A.  All right.  Thank you.

19 Q.  And would you turn to Exhibit 3, please.

20 A.  Yes.

21 Q.  Do you recall that we served a document subpoena on your

22 office?

23 A.  Right.

24 Q.  And you produced documents to us in response to that

25 subpoena?

1    A.   Yes.

2    Q.   And is this one of the documents you produced?

3    A.   Yes.

4    Q.   Is that your handwriting on the top?

5    A.   Yes.

6    Q.   And it says "initial contact"?

7    A.   Yeah.  I put that on there so you would know what that

8    was.

9    Q.   Okay.  And could you just describe what this document is,

10   please?

11   A.   This is the initial contact that came through my

12   administrative people telling me that someone had been

13   referred, a student from the University of Cincinnati, that's

14   what UC is.  And he had met with Michael Southern, who is the

15   director of disability services.

16   Q.   Okay.  And at the bottom there, that's the note from Ann

17   Florence to you?

18   A.   Right.  Because she's my admin at that time.

19   Q.   And she's reporting she got a message today from Brendan

20   Berger?

21   A.   Right.  And that's her transcription or her paraphrase.

22   Q.   And Brendan reported that he had been recommended to see

23   you about a reevaluation?

24   A.   Is that what it says?

25   Q.   Yes, the bottom of the page.

1    A.   Yes.  Okay.

2    Q.   Does that refresh your recollection that your first

3    contact in this matter came through Mr. Berger?

4    A.   Yeah, and that would be what I would expect.  And then I

5    followed up with Michael Southern, and I, you know, I said

6    what's the deal.

7    Q.   All right.  And that was May 14th, then.  It looks like

8    there's a follow-up note from you to Ellen.  Who is Ellen?

9    A.   Ellen is a psychologist that works with me and

10   collaborates with some evals.  And because she's a clinician,

11   she's able to manage my schedule.

12   Q.   Did she play any role in evaluating Mr. Berger?

13   A.   No, but she runs my schedule.  She's better at it than I

14   am.

15   Q.   All right.  And you say in your note to Ellen, "There is

16   perhaps a timeline here, as evaluation reports have to be

17   completed and at the MCAT office for review by a set date,

18   well in advance of the date for test administration.  It will

19   be important to ask him when he intends to take the MCAT.  The

20   website will give the deadlines for the finished report.  You

21   know where I'm going with this.  Let's schedule an initial

22   soon so I can learn about the above and get him rolling."

23   A.   Right.

24   Q.   So it looks like at this point in time, it's May 14th,

25   you haven't seen Brendan, you haven't spoken to his parents,

1    you haven't seen any of his documentation, but you're already

2    anticipating preparing a report and getting it to AAMC?

3    A.   Well, if there's even a shadow of a possibility, you

4    know, but it's not a given.

5    Q.   Okay.

6    A.   I mean, that's a lot of work to complete in a very short

7    amount of time; and, you know, so that's the type of thing

8    where I'm just planning ahead, but I'm not signed on because I

9    haven't met him and I haven't final'd the situation yet.

10   Q.   Okay.  Take a look, if you would, at Exhibit 4.

11   A.   Yes.

12   Q.   And is Exhibit 4 a document that you prepared?  It's

13   captioned "Brendan To-Do List"?

14   A.   Yes.

15   Q.   And what was the purpose of this document?

16   A.   For anybody that is seeking accommodations for this type

17   of evaluation or, you know, this type of a test, even if I'm

18   not evaluating, there are going to be required and recommended

19   documents that are supporting.  And those are listed on the

20   website.  And there are some common denominators that go

21   across various tests at the graduate and professional level.

22        So, you know, I either give generic advice, or I give

23   them a handout that says I would like these documents if I'm

24   going to be evaluating you or giving you an opinion.  And also

25   I want those documents for my own diagnosis purposes,

1    especially in this case.

2        And I remember yesterday, you asked me what I meant.  I

3    think I might have said something about him being complicated,

4    and I didn't have context, and so I wasn't -- but one of the

5    things that I would say was complex about this case is you

6    have a guy who was evaluated at age eight, and he's not

7    evaluated again until he's 17 and a half.  And there's a lot

8    of time in between.  And especially if you're in the private

9    school system, where they don't write down accommodations and

10   stuff at that time, you know, there's a lot of vagueness.

11       And another thing that I really judged in just looking at

12   his evaluation work that had been done to date is that even

13   the more recent stuff, the whole diagnosis question was very

14   unsettled.  And I felt like, okay, this is a guy that if he's

15   going to request accommodations or, you know, he needs a

16   diagnosis.  He needs a good diagnosis; and, you know, I'm

17   prepared to do that for him, but in order to do that, I need

18   his self-report, but I need to hear from his parents, his

19   teachers from the past, present, et cetera, you know, so I

20   needed a comprehensive history.

21       And I thought also that part of the problem, if I were

22   reviewing his request for MCAT accommodations, the history in

23   the reports that were prepared by Dr. Smith were kind of cozy,

24   so they were okay.  The history was okay for local people.  So

25   I know that if he worked with Jane Kagy at Moeller High

1    School, that he was in the LD program, and it's the only boys

2    high school that has an LD program, so there was a lot of

3    information embedded, but it wasn't laid out, you know, so I

4    really thought that was a problem in terms of arriving at a

5    clear diagnosis the history of learning problems, but also for

6    requesting accommodations, you know.

7    Q.   Okay.

8    A.   So I wanted him to get specific documents, and so none of

9    those were to hand.  So when you look at that table of

10   contents on the appendix, those are things that I asked

11   Brendan and his parents to scramble around and get for me

12   because they were not all in a neat pile.

13   Q.   Okay.  Turning your attention back to Exhibit 4.

14   A.   Uh-huh.

15   Q.   One of the things you asked him to get was a CV from

16   Dr. Smith, correct?

17   A.   Yes.

18   Q.   And he eventually did that?

19   A.   Yeah.  Dr. Smith was reluctant because he considered that

20   a confidential document, and he didn't know me personally.

21   Q.   Okay.  But he provided it to you?

22   A.   Eventually, yeah.

23           MR. BURGOYNE:  And Your Honor, I don't think you have

24   that.  I'll give you a copy.  I don't think it's attached to

25   the exhibits, but I'll have a copy of that for you.

1           THE COURT:  Okay.

2    Q.   Then you also asked him, in paragraph 3, to try to get

3    something from Moeller regarding his eligibility?

4    A.   Right.  And Karen Matuszek is the current director of the

5    learning disability program at Moeller.

6    Q.   I know you contacted her in 2019.  Did you contact her in

7    2010?

8    A.   I don't recall.  I don't believe I did.  I believe my

9    instructions were to Brendan to contact the high school and

10   elementary school to see if they had any records, and also to

11   see if there were any -- if they don't have records, to see if

12   any of the teachers he had were still there, and they would

13   remember him and could, you know, prepare some kind of

14   statement about what they recall.

15   Q.   Okay.  Paragraph 5, you describe what he needs to do in

16   terms of a cover letter?

17   A.   Yes.

18   Q.   I think he sent you what he had done, and you thought it

19   was a good start but needed some work?

20   A.   Yeah.  It was too broad.  It's hard for people to know

21   what it is that the person reading that letter really wants to

22   hear.  It's not the same as your essay that you write to apply

23   to medical school why I want to be a doctor.  It's a different

24   kind of letter.

25   Q.   Okay.  And one of the things you suggest to him on the

BEACH - CROSS                           2-11

1    next page is that he gives some additional background on how

2    he's affected by his impairment?

3    A.   Right.  Because the diagnosis is not of disability.

4    Q.   And then at the third full paragraph, there's the

5    sentence, "How has this affected you in daily living"?

6    A.   Right.

7    Q.   In parenthesis, In a second setting beyond academics,

8    there has to be impact in multiple, at least two domains?

9    A.   Right.

10   Q.   Is that relative to a learning disability diagnosis?

11   A.   No.  I'm saying that in general, you know, for ADHD we

12   would say that, and also in considering a disability, that

13   could be relevant.  It could be diagnostically relevant, you

14   know.  For a learning disability, we generally say there's a

15   pervasive impact, you know --

16   Q.   Typically, when you --

17   A.   -- but I am wanting the person to not just to say, you

18   know, this affects my reading.  You'd be like, well, then

19   what.

20   Q.   You'd agree, typically, when you're talking about being

21   affected in multiple domains, that's in the context of an ADHD

22   analysis?

23   A.   Yeah, right.

24   Q.   And then you give him an example here, "Did you ever sign

25   something like an apartment lease or a car sales contract

```
 1    without reading it at the time --"

 2    A.   Uh-huh.

 3    Q.   -- "because your reading rate was slow --"

 4    A.   Uh-huh.

 5    Q.   -- "and you didn't want to be put on the spot for that,

 6    so you went home and read it later"?

 7    A.   Uh-huh.

 8    Q.   And then you gave him some other examples?

 9    A.   Right.  Uh-huh.

10    Q.   And then you say, "You get the idea, right"?

11    A.   Right.

12    Q.   Was that common for you to sort of work in that -- beyond

13    just doing an evaluation and to get more involved in helping

14    the individual document an accommodation request from a

15    testing company?

16    A.   What I would say is not telling them what to say, but

17    helping them to understand the instructions, or, you know,

18    what is the information that is needed.  And I think that's

19    important to do and just make sure people have an

20    understanding.  But I don't tell them what to write in their

21    letter, but I do give concrete examples because it's

22    oftentimes not something people have been asked to do before,

23    to write a letter like this.

24    Q.   Exhibit 5, is that your handwriting at the top?

25    A.   Right.
```

BEACH - CROSS                                         2-13

1    Q.   And is this handwriting you put on there for my benefit,

2    to tell me what --

3    A.   Mine too.

4    Q.   Okay.  It says, "Completed by Alexander Smith, Ph.D.,

5    4/3/10"?

6    A.   Uh-huh.

7    Q.   And is this the consideration request that he submitted

8    with Brendan to the Association of American Medical Colleges?

9    A.   Yes.  So reconsid -- I'm trying to think.  So he did an

10   initial, and then he did a reconsideration.  Did he do

11   another?

12   Q.   I believe you were the second reconsideration.

13   A.   Okay.  Yeah, yeah.  I'm just double-checking.  Yes.

14   Okay.  Then I know where we are.  So this is after he prepared

15   his addendum.

16   Q.   That I can't say.

17   A.   Yeah.

18   Q.   I just know this was April 2010.

19   A.   Uh-huh.

20   Q.   Reconsideration request --

21   A.   Uh-huh.

22   Q.   -- was submitted.

23   A.   Uh-huh.

24   Q.   Would you look at the second page of this document?

25   A.   Yes.

1    Q.   And what impairment did Dr. Smith identify to the

2    Association of American Medical Colleges?

3    A.   He checked -- well, I don't know if he checked it or

4    Brendan checked it.  It says, "Nature of your impairment,

5    learning disability."

6    Q.   Okay.  And there's no checked box on ADHD, no checkmark?

7    A.   No.

8    Q.   And then if you see the next page, there appears to be

9    diagnostic information.  Do you understand that to have been

10   provided by Dr. Smith?

11   A.   Which page is that?

12   Q.   That is the page that's got 192 at the bottom, and then

13   continuing over to 193.

14   A.   So you're saying there's a diagnosis on here?

15   Q.   Not that there's a diagnosis, but there's assessment

16   data?

17   A.   Oh, oh, I see.  Yes.

18   Q.   And doesn't that suggest to you that this was provided by

19   Dr. Smith?

20   A.   I would think so.  Yeah, because it says -- well, I don't

21   know.

22   Q.   Go to the last page, you'll see a signature?

23   A.   Yes.

24   Q.   Okay.

25   A.   Or is that Brendan's signature?

```
 1    Q.   The very last page of this document.

 2    A.   Oh, after the checklist for evaluators?

 3    Q.   Yes.  You see Dr. Smith's signature?

 4    A.   Uh-huh.

 5    Q.   And do you see on page 192, there's a description of the

 6    evaluator's experience?  It's in paragraph 10, numbered

 7    paragraph 10.

 8    A.   Yes.

 9    Q.   Do you see it says, "Dr. Smith evaluates children and

10    adults for ADHD, learning disabilities, and emotionally-based

11    learning disorders"?

12    A.   Yes.

13    Q.   Was it your understanding at the time that Dr. Smith did,

14    in fact, evaluate both LD and ADHD?

15    A.   My impression is no, because throughout his reports, he

16    says there is a lot of evidence for an attention disorder, so

17    Brendan should be seen by a neuropsychologist to have that

18    diagnosis determined.  So he seems to defer and not feel that

19    that is his domain.

20    Q.   Do you have any reason to question the statement on that

21    document that he evaluates people for LD and ADHD?

22    A.   Well, in the contents of his report where he repeatedly

23    describes symptoms and test scores that are indicative, but

24    then he -- and so I can't say, you know, perhaps he felt he

25    didn't have enough information about the history, or he didn't
```

1    have, you know, enough information to make a determination.

2    And I believe that he ended up assigning a diagnosis of NOS,

3    didn't he?

4    Q.   I don't know what he assigned in his last 2010

5    evaluation.  I know he didn't assign anything in 2003, and

6    then he ruled out ADHD in 2008?

7    A.   Yeah, but then he said -- it was ruled out, and then he

8    said it was like ruled back in.  So he is very unclear about

9    his diagnosis throughout.  And he goes back and forth between

10   the concept of a disability or a disorder, and it doesn't mean

11   they're always different, but his diagnostic perspective seems

12   to switch.  And he also switches between the categories used

13   in the educational system, like what categories of special

14   education would you qualify under versus DSM-IV, which is a

15   different system.

16        So, you know, like dyslexia is not in either.  So he's

17   saying he has dyslexia, but he doesn't diagnose it because it

18   doesn't exist in DSM-IV or in the public school categories.

19   Q.   And we'll get to that.

20   A.   So it's unclear to me what he's doing with ADHD.

21   Q.   Let me ask you something here just as a favor here.

22   Whether it's me or you, we have a tendency to be talking at

23   the same time, and that makes it really hard for the court

24   reporter to get a clean record.

25   A.   Got it.

1    Q.   So I will try to do a better job, and if we could both?

2    A.   Thank you.

3    Q.   When you prepared your draft reports, you sent those to

4    Brendan to review, didn't you, routinely?

5    A.   Well, I wouldn't make that plural, but I would say that

6    because I'm very concerned about accuracy, and particularly

7    when the history is not well documented at this time, and

8    there are a lot of events that have to be correct, I will send

9    the report and ask the patient or their parents to review it

10   for accuracy so that it doesn't go out with mistakes.

11        And so, for example, if I say something happened during

12   the third grade, and then the patient reads it and they say,

13   oh, no, that was fourth grade, you know, I want to get that

14   right.  And sometimes we do make mistakes, you know, with

15   important details.  And especially if somebody has a

16   complicated history, I want to make sure that I'm describing

17   what they told me accurately, I will send that out for

18   verification of fact, not for their editorial comments about

19   my interpretation, or anything like that.

20   Q.   Okay.

21   A.   But I don't like -- when someone comes to see me, and

22   they have an evaluation report that was previously done, and

23   then they have a big line drawn through something in their

24   history and they say, well, I don't know where that came from

25   but it didn't seem to matter so I didn't go back to the

1    psychologist, but then I don't know, is that true or not, you

2    know, so I really want to be accurate.

3    Q.   And I appreciate that.  The answer to the question was

4    yes, you routinely sent copies of your draft reports to

5    Brendan to review?

6    A.   Well, I wouldn't say copies, you know, it's not like

7    we're going --

8    Q.   Drafts?

9    A.   Yeah, for accuracy.

10   Q.   And he routinely provided you comments and suggested

11   edits?

12   A.   He would find errors, not suggest edits.

13   Q.   Okay.  Let's take a look at Exhibit 6.  Exhibit 6

14   consists of two documents.  The first one is one that you

15   produced to us?

16   A.   From the subpoena.

17   Q.   Yes, correct.  And that has Mary Lou Huth at the bottom?

18   A.   Yes.

19   Q.   And the second one is signed and on St. Gabriel

20   letterhead?

21   A.   Correct.

22   Q.   And this letter was obtained specifically to provide to

23   the Association of American Medical Colleges, correct?

24   A.   Well, and for my own diagnosis, correct.

25   Q.   Okay.  And did you request this, or did Brendan?

1   A.   This is an example where I had said try to find a teacher

2   that remembers you and get a statement, and I would want that

3   to be on a letterhead if possible, and to have that notarized

4   if possible so that I'm sure who wrote it, okay?  And so I did

5   not contact this person, but I can tell you why there's two

6   versions.  Is that what you're asking?

7   Q.   Well, I'm going to in a minute.  Did you talk to Mary Lou

8   Huth at any point?

9   A.   No.

10  Q.   Did you communicate with her at any point?

11  A.   No.

12  Q.   And is it your testimony that you didn't draft any part

13  of this letter?

14  A.   No.

15  Q.   Do you know if Brendan drafted any part of this letter?

16  A.   I would not think so, especially since it came back

17  notarized.

18  Q.   Okay.

19  A.   That's why I do that.

20  Q.   And the reason I ask -- and look at the second page, the

21  signed version.  Do you see the sentence there, "Although

22  Brendan's IQ placed him in the gifted range, standardized

23  testing indicated a significant discrepancy in performance as

24  compared to ability.  It was my understanding at the time that

25  Brendan's difficulties were related to a diagnosis of

1   dyslexia."

2   A.   Uh-huh.

3   Q.   That doesn't sound like a fifth grade parochial school

4   teacher to me.

5   A.   Oh, really?

6   Q.   Yeah.  Isn't that the terminology you'd ordinarily use

7   for a discrepancy analysis?

8   A.   No.  I mean --

9           MR. WEINER:  Your Honor, I'm going to object.  It's

10  argumentative.

11          MR. BURGOYNE:  That's fine, Your Honor.

12  Q.   There also a reference here to dyslexia?

13  A.   Right.

14  Q.   I thought I understood you to say that that didn't exist

15  at the time?

16  A.   Well, it does, but I'm just saying it wasn't in the DSM-V

17  or IV, and it wasn't in the public school category that you

18  qualify for special ed, but everybody knows it exists.  He was

19  diagnosed with it as a very young child, and the teachers were

20  aware of it so, you know, it's kind of like the disorder

21  that -- I don't know how to put it, you know.  I guess

22  language-based learning disorder is another way of referring

23  to learning disability, and that's not official either.  But

24  dyslexia, people know what that is, and it's out there.

25  Q.   Okay.

1    A.   I mean, teachers know what that is.

2    Q.   Look at Exhibit 7.

3    A.   Am I allowed to make a comment about why there's two

4    versions of this letter?

5    Q.   Oh, by all means, yes.  I think you said something

6    yesterday on it, but by all means.

7         THE COURT:  Dr. Beach, just generally, I'd like you

8    to answer the questions that are proposed to you, and then if

9    plaintiff's counsel feels that there are additional questions

10   that would be helpful for additional information to be brought

11   out, then he will do that, and it just might kind of speed up

12   our process.  Thank you.

13        THE WITNESS:  Move us along.  You got it.

14        THE COURT:  Go ahead.

15   Q.   Why did you have the version of the -- the other version

16   of the letter?  I think you testified to it yesterday, but if

17   you want to repeat that, feel free.

18   A.   She had retired, and I wanted to get an advance version

19   of it before she went through the steps of putting it on

20   letterhead and notarization.  I was writing a report very

21   quickly and wanted to know what was in it so that I could use

22   that information.

23   Q.   And then Exhibit 7, is that your handwriting on the top?

24   It's a two-paragraph letter that appears to be from Brendan to

25   the MCAT office of accommodated testing?

1    A.   Yes.

2    Q.   And was this his draft cover letter that he sent to you

3    to look at?

4    A.   It appears to be.  I don't remember it.

5    Q.   Exhibit 8, is this a request for reconsideration form

6    that you helped Brendan submit?  If you'll look at the last

7    page, that might refresh your recollection.

8    A.   This is Brendan's part in the beginning.

9    Q.   Right.

10   A.   And there's probably an examiner checklist somewhere in

11   here.

12   Q.   Look at, if you would, at the page that has 323 at the

13   bottom?

14   A.   Yes.

15   Q.   And would you confirm this is the revised cover letter

16   that Brendan provided to AAMC?

17   A.   I don't know if this is a cover letter or personal

18   statement, I don't know what.

19   Q.   Okay.  Next page, two pages, rather, there's a checklist

20   for evaluators?

21   A.   Yes.

22   Q.   And you completed this document?

23   A.   Yes.

24   Q.   And then on the second page of that, there's a checkmark

25   next to the comment "the evaluation was a comprehensive

```
 1    assessment."  Is that an accurate statement from your 2010

 2    evaluation of Brendan?

 3    A.   Well, it says beyond what's gleaned from IQ battery,

 4    yeah, uh-huh.

 5    Q.   Where is the part about beyond what's gleaned from IQ

 6    battery?

 7    A.   That's the statement.

 8    Q.   Are you looking at the same thing?

 9    A.   On 327, on the bottom.

10    Q.   The top, the second thing, "The evaluation was a

11    comprehensive assessment"?

12    A.   Oh, I'm at the wrong place.  Yes.

13    Q.   And you confirm that was an accurate statement at the

14    time?

15    A.   Yes.

16    Q.   And then there was a series of boxes you could fill in

17    relating to ADHD, and you didn't check any of those boxes?

18    A.   No.

19    Q.   And then that's your signature on the final page?

20    A.   Yes.

21    Q.   Look at Exhibit 10 for me.

22    A.   (Complies with request.)

23    Q.   Is that your handwriting?

24    A.   Yes.

25    Q.   And this is July 2010?
```

1    A.   Yes.

2    Q.   It looks like at this time, you were discussing whether

3    or not you might submit an additional reconsideration to MCAT

4    relating to vision issues?

5    A.   Yes, that was brought up.

6    Q.   Okay.  But you decided not to do that?

7    A.   He asked my opinion about whether that was important to

8    do, or would be something that one would do, and I gave him

9    like a mixed response.

10   Q.   Okay.  Look at page -- Exhibit 2, rather.  I'm sorry.  I

11   have shifted on you.  Now we need to go to plaintiff's

12   notebook.

13        Do you recognize this letter from Archbishop Moeller?

14   A.   Yes.

15   Q.   It's dated March 28, 2007?

16   A.   Yes.

17   Q.   Is this the only document you or Brendan were ever able

18   to obtain from the school regarding his history there?

19   A.   Yeah, as far as I recall.

20   Q.   And would you agree that in this letter, Jane Kagy

21   says -- why don't you read the second paragraph quickly, and

22   then -- the second and third paragraph, just read those to

23   yourself quickly.

24   A.   Yes.

25   Q.   You've had a chance to do that?

1    A.    Uh-huh.

2    Q.    And have you spoken to Jane Kagy at all in connection

3    with this case?

4    A.    Not to Jane, no.

5    Q.    Have you spoken to anybody else at Archbishop --

6    A.    Well, I spoke to Karen Matuszek, but she started there

7    after he had graduated.

8    Q.    Okay.  And then would you agree in this letter that

9    Ms. Kagy is addressing accommodations that were provided by

10   the school after Mr. Berger obtained his evaluation from

11   Dr. Smith in 2003?

12   A.    Well, I'm a little uncertain how best to explain, but my

13   interpretation of this, knowing the school, is that he had had

14   accommodations like extended time in elementary, and at that

15   time, you know, you could have additional test time but you

16   didn't have a service plan.

17        To have a service plan, they had a two-tiered program,

18   and so what she's saying is he was in the more intensive tier

19   of the program, where you have -- I don't know if they had a

20   scheduled study hall, but they had access to a more intensive

21   learning assistance component to help with reading

22   comprehension, preparing papers, and that's like another tier

23   of service compared to teachers just giving you extra time.

24   Do you know what I mean, the difference between learning

25   support and extra time?

BEACH - CROSS                                                    2-26

1    Q.   I think I understand you, but I'm really just focusing on

2    this letter.

3    A.   Uh-huh.  So she's talking about in the later part of his

4    education, he was given more intensive learning services.

5    Q.   Okay.  You see the sentence, the first sentence of the

6    second paragraph, "Upon entering Moeller High School, Brendan

7    continued to use audio books that he acquired on his own and

8    to apply acquired strategies to deal with his disability --"

9    A.   Right.

10   Q.   -- "without direct support from the Moeller support

11   team"?

12   A.   Right.  That would be the learning help.

13   Q.   You don't read that as talking about accommodations?

14   A.   No.

15   Q.   Even though it talks about audio books?

16   A.   The Moeller support team are the learning specialists

17   that do more instructional.

18   Q.   All right.  And then you see she goes on to report that

19   in his junior year at Moeller 2013, he got the evaluation from

20   Dr. Smith?

21   A.   Uh-huh.  Right.  And then that is what they needed in

22   order to authorize his placement in that more intensive -- so

23   they weren't free to just do that.

24   Q.   And then it goes on to say, "Given the results of the

25   evaluation --" which again was January 2013 -- "a Moeller

BEACH - CROSS                                                          2-27

 1    Assistance Plan was developed to provide accommodations to
 2    address Brendan's needs"?
 3    A.   Yes.
 4    Q.   She's not distinguishing between informal or formal
 5    there, she's just saying at that point in time, we started to
 6    provide accommodations?
 7    A.   Well, they were formally documented.
 8    Q.   I see.  And then from -- starting then, "Brendan was
 9    provided with extended time for assessments in a separate
10    area, permitted to purchase his own copies of texts and to
11    utilize audiotapes of novels."  Do you see that?
12    A.   Yes.
13    Q.   Did you not understand that to mean that as of January
14    2013, Brendan was given extended testing time at Moeller?
15    A.   No.
16    Q.   Let's look at PX16.  Do you recognize this document?
17    A.   Yes.
18    Q.   And you'd agree with me that in all of your reports, you
19    state that Mr. Berger was first diagnosed with a learning
20    disability in kindergarten?
21    A.   Yes.
22    Q.   And could you show me where in here there's a diagnosis
23    of a learning disability?
24    A.   In this report?
25    Q.   Yes.  Could you show me where in the report, yes, because

1    I assume that's what you base those statements on in your

2    reports?

3    A.  On PX33.

4           THE COURT:  I'm sorry.  What page were you talking

5    about?

6           THE WITNESS:  PX33.

7    Q.  I don't have a PX33.

8    A.  Am I in the wrong book?

9    Q.  I don't know.

10          THE COURT:  I think you're just in the wrong exhibit.

11   We're looking at Exhibit 16.

12   A.  Oh, I'm in -- sorry.  Got it.

13   Q.  And could you show us where in this exhibit there is a

14   diagnosis of a learning disability?

15   A.  My interpretation of this is that it is a diagnosis.  So

16   on page 238, which is page 1, if you look at clinical

17   classification, that's what is said, Delays in cognitive

18   language and written language ability, so written language

19   refers to reading, writing.

20          THE COURT:  Can I -- I'm sorry.  Where are you

21   looking at?

22          THE WITNESS:  Here.

23          THE COURT:  Oh, in the clinical classification?

24          THE WITNESS:  Uh-huh.  Right.

25          THE COURT:  So that's what you're reading to --

1          THE WITNESS:  Right.

2          THE COURT:  -- describe --

3          THE WITNESS:  Right.

4          THE COURT:  I'm sorry, Sue.

5          THE WITNESS:  Right.  It's an evaluation by a speech

6     language pathologist, and they don't necessarily use the

7     psychiatric diagnostic manual.

8     Q.   So your testimony is that when she referred in the

9     caption of this report to having delays in receptive language

10    and written language abilities --

11    A.   Yes.

12    Q.   -- what she really was doing there was providing a

13    diagnosis of a learning disability?

14    A.   Yes.

15    Q.   Okay.  Is there anywhere else in this -- if we look for

16    this report as we do in yours and Dr. Smith's, is there

17    anywhere there a diagnosis is provided in the usual manner?

18    A.   In this report, the symptoms are presented or described

19    that are unusual for early language learning, including

20    difficulty with reversing letters and so forth so, you know,

21    it's being presented in terms of an area of difficulty in the

22    phonological sequencing.

23         And then in the clinical impressions, delayed receptive

24    language abilities in the areas of auditory closure,

25    processing complex directions and statements, and delayed

1    written language skills, so that's where I get that.

2    Q.   Okay.  Neither of those in themselves would be sufficient

3    to base a learning disability diagnosis, would it?

4    A.   For me, no, but back in the day -- well, sorry.

5    Q.   No, that's okay.  And then at the end, she refers to

6    normal fluency?

7    A.   Yes.

8    Q.   What did you understand that to mean?

9    A.   Conversational speech.

10   Q.   You didn't read that as addressing his fluency generally?

11   A.   No, because he wasn't old enough to have any.  He was

12   still learning to read and write letters.  And if you look at

13   the paragraph above, it says -- she's analyzing his

14   articulation for spoken language, and then it says, "Fluency

15   patterns in conversational speech were judged to be within

16   normal limits," so that means his ability to have a

17   conversation.

18   Q.   Okay.  Exhibit 17, you recognize this as Dr. Artner's

19   evaluation of Mr. Berger?

20   A.   Yes.

21   Q.   In the second grade?

22   A.   Yes.

23   Q.   I believe you testified that she diagnosed him with both

24   ADHD and a learning disability in this report?

25   A.   That's my interpretation, yes.

BEACH - CROSS                                                      2-31

1   Q.   And I believe you said that in reaching that

2   interpretation, you were, quote, putting things between the

3   lines, or reading between the lines?

4   A.   Yeah.  I'm not sure if I would say it that way, but what

5   I am saying is that in this period of time, it was typical not

6   to give a crisp diagnosis or to give a DSM diagnosis.

7   Clinicians would say things like, you know, there are delays

8   or challenges, but they would put the symptoms in there

9   descriptively, and then you could also see it in the

10  recommendations.

11       So they're saying go to your physician and consult for

12  medication for ADD.  We're giving you information about it,

13  but they're not wanting to step on the toes of the physician

14  who might resent having a non-MD making that diagnosis.

15  Q.   Do you have any factual basis for stating that that's

16  what was going through Dr. Artner's mind?

17  A.   Other than experience and just having been one of those

18  people.

19  Q.   Okay.  You've never spoken to Dr. Artner?

20  A.   No.  I know of her reputation.  Well, I've met her, but I

21  mean, I'm not best friends.

22  Q.   Okay.

23  A.   Yeah.

24  Q.   But you've never spoken to her about her evaluation of

25  Brendan Berger?

1    A.   No.

2    Q.   I think you said yesterday you assumed she wanted to stay

3    in her lane?

4    A.   Uh-huh.  Right.

5    Q.   And by that you meant she was somehow uncomfortable

6    making an LD or an ADHD diagnosis expressly?

7    A.   A lot of times for medical -- as I say, it's a little

8    different in the present day, but there's a certain amount of

9    tension around who's entitled to make that diagnosis.  So as a

10   school psychologist with a one-year master degree, who has

11   never had a course in the related processing issues, is that

12   person legit to diagnose ADHD.

13        And sometimes they overstep, and sometimes, you know,

14   people hang back because the reality is, you know, some

15   physician might have told this patient that, you know, your

16   child is well behaved and can't have an attention disorder, or

17   something like that.

18        And if you recommend medication when you're a

19   psychologist, well, you know, you're not an MD.  So people

20   also -- if I'm writing a report for the school, you know, and

21   I am saying this person should have special education services

22   for specific learning disorder, that's not received very well.

23   Q.   Do you have any reason to suggest to us today that

24   Dr. Artner wasn't professionally qualified to expressly

25   diagnose a learning disability or ADHD at the time?

1    A.   Oh, I believe she was, and I believe she did, but she did

2    it in a way that it was customarily done.

3    Q.   And where is her learning disability diagnosis in here?

4    A.   If you look at the recommendations that she's giving are

5    very specific for dyslexic type of reading disorder.  She's

6    also saying the reason for referral to determine if dyslexia

7    or another specific problem is interfering with learning.

8    Also, his mother told me that when she met with Dr. Artner,

9    that --

10              MR. BURGOYNE:  Objection.  Your Honor.

11              THE COURT:  Sustained.  You can't --

12   A.   Oh, okay.  So -- but as she is reporting throughout, she

13   repeatedly says how much time and effort and exhausting work

14   goes into producing academic work that is usually very

15   automatic by the end of second grade.  And he continues to

16   show classic diagnostic signs of backwards letters and so

17   forth.  So there's a lot of detail in here that makes it

18   clear, and she does talk about reading and writing being a

19   specific area of difficulty.

20   Q.   Okay.  And there's a lot of reasons reading and writing

21   could be difficult for someone beyond a disability?

22   A.   That's not what she's saying, my interpretation of her

23   report.

24   Q.   Exactly.  Thank you.

25   A.   Right.  Uh-huh.

1    Q.   That's a good clarification.

2    A.   Uh-huh.

3    Q.   So they go to see her specifically to find out if he has

4    dyslexia, and there's no diagnosis at the end of this document

5    saying I've diagnosed him with a learning disability in

6    reading; is that correct?

7         Or look at the diagnostic impressions and just show us

8    where it is that she says I have diagnosed him with a reading

9    impairment.  I mean, isn't that where we would look, the

10   diagnostic impressions to get the diagnosis?

11            THE COURT:  Page 250.

12   A.   She says, "A severe discrepancy between IQ and

13   achievement, word identification, and spelling."

14   Q.   Did she assign any diagnosis there?  I mean, she's

15   describing a discrepancy.

16   A.   I believe that's why she's describing it.

17   Q.   Okay.  Is there a reason she was so opaque?

18            MR. WEINER:  Objection.

19            THE COURT:  Sustained.

20   Q.   Let's look at paragraph 7.

21   A.   Yes.

22   Q.   And she says, "Some of his behaviors raised the

23   possibility that he might have Attention Deficit Disorder

24   without Hyperactivity"?

25   A.   Yes.

1    Q.   And she, in the next recommendations section, she gives

2    the parents some literature on ADD?

3    A.   Uh-huh.

4    Q.   And says, "If the parent has noticed uneven attention and

5    distractibility, and these have interfered with learning, it

6    would be prudent to discuss the behaviors with a physician."

7    Is that what you're relying on as her diagnosis of ADHD?

8    A.   Yes, because she's going that mile.  But I would say the

9    reason she needs -- if the parents had noticed it in that

10   setting, because she didn't assess for that, and we need

11   multiple settings.

12   Q.   Okay.  And if she didn't assess for it, she obviously

13   didn't diagnose it?

14   A.   Yeah.  I get that that's a diagnosis.  Why would you send

15   someone to the doctor and say we're -- you talk about a trial

16   of medication if you're not diagnosing?

17   Q.   She --

18   A.   She also says -- I mean, well, go ahead.

19   Q.   She didn't put him on a trial medication, did she?

20   A.   Psychologists cannot prescribe medications.

21   Q.   Exactly.

22   A.   Right.

23   Q.   And in fact, at the end she says, "If he should ever

24   re-enter the public school, he should be enrolled in the

25   special classes for gifted and talented students"?

1    A.    Uh-huh.  Right.

2    Q.    Let's look at Mr. Smith's evaluation.  You also relied on

3    that in formulating your opinions, correct?

4    A.    Yes.

5          MR. BURGOYNE:  And that is Exhibit 23.  We've got

6    three opinions or reports, at least, from Dr. Smith, but none

7    of them include, I don't think, Your Honor, his CV.  So if I

8    could hand those to the Court and the witness.

9          THE COURT:  Okay.  Hand it to Mr. Hill so he can make

10   it an exhibit, please.

11         MR. BURGOYNE:  It's DX25, Your Honor.

12         THE COURT:  Thank you.

13   Q.    And I'll represent to you this was attached to the

14   evaluations from Dr. Smith that were provided to the National

15   Board of Medical Examiners.

16   A.    Right.

17   Q.    Do you recognize this document?

18   A.    Yes, I've seen it.

19   Q.    Okay.  And do you understand this to be Dr. Smith's CV?

20   A.    Yes.

21   Q.    Okay.  All right.  Let's shift, then, back to his report

22   from 2003.

23   A.    Yes.

24   Q.    And the dates of his assessment, it looks like this was a

25   three-day evaluation; is that correct?

1    A.   Yes.

2    Q.   Of the tests that he administered here, which ones are

3    reviewed to help determine whether someone has ADHD?

4    A.   The primary ones would be the WAIS, Wechsler Adult

5    Intelligence Scale, California Verbal Learning Test, Brown

6    Scale.  There's a continuous performance test, the Gordon CPT.

7    There's a -- it says visual and auditory, so that would be

8    relevant.

9    Q.   Okay.  And then his assessment highlights, "Brendan

10   currently functions in superior to average ranges of

11   intelligence"?

12   A.   Yes.

13   Q.   And then the fourth one, "Brendan demonstrates

14   discrepancies between ability and achievement in written

15   expression but not within the Ohio LD Guidelines"?

16   A.   Yes, that's what he says.

17   Q.   You're chuckling.  Do you --

18   A.   Well, that's his interpretation of the Ohio LD

19   Guidelines, which I would say are incorrect.

20   Q.   Okay.  And then did you understand this report to

21   diagnose Mr. Berger as having ADHD?

22   A.   No.  He reports a lot of symptoms but stops short of a

23   diagnosis.

24   Q.   Okay.

25   A.   He says he should be seen by neuro psych.

1    Q.   And then on the page that has 269 at the bottom, he

2    discusses the information that was provided to him regarding

3    Mr. Berger's experience at Moeller High School.  Do you see

4    there's a reference to the Moeller committee?

5    A.   Yes.  I know about that.

6    Q.   Okay.  And he says here, at that time, the start of the

7    2003, 2004 school year, the conclusion was reached there was

8    no need for special education assistance?

9    A.   Right.  From the public school.

10   Q.   What about the Moeller committee?

11   A.   Well, what it is is the committee meets, and then there's

12   a psychologist from the school district of residence.  The

13   committee was meeting to petition the school district to

14   qualify him for special education, which would then fund some

15   services, and the school district said no.

16   Q.   Well, this is referring to the Moeller committee deciding

17   there was no need for special assistance?

18   A.   Well, yeah, but the public school psychologist being

19   there, that's the -- that's what that means.

20   Q.   That's what that means, even though that's not what that

21   says?

22   A.   Well --

23   Q.   Okay.

24        THE COURT:  Hang on.  You're saying the Moeller

25   committee met with the psychologist from Princeton, correct?

 1              THE WITNESS:  Right.

 2              THE COURT:  Are you saying that the purpose of such a

 3      meeting was to determine whether there would be funding for

 4      special ed through the State of Ohio?

 5              THE WITNESS:  Whether they felt he qualified for

 6      services, so the Moeller committee doesn't --

 7              THE COURT:  "They" meaning the public school

 8      district, Princeton, where Moeller sits?

 9              THE WITNESS:  It's your district of residence in the

10      private school.

11              THE COURT:  Oh, okay.

12              THE WITNESS:  So the private school doesn't need

13      permission from the public school to provide accommodations.

14      They're independent.  But if they are seeking to have funding

15      and resources from the public school, then the public school

16      has to come in and meet with them and then say do we determine

17      that there is a need for us to pay for the private school

18      student to have some additional services.

19              THE COURT:  And is that indicative of the absence of

20      a learning disability?

21              THE WITNESS:  No.

22      BY MR. BURGOYNE:

23      Q.   Is it indicative of a perception that someone doesn't

24      qualify under applicable state guidelines assistance?

25      A.   What it means is that that was the determination of the

1   psychologist at the meeting from the public school.

2   Q.   Okay.

3   A.   Is that clear?

4   Q.   That's fine.  On page 270, Mr. Smith reports that

5   "Brendan's greatest difficulties, while within a low average

6   range, are around processing speed, separating essential from

7   non-essential detail"?

8   A.   Yes.

9   Q.   And then lowest scores fall in working memory, perceptual

10  organization, and processing speed, coding.  Are those some of

11  the areas you discussed yesterday?

12  A.   Wait a minute.  I believe I did refer to those.  I don't

13  recall specifically what you're referencing.

14  Q.   Okay.  Let's look at the last page, where he provides his

15  suggested diagnosis.

16       And right above the statement that says "the following

17  recommendations" is the sentence, "Discrepancies between

18  intellectual ability and achievement do not fulfill current

19  Ohio guidelines for an LD placement or assistance --"

20            THE COURT:  Mr. Burgoyne, it would be helpful if you

21  waited until the witness is at the page.

22            MR. BURGOYNE:  Sorry.

23  A.   What page are we on?

24  Q.   274, the last page of the document.

25  A.   Okay.

1          MR. BURGOYNE:  That would be helpful, Your Honor.

2          THE COURT:  And then you can ask your question.  Go

3     ahead.

4          MR. BURGOYNE:  Sure.

5     Q.   The last sentence before the recommendations?

6     A.   Yes.

7     Q.   And you see there's the statement the "discrepancies

8     between intellectual ability and achievement do not fulfill

9     current Ohio guidelines for an LD placement or assistance"?

10    A.   Yes, I see the sentence.

11    Q.   And was that a conclusion he reached?

12    A.   That is a conclusion that he reached based on his own

13    interpretation of how things work, the law.

14    Q.   Okay.  And then he assigns the diagnosis of learning

15    disorder of written language.  That's different than a reading

16    disorder; is that correct?

17    A.   Well, it was under DSM-IV.  It's a separate kind of

18    difficulty, and if I'm right, I believe his point is that

19    there was a two-standard deviation difference between the WIAT

20    writing score but not to any other of those test scores.

21         So DSM-IV and his interpretation of the school criteria

22    would mean that that would be the only category that he would

23    qualify, if that were how we did diagnosis or classification.

24    Q.   Okay.  And he assigned a code of 315.2?

25    A.   Uh-huh.

1   Q.   And what is the code for a reading disorder under DSM-IV?

2   A.   I believe it's 315.0, I think.

3   Q.   Okay.  And what are the type of impairments you

4   experience if you have a disorder of written language or

5   written expression, how does that affect you?

6   A.   That could be difficulty with spelling and/or expressing

7   thoughts in writing.

8   Q.   And in fact, you recall that when he recommended

9   accommodations for the MCAT, he recommended accommodations on

10  the essay section?

11  A.   I believe he did.

12  Q.   Okay.  Let's look at the next Smith report, which is 29.

13  This is his 2008 report.  Do you recognize this document?

14  A.   Yes.

15  Q.   And this is also a document you relied upon in forming

16  your opinions?

17  A.   I reviewed it, yes.

18  Q.   And this also reflects a three-day review of Mr. Berger?

19  A.   Yes, it appears.

20  Q.   At this point he's requesting an updated

21  psychoeducational evaluation because he's planning to take the

22  MCAT?

23  A.   Yes.

24  Q.   If you look at the bottom of the page that says 293?

25  A.   Yes.

1   Q.   There's the following statement, "His verbal ability was

2   in the superior range, his performance in the average range,

3   his full scale IQ in the high average range."  Is that

4   consistent with the conclusions you reached based on your

5   assessments?

6   A.   Are you talking about my own evaluation, or --

7   Q.   Yes.

8   A.   Well, my findings are different.  I mean, are you asking

9   me what I think of those numbers, or --

10  Q.   I'm just asking you to focus on that sentence.  We'll get

11  into specific assessments separately.  But he characterizes

12  his verbal ability as in the superior range, his performance

13  in the average range, and his full-scale IQ in the high

14  average range.

15       I'm just asking you whether that is consistent with how

16  you would characterize Mr. Berger's profile?

17  A.   I don't have enough information just looking at this

18  page.  Those are qualitative labels that one can choose to use

19  for numbers in that range if they apply.  But if there's

20  inconsistency within those areas, then I would not apply them.

21  Q.   And I was really asking you, based on your own

22  assessment, whether those are characterizations that you

23  believe to be accurate?

24  A.   No, I wouldn't say that.

25  Q.   On the next page, page 3, 294 at the bottom, he reports,

1    "Following the 2003 assessment, Mr. Berger was given

2    appropriate accommodations for a learning disability.  He was

3    given extended time to finish tests, an issue that had been

4    especially problematic."  Is it your understanding the

5    assessment referred to there is his January 2003 assessment?

6    A.   Yes, I believe so.

7    Q.   On page 296, right below the top numbers is the

8    statement, "Mr. Berger currently functions in the superior to

9    very superior range of intelligence.  He continues to

10   demonstrate relative strengths in verbal reasoning and

11   comprehension skills.  Similarly, he displays relative

12   weaknesses in memory and processing speed abilities."

13       Is it common for people to have relative strengths and

14   relative weaknesses in their profiles?

15   A.   Yes, within a limited degree among the average

16   population.

17   Q.   On page 6, the first full paragraph, he's discussing the

18   processing speed index score.

19       THE COURT:  Mr. Burgoyne, for my benefit, if you

20   could just kind of point out on the page where you're looking,

21   because I'm not able to find it.  I'm not as familiar with

22   these documents as you are.

23       MR. BURGOYNE:  Sure.  It's the first full paragraph,

24   and the sentence is on page 297, at the bottom.  It's the

25   sentence that reads, "The processing speed index score

1    increased by three standard score points."

2            THE COURT:  I see.  Thank you.

3    Q.  Do you see that as well, Dr. Beach?

4    A.  Yes.

5    Q.  And it says, "This means that relative to his overall

6    abilities, Mr. Berger continues to process new visual material

7    less efficiently, even though psychometrically his scores are

8    in the average range."  Is that consistent with your findings

9    regarding his processing speed?

10   A.  I disagree with that interpretation.

11   Q.  Okay.  And then on the page that has 299 at the bottom,

12   he's confirming that -- it's the paragraph under differential

13   diagnostic considerations, and the last sentence in that

14   paragraph, he states that in 2003 -- "In the 2003 assessment,

15   ADD was essentially ruled out."  I believe that's consistent

16   with your characterization of the 2003 report as not finding

17   attention deficit issues?

18   A.  Well, he found symptoms, but he didn't conclude there was

19   a diagnosis, and so you're asking me what about this one.  I

20   mean, it says there may be a blend of ADD and learning

21   disability symptoms, but the preponderance is a specific

22   learning disability.

23   Q.  Okay.  And then on page 300, he provides his diagnosis?

24   A.  Yes.

25   Q.  And he assigns, again, a diagnostic code of 315.2, a

1   disorder of written expression?

2   A.   Right.

3   Q.   He does not assign a diagnostic code of 315, of a

4   disorder in reading; is that correct?

5   A.   Right.  That's because he gave extended time tests, and

6   only the writing extended time tests came up significantly

7   below IQ.

8   Q.   And then he has ruled out Attention Deficit Disorder NOS?

9   A.   No, that's not what that means.

10  Q.   Well, that may not be --

11  A.   When you put --

12  Q.   Go ahead.  Let me ask you this.  It says it was ruled

13  out, correct?

14  A.   No.

15  Q.   The words on the paper say "rule out."  I will let you

16  explain what they mean, but does it say there was a rule out

17  of Attention Deficit Disorder NOS?

18  A.   No.  I mean, that's not what it -- it's not a rule out

19  of, it just says, Rule out attention disorder NOS.

20  Q.   Feel free to explain that.

21  A.   Okay.  It doesn't mean he ruled out a disorder.  When you

22  put that in a diagnosis, it means I'm saying I think it's

23  there, but I don't quite have enough evidence to make a final

24  decision.  It doesn't mean I decided it's not there.  It means

25  I think it is there, but I really want him to see a

1    neuropsychologist to confirm it.

2    Q.   Does it mean that I think it is there, or does it mean I

3    think there are issues that should be investigated further?

4    A.   If you say rule out a disorder, it means I think it's

5    there and I'm not ready to diagnose it yet.

6    Q.   Okay.  In all events, he didn't diagnose it at that time?

7    A.   No.  He said rule out.

8    Q.   On the next page, there's a reference to Axis V.  And

9    that's under the DSM-IV diagnostic criteria?

10   A.   Yes.

11   Q.   And there's a global assessment of function there?

12   A.   Yes.

13   Q.   And assigned a global assessment of function of 94?

14   A.   Yes.

15   Q.   And turn if you would, this is a little confusing, but I

16   have the DSM-IV --

17           MR. BURGOYNE:  May I assist the witness, Your Honor?

18           THE COURT:  Sure.

19   Q.   -- here that has the GAF page from DSM-IV.  It's

20   Exhibit 21 at Tab F.

21   A.   Thank you.

22   Q.   You're familiar with the global assessment of function --

23   A.   Yes.

24   Q.   -- criteria.  And why does one assign -- under DSM-IV,

25   what was the purpose of assigning a GAF score as part of the

1    diagnosis?

2    A.   It's, as it says, global assessment of function, so it's

3    kind of like a ballpark overall subjective descriptor of how a

4    person is doing.  And so it's sort of similar to when a doctor

5    says what is your pain level on the zero to ten scale,

6    clinicians developed this to say on a zero to a hundred scale,

7    what is this person's level of functioning.

8         And it's very helpful in the medical case, especially for

9    things that are medically treated, because if a person has

10   depression, and let's say that they are psychotic and very

11   severely ill, then they would have a very low number.  But

12   then if they were medically treated and they improved, you put

13   a higher number on that.  And so a physician could look at

14   that and say, okay, there's been a significant upgrade in this

15   person's functioning, they've gotten better, or you could say

16   they've gotten worse.  And so that was really the purpose of

17   it in terms of most useful in describing people that are more

18   ill.

19   Q.   Okay.  Look at the second page of the document.  It

20   refers to considering psychological, social, and occupational

21   functioning on a hypothetical continuum of mental health

22   illness.  Do you see that on page 2 of the Exhibit F?  It's at

23   the very top of the document.

24   A.   Oh, I thought you were looking for another page here.

25   Q.   No.

1    A.   Yes.

2    Q.   And what does that score of 94 signify?

3    A.   That means that the person is very high functioning.

4    Q.   And that's across a range of activities?

5    A.   It's an overall ballpark.  It's difficult to say what

6    that means for somebody that has a learning disorder, a

7    non-medical condition.  It's hard to interpret.

8    Q.   But it also signifies, doesn't it, that there are no

9    symptoms?

10   A.   No.

11   Q.   Well, does it say --

12   A.   It signifies that the person is managing very well.  I

13   mean, it's really kind of hard to say.  Like we got rid of

14   that for the current DSM because nobody really knew what each

15   other meant.  But also within the community of people that

16   work with learning disorders, they don't -- they aren't cured,

17   and so you're looking at the impact of the disorder on the

18   person's functioning.

19        And at this point in time, that would be my take on it,

20   that he was doing very well; that he still had symptoms, but

21   under the circumstances of learning and goal attainment, that

22   he was successful and happy and doing well.

23   Q.   What are the last two words in the score range for 91

24   through 100?

25   A.   No symptoms.

BEACH - CROSS                                                    2-50

 1    Q.   Okay.

 2    A.   And I would say no symptom impact on functioning, because

 3    it's called the global assessment of functioning.  It doesn't

 4    mean that you're cured.

 5    Q.   I do not take issue with that.  Thank you.  Let's look at

 6    his 2010 evaluation.

 7         Do you recall this report?

 8              THE COURT:  What exhibit are you on?

 9              MR. BURGOYNE:  I'm sorry, Your Honor.  It's

10    Exhibit 32, Plaintiff's Exhibit.

11    A.   Yes.

12    Q.   And is this another report you relied upon?

13    A.   I reviewed it.

14    Q.   And on page 314, it looks like he, again, applied an

15    instrument that evaluates ADHD diagnostic?

16              THE COURT:  I'm sorry.  Page 14?

17              MR. BURGOYNE:  314, Your Honor.  At the bottom,

18    PX314.

19    Q.   And you see at the top there, he's discussing some

20    scales, rating scales that he administered?

21    A.   The Vanderbilt.

22    Q.   Right.  And he does not conclude in this report, does he,

23    that ADHD is -- a finding of ADHD is warranted?  And I'll

24    direct your attention to 317, right before recommendations.

25    A.   He rules it out as a primary diagnosis, but I believe

1    earlier in the report, he again says get a neuro psych

2    evaluation because he reports a number of significant scores

3    for cognitive measures designed to assess ADHD.

4    Q.   So at a minimum, he's saying at this point, further

5    evaluation's needed?

6    A.   He continues to say that.  Neuro psych has to make that

7    diagnosis.

8            MR. BURGOYNE:  Okay.  Your Honor, this is a good

9    break point, if you'd like to.

10           THE COURT:  Yes, let's do that.

11           MR. BURGOYNE:  Okay.

12           THE COURT:  Let's take ten minutes.

13           (Brief recess.)

14   Q.   Dr. Beach, if you could look at Exhibit 5, please, I

15   think it's the notebook you have opened.

16       This is your June 2010 evaluation report on Mr. Berger?

17   A.   Yes.

18   Q.   And page 1 lists the materials that you reviewed?

19   A.   Yes.

20   Q.   And that also lists the tests and procedures you

21   administered?

22   A.   Yes.

23   Q.   And which of the assessments that you administered are

24   directed specifically at symptoms that might relate to an ADHD

25   diagnosis?

1   A.   The Wechsler Memory Scale, there was one -- I think one

2   subtest in this.  I'm not sure.  So some of the tests from

3   that Woodcock-Johnson might be relevant.  The BASC has a scale

4   for attention problems.

5   Q.   Is that directed specifically at attention-related

6   issues?

7   A.   No.  It's a broad-based assessment that has a scale

8   measuring that.

9   Q.   It includes a component?

10  A.   It includes, uh-huh.

11  Q.   If you'd look at page PX15, please?

12  A.   Yes.

13  Q.   And there's a statement at the top, "Mr. Berger was

14  interviewed at this office to obtain a complete developmental,

15  medical, family, employment, and academic history"?

16  A.   Yes.

17  Q.   And I believe you also spoke to both of his parents at

18  the time?

19  A.   Yes.

20  Q.   And his father, Dr. Berger, he lives here in Cincinnati?

21  A.   I believe so.

22  Q.   Have you spoken to him on any other occasions?

23  A.   Yes.

24  Q.   And then under the description of the presenting problem,

25  you refer to the fact that he's diagnosed with reading

1    disorder, and disorder of written expression with dyslexic

2    features.  And you say the etiology is unknown.  I believe you

3    discussed that concept yesterday.  And then you say, "There is

4    no known family history"?

5    A.  Yes.

6    Q.  What's the basis of that statement?

7    A.  Learning and attention disorders are highly heritable, so

8    if there is a family history, it increases the likelihood,

9    kind of like risk factors around birth, you know, that might

10   contribute, but it's not an absolute because we don't know for

11   sure who's been evaluated or not, or identified, but if it's

12   there, it's a sign.

13   Q.  Okay.  And then again, you say in the next paragraph, two

14   paragraphs down, end of the paragraph, "There is no known

15   family history of learning disorder"?

16   A.  Yes.

17   Q.  And that's information you presumably obtained from

18   Mr. Berger and his parents?

19   A.  Yes, at that time.

20   Q.  Look if you would at page PX17.

21       And the second full paragraph is a discussion of

22   Mr. Berger's time at St. Gabriel since fifth through eighth

23   grades?

24   A.  Yes.

25   Q.  And do you see the sentence that begins "nonetheless"?

1    A.    Yes.

2    Q.    And you state, "Nonetheless, there was formal recognition

3    of Brendan's learning disability, and he was provided with any

4    needed modifications and accommodations throughout his

5    attendance at St. Gabriel (as indicated in a notarized letter

6    to that effect from his fifth grade teacher)."  Do you see

7    that?

8    A.    Yes.

9    Q.    Keep that page open, but could you look at PX1, which is

10   a copy of the letter from St. Gabriel.  Do you see that

11   letter?

12   A.    Yes.

13   Q.    It's PX1?

14   A.    Yes.

15   Q.    Okay.  And again, we've spoken about this letter earlier.

16   Is this the sole basis of any statements made in your report

17   regarding the accommodations he received at St. Gabriel?

18   A.    No.  I mean parent report.

19   Q.    The only thing you cite here, you say that the

20   St. Gabriel letter confirms the statement you just made,

21   correct, in your report?

22   A.    Ask me again, please.

23   Q.    I made that more complicated than it needed to be.  Did

24   Mary Lou Huth address anything beyond accommodations that she

25   provided to Mr. Berger in the fifth grade?  I'll direct your

1    attention --

2    A.   It does say "in my classroom."

3    Q.   So she said "Brendan was informally accommodated in my

4    classroom"?

5    A.   Uh-huh.  Right.

6    Q.   And then it says she allowed him extended time for test

7    taking?

8    A.   Uh-huh.

9    Q.   So in your report, when you state that the notarized

10   letter from St. Gabriel indicates that he received

11   accommodations throughout his time at St. Gabriel, that wasn't

12   accurate, was it?

13   A.   That was poorly phrased, yeah.

14   Q.   All right.  Let's look at the next paragraph, where you

15   transition to his accommodation history in high school?

16   A.   Yes.

17   Q.   All right.  And you state, "His learning disability was

18   documented upon matriculation, and he was eligible for

19   disability services, including extended time for test

20   completion."

21       Did you mean to communicate by way of that sentence that

22   he began getting accommodations, including extended testing

23   time, as soon as he matriculated?

24   A.   Yeah, that's my understanding.

25   Q.   And we looked earlier at the letter from Moeller High

 1    School, which doesn't support that understanding, you'll

 2    agree?

 3    A.    I don't remember.  I'd have to look at it.

 4    Q.    Okay.  Take a look at it.

 5    A.    Okay.  What was the question?

 6    Q.    The question was, does the letter state that he began

 7    receiving accommodations, including extended testing time,

 8    upon matriculation?

 9    A.    The letter addresses when he was given another level of

10    intervention.

11    Q.    And does it discuss the fact that he began receiving

12    extended testing time after the 1983 evaluation?

13              THE COURT:  1983?

14              MR. BURGOYNE:  I'm sorry, Your Honor.  My mind

15    blanked.  I meant 2003.

16    A.    It's hard to keep them all straight.

17    Q.    Yes, it is.

18    A.    Yes, after the evaluation, they were able to provide the

19    more intensive learning support.

20    Q.    Including extended testing time?

21    A.    Yeah, they mention that, uh-huh.

22    Q.    All right.  Your next sentence, you refer to the high

23    school requesting accommodations for him.  How did you know

24    the high school did it, as opposed to Mr. Berger asking for

25    accommodations?

1    A.   Well, the high school has to participate in that request.

2    Q.   Okay.  They provided documentation in support of the

3    request?

4    A.   Right.

5    Q.   Okay.  And then you state here that he was granted

6    extended time to complete the college board examinations,

7    including AP, PSAT, and SAT, correct?

8    A.   Yeah.  That was my understanding.

9    Q.   Did you know at that time that he hadn't actually taken

10   the PSAT with accommodation?

11   A.   No, you know, I would have said something different.

12   Q.   You would have worded that differently if you knew --

13   A.   Uh-huh.

14   Q.   -- that he didn't have accommodations?

15   A.   Right.

16   Q.   All right.

17   A.   And at that time also I had a letter, you know, granting

18   the accommodations for the tests, but I didn't have, you know,

19   any other evidence.

20   Q.   Okay.

21   A.   Yeah.

22   Q.   Had you discussed his taking the PSAT with Brendan?

23   A.   Yeah, I would have discussed it, but I went with what I

24   thought was the case at the time.

25   Q.   Last paragraph here, you transition into a discussion of

1      the MCAT and his experience on the MCAT?

2      A.   Uh-huh.

3      Q.   And you say, "He earned a total score of 25, which was

4      disappointing, but not as low as might be expected for someone

5      with a reading, writing, written, math disability and slow

6      processing speed"?

7      A.   Uh-huh.

8      Q.   So you'd agree, I'd take it, that that MCAT score is

9      inconsistent with the information you've seen in his

10     assessment history?

11     A.   I wouldn't make that conclusion.  I mean, your MCAT score

12     depends on a lot of factors.

13     Q.   Okay.  A lot of reasons why you might get a particular

14     MCAT score?

15     A.   Yeah, like higher or lower.

16     Q.   Page 18, you report that he has no -- in the middle of

17     the page, on his developmental medical history, you report he

18     "has no significant, known health problems.  He reports

19     corrected vision within normal limits with glasses or

20     contacts"?

21     A.   Yes.

22     Q.   So no visual issues had been discussed with you as of

23     2010?

24     A.   Not at this point in time.

25     Q.   PX19, the last paragraph above "results from previous

1    group-administered standardized testing"?

2    A.   Yes.

3    Q.   And do you see the sentence, "The evaluation history over

4    the years indicates no psychological or emotional disorder to

5    explain or be comorbid with a learning disorder"?

6    A.   Yes.

7    Q.   Do you see that?

8    A.   Uh-huh.

9    Q.   And that was based upon your review of at least the

10   Artner report and the three Dr. Smith reports?

11   A.   Yes.  There was stress as a child that was reported in

12   the very early documents, but no disorder.

13   Q.   And is ADHD a disorder that can often be comorbid with a

14   learning disorder?

15   A.   Yes.

16   Q.   But you had concluded at this point that there was

17   nothing in that evaluation history to suggest that ADHD was

18   comorbid with a learning disorder?

19   A.   I would say that's a poorly worded sentence, because what

20   I'm referring to is the diagnostic criterion, you know, that

21   often is in place.  We are saying, you know, you have to rule

22   out that someone's not depressed.  They don't have slow

23   processing speed because of a disorder like depression or

24   anxiety, so I could have worded that better.

25   Q.   Okay.  Your discussion of standardized testing, end of

1      the paragraph, "Mr. Berger was provided with test taking

2      accommodations throughout his education, and these were also

3      provided for standardized tests such as the PSAT, SAT and AP."

4      That statement about accommodations on the PSAT was

5      inaccurate, correct?

6      A.   At this time, I know that it is inaccurate, uh-huh.

7      Q.   Page 22, PX22.

8           At the very bottom of the page, next to last full

9      sentence, you state, "The MCAT requires fluent, effective,

10     sophisticated reading comprehension skills to accurately

11     interpret conceptually challenging test question statements

12     and multiple choice answers, and it is administered under

13     time-limited conditions."  Is that a statement you still agree

14     with?

15     A.   Yes.

16     Q.   Page 27, at the top there's the statement, "Multiple

17     choice exams require reading comprehension and retention of

18     material in working memory for problem solving."  Is that a

19     statement you still agree with?

20     A.   Yes.

21     Q.   And then on page 28, you describe Mr. Berger's

22     functioning in the non-academic context.  I'm starting with

23     the sentence at the end of that carryover paragraph, "He has

24     an intense work ethic"?

25               THE COURT:  I don't know where you're at.

1          MR. BURGOYNE:  The carryover paragraph, Your Honor,

2     at the last three or four sentences, beginning with "he has an

3     intense work ethic."  It's PX28.

4          THE COURT:  Okay.  Go ahead and ask your question.

5     Q.  And what is your purpose in describing these aspects of

6     Mr. Berger's life?

7     A.  Providing information about his psychological and

8     emotional functioning.

9     Q.  The next paragraph, you refer to him as highly organized?

10    A.  Yes.

11    Q.  And then you state that although he studies a lot, he has

12    time to pursue interests outside of school?

13    A.  Yes, at this point in time.

14    Q.  And then you discuss your completion of the Behavior

15    Assessment Scale For Children, College/Adult Self-Report, and

16    the Millon Multiaxial Clinical Inventory?

17    A.  Uh-huh.

18    Q.  And you state, "The results show no significant

19    elevations on clinical problem scales.  Clinical diagnostic

20    interview is also negative for signs of clinical disorders,

21    including anxiety, depression, personality disorder, or other

22    condition"?

23    A.  Yes.

24    Q.  Is that where you would have mentioned ADHD if you had

25    concerns at that time?

1    A.   No.  And that's a, you know, a point.  That's more where

2    I'm talking about anxiety or depression.  But if it was a

3    significant elevation, I would have mentioned it somewhere.

4    Q.   Okay.  The next section you discuss whether there might

5    be alternative explanations for academic problems?

6    A.   Yes.

7    Q.   And would you agree that coming from a bilingual home

8    environment can play a role in the development of language

9    skills?

10   A.   Absolutely.  If someone comes from a bilingual

11   environment, we always consider that.

12   Q.   And issues that result from a bilingual environment have

13   potential to lead to a misdiagnosis of a learning disability?

14   A.   Not by somebody who's qualified to do evaluation.

15   Q.   Does the DSM specifically call for practitioners to

16   consider a patient's cultural and linguistic background?

17   A.   Yes.

18   Q.   Let's look at page 33.  And this is where you provide

19   your diagnosis from 2010.  And there's a good illustration

20   here of the distinction between a reading disorder and the

21   disorder of written expression.  You diagnosed both of those?

22   A.   Yes.

23   Q.   Are you the first person to formally diagnose Mr. Berger

24   with a reading disorder and assign a DSM code to it?

25   A.   Yes.  As I've said before, my impression, my reading and

1    understanding of the early childhood assessments, statements

2    by the family and the records I've looked at, my impression is

3    that was identified earlier, but I am the first person to put

4    a label on it.

5    Q.   Okay.

6    A.   It's part of what I thought he needed at this point in

7    his life was an accurate diagnosis.

8    Q.   Okay.  And at this point, you had reviewed the Artner

9    report, correct, which you characterized as including an ADHD

10   diagnosis?

11   A.   Yes.

12   Q.   And you had reviewed Dr. Smith's 2008 report, which you

13   characterized as Dr. Smith suggesting that there were issues

14   there relating to ADHD that needed to be explored?

15   A.   Yes, in the cognitive measures, but not consistent or he

16   didn't conclude.

17   Q.   Okay.  And then you'd also administered your own

18   assessments, including some which relate to the diagnosis of

19   ADHD?

20   A.   Yes.

21   Q.   And at that point in time, you didn't diagnose Mr. Berger

22   as having ADHD; is that correct?

23   A.   Yeah, I didn't have enough information.

24   Q.   Okay.  And you assigned a GAF score to him of 90?

25   A.   Yes.

1    Q.   And do you still have your GAF summary there?  My

2    apologies.

3    A.   I can find it.

4    Q.   You don't need to.

5         MR. BURGOYNE:  Your Honor, it's in the record.

6         THE COURT:  It's fine.

7         THE WITNESS:  It's that number zero to 100.

8         THE COURT:  I'm familiar with it.

9    A.   Do you remember what page it was?

10   Q.   Don't worry about it.  We've got a lot to cover here for

11   the balance of the day, so I don't want to delay things.

12   A.   Well, you could ask me ballpark.

13   Q.   Let's look at your test score summary.  You discussed a

14   lot of these scores yesterday on your direct testimony, I

15   believe.

16        THE COURT:  What page are you on?

17        MR. BURGOYNE:  I am referring, Your Honor, to page

18   PX37 and the pages that follow.

19   Q.   And I think you were discussing a lot of these percentile

20   ranks.  The first one was mental control that had a percentile

21   rank of five.  And then on the Woodcock-Johnson, there's a

22   percentile rank of less than one for rapid picture naming.  On

23   the Gray reading test, on the following page, you assign a

24   percentile rank of one for reading rate, reading accuracy and

25   fluency, reading fluency.  And you assign to that approximate

1    grade equivalence, or grade equivalence that attach to that

2    information are fourth grade and then second grade, it looks

3    like, roughly, and third grade.  Am I reading that information

4    correctly?

5    A.   Yes.

6    Q.   So is it your testimony that Brendan Berger reads at the

7    level of a second, third, or fourth grader?

8    A.   No.

9    Q.   And do you believe someone who reads at that level would

10   be able to perform as well as he has performed on tests such

11   as the PSAT and the MCAT?

12   A.   Let me clarify.  That's not what age equivalent means.

13   Those scores, that's not what that means.

14   Q.   The grade equivalent?

15   A.   Age and grade equivalent do not mean that he reads at

16   that level.

17   Q.   Okay.  And what does the grade equivalent tell us?

18   A.   What that means is that for this particular test that has

19   a series of reading passages and questions that begin very

20   simple and become gradually harder and harder and harder as we

21   go up through the test, that he reached his maximum

22   performance level at the same point or at the same difficulty

23   level that if you -- like let's say for reading rate.  If you

24   gave that same test to people in the fourth grade, 50 percent

25   of fourth graders would get the same accuracy scores he did.

```
 1          So let me do comprehension is maybe easier to understand.
 2     So as the passages become increasingly complex, the point
 3     where he reached his level of ability is the point where
 4     50 percent of people in that grade level with that same test
 5     were getting correct answers.
 6     Q.   I know you're referring --
 7     A.   So it doesn't transfer to another test.
 8     Q.   Okay.  And where his reading comprehension, is that a
 9     better reflection of his broader reading ability?
10     A.   No.
11     Q.   So --
12     A.   So for the same reason.
13     Q.   So what does this information tell us about the extent to
14     which Mr. Berger has reading deficiencies that might impact
15     him when he's taking the USMLE Step 2 exam?
16     A.   What do the age and grade equivalent?
17     Q.   Yes.
18     A.   That tells us that 50 percent of people in the third
19     grade, or approximate age of eight, with this particular test
20     showed the same level of ability with the accuracy.  For the
21     reading, that means that 50 percent of 18-year-olds for this
22     particular test performed at the same level.
23     Q.   Let's look at the Nelson-Denny test results, which you
24     also discussed yesterday.  And this is looking first at the
25     one that was administered under standard time conditions?
```

1   A.   Yes.

2   Q.   And here for approximate grade equivalent, again, he

3   shows up as the first percentile ranking for both reading rate

4   and reading comprehension?

5   A.   Yes.

6   Q.   And what does it mean to have N/A assigned to the grade

7   equivalent?

8   A.   There is no grade equivalent score for reading rate for

9   that test.

10  Q.   And then what does it mean to assign a 4.1 grade

11  equivalent for his reading comprehension?

12  A.   That means that 50 percent of students in the fourth

13  grade would achieve that level of -- that number of correct

14  responses on that specific test.  It doesn't mean that the

15  person can read all of the material that would be presented at

16  the fourth grade level.  It means just that on this particular

17  test, that's where people scored.  So it's useful when you

18  know the test and you know it's a descriptor, but it's not a

19  statistic you can do math with, or that you can generalize to

20  a different test.

21  Q.   Does this tell us anything about sort of his grade level

22  reading abilities?

23  A.   What the score pattern shows is that he can guess or he

24  can -- he had a very limited input, but he's able to perform

25  at a higher level with comprehension than, you know, you would

1    think for the input going in.  Does that answer your question?

2    Q.  Yes.

3            THE COURT:  I'm sorry.  I didn't understand the

4    answer.  This is what I understood the question to be.  I

5    mean, the gist of it is how can somebody in medical school,

6    who appears to be performing successfully, get a reading grade

7    level of fourth grade?  How does that happen?  Or am I really

8    asking the wrong question because that's not what this test is

9    aimed at telling us, or aimed at giving us information about

10   something else?

11           THE WITNESS:  What it is telling us is that under a

12   standard time limit, he couldn't do it.  There's no way.  If

13   he had to read the same textbook as the next person, and they

14   both had, you know, a limited time to do it, he would not be

15   able to do it.  It would take him longer, like say for

16   learning and studying.

17           THE COURT:  Okay.

18           THE WITNESS:  But when he has more time, then he can

19   achieve that higher level.

20           THE COURT:  And this is compared to the average

21   person, as opposed to the average medical school student?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.

24   Q.  When you say he couldn't do it, what do you mean?  He

25   couldn't do what?

1    A.   There's a very heavy reading load for the study of

2    medicine, for example.  And if a person is very slow, an

3    inaccurate reader, and it takes them a lot longer to do that

4    learning activity, and they didn't have available to them

5    twice as much time to do that learning and studying as other

6    people, they would not be able to do it.  I mean, you can't

7    just read faster at will, you know.

8    Q.   Again, what do you mean when you say he couldn't do it?

9    He couldn't do what?  He couldn't read at a particular speed?

10   A.   Right.

11   Q.   He couldn't get through the whole exam?

12   A.   Right.  He couldn't read at a particular speed for like

13   learning.

14   Q.   Because in the context of taking the MCAT, of course, he

15   did do it.  He did that.  He scored at the 78th to 83rd

16   percentile in verbal reasoning?

17   A.   Yeah.  He had a good strategy.

18   Q.   Okay.  Let's look at Exhibit 6.  This is your 2013

19   report?

20   A.   Yes.

21   Q.   And you discuss over on the right the material you

22   reviewed?

23   A.   Yes.

24   Q.   All right.  And you refer to the Standard Achievement

25   Test series there?

1    A.   Yes.

2    Q.   Okay.  And nothing to suggest there whether they were or

3    were not taken with extended time?

4    A.   I was told they were taken with extended time, or some of

5    them were, but I don't have evidence of that.

6    Q.   You don't have anything to support that?

7    A.   No.  Other than what I was told, yeah.

8    Q.   And who told you that?

9    A.   Family.

10         MR. BURGOYNE:  Your Honor, I'll just note for the

11   record that it's hearsay and not supported by any testimony we

12   had yesterday.

13         THE COURT:  Hang on.

14         MR. BURGOYNE:  I'm not moving to strike it, but

15   it's --

16         THE COURT:  All right.  I mean, she's talking about

17   the basis of --

18         MR. BURGOYNE:  No, no, Your Honor.

19         THE COURT:  All right.  Go ahead.

20   Q.   And then you refer to the St. Gabriel school, and you

21   correctly identify that as referring to grade five?

22   A.   Yes.

23   Q.   And then you refer to his approval for accommodations on

24   the PSAT, SAT, and AP, but it looks like at this point you

25   still hadn't reviewed his PSAT performance?

1    A.   Yeah.  If I had, it would be in there, or it should be in

2    there if I looked at it.

3    Q.   Okay.  And then you don't reference his 2010 MCAT

4    performance in here either.  Was there a reason for that?

5    A.   Yeah.  I think I knew that he had retaken it, you know.

6    What year was that?

7    Q.   This is 2013, and he's coming to you in order to get

8    accommodations for a Step exam, so I assume by that point you

9    would have been aware of that fact?

10   A.   Uh-huh.

11   Q.   Do you recall being aware that he took the MCAT twice?

12   A.   I know that now, you know, but I have to say that at one

13   point I was not sure of it because I evaluated him in June, he

14   was intending to take it the following October, and I'm sure

15   that I heard from him that his request had been denied.

16       But I think a long time went by, like I didn't talk to

17   him until maybe spring of 2011, so I'm kind of thinking out

18   loud.  And then he was going, you know, to medical school, so

19   I did have some confusion about that at one point.  So I may

20   not have had those scores.  I can't remember.

21   Q.   If you had the --

22   A.   Or the report, you know what I mean?  I might have known

23   about it, but I didn't have the report.

24   Q.   Okay.  If you knew he had taken it a second time, would

25   you have wanted to see that score report as well, just as you

1    looked at --

2    A.  Oh, yeah, absolutely.  Uh-huh.

3    Q.  -- the 2000 -- again, try not to speak over me, and I'll

4    do likewise so we get a clean record.

5        There's no reference in here that I could see of your

6    reviewing any ADHD diagnosis by a psychiatrist.  But on pages

7    47 and 48, you refer to an ADHD diagnosis by a psychiatrist.

8    What are you referring to there on pages 47 and 48?  It's the

9    last paragraph.

10   A.  Yeah, I found it.  So dating back to kindergarten, there

11   was evidence of symptoms, including distractibility, et

12   cetera, showing up along the way.  I didn't feel I had enough

13   data of my own to make a diagnosis in 2010, and so my

14   recommendation was to see a psychiatrist to do a consult about

15   a medical diagnosis of ADHD; and, you know, with the idea that

16   if a physician is diagnosing it, they might consider it

17   appropriate to prescribe, so I didn't want to do further

18   evaluation.

19   Q.  Who is the psychiatrist that's being referred to here,

20   because you don't list that as anything you reviewed in your

21   list of materials review?

22   A.  Oh, okay.  James Thomas.

23   Q.  Did you refer him to the psychiatrist for a review?

24   A.  I recommended that psychiatrist.

25   Q.  Page 44, at the middle of the page, there's a paragraph

1    that begins, "Brendan has a history of formally documented

2    academic accommodations"?

3    A.   Yes.

4    Q.   You say, "As an adult, his primary need has been extended

5    time to complete tests, recorded texts or a reader, and a

6    distraction-limited setting for tests.  As an undergraduate at

7    the University of Cincinnati, he was granted these

8    accommodations.  As a medical student at the AUC-SOM, he has

9    had similar test accommodations."  Wasn't it inaccurate to say

10   that he had had recorded texts and a reader at the University

11   of Cincinnati?

12   A.   No, he had a reader.

13   Q.   Look at Exhibit 9.

14        Is this a list of accommodations that you're referring to

15   in your report?

16   A.   Yes.

17   Q.   So he had extended time, he had a proofreader, and he had

18   books in a digital audio format?

19   A.   Uh-huh.  That's what it says.

20   Q.   So there's not a reference there to a reader?

21   A.   Yeah, I don't see it on there.

22   Q.   And then how about PX10, where we're talking about the

23   accommodations he had at AUC?

24   A.   PX10?

25   Q.   Yes.  And he was not, in fact, given recorded text --

1            THE COURT:  She's on the wrong -- no, it's page 218

2     of Exhibit 10.  When you say PX10 --

3            MR. BURGOYNE:  I'm sorry.  I was referring to the

4     exhibit as well.  I apologize.

5            THE WITNESS:  Exhibit 10?

6            THE COURT:  Page 218.

7     A.  Okay.  Go ahead.

8     Q.  And will you confirm for us that AUC did not, in fact,

9     list recorded text or a reader?

10    A.  That's right.

11    Q.  Okay.  So that's also inaccurate in your report?

12    A.  It must be.

13    Q.  If you look at page 45, the next page, you discuss

14    Mr. Berger's, I guess, test taking strategy?

15    A.  Okay.  Wait.  What section are we on?

16    Q.  "Presenting Concerns," first paragraph.

17           THE COURT:  What page are you on?

18           MR. BURGOYNE:  45, Your Honor.

19           THE COURT:  Of Exhibit 10?

20           MR. BURGOYNE:  No.  I'm sorry.  I'm still on

21    Exhibit 6.  We're back to her report.

22    A.  What page?

23    Q.  Page 45 in Exhibit 6.

24    A.  Okay.

25    Q.  And then the top of that page, at the end of the

1    paragraph "presenting concerns," you report, "He has adopted a

2    strategy of randomly marking answers to the unread test items

3    as the end of the time limit, or reading only part of a test

4    question and guessing to answer on that basis.  This would not

5    be an acceptable system to manage USMLE test questions"?

6    A.   Yes.

7    Q.   Did you ever advise Mr. Berger just to assign random

8    answers to any questions when he took the Step 2 exam?

9    A.   I would never do that, although maybe this is poorly

10   worded, where the intention is when you start running out of

11   time, or, you know, at some point during the test.  But would

12   I say take a test and randomly mark answers?  No.

13   Q.   Okay.  Continuing on in that page, there's a discussion

14   of his performance on the MCAT.  Do you see that discussion?

15   A.   Yes.

16   Q.   And you describe his total score as being mid-average?

17   A.   Yes.

18   Q.   And then you say his worst score was the verbal

19   reasoning, and you describe that as below average.  And then

20   you go on to say that that is not as good a performance as he

21   had on other tests, classroom tests and standardized tests.

22   Why did you single out verbal reasoning for discussion?

23   A.   Because it's reading intensive and it's verbal intensive,

24   and it was the slowest.

25   Q.   At the bottom of that page, you're discussing the impact

1   that his reading issues have had on other domains in his life?

2   A.   Yes.

3   Q.   You give us an example, "He was asked to read and sign a

4   rental lease, and he was not able to read it as expected on

5   the spot and did not want to sign it without knowing what the

6   contract said, so he took it home, read it slowly for

7   comprehension, and then signed it."  Do you recall that's one

8   of the examples you gave him of something he might put in a

9   cover letter?

10  A.   Yes, and that came from a conversation that -- he

11  described it to me.

12  Q.   Next page, 46, his social history, "English is the

13  primary language in the home; he is fluent"?

14  A.   Yes.

15  Q.   Is that information you obtained from Brendan and his

16  family?

17  A.   Yes.

18  Q.   And did you discuss with them at the time the extent to

19  which other languages or any other language was discussed in

20  the home?

21  A.   Yes, because of the previous evaluation report referring

22  to a bilingual home.

23  Q.   Page 49, the next to last paragraph that begins

24  "throughout his attendance at St. Gabriel."  Then you state,

25  "Brendan had the following accommodations and modifications

1   through elementary school; a reader and scribe for assignments

2   and tests, recorded books, extended time." Were you basing

3   that on Ms. Huth's letter?

4   A.   Partly, and partly to information provided by the

5   parents.

6   Q.   And I'll just represent to you there's no reference of a

7   reader or scribe in Ms. Huth's letter?

8   A.   No.

9   Q.   Or recorded books?

10  A.   No.  That came from the parents.

11  Q.   On page 50, you discuss what was going on at Moeller High

12  School?

13  A.   Yes.

14  Q.   And you refer to the Moeller High School Assistance Plan.

15  And then you state, The plan established at that time

16  indicates he was determined to have a learning disability, and

17  to mediate that, he was granted extended testing time,

18  administration of tests in a distracted-limited setting, a

19  reader or recorded test materials, audio recordings of books,

20  and allowed to purchase a second set of books that could be

21  marked.

22      This suggests that you read a Moeller High School

23  Assistant Plan to the extent you're saying what the plan,

24  quote, indicates.  I believe you testified earlier you never

25  saw a Moeller Assistance Plan?

1    A.   Right.   This is combination of information that I gleaned

2    from Smith's report, also interview with the family, you know,

3    so I could have been more specific and said based on what I'm

4    told.

5    Q.   Okay.  Ms. Kagy is discussed on the next page, 51.  At

6    the top, you refer to her letter, and you say, "It provides a

7    useful summary of his history of disability and school-based

8    accommodation, and it specifically confirms that during high

9    school, accommodations and modifications included recorded

10   books and tests, a test reader and scribe."

11        Would you look at Exhibit 2 and tell me whether or not

12   that was an accurate statement?  I'll refer you to the third

13   from the bottom paragraph.

14   A.   Again, that's a combination of what I was told, and

15   interviewing the patient's family; and, you know, the letter

16   that I had.

17   Q.   Okay.  So when you say the letter specifically confirmed

18   that those accommodations were provided, you didn't really

19   mean that the letter said that?

20   A.   Yeah.  I should have said the letter and other

21   information.

22   Q.   Okay.  And likewise, in the next paragraph, where you

23   refer to the letter from Michael Southern and say that it

24   confirmed that he was provided books and tests in a digital

25   audio format, that wasn't something based entirely on the

1    letter?

2    A.    Right.  The letter didn't list it, so I'm not.

3    Q.    And is this all in advance of your recommending the

4    accommodation of recorded tests or a reader for Mr. Berger?

5    A.    Is what?

6    Q.    All these statements about him having gotten these

7    accommodations in other contexts, which don't show up in your

8    earlier reports, now they're here, and then we get to your

9    recommendations and you recommend that he be provided the test

10   in a recorded format or with a reader?

11   A.    Uh-huh.

12   Q.    Isn't that why you were discussing this history, as to

13   support the provision of that accommodation?

14   A.    When I decided that it would be something I might want to

15   recommend, I know that I did explore the history of that.  And

16   it's important to establish what the history of providing a

17   specific accommodation is.  So my recommendation was based on

18   my findings in the evaluation and his inconsistent reading

19   comprehension accuracy over test items.  So I wanted to know,

20   you know, more about the history of recorded material.  I

21   circle back to that.

22   Q.    Page 54, you discuss the group administered standardized

23   tests?

24   A.    Yes.

25   Q.    What do you mean by "group administered"?

1    A.   So if you're going to take the SAT in a room full of

2    people, with a computer or paper and pencil, as opposed to

3    individual assessment by someone like myself where it's

4    directly administered.

5    Q.   And then within that category of a test, you discuss both

6    the Stanford Achievement Test, as well as the Iowa Test, the

7    basic skills, correct?

8    A.   Yes.

9    Q.   And I believe this is the first time where you suggest

10   those tests were administered with extended testing time?

11   A.   Uh-huh.   Yeah.

12   Q.   Is there a reason you didn't discuss that in your 2010

13   report?

14   A.   If I didn't, it's because I wasn't clear and I didn't

15   think it was a priority to investigate.   And what I can tell

16   you is that in the private school, especially if someone is

17   already getting accommodations, these tests are very

18   unimportant at the early grades, and sometimes they get

19   extended time and sometimes they don't, depending what they

20   want to learn.

21        Now, if it's for placement in math, they might give you

22   extended time that year, but if there's nothing at stake, they

23   might not want to bother you with it.

24   Q.   Okay.   And putting aside any self-report you got from

25   Brendan or his family, do you have any personal knowledge

1   whether those assessments were administered to him with

2   extended time?

3   A.   No.  I would have to go back and look and see if there

4   was anything marked on the test report, which is possible but

5   not necessarily probable.

6   Q.   Okay.  At that time, were there indications were test

7   score reports annotated if they were administered with

8   extended time?

9   A.   Not consistently, but I know that I did ask Brendan and

10  the family, you know, what they could remember going back.

11  Q.   At the bottom, again, of this page 54, you say that it is

12  noteworthy that he earned extremely low scores in the test

13  areas that interface more directly with his disability.  And

14  you reference verbal reasoning and writing samples of the

15  MCAT?

16  A.   Yes.

17  Q.   I apologize.  This is a long one.  Page 106, and this is

18  your DSM-IV diagnosis?

19  A.   Yes.

20  Q.   And you assigned a reading disorder, and you put the date

21  of diagnosis, or the early diagnosis, you assign that to

22  Dr. Artner?

23  A.   No, that precedes her.  Collins.

24  Q.   '92?  I'll double-check.  I thought that was the Artner.

25  You're right, so --

1    A.   I think Collins is the speech and language.

2    Q.   All right.  So as the evidence of the early diagnosis of

3    a learning disability, you're referring back to the Collins

4    report?

5    A.   Uh-huh.

6    Q.   The same with the disorder of written expression?

7    A.   Uh-huh.

8    Q.   And then for the ADHD diagnosis, that's the one that

9    refers back to Dr. Artner?

10   A.   Artner, uh-huh.  Yep.

11   Q.   Let's look at Exhibit 7, which is your 2015 report.

12        And this time it looks like you put asterisks on the

13   Stanford Achievement Test, indicating that they were, to your

14   understanding, administered with some form of accommodation?

15   A.   Yes, to my understanding.

16   Q.   You still don't list the PSAT, and you still don't list

17   the MCAT 2010?

18             THE COURT:  What page are you on, please?

19             MR. BURGOYNE:  Your Honor, that is page 136.

20   Q.   Is that correct?

21   A.   It's not on the list, no.

22   Q.   Okay.  Exhibit 8, your 2017 report.  Do you have that

23   open?

24   A.   Yes.

25   Q.   Great.  Again, same format.  You identified the tests you

1    administered, the documents you reviewed, and historical

2    documents reviewed?

3    A.   Yes.

4    Q.   All right.  And it looks like you've now revised how you

5    describe some of these documents, so you list for 1996 through

6    2000, you put St. Gabriel school letter documenting disability

7    determination with accommodations and modifications, and you

8    characterize that as referring to grades five through eight?

9    A.   Yes.

10    Q.   And before you described it as referring it to grade

11    five?

12    A.   Yes.

13    Q.   The next set of years, 2000 through 2004, you referred to

14    the documents that you reviewed as including Moeller High

15    School individual assistance plans, with recommended

16    postsecondary disability services for grades nine through

17    twelve?

18    A.   Uh-huh.

19    Q.   That wasn't accurate, is it?

20    A.   No, because I never saw the assistance plan.

21    Q.   Correct.

22    A.   So it was not reviewed.

23    Q.   And you refer to The College Board letter confirming

24    disability accommodations for the PSAT and the SAT, but no

25    reference, again, to the actual taking of the PSAT?

1    A.   Yeah.  If it wasn't on there, then I didn't see it,

2    unless it's discussed in the report and I forgot to put it on

3    page 1.

4    Q.   And likewise, no reference to the 2010 MCAT still?

5    A.   Right.  If I didn't see it, it's not on there.

6    Q.   On page 160, you state that for standardized tests,

7    including the SAT and ACT, there is a documented history of

8    being regarded as an individual who has a disability and being

9    granted test accommodations to mediate the impact.  Mr. Berger

10   testified yesterday he's never taken the ACT?

11   A.   Right.  That's a mistake.

12   Q.   That's a mistake.  And then you state in the next

13   paragraph, about halfway down, "Also during high school, he

14   was considered to have a learning disability from the start

15   and offered formally granted accommodations."  That wasn't

16   accurate, was it?

17   A.   Yeah, and that word formally is misleading; formal,

18   informal, you know, my understanding was that he was given

19   extended time by his teachers, but he didn't have a learning

20   plan until later, and then I never saw it.

21   Q.   Okay.  Same paragraph, you state, "In this report, the

22   private high school arranged for a meeting with the public

23   school district, Princeton School District, and the public

24   school district determined that he met legal criteria for a

25   specific learning disability and was eligible for special

1    education services which go beyond test accommodations to

2    include learning assistance, especially for reading and

3    writing," and you referred as evidence of that Dr. Smith's

4    reports?

5    A.   Right.  After Dr. Smith's evaluation, he was made

6    eligible for the more intensive services.

7    Q.   When was it -- your other documents suggest that

8    throughout his tenure at Moeller, Moeller was trying to get

9    Princeton to approve special assistance, and that they did not

10   do so.  Do you recall the document we looked at earlier, where

11   you explained to the judge that the psychiatrist recommended

12   that that wasn't needed?

13   A.   What happened was that the teachers wanted to make that

14   available to Brendan, and the public school district at first

15   did not approve it.

16   Q.   Page 162, summary of disability history.  Again, there's

17   a reference to him getting accommodations on the ACT exam?

18   A.   Uh-huh.

19   Q.   That's just a mistake that carried over?

20   A.   Right.

21   Q.   And then there's another discussion of the accommodations

22   he got at the University of Cincinnati, and you state -- in

23   the paragraph that begins "during university education," you

24   state, "The test accommodations included recorded test

25   material in addition to the printed test."  I think we've

1    established that that is not referenced in the University of

2    Cincinnati letter?

3    A.   It's not in the letter.

4    Q.   Let's go to page 199.

5         This is your diagnosis page.  You have the same diagnoses

6    of specific learning disorder with impairment in reading and

7    writing, a written expression, and then also ADHD?

8    A.   Yes.

9    Q.   Of your two learning disorders, which of those is

10   relevant to taking a multiple choice test as opposed to a test

11   that has writing components?

12   A.   I think what you're asking me is which -- is whether a

13   reading disorder is a primary impact on reading intensive

14   multiple choice tests?

15   Q.   Correct.

16   A.   Yes.

17   Q.   And to what extent, if at all, is the written expression

18   relevant in that context?

19   A.   When there's no writing component, minimal.

20   Q.   And then here again you discuss the etiology of the

21   diagnoses you've provided, and here you report that unknown

22   for both learning and attention.  And here you say, "Family

23   history of learning disorder"?

24   A.   Yes.

25   Q.   You recall, in your 2010 report, you said in three places

BEACH - CROSS

1    there is no family history of --

2    A.   Yes.

3    Q.   -- learning disorder?

4    A.   Right.

5    Q.   What has changed?

6    A.   New information.

7    Q.   New information?

8    A.   Uh-huh.  I mean, people get diagnosed, or people come

9    forward and say, oh, I never told you but, you know, my son --

10   Q.   What was that new information?  Who was diagnosed with a

11   learning disorder between 2010 and 2017?

12   A.   Well, not necessarily diagnosed, but maybe came forward

13   or said something.  But I would have to go back and look in my

14   records for that.

15   Q.   Okay.  At that point in time, were you aware of any

16   family history of ADHD?

17   A.   I don't recall whether it was one or both, and I don't

18   want to guess.  I would rather look it up.

19   Q.   You didn't reference a family history here at all?

20   A.   Uh-huh.

21   Q.   "Uh-huh" meaning yes, that's correct?

22   A.   Yes.  So in the medical history, it doesn't say, that's

23   what you're saying?

24   Q.   Yes.

25   A.   Okay.  I'll take your word for it.

1    Q.   You don't have to take my word.  You can look at that

2    page.

3    A.   No, I believe you.

4    Q.   Okay.  Look, please, at -- switch notebooks for me and go

5    to Exhibit 14.  You got that document?

6    A.   Yes.

7    Q.   And will you just confirm for the Court that these are

8    some of the email communications that you provided to us in

9    response to our subpoena?

10   A.   Yes.

11   Q.   And then if you look at the first paragraph here, this is

12   the email captioned "Timeline Update"?

13   A.   Yes.

14   Q.   You wrote to Brendan, "By the way, the edits you sent me

15   for the intro and recommendations sections are made in the

16   master copy."  Is that an instance in which he provided you

17   with edits regarding drafts that you sent him?

18   A.   Yeah.  I asked him to review for accuracy.

19   Q.   And then on page 003, Brendan writes you at the bottom,

20   "Hi, Dr. Beach.  I don't think I have made any changes to the

21   TOC recently.  Maybe we can look it over together as we

22   discuss exactly what to put in the packet we send out."  Did

23   you work with him to figure out what documents you were going

24   to provide to --

25   A.   Less so.  I do have a note on that that I came across the

1    other day where I will work a lot with people the first time

2    they're putting together a set of historical documents, but my

3    instructions to Brendan were keep what you have, add anything

4    new, you know, and bring it up to date.

5        And I work a lot less with people at that stage of the

6    game.  Like I am kind of out of it, really.  I might look it

7    over, but -- so it's a process of looking at what's there.

8    The intention would be to make sure everything is included.

9    Q.  Okay.  Page 0004, a September 30, 2013 email from you to

10   Brendan, and you state, The report's almost 90 pages, "You

11   have already read the intro/history and recommendations.  For

12   now, if you have time to look the report over, the most

13   important part to look at is the final section, diagnostic

14   impressions."

15       In your diagnostic impressions, does that discuss sort of

16   factual information relating to him?  Does that include

17   discussion there?

18   A.  Yes.  There's a review of the history.

19   Q.  Okay.  On page 0007, Brendan reports to you that he was

20   able to get Jane Kagy's letter put on letterhead.  Did you

21   have a discussion with him about doing that?

22   A.  I remember that my original instructions were to get a

23   letter from school people, and I would recommend that that's

24   on letterhead and that it's notarized, you know, but it was

25   tricky because she was retired.

1   Q.   Let's look at page 0013.  Now we're transitioning.

2   You're talking about your 2017 report, and this is the report

3   where you recommended, I think for the first time, that he get

4   a recorded test.

5       And you say, "Attached is the revised document.  I ran

6   spell check and it was happy.  I made the edits you pointed

7   out.  I tweaked a few words here and there, but nothing

8   substantive.  One thing substantive is that I added a comment

9   about why you haven't requested recorded tests during medical

10  school and for NBME exams.  You said you didn't think this was

11  an option, which is more or less true.  You might want to

12  address this in your personal statement, saying you didn't

13  think it would be an available accommodation for you for med

14  school or NBME exams."  Which part of that statement is the

15  more true and which part is the less true?

16  A.   Well, it is casual language, so I don't mean it to be.  I

17  don't mean to imply that it is not true, but I am saying if

18  you're going to request an accommodation, you have to provide

19  people with information about why you would do that, what your

20  history is.

21  Q.   Okay.  Let's go to page 16.  It's a little confusing at

22  the top.  It's actually a January 2019 email from you to

23  Brendan, maybe it's a typo, but referring to the evaluation

24  report for GRE?

25  A.   Yes.

BEACH - CROSS                                        2-91

1   Q.   And the GRE is a standardized test that is used for

2   purposes of admission to graduate school programs; is that

3   correct?

4   A.   Yes.

5   Q.   And you've been helping Mr. Berger over the past year

6   apply for accommodations on that test?

7   A.   Yes.

8   Q.   And then you discuss in here, starting with the "I

9   remember now" paragraph?

10  A.   Uh-huh.   Right.

11  Q.   "I remember now why I wanted to omit the 2008 evaluation.

12  In this one, Dr. Smith does a good job of describing slow

13  processing speed and dyslexia, but in the interpretation and

14  diagnosis, he gets tangled up in the jungle of disability

15  versus disorder, legally qualifying for school district

16  services versus DSM diagnoses, clinical diagnosis of dyslexia

17  and DSM-IV," and then you go on to express some additional

18  views why you didn't agree with Dr. Smith's 2008 evaluation?

19  A.   Right.

20  Q.   Did you end up not providing that evaluation to --

21  A.   No, it was provided.

22  Q.   You decided to go ahead and provide it?

23  A.   Right.

24  Q.   Page 18, at the bottom 0018.   Is this your email exchange

25  with Karen Matuszek at Moeller High School?

BEACH - CROSS                                      2-92

1    A.   Yes.

2    Q.   And at the bottom is your note to her dated January 28,

3    2019?

4    A.   Yes.

5    Q.   And you remember drafting this email to her?

6    A.   Yes.

7    Q.   Several months ago?

8    A.   Yes.

9    Q.   And at the bottom there, you're explaining why you want

10   written documents that show evidence of a history of being

11   considered someone who has a disability.  And then a few

12   paragraphs in you say, "I have a 2004 letter from The College

13   Board granting accommodations, but this is not sufficient to

14   show that the school granted accommodations"?

15   A.   Right.  We didn't have an assistance plan or anything

16   like that.

17   Q.   Okay.  And then you say, "I have documentation for

18   accommodations during adult education.  We are lacking

19   documentation for high school and elementary school"?

20   A.   Yes, could be stronger.

21   Q.   And then you say, I know this is a long shot, but I'm

22   wondering if you have a service plan or any other

23   documentation from his elementary school, St. Gabriel, from

24   the time that he was an incoming student that we could submit

25   to verify that he had accommodations?

1    A.   Yes.

2    Q.   So you were also trying to get documentation to support

3    what had happened in his time at St. Gabriel?

4    A.   Yeah, and to clarify, because as you point out, the

5    information I had, I had information from parents and

6    self-report, but I was seeking a stronger written record.

7    Q.   You had evidence from the fifth grade?

8    A.   Yeah.  And I'm interpreting that to mean all the way

9    through, but that's an interpretation.

10   Q.   Okay.  And at the end of it, going back to the prior

11   page, the upshot was she couldn't find any special ed or

12   accommodation records at Moeller High School?

13   A.   Yeah.  She told me we don't keep them that long, and we

14   didn't write things down back then anyway.

15   Q.   Look at Exhibit 12.  These appear to be handwritten notes

16   relating to Brendan and taking the USMLE from 2013?

17   A.   Yes.

18   Q.   Okay.  Are these your notes?

19   A.   Yes.  They're hard to see.

20   Q.   Some of them are a little hard.  Go in to page 504,

21   diagnosis of ADHD considerations.

22   A.   Yes.

23   Q.   And your 2013 report is the first time you assigned an

24   ADHD diagnosis; is that correct?

25   A.   I believe that's correct.  And I'm not sure, was that me

1    assigning that, or was that me reporting it?

2    Q.   I believe you make the diagnosis in 2013 of ADHD.  Could

3    you read the sentence that says "previously"?

4    A.   "Previously we decided not to add this to the diagnosis

5    for Step 1 so that we don't stir the pot."

6    Q.   By "we," do you mean you and Mr. Berger?

7    A.   No, I mean me, the royal we.

8    Q.   And then the next sentence you say, "Another

9    consideration, adding the ADHD might explain the mystery of

10   previous denial?  Call it NOS?"  What are those sentences?

11   A.   I'd have to look at the date on this to really understand

12   it, because it makes it sound there is no diagnosis yet of

13   ADHD, and I was mystified by the denial, surprised, and --

14   yeah.

15        So like Dr. Smith, I wondered if it was due to the lack

16   of ADHD diagnosis, like it was a misdiagnosis.  I don't see a

17   date on here, so I can't place it in my mind.  I can't.

18   Q.   The only date I saw was on page 1, it just said 2013, so

19   it's not that specific.

20   A.   Well, yeah.  Okay.  That's not helpful.

21   Q.   Okay.  Let's look at 506.

22   A.   Yes.

23   Q.   Item in the middle section there.  Can you read the part

24   next to Item 11 for LD?

25   A.   "I have to say when the accommodations were used, and

1   also whether they were effective."

2   Q.  Can you continue on and read the balance of that

3   paragraph?

4   A.  Sorry.  I'm decoding it here.  I pretty much wanted to

5   say with no accommodations for the MCAT, you got low scores.

6   And also, I want to say when -- looks like it says, you know,

7   in other circumstances, when the extended time is used, it's

8   effective.  And so it's evidence to predict that you would do

9   better on the MCAT, or the -- whatever test it is, with more

10  time.

11  Q.  Do you have any understanding on whether most people

12  would do better with extended time?

13  A.  The research shows that they might get a few more done,

14  but they're not going to do significantly better.  But if

15  somebody has a learning disorder, and you don't give them

16  extended time, they do much worse.

17  Q.  Have you personally done any research in that area?

18  A.  No, but I'm aware of the research out there.

19  Q.  Then on page 507, there's a discussion of visual

20  impairment?

21  A.  Right.

22  Q.  Question mark, question mark, question mark, "Are we

23  going to add?  We said no before"?

24  A.  Uh-huh, uh-huh, uh-huh.  Right.  Again, the royal we.  We

25  had talked about his history of some visual impairment, and it

1    just seemed to me like it was an add-on, or it didn't -- it

2    just didn't feel compelling to me to have a reason to include

3    it, but it was up for discussion.

4    Q.   Exhibit 13, take a look at that for me.

5    A.   Yes.

6    Q.   Would you identify this, please?

7    A.   Yeah.  This is a form that is used by Michigan State that

8    I borrowed, and it's like an interview framework relevant to

9    symptoms of ADHD, like a screening.

10   Q.   And when were the notes that are on this document

11   prepared?

12   A.   It says 2013.

13   Q.   Does that include the "we are borrowing a useful

14   framework, re: Documentation"?

15   A.   Right, right, right.  So I'm just borrowing a framework

16   for organizing question and answer to interview effectively.

17   Q.   Is this the document you used when interviewing Brendan?

18   A.   Yeah.  I tried it to see if it was useful.

19   Q.   So the notes here are yours?

20   A.   Yes.

21   Q.   There are places in here where, on another page that's

22   488, in one place minimal is circled and then X'd out and a

23   different assignment is given, a different severity level?

24   A.   Yes.

25   Q.   There's a reference on page 489, there's a star.  And one

1    of the things that this form suggests people evaluate is

2    global assessment of functioning?

3    A.   Yes.

4    Q.   And you have a star next to that?

5    A.   Yes.

6    Q.   Do you recall why you have a star next to that?

7    A.   No, because I didn't write anything in there, so --

8    Q.   Okay.  I don't know that this tells us a great deal.

9    This was the only document -- this was as close to a document

10   that reflects actual assessments, the actual assessment

11   documentation?

12   A.   You mean the assessment record?

13   Q.   Yes.  Exactly.

14   A.   Like the record form?

15   Q.   Exactly.

16   A.   Uh-huh.

17   Q.   Do you still have all those records --

18   A.   Oh yeah.

19   Q.   -- for him?

20   A.   Uh-huh.

21   Q.   But those were not included in the documents you gave to

22   us?

23   A.   Those are copyrighted and protected, and so they're not

24   allowed to be released.

25   Q.   Okay.

1    A.   Although I -- well, never mind.

2    Q.   Would you look at PX18, 19, and 20 for me?

3         THE COURT:  Now we're looking at the plaintiff's

4    exhibit book?

5         MR. BURGOYNE:  Plaintiff's.  We were just in

6    defendant.  I apologize.

7    Q.   You recognize, again, these are the standard achievement

8    tests.  Are you looking --

9    A.   Where are we again?

10   Q.   PX18, 19, and 20.

11   A.   In what section?

12   Q.   Well, they should just be the exhibit.  It should just be

13   a tab in the plaintiff's exhibit book.

14   A.   Plaintiff is the white cover?

15   Q.   I'll have to come look.

16        THE COURT:  No, it's the other one.

17   Q.   It's the tab number I'm looking for.

18   A.   Oh.

19        THE COURT:  So it would be page 253 if you're looking

20   at the bottom.

21        THE WITNESS:  Does PX stand for plaintiff?

22        THE COURT:  Plaintiff exhibit, but then there's page

23   numbers which reflect the same thing, so it is a little

24   confusing.

25        THE WITNESS:  That helps, though.

1    Q.   And these are -- and they're all the same.  It's for

2    three different years, second grade, third grade, and fourth

3    grade, and these are the Standard Achievement Test results.

4    And you suggested there might be something on the form that

5    indicates whether or not these were administered with extended

6    time?

7    A.   Maybe.

8    Q.   Okay.  And as you're probably more familiar with these

9    than me or the court, could you just look here and tell us

10   whether there's anything on here that indicates that these

11   tests were administered with extended time?

12   A.   For second grade, I see no reason to think it would have

13   been.  And he was in the public school, and I see no evidence

14   of it for during the years he was home schooled.  I believe he

15   said that he took the test at a school, and I would not expect

16   at that point, unless it says something.  I don't know.  You

17   know, during the home school years, I don't know.  My

18   understanding was maybe then but also after, after he came

19   back to St. Gabriel.

20              MR. BURGOYNE:  Okay.  No further questions, Your

21   Honor.

22              THE COURT:  Any redirect?

23              MR. WEINER:  Yes, Your Honor.

24                       REDIRECT EXAMINATION

25   BY MR. WEINER:

BEACH -REDIRECT                    2-100

1    Q.   Dr. Beach, have you worked with public schools in

2    connection with special education?

3    A.   Yes.

4    Q.   And in what capacity?

5    A.   I'm an outside consultant.  I did work for a school for a

6    short time many, many years ago for a public school

7    temporarily as a school psych; but otherwise, if I evaluate

8    someone in a private practice setting, I will typically meet

9    with school, and especially if there's some finding of a

10   learning problem.

11   Q.   Is your understanding that there is a difference between

12   public school evaluations and private school evaluations?

13   A.   Yes.

14   Q.   You used the term "IEP."  Can you explain what that is?

15   A.   It's an Individualized Educational Plan.  And if someone

16   has a qualifying disorder or impairment, then they have

17   instruction at the level of their ability at the present time.

18   So for example, if you are delayed in math, and you're in the

19   fifth grade, and there are some things that you don't have

20   mastery of that others in your class do, they would develop a

21   learning plan specific to you that would take you to the next

22   level from where you currently are.

23   Q.   And that's done through the process called especially

24   designed instruction?

25   A.   Yes.

1    Q.   And is especially designed instruction applicable to

2    private schools?

3    A.   Well, it varies by state, and it varies -- it varies a

4    lot.  The private schools do not need an IEP or a public

5    school determination of disability.  They make their own

6    in-house determination and their own arrangements to help

7    people learn.  But if there is one, there could be one, but

8    there need not be.  Does that answer your question?

9    Q.   Yes.  An IEP is a formalized document that is acquired

10   under the Individuals with Disabilities Education Act?

11   A.   Yes.

12   Q.   All right.  That is a different law than either the ADA

13   or Section 504, as you understand?

14   A.   Yes.

15   Q.   Is there a different definition for disability under the

16   Individuals with Disabilities Education Act?

17   A.   Yes.

18   Q.   And part of the definition is that an individual's in

19   need of especially designed instruction?

20   A.   Right.  There's some evidence to show that they are not

21   learning as expected.

22   Q.   And there are, in some states, and I'm assuming Ohio may

23   be one, where private schools can contact the local public

24   school to obtain funding for specially designed instruction?

25   A.   Correct.

BEACH -REDIRECT                2-102

1   Q.   So --

2   A.   Yeah.

3   Q.   So when Dr. Smith is talking about meeting Ohio's

4   standards, is he referring to the Ohio standards under the

5   Individuals with Disabilities Education Act?

6           MR. BURGOYNE:  Objection, Your Honor.  Lack of

7   foundation.

8           MR. WEINER:  I felt I established a foundation.

9           MR. BURGOYNE:  I don't know how she would know

10  what --

11          MR. WEINER:  I understand now the objection.

12          THE COURT:  Okay.  I'm going to sustain the objection

13  and you can lay a foundation.

14  Q.   Does Ohio have standards under the Individuals with

15  Disabilities Act that now are applicable to public schools?

16  A.   Yes, the State of Ohio and then individual school

17  districts in other regions can set policy.

18  Q.   And are those Ohio standards also provide the funding

19  mechanism that public schools fund private schools with this

20  specially designed instruction?

21  A.   Yes, that is correct.

22  Q.   And is Dr. Smith, when he's referring to Ohio standards,

23  is it perhaps those Ohio standards he's referring to?

24  A.   Yes.

25  Q.   If you would, can you turn to Exhibit 23 in plaintiff's

 1   book, please.

 2        What test of achievement did Dr. Smith administer?

 3   A.   The Wechsler Individual Achievement Test, Second Edition.

 4   Q.   At the time that the second edition was out of the WIAT,

 5   was there a timed reading achievement test?

 6   A.   No.  He did not administer any.

 7   Q.   Okay.  And at that time, the WIAT, did it have any

 8   subtest of reading fluency?

 9   A.   No.

10   Q.   If you turn to Exhibit 29 in plaintiff's book.

11        Did Dr. Smith administer a test of achievement?

12   A.   Yes, the same one.

13   Q.   And that has a test of reading achievement?

14   A.   Yes.

15   Q.   Does it have a test of reading fluency?

16   A.   No.

17   Q.   Was there any administration of a test of reading fluency

18   in Dr. Smith's evaluation?

19   A.   There is no time limited reading test.

20   Q.   And if you would, would you turn to Exhibit 32.

21        And in particular, if you could turn to PX310 and PX311.

22        Did Dr. Smith administer any tests of achievement?

23   A.   Yes.

24   Q.   And what tests of achievement?

25   A.   The Woodcock-Johnson III.

1   Q.   Does that contain a subtest of reading achievement?

2   A.   Yes.

3   Q.   And does it also contain a test that is timed in the area

4   of reading?

5   A.   Yes.

6   Q.   And what is that subtest referred to as?

7   A.   Reading fluency.

8   Q.   And the reading fluency subtest, what did Mr. Berger

9   score on that reading fluency subtest?

10  A.   Standard score of 83, a 16th percentile.

11  Q.   And is that a below average score?

12  A.   In my opinion, very much so.

13  Q.   Is that the first time that a timed reading test was

14  administered to -- a timed diagnostic reading test was

15  administered to Mr. Berger?

16  A.   Yes.

17  Q.   Is the global assessment of function still used in

18  diagnosing cognitive impairments?

19  A.   No.

20  Q.   Is the GAF appropriate to use to identify limitations in

21  a single major life activity?

22  A.   No, because it is global.

23  Q.   Is it appropriate to use in determining whether or not a

24  person has a disability under the Americans with Disabilities

25  Act?

1          MR. BURGOYNE:  Objection, Your Honor.  I don't know

2     that she's got a foundation for that answer.

3          THE COURT:  She's already testified that she is

4     familiar with the Americans with Disabilities Act and the

5     definition, so overruled.  Go ahead.

6     A.   Ask again, please.

7     Q.   Is utilizing the GAF appropriate in determining a

8     person's functional limitations under the Americans with

9     Disabilities Act?

10    A.   It could be used.  I don't think it would be informative.

11    I wouldn't use it.

12    Q.   If you would, can you turn to Exhibit -- I believe it's

13    Exhibit 4.

14    A.   Okay.

15    Q.   Mr. Burgoyne had pointed out that in your report, you

16    referenced that Mr. Berger had accommodations on the PSAT?

17    A.   Yeah.

18    Q.   Can you read the first sentence of PX8, please?

19    A.   "You asked for confirmation that you're approved to take

20    college board exams, which includes SAT, PSAT, and AP, with

21    accommodations."

22    Q.   Is that a potential source of the information you

23    received about the PSATs?

24    A.   How do you mean?

25    Q.   When you indicated that Mr. Berger, in his report -- in

1    your report, when you indicated that Mr. Berger had

2    accommodations on the PSATs, would this have been a source of

3    information?

4    A.   Oh, yes.

5    Q.   And if you would turn to Exhibit 4, and it would be at

6    page PX39, please?

7    A.   Different book?

8    Q.   No, same book.  It's Plaintiff's Exhibit 4.

9         THE COURT:  Plaintiff's Exhibit 4 only has the one.

10        MR. WEINER:  Yes.  I'm sorry.  It's Exhibit 5.

11        THE COURT:  Okay.

12   Q.   It's Plaintiff's Exhibit 5, and it's page PX39.

13   A.   Yes.

14   Q.   I wanted to try and have you explain how the Nelson-Denny

15   is administered.  So under standard time, how long is one

16   given on the Nelson-Denny Reading Test?

17   A.   Twenty minutes.

18   Q.   And as I understand, the Nelson-Denny Reading Test has

19   several paragraphs, and after each paragraph there's a series

20   of questions?

21   A.   Right.

22   Q.   How many paragraphs are there on the Nelson-Denny Reading

23   Test?

24   A.   I believe the version that I was using had maybe seven.

25   Q.   And how many questions total are on the Nelson-Denny

1    Reading Test?

2    A.    I believe 38.

3    Q.    And under standard time, one is asked to complete all 38

4    questions?

5    A.    I think people would try, uh-huh.

6    Q.    Okay.  And the grading itself, it is a reflection of both

7    how many questions a person answers, and how many questions a

8    person answers correctly?

9    A.    Reading comprehension score is based on both, so the

10   number, correct.

11   Q.    All right.  So if Mr. Berger was unable to answer all 38

12   questions, but of what he answered correctly he did, he would

13   still lose points?

14   A.    Right.

15   Q.    So if he had trouble completing that assessment, that

16   might reflect in a lower score?

17   A.    Oh, yes.

18   Q.    And conversely, if one answered all the questions but

19   answered a lot of them wrong, that would also reflect a low

20   score?

21   A.    Yes.

22   Q.    All right.  Between those two scenarios, which was

23   Mr. Berger's?

24   A.    He did not complete very many of the test items.

25   Q.    Okay.  And does that explain the low score?

1    A.   Yes.

2              MR. WEINER:  I have no further questions, Your Honor.

3              THE COURT:  I have some questions for Dr. Beach, and

4    I will allow the attorneys to follow up on my questions.

5         Dr. Beach, in your 2013 and 2014 assessment, you

6    recommended 50 percent extended time on the USMLE.  And then

7    on the 2017 assessment, you recommended 100 percent extended

8    time.

9         Can you tell me what the difference is and what caused

10   you to recommend the higher amount of extended time for the

11   2017?

12             THE WITNESS:  I'm familiar with the format and the

13   content of that exam, the later exam, and it does involve more

14   reading.  It's lengthier passages, and it also includes more

15   specific detail.  It's very important to read accurately and

16   to accurately register in your mind what the content of the

17   question is.  And so I was concerned, you know, that 50

18   percent was not enough.

19             THE COURT:  For the USMLE 2 CK?

20             THE WITNESS:  Right.  And another factor that went

21   into that was that Mr. Berger reported that he had 50 percent

22   extra time on the shelf exams, and that he was very, very

23   pressed for time, under a lot of time pressure, so he passed

24   them but under a lot of pressure.  And the content of the

25   shelf exams is similar to USMLE 2 CK, it's just that you take

 1    those separately after you complete a rotation in a particular

 2    area, so that was another factor.

 3              THE COURT:  Any follow-up questions by counsel?

 4              MR. BURGOYNE:  None here, Your Honor.

 5              MR. WEINER:  No, Your Honor.

 6              THE COURT:  I've got more questions.  Mr. Berger

 7    received passing scores for the MCAT, PSAT, the Step 1 and the

 8    Step 2 CS.  Can you draw any conclusions regarding how a

 9    passing score on those tests might relate to a person in the

10    general population in terms of performance?

11              THE WITNESS:  A person in the general population who

12    had the equivalent knowledge, you know, because what -- the

13    goal of the test is to measure what you know, so a person from

14    the general population might have an average reading ability,

15    but if they didn't have the knowledge -- you know, they can

16    read at a rate that's typical, but if they didn't have the

17    knowledge, then they would not do well on that test.

18         So I don't know if that answers your question; but, you

19    know, I'm separating out reading ability from specific

20    knowledge, so you could give me all the time in the world to

21    pass the bar exam, but even if I write fast --

22              THE COURT:  So --

23              THE WITNESS:  If you had -- let's say the average

24    person went to medical school, because I would not say that

25    never happens, and that, you know, someone we would consider

1      the average adult, they would have -- if they had the

2      equivalent knowledge, they would have a fair opportunity to

3      read and respond to the test questions because the pacing of

4      the test is designed around what we know about the reading

5      rate of the average person.

6          You're not going to invent a test that doesn't give most

7      people enough time, so, you know, this is a case where I would

8      say if you had the average person and they were taking that

9      test, they might feel a little pressure but they would have

10     sufficient time, whereas he would not have time.

11             THE COURT:  Any follow-up questions?

12             MR. WEINER:  No, Your Honor.

13             MR. BURGOYNE:  No, Your Honor.

14             THE COURT:  Let's assume there was an opinion by a

15     psychologist who suggested that because Mr. Berger grew up in

16     a bilingual household, that he should have been evaluated as

17     bilingual and not monolingual.  Do you have an opinion about

18     that?

19             THE WITNESS:  If that were true, I would have at

20     least gotten a consult, because I have close colleagues who

21     actually specialize in that area, because they work in the

22     public schools where there's a large population of immigrants

23     with children at the elementary school level, and if they're

24     having difficulty learning literacy skills like reading and

25     writing at the same time they're learning English, or let's

1    say they've only spoken English for a couple of years, you

2    need to be able to distinguish what's going on and to identify

3    if it's really that they're still learning the language.  So

4    if someone grew up in a bilingual household, then I

5    re-evaluating them, I would definitely be on that, and I would

6    get a consult.

7        The impact when someone is an adult and hasn't spoken the

8    language or heard it for many years, I'd think that's more

9    debatable.  I mean, there are theories that people are

10   affected, but it's not a fact.

11           THE COURT:  Do you consider Mr. Berger as falling

12   into that category of having grown up in a bilingual household

13   such that he should have been evaluated as bilingual and not

14   monolingual?

15           THE WITNESS:  No, and I was very careful to check on

16   that, because I also evaluate a lot of people that have lived

17   internationally, because some of our businesses here in

18   Cincinnati have a lot of international moving, or people from

19   other countries come here, and so I always ask about that and

20   make sure.  And so I definitely talk to the parents.

21       But I was assured that, no, English was spoken in the

22   home.  They didn't -- in fact, his mother said that the

23   pediatrician told her not to speak French in front of the

24   children, so they were pretty emphatic on that; otherwise, I

25   definitely would have done something with it.

1          THE COURT:  Can a person be gifted -- and gifted in

2    terms of the term that we've been using here -- and have a

3    learning disability at the same time?

4          THE WITNESS:  Absolutely, and that's a big part of my

5    patient population is I do meet a lot of people that are

6    preparing to take the bar exam or specialty medical boards and

7    so on, it's quite possible, because your conceptual knowledge

8    and ability is highly developed.

9        But there is something about, say, the reading process

10   that is extremely slow and inefficient compared to most other

11   people, so that the process of reading something like a test

12   question is -- it really interferes with that, and a person

13   has to reread maybe one more time.

14       So you can be gifted in a lot of ways, and then also

15   maybe not be good in math.  So you could be gifted in verbal.

16   Some people are more broadly gifted, but they have a specific

17   deficit in some area that can really make an impact.  Math,

18   for example.  I've met people that are really brilliant and

19   verbal, and they have never been able to really grasp math.

20       And I meet a lot of engineers that are really gifted.

21   Surgeons, people that -- dentists, people that work with the

22   visual spatial skills that are very -- have a hard time with

23   the reading pace and their reading accuracy.

24          THE COURT:  Okay.  Any follow-up questions?

25          MR. WEINER:  Briefly, Your Honor.

1          THE COURT:  Go ahead.

2   BY MR. WEINER:

3   Q.   Being a Pennsylvania lawyer, I'm a bit unfamiliar with

4   Ohio public school, but does Ohio public school have gifted

5   IEPs?

6   A.   Yes, but kind of.

7   Q.   Can you explain what you mean?

8   A.   They're in transition back and forth at one point in --

9   so yes, you can be identified as exceptional and have access

10  to enrichment and special education programs.  At one point

11  for a few years they established a school where you could be

12  placed, you have a gifted curriculum, and now they've changed

13  their mind about that.  So to the extent that the public

14  school district has resources to provide that, it is there.

15  Q.   All right.  Are you aware if there are circumstances in

16  Ohio where students can have both a traditional IEP as well as

17  a gifted IEP?

18  A.   Yes.

19  Q.   And in that case, a student would both be in special

20  education as well as gifted education?

21  A.   Yes.  Oh, yes.

22  Q.   And that's often referred to as being twice exceptional?

23  A.   Something like that, yeah.

24          MR. WEINER:  Thank you.

25          THE COURT:  Mr. Burgoyne?

1          MR. BURGOYNE:  Just a couple quick questions, Your

2     Honor.

3                    RECROSS-EXAMINATION

4     BY MR. BURGOYNE:

5     Q.   On the question of gifted LD, I believe your testimony

6     was you could be gifted but still be diagnosed with having a

7     learning disability?

8     A.   Right.

9     Q.   And individuals in that category, is it often the case,

10    or is it still possible that although they have a learning

11    disability, they perform at a level, they read at a level that

12    is better than the average person in the general population?

13    A.   If they have additional time, you know, enough time to

14    reread, that could happen.

15    Q.   I'm just talking about their reading abilities generally.

16    Notwithstanding a diagnosis, they read at a level that is

17    average, or low average, high average, but in all events

18    average?

19    A.   Well, I think if you have a learning disability involving

20    reading, that is what it is, but the type of reading material

21    would make a difference.  If you're reading recreationally,

22    and you're reading Harry Potter or some novel, you have a lot

23    more context.  People that have higher levels of intelligence

24    have more cognitive resources to come up with creative ways to

25    compensate or work around their difficulties that they

1    experience, and that's why they're often diagnosed later in

2    life, when the bar is raised high enough that they aren't able

3    to compensate.

4        So I would say, in general, can they just make up for it

5    by being intelligent?  No, but they are able to effectively

6    compensate in many areas.  But there are people that no matter

7    how conceptually intelligent they are, if they have a learning

8    disability involving visual spatial processing, I don't want

9    them to be my surgeon, I mean --

10   Q.  Okay.  I'm not sure that answered the question, but

11   that's fine.  I'll get at this issue with a different witness.

12       You mentioned, on the question of the bilingual issue,

13   that it was your understanding that that wasn't applicable

14   here, and therefore you didn't see a need to get a consult?

15   A.  Right.  And I did explore it.

16   Q.  And in doing that, did you consider the statement by

17   Dr. Artner that French was often spoken in the home?

18   A.  Yes, I did ask about that at the time I met the parents.

19   Q.  And then did you also consider Dr. Smith's observation

20   that according to Brendan, he grew up in a bilingual family?

21   A.  My interpretation of that is a bilingual family means my

22   parents were bilingual.

23           MR. BURGOYNE:  No further questions, Your Honor.

24           THE COURT:  Okay.  I've got an additional question.

25   If somebody was repeatedly tested on the Woodcock-Johnson

1    Reading Fluency Test, and assume in 2010 their reading fluency

2    score was 85, in 2013 their score dropped to 75, and then in

3    2017 their score dropped to 46, would there be an explanation

4    for the variation in those scores?

5            THE WITNESS:  Yes.

6            THE COURT:  Can you explain that, please?

7            THE WITNESS:  There are at least two factors for

8    sure.  The simplest factor is that the fourth edition of that

9    test came out, and so those earlier scores were from third

10   edition and the later score was from fourth edition.  And so

11   what that means is that new norms are constructed, so

12   generally, roughly speaking, that might raise the bar a little

13   bit.

14       And I can tell you for sure that the same raw score,

15   meaning number correct for the version three of the extended

16   time reading comprehension test, if I give you version four

17   and you have the exact number correct, your score difference

18   would be almost two standard deviations.

19       So for people that are from the general population, a lot

20   of work goes into constructing that test so that that does not

21   happen, so that you have continuity.

22       But if somebody has a learning disability, and the format

23   of the test and material, or there's something, you know, that

24   has changed about the way things are set up, that can be a

25   sign, you know, that they are more sensitive and that they are

1    more reactive.  So the scores can go a little lower for

2    somebody who has a disability with the upgrade or the new

3    version, so for the fluency scores.

4        The other thing that happens is that our norms are age

5    based.  And so as you -- up until you're about 30, we're

6    expecting that you're going to do -- that your brain is pretty

7    much developed, but you might show some strong improvement.

8        So let's say, you know, up until about age 20 or

9    something, your brain is growing a lot, and then it kind of

10   like levels off.  So the norms are based on the same age

11   cohort as Mr. Berger, and as these people, who are typical,

12   develop say at this rate, and then they're up here in a

13   disability involved area, you might develop at a slower rate

14   and maybe asymptote out at some level down here.  So these

15   people are now way up here, and the gap in between you and the

16   typical person by adulthood is increased.  And the standard

17   score is based on you compared to the typical person.

18       So what I would say is there's greater functional impact

19   at a higher age, and so that's another factor.  But I would

20   call that probably less of a factor in this case, other than I

21   think that his reading -- it's clear to me his reading ability

22   has leveled off.  I mean, he's not continuing to develop.  And

23   it's leveled off at a point that is lower than most other

24   people.  Does that make sense?

25            THE COURT:  Yes.  Thank you.  Any follow-up

1    questions?

2            MR. WEINER:  Yes.

3            THE COURT:  Go ahead.

4                    FURTHER REDIRECT EXAMINATION

5    BY MR. WEINER:

6    Q.   In your description of the standard scores between the

7    various Woodcock-Johnson tests, is it assumed that as a person

8    gets older, up until age 30, that an individual's going to

9    make progress?

10   A.   Yeah, but most of it is accomplished by age about 18 or

11   20, so that's why we evaluated that age with the adult testing

12   instruments, because we're saying you're neurocognitively

13   mature.

14   Q.   So what would explain Mr. Berger's standard score as well

15   as percentile not going up between the tests, or at least not

16   staying at the same level?

17   A.   You mean over time?

18   Q.   Over those three tests.

19   A.   Oh, we continue to raise the bar, and in the new -- you

20   know, of expectation.  So even though we're saying people are

21   mature, we're also kind of -- you want to factor in that maybe

22   people read even faster in college than they do during high

23   school, so they're still developing skills.  So especially in

24   the academic area, we would continue to have increasing

25   expectations for the average person.

1    Q.  Right.  And my understanding, from your earlier

2    testimony, that the Woodcock-Johnson test of reading fluency

3    is a three-minute test?

4    A.  Right.

5    Q.  And how many questions is one expected to answer in that

6    three minutes?

7    A.  Gee, I don't have a fast answer for, you know, what would

8    put you in the normal range.  I don't automatically know that.

9    Q.  In terms of the standard score difference, you know, how

10   many correct or how many incorrect might change that standard

11   score?

12   A.  That would be a function of the age-based norm.  So the

13   number correct would change over time, you know.  Depending on

14   your age, it probably wouldn't change radically at that age

15   group, but if you increase the difficulty of the test items

16   or, you know, does that answer?  I'm not sure.

17        MR. WEINER:  Okay.  Thanks.  Your Honor, that's all I

18   have.

19        THE WITNESS:  I think there's more impact on longer,

20   harder reading stuff.

21        THE COURT:  Mr. Burgoyne?

22        MR. BURGOYNE:  Nothing, Your Honor.

23        THE COURT:  Okay.  Those are all my questions.  Thank

24   you, Dr. Beach.

25        (Witness excused.)

1          THE COURT: So we are at 20 after 12. It probably is

2     a good time for our lunch break.

3          MR. WEINER: I was just going to say, Your Honor,

4     plaintiff's case closes and we'll put in the exhibits, if you

5     want me to do that formally, and then we can take a break?

6          THE COURT: Yes, let's do that.

7          MR. WEINER: At this time, we are closing plaintiff's

8     case. We are asking all testimony exhibits be entered and

9     admitted.

10          THE COURT: Any objections?

11          MR. BURGOYNE: Is that all the exhibits on your list?

12          MR. WEINER: I can go through the exhibits that I

13     have listed, and I have Exhibits 1 through 8 --

14          MR. BURGOYNE: I mostly meant were you intending to

15     offer all of the exhibits in the notebook?

16          MR. WEINER: Yes.

17          THE COURT: As opposed to what has been testified to,

18     is that your question?

19          MR. BURGOYNE: Yes, Your Honor.

20          MR. WEINER: I think there's just a few that are

21     excluded at this point, not all the -- I have not introduced

22     all the exhibits.

23          MR. BURGOYNE: Your Honor, there's only one, and I

24     don't know whether he's intending to move this in or not, but

25     it's Exhibit 61, that is the ADA Guidance. I don't think

1     anyone testified about it.

2          MR. WEINER:  That's correct.  I was going to

3     introduce it during Dr. Farmer's testimony.

4          MR. BURGOYNE:  Okay.  I may not call Dr. Farmer in

5     the interest of expediency, but --

6          THE COURT:  Well, do you want to call Dr. Farmer,

7     then?  There's a couple ways we can do it.  If you're going to

8     call Dr. Farmer, then plaintiff can offer this then.  If

9     there's a question that you might not, then let's call her for

10    the purposes of this exhibit.

11         MR. WEINER:  I'd like to call Dr. Farmer.  I have a

12    few questions for her.

13         MR. BURGOYNE:  Your Honor, then I'll just call her,

14    ask my set of questions.  Do you want to get her on now, get

15    her done?

16         MR. WEINER:  I think we should break, because I might

17    have some --

18         THE COURT:  Yes, let's break.  I think we all need a

19    refresher.  Let's do Dr. Farmer, and then we can talk about

20    moving exhibits into evidence.

21         MR. BURGOYNE:  Okay.

22         THE COURT:  How much time do you all want?  I'm just

23    going to leave it up to you because I don't really care.

24         MR. BURGOYNE:  Your Honor, I work backwards from my

25    flight time.  I have a flight tonight.  The good news is for

1    everybody that that's at 7:45, so certainly my hope is I'm

2    going to try to be as quick as I can with three witnesses we

3    have, so maybe take an hour, come back at 1:30?

4         THE COURT:  Does that work for plaintiff?

5         MR. WEINER:  That works for us.

6         THE COURT:  Okay.  Let's do that.  So we'll resume at

7    1:30.

8         (Lunch recess.)

9         MR. BURGOYNE:  Cathy Farmer, Your Honor.

10                   CATHERINE FARMER, Psy.D.

11   a witness herein, being first duly sworn, was examined and

12   testified as follows:

13                   DIRECT EXAMINATION

14   BY MR. BURGOYNE:

15   Q.   Good afternoon, Dr. Farmer.

16   A.   Good afternoon.

17   Q.   Could you please state your full name for the record?

18   A.   Catherine Farmer, F-a-r-m-e-r.

19   Q.   And what is your job title?

20   A.   I'm the director of disability services, and the ADA

21   compliance officer for testing programs at the National Board

22   of Medical Examiners.

23   Q.   How long have you held that position?

24   A.   Since September 2006.

25   Q.   There was a suggestion at the beginning of this case that

1    in processing Mr. Berger's accommodation request, the NBME

2    engaged in delay tactics.  Did you at any point do anything

3    that was intended to delay the process of his application?

4    A.   No.

5    Q.   Can you explain for the Court what your standard

6    turnaround time is for an accommodation request, and why a

7    given request may take a longer or shorter amount of time?

8    A.   Well, I'll try.  So we publish guidelines of the USMLE

9    website for individuals who are going to request test

10   accommodations.  In the application process, we ask them to

11   allow at least 60 days, and that's for us to process the

12   request.  And that's once we've received complete information.

13   Complete information would be the final document that they

14   send to us, and then let us know that they've submitted

15   everything they want us to review.

16        Once we receive the documents, we put them into process.

17   They're reviewed internally by myself or one of my

18   professional staff.  And then, if necessary, and if we think

19   it's necessary to send it out to an external consultant, that

20   consultant would send us a recommendation about the

21   accommodations.  We make the decision internally and then

22   communicate the decision to the examinee.

23   Q.   Does the examinee's registration status affect the

24   processing or the timing of the processing of an accommodation

25   request?

1     A.   It can.  So we ask folks to do both at the same time,

2     register for the examination -- in this instance, the

3     Educational Commission For Foreign Medical Graduates, or the

4     ECFMG, is responsible for registering individuals who were

5     students or graduates of foreign medical schools for the USMLE

6     Step 1 and Step 2.  So we ask them to do that process, and at

7     the same time submit their request for accommodations and

8     their disability documentation to the National Board of

9     Medical Examiners.  We won't start a review of all of that

10    documentation until ECFMG has confirmed that the individual is

11    eligible for the exam.

12    Q.   Do most of your accommodation requests get processed and

13    the decisions made in less than 60 days?

14    A.   I would say at least half.  Most are within 60 days.

15    Q.   And are there some that get processed in less than 30

16    days?

17    A.   Yes, many get processed in less than 30 days.

18    Q.   Is that dependent, in part, on the nature of the

19    impairment and the documentation?

20    A.   Yes, and if they've been reviewed before.  So if they're

21    coming back for the same accommodation, for the same

22    disability, the process is very quick.

23              MR. BURGOYNE:  No further questions, Your Honor.

24              THE COURT:  Thank you.

25                        CROSS-EXAMINATION

1   BY MR. WEINER:

2   Q.   Good afternoon, Dr. Farmer.

3   A.   Good afternoon.

4   Q.   The NBME has approved accommodations of extended time for

5   other test takers, correct?

6   A.   Correct.

7   Q.   And in fact, they've approved on occasion extended time

8   of double extended time for other test takers; is that

9   correct?

10   A.   Correct.

11   Q.   NBME is not making any blanket assertion in this matter

12   or any other matter that receiving double extended time

13   fundamentally alters the skill or knowledge of the exam; is

14   that correct?

15   A.   Correct.

16   Q.   You would agree that when Mr. Berger submitted his

17   documentation on each of the requests to the NBME, that he

18   submitted complete documentation?

19   A.   I believe he supplemented his documentation in one

20   instance, and I believe he was not completely registered or

21   eligible for the exam in at least one instance, that's my

22   recollection.

23   Q.   Let's go with the 2013 evaluation, 2013 request.  When he

24   submitted his documentation, was that a complete submission?

25   A.   Offhand, I don't recall.

1   Q.   Do you recall any time that you had to go back to him and

2   request additional information?

3   A.   I don't recall also.  I'd have to look at the request.

4   Q.   And when you get a complete documentation, it's at that

5   point that you then submit it out to an external reviewer?

6   A.   Well, first it would be reviewed internally.

7   Q.   Okay.  And what does that process entail?

8   A.   So there are currently myself and two other individuals

9   who are trained at the doctoral level in psychology.  And we

10  have a caseload of requests, so each one of us is assigned

11  some requests.  And we go through each one of them and do a,

12  what we call a preliminary audit.  So we're looking to see if

13  there's any information that's missing, any information that

14  doesn't quite make sense, anything that we want to ask for.

15      After that audit process, then we're going to decide is

16  there sufficient information there to make a decision, a yes

17  decision on all the requests.  And if not, is there more

18  information we want to ask for, or are we ready to send it out

19  to an external consultant if we don't think we could say yes

20  at that time.

21  Q.   Okay.  And this initial review, what you're looking for,

22  in part, is that there is a current evaluation that was

23  conducted of the applicant?

24  A.   Well, what we're looking for is a number of things.  Is

25  there documentation that demonstrate that they're impaired and

1    that it's a substantial limitation in a major life activity

2    that's relevant to the exam that they're going to take.  That

3    usually involves at least an assessment of some sort, and

4    depending on the condition, the currency of the assessment

5    could be important.

6    Q.   When you send a documentation out to an external review,

7    it is a complete file that you're sending.  You're not

8    requesting any additional documentation of the applicant; is

9    that correct?

10   A.   Not at that time, correct.

11   Q.   And in Mr. Berger's 2013 request, you sent it out to

12   Dr. Lovett, and at that point, that would signify that the

13   documentation was complete; is that correct?

14   A.   Correct.

15   Q.   All right.  And in the 2015 request, you did that review;

16   is that correct?

17   A.   The internal review?

18   Q.   The review that ultimately --

19   A.   The audit?

20   Q.   Well, was this sent out in 2015 to an external reviewer?

21   A.   I don't recall 2015.

22   Q.   Okay.  Do you have any recollection whether or not you

23   felt the documentation was incomplete during that submission?

24   A.   There was a submission.  Now, 2013 was for Step 1,

25   correct?

1    Q.   Yes.  And 2015 was for the Step 2 CK.

2    A.   Right.

3    Q.   So that first application of that Step 2 CK, his 2013

4    documentation was being considered, as well as any additional

5    documentation being submitted?

6    A.   Correct.  It's all cumulative.  We keep it all and send

7    it all out.

8    Q.   And was his documentation considered complete for 2015?

9    A.   We ask the, actually the individual to determine when

10   they think they've sent us everything that they want to send

11   us.

12   Q.   You don't have a recollection of asking for any

13   additional information from Mr. Berger?

14   A.   Not as I sit here, no.

15   Q.   And for the 2018 request, there was no request for any

16   additional documentation, is there?

17   A.   That I don't recall without looking at the documents.

18   Q.   And on each of his requests, NBME never requested to have

19   a bilingual evaluation completed; is that correct?

20   A.   That's correct.

21   Q.   And you've had this -- prior to this lawsuit,

22   Mr. Berger's requests have been reviewed three times; is that

23   correct?

24   A.   Internally, yes.

25   Q.   Okay.  And there's been three decisions; is that correct?

1    A.   Correct.

2    Q.   And each decision resulted in a denial, correct?

3    A.   Correct.

4    Q.   And on none of those denials did it indicate that a

5    bilingual documentation was necessary; is that correct?

6    A.   That's correct.

7    Q.   And at no time was it even mentioned that there was a

8    concern about the bilingual issue as that request.  Is that

9    fair to say?

10   A.   That's correct.

11   Q.   And Dr. Lovett had reviewed Mr. Berger's documentation

12   twice, correct?

13   A.   Correct.

14   Q.   And Dr. Lovett is an external reviewer that is utilized

15   by the NBME; is that correct?

16   A.   Yes.

17   Q.   And he made no mention of this concern about bilingual?

18   A.   Not that I recall.

19   Q.   And as the director of disability services and ADA

20   compliance officer, you're responsible for ensuring that the

21   NBME complies with the Americans with Disabilities Act, or the

22   ADA; is that correct?

23   A.   That's correct.

24   Q.   And is it fair to say that you're required to have

25   knowledge of the Americans with Disabilities Act and its

1      regulations?

2      A.   That's fair.

3      Q.   And as the director of disability services, you are the

4      person who makes the decision regarding accommodations; is

5      that correct?

6      A.   I was at that time, yes.

7      Q.   None of the people who work under you ultimately make

8      that decision; is that correct?

9      A.   Not in this case, not in this instance.  They

10     subsequently do.

11     Q.   And the external reviewers, they are not responsible for

12     making a decision; is that correct?

13     A.   That's correct.

14     Q.   The decision comes to you?

15     A.   Yes.

16     Q.   Even if an external reviewer may suggest rejecting

17     accommodations, you can go the other way and say approve the

18     accommodations, correct?

19     A.   Correct.

20     Q.   Are you a licensed psychologist in Pennsylvania?

21     A.   No.

22     Q.   Are you a licensed psychologist anywhere?

23     A.   I'm not licensed.

24     Q.   And you've been employed by the NBME since 2006?

25     A.   I've been employed since 1986.

1    Q.   1986?

2    A.   I've been in this role since 2006.

3    Q.   Okay.  Have you ever conducted any evaluations of

4    individuals with disabilities?

5    A.   As a student.

6    Q.   Not as a -- you have a Psy.D, is that correct?

7    A.   Correct.

8    Q.   So not as a doctor, you've not conducted your own

9    evaluation?

10   A.   During my postdoctoral training?

11   Q.   Yes.

12   A.   So I was a graduate, yeah.  I still consider that

13   training.

14   Q.   Have you ever administered the Wechsler Adult

15   Intelligence Scale, Fourth Edition?

16   A.   Not the Fourth Edition.

17   Q.   Have you ever administered the Woodcock-Johnson Test of

18   Achievement?

19   A.   Yes.

20   Q.   Which edition was that?

21   A.   Probably an R.

22   Q.   All right.  So since the Fourth Edition has been out,

23   you've not administered that?

24   A.   No.

25            THE COURT:  Which one was that?

1          MR. WEINER:  The Woodcock-Johnson Test of

2    Achievement.

3    Q.  And the time that you did administer, that would have

4    been as a student; is that correct?

5    A.  As a student and as a postgraduate, a postdoctoral

6    graduate.

7    Q.  And in that circumstance, you would have been under the

8    supervision of a person who had a doctorate; is that correct?

9    A.  Who was licensed, correct.

10   Q.  Have you ever administered the Gray Oral Reading Test?

11   A.  That I don't recall.

12   Q.  Have you ever administered the Scholastics Aptitude Test

13   For Adults?

14   A.  No.

15   Q.  Have you ever administered the Nelson-Denny Reading Test?

16   A.  That I don't recall.

17   Q.  Have you ever conducted an evaluation for the purpose of

18   recommending accommodations on any high stakes test?

19   A.  Not on high stakes test, no.

20          THE COURT:  Can you define what you mean by "high

21   stakes test"?

22          MR. WEINER:  I'm sorry.  For tests such as the SATs,

23   ACTs, MCATs, LSATs.

24   A.  So admissions tests, licensure examinations?

25   Q.  Admissions or licensure tests, yes.  You haven't

1    conducted evaluations for making such recommendations?

2    A.  No.

3    Q.  If you would, Dr. Farmer, could you turn to -- and I

4    think this is in defendant's exhibits.  It would be

5    Exhibit 23.

6    A.  Twenty-three?

7    Q.  Yes.

8    A.  I have it.

9    Q.  And this is a copy of the declaration that you've

10   submitted to the court in this matter in response to the

11   motion for preliminary injunction?

12   A.  It is.

13   Q.  And the tabs there are Tabs A through H are the exhibits

14   to your declaration?

15   A.  Yes.

16   Q.  If you'd turn to Exhibit A, please.

17       Is this a copy of Mr. Berger's cover letter and

18   application requesting accommodations for the United States

19   Medical Licensing Examination Step 1?

20   A.  Yes.

21   Q.  And it indicates, by virtue of the stamp, that it was

22   received on October 14, 2013?

23   A.  Yes.

24   Q.  Is that your recollection as to when you received it?

25   A.  This document, yes.

1    Q.   And this was sent out to Dr. Lovett?

2    A.   Ultimately, yes.

3    Q.   And Dr. Lovett provided you with a report of his

4    recommendations; is that correct?

5    A.   Yes.

6    Q.   And if you would, if you would turn to Exhibit 24 of

7    defendant's book.

8         And it would be under Exhibit 2 of Exhibit 24.  Is this a

9    copy of the recommendations that you received from Dr. Lovett?

10   A.   Yes.

11   Q.   And Dr. Lovett has a date on that of October 22, 2013?

12   A.   Yes.

13   Q.   Is that approximately when you received the document from

14   Dr. Lovett?

15   A.   Approximately, yes.

16   Q.   And Mr. Berger's denial was ultimately sent on

17   December 23, 2013; is that correct?  And I'll direct you back

18   to your --

19   A.   Yes.

20   Q.   So it took roughly two months after receiving

21   Dr. Lovett's recommendation to let Mr. Berger know that his

22   request was being denied?

23   A.   Yes.

24   Q.   The March 18th request for the USMLE Step 2 CK, that was

25   also sent out to Dr. Lovett?

1    A.   I'd have to look at the documents to know for sure.

2    Q.   Okay.  I'll direct you there.  So if you go to

3    Defendant's Exhibit 24 at Tab 3.

4    A.   Yes.

5    Q.   So does this refresh your recollection that you also sent

6    the 2018 request to Dr. Lovett?

7    A.   Yes.

8    Q.   Was that typical of the NBME to send a request to the

9    same reviewer who has previously reviewed a denial?

10   A.   I don't know if it's typical.  We'll send it out to a

11   reviewer who has expertise in the area of disability that the

12   individual is reporting.  And we have a cadre of experts, and

13   so it depends on who's available at the time.

14   Q.   So in terms of trying to be fair to the applicant, if an

15   outside reviewer previously denied an accommodation, a request

16   for accommodation, what's the likelihood that that reviewer is

17   going to change their mind?

18   A.   They would review all the documentation that was

19   provided.  If there was something different in the

20   documentation, they may change their mind.

21   Q.   NBME doesn't have a policy about not sending to outside

22   reviewers the same request that was previously sent?

23   A.   I'm sorry, the same request that was --

24   Q.   So if a reviewer, in this case Dr. Lovett, had reviewed a

25   request for accommodations and made a denial, NBME doesn't

1    have a policy of not sending documentation or a request for

2    accommodations to the same reviewer?

3    A.   No.

4    Q.   Do you think that Dr. Lovett would give Mr. Berger a fair

5    shake since he's already previously denied a request for

6    accommodations?

7    A.   Well, I think he would review all of the documentation

8    that was submitted with the next request and make a decision

9    based on that evidence.

10   Q.   We can go back to Exhibit 23 at Tab C.

11        This is Mr. Berger's application for accommodations for

12   the Step 2 CK; is that correct?

13   A.   Yes.

14   Q.   And it was received by NBME on April 3, 2015; is that

15   correct?

16   A.   Yes.

17   Q.   And that's by virtue of the stamp on the page, that's how

18   we know that?

19   A.   Yes.

20   Q.   And if you take a look through your declaration, did you

21   do this review yourself?  I'll direct you to paragraph 16 of

22   your declaration.  That might help.

23   A.   I'm reading it now.  Yes.

24   Q.   So you reviewed this one yourself?

25   A.   Yes.

1    Q.   It was not sent out to an outside consultant for review?

2    A.   Correct.

3    Q.   How is that decision made not to send something to an

4    outside reviewer, or to send something to an outside reviewer?

5    A.   If there's nothing substantially new or different in the

6    submission, then it's not likely to be sent out.

7    Q.   And in Mr. Berger's case, you felt that the documentation

8    that was submitted to the NBME did not provide any new,

9    substantially new information?

10   A.   Correct.

11   Q.   And you issued your denial on July 25, 2015?

12   A.   Are you referring to an exhibit?

13   Q.   It would be Exhibit D.

14   A.   Looks like it's dated the 24th of July.

15   Q.   Right.  And that's roughly 110 days after Mr. Berger

16   submitted his request for accommodations?

17   A.   It could be, yes.

18   Q.   So even though no new information was submitted to you,

19   it took 110 days, roughly, to give Mr. Berger a decision on

20   his request for accommodations?

21   A.   That's correct.

22   Q.   And this wasn't sent out to an outside consultant; is

23   that correct?

24   A.   Correct.

25   Q.   And if you turn to Exhibit 23E.

1          Is this Mr. Berger's third request for accommodations to

2     the NBME?

3     A.   Yes.

4     Q.   And this is also for the USMLE Step 2 CK; is that

5     correct?

6     A.   Correct.

7     Q.   And Mr. Berger's documentation was received by the NBME

8     on, it appears to be March 2nd?

9     A.   Yes.  This is when we stopped stamping every page, only

10    the first page of a document.

11    Q.   And this was then referred out to Dr. Lovett; is that

12    correct?

13    A.   Yeah, I believe so.

14    Q.   And Dr. Lovett, if we go to Exhibit 24 and it would be

15    under Tab 3, and Dr. Lovett's report is dated March 14, 2018;

16    is that correct?

17    A.   Correct.

18    Q.   And the denial letter that you sent to Mr. Berger, if you

19    look under Exhibit 23F, it's dated May 27, 2018; is that

20    correct?

21    A.   It is.

22    Q.   And it took seven days after receiving Dr. Lovett's

23    recommendation to let Mr. Berger know that his accommodation

24    was being denied; is that correct?

25    A.   Correct.

1    Q.   How is a decision made to send a request for

2    accommodation to an outside consultant?  I mean, is there a

3    standard, or is it the -- I mean, how is that decision made?

4    A.   It's based on the areas of disability that the individual

5    reports, and the expertise that our consultants have, and

6    who's available in those areas.

7    Q.   And so you had mentioned you had a corral or cadre of --

8    A.   Cadre.  Did I say cadre?

9    Q.   -- outside consultants, so some specialize in some areas

10   and some specialize in other areas?

11   A.   Correct.

12   Q.   How is it decided which evaluator will get which?  Is

13   there like a pecking order, or you say, oh, I've got a

14   learning disability, let's send this to so and so?  I mean, is

15   there a way that you go through in deciding who to send it to?

16   A.   It's based on their areas of expertise.

17   Q.   So how many individuals do you have in your cadre that

18   have expertise in learning disabilities and/or ADHD or both?

19   A.   I'd say probably seven, eight, or nine.

20   Q.   So in the 2013 request, you made a decision to send it to

21   Dr. Lovett.  And why was that decision made?

22   A.   Again, at this time, you know, I don't have an answer

23   that we chose him for any particular reason, other than he was

24   available and that's his area of expertise, LD and ADHD.

25   Q.   How do you know if they're available?  You don't just

1    send these out arbitrarily, or do you call them up ahead of

2    time?

3    A.   We ask them to provide their availability for the next

4    several months so that we know who is going to be available

5    during which period of time.

6    Q.   Do you ever consider, when making a referral to an

7    outside consultant, whether or not they previously reviewed a

8    candidate's request?

9    A.   We may.  I don't recall.

10   Q.   Was that done in Mr. Berger's case?

11   A.   Not that I recall.

12   Q.   Dr. Lovett has been a consultant for NBME for about ten

13   years.  Is that fair to say?

14   A.   I'll accept that, sure, yeah.

15   Q.   And every time you send a case, whether it's to

16   Dr. Lovett or to another outside consultant, the documentation

17   will always have an evaluation that was conducted by a

18   psychologist or an evaluator that the candidate submitted; is

19   that correct?

20   A.   It would be whatever the candidate submitted.  There may

21   or may not be an evaluation.

22   Q.   Well, you wouldn't submit something to an outside

23   consultant if there wasn't an evaluation on the file, correct,

24   it would be incomplete?

25   A.   Well, we'll ask an individual to look at our guidelines.

1    And we describe, in general, on the published guidelines what

2    would be helpful information or what's typical, but not

3    everybody has that information or will elect to submit it, so

4    we may ask for additional information.  If they elect to not

5    send additional information, we'll review it on the

6    documentation that they have provided.

7    Q.  So as part of the initial review that NBME does, if a

8    person sent in -- and let's say it's a person who is asserting

9    that they have LD, or ADHD, or both.  If they submit a

10   documentation to you and it did not have a current evaluation,

11   as part of your initial review process, wouldn't you contact

12   that person and say you don't have a current evaluation, we

13   can't consider this?

14   A.  No, not necessarily.  Again, we would refer them to the

15   guidelines, which have all the information in there about

16   what's typical, what would be helpful to have, and ask them to

17   show those guidelines to their -- either their school

18   officials, or their physician, or whomever is helping them

19   with their submission, and talk it over and determine what

20   they have that they could send.

21   Q.  All right.  If a person did not submit a request for

22   accommodation with an evaluator's report, would you send that

23   to an outside consultant to review?

24   A.  I will send whatever the individual sends to us.

25   Q.  About how many cases, if you can estimate, do you send to

1    Dr. Lovett annually?

2    A.   That I really don't know.

3    Q.   Is it more than ten?

4    A.   Yes.

5    Q.   Do you have an estimate on how many times he's

6    recommended denying accommodations?

7    A.   No.  I mean -- no, I really don't.

8    Q.   Do you review that kind of information in terms of how

9    many times your outside consultants are either recommending

10   accommodations or not recommending accommodations?

11   A.   No.

12   Q.   You don't review that material?

13   A.   No.

14   Q.   You don't think it's important that if, for example,

15   Dr. Lovett recommended denying 80 percent of the time, that

16   that's information to be looking at?

17   A.   Not particular, no.  We send him all of the documentation

18   and ask him to make a review of it.  We don't send him the

19   cases that we think are already, you know, our initial review

20   have provided sufficient information to demonstrate an

21   impairment that rises to the level of a disability.  So we

22   don't send the easy cases out to the evaluators or the

23   reviewers.

24   Q.   So you send the more difficult cases, as you're saying,

25   to the outside consultants?

1    A.   Well, we send the cases that aren't a clear yeah.

2    Q.   Okay.  So on these cases that are not a clear yes that

3    you send to Dr. Lovett, it doesn't concern you whether or not

4    he would have an overwhelming amount of denials?  That's not

5    something that the NBME takes a look at or reviews?

6              MR. BURGOYNE:  Asked and answered, Your Honor.

7              THE COURT:  Sustained.  Go ahead.

8    A.   So --

9              THE COURT:  No, you don't have to answer it.  You've

10   already answered it.

11   Q.   Can you estimate how many times NBME follows

12   recommendations of Dr. Lovett when he recommends denying

13   accommodations?

14   A.   No, I couldn't estimate that either.

15   Q.   Do you accept his recommendation of denial every single

16   time?

17   A.   That I don't recall.

18   Q.   And that's not something you review yourself?

19   A.   Previously, yes, I reviewed all of them, uh-huh.

20   Q.   No.  I mean, you don't see how many times you were

21   following the recommendations of your outside consultants?

22   You don't track that information?

23   A.   No.  Huh-uh.

24   Q.   And going back to Exhibits 24 at Tabs 3 and 4.

25             And once again, these are the recommendations from

1    Dr. Lovett?

2    A.   Exhibit 3 is.

3    Q.   Yes?

4    A.   Uh-huh.

5    Q.   You don't send these reports to the candidate; is that

6    correct?

7    A.   The consultant's review?

8    Q.   Yes.  You don't send that to the candidate?

9    A.   Correct.

10   Q.   So Mr. Berger never received a copy of Dr. Berger's

11   recommendations; is that correct?

12   A.   Of Dr. Lovett's recommendation?

13   Q.   I'm sorry.  Mr. Berger did not receive a copy of

14   Dr. Lovett's recommendation under Tab 3; is that correct?

15   A.   Correct.

16   Q.   And he also didn't receive a copy of the recommendation

17   under Tab 2; is that correct?

18   A.   He would not have received any of them.

19   Q.   Right.  And that wasn't provided to me at any time until

20   this preliminary injunction was filed; is that correct?

21   A.   To you?

22   Q.   Right.

23   A.   Correct.

24   Q.   And I assume that that's a policy of NBME not to provide

25   the outside consultant's recommendations to the candidate or

1   the candidate's lawyer?

2   A.   Well, the policy is that the national board would write a

3   letter --

4   Q.   Right.

5   A.   -- explaining the decision.

6   Q.   Dr. Ortiz, he's a consultant for the NBME?

7   A.   Yes.

8   Q.   And he strictly reviews LD matters?

9   A.   Yeah.

10  Q.   And are there specific types of LD matters that he's

11  strictly reviewing?

12  A.   I don't understand.

13  Q.   Is there a particular type of LD case that you sent to

14  him?

15  A.   Most of the time we get disorders of reading, that type

16  of LD, if that's what you mean, but he would review for any

17  LD.

18  Q.   Any LD?

19  A.   (Nods affirmatively.)

20  Q.   How about the ones where you're dealing with a bilingual

21  individual.  Are all bilingual individuals sent -- is their

22  documentation always sent to Dr. Ortiz?

23  A.   No, not all.

24  Q.   You have another person who would review those as well?

25  A.   Yes.

1    Q.    And do you have a sense of how often, on the cases that

2    you sent to Dr. Ortiz, he recommends denial of accommodations?

3    A.    I don't.

4    Q.    Do you have a sense, for those individuals who are

5    bilingual, how many times he's recommending accommodations?

6    A.    I don't.

7    Q.    The documentation that Mr. Berger sent to you indicated

8    that he had accommodations in his primary education?

9    A.    Yes.

10   Q.    And he also provided documentation in his secondary

11   education that he had accommodations of extended time as well?

12   A.    College as secondary?  You mean college?

13   Q.    High school.

14   A.    I don't recall offhand, but I'll accept that.

15   Q.    All right.  And he also provided documentation that he

16   received accommodations in college; is that correct?

17   A.    Yes.

18   Q.    And in fact, his documentation reflected that he received

19   double extended time in college?

20   A.    I don't recall exactly.

21   Q.    If you go to -- it's going to be in the other binder.

22   A.    Sure.

23   Q.    And I believe it's at Exhibit 27.

24   A.    I have it.

25   Q.    Does this refresh your recollection as to whether or not

1    Mr. Berger provided documentation from the University of

2    Cincinnati?

3    A.   It does.

4    Q.   And it reflects that he received double extended time at

5    University of Cincinnati?

6    A.   Yes.

7    Q.   And is it your understanding that University of

8    Cincinnati is required to comply with both Section 504, as

9    well as the Americans with Disabilities Act?

10   A.   I would assume so.

11   Q.   And do you believe that the University of Cincinnati was

12   complying with the ADA in granting Mr. Berger accommodations?

13   A.   I couldn't say why they were doing it.

14   Q.   Would you agree that the NBME is expressly required by

15   the ADA to give considerable weight to accommodations that

16   were provided in high school, elementary school, as well as

17   college?

18   A.   Yes.

19   Q.   And the documentation that Mr. Berger provided to the

20   NBME also reflected that he received extended time on The

21   College Board exams; is that correct?

22   A.   Yes.

23   Q.   And the NBME would be required to give considerable

24   weight to that information as well; is that correct?

25   A.   Yes.

1    Q.   And The College Board, like the NBME, is also subject to

2    the Americans with Disabilities Act; is that correct?

3    A.   Yes.

4    Q.   If you would, could you turn to Exhibit 61 of plaintiff's

5    binder.

6    A.   61?

7    Q.   Yes, Doctor.

8    A.   I have it.

9    Q.   Would you agree these are guidelines or recommendations

10   that the United States Department of Justice has provided or

11   issued regarding testing accommodations in ADA review?

12   A.   It is.

13   Q.   And you've reviewed these before; is that correct?

14   A.   I've seen them, yes.

15   Q.   And are these things that you comply with?

16   A.   Yes.

17   Q.   Or at least you, to the best of your ability, attempt to

18   comply with them?

19   A.   Yes.

20   Q.   These guidelines are not something that you would ignore;

21   is that correct?

22   A.   Correct.  Yes.

23   Q.   So if you turn to PX457.  The numbers are at the bottom

24   of the page.  It indicates that testing entities must respond

25   in a timely manner to request for testing accommodations so as

1    to ensure equal opportunity for individuals with disabilities.

2    Do you see where I'm talking?

3    A.   I see it.

4    Q.   And is that something you endeavor to comply with?

5    A.   It is.

6    Q.   Did you comply with that in this matter?

7    A.   We try as best we can, with the volume of requests that

8    we receive and the staffing available, to review each of them

9    thoroughly and as quickly as possible.

10   Q.   So in Mr. Berger's case, particularly in 2015, taking 110

11   days when there was no new information, that was compliant

12   with this provision?

13            MR. BURGOYNE:  Objection, Your Honor.  Argumentative.

14            MR. WEINER:  I understand.  I'll withdraw, Your

15   Honor.

16            THE COURT:  Sustained.  Go ahead.

17   Q.   And that particular provision comes directly from the

18   statute; is that correct?

19   A.   Yes.

20   Q.   It's a --

21   A.   From the regulations.

22   Q.   Yes, from the regulations?

23   A.   Uh-huh.

24   Q.   And if you turn to page 454.

25        In this guideline, it says, "Past testing accommodations.

1    Proof of past testing accommodations in similar test settings

2    is generally sufficient to support a request for the same

3    testing accommodations for a current standardized exam or

4    other high-stakes test."  Did I read that correctly?

5    A.   Yes.

6    Q.   Was that ignored in this case?

7    A.   No.

8    Q.   Despite the fact that he's received accommodations in

9    both college, high school, elementary school, and a college

10   board test, he was nevertheless denied accommodations; is that

11   correct?

12   A.   That's correct.

13   Q.   And on PX455, the following page.

14        At the top it says, "Formal public school accommodations.

15   If a candidate previously received testing accommodations

16   under an Individualized Education Program, or a Section 504

17   Plan, he or she should generally receive the same testing

18   accommodations for a current standardized exam or high-stakes

19   test."  Did I read that correctly?

20   A.   Yes.

21   Q.   All right.  And Mr. Berger attended University of

22   Cincinnati?

23   A.   He did.

24   Q.   And he supplied documentation from the University of

25   Cincinnati indicating that he received accommodations there?

1    A.   Yes.

2    Q.   And that would have been pursuant to a 504 plan; is that

3    correct?

4    A.   Perhaps.  I don't know.

5    Q.   Well, they're a public institution, as you understand?

6    A.   That's my understanding.

7    Q.   And then below there, the same would apply to private

8    settings for an individual who receives an accommodations

9    plan; is that correct?

10   A.   Correct.

11   Q.   And if you turn to PX456.  In there it says, "Qualified

12   professionals.  Testing entities should defer to documentation

13   from a qualified professional who has made an individualized

14   assessment of the candidate that supports the need for the

15   requested testing accommodations."  Did I read that correctly?

16   A.   You did.

17   Q.   And Mr. Berger submitted documentation from a qualified

18   professional; is that correct?

19   A.   Yes.

20   Q.   In fact, he submitted several evaluations from two

21   evaluators; is that correct?

22   A.   Yes.

23   Q.   And his documentation was always current; is that

24   correct?

25   A.   It was.

1    Q.   And it says further down on PX456, "Reports from

2    qualified professionals who have evaluated the candidate

3    should take precedence over reports from testing entity

4    reviewers who have never conducted the requisite assessment of

5    the candidate for diagnosis and treatment.  This is especially

6    important for individuals with learning disabilities because

7    face-to-face interaction is a critical component of an

8    accurate evaluation, diagnosis, and determination of

9    appropriate testing accommodations."  Did I read that

10   correctly?

11   A.   You did.

12   Q.   And in this case, Dr. Lovett's recommendations took

13   precedence over Dr. Beach's and Mr. Berger's prior

14   evaluations?

15   A.   We denied the request.

16   Q.   And that particular provision is also located in the

17   appendix of the regulations to the ADA; is that correct?

18        MR. BURGOYNE:  Objection, Your Honor.  That's not

19   actually in the regulations to the extent he's suggesting that

20   it is.  And I don't know that she's conversant with the CFR to

21   be in a position to answer that question.

22        THE COURT:  Yes.  That sounds like a -- it's a legal

23   proposition.  Either it's there or it's not.  And that's

24   something that if you want to submit to the Court, that's

25   fine.

1          MR. WEINER:  Fair enough, Your Honor.

2     Q.  Dr. Lovett, by the way, he did not evaluate Mr. Berger;

3     is that correct?

4     A.  Correct.

5     Q.  And no one from NBME evaluated Mr. Berger, correct?

6     A.  Correct.

7     Q.  The determination was strictly made on a review of the

8     documentation?

9     A.  Yes.

10    Q.  Dr. Farmer, if you would, could you turn to Defendant's

11    Exhibit -- I'm switching on you again, Tab 24-2?

12    A.  24-2?

13    Q.  Yes.  And this, once again, is Dr. Lovett's 2013

14    recommendations to you regarding Mr. Berger's application for

15    accommodations?

16    A.  It is.

17    Q.  If you turn to, and it's the third page of his report.

18    If you look in the middle of the page, Dr. Lovett suggests

19    that if Dr. Beach's report and scores are valid, it would

20    suggest significant deficits; is that correct?

21    A.  Yes.  It says what it says, yeah.

22    Q.  Okay.  And he further indicates that he doesn't think

23    they're valid because the 2009 and 2000 MCAT scores reflect

24    that they're not valid?

25    A.  I believe the sentence says his previous diagnostic

1   evals.

2   Q.  The MCAT itself is not a diagnostic test; is that

3   correct?

4   A.  Correct.

5   Q.  In this case, Dr. Lovett's recommendations are based on

6   the outcome, or the score, of the MCAT; is that correct?

7   A.  I'm sorry.  I was reading.  Would you repeat that?

8   Q.  Dr. Lovett's recommendations are based on the score on

9   the MCATs; in other words, it's based on the outcome of the

10  MCAT, is that correct?

11  A.  I would say his recommendation speaks for itself.  It's a

12  fairly long document.

13  Q.  All right.  So I want to direct you on page 3, in the

14  middle, it says "a more appropriate comparison"?

15  A.  Yes.

16  Q.  "A more appropriate comparison would be with Mr. Berger's

17  MCAT scores obtained without accommodations in 2009 and 2010."

18       In that case, isn't Dr. Lovett suggesting to you or

19  recommending to you that the score, an outcome, has more

20  validity than Dr. Beach's scores and assessments?

21  A.  Yes.  He's talking about comparing the later evaluation

22  scores with Dr. Beach with the early evaluation scores and

23  saying that that's not a valid comparison.

24  Q.  Okay.

25  A.  It's more valid to compare it to performances without

1    accommodations in a real world setting.

2    Q.   Right.  And that's the score, the outcome of the MCAT; is

3    that correct?

4    A.   Yes.

5    Q.   And Doctor, the regulations to the -- to Title III of the

6    ADA were amended or implemented in 2016.  Is that your

7    recollection?

8    A.   The regulations were -- I'm sorry, could you repeat the

9    question?

10   Q.   Were the regulations to Title III of the ADA, they were

11   implemented in 2016; is that correct?

12   A.   It's possible, yes.  I don't recall the date.

13   Q.   All right.  And the DOJ, Department of Justice, once

14   again issued some guidance on interpreting the regulations?

15   A.   Yes.

16   Q.   All right.  And would you turn to Exhibit 62, and in

17   particular look at the first page just to confirm that those

18   are the regulations that were being implemented?

19          THE COURT:  And now you're back to the plaintiff's,

20   correct?

21          MR. WEINER:  Yes, we're back to the plaintiff's.

22          THE COURT:  The other book.

23          THE WITNESS:  I'll follow your lead.

24          THE COURT:  When I switch, you switch.

25   Q.   It's Exhibit 62, and eventually I'm going to direct you

 1    to a page, but if you can look through and just confirm that

 2    these are regulatory guidelines received from the DOJ.

 3              MR. BURGOYNE:  Your Honor, I'll note he cites these

 4    in his brief.  The Court's aware of them.  They're

 5    regulations.  I don't know how much is to be gained by using

 6    relatively limited court time to get Dr. Farmer to

 7    acknowledge --

 8              MR. WEINER:  There's just two points that I wanted to

 9    cover.

10              THE COURT:  Go ahead.

11    Q.  So if we go to page 493.

12         There is language there which are guidelines for

13    interpreting the regulations.  Have you reviewed these

14    guidelines before?

15    A.  Yes.

16    Q.  And are these guidelines that you consider when making

17    approval or denial of accommodations?

18    A.  Yes.

19    Q.  And if you look in the middle paragraph, roughly halfway

20    down, it states "the ultimate outcome."  Do you see where I

21    am?

22    A.  I see.

23    Q.  "The ultimate outcome of an individual's efforts should

24    not undermine a claim of disability, even if the individual's

25    ultimately able to achieve the same or similar result as

1    someone without the impairment."  Are these guidelines that

2    you follow?

3    A.   Yes.

4    Q.   And on the following page, in the first column, second

5    paragraph, it says, "Organizations representing testing and

6    educational entities asked the department to add regulatory

7    language indicating that testing-related outcomes, such as

8    grades and test scores, are relevant to disability

9    determinations under the ADA.  The department has considered

10   this proposal and declines to adopt it because it is

11   inconsistent with congressional intent," right?

12        So my question is, in giving precedence to Mr. Berger's

13   MCAT scores, isn't that inconsistent with that regulatory

14   guidance?

15             MR. BURGOYNE:  Your Honor, just to be clear, I don't

16   know what he's reading from.  Some of that is just regulatory

17   preamble, you know.  It's the final rule in which the agency

18   is discussing the decisions it made in implementing the final

19   regulation.  Whatever legal significance that has is fine, but

20   I do object to him characterizing particular text from the

21   Federal Register as agency guidance, which may or may not be

22   agency guidance; and likewise, whatever legal significance it

23   has, as I say, Your Honor, you'll have an opportunity to

24   determine.

25             THE COURT:  Okay.  I'll permit it at this point.  I

1    will consider counsel's argument in relation to that.  Go

2    ahead.

3    Q.  Was that guidance ignored?

4    A.  No.

5              MR. WEINER:  I don't have anything further, Your

6    Honor.

7                       REDIRECT-EXAMINATION

8    BY MR. BURGOYNE:

9    Q.  Ms. Farmer, while he's cleaning up, in the interest of

10   time, I'll move on.  How long do you think your review process

11   would take if you had to personally evaluate every candidate

12   who requested accommodations?

13   A.  I'm not sure I understand.

14   Q.  How long would it take your program to process

15   accommodations if you were required to personally evaluate

16   every candidate?

17   A.  Oh, you mean to do a clinical evaluation?

18   Q.  Yes.

19   A.  It would never get done, I imagine.

20   Q.  Are you aware of any high stakes testing program that

21   personally evaluates candidates seeking testing

22   accommodations?

23   A.  No.

24   Q.  Let me hand you a document that is similar but not

25   identical to one you were just asked about by Mr. Weiner.

1          MR. BURGOYNE:  Your Honor, this is the DX26 that we

2     discussed just before the break.

3          THE COURT:  Thank you.

4     Q.  The document you were handed is actually incomplete.  It

5     didn't include the last page.  Could you please read the last

6     paragraph on the last page?

7          MR. WEINER:  Excuse me.  I don't think I was given

8     this document.

9          MR. BURGOYNE:  Oh, here you go.

10         MR. WEINER:  Thank you.

11         THE COURT:  I'm sorry.  So you are referring -- you

12    are relating this to Plaintiff's 61 or 62?

13         MR. BURGOYNE:  Yes.  It is identical to Plaintiff's

14    61, except there's a last page here.

15    Q.  Do you see that document in the last page there?  I don't

16    need to belabor the line of questioning.  It's just when

17    Mr. Weiner was asking you questions about that document, were

18    you aware that there was an additional page that he hadn't

19    provided you with?

20    A.  Not during questioning.

21         MR. BURGOYNE:  Okay.  Your Honor, and the last page,

22    obviously, addresses the significance of agency guidance and

23    states that it has no binding effect and could not expand upon

24    statutes or regulations, and just wanted to make sure the

25    Court had that copy as well.

1           THE COURT:  Thank you.

2           MR. BURGOYNE:  I have no further questions of the

3      witness, Your Honor.

4           THE COURT:  I've got a question.  Assuming for the

5      sake of this question that Dr. Beach's evaluation and testing

6      were valid, okay?  Accept that.  What accommodations would be

7      provided with someone with that profile?

8           THE WITNESS:  Those scores are so low, it's hard to

9      think of them as -- it's hard to think of them as being valid

10     in the context of all the other information, so I'm not sure

11     if any accommodation would be helpful.

12          THE COURT:  What do you mean "those scores are so

13     low"?

14          THE WITNESS:  So you mentioned, Your Honor, earlier

15     today the decline in his reading fluency scores.  Those are

16     lower than 99 percent of the people of similar age, and they

17     are completely inconsistent with previous -- when he was

18     younger -- performances on tests that require some kind of

19     reading fluency.  That's essentially why we questioned the

20     validity of those.  So if they are really that low, lower than

21     99 percent of people his age, general population, I'm not sure

22     what kind of accommodation would help to take the USMLE.

23          THE COURT:  Okay.  Any follow-up questions?

24          MR. WEINER:  I have one or two brief ones.  Sorry

25     about that.

1                        RECROSS-EXAMINATION

2    BY MR. WEINER:

3    Q.   You had mentioned that the reading fluency tests were so

4    low in the report from Dr. Beach that they don't compare with

5    his earlier assessments.  He was not administered a reading

6    fluency assessment until 2010; isn't that correct?

7    A.   They don't comport with any of the measures that he was

8    given that would require some fluency of reading.

9    Q.   Fluency is based on -- is an assessment both of time and

10   accuracy in reading; is that correct?

11   A.   Correct.

12   Q.   There were no timed reading measures administered to him

13   prior to 2010 --

14   A.   In his assessments.

15   Q.   -- is that correct?

16   A.   Correct.

17           MR. WEINER:  Thank you.

18           MR. BURGOYNE:  I think you can step down, Dr. Farmer.

19   Thank you.

20           (Witness excused.)

21           MR. BURGOYNE:  Your Honor, we would call Dr. Sam

22   Ortiz.

23                   SAMUEL O. ORTIZ, Ph.D.

24   a witness herein, being first duly sworn, was examined and

25   testified as follows:

1          DIRECT EXAMINATION

2    BY MR. BURGOYNE:

3    Q.   Dr. Ortiz, could you please state your full name for the

4    record, and your current place of employment?

5    A.   Samuel O. Ortiz, O-r-t-i-z.  I am currently professor of

6    psychology at St. John's University.

7    Q.   And would you look at Defendant's Exhibit 22, and go to

8    Tab A in that document, and tell me whether or not that's your

9    current CV.

10   A.   22?

11   Q.   Yes, in Exhibit A.

12   A.   Yes, that is my current CV.

13   Q.   And quickly looking through there at a couple of things,

14   that has your educational background?

15   A.   Yes.

16   Q.   And what degrees do you have?

17   A.   I have a Ph.D. in clinical psychology, an MA in clinical

18   psychology, a BA in psychology, a BS in architecture in

19   postdoctorate training in bilingual school of psychology.

20   Q.   And you're currently a professor, I think you said, at

21   St. John's University?

22   A.   Correct.

23   Q.   And what do you teach?  What type of courses do you

24   teach?

25   A.   I teach an undergraduate course in psychological

1    measurement and scaling.  I teach graduate courses in

2    psychological assessment, including non-discriminatory

3    assessment, and I teach courses in cultural diversity in

4    psychological service delivery.

5    Q.   Have you occupied any professional leadership positions

6    within the psychological and assessment field?

7    A.   Yes.  I served as vice president of professional affairs

8    for Division 16 School of Psychology, which is APA, and I

9    served for nine years on the committee on testing -- excuse

10   me, Committee on Psychological Testing and Assessment, CPTA,

11   for the American Psychological Association as well.

12   Q.   Okay.  And the APA that you refer to is the American

13   Psychological Association?

14   A.   Correct.

15   Q.   And if you look at page 3 of your resumé, there's a

16   reference there to a the APA committee on psychological tests

17   and assessment?

18   A.   Yes.

19   Q.   And then I believe there's a discussion in there of the

20   educational standards for testing?

21   A.   Yes.

22   Q.   And tell the Court what the Standards For Educational and

23   Psychological Testing are.

24   A.   Yes.  They're referred to generically as "The Standards,"

25   but the full name is *The Standards For Educational and*

1      *Psychological Testing*.  It's a publication.  The most recent

2      was in 2014, previous to that 1999, I forget, the second

3      edition or first edition when it came out.

4          It is jointly published by the American Educational

5      Research Association, the American Psychological Association,

6      and the National Council For Measurement in Education.  CPTA

7      is the arm and the body which provides the APA input into that

8      publication when it undergoes revision.  And during the last

9      revision, I was serving on CPTA at that time, as well as chair

10     of that particular committee, to provide input for that

11     particular volume.

12     Q.  Okay.  And the standards address both educational

13     testing, for example, the LSAT or the MCAT, as well as

14     psychological testing?

15     A.  Yes.  It's a document that is intended to provide

16     guidance regarding the responsibilities of test publishers, as

17     well as test takers, and it's meant as a policy document, so

18     it's adopted by the three organizations as their official

19     policy regarding psychological and educational testing.

20     Q.  And then have you served for a time as a school

21     psychologist early in your career?

22     A.  Yes, I did.

23     Q.  And did you also serve in the military as a psychologist?

24     A.  Yes, I did.

25     Q.  What was your position in the military?

1    A.   I did my predoctoral internship with the United States

2    Air Force at Wright Patterson Air Force Base Medical Center in

3    Dayton, Ohio.  I did one year of training there.  And then I

4    did three subsequent years within the military at Patrick Air

5    Force Base Hospital in Satellite Beach, Florida.  I was a

6    staff psychologist the first year, and I was chief of mental

7    health services for the following two years.

8    Q.   And how long were you a school psychologist?

9    A.   I served as school psychologist for Encinitas Union

10   School District for approximately three years, from 1993 to

11   1996.

12   Q.   Okay.  And did you personally conduct evaluations of

13   patients in those settings?

14   A.   Yes, I did.

15   Q.   On page 4, there's a discussion of your professional

16   experience, and it's a reference to your work for the National

17   Board of Medical Examiners?

18   A.   Yes.

19   Q.   And is this an accurate description of the work you

20   performed for the NBME?

21   A.   Yes, it is.

22   Q.   And you've been doing that since July 1999; is that

23   correct?

24   A.   That is correct.

25   Q.   In your work for the NBME, do you view yourself as an

1    independent external reviewer?

2    A.   Yes.

3    Q.   And do you attempt, in all instances, to be objective in

4    your analysis?

5    A.   Absolutely.

6    Q.   Do you start your analysis with any preconceptions?

7    A.   No.

8    Q.   When you review the accommodation file of a candidate, do

9    you give careful consideration to any recommendations or

10   reports from the candidate's professional?

11   A.   Yes, of course.

12   Q.   And do you give careful consideration to any history of

13   accommodations the candidate has had?

14   A.   Yes.

15   Q.   Are there instances in which you recommend that a

16   requested accommodation's being granted?

17   A.   Yes.

18   Q.   And likewise, there are instances in which you recommend

19   they be denied?

20   A.   That is correct.

21   Q.   Do you recall reviewing the file for Brendan Berger?

22   A.   I do.

23   Q.   And would you look, please, at Exhibit B, the next

24   exhibit.

25        And could you confirm for the Court that this is the

1    report that you prepared for the National Board of Medical

2    Examiners in March 2019 regarding Mr. Berger's request?

3    A.   Yes, it is.

4    Q.   And I apologize.  See here, I just neglected -- let me

5    back up quickly.  On your CV, I didn't ask about your books

6    and publications.  Since some of those are directly relevant

7    here, I should have.  So if you could go back to Exhibit A and

8    go to page, looks like your articles start on page 7.

9    A.   Okay.

10   Q.   And are these all peer-reviewed articles?

11   A.   Yes.

12   Q.   And the first article that is a work in press is called

13   "Exclusionary Factors-What a Specific Learning Disability is

14   Not: Examining Exclusionary Factors."  And there's a reference

15   there to the National Center for Learning Disabilities?

16   A.   Yes.

17   Q.   Is that a publication you're doing for that organization?

18   A.   I'm working jointly with them on that.

19   Q.   And then several articles down, there's one, I think,

20   that says Sotelo Dynega?

21   A.   Yes.

22   Q.   And you're a co-author here with three others, it looks

23   like.  And the caption of that one, or title, is "English

24   Language Proficiency and Test Performance: Evaluation of

25   Bilinguals with the Woodcock-Johnson III Tests of Cognitive

1    Ability"?

2    A.   Yes.

3    Q.   Is that an area of specialization of yours, the

4    evaluation of students who are bilingual?

5    A.   Yes, very much.

6    Q.   If you look at the next page, page 8.

7         There the second article is an article you did in 2006

8    for the *Journal of Applied School Psychology* called

9    "Multicultural Issues in School Psychology Practice:  A

10   Critical Analysis."  Are multicultural factors important in

11   assessing whether someone has a learning disability?

12   A.   Yes.  Absolutely.

13   Q.   A list of your publications, are these books that you've

14   authored or co-authored, at the bottom of the page?

15   A.   Yes.

16   Q.   Looks like you've written one called the *Assessment of*

17   *Culturally and Linguistically Diverse Students:  A Practical*

18   *Guide, Second Edition*?

19   A.   That's correct.  That one is under current revision.

20   Q.   You've also written one on *Essentials of Cross-Battery*

21   *Assessment*?

22   A.   That is correct.

23   Q.   What does that mean, cross-battery assessment?

24   A.   Cross-battery assessment is a way of understanding and

25   integrating test data from a common framework using CHC

1    theory.  CHC stands for Cattell-Horn-Carroll.  And over the

2    past 20 years, CHC theory has emerged as the preeminent

3    framework for understanding human cognitive abilities.

4         Cross-battery assessment is a way of being able to

5    supplement particular battery or tests that may not measure

6    comprehensively all of the abilities that could be relevant to

7    a referral by using other tests that do provide that

8    particular measurement of that particular construct.

9         So cross-battery just comes from the title of being able

10   to evaluate across one or more batteries to create a

11   comprehensive picture of an individual's cognitive abilities.

12   Q.   Okay.  And then two down, it looks like a book that you

13   co-authored, titled *The Achievement Test Desk Reference,*

14   *Second Edition:  A Guide to Learning Disability*

15   *Identification?*

16   A.   Yes.

17   Q.   Are any of the works we just looked at widely used in

18   courses, to your knowledge?

19   A.   Yes.  *The Assessment of Cultural and Linguistically*

20   *Diverse Students* is used fairly routinely, especially in

21   school psychology, relative to the training of

22   non-discriminatory assessment.  The *Essentials of*

23   *Cross-Battery* is taught fairly routinely as well.  That's the

24   third edition, and it forms a part of psychoeducational

25   assessment courses, as well as courses on learning

1    disabilities.

2        The *Achievement Desk Reference* is probably dated and not

3    used nearly as much, but that one was one of the early

4    operationalizations of learning disability that continues to

5    be refined and cited within the *Essentials of Cross-Battery*

6    book.

7    Q.   Okay.  And have you developed any assessments that are

8    used on a national basis in evaluating individuals to

9    determine whether they have any learning disabilities?

10   A.   Yes, to assist; not necessarily to identify specifically

11   learning disability, but to assist in an evaluation of

12   learning disability, yes.

13   Q.   And what is that assessment?

14   A.   That one would be called the Ortiz Picture Vocabulary

15   Acquisition Test, or Ortiz PVAT for short.

16   Q.   And what is that attempting to evaluate?

17   A.   It's a measure of receptive vocabulary, but its

18   uniqueness comes from having two sets of distinct and separate

19   norms.  One set of norms is only for individuals who are

20   monolingual English speakers.  The other set of norms are for

21   people who are not, essentially people for whom English may

22   not be the only language, or it happens to be a second

23   language that they're learning.

24   Q.   Are you in the process of working on any other

25   assessments?

1    A.   Yes, I am.

2    Q.   And what is that assessment?

3    A.   I'm currently assisting Dr. Richard Woodcock on the

4    development of a Spanish version of the Woodcock-Camarata

5    Articulation Battery.

6    Q.   And is that the same Woodcock that shows up in the

7    Woodcock-Johnson test --

8    A.   Yes, it is.

9    Q.   -- that we've been talking about?

10   A.   Yes.

11   Q.   You were in court yesterday, weren't you, when Brendan,

12   his mother, and Dr. Beach testified?

13   A.   Yes, I was.

14   Q.   Did you hear the discussion of the extent to which French

15   was spoken in the household?

16   A.   Yes.

17   Q.   And likewise, have you personally reviewed the records

18   where there were references to the household as a bilingual

19   home?

20   A.   Yes.

21   Q.   And you've seen the record that said that French was

22   often spoken in the home?

23   A.   I have.

24   Q.   Did you hear any testimony, since you've been in this

25   courtroom, that alters the opinions that were set forth in

1    your report?

2    A.   No.

3    Q.   Can you briefly state for the Court what your opinion is

4    to sort of condense down that 20-page report?

5    A.    Okay.  I would say there are perhaps two parts.  The

6    first part is essentially that, given the extent to which

7    Mr. Berger was exposed to French as well as English, that the

8    types of evaluations that were conducted, especially early on,

9    starting in kindergarten on up through high school, did not

10   account for the fact that his development in language was not

11   equal to that of somebody who was a monolingual.

12        And what I mean by that is that language is something

13   that is tied directly to birth.  If you are only learning a

14   single language and you are five years old, you've been

15   learning that language for five years.  If you are ten years

16   old, you've been learning that language for ten years.  But

17   someone with exposure to another language is splitting some of

18   that time.

19        And depending upon how much time they're splitting, there

20   are predictable and known effects in terms of how these

21   factors can influence educational attainment, learning

22   processes, cognitive development, and language development

23   even through their lifespan.

24        So my opinion was that while these factors were noted,

25   particularly in the first report by Ms. Collins, that French

1       was spoken in the home and/or -- I'm sorry.  I believe that

2       Ms. Collins may not have said anything.  Dr. Artner provided

3       an indication that French was spoken in the home often, but

4       there was no discussion as to how these factors played a role

5       in the results that were being presented.  It was similarly

6       overlooked, or it wasn't explored.  It was not evaluated in

7       any particular way.  It seems as if Mr. Berger was being

8       compared only to individuals who were monolinguals, which

9       comprised the norm samples of the tests that he was

10      administered.

11          This would effectively invalidate conclusions regarding

12      the presence of a disability because one of the main tenets in

13      terms of evaluating for a learning disability would be to

14      exclude certain factors that may be able to better explain why

15      an individual might not be performing the way that they are

16      performing.  So that's the brief part of that particular part.

17          The second part is essentially that when Mr. Berger's

18      evaluated post high school, there's a pattern of results,

19      particularly, as has been discussed, the decrease in the

20      processing speed over the years from 2010 to 2016.  Those

21      things are not necessarily explainable by language, but the

22      effects of language are certainly something that have a strong

23      relationship to the development and diagnosis of a learning

24      disability, as well as explaining, perhaps, functional

25      limitations and impairments that might be present during that

1    developmental period.

2    Q.   In Dr. Beach's 2010 report, the following statement is

3    found, "Mr. Berger grew up in a family with English as the

4    primary language, and he speaks English fluently."  Don't

5    those two factors sort of address your concerns regarding

6    language and culture?

7    A.   No, they don't.

8    Q.   Why is that?

9    A.   Well, primary just means primary, it doesn't mean only.

10   It may mean first, and so that another language could have

11   been second.  It could indicate order.  But again, it

12   doesn't -- it doesn't imply and it doesn't indicate that there

13   was only a single language being spoken, or that that language

14   was necessarily English.

15       Secondly, fluency simply has to do, in the way that most

16   people seem to view it, from a non-let's say professional

17   perspective, as the ability to converse, speak, or perhaps

18   even pronounce the phonemes of the language correctly.

19   Engaging in conversational language would be a type of

20   fluency, and that's usually where the linguists sort of leave

21   it.

22       But when you take it to educational context, fluency is

23   not sufficient for academic success.  You need to advance your

24   language even higher than simple, what we again would call

25   oral fluency, to be able to do well.

1          So those are our words that are just common and generic

2     but aren't really targeting what's happening in terms of

3     development of language during that critical period.

4     Q.   And what about the fact that he speaks English fluently,

5     why does that not respond to the opinions you've expressed in

6     this case?

7     A.   Well, good example would be myself.  I don't speak

8     English fluently.  I'm sorry.  I speak English fluently as

9     well, but that doesn't mean I was monolingual.  So the fact

10    that you speak English fluently means there's been significant

11    exposure to English, and probably early exposure to the

12    phonemes, so there's no development of an accent.  But that,

13    again, does not imply that there was no other language that

14    was a part of the development that occurred.

15    Q.   And in your personal case, when did you learn to speak

16    English?

17    A.   I didn't start speaking English until the age of five.

18    Q.   And what consequence did that have relative to any

19    assessments that might have been performed on you, say, at age

20    ten?

21    A.   Well, that's a real long story but, in essence, if you

22    think of it simply as I'm ten years old, and I have been

23    learning English for, at best, five years -- now remember,

24    when I go home, I'm not really getting that much English

25    because my parents were probably speaking Spanish to me, but

1    let's say it was five years from that point on.

2         Well, that means when I'm ten and I'm in fifth grade, I'm

3    being expected to perform like a fifth grade student who has

4    been learning English their entire life.  So I'm expected to

5    perform comparably to somebody who has at least probably more

6    than twice the amount of language development in English than

7    I do.  And that's patently unfair.  It would be like comparing

8    a 5-year-old to a 10-year-old and saying, well, that

9    5-year-old should be able to do what a 10-year-old can do.  We

10   never do that, that's why we use age-based norms.

11        But language is sort of unique as a developmental process

12   because it can become de-linked from a person's age.  You can

13   begin learning a second language at any point in your life.

14   Q.   And I think you answered this, the assessments we've been

15   looking at, are they normed against monolingual student

16   population?

17   A.   Yes.

18   Q.   And not bilingual?

19   A.   Correct, other than the exception of the English learned

20   norms of the Ortiz PVAT that I mentioned.

21   Q.   In the case of Mr. Berger, if he had come to you, would

22   you have administered different assessments to him?  How would

23   you have approached the issue?

24   A.   Well, it would have depended on the age.  If I were

25   evaluating, let's say when the speech language pathologist

1    Collins did, at age six-and-a-half, then he obviously would

2    have needed a very, very good history of language, language

3    sampling; probably would have engaged in different types of

4    developmental assessment to ascertain relative proficiency at

5    that point, determine the amount and extent of exposure,

6    because then any testing that is done subsequently would have

7    to take that into account and be able to mitigate any

8    interpretation relative to what you know about that exposure.

9        So early on, you know, there is a good deal of

10   information that must be gathered to paint a picture of that

11   child's development.  As they get older, it becomes more

12   complicated because now there's a sort of a neuro maturation

13   of language.

14       Different phases of life involve different aspects of

15   language development, and so therefore, you have to then

16   consider, well, at what point did the person begin learning

17   something, and for how long now has education interacted with

18   that, and how might that then influence the results that you

19   might find.

20       So the older a person gets, the more difficult it becomes

21   because the person has moved beyond the critical period of

22   language development, and you -- when you're looking at things

23   relative to difficulties that are rooted in early learning

24   problems, then it's best to have been evaluating them at that

25   time rather than when they have become adults.

1    Q.   Could the issues that were identified by Ms. Collins and

2    Dr. Artner, any delays in reading or processing, could those

3    be attributable to language based issues in the home?

4    A.   Yes.  Absolutely.

5    Q.   Dr. Beach also included in her report the statement,

6    "There's no evidence to indicate that alternative explanations

7    to reading disorder and disorder of written expression for his

8    history and current presentation of academic learning and

9    performance limitation."  Do you agree that there are no other

10   possible explanations for those issues?

11   A.   I do not agree.

12   Q.   Again, what would you identify as possible alternative

13   explanations?

14   A.   I think there are two, and they may be somewhat related.

15   The first one is what we've been discussing.  The exposure to

16   two languages in the home is a wonderful and great thing, and

17   I don't want to be misunderstood about that.  And it's

18   valuable and can actually have cognitive benefits in the long

19   run.  This is -- it's wonderful to be that way.

20       But there are, by definition, limits to what a person can

21   develop when you're sharing some time in two different

22   languages.  So naturally, those differences can be detected

23   easily by age-based or age-normed types of tasks.

24       And my understanding, based on the documentation, was

25   that there had been sufficient exposure, as noted within the

1    documentation, that would account for why Mr. Berger might

2    have had early reading types of difficulties.  Now, those

3    difficulties obviously appear to go away, but I think there's

4    another good reason for that.

5        And one of them is is that when he began his home

6    schooling, his mom sort of rightly intuited that his

7    instruction at school, and I believe Mr. Berger mentioned this

8    in his testimony, had been applying a whole language program.

9    A whole language program is basically where you develop sight

10   word vocabulary in the absence of developing any type of

11   phonological processing in terms of decoding.

12       And by itself, sight word is horrible, but when given as

13   a primary or only program, can be difficult for many children

14   because a more balanced literacy approach is generally

15   recommended and generally much more successful than simply

16   sight word vocabulary.

17       So what Mr. Berger's mother actually did, according to

18   documentation, was to provide him with that phonology and that

19   training starting in second grade, third grade, and fourth

20   grade, which according to many of the results during that

21   period shows him to progress quite nicely in the development

22   of his phonemic abilities.  And by the time he's tested on the

23   Iowa Test of Basic Skills in sixth grade, I believe, he's

24   showing that his reading is actually at a wonderful level.

25       So I think that in some ways, the difficulties could have

 1    been greater had they not been -- you know, it might have been

 2    intentional or unintentionally assisted by the instruction

 3    that his mother provided.  If it had just been left to a

 4    language difference, and the school providing an education

 5    that wasn't entirely appropriate for him, it could have been

 6    much worse.

 7         So I think both of those are explanations as to why he

 8    displayed some of the early types of difficulties, but also

 9    why those difficulties appeared to fade as he developed in his

10    educational career.

11    Q.  Mr. Berger's father's a doctor, lives locally, and I

12    believe he's in the courtroom.  If he has a really strong

13    French accent, does that affect sort of the exposure to

14    language in the early years?

15    A.  It's not that having an accent would affect his exposure

16    or his development, necessarily.  Does it play a role?  Yes,

17    but it's difficult to sort of express.  I can only give you an

18    example.

19         For example, when I was growing up, my parents lived in a

20    house that had a bedroom that I had, which had a closet in it.

21    Well, in Spanish, there's no actual translation of the word

22    for closet.  People use the word armadio, but that actually

23    means armoire, which is a translation from French.  There is

24    no word to use.  So my parents had to adopt a word to use to

25    point to this thing that was in our house, so the word that

 1    they used was "closet."

 2        Now, I know that seems weird, but if you're listening

 3    carefully, "closet" is closet with a Spanish accent.  That's

 4    what I heard.  But in my mind, because I'm five or six years

 5    old, I don't make a distinction that that's actually the same

 6    word.  The fact that I can hear those phonemes separately and

 7    distinctly leads me to believe that that's just the Spanish

 8    version of the word, not that it was an actual word spoken

 9    with a Spanish accent.

10        So that's kind of an instance of which it would affect,

11    but the real significance of one parent having an accent is

12    simply that it would indicate that that parent likely was not

13    a native speaker of English; that, in fact, their native

14    language was probably something else.  Doesn't mean they can't

15    be proficient in English, they certainly can, but it would

16    indicate that their own phonology is indicating a lack of

17    exposure to the English phonemes during that early

18    developmental period.

19    Q.  Dr. Beach said that if she had had any concerns in this

20    regard, she would have gotten a consult from someone else.  Do

21    you recall that testimony?

22    A.  Yes, I do.

23    Q.  And in your opinion, was there sufficient evidence in

24    Mr. Berger's history that would have warranted such a consult?

25    A.  Yes, I believe there was.

1    Q.   Dr. Beach first evaluated Mr. Berger in 2010, when he was

2    25 years old?

3    A.   I believe that's correct.

4    Q.   Wouldn't any issues relating to his bilingual home

5    environment have been resolved by that point so that they

6    wouldn't have been reflected in the assessments?

7    A.   Some perhaps, but not necessarily all of them.

8    Q.   Does the fact that he is fluent, and became fluent in

9    Japanese in his sophomore year in college, have any

10   significance to you in evaluating whether he might have a

11   learning disability?

12   A.   Yes.  Absolutely.

13   Q.   And what do you -- why do you think that information is

14   relevant?

15   A.   Well, the learning of a second language is predicated

16   upon how well the first language is learned.  Now, when two

17   languages are learned early on, then the difficulty comes in

18   with the nature of education; in other words, does the

19   education support one or the other.  Can the home support one

20   or the other, and so forth.  So there's other issues.

21        But if you've already learned a language, and become

22   fluent in a language, and not just fluent, but I think a

23   better term would be even biliterate; in other words, you've

24   learned to read, you've learned to write, you've learned to do

25   well in that first language, then when you go to learn another

1    language, you don't have to start from scratch.  What you know

2    about language in general is something that can be used to

3    transfer to the new language.

4        For example, Japanese and English really don't have that

5    much in terms of their common underlying proficiency.  They're

6    really very different languages.  Japanese in particular is an

7    isolate language, so it doesn't share a lot with many

8    languages; however, if you already know that in reading you

9    are looking at symbols, and those symbols represent sounds, or

10   they represent words, then you can apply that knowledge to the

11   learning of another language, and Japanese would be no

12   different.

13       So the extent to which you learn that second language,

14   again, depends heavily on how well you are versed and literate

15   in your own language.  And so again, having learned English

16   well, and having demonstrated it, especially by sixth grade

17   and certainly by twelfth grade, there is no reason to believe

18   he wouldn't have been able to learn Japanese, and the fact

19   that he did, I think, strongly indicates that there was no

20   language-based learning disability whatsoever.

21   Q.  If we assume you're wrong and Dr. Beach is right

22   regarding the impact, possible impact of language in his

23   background, and you just look at his assessment history as

24   presented in the reports, do you have an opinion on whether or

25   not the documentation supported a diagnosis of specific

1    learning disability with a reading disorder?

2    A.   I do have an opinion, and that opinion --

3    Q.   What is that?

4    A.   That opinion is that it does not.  And I stated

5    previously that the manner in which his education unfolded,

6    beginning in kindergarten, first grade, and then moved to home

7    schooling, with his mother providing a very solid

8    phonics-based approach to his reading, and the subsequent

9    increase in his reading scores to an average level, and

10   maintaining at an average level through the twelfth grade

11   certainly indicates that whether or not there were two

12   languages in the home was at that point going to be largely

13   irrelevant because he demonstrated the capacity for learning.

14   Q.   I didn't hear you mention the MCAT.  So that's an opinion

15   you base on his assessment history?

16   A.   Developmental history through, you know, the age of 18 or

17   so.

18   Q.   And did you also consider in any way his performance on

19   the MCAT, or was that not a significant part of your analysis?

20   A.   Well, I reviewed the information and, you know,

21   understanding the nature of the results and how they were

22   obtained, it's something that speaks to current performance.

23   But when you're evaluating for a learning disability, the

24   hallmark of a learning disability, the reason it's called a

25   learning disability is difficulty in the development and

1    acquisition of basic skills like reading, writing, and math

2    during that critical period, generally early elementary

3    school.

4        So without evidence of that, if there's difficulties

5    later on, chances are those difficulties are related to other

6    issues, not to a learning disability.

7    Q.   Those are all my questions.  Let me ask you a couple

8    questions quickly that the Court put to Dr. Beach, in case you

9    can speak to those as well.

10       The Court discussed a decline that was noted in the

11   performance records for Mr. Berger, the assessment records, I

12   believe, on the Woodcock-Johnson from 2010 to the last

13   evaluation, so three evaluations.  And she asked what possible

14   explanations there might be for that drop.

15            MR. BURGOYNE:  Your Honor, have I gotten that roughly

16   correct?

17            THE COURT:  Yes.  It was a particular test, the

18   Woodcock-Johnson Reading Fluency Test.  So from 85 in 2010, to

19   2013 of 75, to 2017 of 46.

20   Q.   And did you hear the explanations that Dr. Beach provided

21   as to why one might see that type of drop?

22   A.   Yes.

23   Q.   And can you respond to those explanations?  And I'll

24   summarize, the first one had to do with the fact that there

25   was a change in editions.  What's your opinion about whether

1      or not that's a plausible explanation for the drop?

2      A.    I don't think it's a very plausible explanation.    The

3      Woodcock-Johnson is carefully structured, carefully prepared.

4      It's one of the most technically sophisticated tests around.

5      And if there were that much of a difference in a single

6      subtest like on oral reading fluency, that would really

7      undermine the psychometric characteristics of the test,

8      particularly with reliability.

9           The lack of correlation would just be phenomenal, and

10     people would worry why is this happening, especially since the

11     test really was a name change primarily, wasn't really that

12     much of a structural change to the actual test.    It would also

13     implicate difficulties with the norms in terms of how they had

14     sampled and how they had equated it.

15          The WJ family doesn't actually re-norm the entire test

16     for every revision.    They do what are called equated norms, so

17     they take a sampling of the original norms from the WJR.    That

18     was the last time it was actually normed on a population that

19     included over 8,000 people.

20          From that point, what they'll do is they equate by

21     changing the nature of the norm sample to reflect the current

22     population parameters.    And by filling in those extra people,

23     and using the ones they had before to match them, then that's

24     how the new norms are created.    So they really overlap

25     extensively, and there shouldn't have been not a 40 point --

1    not a two and two-third standard deviation difference there.

2    Q.   A second explanation, as I understood it, is that these

3    assessments might not pick up any change in performance for

4    someone who is an average person in the general population,

5    but if somebody had a learning disability, that the change

6    would be more discerning and you might see this type of drop?

7    A.   I have to admit, I didn't understand that answer.  And I

8    can't agree with it because it doesn't make any sense, you

9    know.  Norms are norms.  They're created by age, and if the

10   average person's abilities are declining over the lifespan,

11   which some abilities tend to do, then the norms will reflect

12   that; if they're increasing at that point, the norms reflect

13   that, but it reflects it in general and for all people.

14       It doesn't distinguish a curve of development that would

15   be appropriate for somebody with a disability versus somebody

16   without a disability.  So I didn't understand that answer, but

17   of course, I didn't agree with it either.

18   Q.   Okay.  I think the next explaining was that there may

19   have been an age-related factor here, and that as people get

20   older, you see a greater functional impact than in their

21   earlier years.  Do you agree with that explanation?

22   A.   I do not.  I think, given the nature of how we learn and

23   when we learn, particularly reading, writing, and math, which

24   is early elementary, the nature of the education through

25   twelfth grade and high school, the fact that the norms aren't

1    stratified solely on the basis of people that go to college

2    either, or people that go to medical school.

3        They're normed on the average person, you know, across

4    the board, which means that individuals who actually continue

5    with their education are much more likely to do better anyway.

6    So for someone to be losing that much ground relative to the

7    general population is, again, not explainable by the reasons

8    that Dr. Beach proposed.

9    Q.   Can you offer any alternative explanations for why one

10   would see such a significant drop in those performance scores?

11   A.   I can think of two.  The most obvious, I think, would

12   have been that the individual, Mr. Berger, suffered some type

13   of traumatic brain injury or some type of rapid neurological

14   deterioration of some kind.  I don't believe that has

15   happened.  I'm just saying that would have been the first

16   thing to look for.

17       Apart from that, the only other thing that I think was

18   truly reasonable was the history of accommodations that have

19   been alluded to, regardless of when they started, it is

20   something that an individual who is being provided with

21   them -- and again, regardless of whether they have a

22   disability or not -- becomes accustomed to.

23       And in time, it's not unusual for someone to learn that

24   time limits may not really apply to me, so when given a test,

25   even a standardized diagnostic test where you're instructed to

1    work as rapidly as you can, it may just not be something that

2    you do.

3        You are going to continue with your sort of deliberate

4    approach that you have developed because that's the way you

5    have been treated.  So that might have been something that

6    could have caused him to just do more poorly.  He just worked

7    more deliberately because it really wasn't something that, in

8    his mind, he was expected to have to work quickly anyway.

9        MR. BURGOYNE:  Your Honor, I don't have any other

10   questions.  If there are any that you want to ask him, by all

11   means.

12       THE COURT:  Well, I'm going to allow Mr. Weiner to do

13   his cross-examination.

14                        CROSS-EXAMINATION

15   BY MR. WEINER:

16   Q.   Good afternoon, Doctor.

17   A.   Good afternoon.

18   Q.   You were retained for this matter by the NBME in March of

19   2019; is that correct?

20   A.   I believe that is correct.

21   Q.   So that was after this litigation was filed, correct?

22   A.   I don't know when the litigation was filed.

23   Q.   Litigation was filed in January or February, I believe,

24   of 2019.

25   A.   Okay.  So yes.

1    Q.   And the documentation you received from the NBME included

2    their denials, correct?

3    A.   Yes, it did.

4    Q.   It also included the consultation reports from

5    Dr. Lovett, correct?

6    A.   There was a single report, yes.

7    Q.   Okay.  So you were aware that the NBME had made a

8    decision three times to deny Mr. Berger his request for

9    accommodations, correct?

10   A.   At least twice.  I don't know about three times.

11   Q.   And I believe that you indicate in your declaration that

12   you are a consultant for other testing entities?

13   A.   I am not on like a consultant list for other agencies,

14   but I have consulted ad hoc for other agencies.

15   Q.   So College Board is one; is that correct?

16   A.   I have not done reviews for The College Board, no.  I

17   have done training for The College Board in terms of their

18   reviewers, but I personally have not reviewed for them.

19   Q.   So College Board actually has some reviewers as well?

20   A.   I believe they do.

21   Q.   All right.  So they submit documentation to outside

22   consultants similar to the way NBME does?

23   A.   I believe they do.

24   Q.   And The College Board in this particular case granted

25   Mr. Berger accommodations; is that correct?

1    A.   I don't recall.

2    Q.   Based on the documents?

3    A.   Yes.

4    Q.   And you yourself never had an opportunity to speak with

5    Mr. Berger; is that correct?

6    A.   That is correct.

7    Q.   You have not evaluated him; is that correct?

8    A.   I have not.

9    Q.   And in making determinations about whether or not a

10   person is bilingual, it would be optimum to have that

11   opportunity to have that kind of discussion; is that correct?

12   A.   I don't know that it would be optimum, but it certainly

13   wouldn't hurt.

14   Q.   Okay.  And one of the factors in determining whether or

15   not one's bilingual is how much exposure they have to the

16   foreign language, correct?

17   A.   No.  You're actually misstating the term bilingual and

18   the definition of it.  Bilingual doesn't mean somebody who has

19   like an even level of fluency in both languages.  Bilingualism

20   is a continuum.  You could be very fluent in one language and

21   then not so fluent in others, or vice versa, you could be

22   balanced in both.  So it isn't ascertaining bilingualism, it's

23   ascertaining the nature of the language development and how

24   many languages were involved.

25   Q.   And I'm sorry if I was not articulate.

1    A.   That's okay.

2    Q.   What I'm trying to refer to is that it would be important

3    for making a determination of whether or not one is bilingual

4    is how much of the foreign language they're hearing; is that

5    correct?

6    A.   Again, I wouldn't use that to determine the nature of

7    bilingual, I would use that to determine the nature of the

8    exposure to either language.  That, in and of itself, isn't

9    like relative to bilingualism.  Bilingualism is a different

10   kind of issue.

11   Q.   All right.  So you believe that Mr. Berger is bilingual

12   because he had a parent who was French and a parent who was

13   American?

14   A.   Not specifically for those reasons.

15   Q.   So let me try this.  You believe that Mr. Berger is

16   bilingual because you believe that people were speaking French

17   in the home often?

18   A.   I believe that Mr. Berger has been exposed to more than

19   one language.  To characterize it as bilingual is not

20   accurate, but to characterize it as having been exposed to

21   more than one language would be more accurate.

22   Q.   All right.  Well, would you give a bilingual assessment

23   to someone who was not bilingual?

24   A.   Again, the term bilingual assessment is probably not what

25   you think it is.  Bilingual assessment is not the same as

1    assessments of bilinguals.  I don't mean that as double talk,

2    Your Honor.  Bilingual assessment is not a recognized

3    practice.  There are no standards.  There are no guidelines.

4    There are no practices where you can go to a book, to a policy

5    and say here's exactly how you would do it.

6        Bilingual assessment generally refers to individuals who

7    are evaluated in a language other than English, so often it's

8    a native language evaluation, also conducted monolingually,

9    which again isn't bilingual.

10       Assessment of bilingualism is when you consider the fact

11   that an individual has been exposed to more than one language.

12   You take that into account to determine then, okay, how might

13   this impact the nature of the testing that I might do,

14   regardless of whether it's in one language or the other.

15   Q.   All right.  So when you assess for a person who -- and

16   I'm mixing up your terms.  It's the assessment of?

17   A.   Bilingual.

18   Q.   Bilingual.  Okay.  So the manner in which you're

19   suggesting Mr. Berger should have been assessed, what would

20   that mean?  How would he be assessed?

21   A.   Well, it would be different, depending on when he was

22   assessed.

23   Q.   Let's say 1992, which is, I think, when you picked the

24   date -- or 1994, which is when, I believe, you picked the date

25   that he should have been assessed as a bilingual.

1    A.   Well, the evaluations, I believe the first one was when

2    he was six-and-a-half by Collins, which is a speech language

3    pathologist.  Speech language pathologists are trained, to

4    some extent, in these types of language issues, although

5    specialization in bilingual speech language pathology requires

6    additional training and specialization.  So perhaps

7    Ms. Collins did not have that and then did not engage in that.

8         But absolutely, at that point, there should have been

9    some and an extensive consideration of the language influence,

10   and this should have been reflected in the type of the

11   evaluation that was done, and it was not.

12        And Dr. Artner conducted her evaluation, and that was, I

13   believe, when he was aged eight at that point, and that was

14   first grade.

15   Q.   1994.

16   A.   '94, right.  Again, the indications were -- and she noted

17   that French was often spoken in the home.  So while it was

18   noted, there was no consideration in terms of how this might

19   affect the evaluation or the interpretation that was provided.

20   So there wasn't anything that was actually done at that point

21   to accommodate that particular factor as a potential

22   explanation for the results that were obtained.

23   Q.   So can you identify the name of the assessment that he

24   should have been administered at that time?

25   A.   There isn't a specific name of anything that he would

1    have been given.  It probably would have, again, stemmed from

2    one creating an accurate and detailed developmental history of

3    the language and the language exposure, interviews with him,

4    with his parents, speaking to them and ascertaining their own

5    level of fluency, proficiency in the languages, and experience

6    and education in the languages.  Probably additional language

7    sampling would have been helpful.

8         So these are qualitative kinds of details that would have

9    been appropriate to gather to help Dr. Artner at that time

10   determine whether her results might even be valid and what

11   they might actually mean.

12   Q.  And are different norms used in these type of

13   assessments?

14   A.  There are no other norms available, other than the norms

15   I mentioned for the Ortiz PVAT, which was only published

16   18 months ago, so it was not available at that time.

17   Q.  And Dr. Beach had indicated that she did attempt to

18   assess the amount of exposure to Mr. Berger's language.  Did

19   you hear her testimony about that?

20   A.  I heard her say that, yes.

21   Q.  And Ms. Holland had testified that there was marginal,

22   not even -- less than, I think she said, one percent was

23   spoken to Brendan when he was in the home?

24   A.  Actually, she said 90 to 99 percent.

25   Q.  Okay.  90 to 99 percent.  So you think that that ten

1    percent may have some relevance?

2    A.  Absolutely.

3    Q.  I'm just trying to get my hands around this.  It would

4    seem that many folks in the United States would be considered

5    to be -- should be tested as a bilingual if only their

6    exposure could be as little as ten percent?

7    A.  Yes.  You're correct.

8    Q.  Okay.  So in my case, for example, since you brought in

9    your case.  Both my parents were English speaking.  They're

10   first generation, but we spoke -- but they spoke some Yiddish

11   in the home.

12   A.  Yes.

13   Q.  And I had grandparents who spoke Yiddish.  So I myself

14   should have been assessed as a bilingual?

15   A.  You should have been assessed with that information in

16   mind, absolutely, yes, you should have.

17            THE COURT:  How does someone do that, though?  I

18   mean, you're saying there's not a test to do that, there

19   aren't norms that -- to test that by.  What would that look

20   like?  What would it look like?

21       Okay.  I'm bringing my six-year-old to you, and I say Dr.

22   Ortiz, my grandparents spoke Italian in the home, and my child

23   has been exposed to that every Sunday when we go for family

24   dinner.  What do you do?

25            THE WITNESS:  What I would do is essentially then I

1    would start asking you, okay, so how much Italian is being

2    spoken?  To what extent?  What are the educational

3    circumstances as well?  For example, is your child going to

4    receive instruction in English only, or is it going to be in

5    Italian as well?  Is there any formal education that will be

6    provided?  How often do you speak to your child, in which

7    language and to what extent?

8        These are things that will affect the development of

9    language.  And what you would look at first in the early

10   language period would be things like phonological development,

11   because that's what the child is hearing.  Plus you would look

12   at vocabulary development.  The splitting of the time tends to

13   create slight delay, as I mentioned, that can be measured by a

14   regular vocabulary test, and you can see that there's a slight

15   delay.

16       So the key would be not to necessarily expect that your

17   child should have, you know, on grade level, on age level of

18   vocabulary development, as well as on grade level and age

19   level phonological development.  They may be a little bit

20   behind.

21       Now, as time goes by, if the English is still

22   predominant, it's still supported and you're able to do that,

23   those things can wash out a bit, but they can have some

24   effects.  One of the effects would be, for example, if there

25   are any educational difficulties, for example in Mr. Berger's

1    case, since he was being taught with the whole language

2    approach, he wasn't getting anywhere with his literacy, so he

3    came at that a little bit later, when his mom finally

4    intervened to be able to promote that.

5         But what that also means is that it could have caused him

6    a little bit of a delay in terms of fluency.  So early on, if

7    he wasn't as fluent as somebody else, that isn't because he

8    lacked ability to be fluent, but because he didn't have as

9    much time and educational opportunity in which to develop that

10   fluency.  So he's being compared to people who have an

11   advantage, not an intrinsic natural advantage, but simply a

12   circumstantial advantage.

13          THE COURT:  How does one measure the amount that's

14   attributable to being exposed in a household where the family

15   might speak ten percent of a different language, to someone

16   who has an actual learning disability?  How do you tease that

17   out?

18          THE WITNESS:  Well, if an individual has a learning

19   disability, and they are growing up in a home like this, then

20   their performance should be -- I was going to say above and

21   beyond, but it should be beyond and below, is that the right

22   way to say it, what would be expected of that individual given

23   the language difference.  So once you've accounted for that,

24   then the premise of a learning disability, you would have to

25   understand would make learning incredibly more difficult

1    because now you're dealing with a language difference, which

2    just gets in the way, and then you're dealing with a

3    disability, which is going to affect that rate of learning.

4        So now the performance would be even further below what

5    would be expected on the basis of language, and that's why

6    having that language, detailed language background in the

7    development down pat is so crucial because that gives you an

8    expectation of what you might expect based on the language,

9    and then you see whether the results are consistent with it,

10   or whether the results are actually below that.  That would be

11   an indication that there's something more going on than just a

12   language difference.

13           MR. WEINER:  Thank you, Your Honor.

14   BY MR. WEINER:

15   Q.  Dr. Ortiz, I had seen a couple of your PowerPoints from

16   your presentation.  I think one of the things you have in your

17   PowerPoints is a physician statement of the National

18   Association of School Psychologists?

19   A.  Yes.

20   Q.  All right.  Is it their position that an individual

21   should be assessed in their native language?

22   A.  Yes, it is.

23   Q.  Okay.  And Mr. Berger's native language is English, is

24   that correct, as far as you understand?

25   A.  Well, again, native language, are you referencing because

1   he was born in the United States is native language, or are

2   you trying to imply that's his only language, or first

3   language, or primary language?

4   Q.   I believe native language has a common term, doesn't it?

5   A.   No, it doesn't.

6   Q.   It doesn't?

7   A.   It does not.

8   Q.   So does the National Association of School Psychologists

9   define that?

10  A.   No, they don't, unfortunately.  I was co-author on that

11  position paper, so I know it well.

12          MR. WEINER:  Okay.  I have no further questions, Your

13  Honor.

14          THE COURT:  Thank you.  Any follow up?

15          MR. BURGOYNE:  Your Honor, I have no follow up.

16          THE COURT:  Thank you, sir.  You may step down.

17          THE WITNESS:  Thank you.

18          (Witness excused.)

19          MR. BURGOYNE:  We call Dr. Ben Lovett, Your Honor.

20                  BENJAMIN J. LOVETT, Ph.D.

21  a witness herein, being first duly sworn, was examined and

22  testified as follows:

23                      DIRECT EXAMINATION

24  BY MR. BURGOYNE:

25  Q.   Good afternoon, Dr. Lovett.

 1    A.   Good afternoon.

 2    Q.   Could you please state your full name and your current

 3    occupational position?

 4    A.   Benjamin Joshua Lovett.  I'm associate professor of

 5    psychology at the State University of New York at Cortland.

 6    Q.   And you're about to change jobs?

 7    A.   I am.  I'm moving in a month.  As of September 1st, I'll

 8    be associate professor of psychology and education at Teachers

 9    College, Columbia University.

10    Q.   And what will you be teaching there?

11    A.   Among other things, I'll be teaching the assessment

12    sequence and psychoeducational assessment.  I'll be teaching a

13    course on legal and ethical issues for school psychologists,

14    things like that.

15    Q.   Would you look at, there's a notebook of defense exhibits

16    up there.  It should be the one that's out, I guess.

17    A.   Yeah.

18    Q.   And it's Tab 24, Exhibit 1.

19    A.   I'm there.

20    Q.   Would you identify this document for us?

21    A.   This is my CV.

22    Q.   And is this a copy of your current CV?

23    A.   It is.

24    Q.   And it indicates you're a licensed psychologist in the

25    State of New York?

1    A.   I am.

2    Q.   And you have your Ph.D. and a master's degree in

3    psychology and a BA in psychology?

4    A.   Yes.

5    Q.   And then page 2, is that a list of your publications?

6    A.   Yes.  It starts there.

7    Q.   What is the book that you've published?

8    A.   I published a book on testing accommodations, using

9    research to make decisions about testing accommodations.

10   Q.   And it looks like the -- is that published through the

11   American Psychological Association?

12   A.   Yes.  They have a publishing house.

13   Q.   And then there's a list of articles.  Are these

14   peer-reviewed articles?

15   A.   The 54 that's there are peer reviewed.  And then there's

16   some other articles and book chapters that follow.

17   Q.   And what are some of the other subjects that you've

18   researched over here?

19   A.   The two things I've researched primarily are, first, the

20   diagnosis of learning and attention disorders; and secondly,

21   the provision of testing accommodations to students with

22   disabilities.

23   Q.   In the area of diagnoses, is there a specialty that you

24   have?

25   A.   Learning disabilities and ADHD would be the core

LOVETT - DIRECT                                    2-203

1    conditions that I specialize in.  There are some others as

2    well, but those are the two core ones.

3    Q.  And you serve as a reviewer for the National Board of

4    Medical Examiners?

5    A.  I do.

6    Q.  And you do that sort of as an independent reviewer?

7    A.  Yes.

8    Q.  And when you perform those reviews, do you always attempt

9    to do that in an objective manner?

10   A.  Absolutely.

11   Q.  Do you view yourself as an advocate for testing

12   organizations?

13   A.  No.  I'm not an advocate for testing organizations or for

14   any other entity.  If I'm an advocate, it's for a

15   science-based, evidence-based, research-based practice.  And I

16   consult not just with testing entities -- well, not just with

17   independent testing agencies, but I also consult with schools,

18   on occasion I consult with parents, anyone who is interested

19   in research-based guidance.

20   Q.  Do you consult for testing organizations other than the

21   National Board of Medical Examiners?

22   A.  Yes.

23   Q.  And what are some of those organizations?

24   A.  Currently, I'm on the reviewer panel for the National

25   Board of Osteopathic Medical Examiners as well, the New York

1    State Board of Law Examiners.  Those would be, I would say --

2    the Law School Admissions Council.  Those would be the three

3    additional ones that I would say I'm sort of on the official

4    reviewer panel for.  In the past, I've done some other

5    reviews, and then on occasion, I've been asked by a few

6    others.

7    Q.  You mentioned the National Board of Osteopathic Medical

8    Examiners?

9    A.  Yeah.

10   Q.  Could you just explain to the Court what the difference

11   is between the NBOME and the National Board of Medical

12   Examiners?

13   A.  Sure.  You know, physicians either have an MD degree or a

14   DO degree.  And I believe in all U.S. states they're licensed

15   to practice in the same way, but they have slightly different

16   educational curricula.

17       And so the National Board of Medical Examiners deals with

18   licensure of allopathic or MD physicians, whereas the National

19   Board of Osteopathic Medical Examiners deals with DO

20   physicians, Doctor of Osteopathy.

21   Q.  Are you aware of any research that's been done on the

22   extent to which documentation submitted to licensing boards

23   and support of accommodation requests meets applicable

24   diagnostic criteria?

25   A.  Licensing boards, per se, I'm not sure.  I'm familiar

1    with it with regard to NBOME, the National Board of

2    Osteopathic Medical Examiners.

3    Q.   What research are you aware of there?

4    A.   There are a couple of studies.  One which was published,

5    I believe back in 2010, was of documentation for ADHD.  And

6    then more recently, colleagues and I actually did a study

7    together looking at documentation of learning disabilities in

8    medical students and medical residents for NBOME.

9    Q.   And what -- just quickly, what is the outcome of those

10   research projects?

11   A.   It's hard to summarize all the results, but both of those

12   studies did find that a substantial number of applicants did

13   not meet accepted criteria in the DSM for having either a

14   learning disability or ADHD; that it was common that students

15   may request accommodations under a learning disability, under

16   an ADHD diagnosis; and, in fact, the evidence that they have

17   submitted does not meet the criteria, does not show that those

18   criteria are met.

19   Q.   Have you also contributed to book chapters?

20   A.   I have many times.

21   Q.   And are those listed here in your CV?

22   A.   They are.  After the peer-reviewed publications.

23   Q.   You don't personally do any evaluations, do you,

24   Dr. Lovett?

25   A.   No, I don't have a clinical practice.

1   Q.   Were you asked by the National Board of Medical Examiners

2   to review Brendan Berger's request for accommodations?

3   A.   I was twice.

4   Q.   Would you look at DX24, Tabs 2 and 3, and confirm whether

5   or not those are the reports you prepared for the National

6   Board of Medical Examiners?

7   A.   They are.

8   Q.   And you've been in the courtroom the last two days?

9   A.   Yes.

10  Q.   And have you heard anything in the court that has altered

11  the opinions set forth in those two reports in any way?

12  A.   Nothing that has changed the conclusions.  I don't recall

13  anything in the reports that has been changed by those.

14  Q.   And could you please summarize for the Court what your

15  opinion was and is regarding whether or not Mr. Berger's

16  documentation established the existence of a learning

17  disability or Attention Deficit Disorder?

18  A.   I believe that it did not.

19  Q.   And could you explain what you based your opinion on with

20  regard to those conclusions?

21  A.   The documentation.

22  Q.   Which aspects of the documentation?  What was it that

23  caused you to conclude that he had not documented the

24  existence of a learning disability?

25  A.   There are a large number of things; the evaluation

1    reports that were submitted by the professionals who he had

2    gone to, information about his performance in various real

3    world settings, of letters that were submitted in support of

4    him, lots of different types of documentation.  The pattern of

5    tests that he had taken with and without accommodations in the

6    real world, things like that, are just -- some of those

7    things, all the documentation was part of my decisionmaking.

8    Q.   So you reviewed all the documentation in the file?

9    A.   Yes.

10   Q.   Did you give careful consideration to his external

11   evaluator's report?

12   A.   Yes.

13   Q.   And you're aware he had gotten prior accommodations in

14   other settings?

15   A.   I was.

16   Q.   Were you opinions based solely on the fact that he had

17   passed the MCAT exam with average scores?

18   A.   No.  I mean, there's not a pass score anyway for the

19   MCAT, but the MCAT was certainly not the sole basis in any way

20   for my decisions.

21   Q.   And are you able to identify anything in particular that

22   was the primary basis for your analysis?

23   A.   Really, my decision -- again, I make a recommendation to

24   the National Board of Medical Examiners.  And my conclusion

25   that there was insufficient evidence to support the diagnoses,

1    functional limitations, or a need for accommodations was based

2    on a number of factors.

3        The two sort of sets of factors that I could discuss are

4    that there was some information that I would expect to be

5    there, some evidence that was not present.  It was absent, and

6    I would expect it to be there in the case of these disorders

7    and these claimed functional limitations.

8        And then the second sort of set of things was evidence

9    that actually would undermine the diagnoses, limitations, and

10   accommodation needs, evidence that would actually argue

11   against those things.

12   Q.   And what was an example of information not being present

13   that you would have anticipated for these types of

14   impairments?

15   A.   One thing that I would expect to see is educational

16   records that showed consistent poor performance early in life,

17   in the case of a learning disability or in the case of ADHD,

18   in a typical case of ADHD that's not being treated.

19   Q.   And what's an example of evidence of inconsistent

20   information that was in the record?

21   A.   The Stanford Achievement Test scores, the PSAT, the MCAT

22   scores.  Those are all examples of things that actually

23   undermine the diagnosis.  Some of the scores that were

24   obtained during early evaluations, like for instance, the

25   achievement testing scores and the Artner evaluation, as well

1    as the Smith 2003 and 2008 evaluations, the scores on

2    achievement tests, and some of the ADHD measures as well.

3    Q.   Look if you would, at the Stanford Achievement Test.

4    Those are PX18, 19, and 20.

5    A.   PX, that's the plaintiff?

6    Q.   Yes.  You got to switch.  Do you have those documents?

7    A.   Almost.  Okay.  I'm there.

8    Q.   And now these are documents that were submitted to the

9    National Board of Medical Examiners, and they're documents

10   which you reviewed?

11   A.   Yes.

12   Q.   And could you identify Exhibit 18 and tell us what this

13   information is?

14   A.   So this is results from Stanford achievement testing that

15   was done when Mr. Berger was in second grade.

16   Q.   And what sort of performance descriptions here, or

17   clusters, would be most relevant to one's ability to take an

18   assessment like the Step 1 or Step 2 exam?

19   A.   Well, the Stanford Achievement Test, as I understand it,

20   has a time limit, and reading comprehension is a skill under

21   timed conditions that would be important if you're going to be

22   taking a test like Step 1 or Step 2 CK of the USMLE.

23        So if we look at the reading comprehension score on the

24   second page of that Exhibit 18, you can see reading

25   comprehension, the national percentile is 63.6.  Basically,

1    Mr. Berger's performance was better on this timed measure of

2    reading comprehension than 63 percent of his peers.

3    Q.   And he was in the second grade at this time?

4    A.   He was.

5    Q.   And was there an evaluation here in the text regarding

6    where his overall performance placed him?

7    A.   The complete battery score, if you see on the same page,

8    the last line of the table, that would suggest that his

9    overall academic skills is measured by the Stanford

10   Achievement Test, was at the 54th percentile, so better than

11   more than half of his peers nationally.

12   Q.   And do you see, at the end of the first paragraph, in the

13   text below, there's the statement that his combined score was

14   well within the average range?  First paragraph at the bottom

15   of the page.

16   A.   Yes.

17   Q.   And would you agree with that, after looking at these

18   numbers?

19   A.   Yes.

20   Q.   Let's look at the same information in Exhibit 19.  This

21   is now his third grade performance.

22   A.   Yes, I see.

23   Q.   And what is his reading comprehension here in the third

24   grade?

25   A.   His reading comprehension score was at the 67th

LOVETT - DIRECT                                    2-211

1    percentile, or 68th if you round up.  67 point -- oh, I see.

2    It's actually 67th percentile, and the second digit is what

3    they call a stanine.  It's another type of score.  So the 67th

4    percentile.  Again, better than, in this case, about

5    two-thirds of his peers nationally for reading comprehension.

6    Q.   So whatever degree of functional impairment he might have

7    been experiencing at this time, he was still reading at the

8    level of a 67th percentile?

9    A.   Yes.  This would not suggest functional impairment with

10   regard to reading skills.

11   Q.   And then how about Exhibit 20, what does that tell us

12   about his reading abilities in the fourth grade?

13   A.   Again, if we look at timed reading comprehension, because

14   this is, as I understand it, a timed test, the national

15   percentile score for reading comprehension is 78.  So on this

16   case, his timed reading comprehension skills were better

17   than more than three quarters of his peers nationally.

18   Q.   And can you read the second paragraph in the text, where

19   it discusses his reading subtests?

20   A.   "The student did well on the reading subtests.  The total

21   score's among the highest for the grade."

22   Q.   And is there any progression here in terms of his reading

23   comprehension improving in these years from the second to the

24   third to the fourth grades?

25   A.   There's some indication of that, but all three of them

1    are -- in terms of timed reading comprehension, all three of

2    them are better than most peers.

3    Q.   And is there anything in here to you that reflects a

4    learning disability, or would suggest the existence of a

5    learning disability?

6    A.   No.

7    Q.   And did you also look at his Iowa Basic Skills Assessment

8    results?

9    A.   I did.

10   Q.   I think that's Exhibit 21?

11   A.   Uh-huh.  Yes.

12   Q.   And are you familiar with this assessment?

13   A.   I am.  I'm certainly familiar with looking at score

14   reports from it.

15   Q.   And is this also a standardized test?

16   A.   Yes.

17   Q.   And this appears to be from the sixth grade?

18   A.   Yes.

19   Q.   And are these years in which -- if you're attempting to

20   evaluate a learning disability, are these years in which you

21   would be paying particular attention to these types of

22   performance records?

23   A.   Typically, a student with a learning disability affecting

24   reading comprehension would show manifestations of that on

25   these tests in these grades.

1    Q.   And that's because learning disabilities are lifelong?

2    A.   They're neurodevelopmental disorders that start during

3    the developmental period.  They start in childhood.

4    Q.   And so ordinarily, we would expect to see manifestations

5    in childhood in academic records?

6    A.   Yes.

7    Q.   And at what level was reading comprehension reported in

8    the Iowa?

9    A.   In the Iowa tests, the reading comprehension level was at

10   the national percentile of 82, so better than 82 percent of

11   peers nationally.

12   Q.   And his composite score, what grade level was he

13   performing at as reflected on this assessment?

14   A.   For the composite score, the grade equivalent score was

15   10.4, so that would suggest someone near the middle, perhaps,

16   of tenth grade, and -- yes.  Uh-huh.

17   Q.   And his percentile rank for reading comprehension was --

18   A.   Again, that was 82.

19   Q.   -- 82.  Are you in the plaintiff's exhibits?

20   A.   Yes.

21   Q.   Let's look quickly at the performance reports and testing

22   summaries from Dr. Beach.

23   A.   Okay.

24   Q.   Are you familiar with those testing summaries?

25   A.   I am.

1    Q.   And if you look at the page that has PX37 at the bottom?

2    A.   In which tab?

3    Q.   It is in Tab 5.

4    A.   Okay.  Let me get there.  Okay.  I'm in Tab 5.  I'm

5    sorry, the page number again?

6    Q.   I'm going to ask you about pages 38 and 39.

7    A.   Okay.

8    Q.   Yesterday Dr. Beach testified about the performance

9    results on the Gray Oral Reading Test, which showed percentile

10   ranks of one, reading rate, reading accuracy, and reading

11   fluency.  And then she also discussed the reading rate on the

12   Nelson-Denny where there was, again, a one percentile rank?

13   A.   Yes.

14   Q.   What was your reaction to this information?

15   A.   When I reviewed this information, I was stunned to see

16   scores this low in the context of other information in the

17   file.

18   Q.   And what is that other information?

19   A.   Some of the information was prior test scores from

20   diagnostic evaluations.  The other information that really

21   provided stunning context was real world test performance.

22   Q.   Why does real world test performance, what does that tell

23   you?

24   A.   Performance on testing taken outside of diagnostic

25   contexts.

1   Q.   And is there any assumption about motivational levels in

2   that context?

3   A.   In the real world testing, the assumption is that the

4   person has incentive to try their best to get the highest

5   score possible.  There are often consequences.  So for

6   instance, if you're taking the PSAT, the PSAT is used for

7   national merit scholarships.  If you're taking, you know, the

8   SAT, then college admission is a consequence.  So real world

9   testing really provides a context in which motivation tends to

10  be relatively high.

11  Q.   And why did you find this information to be so startling

12  relative to what you had seen in the earlier assessments and

13  the real world context?

14  A.   It was extremely inconsistent with those other things.

15  So for instance, looking at the Nelson-Denny.  If you look at

16  the Nelson-Denny on PX39, we can look at the first reading

17  comprehension score, the scale score was 150, the percentile

18  rank was one, the approximate grade equivalent was 4.1.  4.1

19  would be the estimated performance of someone who is just

20  starting fourth grade.

21       So the idea is that the person, in this case Mr. Berger,

22  has obtained a score that is typical for how the estimated

23  beginning fourth grader would perform on this test.  Now, this

24  test involves reading passages and answering multiple choice

25  questions about them.

1    Q.   How long are the passages?

2    A.   On the Nelson-Denny, they vary.  So the first passage is

3    kind of lengthy, it goes for a full page, single-spaced.  The

4    other passages are about half a page.

5    Q.   And I think there was testimony that there are 38

6    questions on the Nelson-Denny?

7    A.   There are.  Each passage has between perhaps four and

8    eight multiple choice questions associated with it.

9    Q.   And do you have any information on how common it is for

10   someone not to answer all the questions on the Nelson-Denny?

11   A.   It's very common.

12   Q.   So the fact if someone hasn't answered all the questions

13   on the Nelson-Denny, that's not indicative necessarily of a

14   learning issue?

15   A.   It's meaningless with regard to learning issues.  It's

16   about half of postsecondary students, according to the

17   Nelson-Denny's own technical data, did not finish the

18   comprehension portion when the test was being developed.

19   Q.   And you mentioned postsecondary, so that's not the

20   average person, that's even at the postsecondary level?

21   A.   Students who are enrolled in colleges.

22   Q.   Were not finishing all of these?

23   A.   Precisely.

24   Q.   Is this a score that you likewise found to be

25   inconsistent with information you saw in the record?

LOVETT - DIRECT                    2-217

1    A.   Absolutely.  So if Mr. Berger's timed reading

2    comprehension skills, on a test that involves reading passages

3    and answering questions about those passages, was at the

4    estimated level of a beginning fourth grader, I would never

5    expect someone like that to be able to perform in the average

6    range, for instance, on the MCAT verbal reasoning section,

7    which involved reading passages and answering multiple choice

8    questions about them.  That would be just one example of an

9    inconsistency.

10   Q.   Let's look at the summaries from the next assessment,

11   which was 2013.  And this is Exhibit 6.  If you would look,

12   please, at page 123.

13   A.   Okay.  I'm there.

14   Q.   I believe questions were asked about, on the Wechsler

15   Index, working memory and processing speed?

16   A.   Yes.

17   Q.   Shown here at the ninth and second percentiles.  What is

18   your reaction to those?

19   A.   I was very surprised, especially by the processing speed

20   score.

21   Q.   And again, why were you surprised?

22   A.   With regard to the processing speed score, what surprised

23   me most was that Mr. Berger had a history of obtaining average

24   range processing speed scores in multiple prior evaluations.

25   Q.   And that was inconsistent with the performance reflected

1    here?

2    A.   Precisely.  It represented a huge decline.  You know,

3    Mr. Berger not just went from the average range to say below

4    average range, or the range below that, but his score went

5    down to the second percentile, to be better than only two

6    percent of individuals at his age group in the general

7    population.

8        To go from average in processing speed to a score at the

9    second percentile is incredible, absent some sort of thing

10   like a head injury, or if there was some reason why the score

11   was not valid that day.

12           THE COURT:  Can I ask a question --

13           MR. BURGOYNE:  Sure.

14           THE COURT:  -- just specifically about these.  So he

15   has a verbal comprehension of 150, 129, 80.  Are these all

16   separately given tests, or they're all together and they're

17   marking or evaluating these five different areas?

18           THE WITNESS:  They are four different areas, and then

19   the final one, general ability index, is made up of the first

20   two.  So the four areas that the WAIS-IV measures are verbal

21   comprehension, perceptual reasoning, working memory, and

22   processing speed.  And each of those scores is made up of

23   either two or three separate tasks.  And the second half of

24   the page, you'll see the individual tasks listed.

25       So under verbal comprehension, that score 150 was based

1    on Mr. Berger's performance on those three tasks;

2    similarities, vocabulary, and information.

3            THE COURT:  So the information that goes into the

4    working memory is not pulled from the tasks that are on the

5    verbal comprehension?

6            THE WITNESS:  Absolutely.

7            THE COURT:  So they're separate tasks or separate

8    tests on each of those areas?

9            THE WITNESS:  Precisely, for the first four.

10           THE COURT:  Okay.

11   BY MR. BURGOYNE:

12   Q.   Dr. Beach was also asked about the processing speed

13   information --

14   A.   Yes.

15   Q.   -- at the bottom.  And again, that information, those are

16   the, I guess the parts of the assessment that are reflected in

17   the top there?

18   A.   Yes.  The two processing speed tasks at the bottom,

19   symbol search and coding, go into the processing speed score

20   at the top.

21   Q.   And did you have any reaction to those numbers?

22   A.   Well, I know that those numbers would lead to a very low

23   overall processing speed score, so I had the same reaction to

24   them that I did to the overall score, that they were

25   implausibly low given the prior test performance in other

LOVETT - DIRECT                                         2-220

1    evaluations.

2    Q.   There's a discussion on the next page of the Wechsler

3    Memory Scale?

4    A.   Yes.

5    Q.   And do you recall Dr. Beach testifying about these

6    results?

7    A.   I do.

8    Q.   Okay.  First of all, are the percentile ranks on this

9    assessment, are those all in the average or above average

10   range?

11   A.   Yes.  The 25th to the 75th percentile is generally

12   considered average.  And all of Mr. Berger's scores across all

13   of the different many tasks on the WMS, as it's often called,

14   the Wechsler Memory Scale, are in the average range or above.

15   Q.   Would this information be relevant in evaluating one's

16   ability to take an examination like the Step 2 exam?

17   A.   I would find it indirectly somewhat relevant.  If someone

18   was reading a paragraph-long vignette about a patient, and

19   could not even remember what the first sentence had been of

20   the vignette, they might have to go back over and over again

21   and read.  Certainly, these scores suggest that Mr. Berger's

22   memory skills are not substantially limited, they're in the

23   average range or above.

24   Q.   And then in the bottom here, there was a discussion of

25   general ability in that -- it's GAI.  What does that stand

LOVETT - DIRECT                                    2-221

1    for?

2    A.   General ability index.

3    Q.   And to tell you the truth, I wasn't entirely clear what

4    point Dr. Beach was making here, but she was discussing the

5    information on the far right, base rate difference?

6    A.   She was comparing Mr. Berger's scores on the memory scale

7    to his general ability index on the intelligence test.  And so

8    what these analyses indicate is that his memory scores are in

9    the average range, or a little above the average range, but

10   his general ability index was much higher than even that.

11        So his general ability index was 150, and his memory

12   scores on those composites ranged from 102 to 115.  So even

13   though all of those scores are, you know, average or better

14   than average, they still vary.  Some -- the GAI's even higher

15   than the memory scores.

16   Q.   So what does the less than one percent tell us?

17   A.   That suggests that less than one percent of the

18   population show that particular variability.

19   Q.   Does it tell us or is it indicative of Mr. Berger having

20   a learning disability?

21   A.   No, absolutely not.  It's not relevant to a substantial

22   limitation in anything.

23   Q.   Let's look on page 126, and these are scores that

24   Dr. Beach spoke to.  I think one was cognitive efficiency

25   cluster?

1    A.   Yes.

2    Q.   And you see there's a percentile rank of seven, and

3    visual matching and numbers reversed of three and 23?

4    A.   Yes.

5    Q.   Those percentiles, I take it, are below average?

6    A.   Yes.  The numbers reversed is in the low average range;

7    the visual matching score would be low, you know, below even

8    below average range.

9    Q.   Did you have any reaction to those numbers?

10   A.   The visual matching score.  Visual matching is really a

11   type of processing speed.  And it's also listed under the

12   processing speed cluster on the same page.  So it's similar to

13   Mr. Berger's performance on processing speed measures from the

14   Wechsler Intelligence Scale.  And so my reaction was the same

15   as it was to them, that his processing speed being so low is

16   implausible, given the history.

17   Q.   Okay.  And again, that leads in to the discussion of

18   processing speed cluster, where the percentiles were two,

19   three, four, and one?

20   A.   Yes.

21   Q.   And those are numbers that you found to be inconsistent

22   with his historic data?

23   A.   Exactly.

24   Q.   And inconsistent with his real life performance on

25   standardized tests?

LOVETT - DIRECT                                         2-223

1    A.   The processing speed I don't really compare so much to

2    real world tests because processing speed tests are so

3    unusual.  They're clerical tasks, where you have to go quickly

4    as possible, make simple marks or make simple decisions.  So

5    processing speed scores, when they're low, even if they were

6    valid, they wouldn't necessarily indicate any need for

7    additional time on a real world test, and I wouldn't generally

8    compare them that way.

9         So I mainly paid attention to how unusual it was that

10   they were so much lower than they had been in the past.

11   Processing speed scores at least would be expected to be more

12   consistent in the same person from evaluation to evaluation.

13   Q.   Cognitive fluency structure, there was a one as the

14   percentile rank?

15   A.   Yes.

16   Q.   And what was your reaction to that?

17   A.   Geographic the same.  Cognitive fluency tasks are very

18   similar to processing speed tasks, and some of them overlap.

19   Again, rapid picture naming is listed under cognitive fluency,

20   rapid picture naming is listed under processing speed.  It's

21   exactly the same task.  He was only given it once.

22   Q.   Again, would you find that indicative of a learning

23   disability that was relevant to taking --

24   A.   No, and even if the scores were valid, it would not be.

25   Learning disabilities are not defined based on processing

1    speed scores.

2    Q.   The next page, there's academic fluency in the

3    Woodcock-Johnson III test, and there's a score of three?

4    A.   Let me see.  Which score?

5    Q.   Academic fluency on page 127.

6    A.   I see academic fluency on 127.

7    Q.   Yes.  And it's a second percentile?

8    A.   Yes.

9    Q.   Did you have a similar reaction to that piece of

10   information?

11   A.   I did.  Academic fluency is made up -- I should say it's

12   a cluster score.  It's made up of performance on reading

13   fluency, writing fluency, and math fluency, so all together

14   you get an overall estimate of the person's fluency performing

15   academic skills.

16        The academic fluency score led me to then look at the

17   individual scores that made it up; reading fluency, writing

18   fluency, math fluency.  And I noted that the scores in reading

19   and writing fluency in particular, I don't recall math

20   fluency, but reading and writing fluency were lower than they

21   had been on the same measure.  So the exact same measures, the

22   very same edition of the test in the report from Dr. Smith in

23   2010, so they were lower than that.

24        Also I considered those scores against real world

25   performance.  If someone's reading fluency was at the fifth

1    percentile, then I would expect that the MCAT verbal reasoning

2    scores, again, would be a lot lower.

3        If you are not able to read at a typical rate, anywhere

4    near an average rate, and understand what you're reading,

5    which the reading fluency task requires, then verbal reasoning

6    scores on the MCAT should be much lower.

7    Q.   I believe there was testimony that the fifth percentile

8    was reading at the first or second grade level?

9    A.   I don't recall offhand.  I would have to --

10   Q.   You would have to check which level that is?

11   A.   I would.

12   Q.   The next page lists behavior rating inventory of

13   executive function?

14   A.   Yes.

15   Q.   What is that assessment relevant to?

16   A.   The behavior rating inventory of executive functioning is

17   a list of about 80 statements that, in this case, the person

18   themselves, I believe Mr. Berger, rated the degree to which he

19   had problems in areas of executive function.

20       So executive functioning is being able to plan ahead,

21   organize yourself, regulate yourself, inhibit yourself when

22   necessary, things like that.  And the BRIEF, the scale is

23   often used in assessments of ADHD because ADHD is thought to

24   be related to deficits in executive functioning.  So

25   individuals who have ADHD typically show very high rates of

 1    problems in executive functioning.

 2    Q.   And so if you looked at this, does this give you any

 3    sense of whether or not an ADHD diagnosis would be warranted?

 4    A.   It would be relevant, although it's not a measure of core

 5    ADHD symptoms.  So looking at these results, there are a lot

 6    of different scores for different areas of executive function,

 7    and generally on the BRIEF, a standard score of 65 is

 8    considered to be a clinical cutoff to suggest that the person

 9    has clinically significant problems in that area of executive

10    functioning.

11         That translates on average to the 93rd percentile; that

12    in a sense, they have problems in executive functioning that

13    are greater than the problems that 93 percent of the general

14    population has.  So I was surprised, actually, that based on

15    the individual's own ratings, I believe in this case, only one

16    of the many scores was at the clinical level.

17    Q.   And those ratings, are those on the next page?

18    A.   The ratings?

19    Q.   The self-report scales.

20    A.   I believe the BRIEF was self-report.

21    Q.   How about the next page, the Brown Attention Deficit

22    Disorder scales?

23    A.   Those scales were given to two people, so there was a

24    self-report version of the Brown Scales that was given to

25    Mr. Berger, and then there was a collateral that was given to

LOVETT - DIRECT                                        2-227

1    a professor of his, it appears.

2    Q.   Did you form an opinion as to whether or not the ADHD

3    diagnosis was supported by the documentation?

4    A.   I did.

5    Q.   And what was your opinion?

6    A.   I found that there was insufficient evidence to

7    persuasively conclude that ADHD would be present.

8    Q.   Let's look at the test results from 2017.  And they are

9    found on page 211, the bottom PX211.

10   A.   I'm there.

11   Q.   And here Dr. Beach identified at least two fluency and a

12   reading rate score results as significant.  I believe she

13   pointed to reading fluency, and then reading rate, and then

14   also academic fluency at the bottom?

15   A.   Yes.

16   Q.   And she may also have identified some of the broad

17   reading.  But what was your reaction, and what is your

18   reaction to the information shown regarding reading fluency

19   here?

20   A.   This was part of a pattern of data that led to my

21   reaction of being very surprised, and finding the diagnostic

22   test scores implausible and likely invalid, given their

23   inconsistency with past diagnostic testing, as well as their

24   inconsistency with real world test results.

25   Q.   So for reading fluency and the percentile rank here, what

1    does that suggest Mr. Berger's reading fluency is?

2    A.   So percentile rank of one would be better than only one

3    percent of people.  A percentile rank of point one would be

4    better than only point one percent of, in this case, age

5    peers.

6        So the fact that it was less than point one, Dr. Beach

7    essentially concluded that Mr. Berger's reading fluency was

8    worse than 999 people out of 1,000 in the general population

9    at his age group.

10   Q.   And then likewise, for oral reading, the conclusion that

11   she reached based on this was that his oral reading skills

12   were less than 99.5 percent?

13   A.   Precisely, or about that.

14   Q.   And then reading rate, does this information suggest that

15   his reading rate is worse than 99.9 percent of everyone in the

16   general population?

17   A.   At his age group, yes.

18   Q.   And is that facially implausible to you, given the

19   historic testing data you saw?

20   A.   It was and it is.

21   Q.   And is it likewise facially inconsistent with the

22   information regarding his real world performance on tests?

23   A.   I find it so.

24   Q.   And is your answer the same regarding the academic

25   fluency information at the bottom of the page?

1    A.   Yes.

2    Q.   Did you prepare a chart that sort of reflects the

3    performance over time on these fluency assessments?

4    A.   Yes, and some others as well, some Woodcock-Johnson

5    subtests.

6              MR. BURGOYNE:  Your Honor, may I approach the

7    witness?

8              THE COURT:  Yes, you may.

9    Q.   And did you prepare this chart or this graph?

10   A.   I did.

11   Q.   And what is it intended to illustrate?

12   A.   The marked decline in scores on key Woodcock-Johnson

13   diagnostic subtests between 2010 and 2017.

14   Q.   In 2010, that was based upon the data reflected in

15   Dr. Smith's evaluation report?

16   A.   It was.

17   Q.   And then the 2013 and 2017, that reflects diagnostic

18   information provided in Dr. Beach's reports?

19   A.   Yes.

20   Q.   And just walk us through here and tell us what this is

21   intended to illustrate.

22   A.   Well, first we can look at reading fluency.  It's the

23   first listed in the key, the red dots, and that's also what

24   the Court had asked about.  So if we look in 2010, we see that

25   Mr. Berger's score was in the middle of below average range,

1    so not quite, you know, what we might hope for for a

2    particular person of that age, but certainly, you know, not

3    extremely low, or anything like that, so --

4        Then in 2013, that dropped to, I believe it was 75, in

5    the middle of the low range, so something that's very clearly

6    below average.

7        And then in 2017, it went down to I believe 46.  It's

8    relatively rare that people score below even 70.  And so the

9    Woodcock-Johnson doesn't even provide different narrative

10   descriptions of the different ranges as you go points and

11   points below, they just say anything below that is very low,

12   anything below 70.  So it's extremely rare to see a score like

13   46.  It's certainly rare in my experience, and it's rare just

14   psychometrically statistically.

15   Q.  And what are the other dots that you've got here, the

16   other colors?

17   A.  So I have writing fluency, which shows the same trend.

18   Even though it's not as extreme in terms of the drop, it's

19   still very considerable.  So in 2010, the score appears to

20   have been 90.  Ninety is sort of the lowest score in the

21   narrow average range, so it's at the 25th percentile, or about

22   there.

23       And then in 2013, it drops, I feel pretty significantly,

24   to the top of the low range, and then it goes below 70 so,

25   again, you know, on the bottom couple percent of the

1       population by 2017.  This is another very marked decline.  So

2       these two lines, if you will, the red line and the green line,

3       show that Mr. Berger worked more and more slowly on these

4       tasks from 2010 to 2013 to 2017, so, you know.

5           I should mention, on the reading fluency task, you read

6       sentences and say whether each one is true or false as quickly

7       as possible.  You have to read through them and circle Y if

8       it's yes, it's true, and N for no, it's false.  So in 2010, he

9       was able to do that as well as below average range.  He worked

10      much more slowly on that task in 2013, and incredibly slowly

11      in 2017 on that task.

12          For writing fluency, you have to write a simple sentence

13      about a picture and three words.  You have to find out a way

14      to get those three words into a sentence, and you have to do

15      that for sentence after sentence after sentence.  Again, you

16      got a short amount of time to do it, you know, as many

17      sentences as possible.

18          In 2010, he was sort of within the average range, then

19      2013, I think lower, and by 2017, very low.  So this really

20      suggests he worked more and more slowly by definition as the

21      years went by.

22          The other two lines, one is for letter word

23      identification, and one is for spelling.  These are not

24      speed-based tests, really.  They're not -- so they're not

25      severely time pressured, but in some ways, it's even more

1   bizarre to see a decline in these skills.

2        So for instance, in letter word identification, you

3   simply hand the individual a list of words, or you show them

4   on sheets words to read, and the words get more and more

5   difficult.  We start off with simple words, and the words get

6   more and more advanced.  And so wherever that person stops is

7   sort of their level of difficulty when they can't get a

8   certain number right anymore.

9        The idea that someone's letter word identification score

10  would go from the high average range, so better than most

11  people, I mean better than three quarters, more than three

12  quarters of the population, and in 2017 to be in the low

13  range, that score would be better than about maybe five

14  percent of people, that's incredible.  To lose the ability to

15  identify words, without having dementia or amnesia, or

16  something like that, that's amazing.

17       I mean, I don't know that I've ever seen a pattern like

18  that in the work that I've done; research, consulting,

19  education, things like that.  And spelling is similarly not a

20  skill that is typically lost outside of neurologic dysfunction

21  that has a late onset.

22  Q.  Were you present in court when the judge asked

23  Dr. Beach how she might -- what explanation there might exist

24  with regard to, I guess, the decline in reading fluency?

25  A.  I was present.

1    Q.   And did any of those explanations seem accurate or

2    plausible to you?

3    A.   They did not.

4    Q.   Why not?

5    A.   So one thing that Dr. Beach claimed was that the format

6    changed, and even though the Woodcock-Johnson changed

7    editions, it was revised between 2013 and 2017, in fact, the

8    format of the reading fluency subtest did not change at all.

9         So on the Woodcock-Johnson III, there's a list of

10   sentences you have to read as quickly as possible and say

11   whether each is true or false.  The same thing is true on the

12   Woodcock-Johnson IV.  The format is identical.

13        If you were to look at the actual test form, on the first

14   page, the items that you're just to open it, you would not

15   know whether you were looking at the Woodcock-Johnson III or

16   the Woodcock-Johnson IV.  The format is identical, so I have

17   to confess, I do not know what she was referring to when she

18   said that the format changed between those.  That was one of

19   her explanations.

20        The other explanation that was sort of a set of

21   explanations was that the norms had changed.  So whenever you

22   take a diagnostic test like the Woodcock-Johnson, you are

23   compared to norms.  You're compared to a sample of, in this

24   case, aged peers.  Dr. Beach used aged peers.  The idea that

25   the norm changes would affect Mr. Berger's scores to this

LOVETT - DIRECT                                2-234

1    degree is -- I cannot imagine it.  It is frankly absurd.

2        So for instance, even though in 2013 and 2017 he was

3    being compared to different aged peers because he had gotten

4    older -- in 2013, at the time of the evaluation, I believe he

5    was 27.  In 2017, at the time of that evaluation, I believe he

6    was 31 -- the idea that that difference would lead to a huge

7    decline in reading fluency would assume that 31-year-olds in

8    the general population can read much better than 27-year-olds.

9    Standard deviations and standard deviation's better, that

10   makes no sense.

11   Q.  What about the explanation -- and maybe it was the

12   variation on that, that sort of as you get older, you reflect

13   a greater functional impact on these assessments?

14   A.  I think something that was related to the norm changes

15   was that Dr. Beach argued that Mr. Berger had a sort of

16   plateauing of his academic skills.  I don't know that we have

17   good independent evidence for that, outside of these extremely

18   questionable scores, but I believe that the general population

19   has a plateauing of academic skills.  You don't gain the same

20   amount of academic skills between 27 and 31 that you do

21   between seven and 11.  You're not in education learning lots

22   of academic skills.  The idea that your reading skills should

23   increase as much between 27 and 31 as between four years

24   earlier in life doesn't make any sense.

25   Q.  And was there anything to the explanation that this is

1    the type of a change you might see in someone with a learning

2    disability, but it wouldn't necessarily be picked up in people

3    in the general population?

4    A.   Absolutely not.  These are not scores that I would

5    associate with a learning disability.  A learning disability

6    is not something that would show tremendous decline over the

7    course of someone's twenties in terms of their academic

8    skills.  Again, this would be if it's consistent with a

9    disorder, and in this case, I don't believe there's evidence

10   of that.  But if there were a disorder that it were consistent

11   with, it would be some sort of degenerative neurologic

12   problem.

13   Q.   Any other explanation, besides a brain injury or other

14   type of traumatic cognitive impairment, that would lead to

15   this type of a decline?

16   A.   Whenever we see implausibly low scores, one of the things

17   we have to consider is the amount of motivation and effort

18   that someone put towards the test.  So whenever you take a

19   cognitive or achievement test, it's predicated.  The scores

20   are predicated on the idea that you are trying to do your

21   best; that you're putting forth significant effort to obtain

22   the highest score that you can.

23        Sometimes these tests are described as tests of maximal

24   performance, so it's not like a personality test, where you're

25   just trying to be honest.  What's key is that you're trying to

1    do well to obtain the best score that you can.

2        So whenever we see an implausibly low score, one

3    possibility is the person was not showing that motivation, and

4    there are a lot of different reasons why someone's motivation

5    might not be as high as it should be to get a valid score.

6        In this case, again, one thing that has to be considered

7    is that these evaluations took place in the context of

8    accommodation requests.  And so in essence, if Mr. Berger had

9    tried his best and done very well on speeded measures, it was

10   possible that that could undercut accommodations requests.

11   Q.   Are there separate assessments that you can use to

12   evaluate motivation?

13   A.   There are.  There have been tests, a number of tests

14   developed to measure motivation and effort during a diagnostic

15   evaluation because it's widely recognized.  It's a significant

16   problem.

17   Q.   And were any of those assessments administered here?

18   A.   No, none that have been specifically developed for that

19   purpose.

20   Q.   Have you done any research on the extent to which extra

21   time does give someone an unfair advantage?

22   A.   I've done a great deal of research on extended time.

23   I've published mean empirical studies on it, and I've

24   published a review of the literature, one of the three

25   systematic reviews of the literature, because there have been

                                    LOVETT - DIRECT                    2-237

 1    dozens of studies on extended time.

 2    Q.   You haven't done any research specific to the USMLE step

 3    exams?

 4    A.   I haven't been given access to the exams to use in a

 5    study.  I wouldn't turn it down, but --

 6    Q.   As a general proposition, do most people benefit with

 7    extra testing time?

 8    A.   On time-pressured tests, standardized tests, the answer

 9    is yes.  And, you know, an exam that doesn't have a strict

10    time limit, then students with and without disabilities often

11    do not show much benefit from extended time, but on a

12    time-pressured standardized test, the answer is yes.

13         And this is something that doesn't just come from my

14    research.  There have been, again, dozens of studies on this.

15    There have been three systematic reviews of the literature

16    published in peer-reviewed journals, all three found the same

17    thing.  I authored one of those in 2010.  There's a more

18    recent one from 2016, with the very same conclusion.  It is

19    not in dispute when you look at the empirical literature.

20    Q.   There was testimony to the effect that Mr. Berger did

21    better on the shelf exams with extra testing time, and that

22    that somehow suggests the existence of a disability.

23         Does the fact that he did better with extra time on the

24    shelf exams support the proposition that he has a disability?

25    A.   No.  It doesn't argue one way or the other.  I mean,

1     again, most people benefit from extended time with or without

2     a disability on a time-pressured test.  And my understanding

3     is that the shelf is a time-limited measure, and so it would

4     be expected that someone would be better with additional time

5     whether or not they have a disability.

6     Q.   He also testified that he felt a great deal of time

7     pressure on that exam?

8     A.   Yeah.

9     Q.   Is that unusual for an examinee?

10    A.   I can't speak to the shelf exam in particular, but on

11    standardized tests, most postsecondary students feel time

12    pressure.  In a survey that colleagues of mine and I did back

13    in, I think it was published in 2014, we found that 87 percent

14    of students with disabilities and 87 percent of students

15    without disabilities reported that they would do better on an

16    exam if they had 50 percent extended time on a standardized

17    test.

18    Q.   Did the survey address whether they perceived that they

19    had not had sufficient time in testing context?

20    A.   We didn't ask that question directly.  We simply asked

21    whether or not you think you would benefit from various

22    accommodations, and extended time was one of them, and we

23    asked about standardized tests in particular.

24    Q.   There was some testimony this afternoon suggesting that

25    if a college like the University of Cincinnati had provided

1    accommodations to Mr. Berger, then they did that because they

2    were obligated to do that under the ADA or Section 504.  Have

3    you ever been in a college context and evaluated the extent to

4    which students receive accommodations in college?

5    A.   I have.  I worked at one college where I was given

6    access, actually, to the files for research purposes,

7    essentially to do an audit, and for other research purposes to

8    obtain participants for studies if they were interested in

9    participating.  And as a faculty member at other institutions,

10   I certainly have spoken with disabilities services office

11   staff.

12       So even though I don't know about the University of

13   Cincinnati in particular, I've spoken to folks at a number of

14   colleges and universities, and I have a sense of how the

15   process works.

16       My sense is that at the colleges where I have spoken to

17   those folks who know what goes on and where I myself have had

18   some direct access to that, colleges typically have a very low

19   bar, we'll say, for providing accommodations.  There's, you

20   know, no reason essentially for them not to.

21       So the law may provide a floor of what's necessary in

22   terms of who absolutely has to be provided accommodations, but

23   it doesn't say you cannot give accommodations to students

24   beyond that.  And so the fact that someone's obtained

25   accommodations in college is certainly relevant.  It's

1    something that I certainly give considerable weight to, along

2    with other documentation when I make decisions, but it is not

3    determinative based on how I understand that accommodations

4    are often given.

5              MR. BURGOYNE:  Your Honor, that's all I have.  I'd

6    like to offer into evidence -- I don't have a number on it,

7    but the demonstrative aid.  Any objection?

8              MR. WEINER:  No.

9              THE COURT:  That's fine.  You want to give it to

10   Mr. Hill.

11             MR. BURGOYNE:  I will, Your Honor.

12             THE COURT:  Unless you have already marked it.

13             MR. BURGOYNE:  I have not, Your Honor.  I'll do that

14   right now.  No further questions, Your Honor.

15             THE COURT:  Should we power through or take a quick

16   break?

17             MR. WEINER:  I think a quick break would be good.

18             THE COURT:  Ten minutes?

19             MR. WEINER:  That's fine, Your Honor.

20             (Brief recess.)

21             THE COURT:  You may begin.

22             MR. WEINER:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24   BY MR. WEINER:

25   Q.  Good afternoon, Doctor.  We're at the home stretch.

LOVETT - CROSS                                    2-241

1    A.   Good afternoon to you.

2    Q.   Congratulations.

3    A.   Thank you.

4    Q.   One of the things you talked about was real world

5    evidence?

6    A.   Yes.

7    Q.   And in this case, the real world evidence that you were

8    pointing to were the MCAT exams?

9    A.   That was one piece of real world evidence.

10   Q.   Okay.  So that was a -- that's a standardized test, and

11   Mr. Berger took it without accommodations?

12   A.   As I understand it, yes.

13   Q.   All right.  And that was something that you had

14   considered, the results of that, as being contrary to some of

15   the other documentation provided?

16   A.   Yes.

17   Q.   Okay.  And when considering real world evidence, such as

18   performance on standardized exams, you wouldn't just look

19   simply at the result of that exam, correct?

20   A.   You would look at whatever information was available.

21   Q.   Okay.  So in terms of making a determination about

22   disability and considering real world evidence, you would want

23   to know the condition, manner, and duration with which one

24   performed that real world test, correct?

25   A.   With any test, that can be relevant.

LOVETT - CROSS                                    2-242

1    Q.   Okay.  So that's something we can agree on, correct?

2    A.   Yes.

3    Q.   So one of the things you would want to look at is how

4    much study effort the person did compared to most people in

5    the general population, correct?

6    A.   If accurate evidence is available about that, then that

7    certainly could be relevant, potentially.

8    Q.   Okay.  You would also want to know what strategies the

9    person took to maximize their time during an exam.  That would

10   also be real world evidence as part of your consideration,

11   correct?

12   A.   Potentially, yes.

13   Q.   And you'd also want to know, for example, how much of the

14   test the person was able to complete as part of the real world

15   evidence, correct?

16   A.   Potentially, yes.

17   Q.   All right.  And other information you would want to know

18   is what type of mitigating measures the person used when

19   taking a real world test, correct?

20   A.   Potentially, yes.

21   Q.   And as part of your consideration, did you also -- so you

22   consider how well a person did, correct?

23   A.   Yes.

24   Q.   But would you also look at how poorly a person did, for

25   example?

1    A.   How well a person does and how poorly a person does, I

2    would think, are answers to the same question, right?

3    Q.   Yes.  Correct.

4    A.   Yes.

5    Q.   So in this particular case, did you also look at

6    Mr. Berger's performance on the USMLE Step 2 CK, and the

7    second attempt on the USMLE Step 2 CK?

8    A.   I believe I knew the outcomes, but I don't recall that

9    score reports were provided.  I could be wrong.  I'd have to

10   go back.  But I believe I did consider or learned from my 2018

11   writ report, I believe that I did know that he had taken and

12   failed the Step 2 CK.

13   Q.   Okay.  And so that would be something that you would want

14   to consider, that he had failed that test, correct?

15   A.   Potentially.  It depends -- so in this particular case,

16   when someone does poorly on a test that the vast majority of

17   the population is not expected to be able to perform on,

18   that's something that we have to consider.  Substantial

19   limitations are something that I comment on in the context of

20   the general population.

21        If someone's skills are worse than those of most medical

22   students, that doesn't necessarily mean that they're

23   substantially limited in that area.

24   Q.   Okay.  And one thing that you would also consider is what

25   type of study efforts he put forth on the USMLE Step 2 CK,

1    correct?

2    A.   Again, potentially it's part of the evidence that I would

3    examine.  I would certainly review that and consider it.

4    Q.   And one of the other things that you would examine in the

5    real world, for example, is what kind of mitigating measures

6    he utilized when taking the USMLE Step 2 CK, correct?

7    A.   Again, if the information was available, I would consider

8    it when I review a file and make -- draw the conclusions that

9    I draw.

10   Q.   And if he was not able to complete a substantial portion

11   of the exam, that would also be a measure that you would look

12   at in determining a real world or real life circumstance,

13   correct?

14   A.   Potentially, yes.  If there was, you know, accurate

15   credible data about that, then it could be relevant.  Depends

16   on what the exam is, how it would be interpreted, and things

17   like that.

18   Q.   And some of the data that you had reviewed included

19   personal statements, correct?

20   A.   Yes.

21   Q.   And his personal statements did include information about

22   what type of mitigating measures Mr. Berger used when taking

23   the MCAT, correct?

24   A.   I do recall that.  I don't recall the details.  I haven't

25   reviewed that in a while.

1    Q.   And another thing he had stated in his personal statement

2    is that he was unable to complete the PSAT exam when he had

3    taken it; is that correct?

4    A.   Again, I recall that vaguely.  I'll trust you on that

5    one, if that was in the personal statement.

6    Q.   Okay.  And there was a PSAT score report, correct?

7    A.   I do recall reviewing that in my 2018 report.  It wasn't

8    in the initial one, I believe.

9    Q.   And there were instances on the reading comprehension

10   section where there were a number of omissions and blanks

11   towards the end of those assessments, correct?

12   A.   Yes.

13   Q.   And despite those omissions, he was still able to score

14   in the 70th percentile?

15   A.   Approximately, yes.

16   Q.   And the same thing in the math sections.  He had left a

17   lot blank in the math section on the PSAT?

18   A.   I don't recall that as well, but I vaguely recall from

19   our discussion in the courtroom yesterday.

20   Q.   Okay.  And he had scored somewhere in the 76th

21   percentile, I believe, on that?

22   A.   Somewhere in the 70s I recall.

23   Q.   One of the things you had mentioned is that you've done

24   research that essentially is saying that time matters on

25   tests, for example?

1    A.   On timed tests --

2    Q.   Timed tests?

3    A.   -- time matters.

4    Q.   Okay.  And there is some research, however, which says

5    that it only matters for people with learning disabilities,

6    correct?

7    A.   I'm familiar with old research that had given tests that

8    have ceilings, where you can't go beyond a certain amount

9    where the researchers had concluded that.  Those were early

10   studies.  I'm not familiar with any recent data, say, in the

11   past ten years.

12   Q.   I believe the research you're referring to is the

13   research by Dr. Nancy Mathers?

14   A.   Nancy Mathers, I don't -- I'm not familiar with an

15   empirical study that she did showing that time only matters

16   for students with learning disabilities, but you might refresh

17   my memory of a study.  I'm not recalling -- I can recall

18   studies by her related to extended time but not saying that

19   exactly.

20   Q.   And with respect to this particular case, you've done no

21   research with respect to any of the USMLEs as to whether or

22   not time matters, correct?

23   A.   No, I've never done empirical research with the USMLE.

24   Again, I haven't been given access to it.

25   Q.   And the survey that you mentioned was a survey of whether

LOVETT - CROSS                                            2-247

1    or not people felt that time would matter, correct?

2    A.   Precisely.

3    Q.   It didn't actually demonstrate for those individuals on

4    that survey that time mattered, correct?

5    A.   My other studies have done that.

6    Q.   I think you mentioned you don't do evaluations yourself?

7    A.   I don't.

8    Q.   Do you teach people how to do evaluations?

9    A.   I do.  And I'll be doing more of -- currently, I do that

10   more in a limited way, because I teach at SUNY Cortland mostly

11   undergraduate courses, so I do teach some evaluations, and I

12   routinely administer many of these measures in the context of

13   education and training, but it's limited compared to what I'm

14   going to be doing soon.

15   Q.   So is one of the measures that you either teach about or

16   that you've administered yourself the WAIS?

17   A.   Yes.

18   Q.   And another would be the Woodcock-Johnson?

19   A.   Yes.

20   Q.   And these are robust measures that are used in diagnosing

21   various cognitive conditions?

22   A.   Yeah, I think that's a fair characterization in the sense

23   that the Woodcock-Johnson has a cognitive ability and an

24   achievement part.  I think that those can be used as part of

25   the data to diagnose learning disabilities, intellectual

1    disability, and the WAIS for Intellectual Disability

2    Giftedness, so yes.

3    Q.    And these are measures that Dr. Beach had administered?

4    A.    Yes.

5    Q.    And just so I understand, the measures that Dr. Beach

6    administered, are these all considered robust measures of --

7    that are utilized in assessing a person with learning

8    disabilities?

9    A.    Robust isn't a technical term, but maybe I can say that

10   they have higher liability values based on the data and the

11   manuals, and they have a number of sources of evidence for

12   their validity in terms of predicting things.  So I think if

13   that's what you mean by robust --

14   Q.    Yes.

15   A.    -- I would say that.

16   Q.    Thanks for clarifying that.  It's a much better way of

17   saying it.  The tests like the WAIS, or the Woodcock-Johnson,

18   would you, if you had a patient, give the person the

19   assessment, say take it home, fill it out and bring it back

20   into your office?

21   A.    I would not.

22   Q.    Why wouldn't you do that?

23   A.    It would not be possible to know in that case, so I would

24   not have as great confidence, that it was taken under

25   conditions that are appropriate or even by the right person.

1    Q.   All right.  And so part of the hallmark of doing an

2    assessment is that there is the interaction and contact

3    between the evaluator and the individual; is that correct?

4    A.   I haven't said that, but I would agree that an individual

5    evaluation includes that.

6    Q.   Would you also agree that making a diagnosis of a

7    learning disability does require an actual clinical

8    evaluation?

9    A.   To make a diagnosis of a learning disability, a clinical

10   diagnosis, it requires a clinical evaluation, which is

11   something that you're doing in person.

12   Q.   And in this particular case, you have not actually

13   evaluated Mr. Berger?

14   A.   No.

15   Q.   You have not interviewed Mr. Berger; is that correct?

16   A.   No.

17   Q.   Other than the Woodcock-Johnson, which assesses reading,

18   writing, and math, other assessments were administered

19   involving reading; is that correct?

20   A.   Yes.

21   Q.   So for example, in one of Dr. Beach's evaluations, she

22   administered the SATA, correct?

23   A.   The what?

24   Q.   The SATA.

25   A.   Yes.

1    Q.   And that's a timed reading measure?

2    A.   It is.

3    Q.   And another measure that she had administered was the

4    Nelson-Denny Reading Test --

5    A.   Yes.

6    Q.   -- is that correct?

7    A.   Yes.

8    Q.   And so when Dr. Beach had made her diagnosis of a

9    learning disability, she just didn't simply base it on the

10   reading fluency score of the Woodcock-Johnson, she also based

11   it on other assessments; is that correct?

12   A.   Yes.

13   Q.   And that's the way one would go about making those types

14   of diagnoses, correct?

15   A.   Generally, yes.

16   Q.   You wouldn't simply rely on one particular data point,

17   correct?

18   A.   Generally, it's better to use multiple measures.

19   Q.   And the measures that Dr. Beach had administered did show

20   below average scores in multiple measures; is that correct?

21   A.   Mr. Berger obtained below average scores on multiple

22   timed reading measures.

23             MR. WEINER:  No further questions, Your Honor.

24             THE COURT:  Any redirect?

25             MR. BURGOYNE:  Nothing.

```
 1          THE COURT:  Okay.

 2          MR. BURGOYNE:  Do you have any questions, Your Honor.

 3  I know you had some for Dr. Beach.

 4          THE COURT:  At times you make recommendations for

 5  certain accommodations for people who are applying for

 6  accommodations, correct?

 7          THE WITNESS:  Yes.

 8          THE COURT:  Assuming that the data and the testing

 9  done by Dr. Beach is considered valid, what type of

10  accommodations would you recommend?

11          THE WITNESS:  Some of the scores, which are below the

12  average range on timed measures of reading, could suggest a

13  need for additional time if there was other evidence in the

14  file that was consistent with that.

15     So it's not just a matter of the scores being valid,

16  there would have to be additional data as well.  But extended

17  time is an accommodation that would be relevant for

18  individuals who have really slow reading ability.

19          THE COURT:  Any follow-up questions by counsel?

20          MR. WEINER:  No, Your Honor.

21          THE COURT:  That's the only question I had.  Okay.

22  You may step down.  Thank you.

23          THE WITNESS:  Thank you.

24          (Witness excused.)

25          THE COURT:  Mr. Burgoyne, any other witnesses?
```

1    MR. BURGOYNE:  No other witnesses Your Honor.

2    THE COURT:  Okay.  Should we go through exhibits,

3    then?

4    MR. BURGOYNE:  Your Honor, neither one of us has any

5    objection to your considering anything that was in the two

6    sets of exhibits that we've given to you.

7    THE COURT:  That makes it easy.

8    MR. BURGOYNE:  Does that keep it simple?

9    THE COURT:  Yes.  Very good.  So all exhibits are in.

10    Okay.  Let's talk about where we go from here.  Do you

11    wish to make a closing argument orally?  Do you wish to submit

12    something to me in writing with proposed findings of fact and

13    conclusions of law?

14    MR. BURGOYNE:  Well, Your Honor, in the ordinary

15    course, I would go submitting something to you in writing with

16    proposed findings and conclusions of law.  The challenge is

17    that would best be done with a copy of the transcript, and I

18    don't know what -- I haven't worked back to look at our time

19    frame here.

20    THE COURT:  Right.  And you know, I was looking back

21    through my notes, and I'm not sure that we decided -- and

22    honestly, I have another case where I had a preliminary

23    injunction where I had to do a report and recommendation, so

24    timing was -- and I'm not sure if you were the two that said

25    you would give a week for objections to any R&R?  You did say

1    that?

2            MR. BURGOYNE:  I did.

3            THE COURT:  Okay.  Well, that makes that easy.  It

4    wasn't the other guys.  Okay.  So that's one piece of it.  So

5    let's work back.  Judge Dlott has told me she needs a week.

6    So realistically, the test is on the 28th, correct, or the

7    29th?

8            MR. BURGOYNE:  He's not registered to test.  I think

9    that is the date he has said he has to test by.

10           MR. WEINER:  And part of the -- so there's not a date

11   that the test is given.  It's when you register, and that's

12   part of the complexity here.  If NBME granted the

13   accommodation, then ECFMG would then enable Mr. Berger to

14   schedule the exam.

15     The issue that we have is that we need the score by, I

16   think October 3rd, something around that.  So whenever NBME

17   would be able to score the exam, then that predicts the date.

18           THE COURT:  So everybody doesn't sit for the exam at

19   the same time?

20           MR. BURGOYNE:  No.  You can take the exam virtually

21   daily.  There is no magic to that date.  In our view, there's

22   no magic.

23           THE COURT:  Okay.  That was my misunderstanding.  I

24   thought everybody was sitting for the exam on that date.

25           MR. BURGOYNE:  No.  So he could test in November, he

1    could test, you know, in September.  I mean, there's all sorts

2    of dates when he could test, so --

3         MR. WEINER:  The issue is when it can be scored.  So

4    we think that if he takes it after August 28th, we would not

5    have a score by October 3rd.

6         THE COURT:  Do you all have any control over the

7    scoring?

8         MR. BURGOYNE:  We have a vendor that administers and

9    does the initial part of the scoring, so I don't have a firm

10   answer.  I think we could always say to the vendor could you

11   please expedite this, but my guess is -- my guess is it

12   wouldn't have to be taken on August whatever his date is even

13   to get the score by their date; but again, there's no magic to

14   that date, that's just when he wants to start interviewing.

15        THE COURT:  No, I understand.  I understand.  I'm

16   trying to be conservative, but it sounds like if you all were

17   able to expedite the scoring, then perhaps the deadlines

18   aren't as soon as I think they are.

19        MR. BURGOYNE:  Your Honor, why don't I check on that

20   and send you an email that tells you.

21        THE COURT:  Okay.

22        MR. BURGOYNE:  Would that be helpful, and then you'll

23   know?

24        THE COURT:  Yes.  And then if you all wanted to do

25   proposed findings of fact and conclusions of law in writing,

1    we could do that, or you could take a shot at it without the

2    transcript.

3         MR. BURGOYNE:  Would that help you, Your Honor, to

4    have proposed findings?

5         THE COURT:  I think it would.  There's just a lot of

6    information, a lot of it is technical, and I'm trying to

7    absorb it all.  I think I'm getting a hang of it, but you all

8    have been living with this case for a while, so --

9         MR. BURGOYNE:  Why don't I get together with

10   Mr. Weiner and we try to propose a schedule?

11        THE COURT:  Perfect.

12        MR. WEINER:  The one thing I think we're clear on is

13   we don't need to do closings here.

14        THE COURT:  Okay.

15        MR. BURGOYNE:  That works?

16        THE COURT:  Yes.  Propose a schedule, and just know

17   that if you all agree to a week for objections to a report and

18   recommendation, and Judge Dlott has said she needs a week

19   before the test, or she needs a week to review everything to

20   make a decision.  So if you could just keep those two things

21   in mind, then I'm open to what you want to propose.

22        MR. BURGOYNE:  Great.  Thank you, Your Honor.

23        MR. WEINER:  Thank you, Your Honor.

24        THE COURT:  Okay.  Thank you.

25        MR. BURGOYNE:  You have been really paying attention.

1    Thanks.

2             THE COURT:  Thank you.  All right.  Take care all.

3             (Proceedings concluded at 5:02 p.m.)

4                        -  -  -

5

6             C E R T I F I C A T E

7                        -  -  -

8    I, M. Sue Lopreato, the undersigned, certify that the

9    foregoing is a correct transcript from the record of

10   proceedings in the above-entitled matter.

11

12

13                    /s/ M. Sue Lopreato
                      M. Sue Lopreato
14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

```
1                        I N D E X

2
                                                  PAGE
3
   CHERYL BEACH, Ph.D.
4
   Continued cross by Mr. Burgoyne....................    2
5  Redirect by Mr. Weiner...........................   100
   Recross by Mr. Burgoyne..........................   114
6  Further Redirect by Mr. Weiner...................   118

7  CATHERINE FARMER, Psy.D.

8  Direct by Mr. Burgoyne...........................   122
   Cross by Mr. Weiner..............................   125
9  Redirect by Mr. Burgoyne.........................   158
   Recross by Mr. Weiner............................   161
10
   SAMUEL O. ORTIZ, Ph.D.
11
   Direct by Mr. Burgoyne...........................   162
12 Cross by Mr. Weiner..............................   189

13

14 BENJAMIN J. LOVETT, Ph.D.

   Direct by Mr. Burgoyne...........................   200
15 Cross by Mr. Weiner..............................   240

16

17

18

19

20

21

22

23

24

25
```