**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

|  |  |  |
|---|---|---|
| _____ | ) | |
| **BRENDAN J. BERGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 1:19cv00099** |
| | ) | |
| | ) | **Magistrate Judge: Hon. Karen L. Litkovitz** |
| **NATIONAL BOARD OF** | ) | |
| **MEDICAL EXAMINERS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Defendant National Board of Medical Examiners respectfully submits the following proposed findings of fact and conclusions of law:

## INTRODUCTION

Plaintiff Brendan Berger alleges in this action that the National Board of Medical Examiners ("NBME") violated the Americans with Disabilities Act ("ADA") by not giving him extra testing time and other accommodations on one of the Step exams that make up the United States Medical Licensing Examination ("USMLE"). On July 3, 2019, he filed a motion for a preliminary injunction. (Doc. 20). The Court held an evidentiary hearing on July 29 and 30, 2019 (Doc. 29).

Mindful that a preliminary injunction is an "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008), to be awarded only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008), the Court denies Mr. Berger's motion based upon the following findings of fact and conclusions of law.

## FINDINGS OF FACT

A.      **Parties**

1.   NBME is a non-profit corporation whose mission is to protect the health of the public by providing standardized, state-of-the-art assessments for health professionals. Declaration of Catherine Farmer, Psy.D. ¶ 3 (DX 23).

2.   Together with the Federation of State Medical Boards, NBME has established the United States Medical Licensing Examination, or "USMLE."  The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.  Farmer Decl. ¶ 4 (DX 23).

3.   Brendan Berger ("Mr. Berger" or "Brendan") is on a leave of absence from the American University of the Caribbean School of Medicine ("AUC").  He completed his classes and his clinical rotations in April 2016.   Decl. of B. Berger ¶ 1 (Doc. 20-2).

4.   Among other graduation requirements, Mr. Berger must pass the USMLE Step 1, Step 2 Clinical Skills (Step 2 CS), and Step 2 Clinical Knowledge (Step 2 CK) examinations.  He passed the Step 1 and Step 2 CS exams, without accommodations.  He has taken but not yet passed the Step 2 CK exam.

5.    Mr. Berger claims to be disabled under the ADA and entitled to extra testing time based upon diagnoses that he received, as an adult, of a Specific Learning Disability with Impairment in Reading (DSM-5, 315.00), and Attention Deficit Hyperactivity Disorder ("ADHD") (DSM-314.00).  *See* Psychological and Educational Re-evaluation Report at 42 (2017) (PX 8 at PX000199); Pl.'s Motion for Preliminary Injunction ¶ 2 (July 3, 2019) (Doc. 20); Hearing Transcript 2-62:23 - 2-63:25 (Doc. 33) ("Tr.").  NBME denies that Mr. Berger is disabled within the meaning of the ADA or entitled to accommodations.

**B.**     <u>The United States Medical Licensing Examination</u>

6.     There are three "Steps" to the USMLE, all of which must be passed before a physician with an M.D. degree is eligible to apply for an unrestricted license to practice medicine in the United States. **Step 1** is a one-day, computer-based, multiple-choice examination that assesses understanding and application of basic science concepts important to the practice of medicine. **Step 2** has two components: **Step 2 CS** (Clinical Skills) and **Step 2 CK** (Clinical Knowledge). Step 2 CS uses standardized patients to assess an examinee's ability to gather information from patients, perform physical examinations, and communicate his or her findings. Step 2 CK is a one-day, computer-based, multiple-choice examination that assesses the application of medical knowledge, skills, and understanding of clinical science for the provision of patient care under supervision. **Step 3** is a two-day, computer-based examination that assesses whether examinees can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine. *See* Farmer Decl. ¶ 6 (DX 23).

7.     Medical licensing authorities across the country rely upon the USMLE as part of their licensure process for ensuring the qualifications of prospective physicians. *Id.* ¶ 5 (DX 23).

8.     This case involves the USMLE Step 2 CK examination.

9.     Like the other Step exams, the Step 2 CK exam is a standardized examination. *Id.* ¶ 7 (DX 23). "When directions, testing conditions, and scoring follow the same detailed procedures for all test takers, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the test taker's knowledge, skills, abilities, or other personal characteristics, standardization helps to ensure that all test takers have the same opportunity to demonstrate their competencies." *Standards for Educational & Psychological Testing* at 111 (2014).

C.     **Testing Accommodations on the USMLE Exams**

10.     NBME provides testing accommodations on the USMLE to individuals who have a physical or mental impairment that substantially limits their ability to perform one or more major life activities that are relevant when taking a USMLE examination. USMLE Accommodation Policies (PX 56 at PX000427). Depending upon the disability, the accommodations might include additional break time, a scribe to assist with keyboard tasks, an audio version of the test, or extra testing time. *Id.* (PX000428).

11.     NBME's accommodation process is intended to ensure that individuals who have disabilities within the meaning of the ADA receive reasonable accommodations, and that accommodations are not provided when they have not been shown to be warranted.  Unwarranted accommodations can affect the reliability of test scores and provide a licensure candidate with an unfair advantage over other candidates.   Farmer Decl. ¶ 9 (DX 23).

12.     NBME employs three individuals who are trained at the doctoral level in psychology and additional administrative staff to review accommodation requests, communicate with candidates, and coordinate approved accommodations. Tr. 2-126 (Doc. 33).  Dr. Catherine Farmer is the Director of Disability Services for NBME.   Tr. 2-122 (Doc. 33).

13.     NBME's standard practice is to process accommodation requests in the order in which they are received.  It does not begin reviewing a request, however, until it has received all supporting documentation. Tr. 2-123:10-15 (Doc. 33).  An examinee's registration status can also affect the turnaround time on an accommodation request.  Tr. 2-123:23 - 2-124:11.

14.     NBME routinely seeks input from independent, external professionals who have expertise in the impairment that is identified as the basis for a candidate's accommodation request. Tr. 2-123:18 - 123:22 (Doc. 33).  The external experts are asked to review all the candidate's documentation and then address three questions:  (i) does the documentation confirm the existence

of an impairment; (ii) if so, does the impairment substantially limit the candidate's ability to perform one or more major life activities that are relevant when taking a USMLE exam; and (iii) if so, are the accommodations requested by the candidate reasonable – that is, will they enable the candidate to take the exam in an accessible manner, notwithstanding his or her disability? Declaration of Benjamin J. Lovett, Ph.D., ¶ 6 (DX 24).

15.     External reviewers make recommendations to NBME on whether a given accommodation request should be granted.  NBME makes the final decision, however.  Tr. 2-123:19 - 123:22 (Doc. 33).

16.     According to Dr. Lovett, one of the experts who NBME consulted regarding Mr. Berger's accommodation request, "[i]t is common practice for testing entities to seek input from external experts regarding disability-based accommodation requests."  Lovett Decl. ¶ 6 (DX 24). Dr. Lovett stated that "[t]he practice of reviewing supporting documentation and providing an opinion is both well established and professionally sound."  *Id.*

17.     The Court agrees that it is reasonable for testing entities like NBME to seek input from external professionals who base their opinions and recommendations on a review of the documentation submitted by a candidate, without personally examining the candidate. Indeed, Mr. Berger's supporting professional, Dr. Cheryl Beach, engaged in a similar practice when she served as a Medical Expert for the Social Security Administration, Office of Hearing and Appeals.  Dr. Beach would "[r]eview medical evidence in the record, summarize the content of evaluations completed by all disciplines involved in the assessment of the individual to the SSA hearing officer, [and] provide [her] expert opinion and recommendation" regarding whether the "individual legally qualifies as a person who has a disability under the Social Security Act."  CV of Dr. Beach at 11 (PX 63 at PX000512).  Dr. Beach testified that she did not personally examine

the individuals who were seeking benefits; that the impairments she evaluated included learning disabilities, ADHD, and other mental impairments; and that her review of the candidate's records put her in a position to provide an opinion and make a recommendation to the administrative law judge regarding whether the individual met the applicable standard for being disabled.  Tr. 258-59 (Doc. 30).

18.     In 2011 (after enactment of the ADA Amendments Act), the United States Department of Justice ("DOJ") acknowledged NBME's right to seek input from external professionals and to rely upon the opinions and recommendations of those professionals rather than a candidate's supporting professional, so long as NBME explains its reason for doing so.  *See* Settlement Agreement Between NBME and DOJ ¶ 17 (Feb. 23, 2011) (available at https://www.ada.gov/nbme.htm).  As stated in that Agreement, NBME "is not required to defer to the conclusions or recommendations of an applicant's supporting professional."  *Id.*  DOJ has enforcement authority under Title III of the ADA, which is the Title applicable here.

D.     **Mr. Berger's Testing History on the USMLE**

19.     Mr. Berger passed the Step 1 exam on his first attempt.  The passing score was 192, and he achieved a score of 198.  Step 1 Score Report (March 28, 2014) (DX 16 at 1).  As noted above, Step 1 is a multiple-choice examination, taken on a computer, and lasting a full day under standard time conditions.

20.     Mr. Berger took Step 1 under standard conditions, with no extra testing time or other accommodations.  Tr. 86 (Doc. 30).

21.     Mr. Berger testified that, although he achieved a passing score on Step 1, he did so by reading only the last sentence or two of each question.  According to Mr. Berger, this test-taking strategy was necessary to overcome the time constraints caused by his alleged impairments.  Tr. 87 (Doc. 30); *see also* Re-evaluation Report from Dr. Beach at 10 (2015) ("2015 Beach Report")

(PX 8 at PX000142) ("[F]or almost all of the Step 1 test items, he literally read only the last sentence of the question and then marked his answer.").

22.     Mr. Berger testified that Step 1 is an extremely demanding exam.  Tr. 146 (Doc. 30).  Based upon its review of the sample Step 1 questions in the record, the Court finds it implausible that Mr. Berger was able to achieve a passing score on Step 1 by employing the test-taking strategy that he described.  For virtually all the sample questions, an examinee would not be able to choose the right answer by reading only the last sentence and ignoring the information that preceded it.  Instead, short of guessing from among the four or five answer choices provided for each question (a strategy that likewise could not reasonably be expected to result in a passing score), an examinee would need to read the entire question to provide a correct answer.  *See, e.g.,* Step 1 Sample Questions (DX 23G) at 11, Q.12 ("This patient most likely ingested which of the following drugs?"); 15, Q.26 ("Which of the following is the most likely diagnosis?"); 16, Q.31 ("Which of the following is the most likely diagnosis?"); 17, Q.33 ("Which of the following is the most likely cause of this patient's condition?"); 21, Q.44 ("Physical examination is most likely to show which of the following findings?"); 26, Q.65 ("Which of the following is the most appropriate pharmacotherapy?"); 27, Q.70 ("Which of the following processes is most likely to be involved?"); 42, Q.113 ("Which of the following is the most likely outcome of this patient's infection?").

23.     Immediately after taking Step 1, Mr. Berger sent an email to Dr. Beach saying that he "did well with time management" on the exam.  Email (April 2, 2014) (DX 14 at CMB-PI-0010).  He did not suggest that he read only the last sentence of each question or that he randomly guessed at answers.  Tr. 149-150 (Doc. 30).  It is thus reasonable to conclude that his passing score on the Step 1 exam reflected the work he put into preparing for the exam and his reading entire

questions, not the test-taking strategy that he and Dr. Beach described.

24.     Mr. Berger took the Step 2 CS exam for the first time on April 13, 2016.  Step 2 CS requires only limited reading (a short summary of each patient's history on the door to the examination room).  Tr. 152 (Doc. 30).

25.     Mr. Berger received a failing result on the Communication and Interpersonal Skills subcomponent of Step 2 CS, which involves no reading.  Tr. 152-53 (Doc. 30).  As a result, he achieved an overall failing outcome.  Step 2 CS Score Report (Apr. 13, 2016) (DX 16 at 3-4). Mr. Berger took Step 2 CS a second time on August 17, 2016.  Although his performance on two of the three subcomponents was "Borderline," he received a passing outcome.  *See* Step 2 CS Score Report (Aug. 17, 2016) (DX 16 at 5-6).

26.     Mr. Berger took the Step 2 CS exams under standard conditions, with no extra testing time or other accommodations.   Tr. 153 (Doc. 30).

27.     Mr. Berger has taken the Step 2 CK exam twice, under standard testing conditions. He did not achieve a passing score on either attempt, but his score improved the second time.  Step 2 CK Score Reports (DX 16 at 7-10).

28.     Mr. Berger testified that his medical school has a relatively high pass rate for first-time test takers on the Step 2 CK exam.  Tr. 107-08 (Doc. 30).  To the extent this testimony was intended to suggest that his failure to pass Step 2 CK on his first and second attempts shows that he is disabled, the Court does not agree.  The evidence indicates that many international medical school graduates (IMG's) do not pass the Step 2 CK exam on their first attempt -- presumably for any number of reasons that have nothing to do with whether the examinees have disabilities.  *See* ECFMG Fact Card (DX 20) (noting a failure rate of 20% for IMGs).  Consistent with that fact, Mr.  Berger's  medical  school  gives  its  students  *six*  opportunities  to  pass

Step 2 CK before they are subject to academic dismissal, provided they pass within 7 years of matriculating.  AUC Student Handbook at 100-01 (DX 21B).  There is no basis for concluding that a student's need to take Step 2 CK multiple times reflects that the student has a disability.

E.     **Mr. Berger's Requests for Accommodations on the USMLE**

29.     Mr. Berger requested accommodations on Step 1 (50% additional testing time, extra break time, testing over two days, distraction-reduced setting, and a test reader or recording); Step 2 CS (two extra minutes per patient encounter and ten extra minutes per post-examination note), and Step 2 CK (50% additional testing time with his first request, 100% additional testing time with his second request; plus -- with both requests -- extra break time, testing over two days, distraction-reduced setting, and a test reader or recording).  See Farmer Decl. ¶¶ 11, 15, 20 (DX 23).

30.     NBME concluded in each instance that Mr. Berger had not shown that he has a disability within the meaning of the ADA that warrants accommodations.  *Id.* ¶¶ 12-13, 16, 21-23. NBME informed Mr. Berger of its decisions in letters dated December 23, 2013, July 24, 2015, and May 27, 2018.  *Id.*, Exs. B, D and F (DX 23B, DX 23D and DX 23F).

31.     NBME consulted two external professionals regarding Mr. Berger's accommodation requests, Dr. Benjamin Lovett and Dr. Samuel Ortiz.  *Id.* ¶¶ 12-13, 21-22, 24 (DX 23).  Both concluded that Mr. Berger's supporting documentation did not establish that he has a disability that warrants testing accommodations.  *Id.; see also* Lovett Decl., Exs. 2, 3 (DX 24-2, DX 24-3); Decl. of Samuel O. Ortiz, Ph.D., Ex. B (DX 22B).

32.     NBME tries to make accommodation decisions within 60 days. Tr. 2-123:10-123:12 (Doc. 33).  The processing time for each of Mr. Berger's requests took more than 60 days. The specific reasons are not in the record, but in one instance he supplemented his documentation and in another he was not completely registered.  Tr. 2-125:19 - 125:22.

33.     Mr. Berger's counsel argued during the preliminary injunction hearing that the NBME used "dilatory tactics" in processing Mr. Berger's accommodation requests.  Tr. 8 (Doc. 30).  It is not clear to the Court what NBME would gain from purposefully delaying an accommodation decision.  In all events, there was no evidence that the turn-around time on Mr. Berger's accommodation requests reflected any improper motivation or unlawful action on NBME's part.  *See* Tr. 2-122:25 - 123:4 (Doc. 33).

### F.     Mr. Berger's Speech/Language and Psychoeducational Evaluations

34.     Mr. Berger was seen by Sharon Collins, M.S., when he was in kindergarten because parents were concerned about his language skills.  Ms. Collins administered a limited number of assessments relating to Mr. Berger's articulation skills, language development, auditory processing and ability to remember and reproduce letters in a specific order.  *See* Speech and Language Evaluation Report at 2-3 (PX 16 at PX000239-240).  She did not perform a psychoeducational evaluation.

35.     "Clinical Impressions" are provided in the Collins report, but Ms. Collins did not diagnose any disability.  *See* Collins Report at 3 (PX000240).  As Dr. Beach noted, Ms. Collins was a speech language pathologist, and her clinical impressions would not be a sufficient basis for diagnosing a learning disability.  Tr. 2-29:5 - 2-30:4 (Doc. 33).

36.     Mr. Berger was next evaluated in 1994, when he was in the second grade.  Jeanne Artner, Ph.D. interviewed Mr. Berger and his mother and administered various academic skills assessments.  *See* Psychological Test Report at 1-4 (PX 17 at PX000243-246).  Brendan "earned average range standard scores" and performed at his grade level.  *Id.* at 5 (PX000247).  There were some discrepancies between his academic skills and his Full-Scale IQ that "could lead to him being classified as a student with learning disabilities," *id.*, but Dr. Artner made no such diagnosis. *See id.* at 8-9 (PX000250-51); Lovett Decl. ¶ 32 (DX 24).  Indeed, she recommended that Brendan be

"enrolled in the special classes for gifted and talented students" if he returned to public school. Artner Report at 9 (PX000251).

37.     Dr. Artner mentioned in her report that some of Brendan's behaviors during the evaluation "raised the possibility that he might have Attention Deficit Disorder without Hyperactivity."  *Id*.   She recommended that his mother "discuss the behaviors with a physician" if she had concerns in that regard.  *Id*. at 9 (PX000251).  Dr. Artner did not diagnose Mr. Berger as having ADD or ADHD.

38.     Mr. Berger was next evaluated in early 2003, by Alexander Smith, Ed.D., ABPP. He went to see Dr. Smith when he was a junior in high school because he was "concerned about doing well" on his college admission test and wanted "assistance around documenting any learning disorder so that accommodations might be appropriately applied."  Psychoeducational Evaluation Report at 8 (2003) (PX 23 at PX000267).

39.     Dr. Smith administered a battery of assessments to Mr. Berger that are intended to assist in diagnosing learning and attention disorders. *Id*. (PX000267). Based on those assessments, Dr. Smith concluded that: (i) "Brendan currently functions in the Superior to Average Range of intelligence;" (ii) there were some "discrepancies between ability and achievement in Written Expression;" (iii) based upon those discrepancies, "a case could be made for a learning disability in the area of written language," although his "discrepancy scores do not meet the State of Ohio educational guidelines" for designating a student as having a learning disability; and (iv) the assessment results "help rule out specific attention deficit problems," but further evaluation by a neuropsychologist would be necessary to confirm that conclusion.  *Id.* (PX000267, PX000271, PX000272).

40.     Dr. Smith provided a "suggested diagnosis" of "Learning Disorder of Written

Language 315.2 (DSM-IV)." *Id*. (PX000274).  Now referred to as a Specific Learning Disability with Impairment in Written Expression in the DSM-5, this disorder relates to an individual's *writing* skills (*e.g.*, handwriting, spelling, and/or composing) -- not to impairments in reading.  *See* Tr. 2-41:14 - 42:11; 2-62:18 -62:24; 2-86:5 - 86:19 (Beach testimony).   Dr. Smith did not diagnose Mr. Berger as having a learning disability in reading or ADHD.

41.     Mr. Berger went back to Dr. Smith in 2008 to obtain "an updated psycho-educational re-evaluation that may allow him to seek accommodations" on the Medical College Admission Test ("MCAT").  Psycho-educational Re-evaluation Report at 1 (2008) (PX 29 at PX000292).  According to Dr. Smith's report, Mr. Berger wanted 50% more time "on *essay* portions of the exam."  *Id*. at 3 (PX000294) (emphasis added).

42.     Dr. Smith's 2008 report began by summarizing the findings he made in 2003:  Mr. Berger's "verbal ability was in the superior range, his performance in the average range, [and] his full-scale IQ in the high average range."  *Id*. (PX000293). He then discussed the results from the assessments he administered as part of his latest evaluation.  The WAIS-III results indicated that Mr. Berger continued to function "in the Superior to Very Superior range of intelligence," with some "relative strengths in verbal reasoning and comprehension skills" and some "relative weaknesses in memory and processing speed abilities."  *Id*. (PX000296).  "[R]elative to his overall abilities," Mr. Berger processed "new visual material less efficiently," but "psychometrically" his "scores are still in the average range."  *Id.* (PX000297).  His WIAT-II results showed no issues in the academic areas of Reading or Mathematics.  *Id.* (PX000298).  They did reflect, however, a significant discrepancy between "his overall ability and his use of written language;" although his "Written Language score" fell in the "low average range," it was "significantly below the expected level for his ability."  *Id.*

43. Comparing Mr. Berger to "the average student taking the MCAT," Dr. Smith concluded that Mr. Berger was "eligible, under the ADA, for appropriate accommodations for the MCAT for a learning disability for written language;" and that he "*would be best served by allotting him time and a half for essay questions*." *Id*. (PX000300) (original emphasis).

44. Dr. Smith's 2008 report reflects a diagnosis under the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), Fourth Edition, of "Disorder of Written Expression" (DSM-IV 315.2). *Id.* He did not diagnose Mr. Berger as having ADHD. *See id.* And he did not diagnose Mr. Berger as have a reading learning disorder. *See id.*

45. Dr. Smith assigned a Global Assessment of Functioning ("GAF") score of 94 to Mr. Berger as part of his 2008 diagnosis. *Id.* at 10 (PX000301). According to the DSM-IV, individuals with "psychological, social and occupational functioning" in the range of 91 to 100 have "[n]o symptoms" and exhibit "[s]uperior functioning in a wide range of activities." GAF Scale (DX 23F).

46. Mr. Berger went to see Dr. Smith a third time, in March 2010, after his initial request for accommodations on the MCAT exam was denied by the Association of American Medical Colleges (see discussion *infra*). Dr. Smith administered additional assessments relating to possible learning disorders and ADHD. *See* Addendum for Psycho-educational Evaluation for MCAT Accommodations (2010) (PX 32). Dr. Smith did not include a DSM diagnosis in this report (as he had done in his 2003 and 2008 reports), but he noted that the assessment results reflected "*conditions of impaired and delayed encoding [that] suggest a learning disability affecting reading, math and written expression*," *id.* (PX000314) (original italics), and that "Mr. Berger and his parents ... [had] offered a very plausible and parsimonious explanation by addressing the problem as that of an undiagnosed problem of dyslexia," *id.* (PX000316). Dr. Smith

stated, however, that "[t]hese interpretations are tentative and are certainly not conclusive," ...." *Id.* (PX000317).

47. Mr. Berger submitted Dr. Smith's Addendum to the Association of American Medical Colleges in support of a request for reconsideration of its denial of accommodations on the MCAT. AAMC denied the request, after seeking input from an external expert (see discussion *infra*).

48. Mr. Berger then sought documentation from a new professional, Dr. Cheryl Beach, in mid-May 2010, to submit to AAMC in support of a second reconsideration request. *See* Tr. 83 (Doc. 30); Beach Emails (May 14, 2010) (DX 3).

49. Dr. Beach stated in one of her reports that the Disability Services Office at the University of Cincinnati reached out to her because they were "greatly concerned on Brendan's behalf" when they learned that he had been denied accommodations on the MCAT. 2013 Beach Report at 11 (PX 6 at PX00052). Mr. Berger, however, had a different explanation for how he connected with Dr. Beach. He testified that he went to the UC Disability Services Office when AAMC denied his initial reconsideration request, "explained the situation to them," and asked if they had anybody they could recommend he see for "a more comprehensive evaluation.... And they recommended Dr. Beach." Tr. 83-84; *see also* Tr. 176-77 (Doc. 30). He then called Dr. Beach's office and spoke to one of her staff members. (DX 3).

50. Upon learning that Mr. Berger had called her office, and before talking with him, Dr. Beach instructed a colleague to check the MCAT website to find out "the deadlines for the finished report." Email to E. Yass-Reed (May 14, 2010) (DX 3). She subsequently prepared a "to-do" list that identified documents Mr. Berger should gather to support his reconsideration request and gave him suggestions for a cover letter to AAMC. *See* Brendan To-Do List (DX 4).

51.     On June 3, 2010, Dr. Beach met with Mr. Berger and administered several tests relating to possible learning and attention disorders.  *See* Psychological and Educational Re-Evaluation Report (2010) (PX 5). Her report notes the tests she administered as well as the additional material that she relied upon in making her diagnoses. 2010 Beach Report (PX000012). Those materials included Dr. Smith's 2003 and 2008 reports and 2010 Addendum; Dr. Smith's CV; Ms. Collins' 1992 Speech and Language Evaluation Report; Dr. Artner's 1994 Psychological Evaluation Report; and a letter dated May 28, 2010 from a teacher stating that Mr. Berger had received informal accommodations in her classroom at the St. Gabriel school in the 5th grade.  *Id*.

52.     Dr. Beach's 2010 report diagnosed Mr. Berger as having a Disorder of Written Expression, DSM-IV 315.20 (the same diagnosis that Dr. Smith had given in 2003 and 2008).  *Id.* at 22 (PX000033).  That disorder would not affect Mr. Berger's ability to take the Step 2 CK exam, because Step 2 CK is a multiple-choice exam with no writing component.  Tr. 2-86:5 - 86:19 (Doc. 33).  Dr. Beach also diagnosed Mr. Berger as having a Reading Disorder, DSM IV 315.00.  2010 Beach Report at 22 (PX000033).  She acknowledged at the hearing that she was the first of his evaluators to provide this diagnosis.  Tr. 2-62:23 -2-63:4 (Doc. 33).

53.     Dr. Beach did <u>not</u> diagnose Mr. Berger as having ADHD in her 2010 report.  She performed a "comprehensive" evaluation that included interviewing Mr. Berger and his parents. Tr. 2-22:19 - 23:20; 2-52:13 - 52:23 (Doc. 33).  She administered assessments that relate to diagnosing ADHD.  Tr. 2-51:16 - 52:10.  She reviewed the 1994 report by Dr. Artner that she later described as implicitly providing an ADHD diagnosis, and she reviewed Dr. Smith's 2003 report that she later described as reporting ADHD symptoms. Tr. 2-30:18 - 33:2; 2-34:22 - 35:14; 2-63:8 - 63:23 (Doc. 33).  But, with all that information, she apparently did not find any basis for diagnosing Mr. Berger with ADHD.

54.     Dr. Beach assigned a GAF score of 90 to Mr. Berger's level of functioning in her 2010 report.  *See* 2010 Beach Report at 22 (PX000033).  Under DSM-IV, a GAF score in the range of 81 to 90 reflects "[a]bsent or minimal symptoms (*e.g.*, mild anxiety before an exam)" and "good functioning in all areas."  GAF Scale (DX 21F).

55.     According to Dr. Beach, Mr. Berger presented a "complex" case because "you have a guy who was evaluated at age eight, and he's not evaluated again until he's 17 and a half.  And there is a lot of time in between....  [T]here's a lot of vagueness."  Tr. 2-8:5 - 8:10 (Doc. 33).  She further testified that "even the more recent stuff, **the whole diagnosis question was very unsettled**.  And I felt like, okay, this is a guy that if he's going to request accommodations, or, you know, he needs a diagnosis."  Tr. 2-8:12 - 8:16 (emphasis added).

56.     Mr. Berger submitted Dr. Beach's 2010 Report to AAMC to support his second request for reconsideration.  AAMC again denied his request for accommodations, after receiving input from an external expert (see discussion *infra*).

57.     Mr. Berger went back to Dr. Beach in July 2013, to obtain a report he could  submit in support of accommodations on the USMLE Step 1 exam. Psychological and Educational Re-evaluation Report at 3 (2013) (PX 6 at PX000044).  This time, Dr. Beach diagnosed Mr. Berger with three disorders:  (i) Reading Disorder (DSM-IV 315.00); (ii) Disorder of Written Expression (DSM-IV 315.20); and (iii) Attention Deficit/Hyperactivity Disorder, Primarily Inattentive Type (DSM-IV 314.00).  *Id.* at 65 (PX000106).  She assigned a GAF score of 80 to Mr. Berger's global functioning.  *Id.*  Under DSM-IV, a GAF score in the range of 71 to 80 signifies that an individual experiences "no more than slight impairment in social, occupational, or school functioning," if symptoms are even present.  GAF Scale (DX 21F).

58.     Mr. Berger went back to Dr. Beach again in late 2014, to get an evaluation to

support a request for "disability accommodations for Step 2 of the [USMLE]."  *See* Letter to NBME from Dr. Beach at 1 (Jan. 29, 2015) (PX 7).   She provided the same three diagnoses in her January 2015 evaluation report, and assigned the same GAF score, as she had done in her 2013 report.  *Id*. at 16 (PX000148).

59.    Mr. Berger went back to Dr. Beach again in July 2017, to get an updated evaluation report to submit in support of a renewed request for accommodations on the Step 2 CK exam. *See* Psychological and Educational Re-evaluation Report (2017) (PX 8).

60.    Each of Dr. Beach's multiple reports reflected not merely an evaluation of Mr. Berger, but a collaborative drafting exercise intended to maximize Mr. Berger's chances of being approved for testing accommodations.  *See* Beach Emails (DX 3); Brendan's To-Do List (DX 4); St. Gabriel Letters (DX 6); Draft Personal Statements (DX 7); Beach Handwritten Notes (DX 10, DX 12); Beach and Berger Emails (DX 14).  Mr. Berger reviewed and proposed revisions to Dr. Beach's reports, Dr. Beach provided guidance to Mr. Berger on the documents he should obtain in support of his accommodation requests, and they jointly decided what documents should -- and should not -- be submitted in support of his accommodation requests.  *See, e.g*., Tr. 177-79, 183-84 (Doc. 30); Tr. 2-17:3 - 18:12; 2-88:7 - 91:21 (Doc. 33).   In one instance involving her 2017 report, which recommended that Mr. Berger also be given a recorded version of the Step 2 CK exam, Dr. Beach noted in an email to Mr. Berger that she had added a comment regarding why he had not "requested recorded tests" as an accommodation on exams he took in medical school, saying in her report that Mr. Berger "didn't think this was an option...."  Tr. 2-90:8 - 90:14 (Doc. 33). Dr. Beach stated in her email that this was "more or less true," and she suggested that Mr. Berger make a similar statement in his personal statement.  *Id*.

61.    Dr. Beach testified that she asked Mr. Berger to review her draft reports because

the information in her reports is "important" to the people who review them. Tr. 231 (Doc. 30). According to Dr. Beach, "it's very important to be accurate" when describing a patient's history, and when she does "this type of evaluation," she requires "extensive documented history, not just patient self-report." Tr. 200, 232 (Doc. 30); Tr. 2-2:13 - 2-3:5 (stating that it was a "best practice approach" not to rely solely on a patient's self-report); 2-17:5 - 17:10 ("I'm very concerned about accuracy...."); 2-18:2 ("I really want to be accurate.") (Doc. 33).

62.      Although she testified during the hearing that there was "a lot of vagueness" in the early evaluation reports and that "the whole diagnosis question was very unsettled" even in the more recent evaluations by Dr. Smith, Tr. 2-8:5 - 8:10, 2-8:12 - 8:16 (Doc. 33), Dr. Beach purported to rely on those evaluations in her reports, particularly on the question whether Mr. Berger had been diagnosed with a learning disability or ADHD as a child. *See, e.g*., 2013 Beach Report at 6, 20, 24, 26 (PX 6 at PX00047, PX00061, PX00065, PX00067); 2017 Beach Report at 3 (PX000160) ("Mr. Berger has a lifelong history of extremely slow reading comprehension rate, due to symptom manifestations of a specific learning disorder involving reading and AD/HD; both of these were diagnosed during early childhood (kindergarten and second grade, respectively)...."); *and* 5 (PX000162) (stating that Mr. Berger was "diagnosed with a reading and writing disorder, with dyslexia" in 1992, when he was in kindergarten; and that "AD/HD predominantly inattentive type was diagnosed" in 1994, when he was in the second grade). She presumably pointed to those earlier evaluations because learning disabilities and ADHD are neurologically based, lifelong impairments as to which childhood onset is included in the DSM diagnostic criteria for those disorders. *See, e.g.,* 2010 Beach Report at 4 (PX 5 at PX000015) ("Relevant to DSM-IV criteria [for a learning disorder], there is documentation of childhood symptom onset and diagnosis."); 2013 Beach Report at 73 (PX 6 at PX000114) (noting that DSM-IV criteria for ADHD include a

requirement that there be evidence of "impulsive or inattentive symptoms that cause impairment ... before age of 7 years").

63.     Thus, to support childhood onset here (as referenced in the DSM diagnostic criteria), Dr. Beach stated in her reports and testified at trial that Ms. Collins diagnosed Mr. Berger with a learning disability in 1992, and Dr. Artner diagnosed him with an attention deficit disorder in 1994.  The Court finds, however, that no such diagnoses were made by Ms. Collins or Dr. Artner.  Dr. Beach's testimony is not consistent with the language found in the reports of those earlier evaluators.

64.     Dr. Beach acknowledged that Ms. Collins's 1992 report does not contain an actual diagnosis and that Ms. Collins, a "speech language pathologist," did not have enough information to make a diagnosis.  Tr. 2-29:5 - 30:5 (Doc. 33).  Nevertheless, she testified that it was her "interpretation" that the Collins report "is a diagnosis."  Tr. 2-28:15.  The Court finds no basis for reading Ms. Collins' report in that manner.

65.     Dr. Beach likewise acknowledged that Dr. Artner's report from 1994 contains no actual diagnosis of a learning disability or ADHD, but that it was nonetheless her "interpretation" that Dr. Artner provided those diagnoses in her report.  *See* Tr. 208 - 210 (Doc. 30); Tr. 2-30:18 - 32:4, 2-34:22 - 35:14 (Doc. 33).  According to Dr. Beach, the report should be understood as making such diagnoses because Dr. Artner "put things between the lines" and was trying to "stay in [her] lane."  Tr. 208, 210 (Doc. 30).  Although Dr. Artner was a qualified psychologist, in private practice, and the Bergers went to see her specifically to get an opinion on whether Brendan might have "Dyslexia or some other specific problem" (Artner Report at 1 (PX 17 at PX000243)), Dr. Beach testified that she was "not going to tell the school there's a disability, but she's going to suggest they look at it that way."  *Id*. at 210.  The Court finds no support in the report or elsewhere

for that interpretation. The meaning of Dr. Artner's Report is to be found in what Dr. Artner said and did not say in that report -- not in an interpretation of her true meaning by Dr. Beach, who has never spoken to Dr. Artner regarding Mr. Berger or her report. *See* Tr. 2-31:19 - 32:4 (Doc. 33).

66.     Dr. Beach referenced the 2003 and 2008 evaluations of Dr. Smith in the evaluation reports that she prepared in 2010 and 2013 to support Mr. Berger's requests for accommodations on the MCAT and Step 1 exam. *See* 2010 Beach Report at 7-8 (PX 5 at PX000018-19); 2013 Beach Report at 14-16 (PX 6 at PX000055-57). Her later reports, however, largely ignored the earlier Smith reports, even though both reflected multi-day evaluations of Mr. Berger. *See* 2003 Smith Report at 1 (three days of assessment) (PX 23 at PX000267); 2008 Smith Report at 1 (three days of assessment) (PX 29 at PX000292).

67.     As noted above, the 2003 and 2008 reports by Dr. Smith did not diagnose Mr. Berger with a learning disability in reading or ADHD and thus conflict with Dr. Beach's diagnoses. Dr. Beach testified that Dr. Smith was "staying in [his] lane" by not providing an ADHD diagnosis. Tr. 213; *see also* Tr. 217 ("Dr. Smith ... stays in his lane, and he doesn't diagnose an attention disorder but he says, hey, I see a lot of symptoms....") (Doc. 30). She did not explain, however, why his "lane" did not include providing such a diagnosis. The record indicates that Dr. Smith is a licensed, Board-certified psychologist, and diagnosing ADHD, learning disabilities and emotionally-based learning disorders in children and adults is part of his practice. *See* Request for Reconsideration Form Submitted to AAMC (March 33, 2010) (DX 5 at CMB-0192, 0196); Smith CV (DX 25).

68.     On the question of a learning disability diagnosis, it appears that Dr. Beach simply disagrees with Dr. Smith regarding whether Mr. Berger met the DSM-IV diagnostic criteria for a learning disability. *See* Email from Dr. Beach to Mr. Berger (Jan. 27, 2019) (DX 14 at CMB-PI-

0016) (discussing whether to omit Dr. Smith's 2008 report from the documentation that would be provided to another testing entity in support of a request for accommodations by Mr. Berger); Tr. 2-37:18 - 37:19 ("that's his interpretation of the Ohio LD Guidelines, which I would say are incorrect") (Doc. 33). Dr. Smith concluded that Mr. Berger's verbal ability was in the superior range, his performance was in the average range, and his full-scale IQ was in the high-average range. Tr. 2-42:12 - 43:3 (Doc. 33). Dr. Beach said that her findings "are different" and that, in her opinion, Dr. Smith's findings were not accurate. Tr. 2-43:1 - 43:24.

G.      **Mr. Berger's Educational Background**

69.     Mr. Berger grew up "in a bilingual family" near Cincinnati. 2003 Smith Report (PX 23 at PX000268); Tr. 120, 155-56 (Doc. 30). His mother is American and his father, who is a plastic surgeon, is French. Tr. 19-20 (Doc. 30). His mother is fluent in French, as are his two older sisters. Tr. 26, 119-20 (Doc. 30).

70.     Mr. Berger's mother now lives in Rhode Island. Tr. 19 (Doc. 30). She came to Ohio to testify during the preliminary injunction hearing regarding the extent to which French was spoken in the home when Mr. Berger was growing up. Tr. 19-23 (Doc. 30).

71.     Brendan's father continues to live in the Cincinnati area, Tr. 2-52:20 -52:23 (Doc. 33), but Brendan did not call him as a witness to testify regarding the extent to which French was spoken in the home when he was growing up.

72.     English was the primary language spoken in Brendan's home during childhood and he speaks English fluently. 2010 Beach Report (PX 5 at PX000016).

73.     Brendan and his mother both testified at the hearing that French was "rarely" spoken in the home and that Brendan has only a limited understanding of French. *See* Tr. 21-23, 34, 160 (Doc. 30). However, Dr. Artner's psychological evaluation report from 1993, when Brendan was in the 2nd grade, stated that "French [was] often spoken in the home," and that

Brendan "understands French but does not speak it." Artner Report at 3 (PX 17 at PX000245).

74.     Mr. Berger attended a public school in the first grade.

75.     Mr. Berger was home-schooled by his mother in the second, third and fourth grades. Tr. 39 (Doc. 30).

76.     Dr. Beach suggested in her evaluation reports that Mr. Berger was home-schooled because of the academic difficulties he was experiencing in the first grade. *See, e.g.*, 2015 Beach Report at 5 (PX 7 at PX000137) ("[H]e fell so far behind that in order to have access to the individualized services he needed, and make learning progress, he was educated at home by his mother...."). However, Mr. Berger's two sisters were also home-schooled, and neither one had any learning issues. *See* Artner Report at 3 (PX 17 at PX000245); Tr. 27-28 (Doc. 30).

77.     Mr. Berger resumed his school-based education at the Saint Gabriel Consolidated School in the 5th grade and attended that school through the 8th grade. Tr. 40 (Doc. 30).

78.     Dr. Beach stated in her evaluation reports that Mr. Berger received accommodations throughout his years at St. Gabriel, including extra testing time on exams. *See, e.g.*, 2010 Beach Report at 6 (PX000017) ("[T]here was formal recognition of Brendan's learning disability and he was provided with any needed accommodations throughout his attendance at St. Gabriel (as indicated in a notarized letter to that effect from his fifth-grade teacher.")[1]  She

---

[1] The Court notes that there are questions regarding this letter, based upon the fact that an unsigned version with no letterhead was among the records that Dr. Beach produced in response to a third-party subpoena (DX 6), as well as the letter's use of language that does not resonate as coming from a fifth-grade parochial school teacher -- in general, much less 14 years after she taught Brendan. *See* Letter from Mary Lou Huth (May 28, 2010) (PX 1) ("Although Brendan's IQ placed him in the gifted range, standardized testing indicated a significant discrepancy in performance as compared to ability. It was my understanding at the time that Brendan's difficulties were related to a diagnosis of dyslexia."). Dr. Beach denied that she drafted the letter but said "she wanted to get an advance version of it before she went through the steps of putting it on letterhead and notarizations." *See* Tr. 232 (Doc. 30); Tr. 2-21:18 - 21:22 (Doc. 33). Mr. Berger testified that he is the one who obtained the letter from Ms. Huth, but he also denied drafting it and did not know why Dr. Beach had an unsigned version. Tr. 122-24 (Doc. 30). No finding is necessary on this point, however. Regardless of who authored that letter, the letter addressed nothing beyond Mr. Berger's having been "informally accommodated" in his fifth-grade classroom. (PX 1). It does not support Dr. Beach's

acknowledged at the hearing, however, that her statements in this regard were not accurate, and that she there is no documentation indicating that Mr. Berger was provided accommodations throughout his four years at St. Gabriel.  *See* Tr. 2-54:2 - 55:13 (Doc. 33).  She also acknowledged that St. Gabriel did not provide Mr. Berger with "a reader and scribe for ... tests," which was contrary to what she had said in her 2013 report when she recommended that NBME provide him with "a reader or recorded version of the test in addition to the written version...." 2003 Beach Report at 8, 75 (PX 6 at PX000049, PX000116).

79.     From the 9th grade to the 12th grade, Mr. Berger attended Archbishop Moeller High School, "an academically challenging private parochial school."  2010 Beach Report at 6 (PX 5 at PX000017).  Dr. Beach stated in her evaluation reports that Mr. Berger's "learning disability was documented upon matriculation, and he was eligible for disability services, including extended time for test completion."  *See id.*; *see also* 2015 Beach Report at 9 (PX 7 at PX000141) ("The private high school determined he had a disability from the beginning of his attendance, and continued to provide disability services."); 2017 Beach Report at 3 (PX000160) ("[D]uring high school, he was considered to have a learning disability from the start and offered formally granted accommodations.").  Dr. Beach acknowledged at the hearing, however, that the only document that addresses the issue of his accommodations at Moeller was the March 28, 2007 letter from Jean Kagy, and that she had no conversations to Ms. Kagy relating to this case.   Tr. 2-24:13 - 25:4 (Doc. 33).  Dr. Beach also acknowledged that the letter from Moeller high school did not state that Moeller provided Mr. Berger with "a reader or recorded test material," Tr. 2-78:5 - 79:11, which was contrary to what she had said in her 2013 report when she recommended that NBME provide him with "a reader or recorded version of the test in addition to the written

---

assertion that Ms. Huth confirmed that Mr. Berger received accommodations throughout his time at St. Gabriel.  The letter provided no such confirmation.  *See id*.

version...." 2013 Beach Report at 9, 75 (PX 6 at PX000050, PX000116).

80.     Although Dr. Beach testified that she reads the letter differently, Tr. 2-26:24 - 27:15 (Doc. 33), the letter from Moeller high school that Dr. Beach pointed to as evidencing Mr. Berger's purported receipt of extra testing time throughout his four years in high school (*see, e.g*., 2013 Beach Report at 9 (PX 6 at PX000050)), states Mr. Berger did not start receiving extra testing time at Moeller until the Spring of his junior year, after he received a diagnosis from Dr. Smith of a Learning Disorder of Written Language in January 2003.  *See* Letter from Jane Kagy, Moeller High School, to the Office of Student Disabilities, University of Cincinnati (March 28, 2007) (PX 2); *see also* 2008 Smith Report at 3 ("Following the 2003 assessment, Mr. Berger ... was given extended time to finish tests [by Moeller High School]...."). Mr. Berger testified that Ms. Kagy's letter was accurate.  Tr. 45 (Doc. 30).  Mr. Berger's academic performance at Moeller prior to receiving extra time on tests was not part of the preliminary injunction record.  He presumably did well, however, as he was admitted to and attended the University of Cincinnati.

81.     Mr. Berger graduated from the University of Cincinnati ("UC") in 2009, with a BA degree in Asian Studies and a BS degree in Biology.  Tr. 55 (Doc. 30); UC Transcript (PX 28). He received the following accommodations at UC:  double testing time; a proofreader; and books in digital/audio form.  UC Letter (April 30, 2009) (PX 27); Tr. 54 (Doc. 30) (confirmation by Mr. Berger that UC letter was accurate).  UC did not provide Mr. Berger with "recorded test material" as an accommodation -- contrary to what Dr. Beach asserted when she recommended that NBME provide Mr. Berger with "a recorded version" of the Step 2 CK as an accommodation.  *See* 2017 Beach Report at 50 (PX 8 at PX000207).  Dr. Beach acknowledged during the hearing that the statement her report was not accurate.  Tr. 2-85:21 -86:3 (Doc. 33).

82.     While at UC, Mr. Berger spent a year abroad in Japan, where he learned and became

fluent in Japanese.  Tr. 35, 120 (Doc. 30).

83.     Mr. Berger enrolled in the American University of the Caribbean School of Medicine ("AUC") in 2011 and is currently on an indefinite leave of absence.  Tr. 66 (Doc. 30). He received "time and a half in a reduced distraction environment as his testing accommodation" at AUC.  AUC Letter (May 2013) (PX 10).  Mr. Berger's class rank in the Medical Sciences part of the school's curriculum was 70 out of 92 students, and he graduated with a C+ average (78.97). AUC Transcript (DX 15 at CMB-0522).

**H.     Mr. Berger's Standardized Testing History**

84.     Mr. Berger testified that if he has "standardized conditions on an exam without accommodation, it's almost impossible."  Tr. 33 (Doc. 30).  However, the record shows that he took numerous standardized tests prior to enrolling in medical school, without accommodations, and performed at a very high level.

85.     Mr. Berger took the Stanford Achievement Tests in the 2nd, 3rd, and 4th grades. (PX 18, PX 19, PX 20). *See* Tr. 134-35 (Doc. 30). His Total Reading and Reading Comprehension scores were consistently average to above average, with his total score for the reading subtests "among the highest for the grade" on a nationwide basis when he was in the 4th grade.  (*See* PX 20 at PX000260).   Mr. Berger was being home-schooled in grades 2, 3 and 4.  He took these tests in a group test administration at a local school, without extra testing time or other accommodations. *See* Stanford Achievement Tests Score Reports (PX 18, 19, and 20) (no annotation reflecting non-standard test administration); Lovett Decl. ¶ 17 (DX 24 at 5, ¶ 17); Tr.134-36 (Doc. 30); Tr. 2-79:22 - 81:3; Tr. 2-99:1 - 99:19 (Doc. 33).  Mr. Berger's performance on the Stanford Achievement Tests does not suggest the existence of a learning disability; to the contrary, his score reports evidence reading abilities that range from average to well above average.  *See* Tr. 2-209:12 - 212:6 (Doc. 33).

86.     Mr. Berger took the Iowa Tests of Basic Skills and Cognitive Abilities Test in the 6th grade.  (PX 21).  His total reading score was in the **96th percentile nationally**, and his Composite score was in the 91st percentile nationally.  (*See* PX 21 at PX000262).  His "overall achievement" on the test was "well above average for sixth grade" and reflected the performance of "a typical student in the tenth grade." *Id.*, Ex. 7.  Neither his score report nor any other record suggests that he received accommodations on that test, and Mr. Berger did not testify otherwise at the hearing. *See* Tr. 136 (Doc. 30).  Mr. Berger's performance on the Iowa Tests reflected excellent reading and comprehension skills.  *See* Tr. 2-212:7 - 213:18 (Doc. 33).

87.     Mr. Berger took the PSAT in the 11th grade with no extended time.  Tr. 46 (Doc. 30).  He purportedly ran out of time while testing, as evidenced by the fact that he omitted answers to some questions.  Tr. 48-51 (Doc. 30).  He acknowledged, however, that there was a "guessing penalty" and students were encouraged not to guess, and that his omitted answers did not come only at the end of sections, 138-39 (Doc. 30). Moreover, he scored in the 77th percentile, which means he was in the top 23% of college bound juniors across the country who tested when he did.  PSAT Score Report (DX 24-5).

88.     Mr. Berger took the SAT in 2004 with 50% extra testing time.  Tr. 52 (Doc. 30).  He scored in the 91st percentile nationally on the Reading section of the test.  Tr. 53 (Doc. 30); SAT Score Report (DX 24-8).  The extra testing time accommodation was based not on learning disability involving reading, but on Dr. Smith's 2003 diagnosis of a Learning Disorder of Written Language.  Tr. 139-40 (Doc. 30); 2003 Smith Report (PX 23 at PX000274).

89.     Mr. Berger took the MCAT twice, first in 2009 and again in 2010, both times with no accommodations.  The MCAT is an extremely challenging test, taken by a highly select group

of individuals with exceptional academic credentials.[2] His first score placed him in roughly the 45th-51st percentile of all individuals who tested when he did, and his second score placed him roughly in the 38th-44th percentile. MCAT Score Reports (DX 24-4).

90. Mr. Berger requested accommodations when he took MCAT a second time based upon a learning disability diagnosis (not ADHD). Request (DX 21D). The test administrator, the Association of American Medical Colleges ("AAMC"), denied his request, noting, among other things, that his 2009 "non-accommodated MCAT score was solidly average even compared to the elite group who take the MCAT." *See* AAMC Denial Letter (May 2010) (DX 21E). AAMC had Mr. Berger's entire file reviewed by an "external expert" in the field of learning disabilities, and the external expert concluded that his documentation did not show that he is substantially limited in learning compared to most people; the expert also noted that the 2010 assessment results of Mr. Berger's supporting professional, Dr. Smith, were "extraordinarily incongruous with all other previous test data and academic history." *Id.*

91. Mr. Berger requested reconsideration of AAMC's denial of accommodations in June 2010, supported by a report of additional testing done by Dr. Beach. AAMC again sent his entire file to one of its "external experts for review," and again concluded that accommodations were unwarranted. *See* MCAT Letter at 1 (July 13, 2010) (DX 9 at CMB-0176). AAMC's external reviewer noted, among other things, that Dr. Beach's report included "statements [that] are at odds with known facts," and that there was a "remarkable degree of <u>inconsistency</u> between Dr. Beach's testing and virtually all other assessments that have been conducted" of Mr. Berger. *Id.* at 2 (DX

---

[2] According to the Association of American Medical Colleges ("AAMC"), which administers the MCAT exam, approximately 70,000 students sit for the MCAT each year. *See* MCAT Essentials at 3 (DX 17). Thus, when Mr. Berger scored in the 67.8 - 83.4 percentile range on the Verbal Reasoning section of the MCAT in 2010, he was among the top third, at least, of everyone who took the MCAT that year -- and the MCAT reflects an elite testing group with abilities well above most people in the general population.

9 at CMB-0177) (original emphasis).

92.     Like the USMLE Step 1 and Step 2 CK exams, the MCAT exam is a standardized exam, lasts several hours, contains multiple-choice questions, and is administered on a computer. *See* MCAT Essentials at 3 (DX 17). The purpose of the MCAT "is to test the skills and knowledge that medical educators and physicians have identified as key prerequisites for success in medical school and the practice of medicine," with questions in the Physical Sciences, Biological Sciences, and Verbal Reasoning, as well as two 30-minute essays. *Id*. at 3-5.

93.     A sample MCAT exam was provided to the Court from 2010. (DX 18). Sample questions were also provided to the Court from the USMLE Step 1 and Step 2 exams (DX 23G, DX23H). Mr. Berger testified -- and the Court agrees -- that the question vignettes on the MCAT are comparable to and often greater in length than questions found on the Step 1 and Step 2 CK exams. Tr. 59 ("[P]articularly the verbal section was difficult because it had so much reading.") (Doc. 30).

94.     Mr. Berger's best scores were on the Verbal Reasoning section of the MCAT, where he scored in the 68th-83rd percentile range. 2010 MCAT Score Report (DX 24-4). This is significant, because the Verbal Reasoning section requires the most reading of any section on the MCAT. Tr. 56 (Doc. 30).

95.     Dr. Beach acknowledged that the "MCAT requires fluent, effective, sophisticated reading comprehension skills to accurately interpret conceptually challenging test question statements and multiple-choice answers," and that it is "administered under time-limited conditions." *See* Tr. 2-60:6 - 60:15 (Doc. 33); 2010 Beach Report at 11 (PX 5 at PX000022). She also acknowledged, at least implicitly, that Mr. Berger's performance on the reading-intensive Verbal Reasoning section of the MCAT is particularly significant in evaluating whether Mr.

Berger needs extra testing time on the Step 2 CK exam. *See* 2013 Beach Report at 4, 13 (PX 6 at PX00045, PX00054) (discussing Mr. Berger's 2009 Verbal Reasoning score, which was still average (27th-38th percentile), while ignoring his excellent score on Verbal Reasoning in 2010); *see also* 2010 and 2009 MCAT Score Reports (DX 24-4).

96.     Mr. Berger testified that his test-taking strategy on the verbal section of the 2010 MCAT exam was "to actually not read the passages at all" and "just read the questions" that followed each passage. Tr. 63; *see also* Tr. 65 (stating that his "strategy" was "just reading the questions and not reading the paragraph") (Doc. 30). Here, too, the Court does not find this testimony to be credible, based upon its review of sample Verbal Reasoning questions from the MCAT. See Jan. 2010 MCAT Test Form (DX 18 at 27-42). It is facially implausible that a person could perform well enough to be in the top third of all MCAT examinees on the Verbal Reasoning section by entirely disregarding the one-page passages that contain the facts needed to answer the questions that follow the passages.

97.     Mr. Berger testified that he received accommodations on his medical school subject-matter "Shelf" exams and suggested that he was able to pass because he received extra testing time. Tr. 68-69, 94-95 (Doc. 30).

## CONCLUSIONS OF LAW

### A.     Preliminary Injunction Standard

98.     A preliminary injunction is a "drastic" and "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat'l Res. Def. Council,* 555 U.S. 7, 22 (2008); *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). "'[T]he proof required ... is much more stringent than the proof required to survive a summary judgment motion,'" *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citation omitted), and relief "should be granted only if the movant carries his or her burden that the circumstances clearly demand it,"

*Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). "[T]he party seeking the injunction must establish its case by clear and convincing evidence." *Roe v. Director, Miami Univ., Office of Community Stds.*, No 1:19-cv-136, 2019 WL 1439585, *3 (S.D. Ohio April 1, 2019).

99.     "In determining whether to issue a preliminary injunction, the Court must examine four factors: (1) whether the movant has made a strong likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction." *Overstreet*, 305 F.3d. at 573. The claimed irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006); *see also Winter*, 555 U.S. at 22 ("plaintiffs seeking preliminary relief [must] demonstrate that irreparable harm is *likely* in the absence of an injunction," not merely possible) (original emphasis).

**B.     Mr. Berger Has Not Shown That He Is Likely To Suffer Actual And Imminent Irreparable Harm Absent A Preliminary Injunction**

100.     While all four factors must be considered in evaluating a request for a preliminary injunction, "likelihood of success" and "irreparable harm" are the dominant factors.

101.     As discussed further below, Mr. Berger acknowledged at the hearing that he is not, in fact, facing an actual and imminent risk of irreparable harm. For this reason alone, his motion must be denied.

102.     Mr. Berger argues that the Court should "presume" that he will suffer irreparable harm absent an injunction because he has alleged "a violation of the ADA," which is intended to protect civil rights. Pl. Mem. 16 (Doc. 20-1). The Court disagrees. As shown by numerous ADA cases in which the irreparable harm factor is appropriately included as part of the required analysis

for a preliminary injunction request, many of which are cited in this decision, irreparable harm is not presumed in ADA cases.  *Cf. EEOC v. Anchor Hocking Corp*, 666 F.2d 1037, 1040-42 (6th Cir. 1981) (rejecting argument that irreparable harm should be presumed when the EEOC seeks a preliminary injunction under Title VII of the Civil Rights Act).

103.    Mr. Berger must show -- with record evidence -- that he is "likely" to suffer "actual and imminent" irreparable harm absent a preliminary injunction.  *Abney v. Amgen, Inc*., 443 F.3d 540, 552 (6th Cir. 2006).  He has not made this showing.

104.    Mr. Berger alleged in his preliminary injunction papers that he "must take" Step 2 CK "by August 28, 2019, in order to advance in medical school and to participate in the next residency match."  Pl.'s Mot. for Prel. Inj. ¶ 11 (Doc. 20).  He asserted that he would be irreparably harmed if not granted an injunction because (1) "if he fails the USMLE Step 2 CK a third time, he will be dismissed from AUC and effectively be barred from earning his medical degree;" (2) if he is not allowed to test with his desired accommodations, "he will be placed at a disadvantage of competing for quality residency positions;" and (3) if he does not test by August 28th, "he will lose the extensive time he has invested in preparation for the exam."  Pl. Mem. 17-18 (Doc. 20-1).  These allegations are speculative and fail to establish a risk of imminent irreparable harm.

105.    No evidence was presented that Mr. Berger is about to be removed from medical school.  To the contrary, Mr. Berger acknowledged at the hearing that, given the pendency of this lawsuit, he is under no time deadline by which he must pass the Step 2 CK exam to prevent being dismissed from medical school; his school will allow him to take the Step 2 CK exam at the end of this lawsuit.  Tr. 113-14, 133-34 (Doc. 30); *see also* Letter from AUC Attorney to Mr. Berger's Attorney (Dec. 14, 2018) (DX 21A).

106.    There is no evidence beyond Mr. Berger's assertions that a need for extra testing

time explains his past performance on Step 2 CK, as opposed to a deliberate testing style, his knowledge of the subject matter, misguided test-taking strategies, his test preparation, his mood the days he tested (*e.g.*, was he anxious or depressed), or whether he had a good night's sleep the night before.[3]   For example, he had a class rank of 70 out of 92 students on the Medical Sciences part of his medical school curriculum, suggesting an issue regarding his subject matter mastery. Tr. 167-68 (Doc. 30).  Similarly, he was unable to pass the Comprehensive Clinical Science Exam (CCSE) despite taking it multiple times with his medical school-approved accommodation of 50% extra testing time.  Tr. 130-31 (Doc. 30); *see also* AUC Step 2 CK FAQ's at 3 (DX 21C) (stating that the CCSE "can be a predictor for readiness to take Step 2 CK").  This also suggests an issue with subject matter mastery.  And he failed the Step CS exam the first time he tested because he received a failing score on the communication-skills part of the test, which requires no reading.

107.    There is no evidence that Mr. Berger will pass Step 2 CK if he is granted his requested accommodations or, conversely, that he will fail without accommodations. Other than registering to take the test (which it is not clear that he has done), there is nothing preventing Mr. Berger from taking the Step 2 CK exam by the August 28th date noted in his preliminary injunction papers. He does not need a preliminary injunction to test without accommodations. Although he testified that he "likely will fail" if he does not test with accommodations, Tr. 117 (Doc. 30), he might pass Step 2 CK under standard testing conditions (just as he passed Step 1 without accommodations).  If he adequately prepares and knows the subject matter, there is no evidentiary

---

[3]  A failure of proof on the issue of causation would preclude Mr. Berger from establishing that NBME violated the ADA by denying him accommodations, even if he could show that he has been properly diagnosed with a learning disability or ADHD and that one or both of those impairments substantially limit his ability to perform one or more major life activities.  *See, e.g., Singh v. George Wash. Univ. Sch. of Medicine*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) ("We need not decide whether Singh has an impairment within the meaning of the ADA, or whether that alleged impairment substantially limited a major life activity.  The … factual finding on causation … alone dooms her case.  The district court identified 'many reasons aside from [Singh's] impairment that might explain why [she] has done relatively poorly on extremely time-limited tests.'").

basis for concluding that he will not achieve a passing score under standard conditions.

108.    Finally, even if a desire to participate in *this year's* residency Match were sufficient grounds to create a risk of irreparable harm (and the Court does not believe that it is), the evidence did not establish that he must have a passing score on the Step 2 CK exam by October to participate in this year's National Residency Matching Program (the 2020 "Match"). *See generally* http://www.nrmp.org/.  Applicants have until **February 26, 2020** to submit their rank order lists and verified credentials for this year's Match, including their Step scores.    *See* http://www.nrmp.org/match-calendars/.  Consistent with that timeline, AUC advised students who wanted to participate in *last year's* Match (the 2019 Match) to **take Step 2 CK no later than December 31, 2018** "to help ensure that results will be available in time to participate in the 2019 Main Match." *See* AUC Step 2 CK FAQ's at 5 (DX 21C) (emphasis added). Applying that advice here, Mr. Berger could take Step 2 CK by the end of the year and still be able to participate in the upcoming Match.  He acknowledged at the hearing that this is "technically ... correct."  Tr. 170-72 (Doc. 30).

109.    No evidence was presented that Mr. Berger needs to have passed Step 2 CK to participate in interviews, that he will be invited to interview if he passes Step 2 CK, or that he would obtain a higher-quality residency position if he passes Step 2 CK before beginning his interviews.

110.    In addition to passing Step 2 CK, Mr. Berger must have a letter from his medical school Dean to participate in the Main Match for residency positions.  Tr. 168 (Doc. 30). He does not yet have such a letter and he is not certain when he will receive it.  *Id.*  Without such a letter, Mr. Berger may not be able to apply for the Match, even if he has passed Step 2 CK.

111.    There is also a question whether Mr. Berger has taken the actions necessary to

register to take the Step 2 CK exam (with or without accommodations).  *See* Tr. 161-66 (Doc. 161).  A third-party organization -- the Educational Commission for Foreign Medical Graduates ("ECFMG") -- must certify that he is eligible to take Step 2 CK before he can do so, and Mr. Berger was unclear on where that approval process stands.  *Id.*  If he does not, in fact, have the necessary ECFMG approval to test, a preliminary injunction allowing him to test with accommodations would almost certainly not result in him taking him the Step 2 CK exam by the August 29, 2019 date that is supposedly the date by which he must test to avoid his alleged residency-related irreparable harm.  *See* Email from B. Berger to Dr. Beach (Sept. 30, 2013) (DX 14 at CMB-PI-0001) (stating, with respect to Mr. Berger's request for accommodations on Step 1, that the ECFMG would need three weeks to process Mr. Berger's "paperwork" after learning if he had been approved for accommodations before he could "sign up for a Step 1 test date").

112.    Mr. Berger acknowledged that he can participate in the post-Match "scramble" that will occur between March 16 and March 19, 2020, if he does not obtain a position in the main Match.  Tr. 174-75 (Doc. 30); Supplemental Office and Acceptance Program FAQ (DX 21H).  He also acknowledged that there are residency programs that select residents outside of the Match.  Tr. 179-80 (Doc. 30).  Thus, it is not the case that the only way for Mr. Berger to get a residency position is by immediately passing the Step 2 CK exam, interviewing, and obtaining a position in the Main Match.

113.    Finally, Mr. Berger acknowledged that he has the option of participating in next year's Match instead of this year's Match, which obviates all urgency relating to his desire to have a passing Step 2 score before Match interviews begin.  Tr. 176 (Doc. 30).

114.    The Court holds that, consistent with precedent from this Court and other courts, the speculative and non-imminent harm alleged by Mr. Berger is insufficient to support a

preliminary injunction. *See Qui v. Univ. of Cincinnati*, No. 1:18-cv-634, 2018 WL 4496304, *8 (S.D. Ohio Sept. 19, 2018) (denying preliminary injunction in a case asserting claims under the ADA and Section 504 where plaintiff student failed to present "evidence showing that removal proceedings and deportation are imminent or that enrollment in the University of Cincinnati's CCM program is the only way he can maintain his valid nonimmigrant status [and avoid deportation]," or "any evidence that he has explored alternative options to maintain valid nonimmigrant status beyond seeking reenrollment as the University"); *Doe v. Ohio State Univ*., No. 2:15-cv-2830, 2016 WL 692547, *10-11 (S.D. Feb. 22, 2016) (denying medical student's motion for a preliminary injunction reinstating him as a student in good standing, where student "offered only his own testimony that residencies are more likely to be obtained by someone who is a student in good standing" based upon his understanding of "the 'match' and 'scramble' procedures by which medical students are offered residencies," and it was not clear whether plaintiff would be able to obtain a residency even if he was not "reinstated prior to March 14, 2016," or whether any residency he obtained "would be of lesser value" than another residency he might obtain: "Certainly, Mr. Doe's medical education pathway has been disrupted by his dismissal from Ohio State. But it is far from clear that, absent an injunction at this point, he will be unable to complete his education or to pursue his chosen profession."), *objections overruled, report aff'd*, 2016 WL 1578750 (S.D. Ohio April 20, 2016); *see also Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x 122, 125 (10th Cir. 2004) (finding, on the question of irreparable harm, that "the harm alleged by [plaintiff test-taker] is speculative") (overturning preliminary injunction); *Bach v. Law Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632, *5-6 (M.D.N.C. 2014) (noting that plaintiff's argument regarding his likely test results if he tested without accommodations was speculative, as he had successfully taken other standardized tests without

accommodations) (denying preliminary injunction); *Nimmer v. Case Western Reserve Univ.*, 2018 WL 5118306, *5-6 (N.D. Ohio 2018) ("A claim of injury must be based on reliable evidence and what Plaintiff offers is not.  It is not clear that absent an injunction at this point in time, Plaintiff will be unable to complete his education at CWRU (albeit with a later graduation date), finish dental school elsewhere or pursue his chosen profession."); *Mahmood v. Nat'l Bd. of Med. Exam'rs*, 2012 U.S. Dist. LEXIS 86837, *14-15 (E.D. Pa. 2012) ("Although [plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives.  For example, she does not discuss whether her school might grant her an extension of the seven-year requirement and provides no evidence of an inability to transfer schools."); *Oser v. Capital Univ. Law School*, No. 2:09-cv-709, 2009 WL 2913919, *11 (S.D. Ohio Sept. 8, 2009) (claims of dignitary harm, emotional loss, and inability to gain admission to another law school are too conjectural to support a preliminary injunction preventing plaintiff from being dismissed from law school); *Kelly v. W. Va. Bd. of Law Exam'rs*, 2008 U.S. Dist. LEXIS 56840, at *6 (S.D. W. Va. 2008) (no irreparable harm where plaintiff successfully completed other examinations without accommodations); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F.Supp.2d 42, 49 (D. Mass. 2005) ("[I]t is not certain that [plaintiff] will suffer the predicted harm; she may pass the test.") (denying preliminary injunction).

**C.**     **Mr. Berger Has Not Shown A Strong Likelihood Of Success On The Merits**

115.    Mr. Berger alleges that NBME violated Section 12189 of the ADA by denying his

request for extra testing time and other accommodations on the USMLE Step 2 CK exam.

116.    Section 12189 provides, in relevant part, as follows:

Any person that offers examinations or courses relating to applications, licensing, certifications, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative arrangements for such individuals.

42 U.S.C. § 12189.

117.    Pursuant to Section 12189, persons who qualify as disabled under the ADA are

entitled to receive reasonable accommodations during test-taking, if they need accommodations to

take the examination in an accessible place and manner.

118.    To establish his failure-to-accommodate claim under Section 12189, Mr. Berger

must prove the following elements by the preponderance of evidence:

      i.         He has a physical or mental impairment;

      ii.        His impairment substantially limits his ability to perform one or more

relevant major life activities, as compared to most people in the general population;

      iii.       Because of the functional limitations resulting from his alleged

impairments, he needs accommodations to take the Step 2 CK exam in an accessible manner;

      iv.       The accommodations he requested were reasonable; and

      v.        NBME failed to provide his requested accommodations.

*See Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 608 (S.D. Ind. 2012).

119.    Having a diagnosed impairment is not the same thing as being disabled within the

meaning of the ADA.

120.    To be disabled under the ADA, a person must have "a physical or mental

impairment that substantially limits one or more major life activities …." 42 U.S.C. § 12102(1).

More specifically, a person must have an impairment that substantially limits his or her ability to

perform a major life activity "*as compared to most people in the general population*." 28 C.F.R.

§ 36.105(d)(1)(v) (emphasis added). If a diagnosis is unwarranted, or if a diagnosed impairment

does not result in substantial limitations as compared to most people, the individual is not disabled

under the ADA and is not entitled to accommodations under Section 12189.

121. In the ADA Amendments Act of 2008 ("ADAAA"), Congress stated that the ADA

should be construed to provide "broad coverage." 42 U.S.C. § 12102(4). However, Congress did

not remove the "substantial limitation" requirement:

> By retaining the essential elements of the definition of disability including the key term
> 'substantially limits' we reaffirm that not every individual with a physical or mental
> impairment is covered by the ... definition of disability in the ADA. An impairment that
> does not substantially limit a major life activity is not a disability under [the definition's
> first prong]. That will not change after enactment of the ADA Amendments Act....

Statement of Mgrs. to Accompany S. 3406, ADA Amendments Act, 154 Cong. Rec. S8840,

S8841-42 (Sept. 16, 2008); *see also Neely v. Benchmark Family Services*, 640 Fed. App'x 429,

434-35 (6th Cir. 2016) ("Though the 2008 Amendments undoubtedly eased the burden required

for plaintiffs to establish disability, we note that Congress expressly chose to retain the

'substantially limits' modifier for 'one or more major life activities....' A lesser burden is a burden

nonetheless...."); *Mann v. Louisiana High Sch. Ath. Ass'n*, 535 Fed. Appx. 405, 410 (5th Cir. 2013)

("Although the ADA Amendments Act … lowered the standard that plaintiffs must meet to show

that they are disabled, ... a plaintiff must still show substantial limitation....").

122. In determining whether Mr. Berger is disabled within the meaning of the ADA, the

Court must compare him to individuals in the general population, not to other college graduates or

his medical school peers. *See Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 WL 1404157,

*6 (E.D. Pa. 2016) ("It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, other test-takers who are not representative of the general population") (holding that plaintiff was not disabled within the meaning of the ADA, notwithstanding her dyslexia diagnosis, and therefore was not entitled to extra testing time on a medical licensing exam).[4]

123.    Likewise, in determining whether someone is substantially limited because of a learning disability or ADHD, it is not appropriate to compare his performance of a given major life activity to the level of performance that one would anticipate because of his intelligence or IQ. A person who is gifted might be diagnosed with a learning disability based upon discrepancies between his IQ and his performance, as reflected on diagnostic assessments.  *See* Tr. 2-112:1 - 112:23. Those intra-individual discrepancies, however, are not enough to establish a disability within the meaning of the ADA, if the individual is still performing at the average level or above. *See Rawdin v. American Bd. of Pediatrics*, 985 F.Supp.2d at 651 ("Both Dr. Rawdin's treating neuropsychologist ... and his expert witness ... focus on his relative weaknesses as compared to his high IQ score overall, but ... a relative impairment is not enough to qualify Dr. Rawdin as disabled because the Court must compare his test scores and test-taking ability against the general population and not against his own expected capabilities."); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d 607, 614-15 , 620 (S.D. Ind. 2012) ("[A] person may exhibit statistically

---

[4] *See also Bach v. Law Sch. Adm. Council,* 2014 U.S. Dist. LEXIS 124632, *5 (M.D.N.C. 2014) (holding that examinee with ADHD diagnosis needed to be compared "to the general population"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 651 (E.D. Pa. 2013) (relevant comparison group is "the general population"), *aff'd*, 582 Fed. App'x 114 (3d Cir. 2014) (judgment for defendant); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 93 (D. Conn. 2011) ("The relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population.") (judgment for defendant); *Love v. Law Sch. Adm. Council*, 513 F. Supp. 2d 206, 226 (E.D. Pa. 2007) (holding that plaintiff with LD and ADHD diagnoses was not disabled under the ADA and thus was not entitled to testing accommodations).

significant variation in test scores sufficient to support a clinical diagnosis, but this diagnosis is based on an internal referent.  When the test scores are compared to an external referent as the ADA requires -- that is, the general population -- that person may nevertheless exhibit average disabilities."); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d at 46.

124.    There is a significant question whether Mr. Berger meets the applicable diagnostic criteria for either ADHD or a learning disability with an impairment in reading.  Although he asserts that he had been diagnosed as having both disorders by the second grade, Complaint ¶¶ 15 and 16, the evidence shows otherwise.  Mr. Berger was not diagnosed with a learning disability with impairment *in reading* until 2010, when he was initially evaluated by Dr. Beach in connection with his effort to obtain accommodations on the MCAT exam.  *See* discussion *supra*.  And he was not diagnosed with ADHD until 2013, when he was evaluated by Dr. Beach a second time in connection with his desire to obtain accommodations on the USMLE Step 1 exam.  *See* discussion *supra*.

125.    The Court need not decide that issue, however, in ruling on Mr. Berger's request for a preliminary injunction.  Even if the Court assumes for present purposes that Mr. Berger was properly diagnosed with a Specific Learning Disability or ADHD, he does not qualify as disabled within the meaning of the ADA.  Whatever functional limitations he might experience as a result of those diagnosed impairments, they are not substantially limiting when he is compared, as he must be, to most people in the general population.

126.    Mr. Berger urges the Court not to focus on the "outcomes" he has been able to achieve, but courts routinely – and appropriately – consider such objective evidence in evaluating whether a person is substantially limited in his or her ability to perform major life activities as compared to most people in the general population, particularly in cases involving ADHD and

learning disability diagnoses.  Any prohibition on considering an individual's performance on real-life (as opposed to diagnostic) assessments would make no sense, as that evidence will often be the best evidence of an individual's ability to read, concentrate, and think in the context of taking a standardized test.

127.    Here, Mr. Berger achieved an above-average score on the PSAT, with no accommodations.  He achieved average total scores both times he took the MCAT, with his best score on the section that required the most extensive amount of reading (Verbal Reasoning, 68th-83rd percentile).  He also passed the Step 1 exam, on his first attempt, with no accommodations. The suggestion that he achieved those results by reading only the last sentence of the question vignettes or randomly guessing is, as noted above, not credible.

128.    Courts have consistently recognized that individuals who perform at the level that Mr. Berger has performed on real-life examinations – with no extra testing time or other accommodations – do not have a disorder that rises to the level of a disability under the ADA.  *See, e.g.*, *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 630 (6th Cir. 2000) (noting, among other evidence, that plaintiff achieved "an average score" on the SAT with no accommodations and also "took the MCAT twice without accommodations") (preliminary injunction denied because plaintiff examinee with a diagnosed learning disability was not likely to succeed on the merits of his ADA claim); *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d 1247, 1251 (M.D. Fla. 2017) (relying, among other evidence, on plaintiff's average or above-average  performance on the MCAT and other standardized examinations in holding that plaintiff was not disabled within the meaning of the ADA despite being diagnosed with ADHD by a qualified professional, and stating that "average (or above-average) performance presumptively establishes the absence of substantial limitation" when evaluating a person's ability to perform "in comparison to 'most

people in the general population'"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 2016 WL 1404157 at *8 (plaintiff who scored in the "average" range on the GRE (a graduate school admission test) and MCAT without accommodations was not substantially limited compared to most people and was not entitled to extra testing time on a licensing exam); *Bach v. LSAC*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *4 (M.D.N.C. Feb. 4, 2014) ("Mr. Bach's long history of academic success weighs against a finding of disability") (denying preliminary injunction requested by LSAC examinee who claimed to have ADHD); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F. Supp. 2d at 621 ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, ... stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *Rumbin v. Assoc. of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011) (rejecting ADA claim by MCAT examinee); *Love v. LSAC,* 513 F. Supp. 2d at 214 (holding that LSAT examinee had not shown that he was disabled, where he had unaccommodated ACT and SAT scores "within the average range" and a 3.16 high school GPA, and did well in college without accommodations).[5]

129.    Here, Mr. Berger's unaccommodated performance on the PSAT, MCAT and USMLE Step 1 exams support the conclusion that he is not substantially limited in any major life

---

[5] *See also Hetherington v. Wal-Mart, Inc*., 511 Fed. App'x 909, 912 (11th Cir. 2013) (holding that plaintiff employee was not substantially limited in his ability to think, learn, or read, where he was able to read "at a junior high level" and had "completed 12 years of school"); *Collins v. Prudential Investment & Retirement Servs*., 119 Fed. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] testimony about her work, academic [background], and community involvement contradicts her claim that her ADHD/ADD substantially limits her abilities to think, learn, remember and concentrate"); *Bercovitch v. Baldwin Sch*., 133 F.3d 141, 155 (1st Cir. 1998) ("[Plaintiff] never experienced significant academic difficulties, and in fact has excelled academically...."); *Steere v. George Wash. Univ. Sch. of Medicine*, 439 F. Supp. 2d 17, 21-22 (D.D.C. 2006) ("Had he the disability he claims to have [(ADHD)], this Court might expect his achievement to have been more consistently impaired. Instead, plaintiff's educational career demonstrates strong academic achievement and ability....").

activity that is relevant to taking a standardized test, as compared to most people in the general population.  But it is not the only evidence that does so.  The diagnostic assessments administered to Mr. Berger by Dr. Beach and other professionals reflected performance in the average or above-average range until 2010.  As one court has noted regarding such diagnostic results, "[b]y definition, 'average' is not 'substantially limited.'"  *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 870 F.Supp.2d at 620 (holding that plaintiff with "average to low average" diagnostic testing results was not disabled within meaning of the ADA and thus was not entitled to accommodations on his medical licensing exam, despite having been diagnosed with learning disabilities and not having answered all questions when he took the SAT and ACT exams with no accommodations; and also noting that plaintiff "performed above average on his Stanford Achievement Test scores in sixth and seventh grade"); *see also Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d at 627 (noting that plaintiff "scored within the average range" on his diagnostic "reading comprehension tests," and holding that plaintiff was not substantially limited by his learning disability "because he can read as well as the average person"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp.2d 636, 651-52 (E.D. Pa. 2013) (noting that plaintiff's diagnostic test scores were "all either in the average or above average range," and holding that plaintiff was not substantially limited in comparison to the general population), *aff'd on other grounds*, 582 Fed. App'x 114 (3d Cir. 2014); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F.Supp.2d at 46 ("Overall, the plaintiff's performance on the diagnostic testing was within the average range, sometimes low average, sometimes high, with occasional scores above and below the average range.") (holding that plaintiff was not disabled within meaning of the ADA).

130.    The evaluation reports of Mr. Berger's professionals contain additional information regarding the functional impact of his diagnosed impairments.  Three of Dr. Beach's reports

included a Global Assessment of Functioning (GAF) score for Mr. Berger.  GAF scores "measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100," *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009), and are often relied upon in Social Security cases involving alleged mental impairments "as one factor in assessing a claimant's mental functioning," *McBride v. Comm'r of Soc. Sec.*, No. 1:16-cv-708, 2017 WL 3393948, *6 (S.D. Ohio Aug. 7, 2017).  Although no longer provided in the DSM-5 (which was first published in 2013), the Sixth Circuit and this Court have continued to consider GAF scores in assessing a claimant's level of functioning in Social Security cases.  *See id.; see also, e.g., Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835-38 (6th Cir. 2016); *Jordan v. Comm'r of Soc. Sec.*, No. 1:1-18-cv-120, 2019 WL 518533, *10 (S.D. Ohio Feb. 11, 2019) (substantial evidence supported the ALJ's decision to give little weight to the opinion of claimant's supporting professional "concerning  marked or extreme limitations in all categories of work-related functioning" because the opinion was "inconsistent with his own treatment notes and plaintiff's GAF score of 60").

131.    As noted above, Dr. Smith's 2008 evaluation report assigned a GAF score of 94 to Mr. Berger.  Per the GAF Scale in DSM-IV, GAF scores in the range of 91-110 reflect that a person experiences "[n]o symptoms."  (DX 21F).  In her June 2010 report, Dr. Beach assigned Mr. Berger a GAF score of 90. Scores in the range of 81-90 signify "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), [and] good functioning in all areas...."  (DX 21F).  Finally, in her July 2013 and January 2015 reports, Dr. Beach assigned Mr. Berger a GAF score of 80.  GAF scores in the range of 71-80 signify "no more than slight impairment in social, occupational or school functioning...."  (DX 21F).

132.    GAF scores are not given controlling weight in evaluating an individual's functional limitations in the Social Security context, and nor should they be when evaluating a

person's functional limitations for purposes of the ADA.  But they are an additional piece of information on the question whether someone with an alleged mental impairment is substantially limited in his ability to perform major life activities.  *See, e.g., Black v. Nat'l Bd. of Med. Exam'rs*, 281 F.Supp.3d at 1252 (noting that an examinee diagnosed with ADHD had been assigned a GAF score of 80 by her psychologist, which "evidences no substantial limitation").

133.    In this case, the extensive evidence regarding Mr. Berger's actual ability to perform the activities in which he claims to be impaired compels a finding that he is not disabled within the meaning of the ADA.  This conclusion, however, has also been reinforced by the testimony of two experts with extensive experience diagnosing learning disabilities and/or ADHD.  Dr. Lovett concluded that (a) Mr. Berger does not meet the professional diagnostic criteria for a Specific Learning Disability or ADHD, and (b) even if he did, he is not substantially limited in his ability to perform any relevant major life activities as compared to most people in the general population. Dr. Ortiz Report (DX 22B); Dr. Lovett Reports (DX 24-2, DX 24-3); Tr. 2-183:21 - 185:5 (Ortiz testimony); 2-206:14 - 232:21 (Lovett testimony).

134.    The Court notes in this regard that any number of reasons, unrelated to a disability, may explain why Mr. Berger did not perform as well as he had hoped on the Step 1 exam and has not yet achieved a passing score on the Step 2 CK exam.  Those possible reasons -- untested by any discovery in this case to date -- include poor study habits, inadequate preparation, uncertainty about whether he really wants to be a doctor, test anxiety, or insufficient mastery of the underlying subject matter.

135.    Mr. Berger may believe he had trouble finishing the Step 2 CK exam under standard time conditions because of his diagnosed impairments, but subjective beliefs are not enough to show that he is substantially limited in her ability to concentrate, read, think, or learn compared to

most people in the general population. *See, e.g., Singh v. George Wash. Univ. Sch. of Medicine*, 667 F.3d 1, 5-6 (D.C. Cir. 2011) (affirming judgment in favor of GWU where plaintiff failed to prove that any limitation in learning was due to an impairment, because there were many other reasons to explain plaintiff's alleged difficulties, including anxiety, being over-extended in extra-curricular activities, and poor study habits).

136.    Citing informal "technical assistance" from the U.S. Department of Justice, Mr. Berger argues that, under the ADA, testing entities must defer to a diagnosis provided by a test taker's professional. *See* DOJ Technical Assistance (PX 61), and Federal Register Commentary on Final Rule (Aug. 11, 2016) (PX 62). The Court disagrees. In the first place, such informal guidance, which has not resulted from notice-and-comment rulemaking, does not have the force of law and is not binding on the Court or entitled to special deference. *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 159 (2012). Second, and relatedly, the Technical Assistance document includes the following disclaimer:

> This guidance document is not intended to be final agency action, has **no legally binding effect**, and may be rescinded or modified in the Department's discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

*See* DOJ Technical Assistance at 10 (DX 26 at 10) (emphasis added) (also available on DOJ's website at https://www.ada.gov/regs2014/testing_accommodations.html).

137.    Contrary to what Mr. Berger has argued, NBME was not required to defer to the conclusions reached by his evaluators in determining whether he is disabled within the meaning of the ADA or entitled to testing accommodations. *See, e.g., Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157 at *6 (noting the same guidance that Mr. Berger relies upon

here, but not deferring to the examinee's healthcare professionals).

138. Indeed, this case demonstrates why such deference is ***not*** automatically or even generally warranted. Dr. Beach became an advocate for Mr. Berger, providing lengthy reports that -- superficially -- made strong arguments in support of her findings. However, those reports often conflicted with earlier evaluations of Mr. Berger and reflected a dramatic downward trend in reading ability that was not plausibly explained at the hearing. *See* Chart Reflecting Woodcock-Johnson Results Between 2010 and 2017 (DX 27); *see also* MCAT Denial Letter (July 13, 2010) (DX 9 at CMB-0177) (noting similar inconsistency between the assessment results provided by Dr. Beach in 2010 and Mr. Berger's prior assessment results). Dr. Lovett described the decline in scores as so great facially implausible. Tr. 2-229:9 - 232:21 (Doc. 33).

139. Dr. Beach provided various possible explanations for this dramatic downward trend in Mr. Berger's assessment results. Tr. 247 (Doc. 30); Tr. 2-115: 24 - 117:24 (Doc. 33). Dr. Lovett and Dr. Ortiz, however, strongly disputed those explanations. Tr. 2-185:10 - 189:8; 2-232:22 - 236:16 (Doc. 33). According to Dr. Lovett, such a dramatic drop could reasonably be explained by dementia or an intervening traumatic brain injury (none occurred here), or perhaps insufficient motivation on the part of the examinee, but not by the change in edition of the Woodcock-Johnson or the other explanations suggested by Dr. Beach. *See* Tr. 2-232:9 - 232:21; 2-235:10 - 236:19 (Doc. 33).[6]

140. Moreover, there were numerous instances in which Dr. Beach's evaluation reports were either inaccurate or misleading in describing Mr. Berger's diagnostic history or his history of accommodations in other contexts. Several of these are mentioned above, but other examples

---

[6] Dr. Beach testified that she did not administer any assessment that is designed to evaluate an examinee's performance motivation level, "but ... it would be good for me to include that in a test battery ... so I have something objective beyond my own impression." *See* Tr. 229 (Doc. 30).

can also be noted. *See, e.g.*, 2017 Beach Report at 2 (PX 8 at PX000159) (stating that the documents she reviewed included "Moeller High School Assistance Plans" from "Grades 9-12" which "recommended post-secondary disability services" for Mr. Berger -- she admitted in the hearing that no such Assistance Plans exist and that these statements are not true, Tr. 2-77:14 - 78:4; 2-83:13 - 83:22 (Doc. 33); *id.* (stating, with no documentary basis and contrary to evidence presented in the hearing, including her own testimony, that the Stanford Achievement Tests that Mr. Berger took in the 2nd, 3rd and 4th grades, and the Iowa Tests of Basic Skills and Cognitive Abilities Test that he took in the 6th grade, were administered with accommodations); *id.* (referencing Mr. Berger's 2009 MCAT Score Report but omitting any reference to his 2010 MCAT Score Report, which reflected exceptional performance on the section of the test that required the most reading, Verbal Reasoning); *id.* at 3 (PX000160) (stating that "the public school district determined that he met legal criteria for a Specific Learning Disability, and was eligible for Special Education Services," and citing Dr. Smith's 2003 and 2008 reports -- whereas she stated in her 2010 evaluation report to AAMC that Brendan's "family and private school met yearly with the school district to advocate for Brendan and request that he be identified as a student with a SLD, without success," 2010 Beach Report at 9 (PX 6 at PC000050); and Dr. Smith's 2003 report stated that "the Moeller committee met with a psychologist from the [school district] ... and concluded that there was no need for special education assistance" and that Brendan "did not fulfill current Ohio guidelines for an LD placement or assistance," 2003 Smith Report (PX 23 at PX000269, PX000274)); *id.* at 5, 6, 7 (PX000162, 163, 167) (stating that Brendan was approved for and took the ACT college admission test with accommodations -- whereas Brendan testified that he never took the ACT test or requested accommodations on that test, Tr. 155 (Doc. 30), Tr. 2-84:6 - 84:11 (Doc. 33)); *id.* 42 (PX000199) (stating that there was a "family history of learning disorder" --

whereas her 2010 report, prepared after meeting with Brendan and both parents, stated that "[t]here is no known family history of learning disorder," 2010 Beach Report at 4 (PX 5 at PX000015)); Tr. 2-54:2 - 55:13 (Doc. 33) (acknowledging that her 2010 report incorrectly stated that Mr. Berger's fifth grade teacher had confirmed that Mr. Berger was provided with accommodations throughout his years at Saint Gabriel) ("That was poorly phrased, yeah."); Tr. 2-60:1 - 2:60:6 (Doc. 33) (acknowledging that her 2010 report inaccurately stated that Mr. Berger received testing accommodations on the PSAT exam).

141.     The frequency with which Dr. Beach misstated significant facts in her evaluation reports calls her analysis and conclusions into question -- all the more so because of her recognition that it is "very important to be accurate" in such reports.  Tr. 231-32 (Doc. 30).

142.     One of NBME's external reviewers, Dr. Ortiz, raised an additional concern:  Dr. Beach's failure to adequately consider whether Mr. Berger's bilingual family background presented a more plausible explanation for any language development issues that Mr. Berger experienced as a child that a learning disability.  *See* Ortiz Decl. ¶¶ 22-27 (DX 22); Ortiz Consultative Evaluation (DX 22B); Tr. 2-172:3 - 173:16 (Doc. 33).  Dr. Beach acknowledged that language and cultural issues should be considered in evaluating an individual for learning disorders, and that the presence of such issues in Mr. Berger's case would have warranted a "consult" by her with someone with expertise in that area.  Tr. 2-62:4 - 62:17, 2-111:3 - 111:6 (Doc. 33).  She concluded, however, that such issues did not arise in Mr. Berger's background, Tr. 2-110:14 - 111:25 (Doc. 33).  Dr. Ortiz disagreed with that conclusion.  Tr. 2-181:19 - 181:256 (Doc. 33).  The Court concludes that no finding is necessary in this regard, given the other concerns regarding Dr. Beach's evaluation reports that are noted above.

143.     The views of Dr. Lovett and Dr. Ortiz should not be disregarded or discounted

because they did not personally examine Mr. Berger. There are various contexts in which professionals appropriately provide opinions regarding an individual's disability status without personally examining the individual. This is one such context. Another is in the context of a professional such as Dr. Beach serving as a medical expert for the Social Security Administration, discussed above. *See also Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003) (holding that ERISA does not require a plan administrator to accord special deference to a claimant's treating physician, as compared to experts consulted by the plan).

144.    The Step 2 CK exam is a licensing exam, relied upon medical licensing authorities across the country to help evaluate the minimum competency of prospective physicians and thereby help protect the public welfare. It would be inappropriate to require entities which administer such tests to defer to an examinee's supporting professional if doing so might result in unwarranted accommodations. Such accommodations could affect the validity of the resulting scores or give an examinee an unfair advantage over other examinees. As another court has noted, NBME's accommodation procedures "are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination. As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004).

145.    Similarly, NBME was not required simply to follow the accommodation decisions that Mr. Berger's medical school and college made. Being approved for accommodations in an academic context is very different from receiving accommodations on a standardized licensure

test. Likewise the fact that the College Board approved Mr. Berger for accommodations on a college admissions test does not mean that he must be provided accommodations on the USMLE. NBME had the right to conduct its own review of Mr. Berger's documentation and determine whether he is entitled to accommodations. *See, e.g., Ware v. Wyo. Bd. of Law Exam'rs*, 973 F. Supp. 1339, 1357 (D. Wyo. 1997) ("Although information regarding past accommodations may be helpful ..., the fact that a person has been granted a particular accommodation in the past does not mean that such accommodations are presumptively reasonable. Each testing agency has an independent duty under the ADA to determine reasonableness on a case-by-case basis."), *aff'd mem.*, 161 F.3d 19 (10th Cir. 1998).

### D.     The Balance of the Equities Do Not Support an Injunction

146.     Mr. Berger acknowledges that an injunction could cause harm to "NBME or others" but asserts that the harm would be "negligible." Pl. Mem. 18 (Doc. 20-1). The Court disagrees. NBME has a legitimate interest in ensuring that the USMLE program is fair to all examinees. *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d at 88-89. NBME is therefore harmed if an examinee tests with unwarranted accommodations. Once scores are reported, the harm cannot be undone. That potential harm to NBME outweighs any speculative harm to Mr. Berger from not being able to test on August 29, 2019 with accommodations. *See Rothberg v. Law Sch. Adm. Council*, 102 Fed. App'x at 125.

147.     Residency programs and applicants to those programs might also be harmed by the preliminary injunction requested by Mr. Berger. A program that relies upon a passing Step 2 CK score that was obtained with the benefit of unwarranted testing accommodations will have allocated a residency position based, in part, on unreliable information. And, because the number of residency positions in any given residency program is limited, a position given to Mr. Berger would necessarily come at the expense of another applicant for that position.

### E.   An Injunction Would Not Serve The Public Interest

148.   "Although the public certainly has an interest in the enforcement of the ADA, ... the public also has an interest in the fair administration of standardized tests." *Bach v. LSAC*, 2014 U.S. Dist. LEXIS 124632 at *7-8.  Other candidates do not want extra testing time to be granted to individuals who are not disabled, as that could provide an advantage that is denied to other candidates.  Nor do score users want unwarranted accommodations to affect the resulting scores. This is particularly true in the context of licensing examinations that help protect the public welfare -- in this instance, by helping to ensure that licensed physicians have the minimum competencies to deliver safe and effective healthcare services.

### CONCLUSION

Mr. Berger has not shown that he is entitled to the drastic and extraordinary remedy of a preliminary injunction.  His motion for preliminary injunctive relief is DENIED.

Dated:  August 14, 2019                    Respectfully submitted,


                                            /s/   Robert A. Burgoyne
                                            Erin D. French (0090813)
                                            Vorys, Sater, Seymour and Pease LLP
                                            301 East Fourth Street, Suite 3500
                                            Cincinnati, Ohio 45202
                                            Phone: 513-723-4022
                                            Email: edfrench@vorys.com

                                            Robert A. Burgoyne
                                            (admitted pro hac vice)
                                            Perkins Coie LLP
                                            700 Thirteenth Street, N.W. Suite 600
                                            Washington, D.C.  20005-3960
                                            Phone:  202-654-1744
                                            RBurgoyne@perkinscoie.com

                                            Counsel for Defendant NBME

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on the 14th day of August 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


/s/ Erin D. French