**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **BRENDAN BERGER,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 1:19cv00099** |
| ) | |
| **v.** ) | **Judge: Hon. Susan J. Dlott** |
| ) | **Magistrate Judge: Hon. Karen L.** |
| **NATIONAL BOARD OF MEDICAL** ) | **Litkovitz** |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**PLAINTIFF'S PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.  **INTRODUCTION**

Before this court is a suit by plaintiff Brendan Berger against defendant National Board

of Medical Examiners (NBME) arising under the Americans With Disabilities Act (ADA) 42

U.S.C. §12101 et. seq. Plaintiff moved for Preliminary Injunction on July 3, 2019 (docket no. 20)

directing defendant to provide certain accommodations when Plaintiff takes the United States

Medical Licensing Examination (USMLE) Step 2 Clinical Knowledge(CK). The requested

accommodations include (1) Double (100%) extended time over two days of testing; (2) extra

break time; and (3) distraction limited testing environment.  Defendant filed its opposition to said

motion on July 24, 2019. (docket no 27) A two day hearing was held on July 29, 2019 and July

30, 2019.[1]

---
[1] Citation to the hearing transcript will be referred to by the date on which the hearing took place.

## II.     FINDINGS OF FACT

### A.     The Parties and the USMLE

1.      Brendan Berger commenced medical school at the American University of the Caribbean School of Medicine (AUC) in 2011. (July 29 – N.T. 66:24-67:10)

2.      He was expected to graduate from AUC in 2015. (July 29 – N.T. 66:9-13)

3.      Mr. Berger has completed all course work and clinical rotations necessary to graduate from AUC with a Doctor of Medicine (M.D.) degree except for passing the USMLE Step 2 CK. (July 29 – N.T. 29:15-23)

4.      Mr. Berger's didactic training occurred at AUC in the Caribbean, whereas his clinical training occurred in the United States. (July 29 – N.T. 66:22-67:6)

5.      The NBME is a not-for-profit organization that administers the USMLE together with the Federation of State Medical Boards. The NBME reviews, processes and approves (or denies) requests for accommodations presented in accordance with the ADA. (DX 23)

6.      There are three Steps to the USMLE, namely USMLE Step 1, USMLE Step 2 Clinical Knowledge (CK), USMLE Step 2 Clinical Skills (CS) and USMLE Step 3. All exams must be passed before an individual with an M.D. degree is eligible for medical licensure in the United States. (DX 23)

7.      Mr. Berger has taken the USMLE Step 1 without accommodations and narrowly passed but received a scaled score of 198, and a passing score set at 192. (PX 38)

8.      He has failed the USMLE Step 2 CK two times without testing accommodations. (PX 44, 51)

9.      Mr. Berger seeks to take the USMLE Step 2 CK a third time. If he fails the examination one more time, there is a substantial likelihood that he will be dismissed from medical school, as AUC's stated  policy is to dismiss students who fail to complete a degree within seven years. (July 29 – N.T. 112:1– PX 59) Additionally, while AUC has given Mr. Berger several extensions of its policy and several leaves of absences, AUC through counsel has stated that Mr. Berger will be given one additional attempt to pass the USMLE Step 2 CK. (Exhibit PX 60)

10.      Mr. Berger hopes to enter a psychiatry residency program. (July 29 – N.T. 30:10-12)

11.      The application and interview consideration process for residency programs for the 2020 match begin during the first week of October 2019. Because Mr. Berger narrowly passed the USMLE Step 1 and failed the USMLE Step 2 CK twice, he seeks to take the USMLE Step CK with accommodations including extended time so that he can present his score for the residency application and interview process commencing in October. (July 29-N.T. 114:3-118:5)

12.      Without passing the USMLE Step 2 CK, Mr. Berger will be unable to graduate from medical school, he will not be able to be considered for a residency, or obtain medical licensure. He will be foreclosed from taking the exam again thereby ending Mr. Berger's aspirations and efforts to become a physician.[2] (July 29 – N.T. 116:17-118:5)

---

[2] USMLE rules require that in order for one to be eligible to take the exam, one must either be a currently enrolled student or have an MD degree. If Mr. Berger is terminated from AUC he will no longer qualify to take the USMLE.

13.     The USMLE Step 2 CK under standard administration consists of approximately 318 multiple choice test items, divided into eight 60 minute blocks, administered in one nine hour testing session. (Plaintiff Complaint and Defendant' Answer ¶ 37)

14.     NBME's published performance data indicates that 95%-96% of examinees from US/Canadian schools pass the USMLE Step 2 CK. (PX 57) AUC's published performance data reflects that 89% to 92% of AUC's students pass the USMLE Step 2 CK. (PX 58)

**B.     Mr. Berger's Academic History**

15.     Mr. Berger's native language is English, he was taught English in the house, he attended pre-school from the age of 3, where only English was spoken and taught. (July 29-N.T. 21:9-24, 23:1-3, 34:25-35:13) While some French was spoken in the house it is estimated that during Mr. Berger's early childhood, more that 90% of the time English was spoken around him. (July 29-N.T. 22:1-25, 23: 3-11). Mr. Berger is presently unable to speak French. (July 29 – N.T. 35:14-15)

16.     During Mr. Berger's early education, he experienced challenges. While in first grade he received intervention for literacy skills and also received tutoring at home (July 29-N.T. 38:2-39:4)

17.     While in second grade he was evaluated by a psychologist, Dr. Artner due to trouble with reading and behavioral concerns. Dr. Artner reported that behaviors raised the possibility of Attention Deficit Disorder. She further recommended teaching methods to stress a phonics approach in reading sight words and using a multisensory technique in reading lessons. (PX 17)

18.     Mr. Berger was homeschooled in second, third and fourth grades due to the difficulty he was experiencing in reading and learning. (July29 – 23:20-25:9, 39:5-40:6)

19.     He attended a parochial school at St. Gabriel Consolidated School (St. Gabriel's) from 5th through 8th grades. While attending St. Gabriel's he was given accommodations, which included extended time to complete class assignments, examinations and quizzes. He was further administered oral exams because of his difficulty reading. He was also allowed to take tests in a small quiet room. (July 29 – 40:15-41:3 – PX 1)

20.     Mr. Berger attended high school at Archbishop Moeller (Moeller) from 9th through 12th grades. While he attended Moeller he continued to experience challenges with reading and sustained focus. During 9th, 10th and part of 11th grade, Mr. Berger was given informal accommodations by his teachers, which included extra time to complete tests, extra sets of text books for highlighting, and use of audio books. (July 29 – N.T. 41:17-44:19)

21.     During Mr. Berger's 11th grade year, he underwent a psychoeducational evaluation with Dr. Alexander Smith during January-February 2003. (PX 23). Following his evaluation, Mr. Berger received formal accommodations set forth in a Moeller Assistance Plan, which continued to provide extended time for reading and writing assessments due to his difficulty completing such tasks, a separate area for testing, and allowance for extra copies of texts and use of audio tapes of novels. (July 29 – N.T. 42:22-45:15 – PX 2)

22.     During 11th grade, Mr. Berger took the PSAT exam without accommodations. (July 29 – N.T. 46:8-10)  During the exam, Mr. Berger struggled with the time constraints of the exam. (July 29 – N.T. 46:11-47:4) Consequently, because of his slow reading and slow processing speed, Mr. Berger omitted many questions on the Critical Reading section, which

contained reading comprehension passages and on standard multiple choice math sections. (July 29 – N.T. 47:5-51:12 – PX 3 and DX 24-5)

23.    Despite being unable to complete portions of the PSAT, Mr. Berger was able to score in the 72nd percentile on the verbal section and 77th percentile on the math section of the PSAT. (July 29 – N.T. 51:13-52:5 – PX 3 and DX 24-5)

24.    In Mr. Berger's senior year he took the SAT exam and applied for accommodations. The College Board granted Mr. Berger's request for accommodations on the SAT, which included 50% extended time. (July 29 – N.T. 52:6-25 – PX 4)

25.    The College Boards submits requests for accommodations to outside consultants to provide reviews and recommendations on requests for accommodations. (July 30 – N.T. 190:11-191:3)

26.    In January 2004, Mr. Berger took the SAT with extended time. He received a Reading and Math score that was in the 91st percentile and 90th percentile respectively. (July 29 – N.T. 53:7-25 – PX 25)

27.    Mr. Berger commenced college at the University of Cincinnati. At the start of his matriculation, he submitted a request for accommodations to the University's Disability Services Office. The University of Cincinnati approved for Mr. Berger to receive accommodations including double (100%) extended time, a proof reader and audio versions of written text. He utilized the audio recording to get through the reading material. He also took the exam with extended time at the Disability Services Office. (July 29 – N.T. 54:3-55:14 – PX27)

28.     In 2009, Mr. Berger in anticipation of taking the MCAT, applied for accommodations but was denied. (July 29 – N.T. 57:11-18)

29.     Mr. Berger spent many hours studying for the MCAT. He took study courses and studied independently. Compared to his peers he put in more time and a greater effort studying for the MCAT. (July 29 – N.T. 57:23-58:19)

30.     He took the exam in 2009 without accommodations. He utilized many strategies to get through the examination. However, he found it difficult to complete each section, particularly the verbal reasoning section. He found that he wrote in many random answers because he was unable to complete the exam. (July 29 – N.T. 58:20 – 60:3)

31.     Due to being unable to complete substantial portions of the MCAT, Mr. Berger was not able to demonstrate his knowledge and skill when taking the 2009 MCAT. (July 29 – N.T. 60:4-7)

32.     His total score on the 2009 MCAT was 25; however, his verbal reasoning score fell in the $27^{th} - 37.8^{th}$ percentile and writing score fell in the $11.9^{th} - 35.1^{st}$ percentile. (PX 55)

33.     Mr. Berger attempted apply for accommodations for MCAT again in 2010; however, his request for accommodations was denied. (July 29 – N.T. 61:23-62:2)

34.     He put forth a greater effort studying for the MCAT in 2010. He studied for nearly a year. His study efforts included taking a study course and working on strategies to optimize his ability to get through the questions as quickly as possible. He typically studied three to five hours a day studying for the MCAT. (July 29 – N.T. 62:7-63:3)

35.     When Mr. Berger utilized a different strategy for taking the MCAT in 2010. On the verbal reasoning section he did not read the lengthy passages, rather he would read the

questions, he would quickly attempt to pick the best answer by reading a couple of sentences in the paragraph. He attempted to take educated guesses based on his limited review of the questions and passage. (July 29 – N.T. 63:4-25, 65:10-19)

36.     While Mr. Berger was able to improve his Verbal Reasoning score to the $67.8^{th}$ – $83.4^{th}$ percentile, his physical science results declined falling in the $11.6^{th}$ percentile – $23.8^{th}$ percentile and his biological science score also declined falling in the $26.8^{th}$ percentile – $41.9^{th}$ percentile. (PX 30)

37.     Mr. Berger did not gain admission to U.S. medical schools but was able to gain admission to AUC, which he commenced in May 2011. (July 29 – N.T. 65:24-66:10)

38.     When Mr. Berger started medical school at AUC, he applied for accommodations, which entailed submitting his documentation to the staff in charge of reviewing accommodation requests. (July 29 – N.T. 67:7-14)

39.     AUC approved accommodations including 50% extended time on tests and exams. (July 29 – N.T. 67:13-23)

40.     Additionally, in order to get through the reading material in medical school, Mr. Berger utilized different assistive technologies such as text to speech. (July 29 – N.T. 67:24-68:4).

41.     During Mr. Berger's AUC matriculation, he took several exams. He took computerized multiple choice exams that were prepared by professors. He also took Shelf exams, which are computerized exams prepared by the NBME. Mr. Berger receive 50% extended time for both the medical school prepared exams and the NBME prepared Shelf exam. (July 29 – N.T. 68:12-69:25)

42.     Mr. Berger has taken six NBME Shelf exams on which he received 50% extended time. He passed each of the Shelf exams. (July 29 – N.T. 94:19 – 95:15 – PX 42)

### C.     Mr. Berger's Disability and Evaluation

43.     Mr. Berger has disabilities relating to reading and attention issues. He asserts that with anything that involves reading, he needs to seek out ways to use assistive technologies such as audio book or text to speech. (July 29 – N.T. 32:16-33:15)

44.     On standardized exams because he is not able to read fast and comprehend, he runs out of time when extended time accommodations are not provided. (July 29 – N.T. 33-16-34:4)

45.     Mr. Berger has been evaluated three times by Cheryl Beach, Ph.D. who prepared reports of each evaluation in June 2010, July 2013 and July 2017. (PX 5, 6 and 8)

46.     Dr. Beach has been in private practice as a psychologist since 1992. (PX 62) A portion of her practice involves conducting evaluations for diagnosis and treatment of disorders, a portion of her practice entails psycho-therapy and portion of her practice entails evaluating individuals with suspected disabilities for accommodations in a school or test setting. She frequently conducts evaluations of individuals with suspected learning disabilities or ADHD. (July 29 – N.T. 191:21-193:16)

47.     Dr. Beach estimates that she has evaluated approximately 1500 people over the course of her private practice. (July 29 – N.T. 193:24-194:3)

48.     Prior to private practice, Dr. Beach served as an Assistant Dean of Student Affairs at University of Cincinnati, College of Medicine. In this role, part of her duties entailed

developing and running the disability accommodations program for the medical school. (July 29 – N.T. 194:4-195:23)

49.     Mr. Berger first came to Dr. Beach in 2010 after he had been denied accommodations for the MCAT. (July 29 – N.T. 203:4-8)

50.     When conducting the evaluation, Dr. Beach obtain a history through interviews of Mr. Berger and his parents, a review of educations records and evaluations dating back to kindergarten and conducted clinical assessments. (July 29- N.T. 204:21-206:8)

51.     Dr. Beach's history reflected that as early as kindergarten, Mr. Berger had a difficult time learning and retaining early decoding skills which included letter reversals and other signs that were suggestive of a learning disorder. (July 29 – N.T. 206:9-207:22)

52.     Dr. Beach reviewed earlier evaluation reports to develop a history, which indicated concerns with slow reading, difficulty with reading sight words, concerns about attention and recommendations for multisensory and phonics based reading techniques. (July 29 – 208:13 – 212:18).

53.     In the 2010 evaluation, Dr. Beach administered several assessments herself. She administered the Gray Oral Reading Test, 4th edition (GORT-4), the Nelson Denny Reading Test (NDRT), The Wechsler Memory Scale-3rd edition (WMS-III), the Behavior Assessment System for Children (BASC-2). (July 29 – N.T. 215:15-217:13 – PX 5)

54.     On the WMS-III, Dr. Beach reported that Mr. Berger scored in the 5th percentile, which reflected difficulty with working memory and sustained attention. (July 29-217:5-218:2 – PX 5)

55.     On the Woodcock Johnson Test of Cognitive Abilities-III, Dr. Beach administered selected subtests including Rapid Picture Naming and Spelling of Sounds. The Spelling of Sounds results fell in the 10th percentile, which is atypical for adults unless there is a dyslexic type reading disorder. The rapid picture naming subtest is a measure of processing speed. On this assessment Dr. Beach noted that Mr. Berger performed extremely low. (July 29 – 219:11-220:15 – PX 5)

56.     Dr. Beach also administered the GORT-4.  In this assessment, Mr. Berger was asked to read out loud. Dr. Beach observes and identifies misidentified words, misread words and omitted words. Dr. Beach administers the GORT-4 in conjunction with other assessments because the GORT-4 provides some insight into the condition and manner with which one reads, which she asserts, may be difficult to ascertain on a silent measure. On the GORT-4, Dr. Beach observed many hesitations, lack of automaticity and several misidentified words. The results of the GORT-4 reflects Reading Rate and Reading Accuracy subtests, each of which fell in the 1st percentile and his Reading Comprehension score fell in the 37th percentile. (July 29 – N.T. 16-224:16 – PX 5)

57.     Dr. Beach also administered the NDRT. Dr. Smith also administer the NDRT in 2010; however, his assessment was a different version. Dr. Smith administered the extended time version, whereas Dr. Beach administered the standard time version. The standard time version is administered in 20 minutes. Whereas the extended time version is administered in 32 minutes. On the standard time version that was administered by Dr. Beach, Mr. Berger did not complete that assessment within 20 minutes. Dr. Beach reported that Mr. Berger on the standard time version scored in the 1st percentile on the reading comprehension section. However, when

Mr. Berger was given the extended time version by Dr. Smith, it was reported that his reading comprehension score was in the 70th percentile. (July 29 – N.T. 25-227:4 – PX 5)

58.     Dr. Beach's diagnostic impressions included reading disorder and disorder of written expression. Dr. Beach's diagnosis is consistent with DSM-IV criteria as articulated in her report. Due to Mr. Berger's slow reading, poor reading accuracy, limited reading automaticity, which interrupted reading comprehension, she recommended 100 percent extended time. Dr. Beach recommended additional accommodations as well as learning strategies for exams. (PX 5)

59.     Dr. Beach's second evaluation of Mr. Berger was in 2013 and a report was prepared. Dr. Beach administered additional assessments of cognitive abilities and achievement, which are listed in the report. (July 29 – N.T. 232:18-233:14 – PX 6)

60.     On the Wechsler Adult Intelligence Scale-4[th] edition (WAIS-IV), Mr. Berger scored high in the verbal and conceptual knowledge and reasoning, where his score was in the 99th percentile and 97th percentile respectively. However, his working memory and processing speed fell in the 9th percentile and 2nd percentile respectively (July 29 – N.T. 234:12-235:3 – PX 6)

61.     On the Woodcock Johnson Test of Cognitive Abilities- 3rd edition (WJ COG-III) on untimed measures such as the Verbal Ability Cluster and Thinking Ability Cluster he scored high with scores in the 88th percentile and 80th percentile respectively. However on assessments which involved timed measures Mr. Berger was consistently low. For example, on the Cognitive Efficiency Cluster he scored in the 7th percentile and on the Processing Speed Cluster he scored in the 2nd percentile (July 29 – N.T. 237:20-241:23 – PX 6)

62.    The Woodcock Johnson Test of Achievement – 4th edition (WJ ACH-IV), which Dr. Beach administered, assesses various components relating to reading, writing and math. On untimed reading comprehension measures, Mr. Berger performed in the 91st percentile. However, by contrast, the reading fluency subtest, which is a timed measure fell in the 5th percentile (July 29 – N.T. 241:24 – 243:7 – PX 6 )  The testing also demonstrated low scores on the Word Identification subtest (12th percentile) and the Phoneme-Grapheme Knowledge cluster (22nd percentile) (PX 6)

63.    Dr. Beach administered an additional time reading measure, the Scholastic Ability Test For Adults Reading Comprehension (SATA). On this assessment, Mr. Berger is asked to read a passage and answer questions.  On this assessment, Mr. Berger scored in the 5th percentile. (July 29 – N.T. 243:8-17 – PX 6)

64.    Dr. Beach also administer both behavior and attention rating scale to Mr. Berger as well as secondary sources. The results of these scales reflected impaired focus, concentration, and organization (July 29 – N.T. 244:15-245:19 – PX 6)

65.    Dr. Beach provided diagnoses, which included Reading Disorder, Disorder of Written Expression and ADHD. As reflected in her report, the diagnoses were consistent with the DSM-IV criteria. (July 29 – N.T. 245:20 – 246:10 – PX 6)

66.    Dr. Beach recommended several accommodations and learning strategies for both standardized tests (i.e. USMLE) and for school. With respect to the USMLE, Dr. Beach recommended 50% extended time, extra breaks, multiple day testing and a quiet room. (July 29 – N.T. 246:11-20 – PX 6).

67.     Dr. Beach conducted a third evaluation in 2017 relating to Mr. Berger request for accommodations on the USMLE Step 2 CK. (July 29 – N.T. 246:21-247:6 – PX 8)

68.     Dr. Beach administer the WJ ACH-IV. On this measure Mr. Berger continued to demonstrate very low scores for time reading comprehension and other academic areas. He also demonstrated limited ability in automatic and accurate word identification and phonological processing. (July 29 – N.T. 247:7 – 248:19 – PX 8)

69.     On the WJ ACH-IV, Dr. Beach also administer a subtest or oral reading fluency, which is similar to the GORT. Dr. Beach observed that when Mr. Berger reads there is a high rate of word identification errors, omissions and substitution of words. (July 29 – N.T. 248:20-249:16 – PX 8)

70.     Based on the 2017 evaluation, Dr. Beach reported a diagnosis of specific learning disorder with impairment in reading, specific learning disorder with impairment in written expression and ADHD. These diagnoses were consistent with the DSM-V criteria as detailed in the report (July 29 – N.T. 250:6-252:7 – PX 8)

71.     Dr. Beach recommended for the USMLE Step 2 CK, 100% extended time over two day administration, extra breaks and a private distraction reduced testing room. Dr. Beach recommended additional time because the USMLE Step 2 CK is a more reading intensive test than the USMLE Step 1. (July 29 – N.T. 252:9 – 253:16 – PX 8)

72.     Dr. Beach did review Mr. Berger's MCAT scores. She acknowledges that he was able to score higher on the MCAT than on the timed diagnostic measures that she administered. However, she noted that one can significantly increase their reading rate by studying material and understanding the format. She further noted that Mr. Berger is very good at developing

- 14 -

compensatory strategies to speed up his reading on a test like the MCAT. By contrast, the diagnostic assessments contain novel reading for which one does not spend months studying. Dr. Beach in her experience has seen other patients who had average MCAT scores but low reading fluency scores. (July 29 – N.T. 253:17-255:17)

       **D.**     **NBME's Accommodation Review Process**

73.     Katherine Farmer, Psy.D. is the Director of Disability Services and the ADA Compliance Officer for testing Programs at the NBME. (July 30 – N.T. 122:19-22)

74.     Dr. Farmer often consults with external professionals to review supporting documentation submitted by the individual who requested accommodations. (DX 23 ¶10)

75.     While Dr. Farmer consults with external professionals, she is the final decision maker regarding whether to approve or reject accommodations. (July 30 – N.T. 130:3-19)

76.     Dr. Farmer is not a licensed psychologist. She had not conducted an evaluation herself since becoming a doctor. She has never administered without supervision the assessments that were administered by Dr. Beach. She has never conducted an evaluation of a person for recommending accommodations on an admissions or licensure examination. (July 30 – N.T. 130:20-133:2)

77.     Benjamin Lovett, Ph.D. is an external consultant that the NBME submits accommodations documentation for review. Dr. Lovett has been a consultant for the NBME for ten years. (July 30 – N.T. 140:12-14)

78.     Dr. Lovett also conducts reviews for several other testing organizations such as the National Board of Osteopathic Medical Examiners, the New York State Board of Law Examiners, and the Law School Admissions Council. (July 30 – N.T. 203:20-204:9)

79.     Dr. Lovett does not have a clinical practice and does not personally do any evaluations. (July 30 – N.T. 205:23-25)

80.     Samuel Ortiz, Ph.D. is an external consultant to whom the NBME submits accommodation documentation for review. Dr. Ortiz has been a consultant with the NBME since July 1999. (July 30 – N.T. 165:15-166-2)

81.     Dr. Ortiz area of specialization is the evaluation of students who are bilingual. (July 30 – N.T. 168:3-5)

82.     Dr. Ortiz also serves as an external reviewer for other organizations that administer standardize tests regarding request for accommodations from prospective examinees. (DX 22: ¶8)

**E.     Mr. Berger's Requests for Accommodations and NBME's Denials**

83.     On October 14, 2013, the NBME received Mr. Berger's application and supporting documentation for accommodations on the USMLE Step 1. (July 30 – N.T. 133:16-22 – PX 23-A)

84.     Mr. Berger's requested accommodations included time and half (50%) extended time over 2 days of testing and additional break time. (PX 14)

85.     Mr. Berger's request for extended time on the USMLE Step 1 was supported by a substantial amount of documentation including early childhood school records, multiples psychoeducational evaluations taken over Mr. Berger's education, approval of accommodations throughout his education and approval of accommodations on standardized examinations. (PX 6, 12-36)

86.     Mr. Berger provided NBME with a personal statement in which he described the impact of his impairments and his use of compensatory strategies. (July 29 – N.T. 76:14-77:22 – PX 12)

87.     Mr. Berger indicated in his application that he was requesting accommodations based on impairments, which included learning disorders in reading and writing and Attention Deficit Hyperactivity Disorder (ADHD) (July 29 – N.T. 78:17-24 – PX 14)

88.     Mr. Berger furnished his NBME with his prior history of accommodations in medical school, college, elementary through high school and on the College Board exams. (N.T. 78:25-79:8, 80:22-81:3, 81:9-11, 81-17-21, 81:22-82:1 - PX 15, 22, 24, 26, 27 )

89.     Mr. Berger also furnished several early educational records including early standardized examinations such as the Standford exam administered in 2nd through 4th grades. These documents reflect below average results in areas of word study skills, phonetic analysis and phonetic principles. (PX 18 [PX 253], PX 19 [PX 256], PX 20 [PX 259].

90.     Mr. Berger also provided several psychoeducational evaluations from second grade through 2013. (July 29 – N.T. 79:17-21, 81:4-8, 82:8-11, 82:22-83:3, 83:13-85:2-PX 6, 17, 23, 29, 32, 34)

91.     Dr. Farmer referred Mr. Berger's October 2013 request for accommodations to Dr. Lovett. (July 30 – N.T. 134:1-2)

92.     Dr. Lovett returned his report with recommendations to Dr. Farmer on October 22, 2013. (July 30 – N.T. 134:3-15 – DX 24-2)

93.     By letter dated December 23, 2013, NBME denied Mr. Berger's request for accommodations for the USMLE Step 1. (July 29 – N.T. 85:3-25 – PX 37)

94.     It took Dr. Farmer over sixty days after receiving Dr. Lovett's recommendations to communicate the denial of Mr. Berger's request for accommodations. (July 30 – N.T. 134:20-23)

95.     Mr. Berger took the USMLE Step 1 without accommodations. (July 29 - N.T. 86:16-18)

96.     Mr. Berger put forth a significant study effort for the USMLE Step 1. He took a two year leave of absence, during which he spent every day, as long as 12 hours a day studying. He felt prior to taking the exam that he was prepared. (July 29 – N.T. 86:19-87:2)

97.     During the exam, Mr. Berger encountered difficulty reading and processing the information on the reading vignettes. Because of the time that was required to complete the exam, he only had time to review key words to answer questions. He ran out of time on each question block and often had to fill in answers in order not to leave any answers blank. (July 29 – N.T. 87:3-89:8)

98.     Mr. Berger narrowly passed the USMLE Step 1 with a score of 198, a passing score was set at 192.  The mean score was 227. (July 29 – N.T. 89:9-90:5 – PX 38)

99.     Mr. Berger submitted his request for accommodations on the USMLE Step 2 CK on April 3, 2015. In addition to the information furnished with his request for accommodations on the USMLE Step 1, Mr. Berger furnished additional documentation. (July 29 – N.T. 92:13-96:6 – PX 7, 39 – 42)

100.     Dr. Farmer received the request for accommodations for the USMLE Step CK on April 3, 2015. (July 30 – N.T. 136:10-16 – DX 23-C)

101.    Dr. Farmer did not submit Mr. Berger's 2015 request to an outside consultant, rather she conducted the review herself. (July 30 – N.T. 136:20-137:2)

102.    By letter dated July 24, 2015, the NBME denied Mr. Berger's request for accommodations on the USMLE Step 2 CK. (July 29 – N.T. 96:7-18, PX 43)

103.    Despite that Dr. Farmer conducted the review herself and claims no new information was submitted, she did not communicate NBME denial for 110 days.[3]

104.    Over the course of the two years after this denial, Mr. Berger studied for the USMLE Step 2 CK studying many hours each day. (July 29 – N.T. 97:3-16)

105.    When taking the USMLE Step 2 CK in 2017, he utilized a similar strategy to that which he used on the USMLE Step 1. He continue to experience difficulty reading through each passage and reading answers to questions. He felt he had very little time to comprehend the questions. He had to randomly guess many of the answers so that nothing was left blank. (July 29 – N.T. 97:17-98:21) Consequently, Mr. Berger was not able to demonstrate his skill or knowledge on the USMLE Step 2 CK. (July 29 – N.T. 98:22-25)

106.    Mr. Berger failed his April 2017 administration of the USMLE Step 2 CK, receiving a scaled score of 151, with a passing score set at 209 and most scores falling between 190 and 270 (July 29 – N.T. 99:1-8 – PX 44)

107.    Following his failed USMLE Step 2 CK attempt, Mr. Berger through an attorney, requested an extension of AUC's leave of absence in order to take the USMLE Step 2 CK a

---

[3] The ADA requires that testing entities must respond in a timely matter to request for testing accommodations. 28 C.F.R §36.309(b)(1)(vi). See also PX 61 [PX 457]

second time. Mr. Berger's school agreed to give him another extension of the leave of absence. (July 29 – N.T. 99:9-100:17)

108.    In March 2018, Mr. Berger submitted a request for accommodations on the USMLE Step 2 CK. (July 29 – N.T. 104:2-5) On this application, Mr. Berger requested 100% extended time because of his experience on the first attempt of the USMLE Step 2 CK, which suggested that even with 50% extended time, he would be unable to complete the exam (July 29 – N.T. 100:18-101:20 – PX 45)

109.    Mr. Berger submitted additional documentation to the NBME supporting his request for accommodations. The documentation included a July 2017 evaluation conducted by Dr. Beach and an updated personal statement describing Mr. Berger difficulties particularly on his first attempt taking the USMLE Step 2 CK (July 29-N.T. 99:1-104:4 - PX 8, 45-49)

110.    Dr. Farmer received Mr. Berger third request for accommodations on March 2, 2018. (July 30 – N.T. 138:25-139:10 – DX 23E)

111.    Dr. Farmer referred this request to Dr. Lovett who previously recommended denying Mr. Berger's request for accommodations for the USMLE Step 1. (July 30 – N.T. 138:11-13.

112.    Dr. Lovett returned his report with recommendations to Dr. Farmer on March 14, 2018. (July 30 – N.T. 138:14-17 – DX 24-3)

113.    By letter dated May 27, 2018, NBME denied Mr. Berger's request for accommodations. (July 29 – N.T. 104:6-19 – PX 50)

114. It took Dr. Farmer over seventy days after receiving Dr. Lovett's recommendations to communicate the denial of Mr. Berger's request for accommodations. (July 30 – N.T. 138:22-25

115. On Mr. Berger's second attempt to take the USMLE Step 2 CK, he also change his strategy to avoid random guessing as he was running out of time. At the beginning of each block, he would proceed to approximately the 20th question and would mark answers with same letter ("C") for each ensuing answer. He would then return to the first question on each block and then proceed through as many questions as he could answer. This strategy ensured that when he ran out of time on each block a guessed answer was indicated in which he ostensibly had a 20% chance of answering correctly. He estimated that he was able to read to some degree approximately 60 percent of the questions. The remaining questions would have been marked with a single letter ("C"). (July 29 – N.T. 104:22-107:10).

116. Mr. Berger failed his August 2018 administration of the USMLE Step 2 CK, receiving a scaled score of 166, with a passing score set at 209 and most scores falling between 190 and 270. (July 29 – N.T. 107:11-23 – PX 51)

**F. The Consequence of the Second Failed Attempt on the USMLE Step 2 CK**

117. Following Mr. Berger's failed attempt on the August 2018 USMLE Step 2 CK, he received a letter from the USMLE Program Manager advising that a hold was being placed on his account due to concerns regarding anomalous performance. In particular, the USMLE identified that Mr. Berger selected one letter option as his answer more than 44% of the time. (July 31 – N.T. 109:5-110:5 – PX 52.

118.    Mr. Berger responded to the USMLE with a declaration stating the he has disabilities and that because he was unable to complete the exam, his test taking strategy was to randomly guess with the same letter. (PX 53)

119.    In response, to Mr. Berger's declaration, the USMLE lifted the hold placed on his USMLE interactions. (July 31 – N.T. 111:4-13 – PX 54)

120.    After Mr. Berger's second failed USMLE Step 2 CK attempt, he received notice from his school that he was being dismissed without a right to appeal. Mr. Berger at this time was well past the required time limit of seven years to graduate. Through counsel, Mr. Berger submitted another request to extend his leave of absence in order to pursue his request for accommodations and take the USMLE Step 2 CK a third time. (July 29 – N.T. 111:14-113:4)

121.    AUC's attorney provided a letter indicating if the present law suit is successful and Mr. Berger is able to take the USMLE Step 2 CK with accommodations, AUC will allow Mr. Berger to keep his academic status for one additional attempt for the USMLE Step 2 CK. (July 31- N.T.113:5-114:2 – PX 60)

### G.    Dr. Ortiz – Evaluation As a Bi-Lingual

122.    Dr. Ortiz was retained as a consultant in March 2019 after this litigation was initiated. (July 30 – N.T. 189:18-25- DX 22B)

123.    While NBME had reviewed this matter on three separate occasions, neither Dr. Farmer nor Dr. Lovett ever suggested or expressed concern that Mr. Berger should have been evaluated as a bilingual. (July 30-N.T. 129:4-15

124. The basis of Dr. Ortiz's belief that Mr. Berger should have been evaluated as a bilingual is because he may have been exposed to more than one language. (July 30 – N.T. 192:15-21)

125. This contention is contrary to the testimony of Mr. Berger and his mother Maureen Holland. Moreover, this contention disregards his exposure to English at home and exclusive exposure to English in pre-school and elementary school.

126. Dr. Ortiz suggests that one who was exposed to as little as 1%-10% of a foreign language should be assessed as a bilingual. He further suggests many individual residing in the United States should be evaluated as a bilingual even if their exposure to a foreign language was as little as 10 percent exposure. (July 30 – N.T. 195:17-196:7)

127. However, Dr. Ortiz was unable to articulate any type of standardized assessment or norms that can be utilized to assess individuals with limited exposure to a foreign language particularly when Mr. Berger was in his primary or secondary education. (July 30 – N.T. 194:23-199:12)

128. Dr. Ortiz confirmed that it is the position of the National Association of School Psychologists that individuals should be assessed in their native language; however, he was not willing to concede that Mr. Berger's native language is English. (July 30 – N.T. 199:15-200:5)

129. Dr. Ortiz's testimony about proper assessment methodology is unclear and his assumptions are inconsistent with undisputed facts. His testimony should not be credited and given merit in this matter.

## III.    CONCLUSIONS OF LAW

### A.    Standard of Review

In order to merit the relief of a preliminary injunction, Mr. Berger must meet four factors, namely

(1) the likelihood that plaintiff will succeed on the merits (2) the likelihood of irreparable harm to the

plaintiff if the preliminary injunction is denied, (3) that granting preliminary relief will not result in even

greater harm to others, and (4) the public interest favors such relief. *Hunter v Hamilton County Board of*

*Elections,* 635 F.3d. 219, 233 (6th Cir. 2011) No one element is determinative of the outcome and

the Court must engage in a balance of all the elements.  *Welch v. Brown,* 551 F. App'x 804, 808

(6th Cir. 2014) . The ADA expressly authorizes injunctive relief as appropriate to remedy acts of

discrimination against people with disabilities.  *See* 42 U.S.C. § 12188(a)(1).[4]

Title III of the ADA requires private entities, like the NBME that administer licensure

examinations such as the USMLE Step 2 CK, do so in a "place and manner accessible to persons

with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C.

§12189.  The purpose of the ADA is to guarantee that those with disabilities are not

disadvantaged and "to place those with disabilities on equal footing" with others.  *Rush v.*

*National Board of Medical Examiners*, 268 F.Supp. 2d 673 (N.D. Texas 2003); *Agranoff v. Law*

*School Admission Council*, 97 F.Supp.2d. 86 (D. Mass 1999). Accordingly, the ADA prohibits

---

[4] Specifically, the ADA provides, "[t]he remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of section 12183 of this title."  42 U.S.C. § 12188(a)(1).

- 24 -

discrimination by testing entities, stating that it is impermissible to fail to make accommodations to test takers with disabilities.  42 U.S.C. §12182(b)(2)(A)(ii).

B.      **Success on the Merits**

Mr. Berger's probability of success on the merits depends on his likelihood of prevailing under the ADA's standard for requiring appropriate accommodations. In order to succeed on an ADA claim for discrimination in testing accommodations, Mr. Berger must show: (1) that [h]e is disabled, (2) that [his] requests for accommodations are reasonable, and (3) that those requests have been denied." *D'Amico v. New York State Bd. Of Law Exam'rs,* 813 F.Supp. 217, 221 (W.D.N.Y. 1993) Mr. Berger has made a sufficient showing of likelihood of success on all three elements. The second and third factors are not seriously in dispute. Katherine Farmer, NBME's Director of Disability Services, testified that the NBME has granted requests for extended time and even 100% extended time for other test takers. (July 30 – N.T. 128:4-15) Furthermore, Dr. Lovett, NBME's outside consultant testified that extended time would be relevant for individuals who have slow reading ability. (July 30 – N.T. 251:8-18). Accordingly, there is no dispute that Mr. Berger's request for extended time is reasonable. Moreover, there is no dispute that the NBME has denied Mr. Berger's requests for accommodations several times, thereby meeting the third requirement under the ADA.

Mr. Berger has made a sufficient showing that he would likely prevail in proving that he is a person with a disability. A plaintiff is disabled under the ADA if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. §12102(2)(A) Specific learning disorders, dyslexia and ADHD are considered impairments under the ADA. 28 C.F.R. §36.105(b)(1)(ii) and 28 C.F.R. §36.105(b)(2). Mr.

Berger suffers from a specific learning disability in reading (reading fluency), impaired processing speed and ADHD.

The ADA makes clear that the term "substantially limits" shall be construed broadly in favor of expansive coverage.  It further provides that "an impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting" and "the threshold issue of whether  an impairment substantially limits a major life activity should nor demand extensive analysis."  28 C.F.R. §36.105(d)(1). Consistent with this broad interpretation of disability, the U.S. Department of Justice's  (DOJ) regulations on Title III of the ADA, state that the purpose of the ADA Amendments Act is to "make it easier for people with disabilities to obtain protection under the ADA. 28 C.F.R. 36.101(b).

When analyzing whether an individual is substantially limited, ADA's regulations state that it may be useful to consider, as compared to most people in the general population, the condition, manner and duration in which the person performs the major life activity. 28 C.F.R. 36.105(d)(3)(i) Furthermore, when considering the condition, manner or duration, facts such as "the difficulty, effort or time required to perform a major life activity" may be considered when determining whether an individual's impairment substantially limits a major activity." 36.105(d)(3)(ii) Comparing a person's performance of a major life activity to most people in the general population "usually will not require scientific, medical, or statistical evidence", although the ADA does not foreclose an individual from presenting such evidence. 28 C.F.R. §36.105(d)(1)(vii). When considering medical such as psychological evidence, the DOJ heavily favors and individualized assessment or evidence that a "qualified professional has individually

and personally evaluated the candidate as opposed to simply considering scores from a review of

documents." See 28 C.F.R. pt. 36, app. A, at 782-784. The DOJ's guidance also states that the

need for an individualized evaluation is "particularly important in the learning disabilities

context, where proper diagnosis requires face to face evaluation," and that "[r]eports from

experts who have personal familiarity with the candidates should take precedence over those

from, for example, reviewers for testing agencies, who have never personally met the candidate

or conducted the requisite assessments for diagnosis and treatment." 28 C.F.R. pt. 36, app. A, at

784.

     In this matter, Dr. Beach conducted several evaluations of Mr. Berger, which included

her own observations and administration of various assessment. These evaluations were

conducted over period of seven years. Dr. Beach observed first hand, the condition and manner

with which Mr. Berger reads and processed information. She administered assessments herself,

which included timed measures of reading (orally and silently) and processing information. In

each of her evaluations, Dr. Beach administered multiple assessment of reading, which

consistently demonstrated impaired reading fluency, reading rate and reading accuracy. Dr.

Beach's conclusions were based on several normed measures and were never based on a single

measure. Based on these evaluations she reported that Mr. Berger is a person with disabilities

and recommended several accommodations including 100% extended time. Dr. Beach's

recommendations under the regulatory guidance is to be given precedence over the opinions of

NBME's evaluators and consultants.

     The NBME's decision to deny accommodations was based solely on the

recommendations of Dr. Benjamin Lovett. Dr. Lovett has been a consultant for NBME for

approximately ten years and conducts reviews for other testing entities. He does not actually evaluate individuals in a clinical setting. (July 30 – N.T. 205:23-25, 247:6-7) However, he acknowledges the importance of a clinical evaluation in the administration of cognitive assessments and further acknowledge that rendering a diagnosis of a learning disability requires a clinical evaluation (July 30 – N.T. 248:5-249:11) Despite this admission, Dr. Lovett concluded that Mr. Berger does not have a learning disability without conducting a clinical evaluation and without administering a single assessment. NBME's reliance on Dr. Lovett's recommendation is therefore at a variance with the DOJ's guidelines and the intent of the ADA.

Moreover, pursuant to the ADA, Mr. Berger's use of accommodations during his primary, secondary and post-secondary education are to be accorded considerable weight when making accommodation determinations. The ADA regulations provides in pertinent part:

> When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred as a Section 504 Plan).  28 C.F.R. §36.309(b)(1)(v).

Mr. Berger has received extended time as well as other accommodations throughout his primary, secondary and post-secondary education pursuant to both informal and formal accommodation plans and on other standardized exams. Of note, Mr. Berger has received accommodations on standardized medical school exams but also on the Shelf exams, which are prepared by the NBME. Furthermore, the DOJ's guidance further indicates that if a candidate

received formal accommodations in school, the testing entity should approve the same accommodations. The DOJ's guidance provides:

> **If a candidate previously received testing accommodations under an Individualized Education Program (IEP) or a Section 504 Plan, he or she should generally receive the same testing accommodations for a current standardized exam or high-stakes test.** If a candidate shows the receipt of testing accommodations in his or her most recent IEP or Section 504 Plan, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant those same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate. (Emphasis supplied) http://www.ada.gov/regs2014/testing_accommodations.html (PX 61)

Not only has the NBME disregarded this guidance, it is clear from its denials and from Dr. Lovett's recommendations that Mr. Berger's prior documentation of accommodations was not accorded the considerable weight that is expressly required by the ADA. Mr. Berger's history of accommodations is to be accorded considerable weight and is not to be ignored or discredited by the NBME.

Rather than consider the heightened weight to Dr. Beach's recommendations or Mr. Berger's use of accommodations, Dr. Lovett's recommendations and NBME's denials primarily focuses on the outcome (i.e. scores) of Mr. Berger's unaccommodated MCAT and his USMLE Step 1 as the basis for determining that Mr. Berger does not have a disability. This basis of NBME's decision is at a variance with the express provisions of the ADA, DOJ's guidance and the decisional law.

The regulations promulgated under the ADA rejects focusing the outcomes an individual can achieve when deciding whether an individual has a disability. The regulations state:

> In determining whether an individual as a disability…the focus is on how a major life activity is substantially limited, **and not on what outcomes and individual can achieve.** For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population. 28 C.F.R. §36.105(d)(3)(iii) (Emphasis added)

Furthermore, the Department of Justice, in its commentary concerning promulgation of Title III regulations, expressly rejected NBME's practice of relying upon test scores such as the MCAT as a determining factor of whether or not a disability exists. The Department of Justice has declared that testing performance has limited relevance and value with respect to disproving disability.[5] The Department of Justice's commentary to the regulations provides:

---

[5] The commentary to the regulation provides:

> **Organizations representing testing and educational entities asked the Department to add regulatory language indicating that testing-related outcomes, such as grades and test scores, are relevant to disability determinations under the ADA. The Department has considered this proposal and declines to adopt it because it is inconsistent with congressional intent.** As discussed earlier in this section, Congress specifically stated that the outcome an individual with a disability is able to achieve is not determinative of whether that individual has a physical or mental impairment that substantially limits a major life activity. 81 Fed. Reg. 53237 (August 11, 2016) (Emphasis added) (PX 62)
>
> &ast;&ast;&ast;
>
> The Department does not believe that the testing results or grades of an individual seeking reasonable modifications or testing accommodations always would be relevant to determinations of disability. While testing and educational entities may, of course, put forward any evidence that they deem pertinent to their response to an assertion of substantial limitation, **testing results and grades may be of only limited relevance.** Id. (Emphasis added) (PX 62)

> In addition, the Department does not agree with the assertions
> made by testing and educational entities that evidence of testing
> and grades is objective and, therefore, should be weighted more
> heavily, while evidence of self-mitigating measures, informal
> accommodations, or recently provided accommodations or
> modifications is inherently subjective and should be afforded less
> consideration. Congress's discussion of the relevance of testing
> outcomes and grades clearly indicates that it did not consider them
> definitive evidence of the existence or nonexistence of a disability.
> While tests and grades typically are numerical measures of
> performance, the capacity to quantify them does not make them
> inherently more valuable with respect to proving or disproving
> disability. 81 Fed. Reg. 53237 (August 11, 2016) (PX 62)

Furthermore, when considering test results, then - District Court Judge (now Justice)

Sotomayor held that defining a disability cannot be "based on outcomes alone, particularly in the

context of learning disabilities, " especially where a plaintiff is "extremely bright hardworking,

and…uses alternative routes to achieve academic success." *Bartlett v. New York State Bd. Of*

*Law Examiners,* 2001 U.S. Dist. LEXIS 11926 at *122 (S.D.N.Y. Aug. 15, 2001)

Dr. Lovett's adherence to focusing on "real world test" results effectively would preclude

any medical student from receiving accommodations under the ADA if he or she scored within

the average range on an MCAT without accommodations. Such an analysis disregards the

additional time and effort on the part of the test taker when taking the exam and the extensive

study efforts required to find alternative routes to achieve a particular score. Dr. Lovett's

analysis and NBME's adherence to his recommendations contravene the Congressional intent

when it passed the ADA. NBME's scrutiny in this matter represents the type of conduct that

Congress targeted and sought to end when it passed the ADA Amendment Act.  As noted in the

Congressional Record:

> Historically, certain individuals with learning disabilities seeking
> accommodations in higher education – including high stakes
> exams-have seen their access to testing accommodations severely
> undercut by testing companies not willing to consider and support
> that learning disabilities are neurologically based, lifelong
> disabilities that may exist in students with high academic
> achievement because the individual has been able to cope and
> mitigate the negative impact while simultaneously being
> substantially limited in one or more life activities.

2 Cong.Rec. 8296 (Sept. 17, 2008).

Accordingly, NBME's focus on the results of Mr. Berger's MCATs or USMLE Step 1

test have little or no relevance when making accommodation determinations. Rather, when

considering standardized testing, the focus should be on Mr. Berger's study effort and strategies

when taking the exams. Considering solely the results of an exam not only contravenes the ADA,

it leads to incorrect assumptions. This is evident when viewing the results of Mr. Berger's PSAT

exam. If one simply looks at his score, he achieved a Verbal in the 72nd percentile and a Math

score in the 77th percentile. However, because of Mr. Berger's impairments, he was unable

complete many questions on the exam, thereby omitting multiple questions. However, when

given an appropriate accommodation of extended time, such as on the SAT, Mr. Berger was able

to complete the exam and able to achieve a score in the 90th percentile.

The purpose of the ADA is to guarantee that those with disabilities are not disadvantaged

and "to place those with disabilities on equal footing" with others.  *Rush v. National Board of*

*Medical Examiners*, 268 F.Supp. 2d 673 (N.D. Texas 2003); *Agranoff v. Law School Admission*

*Council*, 97 F.Supp.2d. 86 (D. Mass 1999). The regulations implemented in accordance with the

ADA provide that an examination is administered to best ensure that, "the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's [disability]" 28 C.F.R. §36.309(b)(1)(i). *See Enyart v. Nat'l Conf. of Bar Exam., Inc.*, 630 F.3d 115 (9th Cir. 2011); *Bonnette v. District of Columbia Court of Appeals*, 796 F.Supp.2d 164 (D.D.C. 2011); *Jones v. National Conference of Bar Examiners,* 801 F.Supp.2d 270 (D. Vt. 2011). Without accommodations, because of Mr. Berger's impaired reading speed and fluency and slow processing, he is unable to demonstrate his knowledge or skills because he is unable to come close to completing the exam. This was keenly evident from the results of Mr. Berger's two failed attempts when taking the USMLE Step 2. Mr. Berger testified that he was unable to complete a substantial portion of the exam due to his reading impairment and slow processing speed. Of note, the USMLE program even recognized that over 40% of his exam had a pattern of containing the same letter answer, which was due to random guessing when Mr. Berger ran out of time. Mr. Berger is requesting extended time not to gain an advantage but rather to allow him to complete more of the exam so that he can demonstrate his knowledge.

The accommodation of extended time ameliorates the nature of Mr. Berger's impairments including but not limited to slow and dysfluent reading, impaired reading comprehension, slow processing speed and diminished concentration. These significant impairments individually and collectively create a barrier that interferes with Mr. Berger's ability to attend to and read through lengthy reading passages such as the passage-based clinical case presentations found on the USMLE Step 2 CK exams. As noted above, Mr. Berger's experience in taking the USMLE Step 2 CK reflects that due to impairments, he was unable to answer nearly half the questions on the

exams, resulting in two failures. The inability to complete substantial portions of the USMLE

Step 2 CK is tantamount to a denial of access to the exam.

C. **Irreparable Harm**

The second element necessary for a preliminary injunction – irreparable injury – is also

present. Courts have presumed irreparable harm when there was a violation of the ADA, since

the statute's goals "include assuring that all individuals with disabilities enjoy 'equality of

opportunity, full participation, independent living, and economic self-sufficiency.'" *Cupolo v.*

*Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997) (quoting 42 U.S.C. §

12101). Consequently, "[i]njuries to individual dignity and deprivations of civil rights constitute

irreparable injury." Id.; see also, e.g., *Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d 1034,

1040 (N.D. Ohio 2001) (holding that there is irreparable harm when a person is discriminated

against on the basis of disability). Courts also view as irreparable injury a person's psychological

harm in not being able to pursue his chosen profession. In *Enyart v. Nat'l Conf. of Bar Exam.,*

*Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011), the Ninth Circuit affirmed the grant of a preliminary

injunction requiring bar exam administrators to provide accommodations for a blind test-taker,

explaining that he had "demonstrated irreparable harm in the form of the loss of opportunity to

pursue her chosen profession." Id. at 1165. Furthermore, irreparable harm occurs when a

disabled person is barred from participating in a normal life activity by virtue of ongoing

discrimination related to her disability. *See D'Amico*, 813 F. Supp. at 220 (finding irreparable

harm for failure to make accommodations on bar exam); *See also*, *Agranoff v. Law Sch.*

*Admission Council, Inc.,* 97 F. Supp. 2d 86 (D. Mass 1999) (granted preliminary injunction

finding irreparable harm for failure to make accommodations on the Law School Admission

Test).   Accordingly, Mr. Berger will be irreparably harmed unless this Court issues a preliminary injunction.

The USMLE Step 2 CK is not merely an exam, it is the gatekeeper to completing medical school, qualifying for a residency program, seeking medical licensure and ultimately practicing medicine. In Mr. Berger's case, without the accommodation of extended time, he will likely fail the exam as he has done on two prior occasions because he was only able to answer less than 60% of the exam questions.  If he fails the USMLE Step 2 CK a third time, he will be dismissed from AUC and will effectively be barred from earning his medical degree and taking the USMLE Step 2 CK. Accordingly, if Mr. Berger does not take the USMLE Step 2 CK by the end of August 2019 with accommodations, the USMLE Step 2 CK will effectively become the ultimate barrier to the medical profession because the resulting score will not "best ensure" that the exam results will reflect his true ability or achievement level.  Rather, his score will reflect the substantial impact of his disability. *See* 28 C.F.R. §36.309(b)(1)(i). *See Jones v. National Conference of Bar Examiners,* 801 F.Supp.2d 270, 286-288 (D. Vt. 2011) Additionally, if he does not receive appropriate and reasonable accommodations at this juncture, he will be unable to graduate medical school, apply for residency programs and interview for the 2020 match.

Mr. Berger is faced with either taking the USMLE Step 2 CK without accommodations or waiting another year to be considered for the match. NBME's refusal to provide appropriate accommodations places Mr. Berger at a disadvantage and may end his medical education and career in which he has invested considerable time and money. This immediate and actual harm cannot be repaired absent preliminary injunctive relief.  Moreover, as noted above, no other

remedy at law is available in that the only relief available under the ADA is injunctive relief.[6]

Courts have granted preliminary injunctive relief against testing agencies under similar

circumstances. See e.g., *Jones v. National Conference of Bar Examiners,* 801 F.Supp.2d 270,

286-288 (finding irreparable harm if Plaintiff is required to take a "high stakes" exam in

discriminatory circumstances); *Enyart v. Nat'l Conf. of Bar Exam., Inc.*, 630 F.3d 1153, 1165

(9th Cir. 2011) (finding irreparable harm in the form of loss of pursuing chosen profession);

*Bonnette v. District of Columbia Court of Appeals*, 796 F.Supp.2d 164, 186-187 (D.D.C. 2011)

(irreparable harm found for delay in practicing profession); *Agranoff v. Law School Admission*

*Council, Inc.*, 97 F. Supp. 2d 86 (Mass. 1999); *Rush v. National BD. Of Medical Examiners,* 268

F. Supp.2d 673 (N.D. Tx. 2003). Additionally, if Plaintiff is not permitted to take the USMLE

Step 2 CK with appropriate accommodations by the end of August, he will be irreparably harmed

because he will lose the extensive time he has invested in preparation for the exam. See,

*Agranoff*, 97 F.Supp.2d at 88 (found irreparable harm because of loss of time and effort spent in

preparatory course and with tutor for the LSAT).

### D. Weighing the Equities

The third element for a preliminary injunction-weighing the equities-also favors the

plaintiff. The NBME's denial of Mr. Berger's accommodation request denies him the

opportunity to take the USMLE Step 2 CK in a non-discriminatory manner and on equal footing

---

[6] Section 12188(a)(1) provides, "the remedies and procedures set forth in section 2000a-3(a) are the remedies and procedures of this subchapter." 42 U.S.C. 2000a-3(a) provides: "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved." See also, *Barbosa v. Amer. Osteopathic Bd. Of Surgery*, 2008 U.S.Dist. LEXIS 51457 (S.D. OH May 23, 2008) [dismissing claims for monetary damages]; *Powell v. Nat'l Bd. Of Med. Examiners* 364 F.3d 79, 86 (2d Cir. 2004) (holding that "a private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages.")

with non-disabled test-takers, in violation of federal law, and constitutes an irreparable injury, which would be mitigated by the issuance of a preliminary injunction.  By contrast, the harm that an injunction would cause the NBME or others is negligible.[7] NBME admits that it grants extended time including 100% extended time on the USMLE Step 2 CK. NBME will suffer no harm if Mr. Berger is accommodated with 100% extended time, in accordance with its policy of providing extra time for student with disabilities.

Further, the issuance of an injunction providing Mr. Berger with his requested accommodation will not affect other USMLE Step 2 CK test takers. The nature of the appropriate accommodation requested by Mr. Berger merely places him on equal footing with non-disabled test takers, and does not provide him with an unfair advantage on the exam. *D'Amico,* 813 F.Supp. at 221 (purpose of the ADA "is to place those with disabilities on an equal footing and not to give them an unfair advantage"). Furthermore, it has been held that the threatened injury to the student outweighs any damage that granting the preliminary injunction might cause to the NBME or other licensing entities or to the public. See e.g., *Rush v. National Board of Medical Examiners*, 268 F.Supp. 2d 673, 679 (N.D. Texas 2003).

Furthermore the integrity of the USMLE Step 2 CK, as well as the examination process, will not be jeopardized by providing Mr. Berger with extended time. NBME has not presented any evidence to suggest that the integrity of the USMLE Step 2 CK will be impaired if extended time if granted. While Dr. Lovett suggest that he has done research regarding the impact of time on time pressured exams, Dr. Lovett admits that he has not done research specific to the USMLE

---

[7] See, e.g. *Agranoff*, 97 F.Supp.2d at 88 (finding irreparable harm plaintiff will suffer from denial of extra time and a half on LSAT is not outweighed by possible inequities to the LSAC); *Enyart v. National Conference of Bar Examiners*, 630 F.3d 1153, 1167 (finding irreparable harm by plaintiff losing the chance to pursue her chosen profession)

Step exams. (July 30 – N.T. 237:2-5, 246:20-24) Moreover, Dr. Lovett did not conclude that providing extra time either gives one an unfair advantage or negatively impacts the integrity of an exam. At best, Dr. Lovett appears to suggests that people may benefit from extra time. (July 30 – N.T. 236:20-237:19) However, Dr. Lovett is aware that there is research which says that extra time only matters for people with learning disabilities.[8] (July 30-N.T. 246:23-247:11)

### E. Public Interest

The last element for a preliminary injunction - the public interest – also favors Mr. Berger. Vindicating federally guaranteed rights against discrimination is indisputably in the public interest.  The ADA was enacted to eliminate discriminatory hurdles for those with disabilities. 42 U.S.C. §12101(b)(1). Title III of the ADA specifically prohibits testing entities, from engaging in disability discrimination. 42 U.S.C. §12189. The purpose of this provision is "to assure that persons with disabilities are not foreclosed from educational, professional or trade opportunities because an examination or course is conducted in an inaccessible site or without an accommodation." *Rawdin v. American Bd. Of Pediatrics*, 582 F.App'x 114, 118 (3d Cir. 2014)

---

[8] See e.g. Runyan, M.K., "The Effect of Extra Time on Reading Comprehension Scores for University Students With and Without Learning Disabilities," Journal of Learning Disabilities, Vol. 24, No 2 (1991). Cohen, A., Gregg, N., and Deng, M., "The Role of Extended Time and Item Content on High Stakes Mathematics Tests," Learning Disabilities Research & Practice, 20, 225-233 (2005), finding that extended time does not improve scores unless the test taker has a disability and sufficient mastery of the content. Ofiesh, N, Hughes, C., "How Much Time?: A Review of Literature on Extended Time For Post Secondary Students With Learning Disabilities," Journal on Postsecondary Education and Disability, Vol. 16, No. 1, Fall 2002; Concluded that research studies have concluded that extended time does not benefit students without learning disabilities in the same way it benefits students with learning disabilities.  Moreover, when provided with extra time, significant score differences were not found between students with learning differences who received extended time, and their normally achieving peers who received no extra time. Sireci, S.G., Li, S., & Scarpati, S., "The Effects of Test Accommodations on Test Performance: A Review of Literature," Center For Educational Assessment, Research Report No. 485, Finding was that the accommodation of extended time improved the performance of students with disabilities more than it improved the performance of students without disabilities.

(quoting H.R. Rep. No. 101-485 (III), at 68-69 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 491-92)

The injunctive relief Mr. Berger seeks is necessary to achieve these anti-discrimination mandates. Thus, the public interest is served by eliminating the discrimination, which the NBME is currently perpetuating and which Congress sought to prevent through the passage of the ADA.

**IV.     CONCLUSION**

For the foregoing reasons, Mr. Berger requests that his Motion be granted and that the Court issue a preliminary injunction against Defendant compelling that Defendant to provide appropriate accommodations to Mr. Berger to include 100% extended time over two days of testing, extra break time and distraction limited testing environment.

Respectfully submitted

_____/s/_____                                _____/s/_____
Charles Weiner, Esquire                          August T. Janszen (0062394)
LAW OFFICE OF CHARLES WEINER         THE JANSZEN LAW FIRM
Cambria Corporate Center                         4750 Ashwood Drive, Suite 201
501 Cambria Avenue                                Cincinnati, OH 45241
Bensalem, PA 19020                                Tel: (513) 326-9065
Tel:  (267) 685-6311                               Fax: (513) 326-9066
Fax:  (215) 604-1507                               atjanszen@janszenlaw.com
charles@charleswinerlaw.com

*Attorneys for Plaintiff, Brendan Berger*

Date: August 14, 2019

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing Findings of Fact and Conclusions of Law was electronically filed on August 14,  2019, via the Court's CM/ECF System, which will send notification of such filing to counsel of record for Defendant.


Respectfully submitted,


_____/s/_____
Charles Weiner, Esquire
LAW OFFICE OF CHARLES WEINER
Cambria Corporate Center
501 Cambria Avenue
Bensalem, PA 19020
Tel:  (267) 685-6311
 Fax:  (215) 604-1507
charles@charlesweinerlaw.com

Counsel for Plaintiff, Brendan Berger