# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BRENDAN J. BERGER,
Plaintiff,

vs.

NATIONAL BOARD OF MEDICAL
EXAMINERS,
Defendant.

Case No. 1:19-cv-99
Litkovitz, M.J.

**ORDER**

Plaintiff, Brendan J. Berger, brings this action against the National Board of Medical

Examiners ("NBME") alleging, inter alia, violations of the Americans with Disabilities Act

(ADA), 42 U.S.C. § 12101 *et seq.* Mr. Berger alleges he is a person with a disability under the

ADA and is entitled to extra testing time and other accommodations based upon a learning

disability and Attention Deficit Hyperactivity Disorder ("ADHD"). NBME denies that Mr.

Berger is disabled within the meaning of the ADA or entitled to accommodations. This matter is

before the Court on Mr. Berger's motion for a preliminary injunction (Doc. 20) and NBME's

response in opposition (Doc. 27). On July 29 and 30, 2019, the Court held an evidentiary

hearing on plaintiff's motion. The parties have submitted proposed findings of fact and

conclusions of law. (Docs. 34, 35, 36). For the reasons stated below, the undersigned **GRANTS**

plaintiff's motion for preliminary injunction.

## I. Findings of Facts

### A. The Parties

1.       Brendan Berger began medical school at the American University of the

Caribbean School of Medicine (AUC) in 2011. (Doc. 30, Tr. 65-66).

2.       He was expected to graduate from AUC in 2015. (Doc. 30, Tr. 66:9-13).

3.      Mr. Berger has completed all course work and clinical rotations necessary to graduate from AUC with a Doctor of Medicine (M.D.) degree except for passing the United States Medical Licensing Examination ("USMLE") Step 2 CK. (Doc. 30, Tr. 29:15-23).

4.      The NBME is a not-for-profit organization that administers the USMLE together with the Federation of State Medical Boards. The NBME reviews, processes, and approves (or denies) requests for accommodations presented in accordance with the ADA. (DX 23, Declaration of Catherine Farmer, Psy.D. at ¶¶ 3, 4).

**B. The USMLE**

5.      The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care. (DX 23, Farmer Decl. at ¶ 4).

6.      There are three Steps to the USMLE, namely USMLE Step 1, USMLE Step 2 Clinical Knowledge (CK), USMLE Step 2 Clinical Skills (CS), and USMLE Step 3. All exams must be passed before an individual with an M.D. degree is eligible for medical licensure in the United States. (DX 23, Farmer Decl. at ¶ 6).

7.      Mr. Berger has taken the USMLE Step 1 without accommodations. A passing score was set at 192. Mr. Berger passed with a scaled score of 198. (PX 38).

8.      Mr. Berger took the Step 2 CS exam, without accommodations, for the first time on April 13, 2016. (Doc. 30, Tr. 152). He did not pass. (Doc. 30, Tr. 152-53).

9.      Mr. Berger took the Step 2 CS exam, without accommodations, a second time on August 17, 2016. He received a passing outcome. *See* Step 2 CS Score Report (Aug. 17, 2016) (DX 16 at 5-6).

10.    Mr. Berger has taken the Step 2 CK exam twice, without testing accommodations and under standard testing conditions. He did not achieve a passing score on either attempt. Step 2 CK Score Reports (DX 16 at 7-10).

11.    The USMLE Step 2 CK under standard administration consists of approximately 318 multiple choice test items, divided into eight 60-minute blocks, administered in one nine-hour testing session. (Plaintiff Complaint and Defendant's Answer at ¶ 37).

12.    NBME's published performance data indicates that 95%-96% of examinees from US/Canadian schools pass the USMLE Step 2 CK. (PX 57). AUC's published performance data reflects that 89% to 92% of AUC's students pass the USMLE Step 2 CK. (PX 58).

**C. Mr. Berger's Academic History**

13.    Mr. Berger's mother is from the United States of America and his father is from France. (Doc. 30, Tr. 19-20). His mother is fluent in French, as are his two older sisters. (Doc. 30, Tr. 26, 119-20).

14.    English was the primary language spoken in Mr. Berger's home during his childhood, and he speaks English fluently. 2010 Beach Report (PX 5 at PX000016). While some French was spoken in the home, it is estimated that during Mr. Berger's early childhood, more that 90% of the time English was spoken around him. (Doc. 30, Tr. 22:1-25, 23: 3-11). Mr. Berger is presently unable to speak French. (Doc. 30, Tr. 35:14-15).

15.    Mr. Berger attended a public school in the first grade.

16.    While in first grade he received intervention for literacy skills and also received tutoring at home. (Doc. 30, Tr. 38:2-39:4).

17.    Mr. Berger was homeschooled in the second, third and fourth grades due to the difficulty he was experiencing in reading and learning. (Doc. 30, Tr. 29, 39). He was home-

schooled by his mother, a professional educator, who provided intensive instruction on reading, spelling, written expression, and math computation from second through fourth grades. (PX 33).

18.     While in second grade Mr. Berger was evaluated by a psychologist, Jeanne Artner, Ph.D., due to trouble with reading and behavioral concerns. Dr. Artner reported that Mr. Berger's behaviors raised the possibility of Attention Deficit Disorder. She further recommended teaching methods to stress a phonics approach in reading sight words and using a multisensory technique in reading lessons. (PX 17).

19.     Mr. Berger took the Stanford Achievement Tests in the second, third and fourth grades. (PX 18, PX 19, PX 20); (Doc. 30, Tr. 134-35). His Total Reading and Reading Comprehension scores were rated average in the second and third grades and above-average in fourth grade. The Stanford Achievement Tests Score Reports do not reflect standard or non-standard test administration.

20.     Mr. Berger resumed his school-based education at the St. Gabriel Consolidated School in the fifth grade and attended that school through the eighth grade. (Doc. 30, Tr. 40).

21.     While attending St. Gabriel School, Mr. Berger was given accommodations, which included extended time to complete class assignments, examinations, and quizzes. He was administered oral exams because of his difficulty reading. He was also allowed to take tests in a small quiet room. (Doc. 30, Tr. 40:15-41:3); (PX 1).

22.     Mr. Berger took the Iowa Tests of Basic Skills and Cognitive Abilities Test in the sixth grade. (PX 21). His total reading score was in the 96th percentile nationally and his reading comprehension score was in the 82nd percentile. (*Id.*). The score report does not reflect whether or not Mr. Berger received accommodations on the test.

23. Mr. Berger attended Archbishop Moeller High School (Moeller) from ninth through twelfth grades. During ninth, tenth, and part of eleventh grade, Mr. Berger was given informal accommodations by his teachers, which included extra time to complete tests, extra sets of textbooks for highlighting, and use of audio books to address issues of reading and sustained focus. (Doc. 30, Tr. 41:17-44:19).

24. During Mr. Berger's eleventh grade year, he underwent a psychoeducational evaluation with Dr. Alexander Smith in January through February 2003. (PX 23). Following his evaluation, Mr. Berger received formal accommodations set forth in a Moeller Assistance Plan, which continued to provide extended time for reading and writing assessments due to his difficulty completing such tasks, a separate area for testing, and allowance for extra copies of texts and use of audio tapes of novels. (Doc. 30, Tr. 42:22-45:15); (PX 2).

25. During the eleventh grade, Mr. Berger took the PSAT exam without accommodations. (Doc. 30, Tr. 46:8-10). Mr. Berger testified he struggled with the time constraints of the exam. (Doc. 30, Tr. 46:11-47:4). He testified he ran out of time while testing and omitted answers to some questions. (Doc. 30, Tr. 48-51). He acknowledged there was a "guessing penalty," students were encouraged not to guess, and his omitted answers did not come only at the end of sections. (Doc. 30, Tr. 138-39). Mr. Berger scored in the 72nd percentile on the verbal section and in the 73th percentile on the writing skills section of the PSAT. (Doc. 30, Tr. 51:13-52:5); (PX 3 and DX 24-5).

26. In Mr. Berger's senior year, the College Board granted his request for accommodations on all College Board Exams, which included the SAT, PSAT, and AP exams. He was approved for "50% Extended Time accommodations." (Doc. 30, Tr. 52:6-25); (PX 4)

27.     In January 2004, Mr. Berger took the SAT with 50% extended time and scored in the 91st percentile nationally on the Reading section of the test. (Doc. 30, Tr. 53:7-25); (PX 25).

28.     Mr. Berger began college at the University of Cincinnati ("UC"). At the start of his matriculation, he submitted a request for accommodations to the University's Disability Services Office. The University of Cincinnati approved Mr. Berger's request and granted him accommodations, including double (100%) extended time, a proof reader, and audio versions of written text. He also took exams with extended time at the Disability Services Office. (Doc. 30, Tr. 54:3-55:14); (PX 27).

29.     Mr. Berger graduated from UC in 2009, with a B.A. degree in Asian Studies and a B.S. degree in Biology. (Doc. 30, Tr. 55); UC Transcript (PX 28).

30.     While at UC, Mr. Berger spent a year abroad in Japan, where he learned and became fluent in Japanese. (Doc. 30, Tr. 35, 120).

31.     Mr. Berger enrolled at the American University of the Caribbean School of Medicine in 2011 and is currently on an indefinite leave of absence. (Doc. 30, Tr. 66). He received "time and a half in a reduced distraction environment as his testing accommodation" at AUC. AUC Letter (May 2013) (PX 10). Mr. Berger's class rank in the Medical Sciences part of the school's curriculum was 70 out of 92 students, with a grade point average of 78.97. In the Clinical Sciences portion of the school's curriculum, Mr. Berger achieved 11 grades of "honors" and 2 grades of "pass." AUC Transcript (DX 15).

32.     Mr. Berger has applied for and has been granted accommodations for the Graduate Record Examinations ("GRE"). (Doc. 30, Tr. 161). The accommodations include

100% extended time over two consecutive days, breaks, a separate room, and an MP3 Audio Test Format. (Doc. 36) (PX 64) (PX000521).

## D. The Medical College Admission Test ("MCAT")

33. The MCAT is a standardized exam, lasts several hours, contains multiple-choice questions, and is administered on a computer. *See* MCAT Essentials at 3 (DX 17). The purpose of the MCAT "is to test the skills and knowledge that medical educators and physicians have identified as key prerequisites for success in medical school and the practice of medicine," with questions in the Physical Sciences, Biological Sciences, and Verbal Reasoning, as well as two 30-minute essays. (*Id*. at 3-5).

34. Mr. Berger took the MCAT twice, first in 2009 and again in 2010, both times with no accommodations.

35. In 2009, in anticipation of taking the MCAT, Mr. Berger applied for accommodations but was denied. (Doc. 30, Tr. 57:11-18).

36. Mr. Berger spent many hours studying for the MCAT. He took study courses and studied independently. Compared to his peers he put in more time and a greater effort studying for the MCAT. (Doc. 30, Tr. 57:23-58:19).

37. Mr. Berger took the exam in 2009 without accommodations. He utilized many strategies to get through the examination. He found it difficult to complete each section, particularly the verbal reasoning section. He found that he wrote in many random answers because he was unable to complete the exam. (Doc. 30, Tr. 58:20 – 60:3).

38.     Due to being unable to complete substantial portions of the MCAT, Mr. Berger

was not able to demonstrate his knowledge and skill when taking the 2009 MCAT. (Doc. 30,

Tr. 60:4-7).

39.     Mr. Berger's total score on the 2009 MCAT was 25, placing him in roughly the

45th to the 51st percentile of all individuals who tested when he did. MCAT Score Reports

(DX 24-4). His verbal reasoning score fell in the 27th to the 37.8th percentile and his writing

score fell in the 11.9th to the 35.1st percentile. (PX 55).

40.     Mr. Berger requested accommodations when he took MCAT a second time in

2010 based upon a learning disability diagnosis. Request (DX 21D). The test administrator, the

Association of American Medical Colleges ("AAMC"), denied his request, noting, among other

things, that his 2009 "non-accommodated MCAT score was solidly average even compared to

the elite group who take the MCAT." *See* AAMC Denial Letter (May 2010) (DX 21E).

41.     Mr. Berger requested reconsideration of AAMC's denial of accommodations in

June 2010, supported by a report of additional testing done by Cheryl Beach, Ph.D. AAMC

again concluded that accommodations were unwarranted. *See* MCAT Letter at 1 (July 13,

2010) (DX 9 at CMB-0176).

42.     Mr. Berger put forth a greater effort studying for the MCAT in 2010. He studied

for nearly a year. His study efforts included taking a study course and working on strategies to

optimize his ability to get through the questions as quickly as possible. He typically studied

three to five hours a day for the MCAT. (Doc. 30, Tr. 62:7-63:3).

43.     Mr. Berger utilized a different strategy for taking the MCAT in 2010. He testified

that his test-taking strategy on the verbal section of the 2010 MCAT exam was "to actually not

read the passages at all" and "just read the questions" that followed each passage. (Doc. 30, Tr.

63; Tr. 65 (stating that his "strategy" was "just reading the questions and not reading the paragraph"). He would read the questions that followed lengthy passages, and he would quickly attempt to pick the best answer by reading a couple of sentences in the paragraph. He attempted to take educated guesses based on his limited review of the questions and passage. (*Id.*).

44.     Mr. Berger's verbal reasoning score increased to the 67.8th to the 83.4th percentile. His physical science results declined to the 11.6th percentile to the 23.8th percentile, and his biological science score declined to the 26.8th percentile to the 41.9th percentile. (PX 30). 2010 MCAT Score Report (DX 24-4).

45.     Mr. Berger's second MCAT score placed him roughly in the 38th-44th percentile. MCAT Score Reports (DX 24-4).

## E. American University of the Caribbean School of Medicine

46.     Mr. Berger did not gain admission to U.S. medical schools but was able to gain admission to AUC.

47.     When Mr. Berger started medical school at AUC, he applied for accommodations, which entailed submitting his documentation to the staff in charge of reviewing accommodation requests. (Doc. 30, Tr. 67:7-14).

48.     AUC approved accommodations including 50% extended time on tests and exams. (Doc. 30, Tr. 67:13-23).

49.     Additionally, in order to get through the reading material in medical school, Mr. Berger utilized different assistive technologies such as text to speech. (Doc. 30, Tr. 67:24-68:4).

50.     During Mr. Berger's AUC matriculation, he took several exams. He took computerized multiple-choice exams that were prepared by professors. He also took "Shelf"

exams, which are medical school subject matter computerized exams prepared by the NBME. Mr. Berger received 50% extended time for both the medical school prepared exams and the Shelf exams. He passed each of the Shelf exams. (Doc. 30, Tr. 68-69; 94-95); (PX 42).

## F. Mr. Berger's Speech, Language, and Psychoeducational Evaluations

51.     Mr. Berger has impairments in reading, processing, and attention. He testified that with anything that involves reading, he needs to seek out ways to use assistive technologies such as audio books or text to speech. (Doc. 30, Tr. 32:16-33:15).

52.     Mr. Berger testified that on standardized exams, because he is not able to read fast and comprehend, he runs out of time when extended time accommodations are not provided. (Doc. 30, Tr. 33-34).

53.     Mr. Berger was seen by Sharon Collins, M.S., a speech language pathologist, when he was in kindergarten because his parents were concerned about his language skills. Ms. Collins administered assessments relating to Mr. Berger's articulation skills, language development, auditory processing, and ability to remember and reproduce letters in a specific order. *See* Speech and Language Evaluation Report at 2-3 (PX 16 at PX000239-240). Her clinical impressions were age-appropriate articulation and expressive language skills; delayed receptive language abilities in the areas of auditory closure, processing complex directions and statement; and delayed written language skills. (PX000240).

54.     Mr. Berger was next evaluated in 1994, when he was in the second grade. Jeanne Artner, Ph.D., interviewed Mr. Berger and his mother and administered various academic skills assessments. *See* Psychological Test Report at 1-4 (PX 17 at PX000243-246). Mr. Berger "earned average range standard scores" and performed at his grade level. (*Id.* at 5); (PX000247). There were some discrepancies between his academic skills and his Full-Scale IQ

that "could lead to him being classified as a student with learning disabilities." (*Id.*). Dr. Artner did not specifically diagnose a learning disability. (*See id.* at 8-9); (PX000250-51); (DX 24, Lovett Decl. ¶ 32). Dr. Artner recommended that Mr. Berger be "enrolled in the special classes for gifted and talented students" if he returned to public school. Artner Report at 9 (PX000251).

55.     Dr. Artner reported that some of Mr. Berger's behaviors during the evaluation "raised the possibility that he might have Attention Deficit Disorder without Hyperactivity." *Id.* She recommended that his mother "discuss the behaviors with a physician" if she had concerns in that regard. (*Id.* at 9); (PX000251). Dr. Artner did not diagnose Mr. Berger as having ADD or ADHD.

56.     Mr. Berger was next evaluated in early 2003, by Alexander Smith, Ed.D., ABPP. Mr. Berger was a junior in high school, and he was "concerned about doing well" on his college admission test and wanted "assistance around documenting any learning disorder so that accommodations might be appropriately applied." Psychoeducational Evaluation Report at 8 (2003) (PX 23 at PX000274).

57.     Dr. Smith administered a battery of assessments to Mr. Berger that are intended to assist in diagnosing learning and attention disorders. *Id.* (PX000267). Based on those assessments, Dr. Smith concluded that: (i) "Brendan currently functions in the Superior to Average Range of intelligence"; (ii) "Significant discrepancies exist between areas of intellectual functioning"; (iii) "Greatest deficits are noted in processing speed, affecting timed tests"; (iv) "Brendan demonstrates discrepancies between ability and achievement in Written Expression but not within Ohio LD Guidelines"; and (iv) "There do not appear to be problems of vigilance or distractibility with continuous performance tasks," but the problem of distractibility is still evident both subjectively and qualitatively in organizing and sticking to a

task. (PX 23 at PX000267, 271). Dr. Smith reported that "given the difference between Verbal and Performance portions of this assessment (19 point discrepancy), and for the statistically significant discrepancy between Verbal IQ and Written Expression measures, further consideration could be achieved by the admissions and release committee, and an 'override' could be considered, resulting in a possible qualification for special education assistance." (PX000272). Dr. Smith also reported that the "results of this psychoeducational evaluation indicate that while he has very superior verbal and conceptual abilities, there are significant problems in speed of processing and working memory which affect his written language skills in particular." (PX000274).

58.     Dr. Smith provided a suggested diagnosis of "Learning Disorder of Written Language 315.2 (DSM-IV)." (PX000274).

59.     Mr. Berger returned to Dr. Smith in 2008 to obtain "an updated psycho-educational re-evaluation that may allow him to seek accommodations" on the MCAT. Psycho-educational Re-evaluation Report at 1 (2008) (PX 29 at PX000292).

60.     Dr. Smith's 2008 report began by summarizing the findings he made in 2003: Mr. Berger's "verbal ability was in the superior range, his performance in the average range, [and] his full-scale IQ in the high average range." *Id.* (PX000293). He then discussed the results from the assessments he administered as part of his latest evaluation. The WAIS-III results indicated that Mr. Berger continued to function "in the Superior to Very Superior range of intelligence," with some "relative strengths in verbal reasoning and comprehension skills" and some "relative weaknesses in memory and processing speed abilities." *Id.* (PX000296). "[R]elative to his overall abilities," Mr. Berger processed "new visual material less efficiently," but "psychometrically" his "scores are still in the average range." *Id.* (PX000297). His WIAT-

12

II results showed no issues in the academic areas of Reading or Mathematics. *Id.* (PX000298). Mr. Berger "continue[d] to show a major discrepancy between his overall ability and his use of written language." *Id.* "[A]lthough his Written Language score falls in the low average range, it is significantly below the expected level for his ability." *Id.*

61.     Dr. Smith reported that "there are a number of cognitive symptoms which, when taken together, resemble an attention deficit disorder without hyperactivity. . . . While indeed there may be a blend of ADD and learning disability symptoms which overlap clinically, there is a preponderance of evidence in the direction of a specific learning disability. (Given that ADD itself is also a diagnostic category under which the ADA law may apply, a further discussion of differential considerations may be a bit moot)." *Id.* (PX000299-300).

62.     Dr. Smith noted that "[a] final set of issues, as set forth in the MCAT's Documenting Learning Disabilities guidelines for examiners, concerns 'substantial limitation' which impacts specific areas of function based on an 'average member of the population.' The problems of processing speed, visual memory, and written language do indeed continue to disrupt Mr. Berger's performance, especially during test-taking. This is particularly true in the area of written composition. While his score for written language score falls within the average range, it is in the low end, barely within a standard deviation of the mean. DSM-IV-TR criteria for the Disorder of Written Expression call for writing skills to be below those expected for someone his age, intelligence and age-appropriate education. The criteria further specify that these skills significantly interfere with academic achievement or activities of daily living that require the composition of written text. They also require that such deficits are in excess of any sensory limitations. These conditions apply to Mr. Berger's case." *Id.* (PX000300).

63.     Dr. Smith opined that "Mr. Berger has been able to attain his current academic performance because of the accommodations for a learning disability. As noted above, he has received these accommodations throughout his time at the University of Cincinnati, and in his final two years in high school. In comparison with the average student taking the MCAT, it is unlikely that he could be fairly evaluated, or be able to accurately demonstrate his capabilities without being given extra time. In my opinion, based upon the clinical data of this assessment, he is eligible, under the ADA for appropriate accommodations for the MCAT for a learning disability for written language. He would be best served by allotting him time and a half for essay questions." *Id.* (PX000300).

64.     Dr. Smith's 2008 report reflects a diagnosis under the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), Fourth Edition, of "Disorder of Written Expression" (DSM-IV 315.2) and "Rule out" Attention Deficit Disorder, NOS (DSM-IV 314.9). *Id.*

65.     Mr. Berger went to see Dr. Smith a third time, in March 2010, after his initial request for accommodations on the MCAT exam was denied by the Association of American Medical Colleges. Dr. Smith administered additional assessments relating to possible learning disorders and ADHD to redress the deficiencies cited by the AAMC in its letter denying Mr. Berger's request for accommodation and to provide further clarification of the nature of Mr. Berger's learning problems. *See* Addendum for Psycho-educational Evaluation for MCAT Accommodations (2010) (PX 32) (PX000310). Dr. Smith reported that the additional testing demonstrated Mr. Berger's "need for accommodations by not only re-establishing lowered scores for written expression, *but also by expanding the parameters of his disabilities to include significant deficits for fluency in reading and math*." *Id.* (emphasis added).

66.     In reporting test results, Dr. Smith noted that "*scores with asterisks indicate significantly lowered scores when compared to the general population* and not only to discrepancies between Mr. Berger's abilities and academic achievement, as required in the [AAMC's] letter of 10/28/10." *Id.* (PX000310) (emphasis in the original). These included scores on academic fluency, reading fluency, math fluency, and writing fluency on the Woodcock-Johnson III Tests of Achievement. Dr. Smith reported that "[s]ignificantly lowered W-J III scores, each more than one standard deviation below the mean for his age range in the normal population, exist in reading fluency, math fluency, and academic fluency" and these "deficits are consistent with those original results in the 10/2/08 [report] where lowered speed of processing in the intellectual assessment also revealed a similar trend." *Id.* (PX000311, PX000314).

67.     On the Nelson-Denny Reading Test Form-G, Mr. Berger's score on reading comprehension was "significantly lower." *Id.* (PX000312). Dr. Smith found it "noteworthy that Mr. Berger encountered the same types of problems of visual fatigue on this particular timed test of comprehension that he has addressed in the previous [2008] assessment. Essentially, Mr. Berger fails to complete timed tests of lengthy text where comprehension tasks are required. As discussed below, this is now understood as a form of dyslexia. *It is a pattern of 'labored reading' resulting from incomplete but necessary over-learning of phonological processing to make word recognition and association more automatic.* While his WJ-III scores do not show major inadequacies in letter-word recognition itself, the slowing of this phonological process appears to affect the speed of comprehension." *Id.* (PX000312) (emphasis in the original).

68.     Dr. Smith reported that the "results from the Nelson-Denny Reading Test, Form G Extended Time also support the presence of a learning disability, based upon his lowered score for comprehension for timed portions. This is a consistent result seen across several of the tests. Mr. Berger's problematic 'checking' slows his fluency of performance and organization across reading, math and written language. When these deficits in checking are further considered, it may be that an underlying problem with accurate phonemic encoding affects subsequent word recognition which in turn prolong the time necessary for comprehending the longer volumes of text required in timed sequences. This finding may explain an overall trend in significantly lowered timed portions and clarify further his need for accommodations. The scores in themselves indicate a lowered achievement when timed sections are utilized. *As noted, the revised achievement testing scores are based on the national norms for these tests, and are not based upon Mr. Berger's intra-subjective comparison with his own abilities.*" *Id*. (PX000315) (emphasis in the original).

69.     On the Paced Auditory Serial Addition Test (PASAT), Dr. Smith reported that "Mr. Berger's relative increase in scores for more difficult series may seem incongruous until it is recognized that in the second two series he had developed a different strategy to compute numbers he could remember. All the scores for pacings are indicating a diminished capacity and rate of information processing, particularly around sustained and divided attention or 'multi-tasking.' Nevertheless, the scores are well below the means for his age group. They indicate deficits in the regulation of attention to sustained and divided portions of the task." *Id*. (PX000313). Dr. Smith again recommended "extended time (time and a half) so that a more accurate MCAT score is obtained." *Id*. (PX000317).

70.     Mr. Berger has been evaluated three times by Cheryl Beach, Ph.D., who prepared reports of each evaluation in June 2010, July 2013 and July 2017. (PX 5, 6 and 8).

71.     Dr. Beach has been in private practice as a clinical psychologist since 1992. (PX 63). A portion of her practice involves conducting evaluations for the diagnosis and treatment of disorders; a portion of her practice entails psychotherapy; and a portion of her practice entails evaluating individuals with suspected disabilities for accommodations in a school or test setting. She frequently conducts evaluations of individuals with suspected learning disabilities or ADHD. (Doc. 30, Tr. 191:21-193:16).

72.     Dr. Beach estimates that she has evaluated approximately 1500 people over the course of her private clinical practice. (Doc. 30, Tr. 193:24-194:3).

73.     Dr. Beach has also served as an Assistant Dean of Student Affairs at the University of Cincinnati College of Medicine. In this role, part of her duties entailed developing and implementing the disability accommodations program for the medical school. (Doc. 30, Tr. 194:4-195:23).

74.     Mr. Berger first came to Dr. Beach in 2010 after he had been denied accommodations for the MCAT. (Doc. 30, Tr. 203:4-8).

75.     When conducting the evaluation, Dr. Beach obtained a history through interviews of Mr. Berger and his parents, reviewed educational records and evaluations dating back to kindergarten, and conducted clinical assessments. (Doc. 30, 204:21-206:8).

76.     Dr. Beach's history reflected that as early as kindergarten, Mr. Berger had a difficult time learning and retaining early decoding skills, which included letter reversals and other signs that were suggestive of a learning disorder. (Doc. 30, Tr. 206:9-207:22).

77. Dr. Beach reviewed earlier evaluation reports to develop a history, which indicated concerns with slow reading, difficulty with reading sight words, concerns about attention, and recommendations for multisensory and phonics-based reading techniques. (Doc. 30, Tr. 208:13 – 212:18). Those materials included Ms. Collins' 1992 Speech and Language Evaluation Report; Stanford Achievement Test Scores (Grades 2, 3, and 4); IOWA test of basic skills (Grade 6); Dr. Artner's 1994 Psychological Evaluation Report; Dr. Smith's 2003 and 2008 reports and 2010 Addendum; Dr. Smith's CV; and a letter dated May 28, 2010 from a teacher stating that Mr. Berger had received informal accommodations in her classroom at the St. Gabriel School in the fifth grade. (PX 5) (PX000012).

78. Dr. Beach reported that Mr. Berger received extended time on the Stanford Achievement Test Scores and IOWA test. (PX 6) (PX00054).

79. Dr. Beach stated in her reports and testified at the hearing that Ms. Collins diagnosed Mr. Berger with a learning disability in 1992. However, Dr. Beach acknowledged that Ms. Collins's 1992 report does not contain an actual diagnosis. Dr. Beach explained that a "speech language pathologist" like Ms. Collins did not necessarily use the psychiatric diagnostic manual. Dr. Beach interpreted Ms. Collins's clinical impressions of delayed receptive language abilities in the areas of auditory closure, processing complex directions and statements, and delayed written language skills as a diagnosis of a learning disability. (Doc. 33, Tr. 28-30).

80. Dr. Beach stated in her reports and testified at the hearing that Dr. Artner diagnosed Mr. Berger with an attention deficit disorder in 1994. Dr. Beach acknowledged that Dr. Artner's report from 1994 does not contain an actual diagnosis of a learning disability or ADHD. Dr. Beach interpreted Dr. Artner's report as diagnosing Mr. Berger with a learning

18

disability and ADHD. Dr. Beach explained that based on her personal experience during the time period that Dr. Artner performed her evaluation, it was typical for a psychologist not to give a "crisp diagnosis or to give a DSM diagnosis." Instead of making a definitive diagnosis, a clinician like Dr. Artner who was a school psychologist with a master's degree, would describe the symptoms observed during testing in lieu of a formal diagnosis so as not to "step on the toes of the physician who might resent having a non-MD making that diagnosis." (Doc. 33, Tr. 31, 32). Dr. Beach testified that she found significant that Dr. Artner reported "classic diagnostic signs of backwards letters," and the recommendations given by Dr. Artner "are very specific for dyslexic type of reading disorder." (Doc. 33, Tr. 33).

81.     Dr. Beach also reviewed the 2003 and 2008 reports by Dr. Smith, who administered tests that were not time-limited. Dr. Beach did not interpret Dr. Smith's 2003 report as diagnosing ADHD, although Dr. Smith reported many symptoms but stopped short of diagnosing ADHD. (Doc. 33, Tr. 36-37). On the question of a learning disability diagnosis, Dr. Beach acknowledged that Dr. Smith did not diagnose a disorder in reading, but stated that was because Dr. Smith administered extended time tests and "only the writing extended time tests came up significantly below IQ." (Doc. 33, Tr. 46).

82.     In the 2010 evaluation, Dr. Beach administered several assessments relating to possible learning and attention disorders. She administered the Gray Oral Reading Test, 4th edition (GORT-4), the Nelson Denny Reading Test (NDRT), The Wechsler Memory Scale-3rd edition (WMS-III), and the Behavior Assessment System for Children (BASC-2). (Doc. 30, Tr. 215:15-217:13); (PX 5).

83.     On the WMS-III, Dr. Beach reported that Mr. Berger scored in the 5th percentile, which reflected difficulty with working memory and sustained attention. (Doc. 30, 29-217:5-218:2); (PX 5).

84.     On the Woodcock Johnson Test of Cognitive Abilities-3rd edition (WJ COG-III), Dr. Beach administered selected subtests including Rapid Picture Naming and Spelling of Sounds. The Spelling of Sounds results fell in the 10th percentile, which is atypical for adults unless there is a dyslexic type reading disorder. The rapid picture naming subtest is a measure of processing speed. On this assessment, Dr. Beach noted that Mr. Berger performed extremely low. (Doc. 30, 219:11-220:15); (PX 5).

85.     Dr. Beach also administered the GORT-4. In this assessment, Mr. Berger was asked to read out loud. Dr. Beach observed and noted misidentified words, misread words, and omitted words. Dr. Beach administered the GORT-4 in conjunction with other assessments because the GORT-4 provides insight into the condition and manner with which an individual reads, which may be difficult to ascertain on a silent measure. On the GORT-4, Dr. Beach observed that Mr. Berger had many hesitations, lack of automaticity, and several misidentified words. The results of the GORT-4 reflect Reading Rate and Reading Accuracy subtests fell in the 1st percentile. Mr. Berger's Reading Comprehension score fell in the 37th percentile. (Doc. 30, Tr. 215-223); (PX 5).

86.     Dr. Beach also administered the NDRT. The standard time version is administered in 20 minutes, whereas the extended time version is administered in 32 minutes. On the standard time version that was administered by Dr. Beach, Mr. Berger did not complete that assessment within 20 minutes. Dr. Beach reported that Mr. Berger on the standard time

version scored in the 1st percentile on the reading comprehension section. (Doc. 30, Tr. 225-226).

87.    Dr. Beach noted that Dr. Smith also administered the NDRT in 2010. Dr. Smith, however, administered the extended time version, whereas Dr. Beach administered the standard time version. When Mr. Berger was given the extended time version by Dr. Smith, his reading comprehension score was in the 70th percentile. (Doc. 30, Tr. 226-227); (PX 5).

88.    Dr. Beach's diagnostic impressions included reading disorder and disorder of written expression. Dr. Beach's diagnosis is consistent with DSM-IV criteria as articulated in her report. Due to Mr. Berger's slow reading, poor reading accuracy, and limited reading automaticity, which interrupted his reading comprehension, she recommended 100 percent extended time, test administration over two days, distraction-limited test setting, and use of a computer with word processing to perform the written portion of the test. (PX 5).

89.    Dr. Beach personally administered the assessments given to Mr. Berger. Dr. Beach stated that direct clinical observation of the process utilized by the test-taker is essential for diagnosing a learning disability. (Doc. 30, Tr. 216).

90.    Mr. Berger submitted Dr. Beach's 2010 Report to AAMC to support his second request for reconsideration for accommodations on the MCAT. AAMC again denied his request for accommodations, after receiving input from an external expert.

91.    Dr. Beach's second evaluation of Mr. Berger occurred in July 2013. She prepared a report in support of Mr. Berger's request for accommodations on the USMLE Step 1 exam. Psychological and Educational Re-evaluation Report at 3 (2013) (PX 6 at PX000044). Dr. Beach administered additional assessments of cognitive abilities and achievement, which are listed in the report. (Doc. 30, Tr. 232:18-233:14); (PX 6).

92.     On the Wechsler Adult Intelligence Scale-4th edition (WAIS-IV), Mr. Berger scored high in the verbal and conceptual knowledge and reasoning, where his score was in the 99th percentile and 97th percentile respectively. His working memory and processing speed fell in the 9th percentile and 2nd percentile respectively. (Doc. 30, Tr. 234:12-235:3); (PX 6).

93.     On the Woodcock Johnson Test of Cognitive Abilities- 3rd edition (WJ COG-III), on untimed measures such as the Verbal Ability Cluster and Thinking Ability Cluster, he scored in the 88th percentile and 80th percentile respectively. On the Cognitive Efficiency Cluster, he scored in the 7th percentile and on the Processing Speed Cluster, he scored in the 2nd percentile. Both are assessments which involved timed measures. (Doc. 30, Tr. 237:20-241:23); (PX 6).

94.     The Woodcock Johnson Test of Achievement – 4th edition (WJ ACH-IV), which Dr. Beach administered, assesses various components relating to reading, writing, and math. On untimed reading comprehension measures, Mr. Berger performed in the 91st percentile. On the reading fluency subtest, which is a timed measure, Mr. Berger performed in 5th percentile. (Doc. 30, Tr. 241:24 – 243:7); (PX 6). Mr. Berger tested in the 12th percentile on the Word Identification subtest and in the 22nd percentile on the Phoneme-Grapheme Knowledge cluster assessment. (PX 6).

95.     Dr. Beach administered an additional time reading measure, the Scholastic Ability Test For Adults Reading Comprehension (SATA). On this assessment, Mr. Berger was asked to read a passage and answer questions. On this assessment, Mr. Berger scored in the 5th percentile. (Doc. 30, Tr. 243:8-17); (PX 6).

96.     Dr. Beach also administered both behavior and attention rating scales to Mr. Berger as well as secondary sources. The results of these scales reflected impaired focus, concentration, and organization. (Doc. 30, Tr. 244:15-245:19); (PX 6).

97.     Dr. Beach diagnosed Mr. Berger with three disorders: (i) Reading Disorder (DSM-IV 315.00); (ii) Disorder of Written Expression (DSM-IV 315.20); and (iii) Attention Deficit/Hyperactivity Disorder, Primarily Inattentive Type (DSM-IV 314.00). (PX 6) (PX000106); (Doc. 30, Tr. 245:20 – 246:10).

98.     Dr. Beach recommended several accommodations and learning strategies for both standardized tests (i.e., USMLE) and for school. With respect to the USMLE, Dr. Beach recommended 50% extended time, extra breaks, multiple day testing, and a quiet room. (Doc. 30, Tr. 246:11-20); (PX 6).

99.     Mr. Berger returned to Dr. Beach in late 2014, to get an evaluation to support a request for "disability accommodations for Step 2 of the [USMLE]." *See* Letter to NBME from Dr. Beach at 1 (Jan. 29, 2015) (PX 7). She provided the same three diagnoses in her January 2015 evaluation report. *Id.* (PX000148).

100.    Dr. Beach conducted a third evaluation in 2017 relating to Mr. Berger's request for accommodations on the USMLE Step 2 CK. *See* Psychological and Educational Re-evaluation Report (2017) (PX 8); (Doc. 30, Tr. 246:21-247:6).

101.    Dr. Beach administered the WJ ACH-IV. Dr. Beach reported that the construction of the test between the third and fourth editions had changed, along with updated norms, and people who have learning disabilities are more sensitive to the format of the task and material, "so they're more likely to be inconsistent than the average person." (Doc. 30, Tr. 247). She testified she has found "a little variability in that regard." *Id.* Dr. Beach found Mr.

23

Berger was motivated, business-like, and on task. *Id.* On this measure, Mr. Berger continued to demonstrate "very low scores for time limited reading comprehension and other academic areas." He also demonstrated limited ability in automatic and accurate word identification and phonological processing. (Doc. 30, Tr. 247:7 – 248:19); (PX 8).

102.     On the WJ ACH-IV, Dr. Beach also personally administered a subtest on oral reading fluency, which is similar to the GORT. Dr. Beach observed that when Mr. Berger reads there is a high rate of word identification errors, omissions, and substitution of words. (Doc. 30, Tr. 248:20-249:16); (PX 8).

103.     Based on the 2017 evaluation, Dr. Beach reported diagnoses of specific learning disorder with impairment in reading, specific learning disorder with impairment in written expression, and ADHD. These diagnoses were consistent with the criteria of the revised Diagnostic and Statistical Manual of Mental Disorders, the DSM-V, as detailed in the report. (Doc. 30, Tr. 250:6-252:7); (PX 8)

104.     Dr. Beach recommended for the USMLE Step 2 CK, 100% extended time over two-day administration, extra breaks, and a private-distraction reduced testing room. Dr. Beach recommended additional time because the USMLE Step 2 CK is a more reading intensive test than the USMLE Step 1. (Doc. 30, Tr. 252:9 – 253:16); (PX 8).

105.     Dr. Beach also reviewed Mr. Berger's MCAT scores. She acknowledges that he was able to score higher on the MCAT than on the timed diagnostic measures that she administered. However, she noted that an individual can significantly increase a reading rate by studying material and understanding the format. She further noted that Mr. Berger is very good at developing compensatory strategies to speed up his reading on a test like the MCAT. In contrast to the MCAT, the diagnostic assessments she administered contain novel reading for

which an individual does not spend months studying. Dr. Beach in her experience has seen other patients who have had average MCAT scores but low reading fluency scores. (Doc. 30, Tr. 253:17-255:17).

### H. NBME's Accommodation Review Process

106. NBME provides testing accommodations on the USMLE to individuals who have a physical or mental impairment that substantially limits their ability to perform one or more major life activities that are relevant when taking a USMLE examination. USMLE Accommodation Policies (PX 56) (PX000427). Depending upon the disability, the accommodations might include additional break time, a scribe to assist with keyboard tasks, an audio version of the test, or extra testing time. *Id.* (PX000428).

107. NBME's accommodation process is intended to ensure that individuals who have disabilities within the meaning of the ADA receive reasonable accommodations, and accommodations are not provided when they have not been shown to be warranted. Unwarranted accommodations can affect the reliability of test scores and provide a licensure candidate with an unfair advantage over other candidates. (DX 23, Farmer Decl. at ¶ 9).

108. NBME employs three individuals who are trained at the doctoral level in psychology and additional administrative staff to review accommodation requests, communicate with candidates, and coordinate approved accommodations. (Doc. 33, Tr. 126).

109. Dr. Catherine Farmer is the Director of Disability Services for NBME. (Doc. 33, Tr. 122).

110. Dr. Farmer often consults with external professionals with expertise in the relevant disability to review supporting documentation submitted by an individual who requests accommodations. (DX 23, Farmer Decl. at ¶10). The external professional is asked to review

25

the supporting documentation submitted and provide a written report that evaluates whether the documentation demonstrates the presence of an impairment (as identified by the individual) and, if so, to make recommendations on whether accommodations are warranted. (*Id.*).

111.    While Dr. Farmer consults with external professionals, she is the final decision maker regarding whether to approve or reject accommodations. (Doc. 33, Tr. 130:3-19).

112.    Benjamin Lovett, Ph.D., is an external consultant for NBME. Dr. Lovett received his Ph.D. in School Psychology in 2007 and has been a consultant for NBME for ten years. (Doc. 33, Tr. 140:12-14). Dr. Lovett does not have a clinical practice and does not personally perform clinical evaluations. (Doc. 33, Tr. 205:23-25).

113.    Dr. Lovett also conducts reviews for several other testing organizations such as the National Board of Osteopathic Medical Examiners, the New York State Board of Law Examiners, and the Law School Admissions Council. (Doc. 33, Tr. 203:20-204:9).

114.    Samuel Ortiz, Ph.D., has been an external consultant for NBME since July 1999. (Doc. 33, Tr. 165-166). His area of specialization is the evaluation of students who are bilingual. (*Id.*, Tr. 168:3-5).

115.    Dr. Ortiz also serves as an external reviewer for other organizations that administer standardize tests regarding request for accommodations from prospective examinees. (DX 22, Ortiz Decl. at ¶ 8).

## H.  Mr. Berger's Requests for Accommodations and NBME's Denials

116.    Mr. Berger requested accommodations on the USMLE Step 1 exam (50% additional testing time, extra break time, testing over two days, distraction-reduced setting, and a test reader or recording); Step 2 CS exam (two extra minutes per patient encounter and ten extra minutes per post-examination note), and Step 2 CK exam (50% additional testing time

with his first request, 100% additional testing time with his second request; plus -- with both requests -- extra break time, testing over two days, distraction-reduced setting, and a test reader or recording). *See* Farmer Decl. ¶¶ 11, 15, 20 (DX 23).

117. On October 14, 2013, the NBME received Mr. Berger's application and supporting documentation for accommodations on the USMLE Step 1. (Doc. 33, Tr. 133) (PX 23-A).

118. Mr. Berger's requested accommodations included time and a half (50%) extended time over two days of testing and additional break time. (PX 14).

119. Mr. Berger provided NBME with a personal statement in which he described the impact of his impairments and his use of compensatory strategies. (Doc. 30, Tr. 76:14-77:22); (PX 12).

120. Mr. Berger indicated in his application that he was requesting accommodations based on impairments, which included learning disorders in reading and writing and ADHD. (Doc. 30, Tr. 78:17-24); (PX 14).

121. Mr. Berger furnished NBME with his prior history of accommodations in medical school, college, elementary through high school, and on the College Board exams. (Doc. 30, Tr. 78-82) (PX 15, 22, 24, 26, 27).

122. Mr. Berger also furnished several early educational records including early standardized examinations such as the Stanford exam administered in second through fourth grades. These documents reflect below average results in areas of word study skills, phonetic analysis and phonetic principles. (PX 18 [PX 253], PX 19 [PX 256], PX 20 [PX 259]).

123. Mr. Berger also provided several psychoeducational evaluations from second grade through 2013. (Doc. 30, Tr. 79:17-21, 81:4-8, 82:8-11, 82:22-83:3, 83:13-85:2); (PX 6, 17, 23, 29, 32, 34).

124. Dr. Farmer referred Mr. Berger's October 2013 request for accommodations to Dr. Lovett, who concluded that Mr. Berger's supporting documentation did not establish that he has a disability that warrants testing accommodations (Doc. 33, Tr. 134); *see* Farmer Decl. ¶¶ 12-13; *see also* Lovett Decl., Ex. 2 (DX 24-2).

125. By letter dated December 23, 2013, NBME denied Mr. Berger's request for accommodations for the USMLE Step 1. (Doc. 30, Tr. 85:3-25); (PX 37).

126. Mr. Berger took the USMLE Step 1 without accommodations. (Doc. 30, Tr. 86).

127. Mr. Berger put forth a significant study effort for the USMLE Step 1. He took a two year leave of absence, during which he spent every day, as long as 12 hours a day studying. He felt prior to taking the exam that he was prepared. (Doc. 30, Tr. 86:19-87:2).

128. During the exam, Mr. Berger encountered difficulty reading and processing the information on the reading vignettes. Because of the time constraints of the test and his slow reading and processing abilities, Mr. Berger developed a strategy of reading only the last sentence or two of each question and reviewing key words to answer the questions in an attempt to complete the exam. Even then, he ran out of time on each question block and often had to fill in answers in order not to leave any answers blank. (Doc. 30, Tr. 87-89); (PX 7 at PX000142).

129. Mr. Berger passed the USMLE Step 1 with a score of 198; a passing score was set at 192. The mean score was 227. (Doc. 30, Tr. 89:9-90:5); (PX 38).

130. Mr. Berger submitted his request for accommodations on the USMLE Step 2 CS and Step 2 CK on April 3, 2015. In addition to the information furnished with his request for

accommodations on the USMLE Step 1, Mr. Berger furnished additional documentation. (Doc. 30, Tr. 92:13-96:6); (DX 23-C); (PX 7, 39-42).

131.     Dr. Farmer received the request for accommodations for the USMLE Step CK on April 3, 2015. Dr. Farmer conducted the review herself and did not submit Mr. Berger's 2015 request to an outside consultant. (Doc. 33, Tr. 136-37); (DX 23-C).

132.     By letter dated July 24, 2015, the NBME denied Mr. Berger's request for accommodations on the USMLE Step 2 CS and Step 2 CK. (Doc. 30, Tr. 96:7-18); (PX 43).

133.     On April 13, 2016, Mr. Berger took the Step 2 CS exam without accommodations and did not achieve a passing score. (DX 23, Farmer Decl. at ¶ 17).

134.     On August 17, 2016, Mr. Berger took the Step 2 CS a second time without accommodations and achieved a passing score. (DX 23, Farmer Decl. at ¶ 18).

135.     Over the course of the two years after the July 24, 2015 denial, Mr. Berger prepared for the USMLE Step 2 CK by studying many hours each day. (Doc. 30, Tr. 97:3-16).

136.     When taking the USMLE Step 2 CK in 2017, he utilized a strategy similar to that used on the USMLE Step 1. He continued to experience difficulty reading through each passage and reading answers to questions. He felt he had very little time to comprehend the questions. He had to randomly guess many of the answers so that nothing was left blank. (Doc. 30, Tr. 97:17-98:21). Mr. Berger testified he was not able to demonstrate his skill or knowledge on the USMLE Step 2 CK. (Doc. 30, Tr. 98:22-25).

137.     Mr. Berger failed his April 2017 administration of the USMLE Step 2 CK, receiving a scaled score of 151, with a passing score set at 209 and most scores falling between 190 and 270. (Doc. 30, Tr. 99:1-8); (PX 44).

138.    Following his failed USMLE Step 2 CK attempt, Mr. Berger through an attorney, requested an extension of AUC's leave of absence in order to take the USMLE Step 2 CK a second time. Mr. Berger's school agreed to give him another extension of the leave of absence. (Doc. 30, Tr. 99:9-100:17).

139.    In March 2018, Mr. Berger submitted a request for accommodations on the USMLE Step 2 CK. (Doc. 30, Tr. 104:2-5). On this application, Mr. Berger requested 100% extended time because of his experience on the first attempt of the USMLE Step 2 CK, which suggested that even with 50% extended time, he would be unable to complete the exam. (Doc. 30, Tr. 100:18-101:20); (PX 45).

140.    Mr. Berger submitted additional documentation to the NBME supporting his request for accommodations. The documentation included a July 2017 evaluation conducted by Dr. Beach and an updated personal statement describing Mr. Berger's difficulties particularly on his first attempt taking the USMLE Step 2 CK. (Doc. 30, Tr. 99:1-104:4); (PX 8, 45-49).

141.    Dr. Farmer received Mr. Berger's third request for accommodations on March 2, 2018. (Doc. 33, Tr. 138:25-139:10); (DX 23-E).

142.    Dr. Farmer referred this request to Dr. Lovett who previously recommended denying Mr. Berger's request for accommodations for the USMLE Step 1. (Doc. 33, Tr. 138:11-13).

143.    Dr. Lovett concluded that Mr. Berger's supporting documentation did not warrant testing accommodations. In recommending that Mr. Berger's request for accommodations be denied, Dr. Lovett found insufficient evidence of deficits in Mr. Berger's access skills (e.g., timed reading comprehension, concentration), relative to most people in the general population, that would make accommodations appropriate given Mr. Berger's performance on other, similar

high-stakes standardized tests, including the MCAT verbal reasoning sections. Dr. Lovett opined that two of the most important pieces of information in Mr. Berger's record are his MCAT score reports, which Mr. Berger took without accommodations. (DX 24).

144.    Dr. Lovett stated that both times Mr. Berger took the MCAT, his Verbal Reasoning scores were in the average or above average range, compared to all medical school applicants taking that test. Dr. Lovett also noted that Mr. Berger took the PSAT exam in 2002, apparently taking the exam under standard time limits, and his scores in reading, writing, and mathematics were in the average range or above. Dr. Lovett also noted that on the Stanford Achievement Test, Mr. Berger's reading comprehension scores were consistently in the average range or above. Dr. Lovett also considered Mr. Berger's national percentile rank of 94 on the IOWA test verbal ability, but he did not know whether Mr. Berger took this test with or without testing accommodations. (DX 24).

145.    Dr. Lovett states he also considered Mr. Berger's accommodated testing on the SAT, and the accommodations Mr. Berger received throughout high school, college, and medical school. (DX 24).

146.    Dr. Lovett states that a key indicator of learning disabilities is academic skills that are significantly below average. In Mr. Berger's earlier evaluations (conducted in 1994 by Dr. Artner and conducted by Dr. Smith in 2003 and 2008, when Mr. Berger was 8, 17, and 23 years old, respectively), all of his reading and writing scores on diagnostic achievement tests were in the average range or above. Dr. Lovett opined that these scores are not consistent with what he would expect for someone who has a learning disability. (DX 24).

147.    Dr. Lovett also discredited the diagnostic approaches used by Drs. Artner and Smith in their evaluations of Mr. Berger in 1994, 2003, and 2008. (DX24).

148.    Dr. Lovett opined that in Mr. Berger's 2010, 2013, and 2017 diagnostic evaluations conducted by Dr. Beach (and a 2010 addendum to a prior evaluation by Dr. Smith), Mr. Berger's scores on timed measures of reading and writing became increasingly worse, and in his opinion these scores were not credible.   Dr. Lovett noted what he believed to be significant discrepancies between Mr. Berger's performance on timed, unaccommodated real-world reading comprehension tests and his performance in these diagnostic evaluations.  Dr. Lovett also questioned the decline of Mr. Berger's Woodcock-Johnson scores over time, which he would not expect to see in the case of a learning disability.  Dr. Lovett suggested there might be motivational factors at issue.  Dr. Lovett was not persuaded by Dr. Beach's explanations for Mr. Berger's declining scores, i.e., that the testing conducted in 1994, 2003, and 2008 did not involve severely time-pressured reading and writing tasks, in contrast to the 2010, 2013, and 2017.  Dr. Lovett noted that Dr. Beach did not administer a standalone performance validity test to provide a more objective measure of Mr. Berger's motivation.  (DX 24).

149.    Finally, Dr. Lovett stated that while there has been mention of some ADHD symptoms in Mr. Berger's clinical evaluation reports since 1994, he did not believe this to be clear, consistent evidence of ADHD.  Dr. Lovett states that ADHD is a relatively recent diagnosis, and Mr. Berger has not offered any real-world records showing significant ADHD symptoms or related functional impairment at home, in school, or at work.  (DX 24).

150.    Dr. Lovett returned his report with recommendations to Dr. Farmer on March 14, 2018.  (Doc. 33, Tr. 138:14-17); (DX 23, Farmer Decl. at ¶¶ 21-22); (DX 24-3, Lovett Decl., Ex. 3).

151.    By letter dated May 27, 2018, NBME denied Mr. Berger's request for accommodations.  (Doc. 30, Tr. 104:6-19); (PX 50).

152.    On Mr. Berger's second attempt to take the USMLE Step 2 CK, he changed his strategy to avoid random guessing as he was running out of time. At the beginning of each block, he would proceed to approximately the 20th question and would mark answers with the same letter ("C") for each ensuing answer. He would then return to the first question on each block and then proceed through as many questions as he could answer. This strategy ensured that when he ran out of time on each block a guessed answer was indicated in which he ostensibly had a 20% chance of answering correctly. He estimated that he was able to read to some degree approximately 60 percent of the questions. The remaining questions would have been marked with a single letter ("C"). (Doc. 30, Tr. 104:22-107:10).

153.    Mr. Berger failed his August 2018 administration of the USMLE Step 2 CK, receiving a scaled score of 166, with a passing score set at 209 and most scores falling between 190 and 270. (Doc. 30, Tr. 107:11-23); (PX 51).

**I. Dr. Ortiz**

154.    Following the filing of this lawsuit, NBME consulted Dr. Samuel Ortiz, another external reviewer, to evaluate Mr. Berger's accommodation requests in March 2019. (DX 23, Farmer Decl. at ¶ 24).

155.    Dr. Ortiz concluded that Mr. Berger's supporting documentation did not establish that he has a disability that warrants testing accommodations. *Id.*; (DX 22, Decl. of Samuel O. Ortiz, Ph.D.; DX 22-B).

156.    Dr. Ortiz believed that the professionals who evaluated Mr. Berger during his elementary school years failed to consider that "French was often spoken in the home," as noted

in Dr. Artner's report, and the effect that might have had on the testing results obtained. (Doc. 33, Tr. 194).

157.   Dr. Ortiz opined:

> Mr. Berger's current reading and writing issues, and their relation to his taking a timed test, are not attributable to a learning disability but instead represent the early effects of a language difference. Whatever difficulties Mr. Berger may have at present in completing timed tests cannot be viewed or attributed to the presence of a learning impairment in reading or written expression. . . . Because the effect of bilingualism is neither compatible with the definition of disability and does not constitute the basis for establishing one, it is my considered opinion that a diagnosis of learning impairment in reading or written expression is wholly unsupported and that Mr. Berger's request for accommodation on Step 2-CK remains unwarranted and should therefore be denied. (DX 23, Farmer Decl. at ¶ 24).

158.   At the hearing, Dr. Ortiz was unable to explain how a professional evaluator would objectively measure the effect of limited exposure to a second language in the home (at most 10% of the time) in language development and on assessing the presence of a learning disability, including the appropriate standardized tests and norms to be utilized. (Doc. 33, Tr. 196-199).

159.   NBME reviewed this matter on three separate occasions. Neither Dr. Farmer nor Dr. Lovett ever suggested or expressed a concern that Mr. Berger should have been evaluated as a bilingual. (Doc. 33, Tr. 129).

**J. Mr. Berger's Current Academic Status**

160.   After Mr. Berger's second failed Step 2 CK exam, he received notice from his school that he was being dismissed without a right to appeal. Mr. Berger at this time was well past the required time limit of seven years to graduate. Through counsel, Mr. Berger submitted another request to extend his leave of absence in order to pursue his request for accommodations and take the USMLE Step 2 CK a third time. (Doc. 30, Tr. 111:14-113:4).

161. AUC's attorney provided a letter indicating that if the present lawsuit is successful and Mr. Berger is able to take the USMLE Step 2 CK with accommodations, AUC will allow Mr. Berger to keep his academic status for one additional attempt on the USMLE Step 2 CK. (Doc. 30, Tr. 113-114); (PX 60).

162. If Mr. Berger fails the USMLE Step 2 CK a third time, there is a substantial likelihood that he will be dismissed from medical school, as AUC's stated policy is to dismiss students who fail to complete a degree within seven years. (Doc. 30, Tr. 112); (PX 59).

163. Mr. Berger hopes to enter a psychiatry residency program. (Doc. 30, Tr. 30:10-12).

### K. Residency Match

164. The application and interview consideration process for residency programs for the 2020 residency match begin during the first week of October 2019. Mr. Berger seeks to take the USMLE Step 2 CK with accommodations including extended time so that he can present his score for the residency application and interview process commencing October 2019. (Doc. 30, Tr. 114:3-118:5).

165. Without passing the USMLE Step 2 CK, Mr. Berger will be unable to graduate from medical school, and he will not be able to be considered for a residency program or obtain medical licensure. He will be foreclosed from taking the exam again thereby ending Mr. Berger's aspirations and efforts to become a physician.[1] (Doc. 30, Tr. 116:17-118:5).

## II. Conclusions of Law

### A. Standard of Review

---

[1] USMLE rules require that in order for one to be eligible to take the exam, one must either be a currently enrolled student or have an MD degree. If Mr. Berger is terminated from AUC, he will no longer qualify to take the USMLE.

In determining whether to issue a preliminary injunction, this Court must balance the following factors:

1. Whether the party seeking the injunction has shown a "strong" likelihood of success on the merits;

2. Whether the party seeking the injunction will suffer irreparable harm absent the injunction;

3. Whether an injunction will cause others to suffer substantial harm; and

4. Whether the public interest would be served by a preliminary injunction.

*Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689-90 (6th Cir. 2014); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). The four factors are not prerequisites, but must be balanced as part of a decision to grant or deny injunctive relief. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). "[A] district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003), *abrogated on other gds. by Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015).

"The purpose of a preliminary injunction is to preserve the status quo until a trial on the merits." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848-49 (6th Cir. 2017) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "Because they necessarily happen before the parties have had an opportunity to fully develop the record, the movant 'is not required to prove his case in full at a preliminary injunction hearing.'" *Id*. at 849 (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). However, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion" and the

Court therefore expresses "no opinion as to the ultimate merits of the plaintiff['s] case." *Leary*, 228 F.3d at 739). A preliminary injunction is an extraordinary remedy that should only be granted "upon a clear showing that the plaintiff is entitled to such relief." *S. Glazer's Distributors of Ohio, LLC*, 860 F.3d at 849 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Overstreet*, 305 F.3d at 573.

## B. Likelihood of Success on the Merits

Plaintiff must first prove that his claims have a strong likelihood of success on the merits. While plaintiff is not required to prove his entire case at this juncture, "to establish success on the merits, a plaintiff must show 'more than a mere possibility of success.'" *Black v. Cincinnati Fin. Corp.*, No. 1:11-cv-2010, 2011 WL 1640962, at *2 (S.D. Ohio May 2, 2011) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (internal quotations omitted)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. Of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). "The Court's preliminary findings are not entitled to a preclusive effect in the event the case is tried to a fact-finder at a later date, at which time the ultimate fact-finder may reach a different conclusion." *Cabot Corp. v. King*, 790 F. Supp. 153, 156 (N.D. Ohio 1992) (internal citation omitted).

### a. Title III of the ADA

Mr. Berger alleges that NBME violated the ADA by failing to provide him with reasonable accommodations to take the USMLE Step 2 CK examination.

Title III of the ADA provides, in relevant part, that an entity offering "examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in

a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. In this case, NBME acknowledges that it is bound by Title III of the ADA. (Doc. 27 at 5). *See Biank v. Nat'l Bd. of Med. Examiners*, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) ("The USMLE, as a private entity offering examinations related to licensing, is subject to the ADA under Section 12189."). *See also Boggi v. Med. Review & Accrediting Council*, No. 08-cv-4941, 2009 WL 2951022, at *10 (E.D. Pa. Sept. 15, 2009), *aff'd on other grounds*, 415 F. App'x 411 (3d Cir. 2011) (and cases cited therein).

To show a violation of the ADA based on NBME's failure to accommodate, Mr. Berger must show (1) he is disabled; (2) his requests for accommodation are reasonable; and (3) that those requests were denied. *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 647-48 (E.D. Pa. 2013), *aff'd*, 582 F. App'x 114 (3d Cir. 2014); *Mahmood v. Nat'l Bd. of Med. Exam'rs*, No. 12-1544, 2012 WL 2368462, at *4 (E.D. Pa. June 21, 2012); *Mucci v. Rutgers*, No. 08-4806, 2011 WL 831967, at *21 (D. N.J. Mar. 3, 2011). The failure to provide reasonable accommodations can constitute disability discrimination. *Peters v. Univ. of Cincinnati Coll. of Med.*, No. 1:10-cv-906, 2012 WL 3878601, at *8 (S.D. Ohio Sept. 6, 2012) (analyzing student's claim of disability under Title II of the ADA) (citing *Alexander v. Choate*, 469 U.S. 287, 295 (1985); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601, (1999); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)).

The central issue in assessing whether Mr. Berger has a strong likelihood of success on the merits of his ADA claim is whether his impairments satisfy the definition of "disability" under the ADA. In evaluating the evidence presented by the parties on this issue, the Court is mindful of the most recent amendments to the ADA.

A person is disabled under the ADA if he has "a physical or mental impairment that substantially limits one or more major life activities. . . ." 42 U.S.C. § 12102 (1)(A). On January 1, 2009, the Americans with Disabilities Act Amendments Act ("ADAAA") amended the ADA to clarify the criteria for determining whether an individual qualifies as disabled. Congress's purpose in passing the ADAAA was to "reinstat[e] a broad scope of protection to be available under the ADA" and to reject the "inappropriately high" standards for interpreting the term "substantially limits" created by two Supreme Court decisions: *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). *Taylor v. Specialty Restaurants Corp.*, No. 2:12-cv-44, 2014 WL 4922942, at *4 (S.D. Ohio Sept. 30, 2014) (quoting ADA Amendments Act of 2008, Pub. L. 110-325, 122. Stat. 3553, § 2 (2008)). Congress specifically rejected the holding in *Toyota* that the terms "substantially" and "major" should be "interpreted strictly" to create a demanding standard for qualifying as disabled. *Id.*

With respect to the "substantially limits a major life activity" prong, the ADAAA clarifies that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" such as medication, medical supplies, or equipment, among others. § 12102(4). The ADAAA expands the definition of "major life activities" to include, but not be limited to: caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. § 12102(2)(A)-(B). "Reading is a major life activity under the existing precedent of this circuit and the amended ADA." *Jenkins v. Nat'l Bd. of Med. Examiners*, No. 08-5371, 2009 WL 331638, at *2 (6th Cir. Feb. 11, 2009) (citing *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 626 (6th Cir. 2000); 42 U.S.C. § 12102(2)(A) (2006) (amended 2009)). The implementing

regulations to the ADAAA also state that whether an impairment "substantially limits" a major life activity should not demand extensive analysis and requires an individualized assessment. 29 C.F.R. § 1630.2(j)(1)(iii)-(iv).

Not every impairment will constitute a disability within the meaning of the ADAAA. 29 C.F.R. § 1630.2(j)(1)(ii). Rather, an impairment must substantially limit "the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* The Court must compare an individual to those in the general population rather than "an academic peer group, or, in the case of standardized tests, to other test-takers who are not representative of the general population." *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV 15-4987, 2016 WL 1404157, at *6 (E.D. Pa. Apr. 11, 2016) (citing *Rumbin v. Ass'n of Am. Med. Colls.*, 803 F. Supp. 2d 83, 94 (D. Conn. 2011) ("the relevant comparison is not with other test-takers or future doctors, but rather, with members of the general population."); *Singh v. George Washington Univ. School of Medicine and Health Sciences*, 508 F.3d 1097, 1100-01 (D.C. Cir. 2007) (the proper comparison is to "the general population, rather than to persons of elite ability or unusual experience.")). Under the ADAAA, analysis of whether a person is substantially limited in a major life activity "usually will not require scientific, medical, or statistical analysis." 29 C.F.R. § 1630.2(j)(1)(v).

The Department of Justice ("DOJ") guidelines, 28 C.F.R. Part 36, Appx A, provide direction on what a court should consider when analyzing requests for test-taking accommodations under the ADA. As explained by the Eastern District of Pennsylvania:

> The DOJ heavily favors an individualized assessment or evidence that a "qualified professional has individually and personally evaluated the candidate as opposed to simply considering scores from a review of documents." It also states that this need for an individualized evaluation is "particularly important in the learning disabilities context, where proper diagnosis requires face-to-face evaluation," and that "[r]eports from experts who have personal familiarity with the candidate should

take precedence over those from, for example, reviewers for testing agencies, who
have never personally met the candidate. . . ."

*Bibber*, 2016 WL 1404157, at *6. In addition to individualized assessments, courts across the

country have also considered: (1) a plaintiff's objective test results as compared to the average

person, (2) a plaintiff's other activities, including extracurriculars, (3) whether a plaintiff has a

pattern of substantial academic difficulties, and (4) whether a plaintiff has been afforded testing

accommodations in the past. *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F.

Supp. 2d 607, 620 (S.D. Ind. 2012) (internal citations omitted). Moreover, the regulations

provide that entities should give "considerable weight to documentation of past modifications,

accommodations, or auxiliary aids or services received in similar testing situations." 28 C.F.R. §

36.309(b)(1)(v).

### b. Plaintiff has met his burden of showing he is an individual with a disability under the ADA.

The Court concludes that Mr. Berger has shown a strong likelihood of success on the

merits of his Title III claim under the ADA by adducing sufficient evidence demonstrating that

he has "a physical or mental impairment that substantially limits one or more of the major life

activities of such individual." 42 U.S.C. §12102(2)(A). Specific learning disorders, dyslexia

and ADHD are considered impairments under the ADA. 28 C.F.R. §§ 36.105(b)(1)(ii), (2). The

evidence shows that Mr. Berger has impairments in reading fluency, processing speed, and

ADHD which substantially limit the major life activity of reading as compared to most people in

the general population.

Dr. Beach's testimony and evaluations support a conclusion that Mr. Berger is a person

with a disability under the ADA. Dr. Beach is an experienced clinical psychologist who

specializes in the area of disability assessment, and she frequently conducts evaluations of

individuals with suspected learning disabilities or ADHD. She has served as the Assistant Dean of Student Affairs/Academic Support at the University of Cincinnati College of Medicine, and she developed and implemented the disability accommodations program for medical students. Dr. Beach conducted in-person, clinical evaluations of Mr. Berger in June 2010, July 2013, and July 2017. Dr. Beach reviewed extensive materials from Mr. Berger's history, which dated back to kindergarten when he was first evaluated for possible learning disabilities, including the evaluations performed by Ms. Collins and Drs. Artner and Smith and the accommodations Mr. Berger received in elementary school, high school, and college. Dr. Beach personally interviewed Mr. Berger and his parents, administered several assessments relating to possible learning and attention disorders, and prepared detailed reports documenting her findings from each evaluation. (PX 5 (2010 report), 6 (2013 report), 8 (2017 report)). Based on this information, Dr. Beach diagnosed Mr. Berger as having a Disorder of Written Expression, DSM-IV 315.20, a Reading Disorder, DSM-IV 315.00, and ADHD, DSM-IV 314.00. (PX 5 (2010 Report at PX000033); PX 6 (2013 Report at PX 000106)). Consistent with DSM-V criteria, in 2017, Dr. Beach reported updated diagnoses of specific learning disorder with impairment in reading, specific learning disorder with impairment in written expression, and ADHD. (PX 8 (2017 Report at PX000199)).

In rendering these diagnoses, Dr. Beach relied on the consistently low scores of several assessments that tested Mr. Berger's reading comprehension, processing speed, and attention. During the 2010 evaluation, Mr. Berger scored in the 5th percentile on the WMS-III, reflecting difficulty with working memory and sustained attention. (Doc. 30, Tr. 217-18). On the WJ COG-III, Mr. Berger scored in the 10th percentile on the Spelling of Sounds subtest and "extremely low" on the Rapid Picture Naming subtest. (*Id.* at Tr. 219-220). On the GORT-4,

Mr. Berger's overall reading comprehension score fell in the 37th percentile, and he scored in the 1st percentile on the Reading Rate and Reading Accuracy subtests. (*Id.* at Tr. 223). Dr. Beach testified that Mr. Berger's reading rate was slow because his word reading accuracy was very slow, and Dr. Beach observed that Mr. Berger often hesitated before reading a word and had to go back to review or reread a phrase. (*Id.*). On the NDRT, when administered under standard time conditions, Mr. Berger performed in the 1st percentile on the reading comprehension section, whereas he previously performed in the 70th percentile on the extended time version of this test when administered by Dr. Smith in 2010. (*Id.* at Tr. 225).

On the assessments administered in 2013, Mr. Berger consistently scored high in untimed measures and low on timed measures. (Beach 2013 Evaluation, PX 6: WAIS-IV, Mr. Berger had working memory and processing speeds in the 9th and 2nd percentiles respectively; WJ COG-III —Mr. Berger scored consistently low on timed measures, including Cognitive Efficiency Cluster and Processing Speed Cluster; WJ ACH-IV—Mr. Berger performed in the 5th percentile on the timed reading fluency subtest; SATA—Mr. Berger scored in the 5th percentile in a timed reading measure when asked to read a passage and answer questions).

In 2017, Mr. Berger again demonstrated scores indicative of a reading disorder for timed reading comprehension on the WJ ACH-IV. (Beach 2017 Evaluation, PX 8). On the oral reading fluency subtest of the WJ ACH-IV, Dr. Beach observed that Mr. Berger read with a high rate of word identification errors, omissions, and substitution of words. (Beach 2017 Evaluation, PX 8; Doc. 30, Tr. 248-49). Although Dr. Beach did not use a specific test to assess Mr. Berger's vigilance and motivation, Dr. Beach credibly testified that she observed that Mr. Berger worked very hard to do his best and demonstrated motivation and a high level of effort on the assessments taken during his evaluations. (Doc. 30, Tr. 230, 247). The Court finds that the

testing results from Dr. Beach's 2010, 2013, and 2017 evaluations demonstrate that Mr. Berger's impairments in reading fluency, processing speed, and ADHD substantially limit the major life activity of reading as compared to the general population.

NBME contends that Dr. Beach's reports are not entitled to deference. NBME alleges that Dr. Beach's assessments of a learning disability and ADHD are inconsistent with Mr. Berger's previous standardized testing and assessments. For example, NBME points out that Mr. Berger was denied accommodations for the 2010 MCAT on the basis that Dr. Beach's 2010 assessment scores were inconsistent with Dr. Smith's testing results in 2003 and 2008 and Mr. Berger's score on the Iowa Tests for Total Reading in sixth grade, which placed him at the eleventh-grade level. (DX 9). Likewise, Dr. Lovett opined that the decline in Mr. Berger's scores was "implausible" given Mr. Berger's historic data and real-life performance on standardized tests. (Doc. 33, Tr. 222-23). NBME also cites to standardized tests showing Mr. Berger performed at an average or above-average level with no extra testing time or accommodations, including Mr. Berger's above-average PSAT score, average score on the 2009 MCAT exam, average score on the 2010 MCAT exam, which included a Verbal Reasoning score placing Mr. Berger in the 68th to 83rd percentile, and his passage of the USMLE Step 1 exam by six points. (Doc. 34 at 41) (citing cases). NBME also suggests the timing of Mr. Berger's diagnoses of a learning disability in reading and ADHD are suspicious, given they occurred after 2010 when he was first denied an accommodation for the MCAT. (Doc. 34 at 40).[2]

---

[2] NBME also argues that the Global Assessment of Functioning ("GAF") scores in the record reflect Mr. Berger is not substantially limited in his ability to perform major life activities. (Doc. 34 at 44-45). GAF scores are a subjective assessment of an individual's overall level of functioning. The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale. The American Psychiatric Association has explained, "Clinician-researchers . . . have conceptualized [the] need for treatment as based on diagnosis, severity of symptoms and diagnosis, dangerousness to self or others, and disability in social and self-care spheres. We do not believe that a single score from a global assessment, such as the GAF, conveys information to adequately assess each of these components, which are likely to vary over time." *Judy v. Colvin*, No. 3:13-cv-257, 2014 WL 1599562, at *9 (S.D. Ohio Apr. 21, 2014) (Report and Recommendation) (citing http://www.dsm5.org ("FAQs

The Court is not persuaded that the evidence and legal authority presented by NBME compel a contrary finding on whether Mr. Berger has shown a substantial likelihood of success on the merits of his ADA claim. The Court recognizes that some courts, as cited in NBME's brief, have concluded that average to above-average performance on past examinations does not support a finding that a person is substantially limited when compared to the general population. Nevertheless, the Court also recognizes that "[a] definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative routes to achieve academic success," a result that would be inconsistent with the goals of the ADA. *Bartlett v. New York State Bd. of Law Examiners*, No. 93 CIV. 4986, 2001 WL 930792, at *37 (S.D.N.Y. Aug. 15, 2001) (Sotomayor, J.). *See also Peters*, 2012 WL 3878601, at *6 ("Defendant's rationale—that anyone who has had some modicum of academic success cannot be found to have a disability that affects learning—flies in the face of Congress' directives and the relevant implementing regulations."). Many of the cases cited by NBME for this proposition relied on other factors beyond high test scores to conclude that the plaintiff was not disabled. *See Black v. Nat'l Bd. of Med. Examiners*, 281 F. Supp. 3d 1247, 1251 (M.D. Fla. 2017) (in addition to evidence that the plaintiff performed average or above-average on the MCAT and other standardized examinations, the plaintiff had never requested an accommodation from kindergarten through medical school and none of her providers' "reports or diagnoses show[ed] a 'substantial' limitation in comparison to the average person"); *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'r, Inc.*, No. CV 15-4987, 2016 WL 1404157, at *10 (E.D.

About DSM–5 Implementation—For Clinicians")), *adopted*, 2014 WL 1900614 (S.D. Ohio May 9, 2014). The GAF scale was abandoned "because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Mayfield v. Berryhill*, No. 17-cv-2919, 2018 WL 4052169, at *3 n.3 (N.D. Ill. Aug. 24, 2018) (quoting DSM-V, 16 (5th ed. 2013)). The Court gives no weight to the GAF scores in the record.

Pa. Apr. 11, 2016) (the "failure to produce sufficient evidence that her reading process is slow, labored, and difficult when compared to the general population is fatal to [the plaintiff]'s case"); *Love v. Law Sch. Admission Council, Inc.*, 513 F. Supp. 2d 206, 228 (E.D. Pa. 2007) (in addition to having "average" unaccommodated scores, the plaintiff "did not seek additional help or formal accommodations for ADHD or a learning disability in high school even when faced with classes that required significant amounts of reading involving difficult texts. He never sought to take advantage of the formal accommodations available to students with learning disabilities at his undergraduate institution, nor did he attempt to secure accommodations throughout his graduate studies."); *Healy v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012) (in concluding that plaintiff did not show a substantial limitation as compared to general population, the Court considered the plaintiff's "stellar academic record" in the absence of accommodations and the fact that the plaintiff's psychologist testified that his reading process skills were average).

In addition, under the ADA regulations, the Court must consider the condition and manner under which the individual performs the major life activity, as well as the duration of time it takes to perform such activity, in determining whether a person has a disability under the ADA:

> [T]he focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.

29 C.F.R. § 1630.2(j)(4). Mr. Berger credibly testified that in daily life, he is unable to engage in regular activities due to his reading deficits. (Doc. 30, Tr. 70-72). For example, before going to a doctor's office, Mr. Berger requests advanced copies of medical forms to review beforehand to

give himself extra time to read the forms. (*Id.* at 70). Mr. Berger testified that he is unable to read for pleasure because it is extremely grueling, draining, and requires constant attention and focus. (*Id.* at 70-71). Mr. Berger stated that comprehending what he has read is difficult, and when he is processing words, he is unsure if he correctly read the information on the page. (*Id.* at 70). To reduce this burden, Mr. Berger listens to audio books. (*Id.* at 71). *Cf. Bibber*, 2016 WL 1404157, at *10 (considering that the plaintiff was able to read for pleasure and complete day-to-day reading tasks without extreme difficulties).

Despite his reading deficits, Mr. Berger has been able to achieve higher scores on certain examinations due to the specific test-taking strategies he developed for those exams. For example, Mr. Berger studied for the 2010 MCAT for nearly a year. After running out of time on the 2009 MCAT and finding out that his request for accommodations on the 2010 MCAT was again denied, Mr. Berger developed a strategy to work through the examination questions as quickly as possible to optimize his score. (Doc. 30, Tr. 62). On the verbal reasoning section, where he scored in the 68th to 83rd percentile, Mr. Berger approached the exam by not actually reading the long multiple paragraph passages. Instead, he would read the questions and answer choices and try to select the answer he thought was best. (*Id.* at 63). Dr. Beach testified that Mr. Berger's MCAT scores were not inconsistent with the scores he received on her timed reading assessments. (*Id.* at 254). In her experience, Dr. Beach has seen other patients who had average MCAT scores but low reading fluency scores. (*Id.* at 255). She testified that individuals can increase their reading rate on standardized examinations by familiarizing themselves with the content ahead of time. (*Id.* at 254). She testified that Mr. Berger is "very good" at coming up with compensatory strategies to speed up his reading for standardized examinations like the MCAT, such as reading the answer choices and not the content. (*Id.*).

As indicated above, Dr. Lovett took issue with some of the scores Mr. Berger obtained on particular standardized tests administered by Dr. Beach, such as the WAIS-IV and the Woodcock-Johnson, finding them inconsistent with Mr. Berger's performance on previous assessments or in the "real-world" context, such as testing on the MCAT. (Doc. 33, Tr. 214, 217, 227). For example, Dr. Lovett testified that given Mr. Berger's low reading fluency scores on the Woodcock-Johnson III, he would have expected the MCAT verbal reasoning scores to be "a lot lower." (*Id.*, Tr. 225). However, focusing on the outcome of tests in determining whether an individual is disabled under the ADA is contrary to the regulation cited above.[3] Moreover, Dr. Lovett acknowledged that in assessing the results of standardized tests, it is important to know the level of test preparation and other strategies an individual has employed in taking the test to evaluate whether standardized test scores negate the presence of a disability. He agreed that it is relevant to consider the condition, manner, and duration under which the individual performed the standardized test. This would include the amount of study effort one put forth in comparison to most people in the general population; the strategies the individual employed to maximize his or her time on the exam; the amount of the test the person was able to complete;

---

[3] The Court finds the Department of Justice (DOJ) guidance on this issue instructive. In the Commentary to the regulations, the DOJ stated:

> In addition, the Department does not agree with the assertions made by testing and educational entities that evidence of testing and grades is objective and, therefore, should be weighted more heavily, while evidence of self-mitigating measures, informal accommodations, or recently provided accommodations or modifications is inherently subjective and should be afforded less consideration. Congress's discussion of the relevance of testing outcomes and grades clearly indicates that it did not consider them definitive evidence of the existence or non-existence of a disability. While tests and grades typically are numerical measures of performance, the capacity to quantify them does not make them inherently more valuable with respect to proving or disproving disability.

Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 FR 53204-01, 2016 WL 4210327, at *53237 (August 11, 2016).

and any other mitigating measures the individual employed in taking the test. (*Id.*, Tr. 241-42).[4]

He also agreed that these would be valid considerations in assessing an individual's performance on the Step 2 CK exam. (*Id.*, Tr. 243-44).

Dr. Beach and Dr. Lovett have both offered plausible, albeit different, explanations for why certain of Mr. Berger's scores declined in later years. Dr. Beach opined that the earlier testing conducted in 1994, 2003, and 2008 did not involve severely time-pressured reading and writing tasks, in contrast to the 2010, 2013, and 2017 testing. She also testified that the change in format of the Woodcock-Johnson from the third to the fourth edition, along with updated norms, could explain the decline in scores, especially with an individual with a learning disability. (*Id.*, Tr. 116). Dr. Lovett disagreed, attributing the decline to a possible lack of vigilance and motivation.[5] (*Id.*, Tr. 233-35).

The Court notes that Dr. Beach has over 25 years of experience as a practicing clinical psychologist who specializes in assessing learning disorders and ADHD, and she has administered psychometric assessments to over 1,500 individuals during her career. Dr. Beach personally administered numerous assessments to Mr. Berger and made clinical observations over the span of seven years that were essential to diagnosing Mr. Berger with learning and ADHD disorders. Dr. Beach also testified that Mr. Berger demonstrated vigilance during testing and was motivated. Dr. Lovett, in contrast, is not a clinical psychologist. He has acknowledged the importance of a clinical evaluation in diagnosing a learning disability, which is something he did not perform in reviewing Mr. Berger's request for accommodations on the Step 2 CK. Dr.

---

[4] In fact, Dr. Smith specifically recognized that Mr. Berger achieved higher scores on some tests by employing different strategies to increase his scores. (PX 32) (PX000313).

[5] The Court notes that Dr. Smith offered yet another explanation: he suggested that "Mr. Berger's problematic 'checking' slows his fluency of performance and organization across reading, math and written language," which was a consistent result seen across several tests. (PX 32) (PX000315).

Lovett also acknowledged that the Woodcock-Johnson, which reflected declining scores over time, was just one of multiple assessments utilized by Dr. Beach in diagnosing a learning disability and that "Mr. Berger obtained below average scores on multiple timed reading measures." (Tr. 250).

Consistent with DOJ guidance that an individualized evaluation is "particularly important in the learning disabilities context, where proper diagnosis requires face-to-face evaluation," and that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate," *Bibber*, 2016 WL 1404157, at *6, the Court finds the strong weight of the evidence supports the findings and conclusions of Dr. Beach, who personally administered multiple assessments to Mr. Berger and clinically observed his performance and efforts on those assessments.[6]

The evidence also shows that Mr. Berger has an extensive history of receiving both informal and formal accommodations throughout grade school, high school, college, medical school, and standardized exams because of his well-recognized reading deficits. Throughout his formal education career, teachers and other professionals have recognized Mr. Berger's need for accommodations to address his severe reading and processing speed impairments. At St. Gabriel School in the fifth through eighth grades, Mr. Berger received extended time to complete class assignments, examinations, and quizzes. He was administered oral examinations because of his

---

[6] The Court places little weight on the testimony of Dr. Ortiz, who opined that Mr. Berger's exposure to the French language in the home and the "early effects of a language difference," and not a learning disability, accounted for his reading and writing impairments. Dr. Ortiz was unable to explain how a professional evaluator would objectively measure the effect of limited exposure to a second language in the home (at most 10% of the time) in language development on assessing the presence of a learning disability, including the appropriate standardized tests and norms to be utilized. (Tr. 2-196-199). NBME reviewed Mr. Berger's requests for accommodations on three separate occasions, and neither Dr. Farmer nor Dr. Lovett ever suggested or expressed concern that Mr. Berger should have been evaluated as a bilingual individual. (Tr. 2-129). The Court does not find Dr. Ortiz's testimony credible and places little weight on his opinion.

reading deficits and was allowed to take tests in a smaller room apart from other test takers. (PX

1). At Archbishop Moeller High School, during ninth, tenth, and part of eleventh grade, Mr.

Berger was informally accommodated in the classroom by his teachers. Mr. Berger received

extra time to complete tests and extra textbooks for highlighting. He also utilized audio books to

address reading issues and enhance his comprehension of the subject matter. (Doc. 30, Tr. 42-

44). After Mr. Berger's evaluation with Dr. Smith in January 2003, which indicated deficits

affecting Mr. Berger's reading speed and writing skills during timed tasks, a Moeller Assistance

Plan was developed for Mr. Berger to continue receiving accommodations in his junior and

senior years at Moeller High School. (PX 2). In addition, in January 2004, the College Board

approved Mr. Berger's request for 50% extended time accommodations on the SAT, PSAT, and

AP exams. (PX 4). Mr. Berger took the SAT in January 2004 with 50% extended time and

obtained a score in the 91st percentile nationally on the reading section of the test. (PX 25). As

an undergraduate student at the University of Cincinnati, Mr. Berger received accommodations

through UC's Disability Services Office, which included 100% extended time on tests, a proof

reader, audio versions of written text, and the ability to take exams with extended time at the

Disability Services Office. (PX 27; Doc. 30, Tr. 55). In medical school, Mr. Berger received

"time and a half in a reduced distraction environment as his testing accommodation." (PX 10).

In addition to medical school prepared exams, Mr. Berger received 50% extended time for the

Shelf exams, which were prepared by the NBME. (PX 43; Doc. 30, Tr. 68). Mr. Berger has also

been granted accommodations of 100% extended time, breaks, and a reduced distraction

environment on the GRE. (PX 64). The Court gives considerable weight to Mr. Berger's past

history of documented accommodations as a factor supporting a finding that he is a person with a

disability under the ADA. 28 C.F.R. § 36.309(b)(1)(v); *Healy*, 870 F. Supp. 2d at 620.

Dr. Beach's testing results and reports, coupled with the substantial evidence in the record indicating Mr. Berger has a learning disability for which he was consistently granted accommodations throughout elementary, high school, college, and medical school, and for which he was granted accommodations for standardized testing on his college board exams and the GRE, is strong evidence to support a finding that Mr. Berger has a disability under the ADA. In light of the above, Mr. Berger has met his burden of adducing strong evidence showing that he has impairments in reading fluency, processing speed, and ADHD which substantially limit the major life activity of reading as compared to most people in the general population and is thus "disabled" under the ADAAA.

Mr. Berger has also made a strong showing on the second and third elements of his ADA claim. The evidence supports a finding that Mr. Berger's requested accommodations are reasonable. *Rawdin*, 985 F. Supp. 2d at 647. Mr. Berger has requested accommodations of double (100%) extended time over two days of testing, extra break time, and a distraction-limited testing environment. The provision of extended time in a distraction-limited tested environment with extra breaks are accommodations Mr. Berger has received during his formal education and by other testing organizations. In addition, NBME has granted requests for extended time, including 100% extended time, for other test takers. (Doc. 33, Tr. 125). It is undisputed that NBME denied Mr. Berger's request for accommodations on the Step 2 CK examination, thereby satisfying the third element of his claim. *Rawdin*, 985 F. Supp. 2d at 647-48. The Court concludes that Mr. Berger has established a substantial likelihood of success on the merits of his ADA claim.

**C. Irreparable Harm**

52

Mr. Berger must next demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in the original) (citing *Los Angeles v. Lyons,* 461 U.S. 95, 103 (1983); *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 441 (1974); *O'Shea v. Littleton,* 414 U.S. 488, 502 (1974); *see also* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 139 (2d ed. 1995) (applicant must demonstrate that in the absence of a preliminary injunction, "the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered")). Irreparable harm must be "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006).

In the context of preliminary injunctions sought in the area of higher education, this Court has noted that irreparable injury may arise out of an interruption or suspension of higher education. *See Sellers v. Univ. of Rio Grande*, 838 F. Supp. 2d 677 (S.D. Ohio 2012). In *Sellers*, the Court acknowledged there are intangible injuries that may result from the loss of educational opportunities, including the inability to pursue a professional vocation. *Id.* at 687. The Court summarized the approaches of different courts, stating:

> There is some authority for the proposition that an interruption in an educational program is not, of itself, an irreparable injury. *See, e.g. Baer v. National Bd. of Medical Examiners,* 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (stating, in the context of a medical student's ADA claim, that "her inability to continue as a medical student without interruption at Drexel, while desirable, is not a harm that is irreparable to Baer's potential medical career"). There is contrary case law, however, especially when the denial of an educational opportunity is coupled with other types of harm. Thus, the court in *Maczaczyj v. State of N.Y., 956* F. Supp. 403, 408 (W.D. N.Y. 1997), found the evidence of irreparable harm caused by the refusal of a university to permit a disabled student to pursue a graduate degree to be sufficient to support a preliminary injunction where the exclusion "would most likely affect the plaintiff's ability to engage in the future employment of his choice" and there was also an "unquantifiable effect th[e] exclusion will have on plaintiff's mental illness." Because the plaintiff was "likely to suffer additional psychic harm," the court found the injury to be irreparable. Other courts have similarly found even a delay in the ability to pursue a chosen profession to be the type of

irreparable harm which will support temporary injunctive relief. *See, e.g., Bonnette v. District of Columbia Court of Appeals,* 796 F. Supp. 2d 164, 186 (D. D.C. 2011) ("The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation"). And, although not determinative, there is some authority for the proposition that when Congress has enacted a statute such as the ADA to prohibit discrimination against individuals with disabilities, the occurrence of the very discrimination Congress sought to prevent is the type of irreparable injury that may support the issuance of an injunction. *See, e.g., EEOC v. Chrysler Corp.,* 733 F.2d 1183, 1186 (6th Cir. 1984) (injuries from forced early retirement in violation of the ADEA such as loss of work, loss of future prospects for work, and infliction of emotional harm are both the type of injuries Congress sought to avoid through the ADEA and injuries which could constitute irreparable harm).

838 F. Supp. 2d at 687. The *Sellers* Court concluded that injuries, such as lost educational opportunities and the inability to pursue a vocation, were sufficient to establish the irreparable injury to warrant preliminary injunctive relief. *Id.*

Likewise, in *Bonnette*, a case cited by the *Sellers* Court, the court examined whether a law school graduate who sought an ADA accommodation for taking the D.C. Bar Examination would suffer irreparable harm for purposes of a preliminary injunction. The court determined that "[b]ecause Bonnette cannot practice law until she successfully passes the D.C. Bar Examination, any delay in taking the MBE [Multistate Bar Examination] deprives her of time to practice her chosen profession. The lost opportunity to engage in one's preferred occupation goes beyond monetary deprivation." 796 F. Supp. 2d at 1186-87 (citing *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011) (affirming finding of irreparable harm based on the plaintiff's inability to practice law without successfully passing bar examination)). In addition, the plaintiff in *Bonnette* "devoted substantial time and effort to preparing for the July 2011 MBE, which will have been effectively wasted if she must wait to take the test at a later date." *Id.* at 187 (citing *Agranoff v. Law Sch. Admission Council, Inc.*, 97 F. Supp. 2d 86, 88 (D. Mass. 1999) (finding irreparable harm based in part on the lost time and effort in preparing for an exam)). Under these circumstances, the *Bonnette* court found the

plaintiff would likely suffer irreparable harm if she were not able to take the July 2011 MBE with accommodations. *Id.*

Similarly, the court in *Elder v. Nat'l Conference of Bar Examiners*, No. C-11-00199, 2011 WL 672662, at *10 (N.D. Cal. Feb. 16, 2011), found that the delay in the plaintiff's ability to practice law in California would likely result in irreparable harm, whether from his failure to pass the next scheduled bar exam if taken without accommodations or from postponing taking the exam until the case was decided on its merits. The court noted that the plaintiff had "invested substantial time and money in preparing for the February 2011 California bar exam, including setting aside most of the month to study and subscribing to a bar preparation course," which further supported a finding he was likely to suffer irreparable harm if his request for injunctive relief was denied. *See also Jones v. Nat'l Conference of Bar Examiners*, 801 F. Supp. 2d 270, 288 (D. Vt. 2011) (law student showed irreparable harm "in the loss of her preparatory and studying efforts, the time she incurred during the school year to amass the considerable documentation she needed for her requested accommodations, and the ensuing need to take the MPRE [Multistate Professional Responsibility Exam] either during the school year with the attendant impact on her studies, or after she graduates with the attendant impact on her success on the bar exam").

NBME contends Mr. Berger has not met the irreparable injury element for a preliminary injunction because there is no evidence Mr. Berger will pass Step 2 CK if he is granted the requested accommodations or, conversely, that he will fail without accommodations. In addition, NBME argues he "might pass Step 2 CK under standing testing conditions [i.e., without accommodations]." (Doc. 34 at 32). While these are all possible outcomes, the Court's role on a motion for preliminary injunction is to assess not whether a particular outcome or harm is

possible or certain, but whether "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

In this case, the Court finds that Mr. Berger will likely suffer irreparable harm if he is not granted his requested accommodations to take the Step 2 CK test. Mr. Berger finished all of his medical school coursework, including his clinical rotations, in April 2016, and the only thing preventing him from graduating medical school is the successful completion of the Step 2 CK exam. (Doc. 30, Tr. 31). Obtaining a passing score on the Step 2 CK has prevented Mr. Berger from pursuing his chosen career path as a physician, and it is highly likely that without accommodations to address Mr. Berger's impairments in reading fluency, processing speed, and ADHD he will not pass the Step 2 CK a third time. While NBME contends that nothing prevents Mr. Berger from taking the Step 2 CK exam without accommodations by the August 28, 2019 deadline set forth in his preliminary injunction motion, the evidence strongly shows that if he is required to take the Step 2 CK test without any accommodations, he is likely to fail. He has already taken and failed the Step 2 CK test twice and the test-taking strategies he employed did not ameliorate the effects of his disability on the testing time constraints. If Mr. Berger again takes the test without an accommodation, he will most likely fail and be dismissed from medical school. If he is dismissed from medical school, Mr. Berger would be foreclosed from taking the exam again and be unable to practice his chosen profession of medicine.

NBME contends that there is no requirement that plaintiff take the Step 2 CK test on August 28, 2019, because AUC will permit him to remain a student in good standing if he is successful in this lawsuit and takes and passes the Step 2 CK test, which he can do once this case is decided on its merits. However, if Mr. Berger postpones the exam until after the final determination of this case, he will suffer irreparable harm by foregoing the time and effort he has

already expended in preparing for the exam and by the delay in his ability to apply for a

residency program and practice his chosen profession. Mr. Berger credibly testified that he has

already invested substantial time, effort, and money in studying for the Step 2 CK exam

scheduled for August 28, 2019. "There is no dollar amount that the court may readily ascribe to

either Plaintiff's expenditure of these efforts, or to the loss of their potential fruits in the form of

a passing score on the [Step 2 CK exam.]" *Jones*, 801 F. Supp. 2d at 286. *See also Bonnette v.*

796 F. Supp. 2d at 187 ("Bonnette has devoted substantial time and effort to preparing for the

July 2011 MBE, which will have been effectively wasted if she must wait to take the test at a

later date.") (citing *Agranoff*, 97 F. Supp. 2d at 88 (finding irreparable harm based in part on the

lost time and effort in preparing for an exam)). Mr. Berger cannot continue with his medical

training until he passes the Step 2 CK exam. This includes his ability to be considered for a

residency program and to obtain medical licensure. A delay in taking the Step 2 CK exam

pending the resolution of this lawsuit would deprive Mr. Berger of the opportunity to practice his

chosen profession of medicine, and "[t]he lost opportunity to engage in one's preferred

occupation goes beyond monetary deprivation." *Bonnette*, 796 F. Supp. 2d at 186. *See also*

*Enyart*, 630 F.3d at 1166 (affirming finding of irreparable harm based on the plaintiff's inability

to practice law without successfully passing bar examination); *Doe v. Samuel Merritt Univ.*, 921

F. Supp. 2d 958, 964 (N.D. Cal. 2013) (medical student diagnosed with anxiety disorders who

completed significant amount of schooling likely to suffer irreparable harm by inability to

participate in clinical rotations and earn medical degree during the pendency of the litigation,

thus precluding her from advancing her professional career). These factors establish that Mr.

Berger would likely suffer irreparable harm in the absence of a preliminary injunction in this case.[7]

An additional factor the Court considers, albeit to a lesser extent, is the effect of the delay in the resolution of this case on its merits on Mr. Berger's ability to apply for the 2020 National Residency Matching Program. Mr. Berger testified that AUC advises students to take the Step 2

---

[7] Defendants cite several cases for the proposition that speculative and non-imminent harm are insufficient to support a preliminary injunction. Those cases, however, are factually or legally distinguishable. Several involve factual circumstances where the plaintiff failed to explore alternatives to the preliminary injunctive relief sought. *See, e.g., Qui v. Univ. of Cincinnati*, No. 1:18-cv-634, 2018 WL 4496304 (S.D. Ohio Sept. 19, 2018) (non-resident student failed to show removal and deportations proceedings were imminent or that enrollment in college music program was only way to maintain valid nonimmigrant status); *Mahmood v. Nat'l Bd. of Med. Examiners*, No. CIV.A. 12-1544, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012) ("Although [the plaintiff] claims a three-year suspension effectively precludes her ability to graduate from medical school within seven years, she does not fully explore or explain alternatives. For example, she does not discuss whether her school might grant her an extension on the seven-year requirement and provides no evidence of an inability to transfer schools."); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (denying preliminary injunction because record showed the plaintiff may plausibly seek admission to other medical schools that do not condition matriculation on passing USMLE Step 1 exam); *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 125 (10th Cir. 2004) (denying preliminary injunction regarding Law School Admission Test finding "[n]othing requires [the plaintiff] to apply to law schools now"). In contrast to the cases cited by NBME, there are no alternatives to Mr. Berger taking the Step 2 CK exam. Mr. Berger has one final opportunity to take the exam, and a non-passing score will result in his dismissal from medical school and the end of his medical career. The Step 2 CK exam is the gateway to the remainder of Mr. Berger's medical training.

*Doe v. Ohio State Univ.*, No. 2:15-cv-2830, 2016 WL 692547, at *5 (S.D. Ohio Feb. 22, 2016) (Report and Recommendation), *adopted*, 2016 WL 1578750 (S.D. Ohio Apr. 20, 2016), is also distinguishable. *Doe* involved a due process claim based on disciplinary proceedings that resulted in the dismissal of a medical student from the school of medicine, and not a claim of discrimination under the ADA. After dismissal, the student enrolled in another medical school outside of the United States. The student argued his chances of obtaining a residency were greatly reduced by virtue of his dismissal from Ohio State, which was qualitatively a better school. The court found the plaintiff may well obtain a residency as a student at his current school, and there was no evidence in the record showing how the difference in the quality of a residency would play out over the course of a career in terms of either positions available or income potential. The Court concluded that "[g]iven this state of the record, the risk of irreparable injury is not sufficiently strong to outweigh the *low probability that he will succeed on the merits of his constitutional claims*." 2016 WL 692547, at *11 (emphasis added). In the instant case, unlike in *Doe*, Mr. Berger has shown a substantial likelihood of success on the merits of his ADA claim.

The courts in two other cases cited by NBME appeared to have merged the irreparable harm inquiry with the merits inquiry. *See Oser v. Capital Univ. Law Sch.*, No. 2:09-cv-709, 2009 WL 2913919, at *11 (S.D. Ohio Sept. 8, 2009) ("The Court does not doubt that Oser will suffer dignitary harm and emotional loss if he is not permitted to return to law school; however, given the Court's determination that Oser had not shown a likelihood of success on the merits, that injury is unlikely to be legally cognizable, i.e., not a consequence of Capital's failure to reasonably accommodate his disability."); *Kelly v. W. Virginia Bd. of Law Examiners*, No. 2:08-cv-00933, 2008 WL 2891036, at *2 (S.D.W. Va. July 24, 2008) (finding no irreparable harm because the testing accommodations offered to the plaintiff, i.e., time and a half for testing, were sufficient).

CK exam by the end of August 2019, so the exam will be scored in time for the residency match interview process that begins in October 2019.[8] Without a residency interview, a student cannot rank residency programs for the match process. Mr. Berger testified that if he does not take the Step 2 CK exam within this cycle, as a foreign medical student, his chances of obtaining an interview are very minimal, especially in light of his two failing Step 2 CK scores. (Doc. 30, Tr. 175). Mr. Berger would likely forego the residency match program cycle for start of the July 1, 2020 residency program and would have to wait until the next cycle to apply for a residency through the match process in July 2021. The two-year delay in moving forward with a residency program would preclude Mr. Berger from advancing his professional career and pursuing his chosen profession in medicine, which constitutes irreparable harm.[9]

This factor weighs in favor of granting a preliminary injunction.

### D. Balance of Equities and Public Interest

The Court concludes that the remaining two factors weigh in favor of Mr. Berger. The threatened injury to Mr. Berger outweighs any potential harm to NBME. Without an accommodation for his reading disability, Mr. Berger risks failing the Step 2 CK test a third time, dismissal from medical school, and an inability to practice his chosen profession. The Court also recognizes that NBME has a legitimate interest in ensuring that the USMLE exams

---

[8] NBME alleges that AUC advised students for *last year's* Match (the 2019 Match) to take the Step 2 CK no later than December 31, 2018, so Mr. Berger could take the Step 2 CK by the end of the year and still be eligible for the 2020 Match. (DX 21). NBME's argument assumes that a decision on the merits of Mr. Berger's ADA claim will be made before December 31, 2018, which is inconsistent with the Scheduling Order agreed to by the parties and issued by the Court. Moreover, the document cited by NBME also states that for international medical school graduates, "you may improve your chances of getting residency program interviews if your CK score is submitted with your ERAS application in mid-September if at all possible. . . ." *Id.* This is consistent with Mr. Berger's testimony, which the Court credits.

[9] NBME argues that Mr. Berger acknowledged he can participate in the post-Match "scramble" that will occur between March 16 and March 19, 2020, if he does not obtain a position in the main Match. (Doc. 34 at 34). But to participate in the scramble, Mr. Berger would have to be a participant in the Match program, which, for the reasons described above, is unlikely without a scored Step 2 CK exam.

are fairly administered to all examinees and in preventing unwarranted accommodations. (Doc. 34 at 51). Yet, Mr. Berger has established that his requested accommodations *are* warranted based on his past history of accommodations and the clinical evaluations from Dr. Beach. If Mr. Berger does not receive accommodations on the Step 2 CK exam for his reading disability, he will not be tested on his aptitude and knowledge of the subject matter but on how effectively he can overcome his reading disability. In addition, NBME provides accommodations, including double extended time for other test takers. (Doc. 33, Tr. 125). Given Mr. Berger's strong showing of a likelihood of success on the merits and irreparable harm, the Court is convinced that granting Mr. Berger's requested accommodations for the August 28, 2019 Step 2 CK exam is the appropriate resolution. This resolution not only minimizes any harm to Mr. Berger, but it also places him on equal footing by allowing him to fully demonstrate his skill set and knowledge on the Step 2 CK examination.

Granting injunctive relief would further the public interest by prohibiting discrimination by testing agencies, such as the NBME, on the basis of disability. *See Rush v. National Bd. of Medical Examiners*, 268 F. Supp. 2d 673, 679 (N.D. Tex. 2003) (there is a significant public interest in "filling the ADA's requirement that entities offering licensing examinations provide reasonably accommodations to disabled individuals."); *Sellers*, 838 F. Supp. 2d at 688 ("'there is a significant public interest in eliminating discrimination against individuals with disabilities' and [ ] this interest is furthered by appropriate injunctive relief") (internal citation omitted); *Samuel Merritt Univ.*, 921 F. Supp. 2d at 972 ("the public clearly has an interest in the enforcement of its statutes") (internal quotation omitted). Given that Mr. Berger has shown a substantial likelihood of success on the merits of his ADA claim, the Court concludes that it serves the public interest to require NBME to provide his requested accommodations.

### E. BOND

The Court waives the bond requirement of Rule 65(c) of the Federal Rules of Civil

Procedure. *See Planned Parenthood Sw. Ohio Region v. Yost*, 375 F. Supp. 3d 848, 872 (S.D.

Ohio 2019) (citing *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)

(district court has discretion to issue preliminary injunction with no bond); *Roth v. Bank of the*

*Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978) (same)).

### III. Conclusion

Upon consideration of the above factors for injunctive relief, the Court **GRANTS** the

motion for preliminary injunction and **ORDERS** that defendant National Board of Medical

Examiners (NBME) is enjoined to provide appropriate accommodations under the Americans

with Disabilities Act to plaintiff Brendan Berger for the United States Medical Licensing Exam

Step 2 Clinical Knowledge (USMLE Step 2 CK) at the earliest possible date. The appropriate

accommodations, which shall be provided by the NBME to Mr. Berger is: double (100%)

extended time over two days of testing, extra break time, and a distraction limited testing

environment. NBME shall score and report the results of the accommodated USMLE Step 2

CK.

Consistent with the above, there is no requirement of a bond. This Order is effective

upon entry.

**IT IS SO ORDERED.**

Date: ___8/27/19___

Karen L. Litkovitz
United States Magistrate Judge